# 25-3078-cr

# United States Court of Appeals
## *for the*
## Second Circuit

———◆———

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

SHAWN PHILLIPS, JEFFREY NOVIS,

*Defendants,*

PHILIP PRIOLO,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT

ARTHUR L. AIDALA
LINO J. DE MASI
DIANA FABI
LAW OFFICES OF AIDALA, BERTUNA
& KAMINS, P.C.
*Attorneys for Defendant-Appellant*
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011

CP COUNSEL PRESS (800) 4-APPEAL • (393167)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

STATEMENT OF JURISDICTION.................................................................1

QUESTIONS PRESENTED.............................................................................1

STATEMENT OF THE CASE ........................................................................2

PRELIMINARY STATEMENT ......................................................................2

EVIDENCE AT TRIAL...................................................................................5

     A.    Direct Marketing Employees and Contractors.....................................5

         1.    Cheryl Jacquard..........................................................................5

         2.    Mary Lilienkamp.......................................................................10

         3.    Cathy Johnson ...........................................................................13

         4.    Thomas Ressler .........................................................................18

     B.    Direct Mailing Recipients .................................................................20

         1.    Sharon Soltis ............................................................................20

         2.    Pamela Kay Pence....................................................................21

         3.    Ashely Seip ..............................................................................21

         4.    Marilyn Burks ..........................................................................22

         5.    Marlene Montilla......................................................................22

         6.    Alemitu Teshale .......................................................................23

     C.    The Investigation................................................................................23

         1.    Postal Inspector Joseph Bizarro ..............................................23

         2.    Postal Inspector Christine Reins-Jarin.....................................24

SUMMARY OF THE ARGUMENT ...............................................................27

i

ARGUMENT ......................................................................................29

    POINT I

    THIS COURT SHOULD REVERSE PRIOLO'S CONVICTION
    BECAUSE THE EVIDENCE AT TRIAL WAS INSUFFICIENT
    TO PROVE THAT PRIOLO MADE MATERIAL
    MISSTATEMENTS OR THAT HE POSSESSED THE
    REQUISITE INTENT TO DEFRAUD .........................................................29

    A.    Standard Of Review .......................................................29

    B.    The Government Failed to Prove All Elements of the Mail
         and Wire Fraud Statute ....................................................30

         1.    The Record Does Not Support That Priolo's Mailings
             Contained Material Misrepresentations ...................................31

         2.    The Record Does Not Support That Priolo Intended To
             Defraud Recipients .........................................................33

    POINT II

    THE COURT SHOULD REVERSE PRIOLO'S CONVICTIONS
    DUE TO THE DISTRICT COURT'S ERRONEOUS ADMISSION
    OF PRIOR ACT EVIDENCE AND IMPROPER BOLSTERING
    TESTIMONY BY AN UNCHARGED WITNESS ABOUT
    RECEIVING IMMUNITY ........................................................................37

    A.    Standard of Review ........................................................37

         1.    The District Court Committed Harmful Error When It
             Admitted the Testimony of Thomas Ressler about
             Designing Mailings in an Uncharged Sweepstakes
             Scheme in the Late 1990s and early 2000s ..............................39

         2.    The District Court Committed Harmful Error When It
             Permitted the Government to Bolster Its Case by
             Eliciting That Cathy Johnson Was Testifying Under a
             Grant of Immunity ........................................................42

CONCLUSION ..................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Chambers v. Mississippi*,
410 U.S. 284 (1973) ....................................................................................38

*Conway v. Icahn & Co.*,
16 F.3d 504 (2d Cir. 1994)...........................................................................37

*Kousisis v. United States*,
605 U.S. 114 (2025)........................................................................ 31, 32, 33, 34

*Old Chief v. United States*,
519 U.S. 172 (1997), *cert. denied*, 124 S. Ct. 1051 (2004)................................37

*Sullivan v. Louisiana*,
508 U.S. 275 (1993) ....................................................................................30

*Taylor v. Kentucky*,
436 U.S. 478 (1978) ....................................................................................38

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
822 F.3d 650 (2d Cir. 2016)..........................................................................30

*United States v. Al-Moayad*,
545 F.3d 139 (2d Cir. 2008)..........................................................................38

*United States v. Barbarino*,
612 F. App'x 624 (2d Cir. 2015).....................................................................38

*United States v. Corsey*,
723 F.3d 366 (2d Cir. 2013)...........................................................................31

*United States v. D'Amato*,
39 F.3d 1249 (2d Cir. 1994)..........................................................................30

*United States v. Dinome*,
86 F.3d 277 (2d Cir. 1996)............................................................................30

*United States v. Downing*,
297 F.3d 52 (2d Cir. 2002)...................................................................... 37, 40

iii

*United States v. Edwards*,
   342 F.3d 168 (2d Cir. 2003)..................................................................39

*United States v. Fields*,
   466 F.2d 119 (2d Cir. 1972)..................................................................38

*United States v. Glenn*,
   312 F.3d 58 (2d Cir. 2002)....................................................................30

*United States v. Greenberg*,
   835 F.3d 295 (2d Cir. 2016)..................................................................30

*United States v. Grinage*,
   390 F.3d 746 (2d Cir. 2004)..................................................................42

*United States v. Guglielmini*,
   384 F.2d 602 (2d Cir. 1967)..................................................................38

*United States v. Lizza Industries, Inc.*,
   775 F.2d 492 (2d Cir. 1985)........................................................ 42, 43, 44

*United States v. Maniego*,
   710 F.2d 24 (2d Cir. 1983)....................................................................47

*United States v. McDermott*,
   245 F.3d 133 (2d Cir. 2001)..................................................................37

*United States v. McKenzie*,
   13 F.4th 223 (2d Cir. 2021)..................................................................29

*United States v. Rahman*,
   189 F.3d 88 (2d Cir. 1999)....................................................................38

*United States v. Runner*,
   143 F.4th 146 (2d Cir. 2025)....................................................... 34, 35, 36

*United States v. Salameh*,
   152 F.3d 88 (2d Cir. 1998)....................................................................38

*United States v. Schultz*,
   333 F.3d 393 (2d Cir. 2003)..................................................................37

*United States v. Weaver*,
   860 F.3d 90 (2d Cir. 2017)....................................................................31

iv

*United States v. Yousef*,
  327 F.3d 56 (2d Cir. 2003)................................................................38

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
  579 U.S. 176 (2016) ........................................................................31

**Statutes and Other Authorities:**

U.S. Const., Amend. V........................................................................43

U.S. Const., Amend. VI .....................................................................30

18 U.S.C. § 1341................................................................................2

18 U.S.C. § 1349................................................................................2

28 U.S.C. § 1291................................................................................1

Fed. R. Evid. 403 ..............................................................................37

Fed. R. Evid. 404(b)..........................................................................39

Fed. R. Evid. 607 ..............................................................................4

## STATEMENT OF JURISDICTION

Defendant-Appellant Philip Priolo ("Priolo" or "Appellant") appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York. Priolo was convicted, after trial, of Conspiracy to Commit Mail Fraud and Wire Fraud and multiple counts of Mail Fraud. Sentence was imposed by the Honorable Nusrat J. Choudhury on November 18, 2025, and Judgment was entered the following day. On December 5, 2025, the Defendant filed a timely Notice of Appeal. This Court has jurisdiction pursuant to Title 28 U.S.C. § 1291.

## QUESTIONS PRESENTED

1. Whether the evidence at trial was insufficient to support the jury's verdict, when the evidence established that the mailings at issue contained language informing recipients (a) what they were purchasing and (b) that they had not yet won any prizes, and the recipients of the mailings received the purchased items and, if dissatisfied, were refunded their money?

2. Whether the appellant was denied a fair trial by the lower court's erroneous evidentiary rulings admitting overly prejudicial "other act" evidence and impermissible bolstering testimony that a government witness was testifying under a grant of immunity?

1

## STATEMENT OF THE CASE

By Indictment filed November 9, 2021, the Government charged Priolo with five felony counts: one count of conspiracy to commit mail and wire fraud (18 U.S.C. § 1349) and four counts of mail fraud (18 U.S.C. § 1341). Commencing on March 10, 2025, Priolo was tried alone before a jury, with the Honorable Nusrat J. Choudhary presiding. On March 19, 2025, the jury found Priolo guilty on all counts. After the verdict, Priolo made an oral Motion for Judgment of Acquittal. Judge Choudhury denied that motion on November 18, 2025. (ECF 205).[1] On November 18, 2025, the District Court sentenced Priolo to forty-two months' imprisonment on Counts 2–6, with the sentences to run concurrently on each count. Priolo timely appealed on December 5, 2025.

## PRELIMINARY STATEMENT

Philip Priolo owned a direct mail business which sent out mailings to prospective customers throughout the United States, offering the opportunity to purchase a report booklet compiling "sweepstakes opportunities" for a small fee, usually valued at around $20. While the mailings were made to look attractive and

---

[1] Parenthetical numerical references preceded by "ECF" are to the district court docket; by "A" are to the Appendix; and by "T" are to the trial transcript.

enticing to the customer by advertising the potential winnings, they also clearly included detailed disclaimers, stating that the intended recipient had not, in fact, won anything. Priolo, nor his companies, hosted the sweepstakes described in the reports; instead, the sweepstakes were hosted by unaffiliated third-party entities such as Kellogg's. If customers returned the mailings with the fee, they would promptly receive the sweepstakes reports booklet as advertised. Each sweepstakes report booklet provided the customer with information on available sweepstakes they could enter, providing them with a chance to win prizes valued at the amounts advertised in the initial mailings. On rare occasions when Priolo's mailers received complaints from customers or from consumer protection agencies, or if any customer was dissatisfied with the product and requested a refund, Priolo immediately issued the refund and removed the customer from future mailing lists.

Priolo both filed and responded to pretrial motions related to the evidence and charges against him. Relevant to this appeal, Priolo moved to exclude "other act" evidence consisting of conduct stemming from Priolo's affiliation with companies owned by alleged co-conspirator, Sean Novis in the late 1990s and early 2000s. (A. 42-54). Specifically, Priolo objected to the highly prejudicial testimony of Thomas Ressler, who designed mailings for the companies of Sean Novis and Gary Denkberg in the late 1990's and early 2000's. (A. 44-45, A. 199-200). The Government both moved to admit Ressler's testimony and opposed Priolo's motion to preclude. (A.

3

55-69, A. 201-203). The District Court denied Priolo's motion, finding that Ressler's testimony about his work creating mailings for Sweepstakes Advisory Network Incorporated and Justin Grant Limited, companies Priolo had been affiliated with in the late 1990s and early 2000s, was inexplicably intertwined with the charged conspiracy against Priolo, which concerned conduct in 2015 and 2016, and was therefore relevant and admissible as direct evidence of the charged conspiracy. (A. 148, A. 204-212).

Priolo also moved to exclude from evidence any testimony that Cathy Johnson was testifying under a grant of immunity or that she had been interviewed by the Government under a proffer agreement, as its prejudicial effect far outweighed any probative value. (T. 177-180, T. 278-280, T. 373-378, A. 216-218). The Government opposed, arguing that Fed. R. Evid. 607 and established case-law, permits either party to impeach a witness for the purpose of "(1) enabling the jury to properly assess the credibility of the witnesses and (2) to prevent any jury confusion about whether or not the witnesses have been criminally charged and the reasons surrounding that decision, regardless of the defense's intentions about its own cross-examination." (T. 177-180, T. 278-280, A. 213-215). The Court admitted the evidence (A. 219-248), opining that:

> "Contrary to Mr. Priolo's contention, the jury does need to know that
> Cathy Johnson is testifying under immunity because that information is
> highly probative of her credibility, regardless of whether she is facing

4

favorable to the Government or to the defense. A witness's receipt of a benefit for testifying is relevant to the jury's evaluation of their credibility. A witness's grant of immunity can also be probative of the witness's reluctance to testify, which is further relevant to the jury's evaluation of their credibility." (A. 227-228).

"While the defense argues there is a risk of prejudice here, the risk of unfair prejudice to Mr. Priolo does not substantially outweigh the probative value of this evidence for six reasons. First, under the Second Circuit precedence, the fact this witness is testifying under immunity is highly probative of the witness's credibility, whether the witness is testifying favorably for the defense or prosecution. Again, this is *Dixon*. 511 F appendix at page 51. Citing *Gleason*. 616 F.2d at page 15. Second, the risk of unfair prejudice here is less than the arguable unfair prejudice in Freeman because Johnson has not been convicted of a crime related to this case, nor was she ever charged or named as a coconspirator prior to her grant of immunity. Third, the risk of unfair prejudice is also minimized because the Government does not intend to offer Johnson's proffer agreement itself as evidence. The provisions of the agreement that mention Johnson was providing information to the Government about the criminal activity of others would not be presented to the jury. Fourth, unfair prejudice is further reduced because the Government's intended questioning to elicit testimony." (T. 232).

## EVIDENCE AT TRIAL

### A. Direct Marketing Employees and Contractors

*1. Cheryl Jacquard*

Cheryl Jacquard ("Jacquard") worked as a production manager for Sean Novis and Gary Denkberg at "the Marketing Group," a company operating in the direct mailing industry (T. 75) and was paid her salary by Sean Novis (T. 79-80). The company sent out mailings to sell sweepstakes booklets. (T. 77). Jacquard worked at

the company for about nine and a half years starting in 2007 or 2008. In her position, Jacquard would oversee the mailing schedules of the booklets and ensure that the blank forms and envelopes for these booklets were being sent to the "letter shops" where the information was lasered onto the forms and the solicitations were mailed. (T. 78). Jacquard would also compare the proofs for these mailings which were prepared by the letter shops against the multiple mailing schedules provided to her by Sean Novis. This ensured that the mailings were sent at the correct times to the correct people. (T. 79). She also proofread the mailings to ensure that the correct language was used, e.g. "you have not won anything." (T. 261). Each person she worked with had their own mailing schedule. Sean Novis used a mailing schedule by the name of "SSME," and Gary Denkberg used "Horizon."

Jacquard testified that she also worked with other individuals in her capacity as production manager for Sean Novis, including Philip Priolo, whom she had met only once in 2015. (T. 257). Priolo's mailing schedule went by the names "Feel Lucky Group" and "Winner's Circle." (T. 81). Jacquard testified that she worked in the company's office in Syosset, Long Island alongside two other employees: Mary Lilienkamp and Ellen McDermott. (T. 81). Ellen McDermott worked at the company as the bookkeeper, while Mary was in charge of all the data work, i.e. maintaining the database of names and addresses for the company. (T. 82). Jacquard testified that

6

she saw Jeff Novis from time to time at the office, but she did not know the extent of his business relationship, if any, with either Priolo or his son, Sean. (T. 89).

Jacquard described the mailing process from start to finish. She received a mailing schedule once a month, and Sean Novis told her which individual mailing "pieces" would go on the schedule. Sean Novis would communicate this information on behalf of his companies as well as the companies owned by Denkberg and Priolo. (T. 83). Once a month, the companies would send out what were called "front-end" mailing pieces, usually to individuals who had never received a mailing piece. (T. 85). If someone responded with a payment to the front-end mailing, they would receive what are called "back-end" mailings. (T. 86).

The Government introduced Exhibit 110 into evidence, which was an email from a letter shop to Priolo, Sean Novis, and Jeff Novis on which Jacquard was copied. (T. 86). The email came with an attachment which contained proofs of an "OTC"[2] mailing schedule with an envelope, a return envelope and a mailing form. (T. 86-87). Jacquard testified that this form would often contain pre-printed information that would be sent in all the mailings; the forms would also contain blank spaces on to which the print shop would laser information. (T. 91). The forms

---

[2] She testified that it was common for the Novis, Denkberg, and Priolo companies to use three-letter name/acronyms (e.g. "OTC," "NPF" and "CBS") as the payee on the mailings. (T. 92).

also contained a disclaimer on the reverse side of the pages. (T. 93). The Government then entered Exhibit 111, which was a subsequent email that contained the full mailing with the completed lasering, including the names and addresses of the recipients as well as the report fee that needed to be returned. (T. 94). The Government also introduced an email forwarded to Jacquard from Laser Mail to Priolo, Jeffrey Novis, and two other employees – Cathy Johnson and Mary Lilienkamp. The email contained a proof for an "NPF" mailing piece. (T. 97).

Jacquard described how the mailing contained a "key code" to track the mailing and a quantity to identify how many pieces were being mailed out. (T. 99). The key codes would change every month. The mailings would have a return address to a post office box in Plainview, Long Island, but would not contain any other contact information. (T. 101). Additionally, although the forms would indicate that the recipient was "validated," Jacquard did not know how or who decided to whom the mailings would be sent. She acknowledged that Sean Novis worked with the mailing lists. (T. 103). Jacquard did not recognize the name Don Barret, who was listed as the Director of NPF and whose signature was placed on the letter. (T. 107). Jacquard further acknowledged that neither Priolo's name, nor the names of his companies (Feel Lucky or Winners Circle) appeared on any mailings. (T. 107). The Government introduced several other emails addressed to and sent by print shops to Priolo and Jeffrey Novis, copying Jacquard. These emails contained proofs for BNO,

8

a company for which she did not work. (T. 111-113). The Government introduced another mailing from NRS; Jacquard testified that the letter contained two pre-printed names of alleged winners and a third name which would change depending on the letter's intended recipient. (T. 117).

The Government introduced an email exchange between PacNet services, a check clearing house, and Priolo which was forwarded to Jacquard. (T. 134). PacNet assisted in depositing checks for the company and reviewing the mailings that were sent out. The email exchange contained a revision from PacNet, suggesting that Priolo amend the language in one of the mailings ("TRL") to include the word "opportunity." (T. 134). Jacquard assured that the corrections would be made on the proof going forward; however, Sean Novis or Priolo had final say on the wording of the mailing pieces. (T. 136).

Jacquard testified that the individuals who paid a fee in response to the Priolo mailings, including Winners Circle and Feel Lucky, would receive a booklet with various sweepstakes they could enter, although there were no cash prizes. (T. 140). The sweepstakes books were usually prepared by others who were tasked with finding various sweepstakes that would have to match the amounts reflected in the various mailings that were sent out. (T. 141). The Government introduced, as Exhibit 136, an email from a sweepstakes researcher to Jacquard and Jeffrey Novis, discussing names for a sweepstakes report that would cover all the various "doing

business as" companies. The email further listed the billing information as Winners Circle International, with attention to Priolo. (T. 149). Other similar emails between Priolo and Jeffrey Novis were introduced into evidence through Jacquard, including emails with mailing lists being used by Priolo-owned companies, mailing list inventories (T. 249) and emails containing excel spreadsheets that tracked the monthly activities. (T. 251). Jacquard testified that she stopped working for Sean Novis around 2012, when his company was shut down by law enforcement. (T. 255).

On cross-examination, Jacquard conceded that the language in the disclaimer on the back of the form indicated that the individual had not actually won anything. The disclaimer also stated that the company, such as "NPF," was a research and reporting service that compiled sweepstakes opportunities in a report. (T. 263). She testified that she believed that that the mailings were selling booklets with sweepstakes information and that the people who purchased these booklets were looking for that kind of information. (T. 270).

### 2. *Mary Lilienkamp*

Mary Lilienkamp testified that she was employed as a variable data programmer in the direct mailing industry. She began working directly with Sean Novis in 2008 as a data processor for him at his company DMCS. (T. 452). She worked for Priolo as a data processor in 2015 and 2016 (T. 454), although Priolo did

not work for the Sean Novis companies, DMCS and EC consulting. (T. 455). As part of her responsibilities, she converted files that contained names and addresses from the various mailing lists into a standard format so they could be outputted. For a "front-end" mailing, she would normally deal with about 20 lists. (T. 458). She testified that "back-end" mailing lists included people who had responded to the front-end mailing by sending in money. She would send both front-end and back-end mailings for Sean Novis, Gary Denkberg, Philip Priolo, Jeff Novis and Shawn Phillips. (T. 459). The Government introduced, via Exhibit 301, an email from Winners Circle dated Monday, August 22, 2016, containing the attachment "Feel Lucky September 2016 mail schedule." (T. 461).

Lilienkamp described how a beginner in the direct mailing industry would first rent a mailing list for front-end mailings; whoever responded to that mailing would become part of a new list. (T. 466). Oftentimes, the owner of the list would put themselves on the list to ensure quality control, but also to monitor how others were using their lists – these were called "seed" mailings. (T. 467). The Government introduced Exhibit 310 which was an email from Lilienkamp to Philip Priolo and Jeff Novis, containing a spreadsheet of the Winners Circle list rental spreadsheet. (T.471). The email also contained a seed address for Jeffrey Novis at which he received all the mailings coming from that rental list. (T. 472). The Government introduced an email exchange between Lilienkamp and Priolo in which Priolo added

11

his own address as a seed mailing for all his lists, ensuring that he would get a copy of all the mailings as of at least July 2016. (T. 474). Lilienkamp testified that Priolo, both Sean and Jeff Novis, Shawn Phillips and Gary Denkberg all shared their lists with each other. (T. 475). The Government introduced an email from Winners Circle to Lilienkamp with its Feel Lucky Promotion in September 2016, containing multiple lists, including some for Sean Novis. (T. 476-477). Lilienkamp also processed fulfillments; she processed the names of those who would be receiving a book (T. 481) and would also process those who wished to be removed from the lists. (T. 482).

Lilienkamp was asked by the Government about the different companies listed on the various mailings and whether she knew the individuals who signed the letters. Lilienkamp testified that she did not work for those companies, nor did she know who signed the letters. (T. 502-506). Importantly, Lilienkamp testified that she did not believe any research was done in selecting any of the individuals who were the intended recipients of the mailings. On cross-examination, she confirmed that people were not chosen for the lists based on age, mental capacity or economic status. She also confirmed that she would not work for someone she believed was committing illegal acts. (T. 518).

### 3. Cathy Johnson

Cathy Johnson became acquainted with Sean Novis in 1997 through her first job at a teaching supply store. (T. 528). At about the end of 1999, Sean offered Cathy a job at his office in the mail processing room, referred to as the "caging" room. (T. 530). Caging at the Novis office would involve sorting the incoming mail, opening it and marking down who had paid or not. She described how she had worked with Sean Novis from 2000 until 2015 and then had gone out on her own in 2015 or 2016. (T. 530). The Government elicited from Johnson that among her responsibilities from 2000-2015 were customer service, which was her least favorite part of the job. She testified that she disliked reading the letters from the actual customers, which made it obvious to her that the mailings were misleading. (T. 531). She testified that she believed the mailings were misleading because the letters made it sound that the customer had won something when, in fact, he or she had bought something. (T. 531).

Johnson testified that when she first started working with Sean Novis, he had two companies – Justin Grant Ltd. and Sweepstakes Advisory Network – which were both conducting sweepstakes through direct mailings. The Government introduced a document dated February 2000 listing the employees at Justin Grant, including Priolo, Sean Novis and Jeffrey Novis. (T. 533). Johnson further testified that when she started at her position, Sean Novis' partners were Priolo and Gary Denkberg.

13

According to Johnson, Priolo worked there for probably a year or two after she started, left for an extended period of time and then returned around 2015. (T. 537). In 2000, Priolo was Sean Novis' main partner and shared in the profits of the company. (T. 539). Priolo came in regularly, shared the office with Sean, and would oftentimes help cage the mail. Johnson distinguished between sweepstakes and sweeps reports and testified that the other company, Sweepstakes Advisory Network, was handling the sweeps reports and that Priolo was associated with that company.

In 2001 or 2002, Sean Novis formed EC Logistics. The EC stood for Ellen McDevitt and Cathy Johnson. (T. 552). At the age of 19, Cathy was the president of the corporation – although she had no actual authority and Sean Novis made all of the decisions for EC logistics. (T. 553).

In 2015, Johnson set up her own caging operation, called Precise Services, Inc., at the request of Novis and formed it as a corporation with Sean Novis and Gary Denkberg. (T. 555). The operations were set up in the basement of Cathy Johnson's home on Owen Street. Among her clients were Phil Priolo, Jeffery Novis, Sean Novis, Gary Denkberg and Shawn Phillips. As part of her business, she processed all the sweeps reports that came in the mail and through customer service. (T. 556). She did this until 2016 when the postal inspector came to her home. During her testimony, the Government introduced photos taken of Johnson's basement on the day of the execution of the search warrant. She provided commentary to various

14

pictures including a photo of the trash can in her basement (T. 561) which contained mail from the sweeps reports that had been scanned and had not received any response. The mail that did receive responses, either with buyers or non-buyers, would be sent to Mary Lillenkamp. (T. 561). She believed the company would generate about three 64-gallon containers of trash each week consisting of non-responses.

Johnson testified that the first time she agreed to speak with anyone from the Government was the year before trial commenced and that meeting and subsequent meetings were memorialized in a proffer letter; her understanding of the proffer was that nothing could be used against her unless she lied. (T. 558-560). She also acknowledged that she was testifying under a grant of immunity.

The Government introduced Exhibit 156, which contained an agreement between Johnson and Winner's Circle signed by Priolo. (T. 566). The document was given to her by Sean Novis and priced out each service she would provide the company; there had been no negotiation with Priolo. (T. 567). The agreement included pricing for the following: paid response processing; non-paid response processing; productivity sheets; customer service letters responded to; and items that had to be sent to their bank in Canada. (T. 569). The Government introduced Exhibit 157, which contained a similar agreement with the other Priolo-owned company, Feel Lucky Group. (T. 569). Johnson testified that Priolo arranged for her to be paid

15

from the cash they received from the mailings, referring to it as "Johnny Cash" in email exchanges. (T. 593).

Johnson described how Priolo picked up his mail every day from post office boxes and brought it to Johnson's home. (T. 595). The Government introduced text messages reflecting conversations on days when Priolo dropped off the mail for Winners Circle and Feel Lucky Group, or when deposits had been made with the Canadian Bank, PacNet. (T. 596, T. 599). Spreadsheets containing all the information were sent to Priolo on a daily basis. (T. 617). Johnson also dealt with customer service, which entailed issuing refunds or responding to handwritten letters. (T. 622). Usually customers were told that they had not won anything. (T. 623). Johnson would not respond using her own name, because she would not put her name on "anything like that." (T. 623). She worked with customer service from 2000 to 2016 and changed the alias she used based on whose mailer it was. (T. 623). Some of the letters had notes written on the exterior of the envelope. (T. 624-632).

Johnson testified that she often sought guidance on complaints received from Consumer Protection Agencies. (T. 642). When it came to letter from the Attorneys General, if it required more than a simple removal from the mailing list, Johnson would forward it to the person in charge of the corresponding mailing list. (T. 645). Johnson read in the record several complaint letters sent from and to the Attorney General's Offices. (T. 645-655). She testified that in order to request a refund, a

16

customer would have to specifically request the amount they sought refunded. (T. 655). Refunds were issued by the owner of the respective company. (T. 667). She testified that she would typically send the refund requests via email to Priolo. (T. 668). On a high-volume week, Priolo's companies would receive hundreds of these notes and letters. (T. 676).

On cross-examination, Johnson acknowledged that she had previously stated in interviews that she did not recall that Priolo was in the sweepstakes mailing business or that she told the Government that he was not involved in the sweeps report business in the early 2000s. (T. 688). According to Johnson, Priolo and Sean Novis had a falling out about a year after she started in 2000. (T. 727). They did not reconcile until about 2015. (T. 728). Johnson was further cross-examined on prior interviews with the Government where she had stated she did not send many responses to customer service letters. (T. 731). She testified that the companies had sent out millions of mailings in the two years and only a few hundred notes came back with complaints. (T. 733). Johnson was asked about the fact that Priolo had refunded customers that overpaid their report fee, to avoid taking advantage of the customer. (T. 734).

Near the conclusion of her testimony, Johnson confirmed that she never raised concerns with Priolo about mailings. (T. 736). Lastly, the parties stipulated that

Johnson had told the postal inspectors at an interview in March 2024 that Priolo was not involved in sweepstakes reports in 2000. (T. 883).

*4. Thomas Ressler*

Thomas Ressler, a writer and artist from Whitehall, Montana, testified that he had worked in the direct mail industry for 35 years. He had been working on direct mail pieces since 1986 or 1987 for a company called Friedland Marketing – specifically designing their direct mail sweepstakes. (T. 754). Ressler then began working on sweeps report pieces and puzzles in 1992-93, working for a Canadian company called BAJ. (T. 756). Ressler testified that a sweeps report was a solicitation that asked people to pay a fee to get what the offeror was providing, and that usually the offer informed the customer that he or she had won money. (T. 756). Ressler testified that when he was with BAJ, he would create the language and visual elements of the sweeps report pieces, and he was told that the pieces performed successfully. Ressler testified that he was charged criminally in 2017 for his work in direct mailings and had previously pled guilty to conspiracy to commit mail fraud but was clear that his charged conduct was not associated with this case. (T. 758).

Ressler testified that he met Sean and Jeff Novis in late 1990s after his time at BAJ and agreed to work with them; he remained with them until 2008. (T. 759). The Government introduced a sweeps report offer that Ressler created for Sean

Novis in the 1990s. Ressler testified that he recognized certain characteristics from the letter that were unique to his style. (T. 764). Ressler testified that the letter was designed to use certain artistic techniques to make it look as if it were an official letter and not just a repeated advertisement. (T. 765). The goal was to get the reader to believe that he or she had won money and to induce the recipient to respond with an order. (T. 765-766). There was also an artistic technique with the language on the back, which used fonts that made it difficult and boring to read. (T. 769). He testified that the disclaimer had been strategically placed after the potential customer had been told he or she had won; in that way they would be less likely to want to read the fine print. (T. 770). He also testified that the signatures on the document were made to look like real, ink handwritten signatures. (T. 771). Ressler discussed how he developed a language for these mailings, using words such as "entrant directives," which was often found in the sweeps report pieces. Ressler's reasoning was that "entrant directives" really meant "sweepstakes rules;" customers would be less likely to send money however, if they read "sweepstakes rules" because individuals who won would not need to follow rules. (T. 775).

On cross-examination, Ressler acknowledged that none of the notices at issue in the case were his creation. (T. 790). He further conceded he had no idea who created the letters relevant to this case. (T. 791).

19

## B. Direct Mailing Recipients

### 1. Sharon Soltis

Sharon Soltis ("Soltis") from Niwot, Colorado (T. 47) is the daughter of John Single, who had passed away three years earlier at the age of 99. Soltis testified that in 2015 and 2016, she was involved in her father's financial affairs, including managing his bank account in case of emergencies. (T. 49). At the time, her father was residing at the Veterans Affairs Hospital and was suffering from "a little dementia." Soltis testified that during that time period, her father would show her and tell her about "quite a few" letters he had received describing large cash prizes. (T. 50). Soltis testified that her father would often discuss these letters with her, telling her that "he was a winner" and that he had sent in money to the companies listed in the letters, so that he could obtain the advertised prize. Soltis was shown several exhibits which she identified as letters her father would typically receive. (T. 54). The Government introduced Exhibit 51 into evidence (T. 55), containing Single's handwritten letters and read portions of the document into the record, including the requirement of remitting by check a "report fee" payable to a company called CPA for $32. (T. 60). The Government further introduced another similar mailing through Exhibit 52 sent to Single from another company called NPF (T. 66) where Single had written a note instructing the company that the report fee should be taken out of his winnings. (T. 68). On cross-examination, Soltis conceded that she

20

would repeatedly tell her father he had not won any prizes, but he refused to listen to her and was insistent that he had won. (T. 71). Soltis further denied that his mental capacity played any part in his "obsession" with receiving the money. (T. 71).

### 2. Pamela Kay Pence

Pamela Kay Pence ("Pence"), 71 years old from Williamstown, Kentucky, (T. 182) testified that in 2015 and/or 2016 she received letters in the mail about large cash prizes. The Government introduced Exhibit 63-0E, which was a mailing received by Pence; She initially paid the small fee and then later, asked for her money back. (T. 185). Pence stated that she believed the money she paid was a processing fee to have the prize money transferred to her bank account. (T. 186). Pence did not recall receiving a refund check; however, both the Government and defense entered a stipulation that Pence indeed did receive a check from Priolo's business. (T. 205).

### 3. Ashely Seip

Ashley Seip, also from Williamstown, Kentucky, had power of attorney for her grandfather, Wendell Brooks, and was a signatory on his checking account. (T. 292). She testified that in the years 2015 and 2016 she helped her grandfather manage his bills and mail; she would often see letters in the mail regarding prizes specifically addressed to her grandfather. (T. 294). She testified that during that time

21

period, her grandfather was increasingly forgetful, which is why she became involved in administrating his finances. (T. 295).

### 4. Marilyn Burks

Marilyn Burks (61) from Greenville, South Carolina (T. 311) testified that in 2015 or 2016 she recalled receiving a letter about a large cash prize and that she believed that there was a possibility that she could win some money. (T. 315). When she did not receive a prize after sending in $20, she wrote a letter requesting her money back. On cross-examination, Burks was confronted with the stipulation that she, in fact, received two separate refunds of $20 despite only having sent $20 herself. (T. 320).

### 5. Marlene Montilla

Marlene Montilla testified that her husband received many of these mailings, and that she made a list of the companies that sent them, including "WCS" and "NPF." (T. 427). On cross-examination, Montilla conceded that she would highlight and read the disclaimer contained on these letters to her husband, but he would not listen to her and continued to send money. (T. 434). She was asked to read into the record one of the disclaimers highlighted, which read:

> "NRS is a research and reporting service. We specialize in researching sweepstakes sponsored and conducted by corporate organizations with which NRS is completely unaffiliated. We compile these sweepstakes

22

opportunities in a report which sets forth all no purchase entry requirements based on existing federal, state, and local regulations. You have not won any money or prize."

### 6. *Alemitu Teshale*

Alemitu Teshale, 71, (T. 741) was the wife of Alemu Kore, 84. Kore had been suffering from dementia since the COVID-19 epidemic. Teshale testified[3] that in 2015 or 2016 her husband was still working and of sound mind. Financially, her husband had opened a personal bank account, aside from their joint account and they were splitting expenses. She testified that aside from paying for the mortgage, she saw her husband writing checks in response to letters he was receiving. He would continue to send in money because he thought he might win. On cross-examination, Teshale conceded that she never read the letters or the disclaimer on the back side; all she focused on was the name of her husband listed on the letter, the fact that the letter alluded to winning a prize and the amount of the prize.

### C. The Investigation

#### 1. *Postal Inspector Joseph Bizarro*

Inspector Joseph Bizzaro, a 17-year veteran of the United States Postal Service (T. 324) testified that in 2015 and 2016 he was investigating prize

---

[3] Alemitu Teshale's testimony was given via a prior recorded video deposition.

solicitations sent through the mail. On September 22, 2016, his team executed two search warrants at 5 Owen Street and 575 Underhill Boulevard in Long Island, New York looking for documents related to prize solicitations. (T. 325). The Underhill location was a commercial building, housing Direct Marketing Consulting Services ("DMCS"), while the Owen Street location was a residential home belonging to Cathy Johnson and her husband. (T. 328). At Owen Street, the postal inspectors recovered various pieces of opened and unopened mail from trash bins, furniture and $22,000 cash inside a safe, as well as a money counting machine. (T. 335). Aside from solicitations, they found customer complaint letters, payments and other mail associated with the Feel Lucky Group as well as the article of incorporation for Feel Lucky Group, which listed Priolo as the sole director. (T. 338, T. 355).

### 2. Postal Inspector Christine Reins-Jarin

The Government's final witness was Christine Reins-Jarin, a United States Postal Inspector since 2012. Reins-Jarin testified that she had only been part of this investigation since February of 2025. (T. 804). The Government used Inspector Reins-Jarin as a "summary witness."

Through Reins-Jarin, the Government introduced Exhibit 351 which contained account information from Empire National Bank for Winners Circle International, Inc. The account paperwork contained the signatures of Jeff Novis and

24

Philip Priolo at various locations, with Priolo listed as president and authorized signer. (T. 805). The exhibit listed various companies "doing-business as" ("DBA") which were associated with the account of Winners Circle International, including POA, NRA, NPB, and CPC. (T. 807). Each DBA page contained Philip Priolo's signature with a misprinted last name of "PREOLLO." (T. 806-807). The Government similarly introduced Winner's Circle bank records from People's United Bank (T. 808) and another Empire National Bank account related to Feel Lucky Group. (T. 809).

The Government also introduced a series of checks obtained from the People's United Bank account; some of the checks used words such as "prize" and "winnings' in the memo section. (T. 810). Reins-Jarin also testified that, as part of the investigation, Postal Inspectors specifically searched for refund checks to customers issued from the three bank accounts. She acknowledged that refunds were not always issued in the form of checks, and therefore credited transactions under $500 as refunds. (T. 812). In sum, Reins-Jarin testified that it appeared that at least 30 refunds valuing between $2800 and $2900 had been issued from the Priolo run companies during the relevant period of 2015 through 2016.

The Government introduced a series of documents showing the establishment of accounts with PacNet, the Canadian payment processor for both Winners Circle and Feel Lucky Group containing Philip Priolo's notarized signatures. (T. 813-817).

25

Among the PacNet documents, were exhibits containing emails in which PacNet asked for revisions to various mailers. (T. 818). The Government introduced exhibits with various wires received by Priolo from PacNet. (T. 819). The Government also introduced an email from PacNet in March of 2015 that Priolo had forwarded to an email address "threeolo@aol.com," in which PacNet suggested various corrections to a "CBS" mailer which it believed was misleading. (T. 829). The Government subsequently introduced an exhibit of that same mailer which was mailed more than a year later, that had none of the suggested language removed. (T. 829-833).

Through Reins-Jarin, the Government introduced various other exhibits, such as: letters from customers either asking for money to be taken out of their winnings, or alleging that the mailers were a scam (T. 834-837); an email from Sean Novis to Jeff Novis and Priolo, with the subject "AG Letter," which stated that a complaint letter from the Attorney General's Office was found in the Priolo/Jeff Novis P.O. Box (T. 837); an email chain between Philip Priolo and a person named John Greany, in which Priolo wrote that he was looking to buy new lists for his new company Feel Lucky Group. The email contained a discussion of the pricing of the lists and the new "creative" which Philip indicated he would have to discuss with Sean Novis and Jeff Novis. (T. 839-844).

To conclude her direct testimony, the Government introduced the following: letters of complaint from various Attorneys General offices; responses sent from

both Justin Grand Ltd., and Sweepstakes Advisory Network (T. 845-846); and New York Department of State filings regarding Sweepstakes Advisory Network's Certificate of Incorporation dated November 1999 and dissolution dated January 2002. On those documents, Philip Priolo was listed as "director." (T. 847). Lastly, the Government displayed a visual representation of the victim payments as they moved through the mail. (T. 862).

On cross-examination, the Postal Inspector Reins-Jarin conceded that during her participation in this investigation, she did not speak to any of the individuals who had written the complaint notes introduced during her testimony or to any of the witnesses. (T. 871). Reins-Jarin also conceded that she was unable to say whether Priolo even made a profit. (T. 879).

## SUMMARY OF THE ARGUMENT

Priolo submits two issues for appeal in this case:

First, the Government presented insufficient evidence that Priolo intended to engage in a scheme to defraud in violation of the mail and wire fraud statutes, either on his own or in agreement with others. Priolo was in the business of selling booklets that compiled available sweepstakes which customers could enter, and he was engaged in this business through bulk mailings. The mailings did not contain material misrepresentations nor did Priolo intend to mislead the recipients. The

27

mailings at issue, if read by the intended recipient, contained clear language notifying the customer that they had "not yet won anything." If the customer returned the mailings with the requested fee, Priolo's companies would return the sweepstakes booklets containing available sweepstakes that matched or exceeded the amount claimed in the advertisements. If a customer was dissatisfied with the purchase in any way, Priolo would refund the money expeditiously.

Second, the District Court repeatedly allowed the Government to introduce (1) overly prejudicial "other act" evidence through the testimony of Thomas Ressler as well as (2) impermissible bolstering testimony that witness Cathy Johnson was testifying under a grant of immunity. Such evidence permitted the Government to overcome their otherwise insufficient evidence that Priolo intended to engage in a scheme to defraud in violation of the mail and wire fraud statutes. Through these erroneous rulings, the Government elicited that Ressler, in the late 1990s and early 2000s, had designed what he considered to be deceptive mailers for a company with which Priolo had been associated. In addition, and over vociferous objection by appellant, the Government was permitted to elicit the highly prejudicial fact that Cathy Johnson was testifying under a grant of immunity when, in fact, such grant of immunity was unnecessary for several reasons. The record makes it abundantly clear that, ultimately, Cathy Johnson's testimony that she received immunity was not offered for impeachment or to evaluate credibility; instead, it was offered by the

28

Government to bolster her testimony. Regardless, the Government impermissibly elicited from Johnson the prohibited truth-telling provisions of her proffer agreements. Even if these errors could be viewed as harmless when considered separately, these errors in the aggregate deprived Priolo of a fair trial, requiring reversal.

For the reasons set forth herein, the Court should enter a judgment of acquittal on all counts or reverse the convictions and remand this case for a new trial.

## ARGUMENT

### POINT I

**THIS COURT SHOULD REVERSE PRIOLO'S CONVICTION BECAUSE THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO PROVE THAT PRIOLO MADE MATERIAL MISSTATEMENTS OR THAT HE POSSESSED THE REQUISITE INTENT TO DEFRAUD**

**A. Standard Of Review.**

This Court should reverse Priolo's conviction because, as a matter of law, the Government failed to present sufficient evidence at trial to prove that Priolo's mailings made material misstatements or that he possessed the requisite intent to defraud. This Court reviews challenges to the sufficiency of the evidence *de novo,* viewing the evidence in the light most favorable to the Government. *See United States v. McKenzie*, 13 F.4th 223, 238 (2d Cir. 2021). A conviction cannot stand based on speculation or assumption; the Government must introduce sufficient evidence to

sustain each essential element of the crime charged beyond a reasonable doubt. *United States v. D'Amato,* 39 F.3d 1249, 1256 (2d Cir. 1994). "It would not satisfy the Sixth Amendment to have a jury determine that the defendant is probably guilty…" *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002) quoting *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993). Thus, where the evidence, viewed in a light most favorable to the Government, "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain reasonable doubt." *Glenn*, 312 F.3d at 63.

## B. The Government Failed to Prove All Elements of the Mail and Wire Fraud Statute

The "essential elements of a mail or wire fraud violation are: (1) a scheme to defraud; (2) money or property as the object of the scheme; and (3) use of the mails or wires to further the scheme." *United States v. Dinome,* 86 F.3d 277, 283 (2d Cir. 1996). To prove a scheme to defraud, the government must prove that the defendant made misrepresentations that were "material," and "that the defendant acted with fraudulent intent." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016)). The Government failed to prove that Priolo's mailing contained material misrepresentations or that he had the requisite fraudulent intent.

30

**1. The Record Does Not Support That Priolo's Mailings Contained Material Misrepresentations.**

This Court has held that, "[f]raud requires more than deceit. A person can dissemble about many things, but a lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's evaluation of a proposal." *United States v. Corsey*, 723 F.3d 366, 373 (2d Cir. 2013); see also *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017). Common law has long embraced materiality as the principled basis for distinguishing everyday misstatements from actionable fraud. *Kousisis v. United States*, 605 U.S. 114, 131 (2025). Whether in tort or contract law, "materiality look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Services, Inc. v. United States ex rel. Escobar,* 579 U. S. 176, 193 (2016). A misrepresentation is material if a reasonable person would attach importance to it in deciding how to proceed, or if the defendant knew (or should have known) that the recipient would likely deem it important. *Id*.

In *Kousisis v. United States*, 605 U.S. 114 (2025), the Pennsylvania Department of Transportation (PennDOT) awarded defendants Stamatios Kousisis and Alpha Painting and Construction Co. two contracts for painting projects in Philadelphia based on their false representation that they would obtain paint supplies from a prequalified disadvantaged business, as required by the bidding process.

31

However, the defendants' selected business functioned merely as a "pass-through" entity, simply funneling checks and invoices to and from defendants' actual suppliers. Despite the misrepresentation, defendants performed the painting projects to PennDOT's satisfaction and made over $20 million in gross profit. The Supreme Court held that a defendant commits federal fraud by using a material misstatement to induce a victim into a transaction that allows the defendant to obtain the victim's money or property, regardless of whether the defendant did not seek to cause the victim economic loss. *Id.* at 118.

Here, unlike the material misrepresentations made by the defendants in *Kousisis*, i.e. representing that they would be obtaining paint supplies from a disadvantaged company when in fact they did not, Priolo's businesses simply utilized creative language in their mailers to garner the attention and excitement of the recipients around the chance to win money by purchasing the product he was advertising, namely the sweepstakes report booklets, through which the recipients would be able to enter sweepstakes. The Government claims that Priolo induced recipients to respond with money, by sending misleading, personalized mailings, which gave the appearance that they were official and that the recipients had already won. Notably, by presenting testimony from alleged victims or relatives of alleged victims who had diminished cognitive capacity or advanced age, the government

32

was strongly implying to the jury that Priolo had targeted recipients who were likely to misunderstand the mailings.

However, the evidence at trial showed that the mailers simply contained language which conveyed an offer to the recipients, to purchase a booklet containing information about available sweepstakes in which the recipient could enter, in order to win prizes or money, collectively valued at a certain amount, in exchange for a fee. (T. 196, T. 203-204, T. 309-310, T. 741-743). That collective value was also displayed in the mailers. The alleged victims called by the Government either testified that they did not recall fully reading the letters (T. 196, T. 203-204, T. 319, T. 322) or, in the instances where the victims were no longer available to testify, the surrogates testified that they, themselves, read and understood the letters and explained the content of the letters to their family members. (T. 434-435, T. 442, T. 443, T. 741-743). Furthermore, it is amply clear from the record at trial that the selection of recipients was indiscriminate (T. 515-516); there was no targeted effort to send these mailings to individuals of a certain age, cognitive capacity, or economic background.

## 2. The Record Does Not Support That Priolo Intended To Defraud Recipients.

After the Supreme Court's decision in *Kousisis*, "a defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a [transaction]

that requires handing over her money or property." *Kousisis*, *supra* at 118. The *Kousisis* Court held that mail and wire fraud statutes make criminal schemes in which the defendant "intentionally [lies] to induce a victim into a transaction that will cost her money or property." *Id.* at 135.

In *United States v. Runner*, 143 F.4th 146, 157 (2d Cir. 2025), this Court upheld a mail and wire fraud conviction where the defendant, via mass mailings, had "advertised goods and services it never planned to deliver, and otherwise intentionally lied to trick customers into paying money." In *Runner*, the defendant operated a mass-mailing business which used false and misleading advertising to sell purportedly supernatural objects and psychic services to over one million customers in the United States and Canada. Specifically, the defendant sent letters falsely claiming to be from renowned psychics offering personalized psychic readings, supernatural objects, and services. Instead, customers who responded received mass-produced form letters rather than personalized readings, and those who purchased "supernatural" objects received inexpensive trinkets instead of the rare, valuable items that were described. *Id.* at 158.

Here, as opposed to *Runner* and *Kousisis*, the mailers clearly offered to provide the recipients with booklets detailing opportunities to enter into sweepstakes. The evidence at trial consistently corroborates that the mailers at issue in this case included language indicating that the recipients had not won any money

34

or prizes and/or that the mailings were not prize notifications or sweepstakes entry forms. For example, the mailings contained a disclaimer on the back that reads:

> "NRS is a research and reporting service. We specialize in researching sweepstakes sponsored and conducted by corporate organizations with which NRS is completely unaffiliated. We compile **these sweepstakes opportunities** in a report which sets forth all no purchase entry requirements based on existing federal, state, and local regulations. **You have not won any money or prize.**" (T. 434). (emphasis added).

The text in the mailer makes clear what was being offered: a report of available sweepstakes the recipient could enter, if they choose, for the chance to win money and prizes. In fact, the Government's own evidence demonstrated that recipients acknowledged that they were sending in a fee to purchase a "report." (T. 196, T. 309-310, T. 431). Therefore, at the end of the day, the recipients, as opposed to the customers in the *Runner* case, received what they were told they would be receiving: a sweepstakes report booklet for a small fee (and if dissatisfied, a refund).

Moreover, there is insufficient evidence aside from the language contained in the mailers that would point to an intent to defraud by Priolo. The fact that Priolo used post office boxes as a return address or multiple DBAs to send out different mailing lists can, and should be, attributed simply to how Priolo wished to conduct his business. Whether the customer received a letter from CBS, NPF or Winners Circle International would realistically not make a difference in their decision in sending in money to purchase a sweepstakes report – nor would the fact that the

35

mailer was signed by Don Barret instead of Philip Priolo. In fact, the evidence shows that the Priolo companies received communications from customers on a consistent basis, some of which voiced their dissatisfaction with Priolo's product. The evidence also unequivocally shows that Priolo, without question, immediately responded to any customer complaints with a full refund. With respect to the complaints themselves – the complaints were never escalated beyond the customer either voicing their dissatisfaction directly to Priolo or to a consumer protection agency or the local attorney general's office. The evidence did not show that Priolo had to respond to any cease-and-desist letters, temporary restraining orders or any other enforcement proceedings targeting his businesses as the defendant was required to do in *Runner*. *Id*. at 153. Lastly, when attention was directed to the language in Priolo's mailers, Priolo or his staff made the appropriate changes. (T. 135).

The evidence in this case does not support convictions for mail or wire fraud because the mailings did not contain material misrepresentations nor did Priolo intentionally mislead his customers. As a result, the Government provided no evidence that a reasonable jury could rely upon to conclude Priolo possessed the intent to defraud. Accordingly, his convictions should be vacated.

**POINT II**

**THE COURT SHOULD REVERSE PRIOLO'S CONVICTIONS DUE TO THE DISTRICT COURT'S ERRONEOUS ADMISSION OF PRIOR ACT EVIDENCE AND IMPROPER BOLSTERING TESTIMONY BY AN UNCHARGED WITNESS ABOUT RECEIVING IMMUNITY**

**A. Standard of Review.**

"The standard of review applicable to the evidentiary rulings of the district court is abuse of discretion." *United States v. Schultz*, 333 F.3d 393, 415 (2d Cir. 2003) (quoting *Old Chief v. United States,* 519 U.S. 172, 174 (1997)), *cert. denied*, 124 S. Ct. 1051 (2004). "Unless a district court's determination of relevance is arbitrary or irrational, it will not be overturned." *Id.* (quoting *Conway v. Icahn & Co.,* 16 F.3d 504, 511 (2d Cir. 1994)). Because the district court retains broad discretion to weigh potential prejudice against probative value, appellate courts reviewing a district court's evaluation of evidence under Federal Rule of Evidence 403 "generally 'maximize its probative value and minimize its prejudicial effect.'" *United States v. Downing,* 297 F.3d 52, 59 (2d Cir. 2002) (quoting *United States v. McDermott,* 245 F.3d 133, 140 (2d Cir. 2001)).

However, both the Supreme Court and this Circuit have "repeatedly recognized that the cumulative effect of a trial court's errors, even if they are harmless when considered singly, may amount to a violation of due process requiring

reversal of a conviction" where those errors "in the aggregate . . . deprived the defendant[] of a fair trial." *United States v. Barbarino*, 612 F. App'x 624, 626 (2d Cir. 2015) quoting *United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008); *See, e.g., Taylor v. Kentucky,* 436 U.S. 478, 487 (1978) (finding that "the cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness in the absence of an instruction as to the presumption of innocence"); *Chambers v. Mississippi,* 410 U.S. 284, 302-03 (1973) (concluding "that the exclusion of . . . critical evidence, coupled with the State's refusal to permit Chambers to cross-examine [a witness], denied him a trial in accord with traditional and fundamental standards of due process. . . . [U]nder the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial."). The "cumulative unfairness" doctrine is also firmly embedded in this Circuit's precedents. *See, e.g., United States v. Guglielmini,*384 F.2d 602, 607 (2d Cir. 1967) (holding that, even though not "any one of the errors committed during the trial would have required reversal of the convictions," "the total effect of the errors we have found was to cast such a serious doubt on the fairness of the trial that the convictions must be reversed."); *see also United States v. Yousef,* 327 F.3d 56, 172 (2d Cir. 2003) (per curiam); *United States v. Rahman,*189 F.3d 88, 145 (2d Cir. 1999) (per curiam); *Salameh,*152 F.3d at 157-58; *United States v. Fields,* 466 F.2d 119, 121 (2d Cir. 1972).

**1. The District Court Committed Harmful Error When It Admitted the Testimony of Thomas Ressler about Designing Mailings in an Uncharged Sweepstakes Scheme in the Late 1990s and early 2000s**

The District Court committed harmful, reversible error, when it allowed the Government to elicit "other act" testimony from Thomas Ressler regarding his role as the artist designing mailings in an uncharged sweepstakes scheme in the late 1990s and early 2000s. The Government moved in limine, *inter alia*, to admit Ressler's testimony, proffering that the "testimony would demonstrate how the prize notices were created to mislead victims into believing they had already won money through his uses of artistic and linguistic techniques." (A. 57). Priolo opposed the admission of Ressler's testimony, specifically anticipating that Ressler would not be able to identify any of the mailings used by Priolo in 2015 and 2016 as a Ressler creation and that Ressler was unlikely to be able to identify Priolo as one of the persons associated with Sean Novis, with whom Ressler had direct contact. (A. 199-200).

The Second Circuit has adopted an "inclusionary" approach to "other act" evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity. *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003). To determine whether a district court properly admitted other act evidence, the reviewing court considers whether (1) it was offered for a proper purpose; (2) it was relevant to a material issue in dispute; (3) its

probative value is substantially outweighed by its prejudicial effect; and (4) the trial court gave an appropriate limiting instruction to the jury if so requested by the defendant. *Downing*, 297 F.3d at 58.

Here, ultimately, despite the Government's proffered testimony in its moving papers, Ressler **did not** identify Priolo as one of the individuals he knew to be associated with Sean Novis or the Sweepstakes Advisory Network, nor did he communicate with Priolo at any point regarding the creation of the Sweepstakes Advisory Network mailings. The Government introduced a sweeps report mailing that Ressler created for Sean Novis and the Sweepstakes Advisory Network. (T. 764). Ressler testified that he recognized the letter as his creation or "creative" which contained certain design characteristics that were unique to his style. He testified that the goal of the design was to use certain artistic techniques to make a letter feel official with the goal of inducing the recipient to believe that they had won money and respond with payment. (T. 765-766). Ressler further testified how there was an artistic technique to the "disclaimer" language on the back, using fonts that made it difficult and boring to read and utilizing strategic placement so that a customer would be less likely to want to read the fine print. (T. 770). Lastly, Ressler testified how he developed words such "entrant directives" to include in the sweeps report pieces (instead of "sweepstakes rules") that were intended to mask the fact that the letters were selling sweepstakes booklets. (T. 775).

Despite Ressler's testimony describing the misleading nature of the letters he created, Ressler conceded on cross-examination that he was shown at least eight of the mailings that were attributed to Priolo's entities during the 2015-2016 time period and that none of the letters were his "creative" (T. 790) and that he could not determine their origin. (T. 791).

The District Court's error in admitting the Ressler's testimony was not harmless because the jury was most likely influenced by the mistake – given the lack of other sufficient evidence to establish the misleading nature of the mailings at issue. Ressler's testimony prejudiced the jury's view on two critical and disputed factual issues: (1) whether the mailers were misleading and (2) whether Priolo had the requisite intent to defraud. Given that the Government's "other evidence" of Priolo's intent was not strong, the admission of Ressler's conclusory statements regarding the misleading nature of the letters he designed for the Sweepstakes Advisory Network in the 90s and early 2000s, without any direct link to Priolo, became insurmountably prejudicial. The Government argued that because Ressler created what he believed were misleading mailings for Novis and the Sweepstakes Advisory Network and Priolo was affiliated with Novis in the 1990s and 2000s, Ressler's intent and knowledge should be imputed to Priolo 15 years later. In summation the Government argued: "Now, Tom Ressler did not design this piece.

41

Let's be clear. But he told you how the pieces he did design for Mr. Priolo a long time ago work." (T. 975).

Under these circumstances, it is likely that Ressler's testimony improperly influenced the jury's verdict. "Where the erroneously admitted evidence goes to the heart of the case against the defendant, and the other evidence against the defendant is weak, we cannot conclude that the evidence was unimportant or was not a substantial factor in the jury's verdict." *United States v. Grinage*, 390 F.3d 746, 751 (2d Cir. 2004). Accordingly, Priolo's conviction should be reversed.

**2. The District Court Committed Harmful Error When It Permitted the Government to Bolster Its Case by Eliciting That Cathy Johnson Was Testifying Under a Grant of Immunity.**

The District Court committed harmful, reversible error when it allowed the Government to elicit evidence that (1) Cathy Johnson was testifying under a grant of immunity; and (2) that she was interviewed subject to a proffer agreement. (T. 373-403). During the trial, Priolo objected to the admission of this evidence and repeatedly assured the court that the defense would not attack Johnson's credibility on cross-examination. (T. 279, T. 381, A. 216-218).

In reaching its decision to admit the evidence of Cathy Johnson's grant of immunity and proffer agreement, the District Court relied on the case of *United*

42

*States v. Lizza Industries*, Inc., 775 F.2d 492 (2d Cir. 1985). The District Court

opined:

> "There, the Second Circuit found no error in prosecutions questioning of a witness about their claim of privilege and testimony pursuant to a grant of immunity where the prosecution, quote; merely asked a series of four neutral questions so the jury would understand the circumstances under which the witness was testifying. The Government did not comment on that witness's claim of privilege in its summation. Pursuant to the witness's grant of immunity, the witness testified at length, and was subject to cross examination by defendants attorneys, and the judge instructed the jury, quote; that it was not to consider the witness's assertion of its privilege in any way against the defendants."
> (A. 233-234).

However, this Court, in *Lizza*, also found that a "prosecutor who uses the fact

that a witness has invoked his Fifth Amendment privilege against self-incrimination

to discredit that witness or to prejudice the defendant commits trial error." *Lizza* at

496. In that case, the Court found that it was not error for the government attorney

to question the witness with respect to his claim of the Fifth Amendment privilege

against self-incrimination because it was not a "conscious and flagrant" attempt to

bolster the case through the use of inferences arising from the witnesses claim of

immunity nor did the government create an "atmosphere of guilt." *Id*. at 497. The

Court in *Lizza* concluded by saying, "There is always a fear of abuse or prejudice

when the jury is informed of a witness's invocation of his privilege against self-

43

incrimination. Admittedly, it is best, whenever possible, to avoid any mention of it." *Id.* at 497.

Embedded in the District Court's decision, however, remains the undisputed premise that the Government could not introduce into evidence either the immunity agreement itself nor any of the proffer agreements, nor could the Government elicit any of the truth-telling provisions of the agreements. (A. 224-225).

Here, the circumstances under which the Government elicited evidence of Cathy Johnson's grant of immunity and proffer agreement illustrate a "conscious and flagrant attempt" to bolster their case as well as create an "atmosphere of guilt" surrounding Priolo. Johnson was one of the three former employees/staff that Priolo was using during the relevant period of 2015-2016 and that the Government called in its direct case. Neither of the other employees, Jacquard or Lilienkamp, had been arrested, charged, prosecuted, proffered or granted immunity prior to their testimony. Instead, Johnson, whom the Government had been unable to call at the prior trial of co-conspirators Sean Novis and Gary Denkberg, had demanded immunity prior to her testimony at Priolo's trial. The Government conceded at various times that Johnson's immunity was only granted at the request of her attorney and was essentially unnecessary as the Government had never intended to charge her, nor could it, at the time of trial, charge her for any crime. (T. 283, T. 395-398).

44

Despite the fact that all parties were in agreement that Johnson did not require the grant of immunity, the Government insisted that the evidence of the immunity order and her proffer agreement should be placed in front of the jury in order for them to assess her credibility. The defense repeatedly proffered to the District Court that it had no intention of calling Johnson's credibility into question and were offering Priolo to allocute to the same. (T. 279, T. 381, A. 215-218). Ultimately, the defense's theory was not that Johnson was lying about her experiences with Priolo, but rather that the mailings were in fact, not misleading, and that similarly, Priolo did not intend to mislead or defraud customers.

The probative value of eliciting evidence regarding the grant of immunity and proffer agreements diminished dramatically when Priolo represented that he would not attack Cathy Johnson's credibility. Conversely, the prejudicial effect increased exponentially. With the introduction of the agreements, the jury was left to hear that Johnson's "testimony may not be used against her in a criminal case except in a prosecution for perjury, making a false statement, obstruction of justice, or otherwise failing to comply with the immunity order." (T. 520). Naturally, any reasonably jury would come to the conclusion that the conduct that Johnson would be testifying to would be considered criminal in nature and, consequently, that a negative inference could be imputed to Priolo. The later instruction that Johnson "was never charged with mail fraud, wire fraud or conspiracy to commit mail fraud or wire fraud and

45

cannot as of the time of her testimony be charged with those same offenses" (T. 525) was entirely toothless and ineffective.

The Government's flagrant attempt to bolster its case became clearly apparent when the Government elicited testimony from Johnson regarding one of the ultimate issues of the case: whether the mailings were misleading or not.

> Q. Why didn't you like that part?
> A. It made it more obvious that the mailings were misleading when it was right in your face. It was easier to block that out when you weren't reading letters from the actual customers.
> Q. Why did that bother you?
> A. Because I wouldn't want someone to do that to anyone in my family.
> Q. How were the pieces misleading?
> A. Just from reading them, it made it sound like you won something instead of that you were buying something.
> Q. When did you realize that about the mail?
> A. I was pretty apparent right from the beginning. (T. 530-531).

Second, and equally as important, Johnson's testimony ran afoul of the court's ruling and entered into the realm of impermissible testimony regarding the truth-telling provisions of the proffer agreement. After having been warned by the Court at a side bar, the Government elicited the following from Johnson:

> Q. What is your understanding of what a proffer letter is? (T. 558).
> A. My understanding is that anything I said in the proffer sessions wouldn't be used against me, as long as I was being truthful. (T. 560).

While Mr. Froccaro did not move to strike the response from Johnson at a sidebar, he noted that the irreparable harm had been inflicted and that he had no other

46

choice but to move on (T. 575). As any attorney would imagine, any additional argument or instruction to the jury regarding an objection would serve to further call attention to the issue and would exacerbate the harm even further.

Accordingly, the lower Court's decision erroneously allowed the Government to "consciously and flagrantly" bolster the already tenuous evidence through the use of impermissible inferences arising from Cathy Johnson's grant of immunity and proffer agreements while, at the same time, creating an inherent "atmosphere of guilt" which ultimately robbed the jury of its fact-finding province. Furthermore, the Government elicited impermissible testimony regarding the truth-telling provisions of the proffer agreements, which appellate courts, such as this one, have found are not harmless and constitute reversible error. see *United States v. Maniego,* 710 F.2d 24, 27 (2d Cir. 1983). Therefore, Priolo's conviction should be reversed.

47

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendant-Appellant Philip Priolo requests that this Court reverse his convictions on all counts and direct that the Indictment be dismissed or that a judgment of acquittal be entered. Alternatively, Priolo requests that this Court reverse on all counts and remand for a new trial.

Dated: New York, New York

     May 15, 2026

Respectfully submitted,

/s/ Arthur L. Aidala
ARTHUR L. AIDALA
LINO J. DE MASI
DIANA FABI
AIDALA BERTUNA & KAMINS, P.C.
*Attorneys for Defendants-Appellants*
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011

48

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 11,208 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
    May 15, 2026

/s/ *Arthur L. Aidala*
Arthur L. Aidala

49