# 25-3078

**IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

UNITED STATES OF AMERICA,
*Appellee*,

v.

SHAWN PHILLIPS, JEFFREY NOVIS,
*Defendants*,

PHILIP PRIOLO,
*Defendant-Appellant*.

On Appeal from the United States District Court for the Eastern District of New York, No. 2:21-cr-00566
(Hon. Nusrat J. Choudhury)

## ANSWERING BRIEF FOR THE UNITED STATES

A. TYSEN DUVA
Assistant Attorney General

ANN F. ENTWISTLE
CHARLES B. DUNN
JASON FELDMAN
Trial Attorneys
Criminal Division, Fraud Section

SARAH E. EDWARDS
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Ave. NW
Washington, DC 20530
202.913.4782
sarah.edwards@usdoj.gov

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

STATEMENT OF JURISDICTION ..... 1

ISSUES PRESENTED ..... 1

STATEMENT OF THE CASE ..... 2

I. Procedural History ..... 2

II. Relevant Facts ..... 2

A. Priolo's Direct Mailing Operations ..... 3

B. The Prize Notices ..... 7

C. Customer Service, Complaints, and Refunds ..... 13

III. Rulings Under Review ..... 15

SUMMARY OF ARGUMENT ..... 16

ARGUMENT ..... 17

I. Sufficient Evidence Supported Priolo's Convictions For Conspiracy To Commit Mail And Wire Fraud And Mail Fraud ..... 17

A. Background ..... 17

B. Standard Of Review ..... 17

C. The Evidence Supports The Jury's Verdict That Priolo Schemed To Defraud The Mailing Recipients ..... 18

1. Intent To Defraud ..... 18

2. Materiality ..... 24

II. The District Court Did Not Abuse Its Discretion In Its Evidentiary Rulings. 27

A. Standard Of Review ........ 28

B. The District Court Did Not Abuse Its Discretion In Permitting Thomas Ressler's Testimony ........ 29

1. Background ........ 29

2. The District Court Did Not Abuse Its Discretion In Admitting Ressler's Testimony ........ 32

C. The District Court Did Not Abuse Its Discretion In Permitting Testimony And Evidence Concerning Johnson's Immunity ........ 37

1. Background ........ 38

2. The Jury Instruction And Single Question Regarding Immunity Were Not Error ........ 41

3. Johnson's Statement Regarding Her Proffer Letter Did Not Affect Priolo's Substantial Rights ........ 45

D. Priolo Was Not Deprived Of A Fair Trial ........ 48

CONCLUSION ........ 49

CERTIFICATE OF COMPLIANCE ........ 50

CERTIFICATE OF SERVICE ........ 51

# TABLE OF AUTHORITIES

## Cases

*Jackson v. Virginia*,
443 U.S. 307 (1979) .......... 17

*Kousisis v. United States*,
605 U.S. 114 (2025) .......... 19

*Namet v. United States*,
373 U.S. 179 (1963) .......... 44, 45

*United States v. Benson*,
548 F.2d 42 (2d Cir. 1977) .......... 26

*United States v. Bonventre*,
646 F. App'x 73 (2d Cir. 2016) .......... 23

*United States v. Carboni*,
204 F.3d 39 (2d Cir. 2000) .......... 33

*United States v. Certified Environmental Services, Inc.*,
753 F.3d 72 (2d Cir. 2014) .......... 46

*United States v. Coffman*,
94 F.3d 330 (7th Cir. 1996) .......... 26

*United States v. Coonan*,
938 F.2d 1553 (2d Cir. 1991) .......... 33

*United States v. Corsey*,
723 F.3d 366 (2d Cir. 2013) .......... 24

*United States v. Curley*,
639 F.3d 50 (2d Cir. 2011) .......... 35, 36

*United States v. Denkberg*,
139 F.4th 147 (2d Cir. 2025) .......... 2, 18, 19, 20, 21, 22, 24

*United States v. DiMassa*,
117 F.4th 477 (2d Cir. 2024) .......... 18, 28

*United States v. Dixon*,
511 F. App'x 48 (2d Cir. 2013) ....................38

*United States v. Downing*,
297 F.3d 52 (2d Cir. 2002) ....................37

*United States v. Edwards*,
631 F.2d 1049 (2d Cir. 1980) ....................46

*United States v. Frias*,
521 F.3d 229 (2d Cir. 2008) ....................1

*United States v. Garcia*,
413 F.3d 201 (2d Cir. 2005) ....................47

*United States v. Gonzalez*,
110 F.3d 936 (2d Cir. 1997) ....................33

*United States v. Graham*,
51 F.4th 67 (2d Cir. 2022) ....................33, 34, 35

*United States v. Greenberg*,
835 F.3d 295 (2d Cir. 2016) ....................18

*United States v. Harvey*,
746 F.3d 87 (2d Cir. 2014) ....................17

*United States v. Haynes*,
729 F.3d 178 (2d Cir. 2013) ....................48

*United States v. Hild*,
147 F.4th 103 (2d Cir. 2025) ....................21

*United States v. Jabar*,
19 F.4th 66 (2d Cir. 2021) ....................19

*United States v. Kaiser*,
609 F.3d 556 (2d Cir. 2010) ....................33, 34

*United States v. Lizza Indus., Inc.*,
775 F.2d 492 (2d Cir. 1985) ....................41, 42, 44, 45

*United States v. Musacchia*,
900 F.2d 493 (2d Cir. 1990), *vacated on other grounds*, 955 F.2d 3 (2d Cir. 1991)........47

*United States v. Pierce*,
785 F.3d 832 (2d Cir. 2015) ........................................................................17

*United States v. Rowland*,
826 F.3d 100 (2d Cir. 2016) ........................................................................28, 45, 48

*United States v. Runner*,
143 F.4th 146 (2d Cir. 2025) ........................................................................18, 19

*United States v. Rybicki*,
354 F.3d 124 (2d Cir. 2003) ........................................................................24

*United States v. Sean Novis, et al.*,
2:20-cr-335-JMA-JMW ........................................................................2

*United States v. Silverman*,
430 F.2d 106 (2d Cir. 1970) ........................................................................42, 43

*United States v. Thomas*,
377 F.3d 232 (2d Cir. 2004) ........................................................................26

*United States v. Weaver*,
860 F.3d 90 (2d Cir. 2017)........................................................................18, 22, 24, 25, 26

**Statutes**

18 U.S.C. § 1341 ........................................................................2, 18

18 U.S.C. § 1343 ........................................................................18

18 U.S.C. § 1349 ........................................................................2, 18

18 U.S.C. § 3231 ........................................................................1

28 U.S.C. § 1291 ........................................................................1

**Rules**

Fed. R. App. P. 4(b)(4) ........................................................................1

Fed. R. App. P. 4(b)(1)(A)(i) ........ 1

Fed. R. Evid. 402 ........ 33

Fed. R. Evid. 403 ........ 28, 29, 33, 35

Fed. R. Evid. 404(b) ........ 29, 32, 33, 34, 35

## STATEMENT OF JURISDICTION

Defendant-Appellant Philip Priolo appeals the final judgment of conviction in this criminal case. The district court (Choudhury, J.), which had jurisdiction under 18 U.S.C. § 3231, entered judgment on November 19, 2025. App. 249.[1] Priolo filed his notice of appeal on December 5, 2025. App. 257.[2] This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether sufficient evidence supported Priolo's convictions for mail fraud and conspiracy to commit mail and wire fraud.

2. Whether the district court abused its discretion in admitting evidence (a) related to Priolo's involvement in an earlier, uncharged, direct mailing scheme; or (b) of the fact that a government witness was testifying pursuant to an immunity order and had previously proffered with the government; such that Priolo's substantial rights were affected and a new trial required.

---

[1] "App." refers to Priolo's Appendix; "SA" refers to the government's supplemental appendix filed alongside this brief; and "Tr." refers to the trial transcript and provides references to the specific transcript pages and lines, and the evidence at trial is included at pages 28-420 in the supplemental appendix. "Br." refers to Priolo's opening brief.

[2] Federal Rule of Appellate Procedure 4(b)(1)(A)(i) provides that a criminal defendant must file his notice of appeal within 14 days of entry of the judgment or the order being appealed. Priolo filed his notice of appeal 16 days after the district court entered judgment. But because the time period for filing a notice of appeal in a criminal case is non-jurisdictional, *United States v. Frias*, 521 F.3d 229, 233 (2d Cir. 2008) and a district court may extend the time to file a notice of appeal by up to 30 days upon a finding of excusable neglect or good cause, *see* Fed. R. App. P. 4(b)(4), the government waives any timeliness objection in this appeal.

## STATEMENT OF THE CASE

### I. Procedural History

Following a six-day jury trial in the Eastern District of New York, Priolo was convicted of conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. § 1349, and four counts of mail fraud, in violation of 18 U.S.C. § 1341. App. 249-50.[3] The district court sentenced Priolo to 42 months of imprisonment to be followed by two years of supervised release, and it imposed a $1,250,000 fine. App. 251-55.

### II. Relevant Facts

Priolo sent tens of thousands of fake prize notices purporting to notify the recipient that they had won significant sums of money. *See* Tr. 456:9-460:17 (frequency and volume of mailings); Tr. 531:10-11 ("it made it sound like you won something instead of that you were buying something"). The notices led the victims to believe that they could claim their prize by paying a small fee, typically $20 to $40. *See*, *e.g.*, Tr. 186:1-16 (victim testified that she sent in $20 as a fee for "handling of the paperwork" of the $1.2 million she believed she won). But Priolo's companies, Winners Circle and Feel Lucky Group, did not award cash prizes. Tr. 141:8-14. Instead, individuals who sent in

[3] Priolo's co-defendants, Jeffrey Novis and Shawn Phillips, have not yet been tried. *See* App. 6-7, ECF 43 (granting severance of counts related to Shawn Phillips due to ongoing extradition proceedings); App. 10, Minute Entry for December 16, 2024, proceedings (severing Jeffrey Novis and Priolo's trials amid Jeffrey Novis's competency proceedings). Priolo's co-conspirators, Sean Novis and Gary Denkberg, were charged separately and tried in 2022, *see United States v. Sean Novis, et al.*, 2:20-cr-335-JMA-JMW, and this Court affirmed their convictions on appeal. *United States v. Denkberg*, 139 F.4th 147 (2d Cir. 2025).

the requested fee received only a "sweepstakes booklet" that listed publicly available sweepstakes anyone could enter. Tr. 140:12-141:14. Moreover, if a mailing recipient sent in the fee in response to the initial mailing, that individual would then be targeted to receive multiple additional fake prize notifications. Tr. 85:12-86:11. On the back of each prize notification was a block of text labeled "consumer information," that stated, in the fourth sentence "you have not won any money or prize." *See*, *e.g.*, SA 422. Over the course of the scheme, Winners Circle and Feel Lucky Group took in approximately $2.6 million. Tr. 864:4-866:14; SA 807.

At trial, the government's evidence included the testimony of multiple victims and victims' family members, individuals who worked for Priolo and his co-conspirators, and law enforcement officers, as well as the prize notices mailed to victims, emails to and from Priolo and his co-conspirators, and notes and checks from victims that were recovered in the search of an employee's home. The jury found Priolo guilty of conspiracy to commit mail and wire fraud and four counts of mail fraud after hearing evidence of the following facts.

### A. Priolo's Direct Mailing Operations

Priolo worked with Sean Novis in direct mail operations in 2000 and 2001, through a pair of companies called Justin Grant and Sweepstakes Advisory Network. Tr. 531:15-534-16; 537:2-8; 539:21-540:6; SA 733; 804. Sweepstakes Advisory Network was a "sweeps report" or sweepstakes report business. Tr. 531:18-532:6; Tr. 539:21-540:6. A sweeps report was a booklet of publicly available information about various

sweepstakes sent to individuals who sent in money in response to Priolo's mailings. *See* Tr. 140:12-149:19. During this time, Priolo would regularly "cage," or open and sort, the return mail with Jeffrey Novis, Sean Novis's father.[4] Tr. 539:14-20. Priolo was one of Novis's main partners, but after a year or two they had a falling out and Priolo stopped working with Novis. Tr. 538:18-21, 727:8-13.

In 2015, however, Priolo resumed doing business with Novis and his father. By this time, all of Novis's direct mail operations, and all of Novis's partners' operations, were only doing sweeps reports. Tr. 551:16-22. Priolo and Jeffrey Novis started a sweeps report business through their jointly-owned company, Winners Circle. Tr. 534:13-16; 537:9-11; 568:22-569:3. And in 2016, after getting the "go ahead" from Novis, Priolo also started Feel Lucky Group, another sweeps report outfit that operated identically to Winners Circle, except that, as the sole owner, Priolo did not have to "divide up the pie" with Jeffrey Novis. Tr. 841:14-843:19. Cheryl Jacquard, Mary Lilienkamp, and Cathy Johnson all worked for Novis and his partners, including Priolo. Tr. 79:22-80:13 (Jacquard); 452:13-455:7 (Lilienkamp); Tr. 555:12-556:7 (Johnson).

Priolo's sweeps report operations, which were the same as the other sweeps report operations run by Novis and his other partners, worked as follows: an initial, or "front-end," mailing went out at the beginning of the month, typically to approximately 100,000 people. Tr. 85:12-86:6; 456:8-10; 460:2-3. Jacquard, as the production manager,

---

[4] Sean Novis will be referred to as "Novis" and Jeffrey Novis will be "Jeffrey Novis" in this brief.

made sure that the mailing schedules were being followed for each of the various companies, such as Winners Circle or Feel Lucky Group, and checked the proofs from the letter shops that printed and sent the mailings against samples to make sure that each mailing was correct. Tr. 77:18-79:16. Lilienkamp, the data programmer, prepared the lists of recipients for each mailing and sent those to the letter shops. Tr. 456:3-458:21.

The prize notices, described further below, "made it sound like you won something instead of that you were buying" a booklet of publicly available sweepstakes information. Tr. 531:2-13. For the recipient of the prize notice to actually win the amount listed at the top of the prize notice, that individual would have to enter and win all of the prizes in all of the sweepstakes listed in the booklet. Tr. 209:22-216:10.

The prize notices directed recipients to send their fees back to a three-letter acronym associated with that set of mailings at a post office box and included a pre-addressed envelope for that purpose. Tr. 92:12-20; 245:20-24. Each "mail piece," or prize notice, was assigned a three-letter name that was tracked on a mailing schedule, as multiple mailings went out each month for the various different companies. Tr. 245:17-24; SA 586-619. For example, one prize notice sent on behalf of Winners Circle bore a seal that said "NPF" in the top left corner of the first page and contained an envelope for the recipient to send their check or cash to the "NPF Processing Department." Tr. 633:9-13; SA 421; *see also* SA 429-520 (additional prize notices with

other three-letter names). The prize notices did not contain Priolo's name or the names of his companies. Tr: 107:20-108:7; *See* SA 421-581.

Although "everything else" except the ownership of Winners Circle and Feel Lucky Group was the same, the companies used different post office boxes. Tr. 679:23-680:22. And each company had multiple post office boxes "[b]ecause customers would be less likely to pay if they received ten promotions that are all going back to the same PO box." Tr. 680:21-681:1.

Five days a week, Priolo would pick up the mail for Winners Circle and Feel Lucky Group and take it to Johnson, who caged the mail for Novis, Priolo, and the others. Tr. 555:12-556:7; 594:22-595:11. Caging was the process of sorting and opening the incoming mail, and tracking which recipients paid the fee. Tr. 530:12-14. Each mailing had two bar codes, one identifying the customer, and one identifying which company sent the mailing. Tr. 561:3-8.[5] Johnson tracked responses and sent reports to Priolo and others compiling the number of "paid response[s]" in which the victim had sent in money, "non-paid response[s]" where the prize notice recipient sent back the form but not the money, and customer service responses, for instances in which Johnson responded to customer service letters. Tr. 568:5-569:15. Johnson gave the cash that victims sent in to Priolo. Tr. 613:9-13. When victims sent in checks instead of cash,

[5] The companies used by Priolo and his co-conspirators were also sometimes referred to as "lists" by their shared employees. *See*, *e.g.*, Tr. 461:9-17 (Lilienkamp referring to Feel Lucky and Winners Circle as lists).

the checks were scanned and electronically deposited with PacNet, a payment processor located in Canada. Tr. 613:16-21; 813:7-10.

Recipients who sent money in response to a front-end mailing were then added to a list for additional, or "back-end" mailings, of which there were usually ten to twelve per month. Tr. 459:4-21; 460:6-12. And if the owner of a list was renting out their mailing list—for example, if Priolo was renting out the list of recipients who had previously sent money in response to a Winners Circle mailing to Novis or Denkberg for their company's mailing that month—the recipient could be receiving prize notices from multiple different companies. Tr. 481:2-8. Thus, a recipient who sent in the requested fees in response to the notices could end up getting multiple additional prize notices—up to eight to ten per day. Tr. 424:16-23.

### B. The Prize Notices

The prize notices sent out by Priolo and his co-conspirators listed a large sum of money, often in colorful text near the top of the first page, and were adorned with various official-looking stamps and seals. *See* SA 421-585. They bore headings such as "Cash & Prize Advisement," "Checks Scheduled For Release," "In the Matter of $1,000,000.00," or "Ready to Release -- Corporate Bursar Is Awaiting Your Authorization." SA 421, 445, 453, and 475. The notices included a "Claim Certificate" or "Certificate of Acceptance" for the recipient to return, with the fee, in their reply. SA 545 and 583. The notices also communicated a sense of urgency: they were labeled "Awards Expiration Notice!" or directed recipients to pay the fee "WITHIN 10

DAYS," and they appeared to attest to their own legitimacy with language such as "Official Document," "Corporate Legal Notification," or "Statutory Communication," on the front page. SA 437 and 521.

Although a specific prize notice might be sent to 90,000 people, each notice would appear to be individualized for the recipient, including their name in multiple places and ID number. *See* Tr. 116:8-118:24; 121:25-122:9. The notices also included purported signatures and titles for individuals who were listed as officers of the three-letter companies on the prize notices, but the witnesses who worked for Novis and Priolo had never heard of any of these individuals. *See*, *e.g.*, Tr. 230:2-8; 502:14-503:9.

IMPORTANT RECEIVER DOCUMENTS
ATTENTION TO INDIVIDUAL
A GUARANTEED PRIZE NOTIFICATION

CASH & PRIZE ADVISEMENT
IDENTIFICATION PAPERS
NON-TRANSFERABLE MATTER

GOVERNMENT EXHIBIT
1
2:21-CR-00566

# CHECKS SCHEDULED FOR RELEASE

NPF REPORTS DIVISION, MAIN OFFICES P.O. BOX 27, Plainview, NY 11803-0027

**Re:** Available Cash and Awards Win-Opportunity Totaling **$1,200,000.00**
**For Release to:**

162/1 37282****SINGLE-PIECE 11801
Andrew Kluczinsky
[redacted]
Tooele, UT 84074

**Dated:** 9/9/16

*3036927410*

RECORDED

*6805*

We are very excited in issuing this formal letter announcement to you directly, **Andrew**, in regards to this matter of available sweepstakes prize-payments for which your name has been confirmed on record and registered by **I.D.# 3036927410**.

It is our pleasure to announce that your recent participation to win a major sweepstakes contest has been validated and you have been officially approved as the individual identified to receive the available sweepstakes cash and awards prize-data as detailed in **REPORT OF ENTRANT DIRECTIVES NOW PENDING RELEASE TO YOU IN THE TOTAL $AMOUNT OF *** $1,200,000.00 *** $1.2 MILLION DOLLARS IN PRIZES! ***.**

We hereby extend all best wishes to you on this announcement , **Andrew**, and request your direct attention to this matter in order that we may release the entire *** **$1,200,000.00** *** **IN CASH AWARDS PRIZE-OPPORTUNITY** to you without delay.

Please proceed to the enclosed **RECEIVER CERTIFICATE** and indicate by signature that you accept the terms of payment for release of the available cash/prize win opportunity **AS GUARANTEED TO YOU IN REPORT OF ENTRANT PROCEDURE DIRECTIVES.** FOR THE ENTIRE *** **$1,200,000.00** *** **ONE MILLION TWO HUNDRED THOUSAND DOLLARS** ***, **ANDREW**, and return it along with the required $20.00 report fee in order to initiate delivery.

**IMPORTANT:** All of the contests and their relevant deadline dates are strictly officiated by third-party contest officials and not NPF. As such, you are strongly advised to return the enclosed **RECEIVER AND COMPLETION CERTIFICATE** without delay, **ANDREW**, or this once-in-a-lifetime opportunity could be lost to you forever.

Again, we have confirmed that the prize funds are on account for release to winner, **ANDREW**, This is not a sweepstakes entry form .**YOU ARE 100% CONFIRMED AND APPROVED TO RECEIVE THE ENTIRE *** $1.2 MILLION DOLLARS *** IN CASH AND AWARDS PRIZE-WIN OPPORTUNITY AS DOCUMENTED IN REPORT OF ENTRANT DIRECTIVES.** in-full!

We are now on standby and prepared to finalize this matter to you forthwith. It will be our pleasure serving you!

Sincerely,

Dan Barrett

NPF-ARC-FM01

SPECIAL MATTER:
THIS TAG IS OFFICIALLY AFFIXED TO SERVE AS RECORD OF IDENTIFICATION FOR THE INDIVIDUAL NAMED AND FILED ON RECORD.
REGISTRATION : **3036927410**

Gov't Ex. 1
Page 1 of 8

HZN-SWM-00001514

SA 421.

The victims who sent money in response to Priolo's prize notices believed that they had won large cash prizes. *See* Tr: 53:7-53:21 (Sharon Soltis's father sent in money in response to letters about large cash prizes and was "adamant" that "[h]e was a winner"); Tr: 185:15-186:16 (Pamela Kay Pence thought she had won $1.2 million and the $20 she sent in was for "handling the paperwork"); Tr: 302:4-12; 303:12 (Ashley Seip testified that her grandfather would write checks in responses to mailings and tell her "that he was going to be winning things" or "hitting the big time" but "he never won any prizes"); Tr. 315:17-19 (Marilyn Burks "thought that if I sent the $20, like they asked me, then I would win some money."); Tr: 421:15-422:6 (Marlene Montilla's husband wrote "a lot of checks" to "places with three letter names" that he said "were offering him prizes"); Tr. 743, SA 390-92 (Alemitu Teshale's husband wrote checks in response to letters and would say "I'm going to win.").

Sometimes the victims wrote notes in response to the prize notices, instructing the company to deduct the fee from their winnings, or writing other notes or letters that they included in addition to or instead of the requested fee. Tr. 68:17-23; Tr. 669:15-675:25. Some victims were elderly and experiencing dementia or other memory problems. *See*, *e.g.*, Tr. 49:18-24; 190:7-192:15; 294:13-21; 428:18-429:8. And some victims persisted in sending in money and believing that they had won prizes even when their families tried to convince them they had not. *See*, *e.g.*, Tr. 71:4-11; 428:9-20; 431:17-22; 434:3-444:2.

On the back of the prize notices, in block font, was a disclaimer. Tr. 93:10-19; 124:10-18. In the fourth sentence, the disclaimer stated, "YOU HAVE NOT WON ANY MONEY OR PRIZE." Victims testified that they had not read the disclaimer or did not recall reading it. Tr: 203:12-204:5; 319:10-13; 322:4-9; 743, SA 404:13-16.

CONSUMER INFORMATION

NPF IS A RESEARCH AND REPORTING SERVICE. WE SPECIALIZE IN RESEARCHING SWEEPSTAKES SPONSORED AND CONDUCTED BY CORPORATE ORGANIZATIONS WITH WHICH NPF IS COMPLETELY UNAFFILIATED. WE COMPILE THESE SWEEPSTAKES OPPORTUNITIES IN A REPORT WHICH SETS FORTH ALL NO PURCHASE ENTRY REQUIREMENTS, BASED ON EXISTING FEDERAL, STATE, AND LOCAL REGULATIONS. YOU HAVE NOT WON ANY MONEY OR PRIZE. NPF IS NOT LIABLE FOR ANY ENTRIES MADE OR ATTEMPTED BY READERS OF ITS REPORTS. ALL SWEEPSTAKES RESEARCHED AND REPORTED ARE FREE TO ENTER, AS BASED ON THE INFORMATION SUPPLIED BY THE SPONSORS. NPF USES ALL DUE DILIGENCE TO ACCURATELY REPORT THE ENTRY DETAILS OF EACH SWEEPSTAKES. NPF IS NOT A LOTTERY COMPANY, AND DOES NOT OFFER LOTTERY, CONTEST OR SWEEPSTAKES ENTRIES. THIS PROMOTION MAY BE UNDER DIFFERENT CREATIVE PRESENTATION. VOID WHERE PROHIBITED BY LAW. RESPONDERS WILL BE REFUNDED THEIR PURCHASE PRICE OF OUR REPORT IN FULL IF THEY ARE DISSATISFIED WITH THE REPORT. REFUND CLAIMS MUST BE MADE IN WRITING TO THE ADDRESS ON OR BY USING THE ENCLOSED REPLY ENVELOPE WITHIN 60 DAYS OF PURCHASE. IF YOU DO NOT WISH TO RECEIVE FURTHER MAIL SOLICITATIONS FROM NPF, JUST RETURN THIS ENTIRE LETTER IN THE ENCLOSED ENVELOPE TO NPF, WITH THE LETTERS "DNM" NEXT TO YOUR NAME/ADDRESS AREA. PLEASE BE INFORMED THAT YOUR INFORMAITON MAY BE SHARED WITH A THIRD PARTY. BY PAYING FOR YOUR PURCHASE WITH YOUR CHECK, YOU ARE ACCEPTING OUR CHECK ACCEPTANCE POLICY. IN THE UNLIKELY EVENT THAT YOUR CHECK IS RETURNED UNPAID, YOU UNDERSTAND AND AGREE THAT YOUR CHECK MAY BE ELECTRONICALLY REPRESENTED AND WE WILL ALSO COLLECT A RETURNED CHECK PROCESSING CHARGE AS ALLOWED BY STATE LAW. IF YOUR CHECK IS ELECTRONICALLY REPRESENTED, IT WILL NOT BE PROVIDED TO YOU WITH YOUR BANK STATEMENT, BUT A COPY CAN BE RETRIEVED BY CONTACTING YOUR FINANCIAL INSTITUTION. WE ARE COMMITTED TO YOUR PRIVACY AND WE HAVE A PRIVACY POLICY WHICH IS AVAILABLE UPON REQUEST AT THE ADDRESS LISTED ON THE OUTER ENVELOPE. THIS COMMUNICATION IS NOT A SWEEPSTAKES OR AWARD NOTIFICATION AND DOES NOT GUARANTEE THAT YOU WILL WIN ANY SWEEPSTAKES. FOR SPECIFIC ODDS OF WINNING, ELIGIBILITY REQUIREMENTS, END DATES AND OTHER TERMS AND CONDITIONS IN CONNECTION WITH A SWEEPSTAKES, YOU MUST REFER TO THE SPECIFIC RULES FOR THAT SWEEPSTAKES. YOU DO NOT NEED TO PURCHASE THE REPORT TO ENTER ANY SWEEPSTAKES. ALL CUSTOMER SERVICE ISSUES SHOULD BE IN WRITING TO THE ADDRESS ON THE ENCLOSED ENVELOPE.

SA 422.

Priolo referred to the prize notices as "the creative" in emails in which he discussed needing to buy new "pieces" for Feel Lucky Group. SA 796. Thomas Ressler, who created mail pieces for Justin Grant and Sweepstakes Advisory Network, Novis's and Priolo's old companies, explained that he used various artistic techniques to create

the "sense and feel that it was an official document" to encourage readers to respond, and used other techniques for the disclosure language "to make it difficult to read and boring to read and too much to read." Tr. 765:17; 769:5-6; SA 808-827 (notice Ressler created with his handwritten notes). Ressler also explained that he came up with the phrase "entrant directives" on his sweeps report pieces in the late 1990s or 2000 to refer to sweepstakes rules, and that he used "entrant directives" instead because sweepstakes rules would have been "too clear" and the recipients would not have paid if they understood that they would have to follow sweepstakes rules and enter sweepstakes to win. Tr. 775:4-23. The prize notices Priolo sent from Winners Circle and Feel Lucky Group also used the phrase "entrant directives," and similar phrases, but Ressler did not design them. *See*, *e.g.*, SA 423 ("entrant directives" and "prize directives"); 439 ("win directives"); 445 ("entry directives"); 469 ("payment directives"); Tr. 790:19-23.

Priolo and Novis had the final say over what language was used on the prize notices that went out for Winners Circle and Feel Lucky Group. Tr. 136:6-15. In March 2015, a representative of PacNet, the Canadian payment processor, sent Priolo an email stating that its risk department required certain revisions to language on a prize notice to be sent out under the three-letter combination "CBS." Tr. 828:17-829:17; SA 770. PacNet was concerned that the language "may lead the consumer" to believe that "he/she has won a prize." Tr. 828:17-829:17; SA 770. Specifically, PacNet required Priolo to remove the portion of the notice that said, "'No one else notified. If you wish to keep any money won secret from your spouse or family, please consult your lawyer'

since this promotional material will be sent to multiple people." SA 770. PacNet also instructed Priolo to remove the word "legal" so "the recipient doesn't believe that the company operates within any legal, government or official capacity" and to change "payment" to "report fee" to "ensure that the purchase of the compilation is worded clearly." SA 770. When the CBS prize notification was mailed out in September 2016, however, none of PacNet's required changes had been made. Tr. 830:17-833:12; SA 437.

### C. Customer Service, Complaints, And Refunds

In addition to caging the mail for Priolo's companies, Johnson provided "customer service" for Priolo's companies and responded to letters from victims in which the customers requested refunds, or in instances when the victims "weren't understanding the promotion." Tr. 622:18-20. For example, when Johnson opened a letter that said "when can I expect my winning check? Will it be delivered regular mail?" she responded with a "rules letter" advising the victim that he had not won anything. Tr. 622:18-24, 636:9-19; SA 653-83. When she sent rules letters, Johnson did not use her own name because she "wouldn't put [her] name on anything like that," but instead used a "made-up name" that differed by whose customer wrote the letter. Tr. 623:2-8. For Priolo's customers, Johnson responded under the name "Christine Peters." Tr. 623:11. Johnson used this same process to respond to customer letters for the entire time she worked for Novis and his partners, from 2000 to 2016. Tr. 623:12-19.

When Johnson received complaints from a county consumer protection agency, or from various states' attorneys general, she would seek Priolo's guidance on a response or, if it was "something more" than just requesting that an individual be taken off the mailing list, she would give the complaint to "whoever was running that company." Tr. 641:15-644:25. Johnson responded to multiple complaints from the attorneys general for Minnesota, Washington, and Illinois, under the false name "Christine Peters," for complaints arising from Winners Circle prize notifications. Tr. 644:12-648:19; SA 684-732. The letters from the various attorneys general were sent to the post office boxes listed on the mailings from Winners Circle, where Priolo picked up the mail. Tr. 648:16-19.

If a victim wrote and explicitly requested a refund, Johnson would send the name and address to Lilienkamp to confirm how much the individual had paid. Tr. 655:5-14. The victim would only be refunded, however, for the specific amount requested. Tr. 657:8-9. In one instance, a woman had sent in $236 in response to various prize notifications, but when she wrote requesting a refund for $28, she was refunded only $28, not the full $236 she paid. Tr. 656:8-657:17. Johnson did not issue the refund checks herself; Priolo issued them for Feel Lucky Group and Winners Circle. Tr. 666:23-667:4.

In addition to letters from dissatisfied customers, Priolo's companies also received "undeliverable or refused mail" that included notes on the outside of the envelope such as "remove me from your mailing scam." Tr. 624:4-14; SA 620. Other

notes written on the outside of returned envelopes included "this is a scam," "this is FRAUD," "wont get any more money from me!," "Post office send back to sender call the hall of shame!," "Liar," and "No! You all is not getting any money from me! Stop sending this fake (BS) I have made a police report." Tr. 631:9-632:20; SA 625, 630, 641, and 647-48. Priolo received mail like this "every day" when he picked up the mail. Tr. 624:4-14. Recipients of the prize notices who returned the mail were removed from the mailing list. Tr. 624:23-25.

Priolo's and Novis's employees had differing views of the scheme. Lilienkamp, the data processor, testified that she would not work for a company that was committing illegal acts. Tr: 516:5-518:10. Johnson, who caged the mail and responded to notes from customers, said that it was "pretty apparent right from the beginning" that the "mailings were misleading" and that she "wouldn't want someone to do that to anyone in [her] family." Tr. 531:2-13. But although Johnson was concerned that the prize notifications were misleading, she never raised it with Novis, Priolo, or any of their other partners "[b]ecause that was the point of the business" and she "wasn't going to tell them basically to shut down their business." Tr. 685:2-16.

## III. Rulings Under Review

Priolo challenges the district court's denial of his motion for a judgment of acquittal under Rule 29. SA 1-27. He also contests the district court's trial rulings admitting evidence of his involvement in an earlier uncharged mail fraud scheme, App. 148-155, and permitting the jury to learn that Cathy Johnson testified under an order

of immunity and had previously spoken to the government under the protection of a proffer letter, Tr. 381:10-388:20; 559:3-560:4.

## SUMMARY OF ARGUMENT

The evidence at trial amply supported Priolo's convictions for mail fraud and conspiracy to commit mail and wire fraud. The fake prize notices, victim testimony, complaints from victims, and testimony regarding the mechanics of the scheme—including Priolo's use of fake company names and fake signatures on the notices, and a fake customer service representative who responded to complaints to conceal the scheme—all supported the jury's conclusion that Priolo intended to defraud his victims as to a material fact: whether they had won a large cash prize.

The district court also did not abuse its discretion in admitting evidence of Priolo's involvement in another mail fraud scheme with some of the same co-conspirators years before the charged conduct. It also did not abuse its discretion in admitting testimony that one of the government's witnesses, Johnson, was compelled to testify with an order of immunity. The parties agree that Johnson should not have testified on direct examination that she was required to tell the truth during her proffer-protected interviews with the government. Her unexpected statement on that topic, however, consisting of fewer than ten words of her extensive testimony over three trial days, did not affect Priolo's substantial rights and does not warrant reversal.

This Court should therefore affirm the jury's verdict and the district court's judgment.

## ARGUMENT

### I. Sufficient Evidence Supported Priolo's Convictions For Conspiracy To Commit Mail And Wire Fraud And Mail Fraud

#### A. Background

At the close of the government's case, Priolo moved for a judgment of acquittal on the grounds that the government's victim witnesses had not read the disclaimer on the back of the prize notices and therefore the government failed to prove the elements of its case. Tr. 884:8-885:19. The district court reserved ruling on the motion at that time, Tr. 887:13-18, and later issued an opinion denying the motion and finding that the record contained sufficient evidence for a rational jury to find that the government proved all elements of the charged crimes beyond a reasonable doubt. SA 1-27.

#### B. Standard Of Review

This Court reviews challenges to the sufficiency of evidence *de novo*. *United States v. Pierce*, 785 F.3d 832, 837 (2d Cir. 2015). On appeal, the evidence is viewed "in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *Id.* at 838 (quoting *United States v. Harvey*, 746 F.3d 87, 89 (2d Cir. 2014)). This Court will "sustain the jury's verdict if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis original)).

The essential elements of mail and wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017). Because "the mail fraud and wire fraud statutes use the same relevant language," this Court will "analyze them in the same way." *Id.* (quoting *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016). Proof of conspiracy to commit mail or wire fraud requires the government to prove "that the defendant agreed with another to commit [mail or] wire fraud and knowingly engaged in the conspiracy with the intent to commit that offense." *United States v. DiMassa*, 117 F.4th 477, 487 (2d Cir. 2024).

Priolo argues that the government offered insufficient evidence to prove a scheme to defraud, Br. at 27, "an element common to 18 U.S.C. §§ 1341, [ ], 1343, and 1349." *United States v. Denkberg*, 139 F.4th 147, 155 (2d Cir. 2025). "Such a scheme requires proof both that 'the defendant[s] acted with fraudulent intent' and that any 'misrepresentations were material.'" *Id.* (quoting *Weaver*, 860 F.3d at 94).[6]

### C. The Evidence Supports The Jury's Verdict That Priolo Schemed To Defraud The Mailing Recipients

#### 1. Intent To Defraud

"[A] defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a [transaction] that requires handing over her money or property."

[6] Priolo does not dispute that there was sufficient evidence to support the remaining elements of the crimes of which he was convicted. Br. 30-36.

*United States v. Runner*, 143 F.4th 146, 156 (2d Cir. 2025) (quoting *Kousisis v. United States*, 605 U.S. 114, 118 (2025)). Fraudulent intent may be proven through both direct and circumstantial evidence, or through circumstantial evidence alone. *Denkberg*, 139 F.4th at 155 n.26 (citation omitted). And fraudulent intent may be inferred "where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *United States v. Jabar*, 19 F.4th 66, 77 (2d Cir. 2021).

The evidence at trial established that Priolo's mass-mailed prize notices were intended to mislead—and were successful in misleading—victims into believing that they had won large sums of money, when Priolo only ever intended to send those who sent in money a "sweeps report" consisting of publicly available information. Multiple victims and their family members testified that the victims believed they had won a cash prize when they sent in their money. Tr: 50:7-51:21; 185:15-186:16; 302:4-12; 315:17-19 421:15-422:6; 743, SA 390-92. The jury also saw notes from other victims requesting refunds and inquiring about their winnings. SA 653-83. There was a chasm between the cash prizes the victims anticipated and the booklet of sweepstakes information they received. *Jabar*, 19 F.4th at 77.

The prize notices themselves further support the jury's verdict. *See* SA 421-585. As this Court wrote, in affirming Sean Novis's and Gary Denkberg's fraud convictions, the "elaborately-constructed prize notices—which were personalized to recipients; used fictitious names and businesses; resembled checks or financial documents; included

contrived seals or signatures to make them look official; and used confusing language to obscure disclaimers" allowed a rational jury to find "intent to deceive the recipients into believing they had won prizes claimable by payment of a fee." *Denkberg*, 139 F.4th at 156. So too here. *See* Tr. 116:8-118:24; 121:25-122:9 (notices were personalized); 230:2-8; 502:14-503:9 (fictitious signatories); SA 421-585 (official looking documents, seals, and stamps, and confusing language to obscure the disclaimer). Moreover, here, as in the case against Novis and Denkberg, the "jury heard testimony about the victims' understanding that the prize notices entitled them to large cash prizes" and how once a victim sent the requested fee in, that victim was targeted "with even more prize notices." *Denkberg*, 139 F.4th at 156.

Additional evidence demonstrated that Priolo intended for the prize notices to be deceptive. He ignored edits from PacNet, the Canadian payment processor, after PacNet's risk department warned Priolo that his language "may lead the consumer" to believe that "he/she has won a prize." Tr. 828:17-829:17; SA 770. Had Priolo wanted to market his sweeps reports as effectively as possible, a jury could reasonably conclude that Priolo would want the recipients of his mailings to know what they were purchasing. His choice to ignore "required" revisions to clarify that the notification was sent to multiple people, that "CBS" did not operate in a "legal, government or official capacity," and that it was a "report fee" at issue was highly probative of his intent. *See* Tr. 828:17-829:17; SA 770.

The jury could also compare the Winners Circle and Feel Lucky Group prize notifications and the Sweepstakes Advisory Network piece that Tom Ressler testified about and infer that the similarities were intentional. *Compare* SA 421-585, *with* 808-27. Priolo and Novis ran all three companies. Tr. 531:15-540:6; 846:11-847:13; SA 733; 804. A rational jury could infer that they knew why Ressler used the phrase "entrant directives" and made the disclaimer difficult to read in his work for Sweepstakes Advisory Network, a Priolo and Novis company, and that the same techniques were purposefully used on the prize notices for Winners Circle and Feel Lucky Group. *See* Tr. 775:4-23.

Priolo's concealment of his own involvement and the way his companies responded to accusations of fraud also support the jury's finding of fraudulent intent. *See United States v. Hild*, 147 F.4th 103, 113 (2d Cir. 2025) (evidence of efforts to conceal scheme supported jury's finding of intent to defraud). Priolo did not put his own name or the names of his companies on the prize notices; instead, he sent them out under the names of non-existent three-letter companies with purported signatures from fake executives. Tr. 230:2-8; 502:14-503:9; *see Denkberg*, 139 F.4th at 156 (use of fictitious names and business on prize notices supported finding of fraudulent intent). The jury could reasonably infer that he used different three-letter companies and different post office boxes so that recipients would not realize that multiple notices were coming from the same person. In addition, Priolo and Johnson responded to complaints from a consumer protection agency and states' attorneys general under a false name. Finally, a

jury could infer intent to defraud from the fact that Priolo picked up the mail, which "every day" included returned mail with notes on the outside of envelopes that said things like "this is a scam," "this is fraud," and "liar," Tr. 624:4-14; 631:9-632:20, but the scheme continued. *Denkberg*, 139 F.4th at 156 (continuing the scheme after receiving complaints supported finding fraudulent intent).

In response to this evidence, Priolo principally contends that the disclaimer on the back of the prize notices made "clear what was being offered." Br. at 35. That argument falls flat. The disclaimers on the notices themselves, as well as Ressler's testimony regarding the disclaimers that he designed for Priolo's previous company, Sweepstakes Advisory Network, showed that the disclaimers on the Winners Circle and Feel Lucky Group mailings were designed to be difficult to read. SA 422; Tr. Tr. 765:17; 769:5-6; SA 808-827. This feature was successful, and often victims did not read the disclaimer. Tr: 203:12-204:5; 319:10-13; 322:4-9; 743 SA 404:13-16. In combination with the other characteristics of the prize notices, "using confusing language to obscure disclaimers" supports the jury's verdict that Priolo acted with fraudulent intent. *Denkberg*, 139 F.4th at 156; *see also Weaver*, 860 at 95-96 (disclaimers in a contract did not render other oral misrepresentations immaterial or negate fraud defendant's criminal responsibility).

Priolo's remaining points fare no better. There was extensive evidence beyond the language in the prize notices that showed his intent to defraud, Br. at 35, discussed

above.[7] The evidence did not show that Priolo responded to "any customer complaints with a full refund," Br. at 36, it showed that he provided refunds only when explicitly requested and only for the specific amount requested (not the full amount the victim paid Priolo's companies). Tr. 631:9-634:21; 655:5-657:17. Moreover, in response to complaints that the scheme was a fraud or a scam, Priolo instructed Johnson to send "rules letters," not refunds. Tr. 622:18-24, 636:9-19. As the district court noted, the jury could reasonably conclude that the refund policy was not carried out in good faith and was intended to prevent people from escalating their complaints. SA 21. Finally, Priolo highlights evidence of one instance in which he did make an edit that PacNet requested, Br. at 36, but he refuses to address the evidence of the edits requested by PacNet's risk department that he chose to ignore. Tr. 828:17-829:17; SA 770.

In this case, the government presented evidence that Priolo was running a purported business that (1) obscured what it actually provided customers through elaborate and misleading prize notices; (2) never provided Priolo's name or that of his companies, but instead sent prize notices purportedly from three-letter companies that

[7] To the extent that Priolo invites this Court to draw inferences from his actions that are contrary to the jury's verdict—for example that his use of post office boxes and "doing business as" names (the three letter acronyms) "can and should be, attributed simply to how Priolo wished to conduct his business," Br. at 35, or that he Priolo only received complaints from states' attorneys general and was not subject to temporary restraining orders, and so had no intent to defraud, Br. at 36—this Court should decline to do so. *United States v. Bonventre*, 646 F. App'x 73, 84 (2d Cir. 2016) (To the extent the defendant "invites this court to re-weigh evidence, draw inferences in his favor, or re-assess credibility," the jury's verdict "precludes such undertakings.").

did not exist and contained "signatures" from fictitious individuals; and (3) frequently received complaints, including from states' attorneys general, but did not change its practices in response to the complaints and instead responded with letters from a fictitious customer service representative. A rational jury could, and did, conclude based on this evidence that Priolo *intended* for the recipients of the prize notices to be misled in precisely the way that many of them *were* misled and thus that Priolo acted with the requisite intent to defraud.

**2. Materiality**

A statement or omission is material if the misinformation would "naturally tend to lead or is capable of leading a reasonable person to change his conduct." *Weaver*, 860 F.3d 90 at 94 (quoting *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc)). In other words, if the misinformation "would affect a reasonable person's evaluation of a proposal" or "has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaker to which it was addressed" it is material. *Id.* (citing *United States v. Corsey*, 723 F.3d 366, 373 (2d Cir. 2013)). This Court has repeatedly noted that the questions of materiality and fraudulent intent are closely related. *See Denkberg*, 139 F.4th at 159; *Weave*r, 860 F.3d at 95. As with intent to defraud, material misrepresentations have been identified where there is a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits . . . ." *Denkberg*, 139 F.4th at 159. The government "need not prove that the victims of the fraud were *actually* injured, but only that defendants *contemplated* some

actual harm or injury to their victims." *Weaver*, 860 F.3d at 95 (citation omitted) (emphasis original).

At trial, the jury saw considerable evidence that Priolo made material misrepresentations to his victims. The prize notices contained language that appeared to indicate that the victim had been individually selected to win a significant sum of money, and that included language such as "notice[s] of cash funds held in trust," "cash & prize advisement[s]," "corporate legal notification[s]" and that "checks [were] scheduled for release." *See*, *e.g.*, SA 421, 437, and 750. As the testimony of victims and their family members at trial showed, the victims paid Priolo because the prize notifications led them to believe they won a cash prize. They did not intend to purchase a booklet of publicly available sweepstakes rules. In addition, Priolo targeted those who fell for the scheme once with additional "back-end" mailings. Tr. 459:4-21; 460:6-12. That demonstrated a deliberate effort to "address" additional misinformation to "decisionmakers," here, victims who had already paid once, that Priolo knew were more likely to be influenced by the prize notices. *Weaver*, 860 F.3d at 94.

Priolo argues that the misinformation on the prize notices was not material, but was simply "creative language," and that the mailers "conveyed an offer" to purchase a sweepstakes booklet that, in essence, a reasonable recipient would have understood. Br. at 32-33. In so doing, Priolo impliedly invokes the ordinary prudence standard. The "ordinary prudence standard" is a tool "the jury may utilize to gauge the defendant's intent," for example "if the defendant asserts that he was merely joking, that the

statements were mere puffery, or that the statements were merely sharp business dealing, evidence that the statements would have deceived a person of ordinary prudence and comprehension is evidence that defendant actually intended to deceive." *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (citing *United States v. Coffman*, 94 F.3d 330, 333-34 (7th Cir. 1996)). But "[t]he 'role of the ordinary prudence and comprehension standard [in the materiality element] is to assure that the defendant's conduct was calculated to deceive, not to take advantage of the stupid or careless.'" *Weaver*, 860 at 95 (quoting *Thomas*, 377 F.3d at 243). Thus, the standard "is not a shield which a defendant may use to avoid conviction for a deliberately fraudulent scheme." *Id.* This Court accordingly has rejected "the notion that 'the legality of a defendant's conduct would depend on his fortuitous choice of a gullible victim.'" *Thomas*, 377 F.3d at 243 (quoting *United States v. Benson*, 548 F.2d 42, 46 (2d Cir. 1977)). It should do the same here.

Priolo argues that his mailings did not target individuals of a "certain age, cognitive capacity, or economic background." Br. at 33. As explained above, it is legally irrelevant whether Priolo targeted a certain population who might be gullible or careless, so long as his actions were *calculated* to deceive. *Weaver*, 860 at 95. But even if that was required, Priolo's practice of sending additional prize notices to those who sent money in response to his first blanketed mailing (which was sent to tens of thousands of people) shows purposeful targeting of individuals who were more likely to be duped by the scheme. Tr. 459:4-21; 460:6-12.

In any event, there was ample evidence to support the jury's conclusion that Priolo's prize notices were not merely filled with "creative language," but were calculated to deceive. A rational jury could look at the prize notices in evidence and conclude that they conveyed material misrepresentations that the recipients were the winners of cash prizes that they could obtain by paying a fee. SA 421-585. The jury could likewise conclude that the disclaimer on the back was intentionally confusing and difficult to read; that the language and seals decorating the prize notice were intended to give it an aura of authority and authenticity; and that the lack of an email, phone number, website, or any other contact information for a recipient to ask questions, aside from the pre-addressed envelope for the fee, was the result of an intentional effort to influence recipients to respond with money rather than seek to verify the prize being offered. PacNet's risk department found the prize notices misleading, as did Cathy Johnson. Tr. 531:2-13; SA 770. A rational jury could conclude, like Johnson did, that it was "pretty apparent" that the "mailings were misleading," and "that was the point of the business." Tr. 531:2-13; 685:2-16.

Because there was sufficient evidence at trial for a rational jury to find that Priolo acted with fraudulent intent and made material misrepresentations, this Court should affirm the district court's ruling denying Priolo's Rule 29 motion.

## II. The District Court Did Not Abuse Its Discretion In Its Evidentiary Rulings

Priolo next challenges several evidentiary rulings. Because the district court did not abuse its discretion in its rulings and the limited testimony by Johnson concerning

her proffer agreement did not affect Priolo's substantial rights, this Court should affirm the district court's judgment.

### A. Standard Of Review

This Court reviews a district court's evidentiary rulings for abuse of discretion. *United States v. Rowland*, 826 F.3d 100, 114 (2d Cir. 2016). "A district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence or rendered a decision that cannot be located within the range of permissible decisions." *Id.* (citation omitted). This Court will reverse "only if an error affects a 'substantial right,' but if, upon review of the entire record, this Court "is sure that the evidentiary error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." *Id.* (citations omitted).

This Court gives "great deference to a district court in ruling as to the relevancy and unfair prejudice of proffered evidence, mindful that it sees the witnesses, the parties, the jurors, the attorneys, and thus is in a superior position to evaluate the likely impact of the evidence." *DiMassa*, 117 F.4th at 487. When reviewing a district court's Rule 403 determination, this Court will "maximize the evidence's probative value and minimize its prejudicial effect." *Id.* Even when an evidentiary ruling is "manifestly erroneous," this court "will affirm if the error was harmless." *Id.*

### B. The District Court Did Not Abuse Its Discretion In Permitting Thomas Ressler's Testimony

Priolo first argues that the district court erred in admitting Ressler's testimony. It did not. Ressler's testimony was properly admitted as direct evidence to provide background for the charged scheme, and, alternatively, was admissible under Rule 404(b).

#### 1. Background

In advance of trial, the government moved for a ruling that evidence of Priolo's involvement in sweepstakes-related mail fraud in the late 1990s and early 2000s was admissible as direct evidence to explain the background of the scheme described in the indictment, Priolo's knowledge of the scheme, and his fraudulent intent in mailing prize notices. App. 61. Alternatively, the government sought to admit this evidence pursuant to Rule 404(b) as evidence to establish Priolo's knowledge of the scheme, its methodologies and his intent to defraud. App. 65-67.

The district court ruled that evidence of Priolo's involvement in the earlier, uncharged scheme was admissible as "direct evidence of the charged conspiracy and, in the alternative, as proof of Priolo's knowledge and intent to defraud under Rule 404(b)." App. 117, 148-55. The district court further determined that the evidence was admissible under Rule 403. *Id.*[8]

[8] The district court excluded evidence of Jeffrey Novis's prior mail fraud conviction under Rule 403 because its probative value was substantially outweighed by "the risk of unfair prejudice to Priolo, confusing the issues, and misleading the jury." App. 118.

At trial, testimony and documents established that Priolo and Novis were both associated with companies called Justin Grant and the Sweepstakes Advisory Network around the year 2000. *See* Tr. 531:15-540:6; 846:11-847:13; SA 733 (Letter from S. Novis listing Priolo as an employee of Justin Grant); SA 804 (certificate of dissolution for Sweepstakes Advisory Network, Inc. listing Priolo as Director and Novis as Officer). Johnson testified that when she started working for Novis in 2000, Priolo was his partner and Novis's direct mail companies were Justin Grant and Sweepstakes Advisory Network. Tr. 531:15-23, 538:18-21. Johnson specifically identified Priolo as being associated with Sweepstakes Advisory Network, which did sweeps reports. Tr. 540:4-6. During Johnson's testimony, the district court instructed the jury:

> You have heard testimony and may see evidence about alleged conduct that occurred in the early 2000s. This evidence is being introduced as background information about the nature of the scheme alleged in the indictment, its structure, and the development of the relationships between Mr. Priolo and the persons discussed during witness testimony, and in the evidence.
>
> You are not to consider this evidence for any other purpose. I want to remind you that the charged conspiracy in this case is from approximately March 2015 to December 2016. It is up to you to evaluate this evidence and testimony and decide how much weight to give it, if any.

Tr. 546:5-17.

In connection with this testimony and evidence, the government also offered testimony from Thomas Ressler, a writer and an artist who designed direct mail pieces for approximately 40 years, including for companies associated with Priolo and Novis,

and who had previously pleaded guilty to mail fraud in an unrelated case. Tr. 751:17-18; 753:13-756:22; 758:11-21.

Ressler began working for Novis in the late 1990s, after Jeffrey Novis called Ressler and explained that his son wanted to talk to Ressler about sweeps report work. Tr. 759:2-23. Ressler explained that a sweeps report piece is an offer that "tells [the recipient] that they've won money, and therefore, they're sending in—they're filling out the order form to get the money." Tr. 756:17-19. Ressler created sweeps report offers for Sweepstakes Advisory Network, using certain artistic techniques so that recipients would "feel it was real" and "believe that they had won the money that was showing on the face of the document." Tr. 764:1-766:1; SA 808-27. For the disclaimer on the back of the sweeps report offers, Ressler used "a type font or fonts that would be squeezed and thinned down," with the spaces between words and sentences tightened "to make it difficult to read and boring to read and too much to read." Tr. 768:13-769:6. Ressler also started using the phrase "entrant directives," at some point between 1998 and 2000, to obscure the fact that the only thing Sweepstakes Advisory Network was offering was sweepstakes rules. Tr. 775:4-23. Ressler worked for Novis through approximately 2008. Tr. 759:24-760:2.

Ressler did not testify as to whether he had ever met Priolo; he testified that he worked for Novis, and designed prize notices for Justin Grant and Sweepstakes

Advisory Network. Tr. 751-791.[9] The government argued in closing that "Tom Ressler did not design" the prize notifications in this case, but "he told you how the pieces he did design for Mr. Priolo a long time ago work" and argued that the prize notifications from Winners Circle and Feel Lucky Group work "the same way." Tr. 975:7-11. Defense counsel argued that Ressler had "never, ever met my client. Ressler has never, ever spoken to my client, and Ressler has never, ever done any work for my client. Because, if he had, you certainly would have heard about it on the witness stand." Tr. 1024:11-14.

### 2. The District Court Did Not Abuse Its Discretion In Admitting Ressler's Testimony

On appeal, Priolo does not broadly challenge the district court's admission of evidence concerning his prior uncharged conduct. Instead, he focuses solely on the admission of Ressler's testimony. That challenge fails.

Direct evidence of the charged conduct is not subject to Rule 404(b)'s limitations. "[E]vidence of uncharged criminal activity is not considered 'other crimes' evidence" and thus not subject to Federal Rule of Evidence 404(b) "'if it arose out of the same

[9] The parties had anticipated that Ressler would testify that Priolo attended a meeting at Ressler's residence at some point in the late 1990s or early 2000s, and the government advised that it would need to lead the witness during this portion of the testimony to avoid any reference to the attorney who also attended that meeting with Novis and Priolo. Tr. 715:2-17; App. 206-207. Priolo had argued that the testimony should be excluded because at Novis's and Denkberg's trial Ressler did not recall the identity of the fourth individual at the meeting with Ressler, Novis, and Novis's attorney, which the district court ruled went to Ressler's credibility but not the admissibility of his testimony. App. 207-08. Ultimately, Ressler was not asked if he had ever met Priolo.

transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'" *United States v. Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010) (quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)). A "trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment," and background evidence may be admitted to "furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) (quoting *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991)).

If evidence is not direct evidence of the charged conduct, Federal Rule of Evidence 404(b) prohibits evidence of a defendant's other acts for the purpose of proving "a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). This Court "follows the 'inclusionary' approach, which admits all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Graham*, 51 F.4th 67, 81-82 (2d Cir. 2022).

Under Rule 404(b)(2), evidence of other acts is permissible if offered to prove intent or knowledge. Fed. R. Evid. 404(b)(2). "Relevance toward a permissible purpose often turns on the similarity between the prior act and the charged offense." *Graham*,

51 F.4th at 82. When "it is apparent that intent will be in dispute," evidence of prior or similar acts may be introduced during the government's case-in-chief, and such evidence may be admissible even when the other acts do not involve "exactly the same co-conspirators, [conduct], or temporal timelines." *Id.* (citations omitted).

The district court properly admitted Ressler's testimony as direct evidence of the charged conduct. Through Johnson's testimony and documentary evidence, the government established that Priolo worked with Novis on a sweeps report scheme run through a company called Sweepstakes Advisory Network in approximately 2000 and 2001. During this time, Ressler created similarly misleading prize notices for Sweepstakes Advisory Network. Tr. 763:11-771:21. Ressler's testimony concerning the prize notices in a nearly identical scheme in which Priolo was involved years before the charged conduct accordingly was admissible as direct evidence of the charged conspiracy, as it showed that the methods used to carry out "the scheme itself" were used by Novis and Priolo prior to 2015, and thus "complete[d] the story of the crime on trial." *See Kaiser*, 609 F.3d at 570-71 (pre-indictment conduct was not "other acts" evidence when "it would have been impossible to intelligently present a case about much of what went on after April of 2000 without starting at the beginning").

In the alternative, as the district court found, Ressler's testimony concerning the uncharged sweepstakes scheme in which Priolo was a partner "is admissible under Rule 404(b)(2) to prove Priolo's knowledge of the mail fraud conspiracy and his intent to defraud, which are distinct from the prohibited purpose of proving propensity." App.

151-52. Specifically, Ressler's testimony regarding the methods that he used to create prize notices for Sweepstakes Advisory Network "when combined with the evidence that Priolo was involved in the uncharged sweepstakes scheme at the time Ressler worked on notices, is probative of Priolo's intent to defraud and knowledge of the conspiracy." App. 152. As the district court correctly noted, Priolo carried out the Sweepstakes Advisory Network scheme with the same co-conspirators and "same hallmarks" as the charged scheme. App. 152 (citing *Graham*, 51 F.4th at 82 (evidence of an uncharged fraud scheme was properly admitted when carried out with the same co-conspirators and same hallmarks)).

In addition, the probative value of the evidence of the earlier uncharged scheme was not substantially outweighed by the danger of *unfair* prejudice. Fed. R. Evid. 403 (emphasis added). All relevant evidence prejudices a defendant to the extent it tends to prove he committed the crime charged. The probative value of evidence of uncharged acts "depends largely on whether there is a close parallel between the crime charged and the acts shown." *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011). Here, the earlier scheme and charged conspiracy were nearly identical, and therefore the earlier conduct was highly probative of Priolo's knowledge and intent—regardless of whether that knowledge and intent is considered background evidence or permissible 404(b) evidence. Evidence is "unduly prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011). In this

case, where the earlier conduct was the same as the charged conduct and not "significantly more sensational and disturbing than the charged crimes," there was no unfair prejudice. *See id.* at 62.

Priolo principally argues that Ressler's testimony was inadmissible because he did not testify that he directly worked with Priolo in the earlier scheme. Br. at 40. But the fact that Johnson and documentary evidence, and not Ressler, identified Priolo as part of the Sweepstakes Advisory Network does not change the above analysis. There is no requirement that all evidence of the uncharged scheme come from the same source. Whether Priolo and Ressler worked together directly or both worked on the same mail fraud scheme through Novis went to the weight, not the admissibility, of Ressler's testimony against Priolo. Priolo could, and did, argue that he had nothing to do with Ressler. Tr. 1024:9-14. But Ressler's testimony, along with Johnson's testimony and the documentary evidence of Priolo's involvement in the earlier mail fraud schemes, was properly admitted.

Nor is Priolo correct that Ressler's lack of involvement in the charged scheme alters the admissibility analysis. Br. at 41. As discussed, *supra* pp. 34-35, Ressler's testimony was admissible either as direct evidence of the charged conspiracy or to prove Priolo's knowledge of the mail fraud conspiracy and his intend to defraud. Ressler's personal participation in the charged scheme was not required for his testimony to be admissible.

Finally, the district court's limiting instructions also undermine Priolo's assertion, Br. at 41, that Ressler's testimony was unduly prejudicial. The court instructed the jury that it could consider the late 1990s and early 2000s conduct as "background information about the nature of the scheme alleged in the indictment, its structure, and the development of the relationships between Mr. Priolo and the persons discussed during witness testimony, and in the evidence" but that it should not consider it for other purposes, and that the charged conduct took place in 2015 and 2016. Tr. 546:5-17. Juries are presumed to understand and follow limiting instructions. *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002).

### C. The District Court Did Not Abuse Its Discretion In Permitting Evidence Concerning Johnson's Immunity

Priolo next argues that the admission of evidence of Johnson's immunity, and, relatedly, the terms of her proffer agreement with the government, impermissibly bolstered her testimony. The district court did not abuse its discretion in permitting the government to question Johnson about her immunity and her understanding of the previous proffer. Johnson's testimony regarding the truth-telling provisions of her proffer agreement should not have been permitted on direct examination, but it did not affect Priolo's substantial rights and thus should not result in reversal of the jury's verdict.

### 1. Background

Cathy Johnson was represented by independent counsel throughout the prosecutions of Sean Novis, Gary Denkberg, Philip Priolo, and their co-conspirators. Tr. 391:18-20. Johnson refused to testify in the 2022 trial against Novis and Denkberg. Tr. 391:19-25. In 2024, Johnson agreed for the first time to an interview with the government under the protection of a proffer letter. Tr. 391:25-392:3. On the advice of her attorney, however, Johnson would not testify at trial without court-ordered immunity. Tr. 283:13-16. Before Priolo's trial, the government moved for an order of immunity for Johnson, which the district court granted. *See* App. 12, ECF Nos. 93 and 101.

Prior to Johnson's testimony, the district court considered whether the jury would be permitted to learn of Johnson's immunity and proffer agreement, and if so, the extent to which the order and agreement could be discussed. The district court determined that Johnson's grant of immunity was "highly probative" of her credibility, regardless of whether her testimony favored the defense or the government. Tr. 386:7-12 (citing *United States v. Dixon,* 511 F. App'x 48, 51 (2d Cir. 2013)). It further found that the risk of unfair prejudice to Priolo was minimized because Johnson had not been convicted of a crime, the government did not intend to introduce the proffer agreement itself, and the government's questioning about Johnson's grant of immunity and proffer sessions would be narrow. Tr. 386:13-387:3. Finally, the district court noted that any

risk of unfair prejudice to Priolo would be mitigated by his opportunity to fully cross-examine Johnson and the court's willingness to give a limiting instruction. Tr. 387:4-7.

When the government called Johnson as a witness on March 13, 2025, before the government began questioning her, the district court instructed the jury:

> You will now hear the testimony of a witness who will testify under a grant of immunity from this Court after invoking her constitutional right against self-incrimination.
>
> What this means is that testimony of the witness may not be used against her in a criminal case except in a prosecution for perjury, making a false statement, obstruction of justice, or otherwise failing to comply with the immunity order.
>
> Under the law, Congress has granted the right to request that a witness be prepared to testify after exercising their right against self-incrimination.
>
> Earlier this year, I issued an order compelling Ms. Johnson to testify and granting her immunity from prosecution at the request of counsel for the Government.
>
> I'm instructing you, as a matter of law, that you may not consider Ms. Johnson's testimony under a grant of immunity against the defendant, Mr. Priolo. This information is provided to you in order to assess her credibility. The fact that Ms. Johnson is testifying under a grant of immunity does not show that she has done anything wrong.

Tr. 519:24-520:20. Following the court's instruction, counsel for Priolo read a stipulation to the jury that the defendant requested, and to which the government agreed:

> The Government and defendant, Philip Priolo, agree and stipulate that Cathy Johnson was never charged with mail fraud, wire fraud or conspiracy to commit mail fraud or wire fraud, and cannot as of the time of her testimony be charged with those same offenses.

Tr. 525:19-24. After the jury instruction and stipulation, the government began its direct examination of Johnson.

Johnson explained that she did caging and customer service work for Novis, Priolo, and others until September 22, 2016, when postal inspectors executed a search warrant at her home. Tr. 556:2-557:10. The prosecutor then established that Johnson did not agree to be interviewed at the time of the search and spoke to the government for the first time in 2024. Tr. 557:17-558:6. The following exchange then took place:

> Q: Was that first interview and subsequent interviews subject to the terms of what's called a proffer letter?
> A: Yes.
> Q: What is your understanding of what a proffer letter is?
> A: That --

Tr. 558:7-12. At that point, the district court called a sidebar and reminded the prosecutor that he could not ask Johnson about the contents of any proffer agreement. Tr. 559:5-6. The prosecutor explained that he expected the witness to answer that the proffer letters meant that "what she said cannot be used against her," and offered to withdraw the question. Tr. 559:10-12. The district court permitted the question, but when Johnson answered she said "[m]y understanding is that anything I said in the proffer sessions wouldn't be used against me, as long as I was being truthful." Tr. 560:7-9. Defense counsel did not object when the witness gave that answer. The prosecutor then confirmed:

> Q: And you're testifying under a grant of immunity here today?
> A: Yes.

> Q: And have you been made any other promises or guarantees by the Government in connection with your testimony?
> A: No.

Tr. 560:10-16. The prosecutor then resumed questioning Johnson regarding her caging business and experience working for Priolo.

After the jury was excused that day, the parties discussed Johnson's testimony regarding the proffer letter. The prosecutor explained that he had "instructed the witness not to reference the truth telling provisions" and apologized as it "was not [his] intention to elicit that response." Tr. 573:6-13. The district court offered to strike the testimony, and defense counsel initially said that he would "make the motion" to strike but then said "I honestly don't think it's a big deal" and changed the topic, objecting to Johnson's testimony that the prize notices were misleading. Tr. 573:14-575:16.

Johnson's testimony continued over the course of two additional trial days.

#### 2. The Jury Instruction And Single Question Regarding Immunity Were Not Error

A prosecutor who uses the fact that a witness invoked her Fifth Amendment privilege against self-incrimination "to discredit that witness or to prejudice the defendant commits trial error." *United States v. Lizza Indus., Inc.*, 775 F.2d 492, 496 (2d Cir. 1985). But where a prosecutor asks "neutral questions so the jury would understand the circumstances under which the witness was testifying" and does "not comment on [the witness's] claim of privilege in its summation," the witness "testifie[s] at length and was subject to full cross-examination by defendants' attorneys," and the court instructs

the jury that the witness's assertion of privilege was not to be considered against the defendants, this Court has held that there is no error. *Id.* at 497. Likewise, this Court has found "no deliberate attempt" to use grants of immunity to infer guilt where a prosecutor's reference to immunity was "to emphasize the reluctance of the witnesses to testify." *United States v. Silverman*, 430 F.2d 106, 124 (2d Cir. 1970). "A grant of immunity, to government witnesses, . . . may be brought out on direct examination, provided the jury is cautioned that the testimony is not evidence of the defendant's guilt." *Id.* at 124-25.

Here, the district court determined, consistent with this Court's decisions in *Lizza Industries* and *Silverman*, that the jury should be permitted to consider Johnson's grant of immunity in assessing her credibility. It gave an instruction explaining its immunity order, instructing the jury that Johnson's immunity could not be considered against Priolo, and explicitly stating that Johnson's immunity "does not show that she has done anything wrong." Tr. 520:14-20. The district court's instruction in this case was similar to the instruction this Court considered in holding that the defendants in *Lizza Industries* were not prejudiced by questions regarding a witness's immunity. 775 F.2d at 479 n.2.

The district court's instruction was followed by a stipulation read to the jury that Johnson had not been, and could not be, charged with fraud. Tr. 525:16-24. Far from casting Johnson "in a guilty light," the stipulation dispelled any suggestion that she had been or could be charged with a crime. *See Lizza Indus.*, 775 F.2d at 496. The immunity

order and stipulation also informed the jury that Johnson was so reluctant to testify that an order of immunity had been required. That was true even though Johnson could not be charged with the crimes of which Priolo was accused.[10]

Priolo argues that the district court should not have admitted Johnson's immunity because he would not have challenged her credibility. Br. at 45. But the jury must evaluate the credibility of all witnesses, regardless of whether a defendant explicitly challenges the witness's credibility. Accordingly, admitting testimony concerning Johnson's immunity was "relevant to the jury's evaluation" because it "emphasize[d] the reluctance of the witness to testify." *Silverman*, 430 F.3d at 124. In addition, after the fact of Johnson's immunity and her statement about her understanding of the proffer were before the jury, Priolo vigorously contested Johnson's credibility and impeached her on a number of topics. *See*, *e.g.*, Tr. 687:2-690:5 (impeaching Johnson regarding prior statements about Sweepstakes Advisory Network); Tr. 730:15-731:11 (impeaching Johnson regarding prior statements about customer service letters); Tr. 733:17-735:4 (impeaching Johnson regarding her testimony related to refunds). Perhaps most significantly, Priolo questioned Johnson on being paid "under the table" when she worked for Novis and Denkberg, casting her as someone who would cheat the system aside from the fraud scheme at the center of the trial. Tr. 736:11-23. In fact, virtually

[10] Johnson's reluctance to testify was reinforced when the jury learned that she stopped doing caging work after the search of her residence in 2016, but only agreed to speak with the government under the protection of a proffer letter for the first time eight years later, in 2024. Tr. 557:9-558:9.

the entirety of Priolo's cross-examination of Johnson focused on her credibility, which further undermines his argument that he was prejudiced by the testimony concerning her immunity in light of her overall testimony.

Priolo likewise is incorrect that testimony concerning Johnson's immunity was a conscious and flagrant attempt by the government to bolster its case. Br. at 44. The government only asked Johnson one question after confirming that she was testifying under an order of immunity before switching topics, and that there were no other promises from or agreements with the government. That is far from the "'conscious and flagrant attempt' to bolster the case through use of inferences arising from the witness's claim of the testimonial privilege" that this Court's precedent forbids. *Lizza Indus.*, 775 F.2d at 496-97 (citing *Namet v. United States*, 373 U.S. 179, 186 (1963)). In confirming that Johnson was testifying under a grant of immunity, the prosecutor did not even reference Johnson's invocation of the privilege that resulted in the immunity order. Similarly, Priolo's attempt to characterize Johnson's testimony that the mailings were misleading as government bolstering is unpersuasive. Br. at 46. Johnson's testimony that the work she liked doing the least for Novis and his partners was customer service because it forced her to confront how misleading the mailings were neither impermissibly corroborated her other testimony nor attempted to assure the jury it was truthful. It was simply testimony that, while undoubtedly damaging to Priolo, was subject to cross-examination and put before the jury to be judged with the rest of Johnson's testimony.

Nor did, as Priolo suggests, the government seek to "create an 'atmosphere of guilt'" with the introduction of Johnson's grant of immunity. Br. at 44 (quoting *Lizza Indus.*, 775 F.2d at 496). Indeed, as in *Lizza Industries*, the prosecutor only briefly and neutrally questioned Johnson so that the jury would understand the circumstances of her testimony, the government did not comment on Johnson's claim of privilege in its closing, Johnson was subject to extensive cross-examination by Priolo's counsel, and the district court instructed the jury not to consider Johnson's assertion of privilege against Priolo. *See Lizza Indus.*, 775 F.2d at 497.[11] "There is, therefore, no fear that inferences from [her] claim of the privilege added critical weight to the prosecution's case in a manner not subject to cross examination." *Lizza Indus.*, at 497 (citing *Namet*, 373 U.S. at 187). The district court's ruling that the jury could learn of Johnson's immunity, accompanied by an appropriate limiting instruction and circumscribed questioning by the government, should be affirmed.

### 3. Johnson's Statement Regarding Her Proffer Letter Did Not Affect Priolo's Substantial Rights

Priolo also argues that Johnson's testimony concerning the proffer agreement separately warrants reversal. Br. at 46-47. Again, Priolo is mistaken.

---

[11] Priolo points to this Court's statement that "it is best, whenever possible, to avoid mention" of a witness's invocation of his privilege against self-incrimination. Br. at 43-44; *Lizza Indus.*, 775 F.2d at 497. Even if this Court might have handled Johnson's immunity differently in the first instance, however, in light of *Lizza Industries* and *Silverman*, the district court's decision was "located within the range of permissible decisions" and should be upheld. *Rowland*, 826 F.3d at 114.

This Court permits the government to elicit "the fact of the agreement and the witness's understanding of it," but forbids the government from bolstering a witness's credibility by introducing the "truth-telling" provisions of a cooperation agreement or the agreement itself "unless and until" the witness's credibility has been questioned. *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 85-86 (2d Cir. 2014) (citations omitted).

Prior to Johnson's testimony the district court had ruled that the government could elicit the existence of the proffer letter from Johnson during her direct examination but could not question her about its truth-telling provisions. Tr. 383:18-387:19; Tr. 559:3-560:4. Consistent with that ruling, the government asked Johnson about her understanding of her proffer letter expecting her to respond that it meant her statements could not be used against her. The prosecutor had instructed Johnson not to mention the truth-telling provision of the agreement. Tr. 573:6-13. This question was not improper bolstering, as it was consistent with this Court's rulings allowing questions on direct regarding the agreement and "the witness's understanding of it," provided the government does not introduce the entire cooperation agreement. *See United States v. Edwards*, 631 F.2d 1049, 1052 (2d Cir. 1980). But when asked, Johnson responded "[m]y understanding is that anything I said in the proffer sessions wouldn't be used against me, as long as I was being truthful." Tr. 560:7-9.

Priolo now challenges this testimony as improper, arguing that Johnson's extra phrase, "as long as [she] was being truthful," affected Priolo's substantial rights. Tr.

560:8-9. It did not. "An evidentiary error affects substantial rights if it had a 'substantial and injurious effect or influence' on the jury's verdict." *United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005). Errors in eliciting the truth-telling provisions of a witness's agreement with the government do not automatically require reversal; they are subject to harmless error analysis. *United States v. Musacchia*, 900 F.2d 493, 498 (2d Cir. 1990), *vacated on other grounds*, 955 F.2d 3 (2d Cir. 1991) (holding that the elicitation of truth-telling provisions on direct was harmless where government did not intentionally violate the rule against bolstering on direct examination and there was no significant chance that the outcome of the trial was affected by the error).

In this case, the jury was already aware that Johnson was testifying pursuant to an order of immunity, under which she could not be prosecuted for crimes aside from perjury. The fact that Johnson understood that a similar arrangement to the one governing her testimony at trial—her statements could not be used against her so long as she told the truth—applied to her previous interviews with the government is unlikely to have altered the jury's overall assessment of her testimony. Moreover, as discussed, the jury had an extended opportunity to observe Johnson and judge her credibility as she testified over three trial days and was vigorously cross-examined. The mention of her proffer sessions came on the first day of her testimony and would not have had a "substantial and injurious" effect on the jury's impression of Johnson, much less of the entire corpus of evidence presented over the course of the trial. In this context, Johnon's brief statement regarding her proffer letter was of the kind that "did

not influence the jury, or had but very slight effect" so "the verdict and the judgment should stand." *Rowland*, 826 F.3d at 114.

### D. Priolo Was Not Deprived Of A Fair Trial

Priolo suggests in passing that the cumulative errors he purports to identify may collectively require a new trial. Br. 37-38. As discussed above, admitting Ressler's testimony and allowing the jury to learn of Johnson's immunity were not errors. And Johnson's statement on direct examination regarding the truth-telling requirements of her proffer agreement did not affect Priolo's substantial rights. Even assuming Priolo were correct that these were all errors, they do not "call into serious doubt whether [Priolo] received the due process guarantee of fundamental fairness." *United States v. Haynes*, 729 F.3d 178, 197 (2d Cir. 2013). Priolo identifies three purported evidentiary errors over the course of five days of evidence, two of which occurred at the beginning of Johnson's three days of testimony, which included thorough cross-examination. Setting aside Ressler's and Johnson's testimony, however, the government introduced multiple fraudulent prize notices, victim testimony, and documentary evidence showing that additional victims were deceived, that Priolo disregarded suggested revisions to make the prize notices less misleading, and that Priolo was well aware of complaints that his businesses were fraudulent from victims, a consumer protection agency, and multiple states' attorneys general. Accordingly, these three evidentiary rulings, to the extent they were an abuse of the district court's discretion, did not affect Priolo's substantial rights and do not warrant a reversal of the jury's verdict.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the district court.

Respectfully submitted,

A. TYSEN DUVA
Assistant Attorney General

s/ Sarah E. Edwards
SARAH E. EDWARDS
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20530
202.913.4782
sarah.edwards@usdoj.gov
August 14, 2026

ANN F. ENTWISTLE
CHARLES B. DUNN
JASON FELDMAN
Trial Attorneys
Criminal Division, Fraud Section

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because this brief contains 12,087 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Garamond 14-point type.

s/ Sarah E. Edwards
SARAH E. EDWARDS

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the Second Circuit using the ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

s/ Sarah E. Edwards
SARAH E. EDWARDS