# 25-3078

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,
*Appellee*,

v.

SHAWN PHILLIPS, JEFFREY NOVIS,
*Defendants*,

PHILIP PRIOLO,
*Defendant-Appellant.*

On Appeal from the United States District Court for the Eastern District of New York, No. 2:21-cr-00566
(Hon. Nusrat J. Choudhury)

## SUPPLEMENTAL APPENDIX VOLUME I FOR THE UNITED STATES

A. TYSEN DUVA
Assistant Attorney General

ANN F. ENTWISTLE
CHARLES B. DUNN
JASON FELDMAN
Trial Attorneys
Criminal Division, Fraud Section

SARAH E. EDWARDS
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Ave. NW
Washington, DC 20530
202.913.4782
sarah.edwards@usdoj.gov

# TABLE OF CONTENTS


TABLE OF CONTENTS .......... i

District Court's Opinion Denying Defendant's Rule 29 Motion .......... 1

U.S. v PRIOLO TRIAL TRANSCRIPTS .......... 28

I. March 11, 2025 Transcript .......... 28

A. Opening Statements (Tr. 16) .......... 31

B. Sharon Soltis (Tr. 46) .......... 39

1. Direct .......... 39

2. Cross .......... 45

C. Cheryl Jacquard (Tr. 74) .......... 46

1. Direct .......... 46

II. March 12, 2025 Transcript .......... 88

A. Pamela Kay Pence (Tr. 182) .......... 94

1. Direct .......... 94

2. Cross .......... 96

B. Cheryl Jacquard continued (Tr. 207) .......... 100

1. Direct .......... 100

2. Cross .......... 112

C. Ashley Seip (Tr. 289) .......... 121

1. Direct .......... 121

2. Cross .......... 125

D. Marilyn Burks (Tr. 311) .......... 126

1. Direct ... 126

2. Cross ... 128

3. Redirect ... 129

E. Joseph Bizzarro (Tr. 324) ... 129

1. Direct ... 129

III. March 13, 2025 Transcript ... 167

A. Marlene Montilla (Tr. 419) ... 180

1. Direct ... 180

2. Cross ... 183

3. Redirect ... 186

B. Mary Lilienkamp (Tr. 450) ... 188

1. Direct ... 188

2. Cross ... 203

C. Cathy Johnson (Tr. 526) ... 207

1. Direct ... 207


***VOLUME II***


IV. March 14, 2025 Transcript ... 251

A. Cathy Johnson continued (Tr. 590) ... 253

1. Direct ... 253

2. Cross ... 277

V. March 17, 2025 Transcript ... 299

A. Cathy Johnson continued (Tr. 722) ... 304

1. Cross ........ 304
B. Deposition of Alemitu Teshale Shown (Tr. 743) ........ 309
C. Thomas Ressler (Tr. 751) ........ 311
1. Direct ........ 311
2. Cross ........ 318
D. Christine Reins-Jarin (Tr. 798) ........ 323
1. Direct ........ 323
2. Cross ........ 341
3. Redirect ........ 343
VI. Deposition of Alemitu Teshale Transcript ........ 378
GX 1 – Winners Circle NPF Notice ........ 421
GX 2 – Winners Circle NRS Notice ........ 429
GX 3 – Winners Circle CBS Notice ........ 437
GX 4 – Winners Circle CPR Notice ........ 445
GX 5 – Winners Circle GDM Notice ........ 453
GX 6 – Winners Circle MMP Notice ........ 461
GX 7 – Winners Circle PES Notice ........ 469
GX 8 – Winners Circle CPC Notice ........ 475
GX 9 – Winners Circle BNO Notice ........ 479
GX 10 – Winners Circle PVS Notice ........ 487
GX 11 – Winners Circle PAB Notice ........ 492
GX 12 – Winners Circle PPR Notice ........ 497

GX 13 – Winners Circle PPF Notice .......... 502

GX 14 – Winners Circle AAA Notice .......... 508

GX 15 – Winners Circle CPM Notice .......... 513

GX 21 – Feel Lucky Group CBA Notice .......... 521

GX 22 – Feel Lucky Group MDPE Notice .......... 529

GX 23 – Feel Lucky Group DON Notice .......... 537

***VOLUME III***

GX 24 – Feel Lucky Group MMS Notice .......... 545

GX 25 – Feel Lucky Group FDS Notice .......... 553

GX 26 – Feel Lucky Group RCD Notice .......... 559

GX 27 – Feel Lucky Group WCD Notice .......... 567

GX 28 – Feel Lucky Group CPA Notice .......... 575

GX 29 – Feel Lucky Group GPL Notice .......... 578

GX 30 – Feel Lucky Group MPG Notice – Email proof .......... 581

GX 122 – 4/1/15 Email Attaching Winners Circle April 2015 Backend Schedule .. 586

GX 158 – 9/1/16 Email Attaching Winners Circle and Feel Lucky Spreadsheets ... 589

GX 160 – Return to Sender Mailings from Owen St. Search .......... 620

GX 162 – Complaints and Responses from Owen St. Search .......... 653

GX 173 – Complaints and Refunds from Owen St. Search .......... 684

GX 188 – 2/28/00 Justin Grant, Ltd. Letter .......... 733

GX 362 – Mailings to Priolo and 3/2/15 Email re: CBS - amendments .......... 734

GX 374 – 2/24/16 Email re: new company Lucky Group .......... 796

GX 383 – Sweepstakes Advisory Network Corporate Records .................................. 797

GX 393 – Rule 1006 Summary of Transaction and Payment Records ....................... 807

GX 401 – Sweepstakes Reporting Network Mailing with Notes ................................ 808

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| United States of America,<br><br>-v-<br><br>Philip Priolo.<br><br>Defendant. | 2:21-cr-566 (NJC) |

**OPINION AND ORDER**

On November 9, 2021, Defendant Philip Priolo was indicted on charges of conspiracy to commit mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1349, and four counts of mail fraud in violation of 18 U.S.C. §§ 2, 1341 arising out of his alleged involvement in a fraudulent sweepstakes mailing scheme. (Indictment, ECF No. 1.) During a jury trial in March 2025, at the close of evidence from both sides and before the case was submitted to the jury, Priolo's counsel made an oral motion for judgment of acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."), which the government opposed. The Court reserved judgment on the motion pursuant to Rule 29(b). On March 19, 2025, the jury found Priolo guilty of all five counts. The Court permitted Priolo to brief the Rule 29(a) motion, which he declined to do. Instead, Priolo made a brief oral motion and the government opposed orally as well.

For the reasons explained below, Priolo's Rule 29 motion is denied. The record contains sufficient evidence for a rational jury to find that the government has proven beyond a reasonable doubt all of the elements of conspiracy to commit mail and wire fraud and the four substantive mail fraud counts against Priolo.

**PROCEDURAL HISTORY**

The charges against Priolo were tried before a jury over the course of a six-day jury trial, which began with jury selection on March 11, 2025. (Min. Entry, Mar. 11, 2025.) On March 17, 2025, following the close of evidence, Priolo made an oral motion for a judgment of acquittal under Rule 29(a). (Min. Entry, Mar. 17, 2025; Trial Tr. 884:10–885:19.) I reserved ruling on the motion in order to permit the parties to brief it. (Trial Tr. 884:12–15.) Priolo's counsel then had the following colloquy with the Court:

> Priolo's counsel: Do we have to do a briefing if I ask Your Honor is it required, because I just make my motion orally. That's what I normally do. If Your Honor requires it, of course, we'll comply.
>
> The Court: Well, you have to state the grounds for the motion.
>
> Priolo's counsel: I don't think they made a *prima facie* case out, Judge. No way. They've called witnesses, first of all, who have never reviewed the documents. Every victim witness they called, not one of them had reviewed the documents. Every one during cross-examination admitted that they hadn't reviewed the documents. Nobody even bothered to show them to them in the case. They haven't had one witness who could stand up and give actually even an articulable reason why they were defrauded.
>
> Again, none of them saw the consumer information. None of them saw anything. I was actually shocked at the witnesses that came in on the stand.
>
> That's it. So, I don't know how they make out a *prima facie* case that way, Judge.
>
> The Court: Anything further you would like to say?
>
> Priolo's counsel: No, because nobody else had personal knowledge, so there really is nothing else I would like to say. That's their witnesses.

(Trial Tr. 884:19–885:19.)

In response, the government made the following oral opposition:

> Government: As you know, on a motion under Rule 29, when reviewing the sufficiency of the evidence, the Court must view the evidence in the light most favorable to the Government drawing all inferences in the Government's favor and, of course, the jury will make any rulings on witness credibility.

> In this case, the text of the mailings themselves we submit, Your Honor, presents *prima facie* evidence for which the jury could compare the statements on the front of those mailings with the statements [defense counsel] has highlighted on the back of those mailings, and a reasonable trier of fact could determine that they were deceptive and he had the intent to defraud.
>
> In addition to that evidence, we have, of course, presented the evidence of two witnesses who, themselves, testified they were deceived by the mailings -- Ms. Pamela Pence and Ms. Marilyn Burks -- who, themselves, testified that they were deceived by the mailings.
>
> In addition, as Your Honor heard, we had testimony from multiple victim family members regarding similar types of mailings that their family members received and the stated beliefs of their family members regarding what those mailings communicated.
>
> In addition to that, we have put in numerous complaint letters received by Mr. Priolo from state attorneys general as well as other complaints evincing that the recipients of Mr. Priolo's mailings believed they had won money. That information is in evidence.
>
> There is the testimony of Ms. Johnson who worked caging for Mr. Priolo that, on their face, the mailings were deceptive and that non-buyers frequently sent in $20 payment -- or sent in -- I'm sorry, payment coupons with no money and we have seen multiple examples of recipients of those mailings asking that those payments be taken out of their winnings.
>
> So on the question of whether there was intent to defraud, the Government has submitted substantial evidence by which a rational jury could find the defendant guilty.

(*Id*. 885:23–887:12.) After hearing from both parties, I reserved ruling on the Rule 29(a) motion. (*Id.* 887:13–18.)

On March 19, 2025, the final day of trial, after the parties presented their summations and the jury was charged, the jury returned a verdict of guilty on all counts. (Min. Entry, Mar. 19, 2025; ECF No. 156.) After dismissing the jury, I provided the parties an opportunity to propose a post-trial briefing schedule. Priolo's counsel responded: "Judge, I have no plans on making a post-trial motion. We can just go to right to the Circuit, I think [that] makes the most sense." (Trial Tr. 1126:8–15.)

Priolo has not provided any additional briefing or argument in support of the Rule 29(a) motion made orally at the close of evidence. Nor did he pursue a Rule 29(c) motion for judgment of acquittal following discharge of the jury. Accordingly, I scheduled sentencing, which was initially to take place on September 17, 2025 and was subsequently moved to November 18, 2025.[1]

After trial, on April 7, 2025, attorneys Arthur Aidala and Michael Jaccarino filed notices of appearance on behalf of Priolo. (ECF Nos. 163–64.) On June 27, 2025, the government filed a letter with the court providing "additional authority in opposition to . . . Priolo's oral motion for judgment of acquittal," citing the Second Circuit's decision in *United States v. Denkberg*, 139 F.4th 147 (2d Cir. 2025), which affirmed the conviction of two of Priolo's co-conspirators, Sean Novis and Gary Denkberg. (ECF No. 173.) I ordered Priolo to file a response, if any, to the government's June 27, 2025 letter by July 7, 2025. (Elec. Order, June 30, 2025.) Priolo did not file a response.

On September 17, 2025, I held a telephone conference with the parties concerning the pending Rule 29(a) motion. (Min. Entry, Sept. 17, 2025.) Counsel for Priolo confirmed that Priolo wished to have a ruling on the oral motion, but did not request oral argument or the opportunity to provide any supporting written submissions. (Sept. 17, 2025 Status Conf. Tr. 3:15–24.) I indicated that I would issue an oral ruling. (*Id.* 3:25–4:2.) Since then, I determined that a written ruling is appropriate.

---

[1] *See* Min. Entry, Mar. 19, 2025; Elec. Order, Sept. 11, 2025 (rescheduling sentencing to October 6, 2025); Elec. Order, Sept. 30, 2025 (rescheduling to October 16, 2025); Elec. Order, Oct. 9, 2025 (rescheduling to October 30, 2025), Elec. Order, Oct. 27, 2025 (rescheduling to November 18, 2025).

## LEGAL STANDARDS

A. Motion for Judgment of Acquittal

Rule 29(a) of the Federal Rules of Criminal Procedure provides that after the close of evidence "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Pursuant to Rule 29(b), the court may reserve decision on the motion until after the jury returns a verdict of guilty. Fed. R. Civ. P. 29(b). Under Rule 29(c), if the jury returns a guilty verdict, the "court may set aside the verdict and enter an acquittal" in the event there is insufficient evidence to sustain a conviction. Fed. R. Civ. P. 29(c).

A defendant challenging the sufficiency of the evidence that was the basis for a conviction "bears a heavy burden" because the Rule 29 "standard of review is exceedingly deferential." *United States v. Torres*, 124 F.4th 84, 94–95 (2d Cir. 2024).[2] "The question is not whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt." *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013). Rather, it is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Osuba*, 67 F.4th 56, 61 (2d Cir. 2023) (emphasis in original). Accordingly, a "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004).

In considering the sufficiency of the evidence supporting the guilty verdict, the court "must consider the Government's case in its totality rather than in its parts," and the sufficiency

[2] Unless otherwise indicated, case quotations omit all internal quotation marks, brackets alterations, and citations.

test "may be satisfied by circumstantial evidence alone." *United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008). The court must also "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Torres*, 124 F.4th at 94–95; *see also Osuba*, 67 F.4th at 61 (the court must "resolve all issues of credibility in favor of the jury's verdict"). Indeed, "[i]t is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011). As the Second Circuit has emphasized, "the proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury," not in a motion to the court. *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989).

B. Mail and Wire Fraud

The offense of mail fraud is governed by 18 U.S.C. § 1341, whereas wire fraud is governed by 18 U.S.C. § 1343. In order to sustain a charge of mail fraud or wire fraud, the government must prove each of the following elements beyond a reasonable doubt with respect to each count: first, that there was a scheme or artifice to defraud an alleged victim of money or property by false and fraudulent pretenses, representations, promises, or omissions as alleged in the indictment; second, that the misrepresentation, promise, or omission was material; and third, that the defendant knowingly participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud. *United States v. Thomas*, 377 F.3d 232, 242 & n.7 (2d Cir. 2004); *see also United States v. Moses*, 109 F.4th 107, 117 (2d Cir. 2024); *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (per curiam); *United States v. Saint Clair*, No. 22-2100, 2024 WL

413422, at *4 (2d Cir. Feb. 5, 2024). The government must also prove a fourth element beyond a reasonable doubt: for a mail fraud charge, that the defendant used or caused the use of the mails as specified in the indictment; or for a wire fraud charge, that the defendant used or caused the use of interstate or foreign wires as specified in the indictment. *Moses*, 109 F.4th at 117; *see also Weaver*, 860 F.3d at 94; *Saint Clair*, 2024 WL 413422, at *4.

With respect to the second element of both mail fraud and wire fraud, a statement is material "if the misinformation or omission would naturally tend to lead or is capable of leading a reasonable person to change his conduct." *Weaver*, 860 F.3d at 94. "In other words, a lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's evaluation of a proposal." *Id.* "[M]ateriality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.*

With respect to the third element of mail fraud and wire fraud, to prove fraudulent intent, the government must prove that the defendant "either intend[ed] to harm their victim or contemplate[ed] that their victim may be harmed." *United States v. Gatto*, 986 F.3d 104, 113 (2d Cir. 2021). As the Second Circuit has made clear, "[b]ecause an intent to deceive alone is insufficient to sustain a wire fraud conviction, misrepresentations amounting only to a deceit must be coupled with a contemplated harm to the victim." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021). "[F]raudulent intent may be inferred from the scheme itself if the necessary result of the actor's scheme is to injure others." *Gatto*, 986 F.3d at 113. "Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *Jabar*, 19 F.4th at 76–77.

The government may also prove intent to defraud "through circumstantial evidence, including by showing that [the] defendant made misrepresentations to the victim(s) with knowledge that the statements were false." *Jabar*, 19 F.4th at 76; *Saint Clair*, 2024 WL

413422, at *4 (same). While the government must prove that a defendant "*contemplated* some actual harm or injury to their victims," and that the defendant's misrepresentations had "a natural tendency to influence" the intended victims, the government is not required to "prove that the victims of the fraud were *actually* injured." *Weaver*, 860 F.3d at 94–95. As the Second Circuit indicated in *Jabar*, "[p]roof of actual injury to the victim is not required because the scheme need not have been successful or completed." 19 F.4th at 77. "[T]he only significance in a fraud case of proof of actual harm befalling the victim as a result of the scheme is that it may serve as circumstantial evidence from which a jury could infer the defendant's intent to cause harm." *Weaver*, 860 F.3d at 97.

C. <u>Conspiracy to Commit Mail and Wire Fraud</u>

The crime of conspiracy to commit mail and wire fraud is governed by 18 U.S.C. § 1349. The government must establish the following two elements of the crime beyond a reasonable doubt: <u>first</u>, that two or more persons entered into the particular unlawful agreement charged in the indictment to commit mail fraud or wire fraud; <u>and</u> second, that the defendant knowingly and intentionally became a member of the conspiracy. *United States v. DiMassa*, 117 F.4th 477, 487 (2d Cir. 2024); *United States v. Jimenez*, 96 F.4th 317, 324 (2d Cir. 2024).

## DISCUSSION

A. <u>The Parties' Arguments</u>

Priolo's counsel made a brief oral motion for judgment of acquittal under Rule 29 consisting of two sparse arguments. First, Priolo argues that the government has failed to offer evidence establishing a prima facie case. (Trial Tr. 884:25–885:1.) Although Priolo does not specify whether this argument concerns any of the four substantive counts of mail fraud or the count of conspiracy to commit mail and wire fraud for which he was convicted, he appears to make it with respect to all of the charged offenses. I therefore understand this argument to be that

evidence in the record does not establish beyond a reasonable doubt the elements of either the four substantive mail fraud counts or the single count of conspiracy to commit mail and wire fraud for which the jury convicted Priolo.

Second, Priolo argues that the government's witnesses "never reviewed" the disclaimer information on the mailings prior to testifying at trial and that "nobody else had personal knowledge." (Trial Tr. 885:1–9, 17–19.) Although Priolo does not elaborate on this argument, he appears to argue that none of the government's witnesses saw the disclaimer located on the back of the allegedly fraudulent mailings and, accordingly, could not "give actually even an articulable reason why they were defrauded." (*Id*. 885:7–9.)

As noted, Priolo declined the Court's request for written briefing in support of the Rule 29(a) motion, electing to address the motion only orally and briefly at the close of the submission of evidence. The government orally opposed the Rule 29(a) motion and filed a letter with "additional authority in opposition" to Priolo's oral motion on June 27, 2025. (ECF No. 173.)

B. Analysis

The trial record contains sufficient evidence to support the jury's finding that Priolo committed four substantive counts of mail fraud and one count of conspiracy to commit mail fraud and wire fraud, particularly when viewing the record evidence in the light most favorable to the government, crediting inferences in the government's favor, and deferring to the jury's assessment of both witness credibility and the weight of the evidence, as the Court must do on a Rule 29(a) motion.

*1. Mail Fraud*

Priolo does not argue that any particular element of the offense of mail fraud was not met with respect to any of the specific substantive counts of mail fraud. Instead, he makes a general

argument that the record does not contain evidence to support a prima facie case of mail fraud on any of the four substantive counts. However, the record contains more than sufficient evidence to sustain the jury's finding that all four elements of mail fraud were met with respect to each of the substantive mail fraud counts set forth in the Indictment.

a. Element 1: A Scheme or Artifice to Defraud

The record contains extensive evidence supporting the jury's finding that there was a scheme or artifice to defraud an alleged victim of money or property by false and fraudulent pretenses, representations, promises, or omissions, as required to satisfy the first element of mail fraud. The jury heard testimony and saw documentary evidence that, between around March 2015 and December 2016, Priolo owned and operated two companies known as "Winners Circle" and "Feel Lucky Group," through which he sent hundreds of thousands of mailings to consumers nationwide, which were designed to deceive recipients into believing that they had won a large cash prize of more than one million dollars. These mailings are appropriately called "prize notices" because they are reasonably understood to instruct recipients that they could claim the promised large cash prize by paying only a small processing fee, typically between $20 and $40. Moreover, the jury heard testimony that Priolo's direct mail operation never provided any cash prizes to those who paid the fee and never intended to do so. (Trial Tr. 141:8–14.) Instead, Priolo only provided these consumers a "sweepstakes report" or "sweeps report"—a short booklet listing publicly available information about third-party sweepstakes, which anyone could enter to win cash prizes. (Trial Tr. 140:10–141:14; Gov't Exs. 134, 137.) Accordingly, a rational jury could conclude that Priolo's mailings were fake prize notices mailed to hundreds of thousands of people nationwide.

The record contains numerous examples of Priolo's Winners Circle and Feel Lucky Group fake prize notices, which were personalized to recipients, used fictitious names and businesses, resembled checks or financial documents, used prominent font and other techniques to convey that the person had won a significant amount of money, included fictitious seals or signatures to make them look official, and used confusing language and difficult-to-read text to obscure disclaimers stating that in exchange for paying a fee of around $20 to $40, the recipient would receive a report compiling information about third-party sweepstakes. (*See, e.g.*, Gov't Exs. 1–15, 21–30.)

Priolo owned and operated Winners Circle with co-conspirator Jeffrey Novis, as shown by documentary evidence and witness testimony. However, he established Feel Lucky Group on his own so that he would not have to share any proceeds from the mailings with anyone else. (*See* Gov't Ex 263, 374.) Priolo worked with Sean Novis, Gary Denkburg, Cathy Johnson, Cheryl Jacquard, Mary Lilienkamp, and others in executing the Winners Circle and Feel Lucky Group direct mail operations. Jacquard served as a production manager who communicated with the vendors that printed the mailings, while Lilienkamp performed data processing, "maintaining databases for the company of names and addresses" to which mailings were sent. (Trial Tr. 77:18–80:12, 82:6–23, 454:18–457:8.).

The record contains numerous documents that, along with witness testimony, explain how Priolo's fraudulent prize notice schemes were carried out. Government Exhibit 158 is a spreadsheet detailing Winners Circle and Feel Lucky Group mailings over certain months in 2016. Jacquard testified that the exhibit identifies the Winners Circle house file, which consists of the mailing addresses of people who had previously sent money in response to Winners Circle prize notices. (Trial Tr. 251:6–254:15.) The exhibit also identifies mailing lists used by alleged

co-conspirators, including Sean Novis and Gary Denkburg. Jacquard and Johnson testified that Priolo and Novis had an agreement to share mailing lists with Sean Novis, Denkburg, and others in order to target recipients who had paid money in response to prior similar mailings. (Trial Tr. 474:23–475:18, 478:12–479:6.) Government Exhibit 158 shows that Priolo and Novis sent a March 2016 mailing, known as a "front end" mailing and assigned the acronym "NPF," to more than 78,000 people, which generated more than $45,000 from around 2,276 people—around 3% of all recipients. (Gov't Ex. 158 at 22–23; *see also* Trial Tr. 616:13–621:20.) Johnson also explained that the exhibit details the schedule for mailing follow-up "back end" mailings. (Trial Tr. 619:8–621:5; Gov't Ex. 158 at 23.) Lilienkamp testified that according to a back-end schedule for Winners Circle for July and August of 2016, people who had sent money to Priolo in response to a front-end mailing in July were sent fourteen back-end mailings over the next month notifying them that they had won large cash prizes. (Trial Tr. 480:18–481:8.)

b. Element 2 - Material Misrepresentation

The record contains voluminous evidence that would permit a rational jury to conclude that Priolo's elaborate fake prize notices sent through the Winners Circle and Feel Lucky Group direct mail operations were designed to convey material misrepresentations, promises, and/or omissions in an attempt to secure people's money.

A material misrepresentation is a "misinformation or omission [that] would naturally tend to lead or is capable of leading a reasonable person to change his conduct." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017).[3] A material misrepresentation exists where there is a

---

[3] Three months after the jury convicted Priolo, the Supreme Court decided *Kousisis v. United States*, 145 S. Ct. 1382 (2025). Prior to the Court's decision in *Kousisis*, Second Circuit precedent drew "a fine line between schemes that do no more than cause their victims to enter

"discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *United States v. Runner*, 143 F.4th 146, 158 (2d Cir. 2025). Here the government presented significant evidence to support the jury's findings that Priolo's prize notices were designed to materially misrepresent the "benefits reasonably anticipated" from the transaction. *Id*.

The jury had numerous Winners Circle and Feel Lucky Group mailings, which on their face convey the material misrepresentation that the recipient had won a large cash prize and was required to send in a payment of around $20 to $40 to claim it. (*See, e.g.*, Gov't Exs. 1–15, 21–30.) They do so using several distinct techniques. The mailings feature fake seals, signatures, stamps, and company names to create the misimpression that the mailings were from certain fictitious companies or financial institutions, and never accurately represent Winners Circle, Feel Lucky Group, Priolo, or any of the other individuals involved in the scheme. Each mailing is personalized to the recipient, resembles a check or financial document, includes fictitious seals, signatures, and/or certificates to make it look official, and uses confusing language with undefined terms, prominent font, and other techniques to convey that the recipient has won a large sum of money. The back of each prize notice features an obscure disclaimer in grey, difficult-to-read font, which states that in exchange for paying a $20 to $40 fee, the recipient

---

into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Runner*, 143 F.4th 146, 154 (2d Cir. 2025). The Supreme Court "erased [that] 'fine line'" in *Kousisis*, and held that "a defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a contract that requires handing over her money or property." *Id.* at 156 (quoting *Kousisis*, 145 S. Ct. at 1388). However, the line of cases abrogated by *Kousisis* were not at issue here and the jury charge was consistent with the holding in *Kousisis*.

would receive a report compiling publicly-available information about sweepstakes offered by third-parties. Buried in the disclaimer is the statement that the recipient has "not won a prize."

Government Exhibit 1 provides an illustrative example. This mailing, dated September 9, 2016 and addressed to recipient "Andrew Kluczinsky," advertises a cash prize of "**$1,200,000.00.**" (Gov't Ex. 1.) The text, formatting, and design of the mailing conveys that it is a prize notification. It features in prominent font across the top: "CHECKS SCHEDULED FOR RELEASE" and "$1,200,000." In smaller font at the top left, the mailing states "GUARANTEED PRIZE NOTIFICATION," and in similar font on the top right, it states "CASH & PRIZE ADVISEMENT." (*Id.*) The mailing refers to the figure "$1,200,000" in numbers and text no less the seven times, frequently immediately next to the terms "IN CASH AWARDS," "IN PRIZES," and "CASH AND AWARDS PRIZE-WIN OPPORTUNITY." (*Id.*) The first paragraph of the mailing can be read to convey that Kluczinsky is receiving a formal letter announcing available sweepstakes prize payments for which his name has been confirmed on the record and registered. The second paragraph of the mailing refers to "entrant directives"—an undefined and confusing term. The only references to a "report" on the front of the mailing are a reference to the "NPF Reports Division" in small font near the top of the page, two confusing references to "report of entrant directives," and a reference to a "$20 report fee" buried in the body of the mailing. The back of the mailing features a disclaimer presented in a large block of text in small, grey, all caps font that is difficult to read. It states as follows:

> NPF IS A RESEARCH AND REPORTING SERVICE. WE SPECIALIZE IN RESEARCHING SWEEPSTAKES SPONSORED AND CONDUCTED BY CORPORATE ORGANIZATIONS WITH WHICH NPF IS COMPLETELY UNAFFILIATED. WE COMPILE THESE SWEEPSTAKES OPPORTUNITIES IN A REPORT WHICH SETS FORTH ALL NO PURCHASE ENTRY REQUIREMENTS, BASED ON EXISTING FEDERAL, STATE, AND LOCAL REGULATIONS. YOU HAVE NOT WON ANY MONEY OR PRIZE. NPF IS NOT LIABLE FOR ANY ENTRIES MADE OR ATTEMPTED BY READERS OF ITS REPORTS. ALL

> SWEEPSTAKES RESEARCHED AND REPORTED ARE FREE TO ENTER, AS BASED ON THE INFORMATION SUPPLIED BY THE SPONSORS. NPF USES ALL DUE DILIGENCE TO ACCURATELY REPORT THE ENTRY DETAILS OF EACH SWEEPSTAKES. NPF IS NOT A LOTTERY COMPANY, AND DOES NOT OFFER LOTTERY, CONTEST OR SWEEPSTAKES ENTRIES. THIS PROMOTION MAY BE UNDER DIFFERENT CREATIVE PRESENTATION. VOID WHERE PROHIBITED BY LAW. RESPONDERS WILL BE REFUNDED THEIR PURCHASE PRICE OF OUR REPORT IN FULL IF THEY ARE DISSATISFIED WITH THE REPORT. REFUND CLAIMS MUST BE MADE IN WRITING TO THE ADDRESS ON OR BY USING THE ENCLOSED REPLY ENVELOPE WITHIN 60 DAYS OF PURCHASE. IF YOU DO NOT WISH TO RECEIVE FURTHER MAIL SOLICITATIONS FROM NPF, JUST RETURN THIS ENTIRE LETTER IN THE ENCLOSED ENVELOPE TO NPF, WITH THE LETTERS "DNM" NEXT TO YOUR NAME/ADDRESS AREA. PLEASE BE INFORMED THAT YOUR INFORMAITON MAY BE SHARED WITH A THIRD PARTY. BY PAYING FOR YOUR PURCHASE WITH YOUR CHECK, YOU ARE ACCEPTING OUR CHECK ACCEPTANCE POLICY. IN THE UNLIKELY EVENT THAT YOUR CHECK IS RETURNED UNPAID, YOU UNDERSTAND AND AGREE THAT YOUR CHECK MAY BE ELECTRONICALLY REPRESENTED AND WE WILL ALSO COLLECT A RETURNED CHECK PROCESSING CHARGE AS ALLOWED BY STATE LAW. IF YOUR CHECK IS ELECTRONICALLY REPRESENTED, IT WILL NOT BE PROVIDED TO YOU WITH YOUR BANK STATEMENT, BUT A COPY CAN BE RETRIEVED BY CONTACTING YOUR FINANCIAL INSTITUTION. WE ARE COMMITTED TO YOUR PRIVACY AND WE HAVE A PRIVACY POLICY WHICH IS AVAILABLE UPON REQUEST AT THE ADDRESS LISTED ON THE OUTER ENVELOPE. THIS COMMUNICATION IS NOT A SWEEPSTAKES OR AWARD NOTIFICATION AND DOES NOT GUARANTEE THAT YOU WILL WIN ANY SWEEPSTAKES. FOR SPECIFIC ODDS OF WINNING, ELIGIBILITY REQUIREMENTS, END DATES AND OTHER TERMS AND CONDITIONS IN CONNECTION WITH A SWEEPSTAKES, YOU MUST REFER TO THE SPECIFIC RULES FOR THAT SWEEPSTAKES. YOU DO NOT NEED TO PURCHASE THE REPORT TO ENTER ANY SWEEPSTAKES. ALL CUSTOMER SERVICE ISSUES SHOULD BE IN WRITING TO THE ADDRESS ON THE ENCLOSED ENVELOPE.

(Gov't Ex. 1.) Buried in the middle of this hard-to-read block of grey text on the back of the mailing is the statement, "THIS COMMUNICATION IS NOT A SWEEPSTAKES OR AWARD NOTIFICATION AND DOES NOT GUARANTEE THAT YOU WILL WIN ANY SWEEPSTAKES." Notably, the front and back of the mailing refer repeatedly to "NPF," which Jacquard testified is not a real entity, but an acronym used to describe this direct mail piece. (Trial Tr. 101:3–13.)

A rational jury could view Government Exhibit 1, in its entirety, as conveying the material misrepresentation that Andrew Kluczinzky was the recipient of a cash prize of $1,200,000, which he could claim by paying a $20 fee. A reasonable jury could also conclude that the disclaimer on the back of the mailing was intentionally obscure and confusing in order to cover up the fact that payment of the fee would not secure any cash prize for Kluczinzky.

Similarly, other prize notice mailings sent by Priolo to consumers nationwide used fake signatures, fake seals, and fake certificates that a reasonable jury could conclude were intended to make somebody think that they were going to receive a large sum of money, not a request to purchase a report about sweepstakes hosted by third parties. (*See, e.g.*, Gov't Exs. 9–10.) Other mailings were formatted such that they appeared to be from a "trust," which fraudulently conveyed that the mailer was a financial institution, like a bank. (*See, e.g.*, Gov't Ex. 7.) Although some of the mailings listed a post office box address, none of them provide a phone number, street or web address, or email to which the recipient could reach out and ask questions about the terms of the advertised transaction. (*See, e.g.*, Gov't Ex. 1, 7, 9–10.)

c. Element 3: Intent to Defraud

The record includes ample evidence to support the jury's conclusion that Priolo knowingly participated in the scheme to defraud consumers through fraudulent mailings, with knowledge of its fraudulent nature and with specific intent to defraud, as required for a mail fraud conviction. The jury had Priolo's Winners Circle and Feel Lucky Group mailings and documentary evidence that Priolo was aware of the contents of the mailings. (*See, e.g.*, Gov't Exs. 180, 303; Trial Tr. 482:16–483:12.) Lilienkamp testified that Priolo received a copy of every single Winners Circle mailing as of at least July 2016. (Trial Tr. 472:22–474:22; Gov't Ex. 309; *see also* Trial Tr. 676:19–22 (Johnson testimony about her email to Lilienkamp requesting

that Priolo's name and address be added to all mailing files for Winners Circle).) The jury also heard testimony by Jacquard, Johnson, and Lilienkamp that, in return for paying the requested fees, recipients were mailed only a third-party sweepstakes report. (Trial Tr. 140:10–141:2, 144:17–146:12, 481:14–482:1, 687:13–21.) Based on this evidence, the jury could reasonably conclude that through his mailings, Priolo intended to deceive recipients into believing they had won large cash prizes that could be obtained only by paying a fee, even though he only ever intended to provide them with a short document containing publicly-available information in exchange for their money. *See Gatto*, 986 F.3d at 113 ("[F]raudulent intent may be inferred from the scheme itself if the necessary result of the actor's scheme is to injure others"); *Jabar*, 19 F.4th at 76–77 (recognizing that "a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver" can demonstrate harm supporting demonstration of fraudulent intent).

The jury saw evidence and heard testimony concerning Johnson's role in processing the mail received in response to the direct mailings sent by Priolo and co-conspirators, a process known as "caging." (*See, e.g.*, Trial Tr. 530:7–13.) She testified that she received packages via express mail, priority mail, and sometimes even Federal Express from prize notice recipients who sought to claim the cash prizes referenced in the mailings. (Trial Tr. 564:8–565:3, 595:13–605:24.) In evidence are photographs of large bins of mail received by Johnson in response to Winners Circle and Feel Lucky Group mailings, which include packages sent through these priority and express forms of mail. (Gov't Ex. 394.) Johnson also testified that Priolo picked up the mail five days a week and saw these priority and express mail packages. (*Id.*; Trial Tr. 564:8–565:3, 595:13–605:24.) Also in evidence are text messages between Priolo and Johnson concerning Priolo's handling of the mail, including a text from Priolo to Johnon showing a

photograph of express mail parcels. (Gov't Ex. 394.) The jury could reasonably conclude from this evidence that recipients of Priolo's mailings believed that the mailings were promising them something important and life-changing, and that Priolo was aware of this perception.

The jury heard evidence that Priolo received numerous responses and complaints from mailing recipients indicating their belief that the mailings conveyed that they had won a large cash prize. For example, the record includes documentary evidence and testimony that Priolo was aware that mailing recipients sent in notes in which they asked for the $20 to $40 fee to be deducted from their prize money, which placed Priolo on notice that these recipients did not have the money to pay the fee, but believed they were being promised a large cash sum. (Trial Tr. 658:11–667:21) Based on such evidence, a reasonable jury could conclude that Priolo knew that the disclaimers on the back of the mailings failed to inform recipients that all they were being offered for their $20 to $40 fee was a booklet advertising sweepstakes by third parties.

The record also includes numerous photographs of return envelopes sent by recipients of Priolo's mailings, on the front of which were notations indicating that the recipients believed the mailings were a "scam" or a "fraud," or consisted of lies. (*See, e.g.*, Gov't Ex. 160.) The jury heard testimony and saw documentary evidence indicating that Priolo was aware of these markings on the return envelopes, and that nevertheless, he did not change the content or nature of the mailings to eliminate the deception. (Trial Tr. 658:19–667:21.) A reasonable jury could conclude that these complaints put Priolo on notice of the deceptive nature of the mailings.

The record includes numerous examples of letters sent with Priolo's authorization to people who wrote to inquire about the status of their prize money in response to a fake prize notice from Winners Circle or Feel Lucky Group. (Gov't Ex. 162.) Johnson testified that Priolo instructed her to respond to these inquiries with "customer service letters" signed with fake

names—such as "Christine Peters." (Trial Tr. 622:18–623:18, 633:9–18, 645:18–647:3.) Johnson testified that if an inquiry indicated that the consumer believed they had won a prize, she would send a letter restating information from the disclaimer on the back of the mailing, and that she would only provide a refund if the consumer explicitly asked for a refund of a specific payment made in response to the mailing. (Trial Tr. 631:9–634:21; *see, e.g.*, Gov't Ex. 162.) The jury saw documentary evidence showing that Johnson sent such response letters to consumers in response to the NPF promotion, which was a mailing sent through Priolo's Winners Circle direct mail operation. (Trial Tr. 632:21–633:8; Gov't Ex. 162.) This evidence further supports a reasonable conclusion that Priolo was fully aware of the deceptive nature of his mailings.

The jury also saw evidence and heard Johnson's testimony about letters from state attorneys general and county consumer protection authorities, which the jury could reasonably conclude placed Priolo on notice that his mailings were fraudulent and violated the law. Johnson testified that she gave the attorney general and county consumer protection complaints regarding Winners Circle mailings to Priolo. (Trial Tr. 598, 605, 622, 631–40.) Her testimony and emails and letters in the record support the conclusion that Priolo was aware that Pinellas County Consumer Protection was concerned about a complaint from an individual named Gerry Dellavalle that Priolo's mailings were fraudulent (*See* Gov't Exs. 171, 172.) The jury also had letters from the Minnesota Attorney General's Office raising similar concerns about a Priolo mailing (Gov't Ex. 173) and an email by which Sean Novis forwarded that letter to Priolo (Gov't Ex. 364). Johnson testified that Priolo instructed her respond to such correspondence with letters using a fake name, such as "Christine Peters," rather than signing the letters with Priolo's name or even her own. (Trial Tr. 622:18–623:18, 633:9–18, 645:18–647:3.) The jury reasonably concluded that these letters from state and local government officials placed Priolo on notice that

his mailings were deceptive and fraudulent, and that Priolo instructed Johnson to respond in a way that would permit him to conceal that Winners Circle and Feel Lucky Group were shell companies engaging in fraud, rather than legitimate businesses.

The jury also heard testimony about the victims' understanding that the mailings entitled them to large cash prizes. For example, Marilyn Burks and Pamela Pence testified that when they received the mailings, they understood them to convey that they had won money. (Trial Tr. at 314–15 (Burks: "Because I thought I was going to win some money and I thought that if I sent the $20, like they asked me, then I would win some money."); Gov't Ex. 62 (NPF mailing to Marilyn Burks requesting her "attention" in order to "release the entire $1,200,000.00 IN CASH AWARDS PRIZE OPPORTUNITY"); Trial Tr. at 186 (Question: "How did you interpret this letter? What did you think it meant?" Pence: "Well, they didn't send me a check and they didn't put the money in the bank."); Gov't Ex. 63 (NPF mailing to Pamela Pence "FOR RELEASE" of $1,200,000); Gov't Ex 63-OE).

Both Burks and Pence testified that they could not remember whether they viewed the disclaimer on the back of the mailings before sending in the requested fees. (Trial Tr. 203:12–204:5 (Pence); *id*. 319:10–13 (Burk).) However, based on witness testimony and the mailings themselves, a reasonable jury could conclude that Priolo authorized mailings intentionally designed so that recipients, including Burks and Pence, focused on the front of the mailings, which fraudulently promised large cash prizes, rather than the disclaimer buried on the back and presented in small difficult-to-read font. In addition, the jury also heard testimony from the family members of John Single, Art Montilla, and Wendell Brooks, who testified about similar types of mailings that their family members received and that their family members had believed they had won money. (Trial Tr. 46:14–72:13, 288:12–310:15, 419:11–444:10.)

Finally, the jury heard testimony from Postal Inspector Christine Reins Jarins and saw documentary evidence that can be reasonably understood to show that Priolo did not make changes to one of his mailings even after the company that he used to process payments, PacNet, raised concerns that certain text in the mailing "may mislead the consumer into believe he/she has won a prize," including the following sentence: "No one else notified. If you wish to keep any money won secret from your spouse or family, please consult your lawyer." (Gov't Ex. 362 at 37; Trial Tr. 825:7–833:12.) Finally, as discussed, the jury saw documentary evidence and heard testimony showing that Priolo requested that staff add his own name and address to his mailing lists, so that he received copies of his fake prize notices and was fully aware of their content. (*See* Gov't Ex. 309; Trial Tr. 472:22–474:22; 676:19–22.) A rational jury could thus conclude that Priolo did not make any meaningful changes to the deceptive nature of the mailings, even after receiving customer complaints, notices demonstrating that mail recipients believed they had won a large cash prize, and after receiving inquiries from county consumer protection officials and state attorneys general. And a rational jury could also reasonably conclude that Priolo was not only aware of the deceptive nature of his Winners Circle and Feel Lucky Group mailings, but that he also intentionally continued to send out these mailings in an effort to secure money from people duped into believing they were winning large cash prizes.

Throughout the trial, the jury heard evidence that Priolo authorized refunds for certain mailing recipients who wrote to complain that they never received the promised large cash prize. (Trial Tr. 655:2–658:12, 666:13–667:13, 810:10–813:19.) Based on documents in the record and Johnson's testimony, the jury could reasonably conclude that the refund policy was not carried out in good faith and was instead used to prevent people from escalating their complaints. For example, the jury saw letters from consumers who asked for a refund and documents showing

that the consumers were refunded for one specific payment. (Gov't Ex. 174; Trial Tr. 655:5–17, 656:7–657:17.) However, Johnson testified that consumers were not refunded for additional payments made in response to Priolo's mailings if they did not specifically request refunds of those other payments. (Trial Tr. 624:12–625:4, 633:3–634:21.) Inspector Reins-Jarin testified that she had reviewed bank records for Priolo's operations and identified around 30 refund checks, amounting to at most around $2,900 out of $2.6 million in revenue generated through Priolo's direct mailings, even though there were dozens, if not hundreds, of notes from victims conveying some form of belief that Mr. Priolo's mailings informed them that they had won large monetary prizes. (*See* Trial Tr. 812.)

d. Element 4 – Use of the Mails

The record is replete with evidence that Priolo used the mails to carry out the scheme to defraud. All of the fraudulent mailings were sent to recipients through the U.S. mail. (*See, e.g.*, Gov't Exs. 1–15, 21–30.) Additionally, the checks, cash, and complaint letters from recipients were sent back to Priolo through the U.S. mail, Federal Express, and UPS, and Johnson sent responses to inquiries from mailing recipients on behalf of Priolo through the U.S. mail. (*See, e.g.*, Gov't Exs. 62, 63, 160, 162, 171; Trial Tr. 825:12–827:10.)

The jury also heard testimony and viewed documentary evidence sufficient to sustain the four specific counts of mail fraud detailed in Counts Three, Four, Five, and Six of the Indictment. The jury was shown copies of, and Inspector Reins-Jarins testified about, four specific checks sent by victims to Long Island in response to Priolo's fraudulent mailings: one from victim Audrey Gibson mailed on or around November 21, 2026; another from victim Margaret Tousignant mailed on or around December 11, 2016; another from victim Alemu Kore mailed on or around December 15, 2016; and another from victim Nuby Green mailed on or

around December 21, 2016. (Trial Tr. 867:10–870:9.) The jury heard testimony that checks from these victims were deposited directly into the Winners Circle bank account. (Trial Tr. 852:10–854:22)

Based on other examples of Priolo signatures in the evidence, including two examples of his notarized signature, a reasonable jury could conclude that Priolo's signature appears in the endorsement on the back of each of the checks at issue for the counts of mail fraud set forth in Counts Three, Four, Five, and Six of the Indictment. (*See* Gov't Ex. 355 at 7, 16; Trial Tr. 814:1–9.)

*2. Conspiracy to Commit Mail and Wire Fraud*

a. Element One

As discussed, the first element of the conspiracy charge requires the government to prove that Priolo entered into the unlawful agreement to commit mail or wire fraud charged in Count Two of the Indictment with at least one other person. Viewing the record evidence in the light most favorable to the government, there is ample evidence to support the jury's finding that Priolo engaged in a conspiracy to conduct mail and wire fraud with Jeffrey Novis, Sean Novis, and potentially others as charged in Count Two.

As already explained, voluminous documentary evidence and witness testimony support the conclusion that between around March 2015 and December 2016, Priolo owned and operated the Winners Circle direct mail operation through which he sent to consumers nationwide hundreds of thousands of mailings, which were designed to convince people that they had won a large cash prize of more than one million dollars that could be obtained upon payment of a fee. *See supra* Discussion § B.1.a. The record includes evidence showing that Priolo and Novis jointly owned and operated Winners Circle and were fully aware of the

contents of the fraudulent mailings sent through the operation. According to documentary evidence, Priolo and Jeffrey Novis were both on the same bank account for Winners Circle as of November 13, 2024, with Novis as "corporate secretary or authorized signer" and with Priolo as "president and authorized signer." (Trial Tr. 805:8–19.) The jury saw evidence that both Jeffrey Nois and Priolo were associated with the Winners Circle Gmail account and acted together to carry out the operation to mail fraudulent prize notifications in order to secure payments from people duped into thinking they had won large cash prizes. (*See, e.g.*, Trial Tr. 816:2–14, 823:22–825:6.) Documentary evidence and witness testimony indicate that Priolo and Jeffrey Novis worked with Jacquard, Lilienkamp, and Johnson on different aspects of the operations including: to develop and mail the prize notices to mailing lists purchased from co-conspirators and other sources, receive payments in the mail, deposit payments into bank accounts, and to respond to customer inquiries and complaints with letters from fake companies and fake officials with letters stating information from the disclaimers buried in hard-to-read text on the back of the prize notices.

For example, Johnson testified that she had a signed service agreement with Priolo regarding Winners Circle, by which they agreed that she would respond to people who mailed money and/or the return form after receipt of a Winners Circle mailing. (*See* Gov't Ex. 156.) The record also includes evidence of a similar signed agreement between Johnson and Priolo regarding her role in responding to inquiries and complaints relating to Feel Lucky Group mailings. (Gov't Ex. 157.) Johnson also testified that she understood Winners Circle to be owned by both Priolo and Novis, and that she would send both of them a summary of the mail received in response to Winners Circle mailings. (Trial Tr. 568:20–69:15, 616:19–619:11.)

Additionally, documents and testimony in the record reasonably support the conclusion that Priolo and Jeffrey Novis had an agreement with Sean Novis that Jacquard, Lilienkamp, and Johnson, all of whom worked for Sean Novis at various times, would perform services for the Winners Circle direct mail operation, including working with letter shops to print mailings and process the address files. For example, the jury also saw evidence and heard testimony that Sean Novis's bookkeeper, Ellen McDevitt, transmitted invoices to Priolo and Jeffrey Novis for caging services and for the creation of sweeps reports as fulfillment for the Winners Circle's mailings. (Gov't Exs. 358, 360; Trial Tr. 822:3–823:12.) Accordingly, based on the evidence in the record, a reasonable jury could conclude that Priolo had an agreement with Jeffrey Novis and Sean Novis to use the mail to send hundreds of thousands of fake prize notices to consumers nationwide as part of the Winners Circle direct mail operation between around March 2015 and December 2016.

Finally, concerning use of the wires, Johnson testified that she sent checks received in response to Winners Circle and Feel Lucky Group mailings to PacNet, a company located in British Columbia, Canada, for processing. (Trial Tr. 613:16–21.) Based on her testimony and other evidence, including the testimony of Inspector Reins Jarins, PacNet wired money from its bank in Chicago to Priolo and Jeffrey Novis's accounts at Empire Bank in Islandia, New York. (*See* Gov't Ex. 351V; Trial Tr. 863:9–864:3.)

b. <u>Element Two</u>

There is ample evidence to support the jury's determination that the government proved the second element of conspiracy to commit mail and wire fraud: that Priolo knowingly and intentionally became a member of the charged fake prize notice conspiracy.

As discussed at length, the jury saw documents and heard testimony showing that

Priolo knowingly established and operated Winners Circle with Jeffrey Novis, including by creating the corporate entity, opening joint bank accounts, creating a Gmail account they both used to conduct company business, and working with PacNet. (*See, e.g.*, Gov't Exs. 351, 354 at 9; Trial Tr. 568:20–69:15.)

Evidence in the record also supports the conclusion that Priolo intentionally authorized Winners Circle and Feel Lucky Group mailings, that he received these mailings after they were sent out, and that despite his awareness of inquiries and complaints indicating that recipients understood the mailings to convey that they had won a large monetary prize and numerous complaints from state attorneys general and county consumer protection officials that the mailings were fraudulent, Priolo did not change the mailings to cure the deception. *See supra* Discussion § B.1.c. Moreover, the jury also saw evidence and heard testimony that after PacNet recommended that Priolo remove from a mailing misleading information suggesting that the recipient had won money that needed to be hidden from others, Priolo did not make any changes. *See id.* The jury also saw evidence and heard testimony showing that even after being on notice of these complaints about Winners Circle mailings, rather than changing his conduct, Priolo founded Feel Lucky Group in order to keep a greater share of proceeds from these mailings for himself. (Gov't Exs. 263, 374; Trial Tr. 570:2–6.) And, as previously discussed, the jury also heard testimony from witnesses about how once Priolo learned that a victim paid money in response to a front-end mailing, Priolo and his co-conspirators targeted the same person with even more back end mailings, which also promised large cash prizes upon the recipient of a fee ranging from $20 to $40. *See supra* Discussion § B.1.a.

In summary, the jury heard testimony and saw evidence showing that, even after receiving complaints, inquiries from county consumer protection officials and state attorneys general, and inquiries demonstrating that the mailings convinced recipients that they had won a large cash prize, Priolo made no changes to address the deceptive and fraudulent nature of his Winners Circle and Feel Lucky Group mailings. Viewed in its totality, the record was more than sufficient to permit a rational jury to conclude that Priolo was not only aware of the deceptive nature of his mailings, but that he knowingly and intentionally became a member of the charged conspiracy with Jeffrey Novis and Sean Novis to mail hundreds of thousands of fraudulent prize notices to secure money from people duped into believing they had won large cash prizes when in fact the only product they would receive was a short report listing publicly-available third-party sweepstakes. Accordingly, sufficient evidence supports Priolo's conviction for conspiracy to commit mail and wire fraud as charged in the Indictment.

**CONCLUSION**

For all of the reasons set forth in this Opinion and Order, sufficient evidence supports Priolo's conviction on four substantive counts of mail fraud under 18 U.S.C. § 1341 and one count of conspiracy to commit mail and wire fraud under 18 U.S.C. § 1349. This Court therefore denies Priolo's oral motion for judgment of acquittal made under Rule 29, Fed. R. Civ. P., at the close of evidence and before the case was submitted to the jury.

Dated: Central Islip, New York
November 18, 2025

*/s/ Nusrat J. Choudhury*
NUSRAT J. CHOUDHURY
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, : 21-CR-00566(NJC)

: United States Courthouse
-against- : Central Islip, New York

: March 11, 2025
: 10:00 a.m.

PHILIP PRIOLO,

Defendant.

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE NUSRAT J. CHOUDHURY
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government: JOHN J. DURHAM, ESQ.
United States Attorney
Eastern District of New York
100 Federal Plaza, Suite 570
Central Islip, New York 11722

BY: ANN F. ENTWISTLE, ESQ.
CHARLES B. DUNN, ESQ.
JASON FELDMAN, ESQ.
Assistant United States Attorneys

For the Defendant: JAMES FROCCARO, ESQ.
20 Vanderventer Avenue, Suite 103W
Port Washington, New York 11050

JONATHAN I. EDELSTEIN, ESQ.
501 5th Avenue, Suite 514
New York, New York 10017

Court Reporter: DENISE PARISI, RPR, CRR
E-mail: DeniseParisi72@gmail.com

Proceedings recorded by computerized stenography. Transcript produced by Computer-aided Transcription.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*



A F T E R N O O N   S E S S I O N

(In open court, outside the presence of the jury.)

THE COURT: Any applications from counsel for the Government?

MR. FELDMAN: Nothing from the Government, Your Honor.

MR. FROCCARO: No, Judge.

THE COURT: Okay. Thanks so much. We will bring in the jury?

MR. FROCCARO: During my I'm going to need some things place on the Elmo. It's okay if I ask Mr. Edelstein to just control the Elmo?

THE COURT: Yes, absolutely. No problem.

MR. FROCCARO: Thanks.

THE COURT: I just it hope it works after what happened this morning and my asking the Government to move their table.

The Elmo was working last week and then all of a sudden this morning, it decided -- or yesterday, it decided not to work.

And the Government exhibits have been updated? Can I take those binders back or are those not my exhibits?

MS. ENTWISTLE: We returned the Government's binders.

THE COURT: Oh, you did?

***Lisa Schmid, CCR, RMR***
***Official Court Reporter***



MS. ENTWISTLE: Yes.

THE COURT: Where are binders?

And there are no further updates to the Government's exhibits for the Court?

MS. ENTWISTLE: Nothing we're addressing today.

THE COURT: Okay.

MS. ENTWISTLE: So we'll worry about that first thing tomorrow morning.

THE COURT: Great. No problem.

(Jury enters.)

THE COURT: Everyone, please have a seat.

To our jury, thank you so much again for your service. I hope you all had a good lunch break.

I know Mr. Morabito introduced you to the jury deliberations room. As I mentioned before, you can always keep all of your belongings in there. It is a secure room. People cannot get there from the public side of the building. Only court personnel have access to it.

I do not permit phones, beeping things, okay, of any kind here unless it's a medical device that folks need. Please if you have a watch that makes noise, please silence it.

And I believe that each of you when you were in the jury deliberations room provided your contact information to Mr. Morabito, which is really important, so that we can notify

***Lisa Schmid, CCR, RMR***
***Official Court Reporter***



you if there needs to be any change in the schedule.

I already walked through yesterday that our normal trial days will follow the same flow. You will get here by 9:45 in the jury deliberations room, put down your things, settle in. Mr. Morabito will bring you in every morning at 10:00 a.m.

We will listen to testimony. You will view evidence here in the court between 10:30 and 12:30. We'll then take a one-hour lunch break. Somewhere in the middle of that morning, I will give you a bio-break, stretch break. We'll time it based on the testimony, so that it's least disruptive and most helpful.

If at any point you want to stand up and stretch, I welcome that. You are not disturbing anyone. Jumping jacks would be a disturbance, but other than jumping jacks, standing up and stretching is perfectly fine. We want you to be comfortable, so that you can be as focused an attentive as possible to the evidence that's coming in.

After lunch, at 1:30, again, you will go back to the jury deliberations room. Mr. Morabito will bring you back in. We'll have an afternoon session of evidence. It will go from 1:30 to 4:30, and we'll have another mid-afternoon break sometime in there when it makes sense for the testimony.

I pledge to you that I will not keep you here past 4:30 without asking your permission. I may ask your

***Lisa Schmid, CCR, RMR***
***Official Court Reporter***

permission, and I will take a poll just like I did before -- which I take very seriously.

If, for example, a witness is close to finishing up and if we give five or ten more minutes for them to finish up, I will poll you to see if it's okay with you to go past 4:30. And if it's not okay, we will not go past 4:30. Those are my commitments to you.

On Thursday, we will end early at 3:15 p.m., and on Friday, we will have a half-day and we will end at 12:30 p.m.

So with that, we are now moving forward, and we are at the time when I give you some instructions on the law.

So before we broke for lunch, Mr. Morabito administered the oath and I know each of you will carry out that oath faithfully and truly. You will remain under oath during the entire duration of this trial.

Here are my instructions: At the end of the trial, I'm going to give you more detailed instructions on the law that you'll apply to the evidence that you have already seen. At this point, I want to highlight some big picture issues for you.

Yesterday, I told you that in the American system of justice, juries and judges have separate roles. My role is to instruct you on the law, and that law will govern this case. Your job as jurors is to determine the facts based on the evidence that comes in during the course of this trial. You





are the only deciders of facts.

And you will hear the evidence and you will decide those facts and you will then apply the law that I give you to those facts as you see them. That is how you will reach your verdict.

And as I indicated, I'll instruct you on the law, and it is your duty, as I indicated in the questions I asked you, to accept my instructions on the law and to apply them to the facts that you find. On those legal issues, you must take the law as I give it to you, whether you agree with the law or not.

If any attorney throughout the course of this trial states a legal principle that is different from anything that I instruct you, you must follow my instructions.

From time to time, it may be necessary for me to speak to the lawyers out of your hearing, just as I did during the jury selection process. We will go over to this side of the courtroom and speak at a sidebar with white noise on.

During those sidebars, which we will try our best to keep at a minimum -- if it's a short sidebar, you'll remain seated and stretch, do what you need to do to keep the blood flowing; if it's a longer sidebar, I may actually excuse you and give you a break, so that you can walk around and just get some air outside of this courtroom while we resolve whatever the issue is that caused the sidebar.





The purposes of these conferences is not to keep information from you, but to decide how certain evidence is to be treated under the rules of evidence, and to avoid any confusion or error.

Please don't take offense at any sidebars. Don't speculate as to what I'm discussing with the attorneys. Please understand that while you are waiting, we are working, and I will do what I can to limit the number and length of these sidebar conferences.

While I am meeting with the lawyers, as I said, I invite you to stand and stretch, and I'll call a short recess if it's a lengthy issue.

I may not always grant an attorney's request for a sidebar. Don't consider my decision to grant or not grant a sidebar as any indication of my opinion on what this case -- whom should win or who should lose or any issue that's being addressed at the time or what your verdict should be.

You must not take anything that I say or do during the trial as an indication of what your verdict should be. I will not express or imply any opinions about which witnesses you should believe, what facts you are to establish or what inferences you should draw from the evidence.

At times, I may ask questions and if so, it is for the purpose of clarification only. It is not in any way to indicate an opinion on the facts or to indicate the weight





that you should give the testimony of any particular witness.

You are the sole judges of all questions of facts that are submitted to you, and as the sole judges of the facts, you must determine which witnesses you believe, what portion of their testimony you accept, and what weight to attach to it. You will decide what the facts are from the evidence that will be presented here in this courtroom.

You must pay close attention to all of the witnesses during the trial, and you must consider all of the evidence. That evidence will consist of the testimony of witnesses, documents and other things received into evidence as exhibits, and any facts that the lawyers agreed to or they agree to admit into evidence or that I may instruct you to find.

There are two kinds of evidence. One is direct, and the other is circumstantial.

Direct evidence is testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence that is proof of one or more facts from which you can find another fact. You may consider both direct and circumstantial evidence in deciding this case.

The law permits you to give equal weight to both or to none. It is up to you to decide how much weight, if any, to give to any of the evidence.

One of the most important tasks that you have as jurors is to evaluate the credibility of the witnesses who

will testify here at trial. I will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony, if any, to accept or reject.

There is no formula by which you should evaluate witness testimony or exhibits that are admitted into evidence. I will, however, give you some guidelines for determining the credibility of witnesses at the end of this case.

Right now, I will just say that you bring with you to this courtroom all of the experience and background of your lives. You do not leave your common sense outside the doors of this courtroom. The same types of tests that you use in your everyday dealings are the tests that you will apply to your deliberations.

As the trial proceeds, you are going to begin to gather impressions about what happened in terms of the events presented through witnesses and documents. I remind you, please keep an open mind until you have heard all of the evidence in this case.

A case can only be presented step-by-step, witness-by-witness, and as you know from experience, you can hear one person give their version of an event and think it sounds very impressive or even compelling, and yet upon hearing another person's version of the same event or even the same person cross-examined with respect to that event, things





may seem very different. In other words, there may be another side to any witness's story.

You should use your common sense and your good judgment to evaluate each witness's testimony based on all of the circumstances. I cannot emphasize too strongly that you must keep an open mind until the trial is over. You should not reach any conclusions until you have all of the evidence in front of you.

During the trial, I may sustain an objection to a question that is posed to a witness or to a request to admit a certain piece of evidence. When that happens, I will not permit the witness to answer or if the witness has already answered, I will instruct that the answer be stricken from the record. Similarly, when I sustain an objection to an admission of a record, I will strike that evidence from the record.

When I order that certain evidence be struck from the record, you are not to speculate as to the reasons why. I will instruct you to disregard the information or the testimony, and this means that when you are deciding the case, you must not consider the stricken information or testimony in any way. You must treat stricken evidence as though you had never heard or known of it.

You may also not draw an inference from an unanswered question in reaching your decision. You should not





show any bias against any attorney or the attorney's client simply because the attorney objected to the admissibility of evidence or asked the Court for a ruling on the law.

You should also understand what is not evidence, and should not be considered by you. I will list these things for you now.

First, what an attorney says in their opening statements, closing statements or questions is not evidence.

Second, the attorneys' objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe that the evidence being offered is improper under the rules of evidence.

You should not hold it against the lawyers if they make objections. You should not be influenced by the objection or by my ruling on it.

If I sustain an objection, it means the witness cannot respond to the question. If the witness has responded, as I've noted, you will disregard the answer and that answer will be stricken from the record. If it's overruled, you should treat the answer like any other answer.

If I instruct you that some item of evidence is received for a limited purpose only, you must follow that instruction as well.

Third, testimony that I have excluded or told you to disregard is not evidence and you must not consider, as I





noted earlier.

And fourth, anything that you may have seen or heard outside of the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in courtroom 1040.

And finally, anything that I say is not evidence.

The only oral testimony that is evidence comes from the witnesses. What the lawyers say in their arguments to you is not evidence. Their arguments are commentary to help you understand the evidence.

For example, we're about to hear opening statements from the Government and from the defense. The lawyers will tell you what to expect the evidence to show, but what they say is not evidence.

You may consider only the information that is actually introduced into evidence in the course of the trial in reaching your verdict.

And if in the course of your deliberations, your recollection of the facts differs from the lawyer's arguments, it is your recollection that controls.

Now, I indicated earlier -- I provided earlier a summary of the case, and I will provide it again.

The indictment alleges that the defendant, Mr. Philip Priolo, engaged in a mailing fraud scheme in which he sent letters to individuals throughout the United States.

The indictment alleges that these letters falsely and fraudulently induced the recipients to pay fees in order to receive a promised cash prize.

It also alleges that despite payment of the fees by many individuals, the promised prizes were not given, and the defendant denies the allegation that the letters were fraudulent or that any cash prizes were promised.

I saw some of you enter the courtroom with notebooks. Mr. Morabito, I believe provided you those notebooks. You saw them in the jury room. I do permit note-taking in court, but I will give you an instruction about this.

So each of you has a notebook and pen accessible to you if you choose to use it. You don't have to take to notes. That's the first thing to know. Some people like to take notes. Some people don't need to take notes to follow information and evidence in court. So do not feel any obligation to take notes during the course of the trial.

Please be sure to -- please make sure to ensure that if you do choose to take notes, that your note-taking doesn't interfere with your ability to look at witnesses when they're testifying, to make those credibility assessments, and to pay attention to what is going on in the court.

If you do take notes, you must not show them or discuss them with any other juror or anyone else at any time,





either before or during your deliberations in the jury room.

Any notes you take are used solely to assist you, and your notes are not to substitute for your recollection of the evidence.

The fact that a particular juror takes notes entitles that juror's views to no greater weight than those of any other juror.

If during your deliberations you have any doubt as to any of the testimony, you can request that the official transcript of these proceedings be read to you.

And you've seen our wonderful court reporters taking down everything that is said in this courtroom.

Mr. Morabito, my courtroom deputy, will safeguard your notebooks during breaks and at the end of each day, and secure them. You are not permitted to take your notebooks with you when you leave court, and no one is permitted to review your notes. After the trial has concluded, the notebooks and your notes will be collected and destroyed.

If you do plan to take notes, please write your juror number and name and initials on the cover, so you will know that the notebook is yours.

Now, I know we went through a lot of different juror numbers for you in order to get to the selection, but each of you at the end of the selection process identified your juror numbers and your seats correspond, so that top row of





the jury box is juror one through eight, and the front row is juror nine through 16. So on your notebooks, please write down your juror number and please remember your juror number as well going forward.

So we talked about my caution and instructions of not doing research, not speaking with anyone about the case, not speaking with any of the counsel, the parties, court personnel or each other about the case or anyone having to do with the case.

We talked about no communications of any kind, no social media of any kind, no communication, electronic, nonelectronic, old school, new school, anyway about this case. It is very, very serious and important. So I've covered those numerous times, and I won't go through all of them again.

I will proceed now to give you an outline of the trial. I will summarize the stages of the trial for you.

First, each side may but doesn't have to make an opening statement. An opening statement is neither evidence nor argument. It is an outline of what the party intends to prove and it is offered to help you follow the evidence.

Then you will hear from witnesses. Both parties will question each witness. You should not attach any significance to the order in which witnesses are called. You may consider the relevant testimony of all witnesses, regardless have who may have called them.





The defendant has no obligation to present any evidence, but he has an opportunity to do so if he would like to. After all the witnesses have testified, I will again give you instructions on the law.

The parties will then make their closing arguments to summarize and give you their interpretation of the evidence. Like opening statements, their closing arguments are not evidence.

After the closing arguments, I will instruct you on the law, and you will retire to deliberate on your verdict. Please do not make up your mind about what the verdict should be until the very end of the trial. After I have instructed you on the law at the end of the case and you have gone to the jury room and discussed the evidence with your fellow jurors, keep an open mind until then.

The parties deserve and the law requires that you give them an opportunity to be fully heard.

With that, we are ready for opening statements from the Government. Thank you.

MS. ENTWISTLE: In 2015, John Single was in his nineties and living in a veterans home. One day, John Single received a letter from the mail. It was a prize notification notifying him that he was the winner of a large cash prize, and all he needed to do to claim that prize was send in a small fee. Mr. Single sent in the payment.

Soon, Mr. Single received another letter appearing to come from another company, also informing him that he was the winner of a large cash prize he was entitled to receive in exchange for a small payment. Mr. Single made another payment.

Then came another notice from another company, and another one. And he sent in more payments. In the months that followed, John Single received an avalanche of prize notices. In response, he sent payment, after payment, after payment, but the prize money never came.

What John Single didn't know, what he couldn't know, was that 42 of those payments he mailed to many different companies were all going to the same person: The defendant, Philip Priolo.

And John Single wasn't the only person who was tricked by the defendant's prize notices.

From the beginning of 2015 through the end of 2016, the defendant and his partner took in more than two million dollars from thousands of victims across the United States. And once a victim fell for one of the defendant's prize notices like John Single did, the defendant targeted that victim again, and again, and again.

For the defendant, it was simple business. Prize notices went out. Payments came in. But each of those payments came from a person with a story, just like John





Single.

This is a case about fraud. Fraud is lying to people to steal their money. The evidence will show that's what the defendant did.

He mailed out fake prize notices, signed by fake people from fake companies, and the defendant used these prize notices to deceive victims, including elderly and vulnerable people like Mr. Single into paying millions of dollars.

You will learn that the defendant tricked these people into believing that they would receive a large cash prize of over a million dollars if they sent in a processing fee of between 20 and $40 on average. But it was all a scam. No one ever received a prize.

The defendant never sent back any prizes or million dollar awards to these victims. The only people who collected millions of dollars were the defendant and his partner.

In this trial, the United States will prove beyond a reasonable doubt that Philip Priolo operated a mail fraud scheme. Right now, I'm going to give you an overview of the case, a preview of the evidence you are going to see and hear. I will explain how the defendant's scheme worked, what the criminal charges are, and how the evidence will prove beyond a reasonable doubt that the defendant is guilty of those charges.

The evidence will show that the defendant operated a





mail fraud scheme from here on Long Island. He sent fraudulent mailings to victims throughout the United States, and each of those mailings contained a return envelope addressed to PO boxes throughout Long Island.

During the trial, you will see copies of more than two dozen different prize notices, all sent by the defendant to victims around the country. All of these prize notices appeared to be personalized letters, notifying the recipient that they have been individually selected to win a large cash prize, usually over one million dollars.

That big dollar amount is printed in large font multiple times. The mailings looked like they were official notification letters from various companies. The letters claimed to be from over two dozen different companies with names like Prize Verification Service or Million Dollar Prize Exchange or Meechum, Montgomery and Sinclair Trust Company. The notices have various different headings at the top of letters, including cash and prize advisement or notice of cash funds held in trust.

Here is just one example of the many prize notices you will see in the evidence throughout this trial: Corporate Legal Notification, total amount in U. S. Dollars, $1.3 million, urgent attempt to inform.

The notices appear to have been individually signed by company officials, and although the defendant mailed the





same prize notices to thousands of people at a time, they appeared to be personalized, referring to the victim by name and address multiple times throughout the notice.

According to the notice, all the recipient has to do to claim their winning is to fill out the enclosed form and mail in a fee, $1.3 million reply form. That was a scam.

The defendant didn't operate lotteries or sweepstakes. He did not award cash prizes. What victims received after they had a payment was a piece of paper.

A single piece of paper listing publicly available information, information anyone could find through a Google search about various sweepstakes that were available for any member of the general public to enter.

Now, you will see that each of the defendant's prize notices contains a block of text on the backside, labeled consumer information, a one large block of text. Among other information, this text says something to the effect that the recipient has not won any money or prize.

In addition to being designed to make it difficult to read, this statement directly conflicts with the overall impression given by every other piece of the mailing that the individual receiving the letter has been individually selected to receive a cash prize.

Now I'm going to tell you about the defendant's process for sending out the prize notices and how he decided

who to mail to and what they would receive.

You will hear from multiple witnesses during this trial who worked on behalf of the defendant to help him run the day-to-day operation of his mailing scheme. Those witnesses will tell you that the first prize notice mailing the defendant would send out to thousands of people every month was what they called a front-end mailing. This was a prize notice, just like all of the other prize notices. What made it different was who the defendant would mail it to.

He would rent lists of names from other people including people he worked closely with who sent the same type of prize notices he was sending. He would get mailing lists from those other mailers with names and addresses of people all across the country and at the beginning of the month, he would send out a front-end mailing to thousands of people.

The evidence will show that the response rates to these front-end mailings were very low, often less than five percent response rate. The evidence at trial will also show that the purpose of the first mailing was to find out which victims fell for the scheme. Once a victim mailed in a response to that first prize notice, that victim's name and address went on the defendant's own mailing list and that victim was bombarded with additional prize notices.

Over the course of the next month, that victim would receive up to 13 additional prize notices from the defendant,





all the same type of prize notices I have shown you and described, but appearing to come from different fake companies and signed by different fake people. There was no way for the victim to know the truth that all of those letters were from the defendant.

The evidence will show that beginning in late 2014, the defendant was running this scheme with a partner. Jeff Novis. Phil Priolo and Jeff Novis decided which prize notices would be sent out, and what lists of people would receive their prize notices.

And Philip Priolo and Jeff Novis collected the proceeds of their scheme. Money received from victims was deposited into a bank account in the name of the company, Winners Circle International. Both the defendant and Jeff Novis were signatories on that bank account and you will hear testimony and see evidence that they both received the money victims sent in.

The evidence will also show that in early 2016, the defendant kept working with Jeff Novis to run the Winners Circle scheme, but he also began running his own scheme under the name Feel Lucky Group.

As part of this second mailing operation, the defendant sent out the same type of prize notices filled with the same types of lies. These prize notices also all appeared to come from different fake people at different fake





companies. None of them said they were coming from the defendant or his New York registered companies.

So every month, the defendant was sending out more than a dozen prize notices for Winners Circle and sharing the profits with Jeff Novis. And every month, he was also sending out another ten additional prize notices from his own mailing scheme where he kept all of the profits -- more mailings going out, more victim payments coming in.

The defendant also worked with Jeff Novis's son, Shawn Novis. Shawn Novis and partner, Gary Denkberg, were running the same scam, sending out their own prize notices: Same lies, different company names. Sean Novis had employees working for him to help run the day-to-day operation of the scheme. Philip Priolo and Jeff Novis used these same employees to run the day-to-day operations of their mailing scheme as well.

You will hear evidence that Philip Priolo shared lists of names of victims who had recently fallen for the scheme with these other partners on a monthly basis. So people who fell victim to the defendant's prize notices began receiving additional prize notices not only from the defendant, but his co-conspirators as well.

The evidence will show that the defendant knew that his prize notices were deceiving people. You will hear and see evidence that in addition to sending money, victims sent





in notes and letters in the return envelopes. Some of their return envelopes didn't contain a payment, just a note from the recipient of the letter saying, please take the $20 payment out of my winnings and sent me my prize.

The evidence will show that the defendant received these types of responses to his mailings on a daily basis, and that the defendant kept track of the number of responses he received that included no payment.

Victims also sent letters asking why they had not received their cash prize after sending a payment. Victims sent in so many of these letters that the main customer service task for the defendant's scheme was responding to some of those complaint letters and explaining to some of those victims that they had not won a prize.

The evidence will show that the defendant received complaint, after complaint, after complaint. You will see letters and notes that victims, their family members, and state attorneys general around the country sent regarding defendant's prize notices.

Now, you will hear that the defendant provided refunds to some victims, but will you also see evidence that he never altered his fraudulent scheme. He never changed the wording of his mailings after receiving complaints.

When government officials wrote to the defendant on behalf of the victims, Philip Priolo sent refunds to those

specific victims, removed them from future mailing lists, and then continued to mail the same letters to thousands of other people in the exact same way that he had before.

You will also hear evidence that there was one circumstance in which the defendant would change the wording of his mailings if he was asked to do so by his payment processor before that company would agree to process victim checks on his behalf.

You will hear evidence that for much of his scheme, the defendant had scans of the victim checks he received sent to a payment processing company in Canada. That Canadian company would deposit the check in their own bank accounts and then wire funds at the defendant's request back to a local bank on Long Island.

The evidence will show that the Canadian payment processor had a risk department, and they would sometimes ask the defendant to make changes to a few specific words in his prize notices. Nearly every time the payment processor asked him to make a change to a prize notice, the reason they gave was that the original wording made it sound like the recipient of the letter had won money or was guaranteed to win money.

The evidence will show that the defendant did make some of those changes because that was the only way to get the Canadian company to process his checks. But you will also see that those minimal changes did nothing to change the overall





impression conveyed by his mailings.

The evidence will further show that the defendant took steps to distance himself from his victims and to hide his involvement in the scheme.

The prize notices instructed victims to make out their checks to fake three letter companies. The defendant never used his own name or even the names of his own New York registered companies on these notices. The notices never include a phone number, an email address or website.

When the victims mailed those checks to one of many PO boxes the defendant rented around Long Island, the defendant never instructed victims to mail payments to an actual business address where he worked.

And as I have just mentioned, the defendant took checks from the PO boxes and routed them to a check processor in Canada before those victim funds were finally wired back to his local bank on Long Island. The cash, on the other hand, you will hear Defendant Priolo regularly collected himself.

Now, let me tell you about the charges Mr. Priolo is facing. Philip Priolo faces five criminal charges. All of the charges are about fraud, lying to people to steal their money.

The defendant is charged with conspiracy to commit mail and wire fraud. A conspiracy is a kind of a criminal agreement. The evidence will show that the defendant is





guilty of that crime because he agreed with other people to defraud using the mail and wires.

Next, the defendant is charged with four specific acts of mail fraud against specific victims. Those charges are related to specific victims who received a prize notice from the defendant through the mail and sent a payment back through the mail in response to the prize notice. That is mail fraud.

So those are the charges. How will we prove them? We will show you the evidence. You will see the fraudulent prize notices the defendant mailed, and you see the checks and letters victims sent in response. You will see the defendant's email and bank records.

You will hear testimony from former employees of Shawn Novis, who also helped the defendant to run the day-to-day operation of his mailing scheme. You will hear testimony from Cathy Johnson, the woman who processed the incoming victim mail and payments on behalf of the defendant and his co-conspirators.

In December of 2016, federal officers executed a search warrant at the office where Cathy Johnson opened and processed victim mail. You will hear testimony from one of the officers who conducted that search, and you will see the evidence he found at that office.

Finally, you will hear from the victims of this





scheme and their family members, not all of them. There were thousands of victims across the country. You will hear from a handful of them. Some of the victims sent payments over, and over, and over again. Some of the victims sent one payment, and then later sent a letter asking why they had not received their cash prize.

Unfortunately, some of the victims of this scheme have passed away or cannot testify because they suffer from dementia. For those victims, you will hear from their loved ones who will tell you about their loved one's experience and how their loved ones fell prey to the scheme.

These victims and their family members will testify that the victims only sent payments because they believed they would receive a large cash prize. You will hear that none of them understood that in exchange for their payment, they would only receive a single piece of paper with publicly available information about sweepstakes.

At the end of this case, the evidence will prove to you beyond a reasonable doubt that the defendant, Philip Priolo, is guilty of all five criminal charges, and that is why at that time, we will ask you to return the only verdict that is consistent with the evidence you will have seen and heard and with the law, and to find the defendant guilty. Thank you.

THE COURT: Thank you, Ms. Entwistle.

Mr. Froccaro?

MR. FROCCARO: Judge, would it be all right if I just removed this mic? I think I speak loud enough, Judge. I'm not going to need it.

THE COURT: Sure.

MR. FROCCARO: Ladies and gentlemen, this is one of the two times that I'm permitted during the course of this trial to be polite and speak to you all directly and greet you. I want to say happy afternoon to you all. It's nice to meet you all.

We have been introduced once before. My name is James R. Froccaro, Jr., and I'm the attorney for Philip Priolo, who is seated right over there.

Philip, if you could please stand up, please?

I'm going to be assisted during the trial by another attorney. His name is Jonathan Edelstein.

Mr. Edelstein, if you could please stand up for the jury as well? Thank you, counsel.

Now, during the trial, I'm always going to try my best to get to the point quickly, and I'm going to start that trend with you all right now.

I know it's obvious, but Philip Priolo has entered a plea of not guilty in this case to all of the charges filed against him. The Government will never be able to prove to you all beyond a reasonable doubt that Philip Priolo committed





any crime here.

Now, for a large part of Philip's adult life, he was the owner-operator of a local car wash. In the years 2015 and 2016, he was also in the sweepstakes reporting business, a business which was conducted through promotions sent directly to consumers nationwide through the mail. And this is what the evidence is actually going to show.

The evidence will show that exchange for as little as a $20 payment, consumers nationwide purchased and received from his business a booklet or report listing numerous then available sweepstakes, along with an aggregate -- aggregate accounting of the guaranteed cash and awards offered by the various sweepstakes promotions.

So when Ms. Entwistle flashed up that thing with the document that said a million, 300 or whatever the document said, that that's the aggregate amount of all the sweepstakes. It's absolutely accurate, so you know and you'll hear that at trial.

Now, not only did it come with an aggregate accounting and accurate -- excuse me. It's a tongue twister -- an accurate aggregate accounting, it also came with all the entry directives, specifically what do you have to do to the enter that sweepstakes.

So for $20 -- excuse me. One other thing I didn't say is you're probably going to get ten to 12 sweepstakes in





the list. So for as little as $20, which is essentially two dollars a sweepstakes, you can win a lot of money potentially. You know, low odds of winning them all, of course they're difficult. Of course you could. It's not a bad shot, no different than a dollar and a dream.

You have heard of places like Publishers Clearing House, Kellogg's, they're all legitimate sweepstakes, and when she flashed up the little document that she said was worthless, if somebody paid $20 that for that, they could win a million. The person that wins the million is not going to say that's not a valuable document.

Now, I listened very carefully to what Ms. Entwistle had to say to you all during her preview, but what Ms. Entwistle said to you all is not proof or evidence of anything, just like what I say to you all is not proof or evidence of anything.

She suggested to you all that Mr. Priolo engaged in a criminal fraud for a number of years, just two, during the years 2015 and 2016, a number of years ago. That he defrauded you'd consumers nationwide -- and I want to be very careful that I make this clear what their theory of the case is -- by falsely promising consumers in mass mailings all over the country that they had won huge cash prizes, in the millions of dollars, and would obtain their winnings by simply paying a small fee, as little as $20.





That's the theory of their case. But ladies and gentlemen, what the evidence is really going to show is that is simply not the truth.

And I'm now going to ask Mr. Edelstein to please place -- it's a document called a Consumer Information Notice on the Elmo, please.

And that just means, just so you know, I didn't know this years ago. It's called an Elmo. When a judge said to me, please put it on the Elmo, I thought Sesame Street, something was going on here. I didn't know what was going on. Now I know what an Elmo is.

John, is it on?

MR. EDELSTEIN: It's on, yes.

MR. FROCCARO: That is what Ms. Entwistle skimmed over with you all in her opening statement of. Remember when she said there was a document right attached to the initial promotion? Well, that's the whole document, and I'm going to go over with you all because that document is going to be a focal point of the entire trial.

Now -- and I'll also read to you guys if don't want -- if you could just please just pay attention to me and I will get to certain portions, that's the critical portions, that are the indisputable portions.

All right. The evidence will show that the Consumer Information Notice was provided to each and every consumer who

received the promotion in the mail from Mr. Priolo nationwide. Every single one got the notice. And it provided every single consumer in no uncertain terms in big capital letters on its own page with nothing else to detract from it or take your attention away from it with the following information -- and remember at the top, it says Consumer Information. That's kind of important if I see something that says consumer information coming from the mail.

And this is what says to start with, that the mailer was a research and reporting service that specialized in researching sweepstakes sponsored by corporate organizations, and compiled sweepstakes opportunities in a report, which sets forth all mail purchase entry requirements based on existing federal, state and local regulations.

And then you know what the next sentence is? Says that the consumer or recipient of the mailing has not won any money or prize. How could it be any clearer than that? What the business is, what you're receiving. That's why it was skipped over during the Government's opening statement. There's always two sides to a coin.

Now, again, that's what the indisputable evidence at trial is going to be, every consumer whoever received a mailing received that nationwide, and maybe you can read along with me now. I'm going to read it, so there is no dispute about it.





CBA is a research and reporting service. We specialize in researching sweepstakes sponsored and conducted by corporate --

Can you guys see with my back to you, first of all? Is my big head in your way? Can you see? It is? I'm sorry.

I'm going to move up here, Judge, if that's all right.

CBA is a research and reporting service. We specialize in researching sweepstakes sponsored and conducted by corporate organizations with which CBA is completely unaffiliated. We compile these sweepstakes opportunities in a report which sets forth all no purchase entry requirements, based on existing federal, state and local regulations. You have not won any money or prize.

Now, the material part about, that keep in mind, okay? Notice how we market this stuff. Is that what the promise was from his business is you received a sweepstakes booklet. That's the promise that what's material, whether it says CBA was the research place, whether it says JRF, my initials, was the research place. Do you get what you pay for? That's what's material. Are you being lied to about what you're receiving.

Now, I'm going on, if you could just bear with me.

Every consumer who received a mailing was provided the information that -- and I believe it's a little further





down -- this communication, meaning the mailing, was not a sweepstakes or award notification, and no guarantee that you would win any sweepstakes.

It says that, too, in big bold capital letters in no uncertain terms on a page that nothing else detracts its attention away from, and if I bring your attention to that and I'll move on: This communication is not a sweepstakes or award notification, and does not guarantee that you will win any sweepstakes. That's what it says, a lot different from what you heard.

Ladies and gentlemen, what the evidence is going to show is that the only way that someone could ever possibly mistakenly believe that they had won millions of dollars in exchange for a $20 report fee is if the person simply didn't read the mailing thoroughly of if the person suffered from a cognitive impairment.

If a poor person with dementia doesn't understand it, but I'm going to get to that. There is a fail safe for clients specifically on that. It's just sad. We feel bad for it, but you'll see that there's a fail safe in that scenario because what the Government is going to do, I'm telling you, they're only going to call people with cognitive impairments because anybody who is a regular person is going to read that and know exactly what they're getting.

In either of those cases, if they didn't read it





thoroughly or if they had a cognitive impairment, the evidence is going to show that Mr. Priolo's mailings provided a fail safe for each and every consumer nationwide.

If the consumer was dissatisfied for any reason with the sweepstakes report that the person received in the mail in exchange for the small fee charged, all the person had to do was request a refund, and their money was refunded in full.

There was an envelope included in the mailing for that purpose. All right? If you weren't happy with our report, send it back and I'll pay you your money back, and you're going to hear at trial, anybody who asked for a refund got paid their money back. There was a procedure to it. If they did it right, they got it back.

And this promise was also right in the Consumer Information Portion of the mailing every consumer received as well, and if you indulge me, I'm going to just read that portion.

Responders -- could you move a little to the left, John, if you don't mind, where it starts responders?

Responders will be refunded their purchase price of our report in full if they are dissatisfied with the report. Says it right there.

So if God forbid, your loved one has dementia, if you actually read the mailing, you just send him a letter and say, listen, you don't even need a reason. Send me back the

money. We're dissatisfied. Give us our money back. So nobody is taken advantage of, and that's not what a fraud actually looks like. They steal your money and you never see them again.

Now, ladies and gentlemen, the evidence will also show that if anyone didn't want to receive any more mailings in the future, all you had to do was send back an envelope included with the mailing, marked DNM. Again, something else that they didn't mention over here -- which was short for do not mail, and you would forever be removed from their mailing list, and never receive a mailing again.

And again, there was an envelope included, so when they're complaining about being bombarded, yeah, they sent a lot of different promotions and mailings. If you didn't want them, you just send back the envelope and they never mailed you again.

Understand it from a business perspective. They don't want people that aren't interested. If you aren't interested, send it back and we don't waste the money on our mailings and our marketing. Again, the evidence will show this information is very plainly laid out in bold capital letters right in the consumer information that every single consumer got.

If you do not wish to receive further mail solicitations from CBA, just return this entire letter in the





enclosed envelope to CBA with the letters DNM next to your name, address area. What else do you have to do?

Now, I'm going ask Mr. Edelstein to place another document on the Elmo that you're going to see at trial. It's called a certificate. It's what you signed acknowledging the $20 that you're paying. There are certain boxes that you check to acknowledge what you're paying the $20 for. All right?

The certificate -- the consumers were asked to sign and return along with a small fee charged for the sweepstakes report, this document. All right? And the evidence will show that right on it, it says, I have enclosed the required $20 report fee for all of the monies and prize directives to me.

If you look, you see right at the bottom over, please sign, that's the boxes they always sign and check, and then sign: I enclosed the required 20 report fee for all the monies and directives sent directly to me.

Where do you see on there that it says, I have checked the box that says I'm getting my $1,392,000 on my $20 fee? They knew they were getting a report in the consumer information, and they were happy with it.

Thank you, John.

Well, I may get to it. Excuse me one second.

For the record, ladies and gentlemen, the promotion which Ms. Entwistle showed you all had the same consumer





information notice attached to it. All right? Of course she didn't highlight the whole thing, just I think she talked about a sentence, which provided the consumer with the exact same information as all the others.

Most importantly, that the mailer compiled sweepstakes reports and they give them all the entry requirements, and what the aggregate value was of these sweepstakes reports, and that the -- most importantly, that the consumer or recipient hadn't won any money or prize. That's the same -- that's the same one as she showed you as well.

There's one thing on the reply form that I don't know if she showed it -- and I apologize, Ms. Entwistle, because I may have -- I may have been concentrating someplace else, but there is a reply form to that, where you check a box again.

If you could put that on the screen, John, I'd appreciate it.

On this form, too, in the payment acknowledgment portion, it says, I am the person affixing the signature below and that the named nominee hereto for the $1,392,892.45 in winnable money and prizes.

Ladies and gentlemen, does that say, in the money that I won or in winnable? Which is right in line with right what's in the consumer information.





Now, listen, ladies and gentlemen, the evidence is going to show that my client's marketing was aggressive. Yeah, it was. Anyone in marketing knows you don't put the most boring stuff on a cover in order to get people's attention. The critical thing in every -- at least I think in every marketing situation is, did you deliver what you promised? Okay.

And I'm going to go into an experience that I recently had. I'm home. I'm watching TV with my wife, and on the screen comes this commercial and it says, men's cream, makes 60-year-old men look 20 years longer, 40 years ago. You look like 20 years old.

So I said, you know what? I'm going to buy that. And my wife just looked at me and said, are you nuts? That's not going to work. Well, dumb me, I bought it for $75. I put it on my face. I didn't look a day younger. They didn't keep their promise. Where's consumer protection on that one?

The difference and the reason why I brought that up is that in Mr. Priolo's particular case, he always delivered on what he promised, which was material, the material part of the transaction, a sweepstakes report booklet, with an accurate listing of numerous sweepstakes that a consumer could enter and win with huge cash and prizes guaranteed by the sponsors for a small price. And if you were unhappy for any reason with the sweepstakes report, all you had to do is send

in this envelope he included in with it, and get a full refund. That's a fraud? That's what you want to ruin a man's life about?

Now, there are few other issues that Ms. Entwistle brought up at trial that I want to touch upon. All right? And briefly address with you. All right.

For example, the prosecutor suggested in her opening statement that Mr. Priolo targeted the elderly -- the venerable and the elderly, I apologize.

But the indisputable evidence at trial is going to be as follows: That the only information that anyone had were the names and addresses of the consumers. That's it. Nothing else. Not their ages, not their mental or physical health, and not their socioeconomic status. How would he know how old they were by sending them a letter with their names and address?

If I didn't know any of you, if you hadn't blurted out your ages, and I only had your name and address, would I know how old you were? Would I what your socioeconomic status is? Would I know your mental health? How would you know those things?

And the Government suggested to you that he targeted the vulnerable. How? It sounds a lot better when you invoke your sympathy and they take the stand. Watch when they're going to put their witness on the stand. I'm going to cross





them. I'm not going to go after some poor woman whose father died of dementia. But it's obvious the man with dementia didn't understand what was going on.

Now, the prosecutor also suggested in her opening statement that complaint letters were sent in. And I want to focus your attention to that, in response to mailings, which I think she suggested should have made or placed Mr. Priolo on notice that he needed -- a change needed to be made in his business in how he was sending these things out.

And I'm going to ask Mr. Edelstein to place another -- a Government's exhibit coming in on the screen. And everything I showed you is a Government exhibit. We're not afraid.

It's on the screen, John?

MR. EDELSTEIN: It's on the screen.

MR. FROCCARO: Thank you so much. Can you make it a little about bigger? I don't know if they can see it.

Can you guys see it? Yes?

Okay. What that is, ladies and gentlemen, is a summary chart of the transactions and payment records that the Government plans to introduce at trial of the direct mailing entities that Mr. Priolo was an owner of in 2015 and 2016, the Winners Circle and the Feel Lucky Group.

Now, they put it up there for a purpose, and she even suggested it in connection with her purpose. She made it





sound like Mr. Priolo made a killing. He made over two million dollars here, right, through this? That's why she did it, in order for you to be prejudice -- oh, he made a ton of money here.

Well, let's start with this. You know what? I apologize. You know what? Let's start with that.

If there were a thousand separate transactions and that's what they have up there. You see the approximate number of transactions? If you add them up, it's well over a thousand separate transactions. Okay?

If it's over a thousand separate transactions, let's call it for argument's sake, and for argument's sake, and I want to go back -- I want to go to the complaint letters that should have made him change his whole business practice.

If you have a hundred thousand transactions, if you have let's say for argument's sake, a hundred complaint letters, well, simple arithmetic reveals that that means that there is 999,900 people who had no complaint whatsoever about the mailings. Would that make you change -- anybody here who is in business, would you change your business practice because that happened? It's absurd that you would make that suggestion. People complain. People complain. 999,900 don't complain, and it's a crime?

Now, the other thing is, percentage-wise, I made -- one of my kids figured it out, how to do it on the calculator.





If there's a hundred thousand transactions and a hundred complaints, that's .1 percent of the purchasers. That's one-tenth of one percent. It's miniscule.

Now, the evidence is going to show, ladies and gentlemen, there's another reasonable word for it, a reasonable doubt.

Now, I'm almost done, Judge. I'm getting there.

The Government suggested to you all that with over two million deposited --

And is that chart still up, John?

With over two million deposited between 2015 and 2016, Mr. Priolo made a lot of money here. Well, that's also misleading. We have -- they have all of his bank statements, showing every single check that was written out of the account, every single check. What they neglected to include or it will come out during cross-examination is in their chart, is that his expenses almost exceeded that, if they didn't exceed them in total.

They make it look to you like, oh, the guy was robbing vulnerable elderlies, he was robbing, and he was making a killing. He made two million dollars, over two million dollars.

(Continued on the next page.)

(Continuing.)

MR. FROCCARO: Tell him to introduce the bank records showing the checks. The expenses were huge for the mailings. He's sending out hundreds of thousands at a time. If he made a profit at all, it was minimal. So when you see that chart, please, I'm asking you to remember, what were his expenses? Why was he suggesting to us he was making that kind of money?

Ladies and gentlemen -- and I got the name right, thankfully -- Judge Choudhury has already explained to you all that the indictment in this case is not proof or evidence of any wrongdoing on Mr. Priolo's part; that by law, Philip Priolo is presumed innocent of any charge or allegation made against him here and that by law he continues to be presumed innocent unless and until the prosecution can meet its burden of proof to prove its case to you all beyond a reasonable doubt.

Judge Choudhury is going to explain to you all at the end of the case exactly what the legal definition of proof beyond a reasonable doubt is. But be sure, it's a heavy burden that the Government will never be able to meet in Philip Priolo's case.

You were each chosen because you each said that you could be completely fair and impartial and that you will render your verdict without bias or sympathy for





either side or any witness. If you're true to your word, as we all expect, the only verdict you could render against Philip Priolo here is a not guilty verdict. Quite simply, that would be the only fair and just result.

I thank you all for listening to me. The next time you will hear from me directly, I will be able to say hello, is at the end of the case for the closing statements when we tell you what the evidence is here at trial.

Thank you all very much for your attention.

THE COURT: Thank you very much Mr. Froccaro.

We will now hear from the Government's first witness.

MR. FELDMAN: Your Honor, the Government calls Sharon Soltis to the stand.

THE COURT: Hello, Ms. Soltis. Please go up to the stand.

THE COURTROOM DEPUTY: Please raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Please state your name for the record and have a seat.

THE WITNESS: Sharon Soltis.

THE COURTROOM DEPUTY: If you could spell your name as well.





THE WITNESS: S-O-L-T-I-S.

SHARON SOLTIS,

called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FELDMAN:

Q. Good afternoon, Ms. Soltis.
A. Good afternoon.
Q. Please introduce yourself to the members of our jury.
A. Sorry?
Q. Please introduce yourself to the members of our jury.
A. I'm Sharon Soltis.
Q. Where do you live?
A. Niwot, Colorado.
Q. How many people are in your household?
A. Right now, just my husband and I.
Q. Do you have any brothers or sisters?
A. Yes.
Q. How many?
A. Three.
Q. What about your parents, are they still alive?
A. No, they're not.
Q. What was your dad's name?
A. John Single.
Q. When did your dad pass away?





A. About three years ago.
Q. How old was he when he have passed?
A. Almost 99.
Q. Before he passed away, was he retired for a period of time?
A. Oh, yes.
Q. Before he was retired, what did he do?
A. He was a salesman.
Q. Did your dad ever serve in any branch of the military?
A. Yes, he did.
Q. What branch?
A. The Air Force.
Q. Was that during World War II?
A. Yes.
Q. What was his job during World War II?
A. I was a bombardier.
Q. I want to direct your attention to the 2015/2016 time period, if I could.
A. Mm-hmm.
Q. During that time period, were you involved at all in your dad's financial affairs?
A. Yes.
Q. How?
A. I was on his bank account in case of emergencies.

Q. Are you familiar with your dad's handwriting?
A. Yes.
Q. What about his signature?
A. Definitely.
Q. If today we showed you documents that had your dad's signature or handwriting on them, do you think you will be able to identify them?
A. Yes.
Q. What was the status of your dad's health in 2015 and 2016?
A. He was at the VA and he was -- he was doing well until he broke his hip.
Q. Do you remember around when that was? Not specifically an exact date, but just general time period?
A. When he broke his hip?
Q. Yes.
A. He was about 92, 93.
Q. What about his mental state in 2015, 2016?
A. His mental state was fine. He had a little dementia, a little.
Q. When you say a little dementia, what do you mean?
A. It depends at what point, how long he was at the VA, because he was declining slowly. I could tell by things that I told him that he would be forgetful.
Q. What other symptoms did you observe other than





forgetting things you told him?
A. He could get angry easily.
Q. Okay. I want to switch gears here. I want to ask you some questions about letters or mailings that your dad got in this same time period, 2015 and 2016, okay?
A. Mm-hmm.
Q. Do you remember if your dad received letters about large cash prizes during that time?
A. Yes.
Q. How do you know that he received those letters?
A. I heard about them and I saw them.
Q. Who did you hear about them from?
A. From him.
Q. And where did you see them?
A. When I visited him in Ohio, he either would show them to me or he had them in a box or he had called me and told me about them.
Q. How many letters are we talking about? Are we just talking about a handful of letters or more than a handful?
A. Quite a few.
Q. Did you ever have conversations with your dad about any beliefs that he had formed about what these letters meant?
A. Yes.
Q. What were --





MR. FROCCARO: Judge, objection. Just can I just approach very quickly?
THE COURT: Sidebar.
(Sidebar.)
(Continued on next page.)





(Sidebar conference held on the record out of the hearing of the jury.)
MR. FROCCARO: Judge, I apologize. I just -- I know how the Second Circuit works, God forbid I need it. I just want to renew my objection regarding hearsay and that's it.
THE COURT: Understood.
MR. FROCCARO: I'm fine with it.
THE COURT: Are you crouching because of my height?
MR. FROCCARO: I didn't want them to see me reading from my lips.
THE COURT: Understood. I will just say also, I hear your objection and I stand by my ruling that it's not offered for the truth of the matter asserted.
Thank you.
(Sidebar ends.)
(Continued on next page.)

(In open court.)

THE COURT: Thank you so much.

BY MR. FELDMAN:

Q. Ms. Soltis, I'm actually going to repeat my question for you.

A. Okay.

Q. When you spoke to your dad about the letters he received, what statements did he make relaying his beliefs about what the letters meant to you?

A. He was a winner.

Q. He told you that?

A. Mm-hmm. Adamant.

Q. Was this something you spoke to your dad about once or more than once?

A. Many times.

Q. Do you know if your dad ever sent any money to the companies that sent him these letters?

A. Yes.

Q. Did he tell you why he was sending in that money?

A. Somehow it was information in his mind that he had to keep paying to get the money.

Q. I want to show you some examples of letters and see if you recognize them.

MR. FELDMAN: Can we pull up Government's Exhibit 51 for the witness only?





BY MR. FELDMAN:

Q. Ms. Soltis, do you see a document on your screen?

A. Not yet.

There we go.

Q. Before I ask you questions, I just want to show you all the pages of the document.

MR. FELDMAN: If we can just scroll through the pages for Ms. Soltis.

Fabulous.

And back up to page 1.

BY MR. FELDMAN:

Q. Ms. Soltis, do you recognize those documents?

A. I haven't seen the actual documents.

Q. Do you recognize what's on the screen in terms of the digital copy of the documents?

A. Yes.

Q. What are they?

A. Do you want me to read what it says?

Q. Not yet. But just generally, what is it?

A. They look like they're documents that my dad filled out and amounts that he could win.

Q. And do these documents have your dad's handwriting on them?

A. This one has his handwriting on, Ohio vet home, his room number, and his name.





MR. FELDMAN: Your Honor, at this time, I will move to introduce Government's Exhibit 51 into evidence.

THE COURT: Is there an objection?

MR. FROCCARO: Same objection, Judge.

THE COURT: Overruled and I will admit the document. Exhibit Number 51 is admitted.

(Government Exhibit 51 received in evidence.)

MR. FELDMAN: Your Honor, at this point I'm showing defense counsel what's been pre-marked for identification as Government's Exhibit 51.

MR. FROCCARO: You got it.

MR. FELDMAN: Your Honor, these are original copies of the same documents. I move them into evidence as well.

THE COURT: They're admitted.

(Government Exhibit 51-EO received in evidence.)

MR. FELDMAN: Mr. Morabito, can we switch to the document camera for a moment?

BY MR. FELDMAN:

Q. Ms. Soltis, can you see that on your screen?

A. Not yet.

There it is.

MR. FELDMAN: Your Honor, can we put this on the screen for the jury as well?

THE COURT: Yes. That document has been





admitted, so, yes.

(Exhibit published.)

BY MR. FELDMAN:

Q. Ms. Soltis, what office name is at the very top of this document that's purportedly sending this letter?

A. It says Main Affairs Office, Department of Filing and Record.

Q. And in the biggest boldest letters on there at the very top, what does that say?

A. Completion document, 1,600,000.

Q. Do you see that there's two stamps on either side of the $1.6 million amount in red?

A. Yes.

Q. I want to first ask you about the stamp on the left.

Are you able to read the language from that stamp?

A. Signatory office notice dispatch agent for release, $1,600,000.

Q. What about the stamp that's actually on the right side of the document? It's actually in a circle. I will first have you read the language that's in the middle of the circle.

A. Filed registry document. 2018, I think.

Q. If you can, I think it's going to be hard to read, but if you're able to, there's language in the stamp

written along the bottom of the document. Are you able to make out what that says?
A. Something and prize notification.
Q. You said -- sorry, I didn't hear you. Can you speak into the microphone?
A. It looks like -- I can't see the first word now. And prize and notification.
Q. Who is this letter made out to?
A. To my dad, John Single.
Q. Can you tell, does your dad's handwriting appear immediately to the right of his address?
A. Yes.
Q. Will you read it for the jury?
A. John Single.
Q. What about the note immediately to the right of his name? Let me see if I can zoom in for you.
A. Oh, up here. It says: Ohio vet's home.
Q. Was your dad living at the Ohio vet's home in the 2015/2016 period?
A. Yes.
Q. Okay. I want to move to the left side of this document, and specifically the part immediately under corporate declaration.
Can you read that portion into the record and stop after it says name?





A. It says: Corporate declaration, matter of record, statement of filing. Be it known that the available cash and awards opportunity documents under advisement have been recorded and filed by the Lincoln Commission Main Affairs Office for the exclusive and sole use of.
Q. And I shouldn't have said stop after the word "name."
A. John Single.
Q. Thank you.
Couple questions about this language.
Have you ever heard of the Lincoln Commission Main Affairs Office?
A. No.
Q. In conversations with your dad, did he ever mention to you a Lincoln Commission Main Affairs Office?
A. Never.
Q. Can you read the next paragraph down from that?
A. It is hereby guaranteed upon the completion and return of this completion document within the date-line specified, the entire set of directives as declared available in money and awards opportunity is now available for payment to winner pending selections will be issued in the full amount to the address listed above and located in Sandusky, Ohio.
Q. I want to next ask you -- I'm going to move this document up. I want to ask you about the section on the





right.
Do you see the box that says receiver instructions? It should be right across from corporate declaration on the left side.
A. There we go, okay.
Q. You got it?
A. Mm-hmm.
Q. Okay.
A. Do you want me to read it?
Q. I want you to start where at that first check box where it says, I, John Single.
A. I, John Single, hereby grant my direct authorization for release of all documentation as stated in hereby request all directives for the full and total opportunity amount of 1,600,000 in money and prizes.
Q. Does it look like your dad checked that box?
A. He did.
Q. Okay. Can you go ahead and read what's immediately below that starting with "I hereby"?
A. I hereby do attest that I am of legal age in the state of Ohio to both participate in and win sweepstakes, contests, and awards and confirm as such by my signature below, John Single.
Q. Is that your dad's signature?
A. Yes, it is.





Q. Now, go ahead and just read the rest of the text and stop after you read the section about the report fee.
A. Nontransferable documentation to be signed by only individual herein. Report fee $32 payable to CPA. Remittance by check.
Q. When you say "remittance by check," is there some sort of notation on the document indicating that your dad checked --
A. Yes. It says cash, check, or money order and he checked check.
Q. Did the purported author of this document sign it?
A. Yes.
Q. Can you read the name of that person?
A. Jim Largent, president.
Q. Have you ever heard of someone named Jim Largent?
A. No.
Q. Did your dad ever talk to you about someone named Jim Largent?
A. No.
Q. Last thing before I take down this document and go to the next page.
A. Oh, you know what that says now? I see. Cash and prize notification. That stamp.
Q. You are talking about the stamp on the right side of the amount?

A. Yeah. I can read it now.
Q. I want to ask you one more question about this before I move on.
Do you see right above Main Affairs Office there's a date?
A. Yes.
Q. Can you read that date into the record?
A. 8/1/16.
Q. I'm going to put the second page of Government's Exhibit 51 on the ELMO, and I want to give you a chance to look at it. Let me know when you're ready.
(Pause.)
A. That's good.
Q. Is there a date in the exact same spot as the one we just talked about for page 1?
A. Yes.
Q. What's the date on this page of Government's Exhibit 51, dash --
A. 9/2/16.
Q. So approximately one month later.
A. Mm-hmm.
Q. Besides that change in date -- and for a moment, I'm not asking about any notations that your dad might have added to this, but just the document itself, does it appear to be the exact same document as the one we just





looked at?
A. It does.
Q. So I just want to ask you the questions about what writing your dad might have added to this document.
Do you see any notations that were written by your dad on this page? Let me see if I can zoom in for you.
A. This one says Ohio vet's home, 115.
Q. Do you also see any checkmarks that your dad added to this page of Government's Exhibit 51-OE in the receiver instructions section of the document?
A. Yes, yes, mm-hmm.
Q. He did add X's?
A. He has X's, yes.
Q. What about the signature? Do you recognize your dad's signature?
A. Yes, that's his, mm-hmm.
Q. Do you see in the remitted section at the very bottom of this document -- again gives three options, cash, check or money order -- which box did your dad check for this one?
A. Cash.
Q. I'm going to put the last page on the ELMO and ask you some questions about it.
Is that on your screen, Ms. Soltis?





A. Yes, it is.
Q. What is at the very top of this document right next to where it gives some sort of issue number?
A. Oh, there it is. Do you want me to read it?
Q. Yes.
A. L73173.
Q. And then next to that, what does it say?
A. File acceptance authorization.
Q. Did your dad add notes to this document as well?
A. Yes.
Q. And did he sign it?
A. He did.
Q. Can you read part C of the document?
A. Yes.
It says: By my signature, I attest that I am of legal age and eligible to accept amounts valued at up to 1 million and 580 million upon winning selection. John Single.
Q. When you say -- 1,580,000; correct?
A. Yes.
Q. Is there a name in part D of who your father was to send the money in response to? Is there a name of a company there in part D?
A. It says, yes, payable to GPI or 1.
Q. Whatever it says, did you ever -- did your dad ever





mention a company like that to you?
A. No.
Q. Have you ever heard of a company like that?
A. Mm-mm.
Q. Is that a no?
A. No.
MR. FELDMAN: Mr. Morabito, would you mind switching back to the document camera --
THE COURTROOM DEPUTY: Laptop?
MR. FELDMAN: I'm going to show a different document.
THE COURTROOM DEPUTY: Okay.
BY MR. FELDMAN:
Q. Ms. Soltis, we are going to pull up on your screen only Government's Exhibit 52. Let me know when that comes up for you.
A. It's up.
Q. So, first, look at page 1, and then can we go to page 2 of the document.
A. Mm-hmm.
Q. What is this document?
A. I have his handwriting note, okay. It says: Authorized receiver certificate.
Q. Is this document made out to your dad?
A. Yes.

MR. FELDMAN: Your Honor, at this time, I would move into evidence Government's Exhibit 52.

THE COURT: Admitted.

(Government Exhibit 52 received in evidence.)

MR. FELDMAN: I'm showing opposing counsel what's been marked for identification as 52-E -- 52-OE, simply the original copy of Government's Exhibit 52. I would also request to move that in at this time.

THE COURT: Mr. Froccaro, no objection?

MR. FROCCARO: No objection.

THE COURT: It's admitted.

(Government Exhibit 52-OE received in evidence.)

MR. FELDMAN: I'm sorry, Mr. Morabito, can we switch back to the document camera and actually show the jury?

BY MR. FELDMAN:

Q. Okay. You already indicated a moment ago this is an authorized receiver's certificate; correct?

A. Correct.

Q. And it's made out to your dad?

A. Yes, it is.

Q. Do you see where it says amount recorded?

A. Yes.

Q. What's the amount recorded there?

A. 1,200,000.





Q. And is it the same address in Sandusky, Ohio where your dad lived around that time?

A. Correct.

Q. Who is the purported author of this letter, this authorized receiver certificate?

A. You mean where it says director?

Q. Exactly.

A. Director. Okay. Dan Barrett, director, NPF.

Q. Have you ever heard of Dan Barrett?

A. No.

Q. Did your dad ever mention a Dan Barrett to you?

A. Never.

Q. What about NPF, have you ever heard of that?

A. No.

Q. Ms. Soltis, I just -- you're almost done reading -- I just want you to read that first paragraph under processing section completion I have a couple additional things, but start with that first paragraph, if you could.

A. Okay. It's marked an X. It says: Yes, I, John Single, am correctly identified. I am definitely the individual named and identified herein as the eligible receiver of the available sweepstakes cash prize opportunity as reported to me in ledger of entrant directives now pending release and issuance to me in the amount of $1,200,000.





Q. What's the next paragraph?

A. It's checked. It says: By my hand below I verify that I am the John Single as identified herein thus fully.

Q. And finally the last paragraph.

A. And it's checked. Have enclosed the required $20 report fee for all of the monies and prize directives to me by.

Q. I want to zoom in on something. You indicated that this third paragraph was checked.

A. Mm-hmm.

Q. Can you tell if it's checked, or is there some sort of note that's added to the check mark?

A. It has a number one. It looks like it's circled.

Q. Let me point to where I'm referring to because you know your dad's handwriting.

A. Mm-hm. Oh, over here on the side?

Q. Right there. What do you make out for that? What does that say?

A. It looks like a one.

Q. Okay. Let me ask you this question.

There's a spot just like we saw on the other forms for your dad to check how he is sending in the money to NPF. Do you see that? There's a bunch of options. Check, cash, or money order.

A. Yes.





Q. Can you tell if your dad checked any of those boxes?

A. He did not.

Q. Did he sign the document?

A. He did.

Q. Immediately below his signature, what did he say in that note?

A. See note. Over.

Q. You said "See note. Over"?

A. Over, mm-hm.

Q. I'm going to flip this document over.

Ms. Soltis, is that your dad's handwriting?

A. Yes, it is.

Q. What about his signature at the very end?

A. Yes, it is.

Q. Okay. Can you go ahead and read your dad's note to the jury?

A. You state no fee required, so I sent no fee. Take it out of any of my winnings, okay? I'm 93 years old, legally blind and deaf, have cancer, live in Ohio vet's home. I'm in World War II vet pension -- oh, I'm on World War II vet pension, flew 38 bomber missions to Japan. Now 70 years later I'm only flyer still alive. God bless you all, Jack Single.

Q. Ms. Soltis, to your knowledge, did your dad ever get any money back from any of these payments in response to

these letters he made?
A. None.
MR. FELDMAN: Brief moment to confer with co-counsel, Your Honor?
(Pause.)
MR. FELDMAN: No further questions, Your Honor.
THE COURT: Thank you.
Mr. Froccaro, your witness.
MR. FROCCARO: I just have a few, Judge.
THE COURT: Thank you.
Take that down from the screen, Mr. Morabito.
Mr. Froccaro, did you want that document on the screen?
MR. FROCCARO: I may, Judge. I'm just going to have a few questions.
THE COURT: Go ahead and publish it, Mr. Morabito.
CROSS-EXAMINATION
BY MR. FROCCARO:
Q. My name is James Froccaro. I represent Mr. Priolo.
I'm sorry about your father's passing. I mean, he was a bombardier; right? I mean, he was from the greatest generation. At least that's what they call it.
You were asked to testify by the prosecution in this case; correct?





A. Yes.
Q. Now, the mailings --
THE COURT: I'm sorry, Mr. Froccaro.
Ms. Soltis, we do need verbal answers just because the court reporter can't take down --
THE WITNESS: Yes. I just got a little teary-eyed about my dad. I couldn't talk.
THE COURT: I understand. Thank you so much.
BY MR. FROCCARO:
Q. The mailings that your dad responded to with checks, you never got an opportunity to read them all with him; right?
A. No.
Q. So you don't know what they said; right?
A. I just know what he said.
Q. Okay. And he had dementia at the time; right, ma'am?
A. It was just slowly. I mean, he was getting old.
Q. Ma'am, he had dementia; right?
A. He didn't. He was not diagnosed with dementia.
Q. But you testified a few moments ago that he had a little dementia.
A. I thought he might have slow dementia. I was not a doctor and a doctor didn't tell us he had dementia, so . . .
Q. Under oath a few minutes ago you said he had a little





dementia. You didn't say you thought. You said that's what he had; right?
A. I didn't go into detail.
Q. Did you ever have an argument with your father and tell him, Dad, you didn't win a million dollars in a sweepstakes.
A. I would say that, yeah.
Q. And he would argue with you no matter what you said, he would say you're wrong; right?
A. I said nobody is going to give you money like that. He was determined.
Q. And that's because he wasn't thinking properly; right?
A. No. Because he was obsessed by getting the money.
Q. Okay. You're saying dementia had nothing to do with it.
A. No.
Q. Okay.
What do you base that on?
A. I mean, who knows.
Q. That's my answer.
Thank you, ma'am.
MR. FROCCARO: No further questions, Judge.
THE COURT: Anything further from the Government?





MR. FELDMAN: Brief moment, Your Honor.
(Pause.)
MR. FELDMAN: No further questions, Your Honor.
THE COURT: Thank you so much.
Ms. Soltis, thank you for participating today. You may now step down.
THE WITNESS: Thank you.
(Witness excused.)
THE COURT: The Government may call the next witness.
MS. ENTWISTLE: The Government calls Ms. Cheryl Jacquard.
THE COURT: Thank you.
MS. ENTWISTLE: Just for the Court's planning purposes, I anticipate Ms. Jacquard will testify for a couple of hours.
THE COURT: Thank you so much.
Why don't we then actually take a brief bio break right now before we call Ms. Jacquard.
Thank you, Ms. Jacquard, for continuing to wait patiently.
We will take a 15-minute break. It's now 2:30. We'll be back here at 2:45.
Thank you so much.
MS. ENTWISTLE: Thank you, Your Honor.

THE COURT: Everyone please stand for the jury.
(Jury exits.)
THE COURT: Thank you, Counsel.
Parties, have a seat.
Any applications from the Government?
MR. FELDMAN: Nothing from the Government.
THE COURT: Mr. Froccaro?
MR. FROCCARO: No, Judge.
THE COURT: Thank you so much. We will see you in 15 minutes.
(A recess in the proceedings was taken.)
THE COURT: Thank you so much, everyone. Please have a seat. Before we call in the jury, are there any applications from counsel?
For the Government?
MS. ENTWISTLE: Nothing, Your Honor.
THE COURT: For the defendant?
MR. FROCCARO: No, Your Honor.
THE COURT: Thank you.
Mr. Morabito, you can get the jury?
(Pause.)
(Jury enters.)
THE COURT: Everyone, please have a seat. We'll proceed with the Government's case in chief.
Government, please call your next witness.





MS. ENTWISTLE: The Government calls Ms. Cheryl Jacquard.
THE COURT: Okay. Thank you.
THE COURTROOM DEPUTY: Please have a seat over here.
(Witness takes the stand.)
THE COURTROOM DEPUTY: Before you take your seat, I need to swear you in. Just raise your right hand.
(Witness sworn.)
THE COURTROOM DEPUTY: Please be seated and state and spell your name for the record.
THE WITNESS: Cheryl Jacquard, C-H-E-R-Y-L, Jacquard, J-A-C-Q-U-A-R-D.
CHERYL JACQUARD,
called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:
DIRECT EXAMINATION
BY MS. ENTWISTLE:
Q. Good afternoon, Ms. Jacquard. What town and state do you live in?
A. Lindenhurst, New York.
Q. How long have you lived on Long Island?
A. Since -- I would say over 50 years.
Q. And what is your educational background?
A. High school and some college.





Q. What do you do for a living today?
A. I am a senior client service specialist for Ambassador Education Solutions.
Q. And what are your job duties in that role?
A. I work with liaisons from universities to set up a virtual bookstore for students making sure that they have all the materials that they need for their courses.
Q. And what was your previous position or job?
A. I worked for -- called The Marketing Group as a production manager.
Q. And who was your boss at The Marketing Group?
A. Sean Novis.
Q. Did you have any other bosses at The Marketing Group?
A. No. Sean was my main boss. And there was a partner Gary Denkberg, but Sean was my main boss.
Q. Just because I spoke you have a little bit, your main bass was Sean Novis and another boss you said was Gary Denkberg?
A. He was a partner that was there that would work with Sean and he would sometimes give direction.
Q. And what industry was The Marketing Group in?
A. Direct mail company.
Q. What is direct mail?
A. It's sending solicitations out to customers to sell a particular item that they might be producing.





Q. And when did you start working for Sean Novis at The Marketing Group?
A. Around 2007, 2008.
Q. And how long did you continue working at The Marketing Group?
A. About nine and a half years.
Q. Did the company go by any other business names?
A. Yes. DMCS, Inc.
Q. And where was the name "The Marketing Group" displayed at the office when you worked there?
A. It was on the front door.
Q. And where did you see the name DMCS, Inc.?
A. That would be on our paychecks.
Q. On your paychecks?
A. Yeah. And it would also be on the email extensions.
Q. What was your understanding of the difference between The Marketing Group and DMCS?
A. I didn't have any different understanding. They were all the same to me.
Q. And who was in charge of The Marketing Group?
A. Sean Novis.
Q. And who was in charge of DMCS?
A. Sean Novis.
Q. You mentioned the email extension.
Do you remember the email address you used while

you were working for Sean Novis?
A. Yes, cheryl@dmcsinc.com.
Q. How did you first come to work for Sean Novis?
A. I was -- he was recommended -- I was recommended to him from another colleague.
Q. And in the time that you worked for The Marketing Group and for Sean Novis, what specifically did that company mail out? What type of advertisements?
A. They were sending out mailings to sell a sweepstakes booklet.
Q. Was that the business they were in when you started working for Sean Novis, I believe you said in 2007 or 2008?
A. Yes.
Q. Did that business ever change in the time you worked for Sean Novis?
A. No.
Q. What was your job title when you worked for Sean Novis?
A. I was a production manager.
Q. And what were your job responsibilities as the production manager?
A. I would oversee the -- there were mailing schedules that the mailings went out according to, and I would make sure that those mailing schedules were kept up with, and





made sure that any forms and envelopes were sent over to companies where they were going to be mailing out these solicitations for them, just keeping track of that.
Q. And did you have an industry term for the companies you were sending the forms and information to?
A. Yeah. They were letter shops.
Q. And what would the letter shop do once they received the forms and envelopes?
A. They would print the -- it was called lasering, but it would be all the verbiage that would go on to a blank form and they would mail those out to wherever they were supposed to mail them out to.
Q. And before the letter would mail out the mailings, would they send anything back to you at The Marketing Group?
A. Yes. They would he send back a sample that would need to be reviewed to make sure that it was correct. They would call it a proof.
Q. Was that part of your job as the production manager to review those proofs?
A. Yes.
Q. What would you be looking for on those proofs?
A. Making sure there was a name and address on them, a dollar amount, certain barcodes, certain source keys that were on there that they would track the mailings with.





Just making sure it was the correct form.
Q. And what would you be comparing that proof to when you were reviewing it?
A. I would usually have a sample that was given to me that I would be able to know that that was the correct one that matched that. And then I would be looking at a mailing schedule making sure that that was the right one going out on the day.
Q. And who would give you that sample of the mailing to compare the proof to?
A. Sean Novis.
Q. And you mentioned mailing schedules.
Did Sean Novis and his partners have just one mailing schedule they worked on or multiple mailing schedules?
A. Multiple.
Q. Do you remember the name of the company or the mailing schedule that Sean Novis used?
A. It would say SSME on it.
Q. And what about Gary Denkberg?
A. His would say Horizon.
Q. And did Sean Novis ever ask you to do this work as a production manager for other individuals other than himself and Mr. Denkberg?
A. Yes.





Q. Who were those individuals?
A. There was a Philip Priolo and there was another gentleman -- I'm sorry, I can't remember his name. It was Sean, but I can't remember his last name.
Q. Okay. Philip Priolo and Sean, you can't remember his last name.
Anyone else?
A. No.
Q. How did you come to work for these other individuals?
A. Sean would send them to me.
Q. So Sean told you you were going to be doing work for these other individuals?
A. Yes, correct.
Q. And did you ever meet Mr. Priolo?
A. Once.
Q. And do you remember the circumstances of that meeting?
A. It was just a brief introduction from Sean. We were in our office in Syosset and just brought him in, introduced him. That was it.
Q. And during what time period -- let me back up.
You mentioned that you worked for Sean Novis from 2017 for approximately eight years, I think -- I don't want to put words in your mouth --
A. Yeah, it was something like that.

Q. Do you remember what time period it was that you were in that Syosset office?
A. Maybe like 2010, 2011.
Q. And were you in that office through the end of your time working for Sean Novis?
A. Yes.
Q. And do you remember approximately what year that was?
A. No.
Q. These other individuals that you were working for as a production manager, did they also have their own companies and mailing schedules?
A. Yes.
Q. Do you remember the name of Mr. Priolo's company or mailing schedule?
A. I believe Winners Circle and Feel Lucky.
Q. In this time period when you were in the office in Syosset that we were just talking about, who else worked for Sean Novis during that time period?
A. There were two other people. Ellen McDermott and Mary Lilienkamp.
Q. And what was Ellen's role in the business?
A. She was the bookkeeper and she would do all the invoicing, the billing, paychecks, payroll.
Q. And you mentioned paychecks. Were you an hourly employee or a salaried employee?





A. Salaried.
Q. And who set your salary?
A. Sean Novis.
Q. Did you ever receive bonuses in that role?
A. No.
Q. And you also mentioned an individual named Mary who worked for Sean Novis.
What was Mary's role in the business?
A. She did all the data work, maintaining databases for the company of names and addresses and other information that she handled.
Q. And in your role as the production manager, would you be communicating with Mary as the data person about these mailing schedules? What was your role in that process?
A. I would be sending her a schedule after the schedules were sent to me.
Q. And what was the purpose of sending her the schedule?
A. She would need to know when the mailings were going to be going out so she could schedule her data.
Q. And who else needed a copy of the mailing schedule?
A. The letter shops would need them in order to make sure that they were mailing the mailings out on time and which mailings they were mailing.
Q. Now I want to briefly go step by step through the production process of how the mailings go from start to





finish.
Who would tell you which individual pieces would go on the mailing schedule for a particular company?
A. Sean Novis.
Q. And what about a mailing schedule for Gary Denkberg's company?
A. That would be Sean and Gary.
Q. And what about for Mr. Priolo's company?
A. That would be Sean and -- yeah, it would be Sean. Yeah.
Q. In the time you were doing work for Mr. Priolo's company, did Mr. Priolo ever pay you directly?
A. No.
Q. Who paid you during this whole time period?
A. Sean Novis.
Q. How often would you receive new mailing schedules?
A. Once a month.
Q. And once -- you mentioned the letter shop and the proofs, so once those letters actually go in the mail, who was tracking responses that came into those mailings?
A. That would be Cathy Johnson.
Q. Who is Cathy Johnson?
A. She was the person who opened the mail and sorted it and tracked all that.
Q. Did Cathy Johnson work with you in Sean Novis's





office?
A. For some time she did.
Q. And then did that change at some point?
A. Yes. Then that changed when they moved from Islandia to Syosset.
Q. When who moved from Islandia to Syosset?
A. The company. The whole company.
Q. And what happened at that time with regard to Cathy Johnson?
A. She -- she went out on her own, started her own company.
Q. But did she continue to play the same role as far as -- and is there an industry term for the process of receiving the mail and opening it and processing the payments?
A. Yeah. They refer to it as caging.
Q. And so after she went out and opened her own business, did Ms. Johnson continue caging for Sean Novis?
A. Yes.
Q. And did she continue caging for Mr. Denkberg?
A. Yes.
Q. And did she continue caging for Phil Priolo?
A. I -- I don't know for sure.
Q. When Cathy was processing responses and payments for multiple mailing schedules, how would she know which

company or mailing schedule a particular piece was associated with?
A. The mailing schedule would say it on top.
Q. And looking at one of the mailing pieces, how could you tell which schedule or company it was associated with?
A. Because it's listed on there with a code. It has a certain code on each piece, so the mailing schedule would have it on there, so she would be able to tie it back to that.
Q. Was there a term for that code?
A. A source code. A key code.
Q. In your work for Sean Novis and for Mr. Priolo, were there certain mailings that were referred to as front-end mailings?
A. Yes.
Q. And what is a front-end mailing?
A. Those are names that have never been mailed out before.
Q. And how often would a front-end mailing be mailed out?
A. Once a month.
Q. And that once-a-month schedule, was that true for Sean Novis's companies?
A. Yes.
Q. Was that also true for Mr. Priolo's companies?





A. Yes.
Q. And far Gary Denkberg's companies?
A. Yes.
Q. Was that true for any of Sean Novis's partners that you did work for as a production manager?
A. Yes.
Q. If someone responded with a payment to a front-end piece, what would they receive the following month?
A. They would receive other mailings.
Q. And was there a term for those other mailings?
A. Yeah. They call them back-end mailings.
MS. ENTWISTLE: Can I have Government's Exhibit 110 displayed just for the witness? Can I actually have split screen, page 1 and page 2?
BY MS. ENTWISTLE:
Q. Ms. Jacquard, if you would just review this briefly.
What is this document on page 1?
A. This is an email from Tuesday, April 7, 2015, from Skip at Game Plan Advertising going to myself, Jeff Novis, and Phil Priolo.
Q. Do you see there's an attachment to this email?
A. Yes.
Q. And based on the file names, can you tell what that attachment is?
A. Yes. It's a return envelope, a mailing envelope, and





also a mailing form.
Q. If you look at page 2, what is in page 2, the attachment to that email?
A. That's a return envelope.
Q. If you scroll briefly through the additional pages 3 through 6, do these appear to be the attachments to that email?
A. Yeah. That looks like a mailing envelope and also the form.
MS. ENTWISTLE: I move Government's Exhibit 110 into evidence.
THE COURT: Any objection?
MR. FROCCARO: No, Your Honor.
THE COURT: It is admitted.
(Government Exhibit 110 received in evidence.)
MS. ENTWISTLE: Can I have Government's -- so if you could please publish for the jury, Mr. Morabito.
(Exhibit published.)
BY MS. ENTWISTLE:
Q. If we look at just the top half of this email.
What is the subject line of this email?
A. It says: OTC preprint forms -- proofs. Sorry. Proofs.
Q. Could you read again for the jury who this email is being sent to?





A. It's going to myself, Jeff Novis, and Phil Priolo.
Q. Who is Jeff Novis?
A. Sean's father.
Q. Did you ever meet Mr. Novis?
A. Yes.
Q. Where did you meet Mr. Novis?
A. He would come into the office from time to time to see Sean.
Q. I apologize, just for clarity of the record, I will repeat the question to differentiate Mr. Sean Novis and Mr. Jeff Novis.
So was that answer you just gave with regard to Mr. Jeff Novis?
A. Yeah, Jeff Novis, he's -- that's Sean's father.
Q. And just for clarity of the record, when did you meet Mr. Jeff Novis?
A. When I first started working for Sean.
Q. And how often did you see Mr. Jeff Novis in person?
A. Not -- not often. He would -- he would just come in rare -- you know, from time to time to maybe meet him for lunch or something like that.
Q. And what was your understanding of Jeff Novis's business relationship with Sean Novis and his other partners?
A. There was -- there wasn't a -- there was no

relationship, as far as I knew.
Q. Were you --
MS. ENTWISTLE: Let me ask a new question.
BY MS. ENTWISTLE:
Q. When you would see Jeff Novis at the office, who was he there to meet with?
A. Sean.
Q. And where would they have those meetings?
A. In Sean's office.
Q. Were you ever present in any of those meetings with Sean Novis and Jeff Novis?
A. No.
Q. Do you remember whether Jeff Novis and Phil Priolo ever had a business relationship?
A. No.
Q. Were you ever in a meeting with Jeff Novis and Phil Priolo?
A. No.
Q. In what way would you communicate with Phil Priolo when you were doing work for his companies?
A. Email.
Q. And would you ever communicate with Jeff Novis via email?
A. I -- no.
Q. Turning back to the Government's Exhibit 110 in the

***Denise Parisi, RPR, CRR***
***Official Court Reporter***



"from" line, can you identify who this email is coming from?
A. It's coming from Steven Kip at Game Plan Advertising.
Q. Do you know who Game Plan Advertising is?
A. It looks like probably a printer.
Q. Based on context from this email?
A. Yes.
Q. Okay.
MS. ENTWISTLE: Let's go to page 2. Actually, page 3.
BY MS. ENTWISTLE:
Q. What is this document?
A. This is a mailing envelope.
Q. And with regard to the mailings you worked on, would this be the outside mailing envelope or the return envelope inside?
A. This is the outside.
Q. And can you read the text across the middle of the envelope?
A. Issuance documents enclosed.
Q. Can you keep reading that line?
A. Official notification.
Q. And can you read the text underneath official notification?
A. Special matter, verified, 210853.

***Denise Parisi, RPR, CRR***
***Official Court Reporter***



Q. That text that you just read, would that be applied individually to the letters with the stamp, or is that preprinted on all of the information?
A. That's preprinted.
MS. ENTWISTLE: Please go to page 5.
BY MS. ENTWISTLE:
Q. What is this document?
A. This is a form.
Q. And in the blank spaces on this form, what would go in those spaces?
A. There would be verbiage that would be lasered in.
Q. Okay. So this is the form before that additional verbiage is added?
A. Correct.
Q. And it appears on the screen as two pages side by side. Is that how someone would receive the mailing?
A. Yes. Well, they would be cut, so it would be one page in front and one page behind.
Q. Can you read the text in the top left of the form?
A. Urgent response notice for.
Q. And the next line?
A. Amount currently report in our prize pay, dash, out dossier.
Q. The amount written in red next to that?
A. $1,226,612. Total aggregate amount in USD funds.

***Denise Parisi, RPR, CRR***
***Official Court Reporter***



Q. Maybe if we zoom in on just the bottom left half of the page just to make it easier for the witness and for the jury.
Can you read the text in red across the top?
A. Issuance and release claim form.
Q. And below that?
A. Total aggregate amount in USD funds $1,226,612.
To the right, too?
Q. Yes.
A. Yes, I wish to receive win-ops dossier as soon as possible. I understand I am fully eligible.
Q. Just one more thing here. Down below you see where it says "make checks payable to"?
A. Yes.
Q. Who is the payee on this form?
A. OTC.
Q. And in your work for Phil Priolo, Sean Novis and these other partners, was it common that a three letter acronym was the payee name on these mailings?
A. Yes.
MS. ENTWISTLE: Can we go back to the full document? If you can just pull out the bottom half of the right side of the page.
BY MS. ENTWISTLE:
Q. Do you see a signature there on the left,

***Denise Parisi, RPR, CRR***
***Official Court Reporter***

Ms. Jacquard?
A. Yes.
Q. And is that an ink signature or is that preprinted?
A. That looks like it's preprinted.
Q. Okay. So preprinted on the form on all of the forms that will go out eventually as mailings?
A. Correct.
MS. ENTWISTLE: Please go to page 6.
BY MS. ENTWISTLE:
Q. And what is this on this page?
A. It's a -- it's a disclaimer or -- it says consumer information on it, but it's a disclaimer.
MS. ENTWISTLE: If you zoom out quickly to the whole thing.
BY MS. ENTWISTLE:
Q. Is that placement typical in your business of where that consumer information would be placed on the back side of one of the forms we just looked at?
A. Correct.
MS. ENTWISTLE: Can we pull up Government's Exhibit 111 just for the witness. Can you also show page 2 in split screen for the witness?
BY MS. ENTWISTLE:
Q. Ms. Jacquard, what is this document?
A. This is an email from Tuesday, April 7, 2015, from





Skip at Game Plan Advertising to myself, Jeff Novis, and Phil Priolo.
Q. And is there an attachment to this email?
A. Yes.
Q. What's the name of that attachment?
A. It's the OTCUR proof.
Q. And do you see the attachment on page 2?
A. Yes.
Q. And what is that?
A. That's the full mailing with the lasering.
MS. ENTWISTLE: Move to admit Government's Exhibit 111.
THE COURT: Any objection?
MR. FROCCARO: No objection.
THE COURT: It is admitted.
(Government Exhibit 111 received in evidence.)
MS. ENTWISTLE: So looking at page 2.
BY MS. ENTWISTLE:
Q. So what has been added to this form compared to the one we were just looking at?
A. All of the name and address information and the -- you know, the dollar -- the report fee that needs to be returned. All of the lasering.
MS. ENTWISTLE: Oh, I apologize. Mr. Morabito, could you publish for the jury. If we can zoom in on the





right side of the page, bottom half where you see the signature.
(Exhibit published.)
BY MS. ENTWISTLE:
Q. Can you read the name and title underneath that signature?
A. Timothy Gentian, prize reportage department.
Q. Is Timothy Gentian someone you knew from your work with Mr. Priolo?
A. No.
Q. Had you ever met a Timothy Gentian?
A. No.
MS. ENTWISTLE: Zooming back out to the full mailing.
Can I have Government's Exhibit 105 just for the witness, page 1 and page 3 in split screen?
(Continued on the following page.)





BY MS. ENTWISTLE (Cont'd):
Q. Ms. Jacquard, what is this document?
A. It's an e-mail from Tuesday, April 7, 2015, from Mary Lilienkamp to me.
Q. And what's the subject line of the e-mail?
A. Oh, 15229 NPF sign off.
Q. And do you see an attachment to this e-mail?
A. Yes.
Q. And when you look at the right side of the screen, what is that attachment?
A. That's the NPF piece.
Q. And, I apologize, one more question on the original e-mail.
Can you read the to-from on the e-mail that's being forwarded to you, so from Laser Mail, starting there.
A. Okay.
That says from Laser Mail to Phil Priolo, to Cathy@dmcsinc.Com, Mary@qdmservices.com, JeffNovis@gmail.com.
MS. ENTWISTLE: Move to admit Government Exhibit 105.
THE COURT: Any objection?
MR. FROCCARO: No objection.
THE COURT: It is admitted.

(Whereupon, Government Exhibit 105 was received in evidence, as of this date.)
MS. ENTWISTLE: Please publish for the jury.
(Whereupon, the above-mentioned exhibit was published to the jury.)
Q. Where it says please see attached for NPF sign off, what does sign-off mean?
A. That would be a proof, they refer to it as a sign-off, but it would be a proof that I would have to look at to make sure that all the right information is there.
Q. And who's Laser Mail who's sending that e-mail with the proof?
A. That would be a letter shop.
Q. And now --
MS. ENTWISTLE: Can we see just the e-mail top half.
Q. Now that it's visible to the jury, who is the letter shop sending that e-mail to?
A. You are asking me?
Q. Yes.
A. Okay.
It's coming from -- it looking like it's -- this is coming --
Q. So not the forward to you, but --





A. Right.
Q. But the --
A. Oh, it's coming from Laser Mail and that's -- it's going to -- right, coming from Laser Mail and going to Phil Priolo, Cathy@dmcsinc.com, Mary@qdmservices.com, JeffreyNovis@gmail.com.
Q. And I think you were about to say, do you recognize that e-mail address, Cathy@dmcsinc.com?
A. Yeah, that would be Cathy Johnson when she was working at our company.
Q. And what about Mary@qdmservices.com?
A. I'm not sure what's that extension.
Yeah, that's Mary's address. I didn't realize she had a different e-mail.
Q. And if you see up at the top on the forward it says Mary Lilienkamp.
Is that the Mary we were talking about?
A. Yes.
She's the data person.
Q. If we go a little bit further down the page where it says files attached, can you read the line below that.
A. Promo, NPF.
Q. And what does promo mean, what is that information?
A. That's the -- telling us what the mailing piece is.
Q. This mailing piece is called NPF?





A. Correct.
Q. And what about the key code, what does that mean?
A. That key code is 6036, it's the code that they use to track the mailing with.
Q. Underneath the key code can you read that line?
A. Quantity, 99,091.
Q. And what does that line mean?
A. That means that's the total quantity it's going to be mailing to that key code.
Q. And are all of those 99,000 mailings going to be the NPF promotion?
A. Yes.
Q. Will they all have that same key code, 6036?
A. I believe so, yes.
Q. Based on your knowledge of how these mailing schedules worked, if Mr. Priolo were to send the NPF mailing the next month would it still have the 6036 key code?
A. No.
Q. So what information does the key code convey, that number?
A. It's tracking this particular mailing piece, going to those -- that quantity, those names.
Q. And on a particular date?
A. Yes.





MS. ENTWISTLE: Can we go to page three, just the top half of the page.
Q. Can you read the text.
It's in small font of the very top, maybe just the top quarter but we are going to be in the top left, if you wanted to zoom in on that.
(Whereupon, there was a pause in the proceedings.)
MS. ENTWISTLE: There we go.
Q. Can you read that, Ms. Jacquard, to the jury?
A. Important receiver documents, attention to individual, a guaranteed prize notification.
MS. ENTWISTLE: And then zooming back in to the text on the top right.
Q. Can you read that?
A. Cash and prize advisement, identification papers, nontransferrable matter.
MS. ENTWISTLE: And if we zoom in again on the top half of this mailing.
Q. The text in larger font across the top of the mailing?
A. Checks scheduled for release.
Q. What's the amount of money in the blue font?
A. $1,200,000.
Q. And do you see an address on this mailing?

A. Yeah, it says main offices PO Box 27 Plainview, New York, 11803.
Q. And what's the company name in front of that address?
A. NPF.
Q. Can you read the whole line, NPF reports division?
A. NPF reports division, main offices PO Box 27, Plainview, New York 11803.
Q. Did you ever work for a company called NPF?
A. No.
Q. Or NPF reports division?
A. No.
Q. What was NPF?
A. It's a mailing piece.
Q. And where it says main offices, what is that address?
A. It's a PO Box number.
MS. ENTWISTLE: If we zoom all the way out.
In the bottom right there is a box. If you could pull that out so it's big enough for the witness and Ms. Jacquard and the jury to read.
Q. Ms. Jacquard, can you read the text in that box.
A. Special matter. This tag is officially affixed to serve a record of identification for the individual named and filed on record. Registration 3014204261.
MS. ENTWISTLE: And if you leave that there for a moment.





Q. Ms. Jacquard, is this a sticker that was affixed to the mailing?
A. No.
Q. What is this?
How did those words get on the mailing?
A. They are lasered on.
Q. And would this graphic look the same on every copy of the mailing that went out?
A. It would look -- that verbiage may be the same.
That number, I believe, changes. I'm not sure. I would have to go back --
Q. That specific number?
A. Yeah.
MS. ENTWISTLE: If you will give us, again -- I'm going to ask Ms. Jacquard to read the first four paragraphs.
A. We are very excited in issuing this formal letter announcement to you directly, Harley, in regards to this matter of available sweepstakes prize payments for which your name has been confirmed on record and registered by ID number 3014204261.
Q. And the second paragraph.
A. It is our pleasure to announce that your recent participation to win a major sweepstakes contest has been validated and you have been officially approved as the





individual identified to receive the available sweepstakes cash and awards prize data as detailed in report of entrant directives now pending release to you in the total dollar amount of $1,200,000.
Q. And one question about this text.
Ms. Jacquard, in your work for Mr. Priolo and for Sean Novis, did you work with anyone whose job was to validate participation in major sweepstakes of the recipients of these mailings?
A. I'm not really sure what you mean by that.
Q. I'll phrase it another way.
What is your understanding of how it was selected who these mailings would be sent to?
A. I'm not -- I don't select who the data goes to or how they are selected.
Q. Do you have any sense of who would make those decisions of what data or what mailing lists these would be mailed to?
A. That would be Sean Novis and whoever was working with the lists and also Mary.
Q. And were you ever aware of anyone whose job was -- and look at the second line it says, has been validated, to validate that the recipients of this mailing participated in a recent sweepstakes?
A. No.





Q. That's not something you remember from your work for Sean Novis and Mr. Priolo?
A. No, nothing that -- no, nothing deep like that into what's going on.
No.
Q. Can you read the third paragraph.
A. We hereby extend all best wishes to you on this announcement, Harley, and request your direct attention to this matter in order that we may release the entire $1,200,000 in cash award prize opportunity to you without delay.
Q. And the fourth paragraph.
A. Please proceed to the enclosed receiver certificate and indicate by signature that you accept the terms of payment for release of the available cash prize win opportunity as guaranteed to you in report of entrant procedure directives for the entire $1,200,000, 1 million, 200 thousand, Harley, and return it along with the required $20 report fee in order to initiate delivery.
MS. ENTWISTLE: And could we go to the next page.
And go to the top half.
Q. What does this say up at the top, the heading?
A. Consumer information.
MS. ENTWISTLE: I think I'm looking for -- if

you can scroll down a little bit to the last sentence.
If you could highlight for the witness the last sentence to make that a little bit -- no. Even further down, beginning all customer service issues.
A. All customer service issues should be in writing to the address on the enclosed envelope.
Q. And what was the enclosed envelope?
A. That would be the return envelope.
Q. So the return envelope in which they would send their payment and mail it back?
A. Yes.
MS. ENTWISTLE: If you show this whole customer information here.
Q. Is there any phone number in this information, Ms. Jacquard?
A. No.
Q. Is there any website?
A. No.
Q. Is there any e-mail address?
A. No.
Q. Are you aware in your time working for Phil Priolo whether there was ever a customer service phone number or e-mail address?
A. No.
Q. Let me ask that question a better way.





Was there ever a customer service e-mail address for Sean Novis's companies?
A. No, not to my knowledge, no.
Q. What about for Mr. Priolo's companies?
A. No, not to my knowledge.
Q. Was there ever a customer service phone number for Sean Novis's companies?
A. No, not to my knowledge.
Q. And was there a customer service phone number for Mr. Priolo's companies?
A. No, not to my knowledge.
MS. ENTWISTLE: Can we go to page five.
And the top half of the page.
Q. I'm going to ask you, Ms. Jacquard, to read all the text above the signature.
A. It says authorized receiver certificate, issued 4/8/2015, formal candidate document.
Registered 3014204261, signatured reply requested.
Q. And continue where it says filed matter.
A. Filed matter, for release, ready for delivery, ten-day reply requested.
Q. And below that?
A. To Harley Dulude, amount reported, $1,200,000.
Q. And then the address has been redacted.





MS. ENTWISTLE: And if you could scroll down or zoom out a little bit.
Q. And if you could keep reading, beginning with status?
A. Status, pending ten-day receiver reply.
Q. And then to the left of the signature, that text?
A. Authorizing signature complete and return entire page.
Q. And then under the signature, what is the title written there?
A. Director NPF.
Q. And did you ever work for a company called NPF?
A. No.
Q. What was NPF?
A. It's a mailing piece.
Q. And can you read that signature on the line?
A. Looks like Don Barrett.
Q. Did you ever work with a Don Barrett in your work for Mr. Priolo?
A. No.
Q. Does Mr. Priolo's name appear anywhere on this mailing?
A. No.
Q. Did Mr. Priolo's name ever appear on any of his mailings?
A. No, not that I remember.





Q. Earlier you testified that Phil Priolo's mailing schedules were called Winners Circle and Feel Lucky.
Did the name Winners Circle appear on this mailing?
A. No.
Q. What about the name Feel Lucky?
A. No.
MS. ENTWISTLE: And just for the witness, please, could I get this exhibit in split screen with Government Exhibit 1.
If you could one of five, page three on the right.
Q. Ms. Jacquard, what is the document on the left?
A. That's an NPF piece, lasered.
Q. And if you look at the date underneath the amount of money, can you read the date?
A. 9/9/16.
Q. On the right is the exhibit we were just looking at.
Can you read the date on that exhibit?
A. 4/8/15.
Q. So does this appear to be to you, and I can scroll through all the pages, to be another copy of the NPF mailing just from a different date?
A. Yes.
MS. ENTWISTLE: Move to admit Government Exhibit

1.
THE COURT: Any objection?
MR. FROCCARO: No objection.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 1 was received in evidence, as of this date.)
MS. ENTWISTLE: You can briefly publish for the jury.
(Whereupon, the above-mentioned exhibit was published to the jury.)
MS. ENTWISTLE: I'm going to move to Government Exhibit 108 just for the witness, pages one and two.
Q. What is this document, Ms. Jacquard.
Is that showing up for you, Ms. Jacquard?
A. No, it's a blank screen.
Q. Not yet?
A. It said no signal there for a minute, too.
Might have just lost connection.
(Whereupon, there was a pause in the proceedings.)
A. There you go.
Q. And what is this document?
A. It's an e-mail from Thursday, April 2, 2015, from Skip at Game Plan Advertising to Jeffrey Novis, Phil





Priolo and copied to me, cc.
Q. And are there attachments to this e-mail?
A. Yes.
Q. And what are those attachments based on those file names?
A. It's a form.
It's a return envelope and a mailing envelope.
Q. Looking at page two, does that attachment appear to be a proof of that BNO mailing?
A. Yes.
MS. ENTWISTLE: Move to admit Government Exhibit 108.
MR. FROCCARO: No objection, your Honor.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 108 was received in evidence, as of this date.)
MS. ENTWISTLE: Please publish for the jury and go to page two, just page two.
We don't need the split screen.
(Whereupon, the above-mentioned exhibit was published to the jury.)
Q. What is this document?
A. This is a lasered mailing piece.
Q. Can you read the text, we are going to have to zoom in.





MS. ENTWISTLE: If you can zoom in.
Q. We are going to read first the large text in the top left.
A. Important receiver documents.
Attention to individual, a guaranteed prize notification.
Q. And the additional text to the right of that?
A. Cash and prize advisement, identification papers, nontransferrable matter.
Q. And the large text below that?
A. Checks scheduled for release.
Q. And who is this mailing coming from, according to the mailing?
A. I'm sorry.
What do you mean who it's coming from? Do you want me to read that BNO reports division?
Q. No. Sorry. That's okay.
Can you just, looking at the whole mailing, what company does it represent that it's coming from?
A. What piece it is, you mean?
BNO.
Q. Again, what is BNO?
Did you ever work for a company called BNO?
A. No.
Q. On the right side of the page, bottom, again, can we





zoom in on the signature.
A. It looks like Sary Kapoor.
I can't read that name but Kapoor looks like the second name.
Q. And did you ever work with a person with that name?
A. No.
Q. And what is the dollar amount on this BNO mailing piece?
A. It's $1,250,000.
MS. ENTWISTLE: And briefly, just for the witness, if we could look at Government Exhibit 9.
Q. What is Government Exhibit 9?
A. No.
Q. Still waiting on your screen.
A. Yeah, it's just waiting on it.
Q. Okay.
A. There you go.
Q. Ms. Jacquard, what is this document?
A. It's a BNO mailing piece.
Q. So just another copy of that same BNO mailing piece we were just looking at?
A. Yes.
MS. ENTWISTLE: Move to admit Government Exhibit 9.
THE COURT: Any objection?

MR. FROCCARO: No objection.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 9 was received in evidence, as of this date.)
MS. ENTWISTLE: Government Exhibit 101, just for the witness, pages one and three for the witness.
Q. Ms. Jacquard, what is this document?
A. It's an e-mail from Friday, April 3, 2015, from Steven Kip at Game Plan Advertising to Jeffrey Novis, Phil Priolo and cced me.
Q. And what is Game Plan Advertising?
A. A printer or letter shop, I believe.
Q. Do you see the attachment to the e-mail on the right side of your screen?
A. Yes.
Q. And what is that attachment?
A. It's an NRS mailing.
MS. ENTWISTLE: Move to admit Government Exhibit 101.
THE COURT: Any objection?
MR. FROCCARO: No objection.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 101 was received in evidence, as of this date.)
MS. ENTWISTLE: And just page three for the





witness.
(Whereupon, there was a pause in the proceedings.)
MS. ENTWISTLE: Apologize, your Honor.
We are just having a brief delay in our technology. Apologies, your Honor. We are just rebooting our system but we will also look for paper exhibits and if that's faster we will move to the ELMO.
THE COURT: Thank you.
(Whereupon, there was a pause in the proceedings.)
MS. ENTWISTLE: It looks like we are back on.
A. I can see it.
Q. Thank you, Ms. Jacquard, for your patience.
MS. ENTWISTLE: If it's easier to leave it and not do the split screen we will do one page at a time.
Q. What is this document?
MS. ENTWISTLE: Mr. Morabito, can you switch to the ELMO for me?
THE CLERK: Sure.
MS. ENTWISTLE: Thank you.
Q. What is this document, Ms. Jacquard?
A. This is an e-mail from Friday, April 3rd, 2015, from Skip at Game Plan Advertising to Jeffrey Novis, Phil Priolo and cced me.





Q. And are there attachments to this e-mail?
A. Yes.
MS. ENTWISTLE: Turning to this next page.
Q. What does that attachment appear to be?
A. It's turned to the side, but --
MS. ENTWISTLE: Let me try to rotate it.
A. Yeah, that's perfect.
It's the -- it looks like a mailing piece for NRS that's been lasered.
MS. ENTWISTLE: Move to admit Government Exhibit 101.
MR. FROCCARO: No objection.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 101 was received in evidence, as of this date.)
Q. Ms. Jacquard, over here can you see who this mailing is being sent to?
A. It's addressed to a Martha Lugo.
Q. And looking on the right side of the page --
MS. ENTWISTLE: I apologize.
Mr. Morabito, could you publish to the jury.
(Whereupon, the above-mentioned exhibit was published to the jury.)
Q. Going back here, Ms. Jacquard, who is this mailing addressed to?





A. Martha Lugo.
Q. And moving over to what would, I believe, be -- well, to the other page of the mailing.
What is the text in that seal at the top?
A. The certificate of authority.
Q. And can you read the paragraph beginning verification of identity.
A. Verification of identity.
In order to be confirmed for release of materials intended to introduce you to unredeemed funds and moneys, we must verify that you are the correct person who is in our files. Can you verify that you are one of the three triple confirmed recipients below.
Q. And can you read the three names below.
A. Charles Goertler, Martha Lugo, and Myrna McKinley.
Q. And, as you sit here today, Ms. Jacquard, can you tell which of that text is variable text and which is the same on all of the mailings?
A. Yes.
The Martha Lugo name would be the variable one, the one that would be lasered on, and the other two are preprinted.
Q. And how do you know -- what typically on these mailings would be a variable field?
A. The actual person that we are mailing the mailing to,

which would be their name and address, a key code, a bar code, a tracking, ID tracking number, that.
Q. Okay.
Just to finish my thought, the other two names, Charles Goertler on the left and Myrna McKinley on the right, those are preprint?
A. I believe so.
Q. And what does preprint mean?
A. It means that they were already on -- they could have already been on the form or they are being automatically lasered on.
Q. And were they the same for every copy of this mailing that went out in one set of mailings?
A. From my experience I would think so, yes.
MS. ENTWISTLE: And just for the witness, Government Exhibit 2.
Q. What is this document, Ms. Jacquard?
A. It's a mailing piece for NRS.
Q. I'll show you the second page.
Does this appear to be a different copy of the NRS mailing piece we were looking at previously?
A. Yes.
Q. And I can go back if you want to compare.
A. It has a different name in the second one.
Q. A different recipient name?





A. Yeah, right.
MS. ENTWISTLE: First I'm going to move to admit Government Exhibit 2.
THE COURT: Any objection?
MR. FROCCARO: None.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 2 was received in evidence, as of this date.)
MS. ENTWISTLE: Please publish for the jury.
(Whereupon, the above-mentioned exhibit was published to the jury.)
Q. You noted, Ms. Jacquard, there is a different recipient name on this mailing.
Who is the recipient on this mailing?
A. Oliver Conrad.
Q. Turning to page two, there are three names on this document.
Can you read those three names?
A. Charles Goertler, Oliver Conrad, Myrna McKinley.
Q. Again, are two of those names the same as the mailing we were just looking at?
A. Yes.
Q. And the only one that's different?
A. Correct, Oliver Conrad.
Q. Going back again just very briefly to the first page.





You can see, Ms. Jacquard, that some of the text appears in pink. Has that been individually highlighted by hand?
A. No.
Q. How was that added to the mailing?
A. I'm not sure if it's done by the printer or the laser shop, one or the other.
Q. But just printed on the mailing?
A. Yes.
MS. ENTWISTLE: And just for the witness I'm turning to Government Exhibit 103.
Q. What is this document, Ms. Jacquard?
A. This is an e-mail from April 3, 2015, from Phil Priolo to me.
Q. What is the subject line of the e-mail?
A. Forward proof, proof.
MS. ENTWISTLE: Move to admit Government Exhibit 103.
THE COURT: Any objection?
MR. FROCCARO: No objection.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 103 was received in evidence, as of this date.)
Q. Can you read the text of the e-mail --
MS. ENTWISTLE: Apologies.





Will you please publish for the jury, Mr. Morabito.
(Whereupon, the above-mentioned exhibit was published to the jury.)
Q. Ms. Jacquard, can you read the text of the e-mail at the top?
A. It says:
Good morning. This is Anthony over at Laser Image. GDM is a new piece going with our front end as a test NPF. Will probably be 90,000 or so and 9,000 will be GDM is -- GDM.
Q. And the salutation at the end?
A. Oh, thanks, Phil?
Q. Yes.
And just for you, who is this e-mail coming from?
A. It's hard to tell.
Q. Is it hard to read?
A. No, it's not hard to read, it's just hard to tell sometimes on a forwarded e-mail.
I guess it says this is Anthony, so it's coming from Anthony, to Phil.
Q. If you look down -- if you see the subject line at the top, does this top e-mail appear to be a forward to you?

A. Yes.
Q. So if you go down to the middle of the page, Laser Mail --
A. Right.
Q. -- to Phil Priolo?
A. Um-hmm.
Q. Can you read that -- well, actually, just read the second paragraph.
A. The one that starts 100,000?
Q. Yes, please.
A. 100,000 for NPF.
We received all the forms and envelopes, just waiting for the mail file. If you want it all out on 4/8 please have the file to us by Monday, 4/6, preferably early, Anthony.
Q. And then does that appear to be the e-mail that was forwarded to you by Mr. Priolo?
A. Yes.
Q. In the text at the top it refers to a front end test.
What is a front end test?
A. That's a piece that's a new piece going out as a test to the front end with new names.
It would be brand new names, names that haven't been mailed before.
Q. And if it says NPF will probably be 90,000 or so and





9,000 will be GDM, what does that mean?
A. It means that they are breaking the front end, the new names up, to test another piece to mail out that piece to 9,000 names.
And the NPF piece -- or one of the pieces is going to go out with 90,000 and one with 9,000.
Q. So one piece sent out to 90,000 people and the other sent out to 9,000 people?
A. Yes.
MS. ENTWISTLE: Just for the witness I'm showing Government Exhibit 118.
Q. Ms. Jacquard, what is this document?
A. This is an e-mail on Monday, October 12, 2015, from Jeffrey Novis to myself.
Q. Does it appear to be a forwarded message?
A. Yes.
Q. Who is it being forwarded from?
A. From LICsign-off@optumline.net.
Q. And is there an attachment to the one forwarded to you?
A. It's the 15668 GDM.
Q. And turning to page three of the exhibit, what appears to be attached at page three?
A. It looks like a GDM lasered mailing piece.
MS. ENTWISTLE: Move to admit Government Exhibit





118.
THE COURT: Any objection?
MR. FROCCARO: No objection.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 118 was received in evidence, as of this date.)
MS. ENTWISTLE: Please publish for the jury.
(Whereupon, the above-mentioned exhibit was published to the jury.)
Q. Ms. Jacquard, can you read the text across the top of the page.
A. Full entrant authorization papers for official use only.
Q. And right underneath that?
A. Ready to release, corporate bursar is awaiting your authorization.
MS. ENTWISTLE: Moving down to the bottom half of the page.
Q. Can you read the text underneath those two bar codes, beginning right here?
A. GDM signatories agreed and sign-off.
Q. And what appears underneath that text?
A. Names and signatures.
Q. And do you recognize the names of any of those people?





A. No.
Q. Were any of those peopler people that you worked with while you were working with Mr. Priolo?
A. No.
Q. Can you read the text underneath that dashed line?
A. Full authorization sweeps pak release.
Q. And right here?
A. Total aggregate amount confirmed, US found $1,217,534, full report.
Q. I'm going to briefly show you the whole page of the first -- this is the first page of this exhibit we have just been discussing, Ms. Jacquard, very briefly.
Then I'm going to turn it over on to the back, and what is that at the top of the page?
A. That's the same disclaimer.
Q. And in your experience is that typically the location where that text would be placed?
A. Yes.
MS. ENTWISTLE: Very briefly, just for the witness, Government Exhibit 5.
Q. What is this document, Ms. Jacquard?
A. It's a lasered piece.
I just don't know what it is, which one it is.
Q. I can show you, here is the piece we were just talking about a moment ago, and then here's the new piece

that I'm showing you.
MR. FROCCARO: Judge, may I have a brief sidebar?
THE COURT: Yes. Let's have a sidebar.
MR. FROCCARO: Thank you.
(Continued on next page.)





(Sidebar.)
MR. FROCCARO: My memory might be wrong, but I thought they could argue in opening and summation these things were disclaimers but at the top this is called consumer information.
That's what the witness called it.
THE COURT: If the witness is calling it a disclaimer, the witness is calling it a disclaimer.
I did not hear Ms. Entwistle use the term disclaimer. Did you hear her say that?
MR. FROCCARO: No. I didn't say that.
It says consumer information. She's calling it a disclaimer.
THE COURT: She's the witness. She's testifying based on her personal knowledge.
MR. FROCCARO: Okay.
MS. ENTWISTLE: She worked there for eight years.
The judge said she is testifying based on her personal knowledge.
MR. FROCCARO: I understood the judge said that.
MS. ENTWISTLE: Apologies.
MR. FROCCARO: Got it.
THE COURT: Your objection is noted.
MR. FROCCARO: Thank you, Judge.





THE COURT: Okay.
(Sidebar concluded.)
(Continued on next page.)





(In open court.)
MS. ENTWISTLE: If we could switch over to the trial laptop, Mr. Morabito, I believe it's up and running but we'll be ready with paper if not.
THE CLERK: For the witness only?
MS. ENTWISTLE: For the witness only.
If we could have Government Exhibit 5 in split screen with Government Exhibit 118, page two.
**Q.** And comparing those two documents, Ms. Jacquard, can you tell what the document is in Exhibit 5?
And we are happy to show you other pages.
**A.** It's the mailing piece, but on -- oh, I see, it says GDM signature.
So it's the GDM piece.
**Q.** So just a different copy of the GDM piece that we were looking at previously.
Is that correct?
**A.** Yes.
It just --
MS. ENTWISTLE: Go to Exhibit 5, page three.
**A.** Yeah, it looks like two different things.
That's why I'm trying to figure out what they are.
**Q.** And then --
**A.** And that's page two, right?

Q. That's page two. So 118 page four.
A. So that's the GDM.
Okay.
MS. ENTWISTLE: 118, page five now.
A. Yeah, those are the GDM pieces.
They are just different -- it looks like different colors or something.
Q. But does this appear to be a different copy of the GDM mailing piece we were looking at a moment ago?
A. They are different, yes.
Q. All right.
A. They are just different colors, though.
They look like the same piece.
Q. Okay. We'll move on.
MS. ENTWISTLE: Government Exhibit 104.
And if you could put page two on the split screen.
Q. What is this document, Ms. Jacquard?
A. This is an e-mail from April 6, 2015, from Skip at Game Plan Advertising to myself, Jeffrey Novis and Phil Priolo.
Q. And what is attached to this e-mail?
A. The TRL, FIA proof and the return envelope and the mailing envelope.
Q. And what is in the attachment to the e-mail?





A. It's the TRL mailing piece lasered.
MS. ENTWISTLE: And if you could show pages eight and nine of Exhibit 104 on the right, on the right.
Q. Ms. Jacquard, does this appear on the right to be the attachment in that e-mail that you received?
A. That's the TRL mailing piece.
Q. And there's pages eight and nine of the attachment?
A. That's the TRL, the return envelope and the mailing envelope.
MS. ENTWISTLE: Move to admit Government Exhibit 104.
THE COURT: Any objection?
MR. FROCCARO: No objection.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 104 was received in evidence, as of this date.)
MS. ENTWISTLE: If we could go to page two.
Q. Can you read the text in the top right in blue?
THE COURT: Ms. Entwistle, do you want to publish this for the jury?
MS. ENTWISTLE: Yes, I do. Thank you, your Honor.
(Whereupon, the above-mentioned exhibit was published to the jury.)
A. Notice of cash funds held in trust.





Q. And what's the amount underneath that?
A. $1,731,000.
Q. And can you read the red text below that?
A. Guaranteed.
Q. And can you please read the first paragraph?
A. It says:
Dear Peggy Moore, we are meticulous in our search and identification of eligible claimants. You have been so identified and selected to receive further entitlement designation and access details for cash payments totaling $1,731,000. Our service is to provide you with the identity of the sponsors holding these funds in trust and the steps to obtain them, which they are bound by regulation to pay.
The cash payment release form below has been prepared in your name to allow you to claim the payment directives currently being held for you. All claims access procedures are subject to --
Q. That's plenty.
Thank you, Ms. Jacquard.
A. Okay.
Q. Looking at the bottom half of the page, can you read the bold text beginning, you are guaranteed access to cash payments?
A. You are guaranteed access to cash payments





opportunity totaling $1,731,000 per the directives you will be sent upon completing this form.
Q. And then can you read the checklist under check all that apply.
A. Check all that apply.
I am over 18 years of age, and have no restrictions on receiving up to $1,731,000.
I understand and agree that I am responsible for taxes on all amounts over $600.
I have not won or been awarded over $10,000 in prize money in the last 12 months.
I am willing to accept any payments by either check, overnight, or bank transfer.
I understand the full directives report of $1,731,000 will detail all access procedures.
I request the access process to begin immediately upon receipt of this form.
I verify that the address below is correct, make any changes needed.
I am enclosing $22 in cash, check or money order payable to TRL for immediate release of my $1,731,000 access report.
Q. Thank you, Ms. Jacquard.
Finally, just the large blue text at the bottom of the page.

A. Participation for cash payment release.
MS. ENTWISTLE: And just for the witness Government Exhibit 130, and just the top half of the page.
Q. What is this document, Ms. Jacquard?
A. This is an e-mail from April 14, 2015, from Phil Priolo to me.
MS. ENTWISTLE: Move to admit Government Exhibit 128.
MR. FROCCARO: No objection.
THE COURT: It is admitted.
MS. ENTWISTLE: I'm sorry.
The court reporter is asking me about the number of the exhibit. It's 130.
THE COURT: I believe you may have said 128.
MS. ENTWISTLE: I did, but the exhibit I want is 130.
Apologies, to the clarity of the record the document or admission that the witness has been looking at is Exhibit 130.
THE COURT: And Exhibit 130 is admitted.
MS. ENTWISTLE: Thank you, your Honor.
(Whereupon, Government Exhibit 130 was received in evidence, as of this date.)
Q. Ms. Jacquard, can you read the text of the e-mail that is being forwarded to you and, first of all, the





e-mail being forwarded to you, who is it from and to?
A. It's from Monica Estrada at PacNet Services, to Phil Priolo.
Q. And what is PacNet Services?
A. They are a check clearing house.
Q. And what is a check clearing house?
A. That's --
Q. To your understanding?
A. -- a company that assists companies clearing, you know, depositing checks, clearing them.
And also they review -- in this case they are reviewing mailing pieces for this company.
Q. Can you read the text of that e-mail from PacNet?
A. It says:
Hi, Phil. Our compliance department reviewed TRL and the following amendment is required.
Q. All right.
A. Please -- read the rest.
Q. Go ahead.
A. Please revise your guaranteed access to cash payments totaling $1,731,000 to you are guaranteed access to cash payments opportunity totaling $1,731,000, kind regards, Monica.
Q. So from reading that, what is the change in language that PacNet is requesting?





A. They are saying to add the word opportunity to that line on the mailing piece.
Q. Just the one word?
A. Um-hmm, yes.
Q. And why would these -- why would this edit be forwarded to you as part of your job?
A. If I was doing a proof or a sign-off and this was something that they wanted to make sure that the change was made and they wanted someone to look at it before, they would give this to me to make sure that on this particular piece this was there.
Q. So going back to the Government Exhibit 4 which was previously admitted.
MS. ENTWISTLE: If we could have all of page two -- 104, page two.
Q. That's the proof of the TRL mailing we were looking at a moment ago.
That language you read beginning your guaranteed access on the bottom half of the page --
A. Uh-huh -- yes.
Q. Does it appear that that change has been made, the adding of the word opportunity?
A. Yes.
Q. And zooming out, so that's the sort of edit you would be looking for in your job?





A. Yeah, that one particular edit, yes.
Q. But all of the rest of this mailing, that one edit was made and at least in that e-mail from PacNet they were not requesting other edits?
A. Correct.
Q. In your job, Ms. Jacquard, could you decide what words were put on these mailings?
A. No.
Q. Who made those decisions?
A. Whoever was -- whoever was creating the piece and sending the lasering over to the laser shops.
Q. So if it was a piece on Mr. Priolo's mailing schedule, who had final say on what words went on that mailing piece?
A. It would either be Sean or Phil.
MS. ENTWISTLE: Now just for the witness Government Exhibit 128.
Q. What is this document?
A. It's an e-mail from April 16, 2015, from Phil Priolo to me.
Q. What's the subject line of the e-mail?
A. Compliance.
MS. ENTWISTLE: Move to admit Government Exhibit 128.
MR. FROCCARO: No objection.

THE COURT: It's admitted.

(Whereupon, Government Exhibit 128 was received in evidence, as of this date.)

Q. Is this just another example of Phil forwarding -- well, read the text -- apologies -- of your e-mail beginning April 16, 2015.

A. The one that's --

MS. ENTWISTLE: Publish for the jury, please.

(Whereupon, the above-mentioned exhibit was published to the jury.)

A. Where am I starting?

Where do you want me to start that reading because it just says yes, thank you.

Q. Right here.

A. It says:

Hi, Phil. I see now the TRL and NPB need to be modified. I'll do that and send back to you to send to PacNet for approval.

MS. ENTWISTLE: Government Exhibit 129, just for the witness.

Q. What is this document, Ms. Jacquard?

A. It's an email on April 14, 2015, to me from Phil Priolo.

MS. ENTWISTLE: Move to admit.

MR. FROCCARO: No objection.





THE COURT: It is admitted.

(Whereupon, Government Exhibit 129 was received in evidence, as of this date.)

MS. ENTWISTLE: Please publish for the jury.

(Whereupon, the above-mentioned exhibit was published to the jury.)

Q. Who is the e-mail from that's being forwarded to you?

A. From Monica Estrada at PacNet to Phil Priolo.

Q. And can you read the text of the e-mail from Monica Estrada at PacNet to Phil Priolo?

A. Hi, Phil. Our risk department reviewed NPB, requested the following amendments.

Read all those?

Q. Yes, please, and to the best you can read it.

A. Please revise the word approved, eligible so the recipient doesn't think he is approved to receive the verified amount being held for payment.

Please revise the text cash payment release to report release so the recipient doesn't think cash payment will be delivered to him.

Please revise the text participation for cash payment release. Win opportunity report release similar to so the recipient doesn't think cash payment will be delivered to him.

Please revise the word approved eligible so the





recipient doesn't think he is approved to receive the verified amount being held for payment.

Kindly find attached PDF that contains notes for these comments. Don't hesitate to contact me should you have any questions. Best regards, Monica Estrada.

Q. And, again, why would these sorts of edits be forwarded to you in the course of your job?

A. Definitely to make me aware of them, because whoever is making the changes I would need to make sure that these changes or on this mailing piece when it came through.

MS. ENTWISTLE: And if you zoom back out to the whole mailing.

Q. Can you see there is an attachment being sent to you?

A. Yes.

MS. ENTWISTLE: And if we go to the second page -- third page.

Q. Does this appear to be an attachment of the NPB mailing that the e-mail was referring to?

A. Yes.

MS. ENTWISTLE: And if we can go back and look at it.

Stay here for now.

Q. Did that e-mail request any edits to the text, notice of cash funds in trust, in the top right?

A. I'd have to go back and look.





Q. Okay.

MS. ENTWISTLE: Can we go back to page one.

A. No -- I'm not really seeing it.

Q. So it doesn't appear that that text -- it doesn't appear that PacNet's asking for that text to be changed in this e-mail?

A. Not that I can see, no.

MS. ENTWISTLE: You can stop publishing that exhibit.

Q. I want to turn, Ms. Jacquard, and discuss the fulfillment for these mailings.

What did individuals who paid a fee in response to one of Mr. Priolo's owes or Mr. Jeffrey Novis's mailing pieces receive?

A. They received a booklet with sweepstakes in it that they could enter.

Q. And was that what they would receive for mailings that went out under the Winners Circle mailing plan?

A. Yes.

Q. And was it the same for the Feel Lucky group mailing plan?

A. Yes.

Q. And was that -- when I use the word fulfillment, do you understand what that word means?

A. Yes.

It means what the customers are receiving back after they send in the payment amount.
Q. And what was the fulfillment for Sean Novis's mailings?
A. It's a sweepstakes booklet.
Q. And for Gary Denkberg's mailings?
A. A sweepstakes booklet.
Q. Did Mr. Priolo's companies award an actual cash prize?
A. Not to my knowledge, no.
Q. Not through Winners Circle?
A. Not to my knowledge, no.
Q. And not through Feel Lucky Group?
A. Not to my knowledge, no.
Q. And the sweepstakes report that we were just discussing, how would that be compiled in your experience?
A. There's other people that are doing research for the company for finding sweepstakes that the company can use to put into their sweepstakes booklets that they hire.
Q. And what was your role in the creating of that fulfillment sweepstakes report?
A. The same type of, you know, just proofing it, making sure that the sweepstakes are there, whatever they are mailing out, making sure that it's correct.
MS. ENTWISTLE: Government Exhibit 121, just for





the witness.
Q. What is this document?
A. This is an e-mail from April 30, 2015, from myself going to Ellen@dmcsinc.com.
Q. And remind the ladies and gentlemen of the jury who is Ellen?
A. Ellen is the bookkeeper.
She does the payroll, the invoicing for the company.
Q. Does there appear to be an attachment to this e-mail?
A. Yes.
Q. Can you just briefly read the text of this e-mail from you to Ellen.
A. It says:
Hi, Ellen. Please bill Winners Circle for fulfillment $300.
Q. And page two -- page three.
What is the attachment?
A. That looks like the sweepstakes that are in a fulfillment booklet.
MS. ENTWISTLE: Move to admit Government Exhibit 121.
MR. FROCCARO: No objection.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 121 was received





in evidence, as of this date.)
MS. ENTWISTLE: Page three.
Please publish for the jury, and page three.
(Whereupon, the above-mentioned exhibit was published to the jury.)
MS. ENTWISTLE: Just briefly, can you also show the jury the second page.
Q. What is your understanding, Ms. Jacquard, based on this proof of how these two pages would be printed?
A. I don't understand what you mean.
What do you mean how they would be printed?
Q. We are looking at one page now, then going back up to page three.
Would this be received as two separate pages?
A. Oh, I believe this was somehow folded.
There was a fold going. It would be one large page and then it would be tri-folded somehow.
Q. So one large --
A. It would be like an envelope size when it was done.
Q. So one piece of paper printed front and back?
A. Yes.
Q. And can you read the title at the top of the page.
MS. ENTWISTLE: If you zoom in on the top half of the page.
A. Sweepstakes compendium.





Q. Does this sweepstakes report include the name of the mailing schedule it's associated with?
A. I don't see it, no.
MS. ENTWISTLE: And if we go back briefly up to page one.
Q. Your text to Ellen:
Hi, Ellen, please bill Winners Circle for fulfillment, so what is your understanding of whose sweepstakes this is, what company?
A. Winners Circle fulfillment.
Q. And going back to page three, and then again page four, does it say Winners Circle anywhere on the mailing?
A. No.
Q. And does it say the name of any of those three letter mailings we have been looking at?
A. No.
Q. Based on your experience, would this sweepstakes report go to a customer only who had received one specific mailing, NPF, for example, or to any of those mailings?
A. It could be to any of those mailings, as long as the sweepstakes totals would correlate to the actual mailing piece.
Q. And how many sweepstakes are listed in this mailing piece, looking at this page and then back up to page three?

A. I need the other page.
(Whereupon, there was a pause in the proceedings.)
A. It looks like ten.
Q. So ten sweepstakes, and we will look at just one example.
MS. ENTWISTLE: Back on page four.
If you could pull out the sweepstakes, Kellogg's Snacks.
Q. Ms. Jacquard, if you could read that text.
A. It says Kellogg's Snacks, Avengers, Age of Ultron instant win game sweepstakes.
Grand prize, a 2015 Jeep Cherokee Limited, approximately value $40,000.
Then 500 first prizes, a Marvel DVD set approximately value $150 each.
2,000 second prizes, a movie ticket approximate value $12.50 each.
Approximate value of all prizes $140,000.
Expires September 30, 2015. Enter online, www.kfr.com/avengersprizes. Enter by mail. Print your name, address and phone number on a three by five card and mail to Avengers, Age of Ultron, instant win game and mail to PO Box 7558 Kalamazoo, Missouri 49003.
Q. Thank you.





What is your understanding of the line approximate value of all prizes?
A. It means that if someone won all the prizes, it could add up to $140,000.
Q. If someone won the Jeep Cherokee, the 500 DVD sets and the 200 movie tickets that adds up to $140,000?
A. Yeah.
Without doing the math I'd say approximately.
Q. But that's your understanding of what that means?
A. Yeah, approximately.
Q. I'm not asking you to do math, but what that phrase approximately value of all prizes means?
A. Correct.
MS. ENTWISTLE: Government Exhibit 136 just for the witness.
THE COURT: Ms. Entwistle, how much time do you need with this upcoming exhibit?
We are at 4:25, so I'm mindful of the jury's time.
MS. ENTWISTLE: We could do just this one exhibit in two minutes.
THE COURT: Okay.
MS. ENTWISTLE: And then I think that would be just fine a time.
THE COURT: And how much more time will you need





with this witness before we go to cross?
MS. ENTWISTLE: Maybe 20 minutes, your Honor.
THE COURT: Okay.
We'll do this exhibit and we'll continue with the rest of the questioning by the government tomorrow morning.
MS. ENTWISTLE: Perfect.
Thank you, your Honor.
MS. ENTWISTLE: Government Exhibit 136, just for the witness.
Q. What is this document?
A. This is an e-mail from me to Jason Noberto and Jeffrey Novis, and dated November 20, 2014.
Q. Down at the bottom half of the page, is this a response to another e-mail you received?
A. Correct.
It looks like it's an e-mail on November 19, 2014, from Jason Noberto and going to me and also Jeffrey Novis.
MS. ENTWISTLE: Move to admit Government Exhibit 136.
MR. FROCCARO: No objection.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 136 was received in evidence, as of this date.)





MS. ENTWISTLE: Please publish.
(Whereupon, the above-referenced exhibit was published to the jury.)
MS. ENTWISTLE: And just the bottom half of the page.
Q. As you sit here today, who is Jason Noberto?
A. I believe that's one of the people that they have looking for -- that were the sweepstakes researchers.
Q. The sweepstakes researchers.
And what is a sweepstakes researcher?
A. He looks for sweepstakes that they can use in their sweepstakes booklets that are, you know, valid, that they can use.
Q. And who else is Mr. Noberto e-mailing on this e-mail?
A. Myself and Jeffrey Novis.
Q. And then please read the text of that e-mail.
A. Hi Cheryl.
It was nice speaking with you. I am copying Jeff on this e-mail and we all need to give some thought to a name for the sweeps report to go on the cover that is generic enough to cover all the various DBAs. We plan on getting the first report from you on 12/5 and going two per month.
Q. And just stopping there.
What's a DBA?

A. Doing -- I believe it's stands for doing business as.
Q. And so do you understand what he's referring to in the context of this e-mail?
A. They are talking about the covers for the sweepstakes, 'cause some of the sweepstakes they don't look like that other one you had.
Some of them would be, like, booklets and they would have maybe a cover on them, and it looks like he's doing some research. They are just probably just starting to -- he's starting to do research to give him sweepstakes that can go to the various different mailings.
Q. Okay.
So I think what you are saying where it says some thought to a name for the sweeps report to go on the cover, that's the fulfillment sweeps report we were just talking about?
A. Yeah.
That's just like a cover, a cover, some name going on the cover.
Q. And the billing info below, can you read the company and individual listed there?
A. The Winners Circle International, attention Phil Priolo, 1 DuPont --
Q. You don't have to read the address.
MS. ENTWISTLE: Just zoom out so I can see the





rest of the e-mail.
Is there a second page?
Q. Then an e-mail address below.
Do you see that e-mail address at the very top?
A. Oh, Phil Priolo08@Yahoo.com.
Q. And if you scroll up so you can see --
MS. ENTWISTLE: Can you do it so you can see the bottom of the other one.
Q. Does that appear to be a continuation of the text the billing info is?
A. That was the one where I just read that address, right?
Q. Right.
Because of the break in the page, does it appear to you that this e-mail address is associated with the text from the bottom of the last page?
A. I'm trying to look to see what you are looking at.
Q. No problem.
A. Oh, okay, so the Phil Priolo one you mean?
Q. Yes.
A. Okay.
It appears on the bottom, the e-mail. I'm trying to figure out what you want me to --
Q. No problem.
MS. ENTWISTLE: We'll leave it there, your





Honor.
THE COURT: Thank you, so much.
Ms. Jacquard, you can step down now. Thank you, so much.
(Witness steps down.)
THE COURT: Jurors, thank you, so much, for your focus and attention this afternoon.
We have made it through our first day of trial with evidence. Now I'm going to remind you again of the reminders I will give you every single time we have a break. Please leave your notes, if you were taking any, in the jury room. That room will be locked and no one will be able to get in there until you return in the morning when Mr. Morabito will open that room for you for your 9:45 a.m. arrival.
Please do not talk to each other about the case, or about anyone who has anything to do with the case, including the parties, counsel, court personnel, any of the names or entities that you heard, including the ones you heard today, and the evidence that was presented to you. Please do not talk to each other about the case or anyone or anything that has anything to do with the case until your deliberations at the close of trial.
Please do not communicate on social media or on any other form about your jury service, or any details





about the case at all, any of the people involved in the case, court personnel or the information that you are hearing.
Please do not do any research about the case, the people, places, companies, evidence that you are hearing, the court, the lawyers in this room, the parties, or anything else having to do with this case or your jury service.
Please do not speak with the parties and counsel as you are entering and exiting out of the building. You may pass them in the hall. They will likely awkwardly avoid you, as they should. That is under my express direction that they not speak with you or engage with you in any way even with facial expressions or anything, no contact with the parties or counsel or teams on either side or any witnesses should you run into a witness in the halls or the elevator as you are exiting the building.
Please do not read any news articles or listen to any podcasts, radio, television, reports about the case or anyone or anything that has anything to do with it. And inform me immediately through Mr. Morabito if you become aware of another juror's violations of these instructions. If you have any questions for me you can write a note to Mr. Morabito and he will give it to me promptly.

With that, I thank you, so much, for your time and attention. Those who need any assistance with public transportation you can ask those questions of Mr. Morabito and we will see you back here in this courtroom at 10 which means we would like you in the jury room by 9:45. Feel free to bring food and whatever you need to be comfortable.

With that, we will stand in recognition of our jury.

(Jury leaves the courtroom.)

THE COURT: Thank you, counsel. Everyone else please have a seat.

Any applications from the government?

MS. ENTWISTLE: The only thing from the government, your Honor, is we have scheduled one of our remote witnesses, Pamela Pence, for tomorrow at 10 a.m.

We expect her to be very brief, less than half an hour from the government, and for purposes of technology, making sure it's working before we start, we would ask that we be allowed to proceed with Ms. Pence first before continuing with Ms. Jacquard's testimony. We have discussed it with defense counsel and they have raised no objection.

THE COURT: That is fine with me. That will be fine.





How many witnesses do you anticipate getting through? I know it's hard to guesstimate, but just so I have a sense of who's coming up?

MS. ENTWISTLE: We will start with Pamela Pence.

We will finish Ms. Jacquard, then I believe it is Postal Inspector Joseph Bizzarro and Ashley Seip, and then if we still have time we will begin with Cathy Johnson.

THE COURT: Okay. Thank you.

Any further applications?

MS. ENTWISTLE: Nothing from the government, your Honor.

THE COURT: Mr. Froccaro?

MR. FROCCARO: Thank you, Judge.

THE COURT: Thank you, all, so much for your time and attention.

Try to get some rest. I'll see you in the morning at 9:15. Thank you, all, so much.

MR. FROCCARO: Thank you, your Honor.

MR. EDELSTEIN: Thank you.

(Whereupon, the trial was adjourned until Wednesday, March 12, 2025, at 9:15 a.m.)





I N D E X


| Witnesses | Page |
|---|---|
| SHARON SOLTIS | 47 |
| DIRECT EXAMINATION | |
| BY MR. FELDMAN | 47 |
| CROSS-EXAMINATION | 69 |
| BY MR. FROCCARO | |
| CHERYL JACQUARD | 74 |
| DIRECT EXAMINATION | |
| BY MS. ENTWISTLE | 74 |




E X H I B I T S


| | Page |
|---|---|
| Government Exhibit 51 was received in evidence | 55 |
| Government Exhibit 51-EO was received in evidence | 55 |
| Government Exhibit 52 was received in evidence | 65 |
| Government Exhibit 52-OE was received in evidence | 65 |
| Government Exhibit 110 was received in evidence | 87 |
| Government Exhibit 111 was received in evidence | 94 |
| Government Exhibit 105 was received in evidence | 97 |
| Government Exhibit 1 was received in evidence | 109 |
| Government Exhibit 108 was received in evidence | 110 |
| Government Exhibit 9 was received in evidence | 113 |
| Government Exhibit 101 was received in evidence | 113 |
| Government Exhibit 101 was received in evidence | 115 |
| Government Exhibit 2 was received in evidence | 118 |
| Government Exhibit 103 was received in evidence | 119 |
| Government Exhibit 118 was received in evidence | 123 |
| Government Exhibit 104 was received in evidence | 130 |
| Government Exhibit 130 was received in evidence | 133 |
| Government Exhibit 128 was received in evidence | 137 |
| Government Exhibit 129 was received in evidence | 138 |
| Government Exhibit 121 was received in evidence | 142 |
| Government Exhibit 136 was received in evidence | 147 |

## $

**$1,200,000** [6] - 66:25, 100:24, 103:4, 104:10, 104:17, 106:24
**$1,217,534** [1] - 124:9
**$1,226,612** [2] - 91:25, 92:7
**$1,250,000** [1] - 112:9
**$1,392,000** [1] - 38:19
**$1,392,892.45** [1] - 39:21
**$1,600,000** [1] - 56:18
**$1,731,000** [8] - 131:2, 131:11, 132:1, 132:7, 132:15, 132:21, 134:21, 134:22
**$10,000** [1] - 132:10
**$12.50** [1] - 145:18
**$140,000** [3] - 145:19, 146:4, 146:6
**$150** [1] - 145:16
**$20** [13] - 24:3, 30:9, 30:24, 31:1, 31:9, 31:25, 35:14, 38:6, 38:7, 38:12, 38:19, 67:5, 104:19
**$22** [1] - 132:20
**$300** [1] - 142:16
**$32** [1] - 60:4
**$40** [1] - 18:12
**$40,000** [1] - 145:14
**$600** [1] - 132:9
**$75** [1] - 40:15

## 1

**1** [15] - 44:2, 54:10, 61:15, 63:17, 63:24, 64:18, 86:14, 86:17, 95:16, 104:17, 108:10, 109:1, 109:5, 149:23, 156:11
**1,200,000** [1] - 65:25
**1,580,000** [1] - 63:19
**1,600,000** [2] - 56:10, 59:15
**1.3** [2] - 19:23, 20:6
**1.6** [1] - 56:12
**10** [2] - 153:4, 153:16
**100** [1] - 1:15
**100,000** [2] - 121:9, 121:11
**10017** [1] - 1:22
**101** [7] - 113:5, 113:19, 113:23, 115:11, 115:14, 156:14, 156:15
**103** [4] - 119:11, 119:18, 119:22, 156:17
**103W** [1] - 1:19
**104** [6] - 129:15, 130:3, 130:11, 130:15, 135:15, 156:19
**1040** [1] - 12:5
**105** [4] - 95:15, 96:22, 97:1, 156:10
**108** [4] - 109:12, 110:12, 110:15, 156:12
**109** [1] - 156:11
**10:00** [2] - 1:6, 4:6
**10:30** [1] - 4:8
**11** [1] - 1:6
**110** [6] - 86:13, 87:10, 87:15, 89:25, 156:8, 156:12
**11050** [1] - 1:20
**111** [4] - 93:21, 94:12, 94:16, 156:9
**113** [2] - 156:13, 156:14
**115** [2] - 62:8, 156:15
**11722** [1] - 1:15
**118** [8] - 122:11, 123:1, 123:5, 128:8, 129:1, 129:4, 156:16, 156:18
**11803** [2] - 101:2, 101:7
**119** [1] - 156:17
**12** [4] - 30:25, 122:13, 132:11, 154:22
**12/5** [1] - 148:22
**121** [4] - 141:25, 142:22, 142:25, 156:23
**123** [1] - 156:18
**128** [6] - 133:8, 133:14, 136:17, 136:24, 137:2, 156:21
**129** [3] - 137:19, 138:2, 156:22
**12:30** [2] - 4:8, 5:9
**13** [1] - 21:25
**130** [8] - 133:3, 133:13, 133:16, 133:19, 133:20, 133:22, 156:19, 156:20
**133** [1] - 156:20
**136** [5] - 146:14, 147:9, 147:21, 147:24, 156:24
**137** [1] - 156:21
**138** [1] - 156:22
**14** [2] - 133:5, 137:22
**142** [1] - 156:23
**147** [1] - 156:24
**15** [1] - 73:10
**15-minute** [1] - 72:22
**15229** [1] - 96:6
**15668** [1] - 122:21
**16** [3] - 15:2, 136:19, 137:6
**18** [1] - 132:6
**19** [1] - 147:17
**1:30** [2] - 4:19, 4:22

## 2

**2** [13] - 64:19, 86:14, 87:2, 90:9, 93:22, 94:7, 94:17, 109:24, 117:16, 118:3, 118:7, 156:16
**2,000** [1] - 145:17
**20** [7] - 1:19, 18:12, 38:16, 40:11, 40:12, 147:2, 147:13
**200** [2] - 104:18, 146:6
**2007** [2] - 76:3, 77:12
**2008** [2] - 76:3, 77:13
**2010** [1] - 81:3
**2011** [1] - 81:3
**2014** [3] - 22:6, 147:13, 147:18
**2015** [25] - 16:20, 17:17, 30:3, 31:19, 42:22, 44:11, 49:9, 49:18, 50:5, 86:18, 93:25, 96:3, 109:24, 113:8, 114:23, 119:13, 122:13, 129:19, 133:5, 136:19, 137:6, 137:22, 142:3, 145:13, 145:20
**2015/2016** [2] - 48:18, 57:19
**2016** [10] - 17:17, 22:18, 27:20, 30:4, 31:19, 42:22, 44:12, 49:10, 49:18, 50:5
**2017** [1] - 80:23
**2018** [1] - 56:23
**2025** [2] - 1:6, 154:22
**21-CR-00566(NJC** [1] - 1:2
**210853** [1] - 90:25
**27** [2] - 101:1, 101:6
**2:30** [1] - 72:22
**2:45** [1] - 72:23

## 3

**3** [5] - 87:5, 90:10, 95:16, 113:8, 119:13
**30** [2] - 142:3, 145:20
**300** [1] - 30:15
**3014204261** [3] - 101:23, 102:21, 106:18
**38** [1] - 68:21
**3:15** [1] - 5:8
**3rd** [1] - 114:23

## 4

**4** [1] - 135:12
**4/6** [1] - 121:14
**4/8** [1] - 121:13
**4/8/15** [1] - 108:20
**4/8/2015** [1] - 106:17
**40** [1] - 40:11
**42** [1] - 17:12
**47** [2] - 155:6, 155:8
**49003** [1] - 145:24
**4:25** [1] - 146:18
**4:30** [4] - 4:22, 4:25, 5:5, 5:6

## 5

**5** [5] - 91:5, 124:20, 128:7, 128:10, 128:20
**50** [1] - 74:23
**500** [2] - 145:15, 146:5
**501** [1] - 1:21
**51** [8] - 53:25, 55:2, 55:6, 55:7, 55:10, 61:10, 61:18, 156:4
**51-EO** [2] - 55:16, 156:5
**51-OE** [1] - 62:10
**514** [1] - 1:21
**52** [5] - 64:15, 65:2, 65:4, 65:7, 156:6
**52-E** [1] - 65:6
**52-OE** [3] - 65:6, 65:12, 156:7
**55** [2] - 156:4, 156:5
**570** [1] - 1:15
**580** [1] - 63:17
**5th** [1] - 1:21

## 6

**6** [3] - 87:6, 93:8, 129:19
**60-year-old** [1] - 40:11
**6036** [3] - 99:3, 99:13, 99:17
**65** [2] - 156:6, 156:7
**69** [1] - 155:9

## 7

**7** [3] - 86:18, 93:25, 96:3
**70** [1] - 68:22
**74** [2] - 155:12, 155:14
**7558** [1] - 145:24

## 8

**8/1/16** [1] - 61:8
**87** [1] - 156:8

## 9

**9** [5] - 112:11, 112:12, 112:24, 113:3, 156:13
**9,000** [5] - 120:10, 122:1, 122:4, 122:6, 122:8
**9/2/16** [1] - 61:19
**9/9/16** [1] - 108:17
**90,000** [4] - 120:10, 121:25, 122:6, 122:7
**92** [1] - 49:17
**93** [2] - 49:17, 68:18
**94** [1] - 156:9
**97** [1] - 156:10
**99** [1] - 48:3
**99,000** [1] - 99:10
**99,091** [1] - 99:6
**999,900** [2] - 43:18, 43:22
**9:15** [2] - 154:18, 154:22
**9:45** [3] - 4:4, 151:15, 153:5

## A

**a.m** [5] - 1:6, 4:6, 151:15, 153:16, 154:22
**ability** [1] - 13:21
**able** [10] - 29:24, 45:21, 46:6, 49:7, 56:15, 56:25, 57:1, 79:5, 85:8, 151:13
**above-mentioned** [11] - 97:4, 109:9, 110:20, 115:22, 118:10, 120:3, 123:8, 130:23, 137:9, 138:5, 143:4
**above-referenced** [1] - 148:2
**absolutely** [2] - 2:13, 30:17
**absurd** [1] - 43:21
**accept** [6] - 6:8, 8:5, 9:3, 63:16, 104:14, 132:12
**acceptance** [1] - 63:8
**access** [11] - 3:18, 131:10, 131:18, 131:23, 131:25, 132:15, 132:16, 132:22, 134:20, 134:21, 135:19
**accessible** [1] - 13:13
**according** [2] - 77:24, 111:12
**According** [1] - 20:4
**account** [4] - 22:13, 22:15, 44:15, 48:25
**accounting** [3] - 30:12, 30:20, 30:21
**accounts** [1] - 25:12
**accurate** [4] - 30:17, 30:20, 30:21, 40:22
**acknowledge** [1] - 38:7
**acknowledging** [1] - 38:5
**acknowledgment** [1] - 39:19
**acronym** [1] - 92:19
**acts** [1] - 27:4
**actual** [5] - 26:13, 54:13, 116:25, 141:8, 144:21
**adamant** [1] - 53:12
**add** [5] - 43:9, 62:13, 63:9, 135:1, 146:4
**added** [7] - 61:24, 62:4, 62:9, 67:12, 91:13, 94:19, 119:5
**adding** [1] - 135:22
**addition** [2] - 20:19, 23:25
**additional** [8] - 21:23, 21:25, 23:6, 23:21, 66:17, 87:5, 91:12, 111:7
**address** [32] - 20:3, 21:22, 26:9, 26:13, 38:2, 41:6, 41:16, 41:18, 57:11, 58:22, 66:1, 76:25, 78:23, 94:21, 98:8, 98:13, 100:25, 101:3, 101:14, 105:6, 105:19, 105:23, 106:1, 106:25, 117:1, 132:18, 145:22, 149:24, 150:3, 150:4, 150:11, 150:15
**addressed** [4] - 7:17, 19:4, 115:18, 115:25
**addresses** [3] - 21:13, 41:12, 82:10
**addressing** [1] - 3:5
**adds** [1] - 146:6
**adjourned** [1] - 154:21
**administered** [1] - 5:13
**admissibility** [1] - 11:2
**admission** [2] - 10:15, 133:18
**admit** [19] - 8:13, 10:10, 55:5, 94:11, 96:21, 108:25, 110:11, 112:23, 113:18, 115:10, 118:2, 119:17, 122:25, 130:10, 133:7, 136:23, 137:24, 142:21, 147:20
**admitted** [25] - 9:6, 55:6, 55:15, 56:1, 65:3, 65:11, 87:14, 94:15, 96:25, 109:4, 110:14, 113:2, 113:22, 115:13, 118:6, 119:21, 123:4, 130:14, 133:10, 133:20, 135:13, 137:1, 138:1, 142:24, 147:23
**adult** [1] - 30:2
**advantage** [1] - 37:2
**advertisements** [1] - 77:8
**Advertising** [9] - 86:19, 90:3, 90:4, 94:1, 109:25, 113:9, 113:11, 114:24, 129:20
**advisement** [4] - 19:18, 58:3, 100:16, 111:8
**Affairs** [5] - 56:6, 58:5, 58:11, 58:14, 61:4
**affairs** [1] - 48:22
**affixed** [2] - 101:21, 102:1
**affixing** [1] - 39:20
**afraid** [1] - 42:13
**afternoon** [7] - 4:21, 4:22, 29:9, 47:7, 47:8, 74:19, 151:7
**age** [3] - 59:20, 63:16, 132:6
**Age** [2] - 145:11, 145:23
**agent** [1] - 56:17
**ages** [2] - 41:13, 41:18
**aggregate** [9] - 30:11, 30:16, 30:19, 30:21, 39:7, 91:25, 92:7, 124:8
**aggressive** [1] - 40:2
**ago** [10] - 31:19, 32:8, 40:11, 48:1, 65:17, 70:20, 70:25, 124:25, 129:9, 135:17
**agree** [4] - 6:10, 8:12, 25:7, 132:8
**agreed** [3] - 8:12, 27:1, 123:21
**agreement** [1] - 26:25
**ahead** [5] - 59:18, 60:1, 68:15, 69:16, 134:19
**aided** [1] - 1:25
**Air** [1] - 48:13
**air** [1] - 6:24
**alive** [2] - 47:21, 68:22
**allegation** [2] - 13:6, 45:14
**alleges** [3] - 12:23, 13:1, 13:4
**allow** [1] - 131:16
**allowed** [1] - 153:20
**almost** [4] - 44:7, 44:17, 48:3, 66:15
**altered** [1] - 24:22
**Ambassador** [1] - 75:3
**amendment** [1] - 134:16
**amendments** [1] - 138:12
**AMERICA** [1] - 1:2
**American** [1] - 5:21
**amount** [25] - 19:11, 19:22, 30:16, 56:12, 58:22, 59:15, 60:25, 65:22, 65:24, 66:25, 78:24, 91:22, 91:24, 91:25, 92:7, 100:23, 103:4, 106:24, 108:15, 112:7, 124:8, 131:1, 138:17, 139:2, 141:2
**amounts** [3] - 54:21, 63:16, 132:9
**angry** [1] - 50:2
**ANN** [1] - 1:16
**announce** [1] - 102:23
**announcement** [2] - 102:18, 104:8
**answer** [8] - 10:12, 10:13, 11:18, 11:20, 71:21, 88:12
**answered** [1] - 10:13
**answers** [1] - 70:4
**Anthony** [4] - 120:8, 120:21, 120:22, 121:15
**anticipate** [2] - 72:15, 154:1
**anyway** [1] - 15:12
**apologies** [5] - 114:6, 119:25, 126:22, 133:17, 137:5
**apologize** [9] - 39:13, 41:9, 43:6, 52:3, 88:9, 94:24, 96:12, 114:4, 115:20
**appear** [23] - 19:24, 57:10, 61:25, 87:6, 107:20, 107:23, 108:3, 108:21, 110:8, 115:4, 117:20, 120:24, 121:16, 122:15, 129:8, 130:4, 135:21, 139:17, 140:4, 140:5, 142:10, 150:9, 150:14
**appeared** [3] - 19:8, 20:2, 22:24
**appearing** [2] - 17:1, 22:2
**applications** [5] - 2:3, 73:5, 73:14, 153:13, 154:10
**applied** [1] - 91:1
**apply** [6] - 5:18, 6:3, 6:8, 9:13, 132:4, 132:5
**appreciate** [1] - 39:18
**approach** [1] - 51:2
**approval** [1] - 137:18
**approved** [5] - 102:25, 138:15, 138:16, 138:25, 139:1
**approximate** [4] - 43:8, 145:17, 145:19, 146:2

**April** [13] - 86:18, 93:25, 96:3, 109:24, 113:8, 114:23, 119:13, 129:19, 133:5, 136:19, 137:6, 137:22, 142:3
**area** [1] - 38:2
**argue** [2] - 71:8, 126:3
**argument** [2] - 15:19, 71:4
**argument's** [3] - 43:12, 43:16
**arguments** [6] - 12:8, 12:9, 12:19, 16:5, 16:7, 16:9
**arithmetic** [1] - 43:17
**arrival** [1] - 151:15
**articles** [1] - 152:18
**Ashley** [1] - 154:6
**asserted** [1] - 52:15
**assessments** [1] - 13:22
**assist** [1] - 14:2
**assistance** [1] - 153:2
**Assistant** [1] - 1:18
**assisted** [1] - 29:15
**assists** [1] - 134:9
**associated** [4] - 85:2, 85:5, 144:2, 150:15
**attach** [2] - 8:6, 15:22
**attached** [7] - 32:16, 39:1, 97:6, 98:21, 122:23, 129:22, 139:3
**attachment** [20] - 86:21, 86:24, 87:3, 94:3, 94:5, 94:7, 96:7, 96:10, 110:8, 113:13, 113:16, 115:4, 122:19, 129:25, 130:5, 130:7, 139:13, 139:17, 142:10, 142:18
**attachments** [4] - 87:6, 110:2, 110:4, 115:1
**attempt** [1] - 19:23
**attention** [17] - 8:8, 13:23, 32:21, 33:5, 35:6, 40:5, 42:6, 46:10, 48:18, 100:11, 104:8, 111:5, 149:22, 151:7, 153:2, 154:16
**attentive** [1] - 4:17
**attest** [2] - 59:20, 63:15
**attorney** [6] - 6:12, 11:1, 11:2, 11:7, 29:12, 29:16
**Attorney** [1] - 1:14
**attorney's** [2] - 7:13, 11:1
**Attorneys** [1] - 1:18
**attorneys** [2] - 7:6, 24:18
**attorneys'** [1] - 11:9
**author** [2] - 60:11, 66:4
**authority** [1] - 116:5
**authorization** [5] - 59:12, 63:8, 123:12, 123:16, 124:6
**authorized** [4] - 64:23, 65:18, 66:5, 106:16
**authorizing** [1] - 107:6
**automatically** [1] - 117:10
**available** [11] - 20:10, 20:12, 28:16, 30:11, 58:2, 58:20, 66:22, 102:19, 103:1, 104:15
**avalanche** [1] - 17:8
**Avengers** [2] - 145:11, 145:23
**Avenue** [2] - 1:19, 1:21
**average** [1] - 18:12
**avoid** [2] - 7:3, 152:12
**awaiting** [1] - 123:15
**award** [5] - 20:8, 35:2, 35:8, 104:10, 141:8
**awarded** [1] - 132:10
**awards** [6] - 18:15, 30:12, 58:3, 58:20, 59:22, 103:2
**aware** [4] - 103:21, 105:21, 139:8, 152:22
**awkwardly** [1] - 152:11


## B


**back-end** [1] - 86:11
**background** [2] - 9:10, 74:24
**backside** [1] - 20:15
**bad** [2] - 31:4, 35:19
**bank** [10] - 22:13, 22:15, 25:12, 25:14, 26:17, 27:13, 44:13, 45:2, 48:25, 132:13
**bar** [2] - 117:1, 123:19
**barcodes** [1] - 78:24
**Barrett** [5] - 66:8, 66:9, 66:11, 107:16, 107:17
**base** [1] - 71:19
**based** [13] - 4:11, 5:24, 10:4, 33:13, 34:13, 86:23, 90:6, 99:15, 110:4, 126:15, 126:19, 143:8, 144:17
**basis** [2] - 23:19, 24:6
**bass** [1] - 75:17
**bear** [1] - 34:23
**become** [1] - 152:22
**beeping** [1] - 3:19
**BEFORE** [1] - 1:10
**began** [2] - 22:20, 23:20
**begin** [3] - 9:15, 132:16, 154:7
**beginning** [10] - 17:17, 21:14, 22:6, 105:4, 107:3, 116:6, 123:20, 131:23, 135:18, 137:6
**behalf** [4] - 21:3, 24:25, 25:8, 27:18
**behind** [1] - 91:18
**beliefs** [2] - 50:22, 53:8
**belongings** [1] - 3:16
**below** [17] - 39:20, 59:19, 59:23, 67:2, 68:5, 92:6, 92:12, 98:21, 106:23, 111:10, 116:13, 116:14, 131:3, 131:15, 132:18, 149:20, 150:3
**best** [5] - 6:19, 29:20, 104:7, 138:14, 139:5
**better** [2] - 41:23, 105:25
**between** [4] - 4:8, 18:12, 44:11, 76:16
**beyond** [6] - 18:17, 18:22, 28:19, 29:25, 45:17, 45:20
**bias** [2] - 11:1, 45:25
**big** [6] - 5:19, 19:11, 33:3, 34:5, 35:4, 101:18
**bigger** [1] - 42:17
**biggest** [1] - 56:8
**bill** [2] - 142:15, 144:7
**billing** [3] - 81:23, 149:20, 150:10
**binders** [3] - 2:22, 2:24, 3:2
**bio** [2] - 4:10, 72:18
**bio-break** [1] - 4:10
**bit** [5] - 75:16, 98:20, 105:1, 105:3, 107:2
**Bizzarro** [1] - 154:6
**blank** [3] - 78:10, 91:9, 109:16
**bless** [1] - 68:22
**blind** [1] - 68:19
**block** [2] - 20:15, 20:16
**blood** [1] - 6:21
**blue** [3] - 100:23, 130:18, 132:24
**blurted** [1] - 41:17
**BNO** [8] - 110:9, 111:16, 111:21, 111:22, 111:23, 112:7, 112:19, 112:20
**bold** [3] - 35:4, 37:21, 131:23
**boldest** [1] - 56:8
**bombarded** [2] - 21:23, 37:13
**bombardier** [2] - 48:17, 69:22
**bomber** [1] - 68:21
**bonuses** [1] - 82:4
**bookkeeper** [2] - 81:22, 142:7
**booklet** [8] - 30:10, 34:18, 40:21, 77:10, 140:15, 141:5, 141:7, 142:20
**booklets** [3] - 141:19, 148:12, 149:7
**bookstore** [1] - 75:6
**boring** [1] - 40:4
**boss** [4] - 75:11, 75:14, 75:15, 75:17
**bosses** [1] - 75:13
**bottom** [17] - 38:14, 57:1, 62:18, 92:1, 92:22, 95:1, 101:17, 111:25, 123:17, 131:22, 132:24, 135:19, 147:14, 148:4, 150:8, 150:16, 150:22
**bought** [1] - 40:15
**bound** [1] - 131:14
**Box** [4] - 101:1, 101:6, 101:15, 145:24
**box** [10] - 15:1, 38:19, 39:15, 50:16, 59:2, 59:10, 59:16, 62:20, 101:17, 101:20
**boxes** [6] - 19:4, 26:11, 26:15, 38:6, 38:15, 68:1
**branch** [2] - 48:9, 48:12
**brand** [1] - 121:23
**break** [10] - 3:13, 4:9, 4:10, 4:22, 6:23, 72:19, 72:22, 150:14, 151:11
**breaking** [1] - 122:2
**breaks** [1] - 14:14
**brief** [7] - 69:3, 72:1, 72:18, 80:18, 114:5, 125:2, 153:17
**briefly** [13] - 41:6, 82:24, 86:16, 87:5, 109:7, 112:10, 118:25, 124:10, 124:12, 124:19, 142:12, 143:6, 144:4
**bring** [6] - 2:8, 4:5, 4:20, 9:9, 35:6, 153:6
**broke** [3] - 5:12, 49:12, 49:15
**brothers** [1] - 47:17
**brought** [3] - 40:18, 41:5, 80:19
**building** [3] - 3:17, 152:10, 152:17
**bunch** [1] - 67:23
**burden** [2] - 45:16, 45:21

**bursar** [1] - 123:15
**business** [22] - 17:23, 26:13, 30:4, 30:5, 30:10, 33:18, 34:17, 37:17, 42:9, 43:14, 43:20, 76:7, 77:11, 77:15, 81:21, 82:8, 84:18, 88:23, 89:14, 93:16, 149:1
**buy** [1] - 40:13
**BY** [27] - 1:16, 47:6, 53:3, 54:1, 54:11, 55:19, 56:3, 64:13, 65:16, 69:19, 70:9, 74:18, 86:15, 87:19, 89:4, 90:11, 91:6, 92:24, 93:9, 93:15, 93:23, 94:18, 95:4, 96:1, 155:8, 155:10, 155:14

## C

**caging** [4] - 84:16, 84:18, 84:20, 84:22
**calculator** [1] - 43:25
**camera** [3] - 55:18, 64:8, 65:14
**Canada** [2] - 25:11, 26:16
**Canadian** [3] - 25:11, 25:15, 25:24
**cancer** [1] - 68:19
**candidate** [1] - 106:17
**cannot** [4] - 3:17, 10:5, 11:17, 28:8
**capital** [3] - 33:3, 35:4, 37:21
**car** [1] - 30:3
**card** [1] - 145:22
**careful** [1] - 31:20
**carefully** [1] - 31:12
**carry** [1] - 5:13
**case** [39] - 5:23, 7:15, 8:20, 9:8, 9:19, 9:20, 10:20, 12:4, 12:22, 15:6, 15:8, 15:9, 15:12, 16:13, 18:2, 18:20, 28:18, 29:23, 31:21, 32:1, 40:19, 45:11, 45:16, 45:19, 45:22, 46:7, 48:25, 69:25, 73:24, 134:11, 151:16, 151:17, 151:21, 151:22, 152:1, 152:2, 152:4, 152:7, 152:19
**cases** [1] - 35:25
**cash** [45] - 13:3, 13:7, 16:23, 17:3, 18:10, 19:9, 19:18, 20:8, 20:23, 24:10, 26:17, 28:6, 28:14, 30:12, 31:23, 40:23, 50:8, 58:2, 60:9, 60:22, 62:19, 62:22, 66:22, 67:24, 100:16, 103:2, 104:10, 104:15, 111:8, 130:25, 131:10, 131:15, 131:23, 131:25, 132:20, 133:1, 134:20, 134:21, 138:18, 138:19, 138:21, 138:23, 139:24, 141:8
**Cathy** [9] - 27:17, 27:21, 83:21, 83:22, 83:25, 84:8, 84:24, 98:9, 154:7
**Cathy@dmcsinc.com** [3] - 96:19, 98:5, 98:8
**CAUSE** [1] - 1:9
**caused** [1] - 6:25
**caution** [1] - 15:5
**CBA** [6] - 34:1, 34:8, 34:10, 34:19, 37:25, 38:1
**cc** [1] - 110:1
**cced** [2] - 113:10, 114:25
**Central** [2] - 1:4, 1:15
**certain** [9] - 7:2, 10:11, 10:17, 32:22, 38:6, 78:24, 85:7, 85:13
**certificate** [8] - 38:5, 38:9, 64:23, 65:18, 66:5, 104:13, 106:16, 116:5
**chance** [1] - 61:10
**change** [14] - 4:1, 25:5, 25:19, 25:25, 42:8, 43:14, 43:19, 43:20, 61:22, 77:15, 84:3, 134:24, 135:8, 135:21
**changed** [3] - 24:22, 84:4, 140:5
**changes** [7] - 25:17, 25:23, 25:25, 102:10, 132:19, 139:9, 139:10
**charge** [3] - 45:13, 76:20, 76:22
**charged** [4] - 26:23, 27:3, 36:6, 38:10
**charges** [9] - 18:22, 18:24, 26:19, 26:20, 26:21, 27:4, 27:9, 28:20, 29:23
**CHARLES** [1] - 1:17
**Charles** [3] - 116:15, 117:5, 118:19
**chart** [4] - 42:20, 44:10, 44:17, 45:6
**check** [23] - 25:12, 26:15, 38:7, 38:15, 39:15, 44:14, 44:15, 59:10, 60:5, 60:6, 60:9, 60:10, 62:19, 62:20, 67:12, 67:22, 67:24, 132:3, 132:5, 132:13, 132:20, 134:5, 134:6
**checked** [9] - 38:19, 59:16, 60:8, 60:10, 67:2, 67:5, 67:9, 67:11, 68:1
**checklist** [1] - 132:3
**checkmarks** [1] - 62:9
**checks** [13] - 25:8, 25:10, 25:24, 26:6, 26:10, 26:15, 27:11, 45:3, 70:10, 92:13, 100:22, 111:11, 134:10
**Cherokee** [2] - 145:13, 146:5
**Cheryl** [4] - 72:11, 74:1, 74:12, 148:17
**CHERYL** [3] - 74:12, 74:14, 155:12
**cheryl@dmcsinc.com** [1] - 77:2
**chief** [1] - 73:24
**choose** [2] - 13:14, 13:20
**chosen** [1] - 45:23
**Choudhury** [2] - 45:10, 45:18
**CHOUDHURY** [1] - 1:10
**circle** [2] - 56:20, 56:22
**Circle** [14] - 22:14, 22:20, 23:4, 42:23, 81:15, 108:2, 108:3, 140:18, 141:11, 142:15, 144:7, 144:10, 144:12, 149:22
**circled** [1] - 67:13
**Circuit** [1] - 52:4
**circumstance** [1] - 25:5
**circumstances** [2] - 10:5, 80:16
**circumstantial** [2] - 8:15, 8:20
**Circumstantial** [1] - 8:17
**claim** [4] - 16:24, 20:5, 92:5, 131:16
**claimants** [1] - 131:8
**claimed** [1] - 19:14
**claims** [1] - 131:17
**clarification** [1] - 7:24
**clarity** [3] - 88:9, 88:15, 133:17
**clear** [1] - 31:21
**clearer** [1] - 33:17
**clearing** [4] - 134:5, 134:6, 134:9, 134:10
**Clearing** [1] - 31:6
**CLERK** [2] - 114:20, 128:5
**client** [2] - 11:1, 75:2
**client's** [1] - 40:2
**clients** [2] - 11:10, 35:19
**close** [3] - 5:3, 8:8, 151:23
**closely** [1] - 21:11
**closing** [5] - 11:8, 16:5, 16:7, 16:9, 46:7
**co** [3] - 23:22, 27:19, 69:4
**co-conspirators** [2] - 23:22, 27:19
**co-counsel** [1] - 69:4
**code** [15] - 85:6, 85:7, 85:10, 85:11, 99:2, 99:3, 99:5, 99:9, 99:13, 99:18, 99:20, 117:1, 117:2
**codes** [1] - 123:19
**cognitive** [3] - 35:16, 35:22, 36:1
**coin** [1] - 33:20
**colleague** [1] - 77:5
**collected** [4] - 14:18, 18:15, 22:11, 26:18
**college** [1] - 74:25
**Colorado** [1] - 47:14
**colors** [2] - 129:7, 129:12
**comfortable** [2] - 4:17, 153:7
**coming** [17] - 4:18, 23:1, 23:8, 33:8, 42:11, 90:1, 90:3, 97:23, 97:24, 98:3, 98:4, 111:12, 111:15, 111:19, 120:15, 120:21, 154:3
**commentary** [1] - 12:9
**comments** [1] - 139:4
**commercial** [1] - 40:10
**Commission** [3] - 58:4, 58:10, 58:14
**commit** [1] - 26:23
**commitments** [1] - 5:7
**committed** [1] - 29:25
**common** [3] - 9:11, 10:3, 92:18
**communicate** [3] - 89:19, 89:22, 151:24
**communicating** [1] - 82:13
**communication** [3] - 15:11, 35:1, 35:7
**communications** [1] - 15:10
**companies** [24] - 17:13, 18:6, 19:13, 19:14, 22:2, 23:1, 23:2, 26:6, 26:8, 53:17, 78:2, 78:4, 81:11, 85:23, 85:25, 86:2, 89:20, 106:2, 106:4, 106:7, 106:10, 134:9, 141:8, 152:5
**Company** [1] - 19:16
**company** [40] - 17:2, 17:6, 19:25, 22:13, 23:12, 25:7, 25:11, 25:12, 25:24, 63:23, 64:1, 64:3, 75:22, 76:7, 77:8, 79:17, 81:13, 82:10, 83:3, 83:6, 83:8, 83:12, 84:7, 84:11, 85:1, 85:5, 98:10, 101:3, 101:8, 107:11, 111:19, 111:23, 134:9, 134:12, 141:18, 142:9, 144:9, 149:20
**compare** [2] - 79:10, 117:23
**compared** [1] - 94:19
**comparing** [2] - 79:2, 128:9
**compelling** [1] - 9:23
**compendium** [1] - 143:25
**compile** [1] - 34:11
**compiled** [3] - 33:12, 39:5, 141:16
**complain** [3] - 43:22, 43:23

**complaining** [1] - 37:13
**complaint** [8] - 24:13, 24:16, 42:5, 43:13, 43:16, 43:18
**complaints** [2] - 24:23, 44:2
**complete** [1] - 107:6
**completely** [2] - 34:10, 45:24
**completing** [1] - 132:2
**completion** [4] - 56:10, 58:17, 58:18, 66:17
**compliance** [2] - 134:15, 136:22
**Computer** [1] - 1:25
**Computer-aided** [1] - 1:25
**computerized** [1] - 1:24
**concentrating** [1] - 39:14
**concluded** [2] - 14:17, 127:2
**conclusions** [1] - 10:7
**conducted** [4] - 27:23, 30:5, 34:2, 34:9
**confer** [1] - 69:3
**conference** [1] - 52:1
**conferences** [2] - 7:1, 7:9
**confirm** [1] - 59:22
**confirmed** [4] - 102:20, 116:9, 116:13, 124:8
**conflicts** [1] - 20:20
**confusion** [1] - 7:4
**connection** [2] - 42:25, 109:19
**Conrad** [3] - 118:15, 118:19, 118:24
**consider** [7] - 7:14, 8:9, 8:19, 10:21, 11:25, 12:15, 15:24
**considered** [1] - 11:5
**consist** [1] - 8:10
**consistent** [1] - 28:22
**conspiracy** [2] - 26:23, 26:24
**conspirators** [2] - 23:22, 27:19
**consumer** [24] - 20:16, 32:25, 33:3, 33:7, 33:16, 33:22, 34:24, 36:3, 36:4, 36:15, 37:22, 37:23, 38:20, 38:25, 39:3, 39:9, 39:25, 40:17, 40:22, 93:11, 93:17, 104:24, 126:5, 126:12
**Consumer** [4] - 32:5, 32:24, 33:6, 36:14
**consumers** [6] - 30:6, 30:9, 31:20, 31:22, 38:9, 41:12
**Cont'd** [1] - 96:1
**contact** [3] - 3:24, 139:4, 152:15
**contain** [1] - 24:2
**contained** [1] - 19:3
**contains** [2] - 20:15, 139:3
**contest** [1] - 102:24
**contests** [1] - 59:22
**context** [2] - 90:6, 149:3
**continuation** [1] - 150:9
**continue** [7] - 76:4, 84:12, 84:18, 84:20, 84:22, 106:20, 147:4
**continued** [1] - 25:2
**Continued** [6] - 44:23, 51:5, 52:18, 95:17, 125:6, 127:3
**continues** [1] - 45:15
**continuing** [2] - 72:20, 153:21
**Continuing** [1] - 45:1
**control** [1] - 2:12
**controls** [1] - 12:20
**conversations** [2] - 50:21, 58:13
**convey** [1] - 99:20
**conveyed** [1] - 26:1
**copied** [1] - 110:1
**copies** [2] - 19:5, 55:13
**copy** [10] - 54:15, 65:7, 82:20, 102:7, 108:22, 112:20, 117:12, 117:20, 128:15, 129:8
**copying** [1] - 148:18
**Corporate** [1] - 19:21
**corporate** [7] - 33:11, 34:3, 34:10, 57:23, 58:1, 59:3, 123:15
**correct** [21] - 63:19, 65:18, 65:19, 66:3, 69:25, 78:17, 79:1, 79:5, 80:13, 91:14, 93:7, 93:19, 99:1, 116:11, 118:24, 128:17, 132:18, 136:5, 141:24, 146:13, 147:16
**correctly** [1] - 66:20
**correlate** [1] - 144:21
**correspond** [1] - 14:25
**counsel** [12] - 2:3, 15:7, 29:18, 55:9, 65:5, 69:4, 73:14, 151:18, 152:9, 152:15, 153:11, 153:22
**Counsel** [1] - 73:3
**country** [5] - 19:7, 21:14, 24:18, 28:2, 31:23
**couple** [3] - 58:9, 66:17, 72:16
**course** [11] - 5:25, 6:12, 12:16, 12:18, 13:18, 21:24, 29:7, 31:3, 31:4, 39:1, 139:7
**courses** [1] - 75:7
**COURT** [93] - 1:1, 1:10, 2:3, 2:8, 2:13, 2:15, 2:25, 3:2, 3:6, 3:9, 3:11, 28:25, 29:5, 46:11, 46:16, 51:3, 52:7, 52:9, 52:13, 53:2, 55:3, 55:5, 55:15, 55:25, 65:3, 65:9, 65:11, 69:7, 69:10, 69:16, 70:3, 70:8, 71:24, 72:4, 72:9, 72:13, 72:17, 73:1, 73:3, 73:7, 73:9, 73:12, 73:17, 73:19, 73:23, 74:3, 87:12, 87:14, 94:13, 94:15, 96:23, 96:25, 109:2, 109:4, 110:14, 112:25, 113:2, 113:20, 113:22, 114:9, 115:13, 118:4, 118:6, 119:19, 119:21, 123:2, 123:4, 125:4, 126:7, 126:14, 126:24, 127:1, 130:12, 130:14, 130:19, 133:10, 133:14, 133:20, 137:1, 138:1, 142:24, 146:16, 146:22, 146:25, 147:3, 147:23, 151:2, 151:6, 153:11, 153:24, 154:9, 154:13, 154:15
**Court** [3] - 1:23, 3:4, 11:3
**court** [16] - 2:2, 3:18, 4:8, 13:11, 13:17, 13:23, 14:11, 14:16, 15:7, 53:1, 70:5, 128:1, 133:12, 151:18, 152:2, 152:6
**Court's** [1] - 72:14
**Courthouse** [1] - 1:4
**COURTROOM** [8] - 46:18, 46:21, 46:24, 64:9, 64:12, 74:4, 74:7, 74:10
**courtroom** [12] - 6:18, 6:24, 8:7, 9:10, 9:12, 12:3, 12:5, 13:8, 14:12, 14:13, 153:4, 153:10
**cover** [9] - 14:20, 40:4, 148:20, 148:21, 149:8, 149:15, 149:18, 149:19
**covered** [1] - 15:13
**covers** [1] - 149:4
**CPA** [1] - 60:4
**cream** [1] - 40:10
**creating** [2] - 136:10, 141:20
**credibility** [3] - 8:25, 9:8, 13:22
**crime** [3] - 27:1, 30:1, 43:23
**criminal** [5] - 18:22, 26:20, 26:24, 28:20, 31:18
**CRIMINAL** [1] - 1:9
**critical** [2] - 32:22, 40:5
**CROSS** [2] - 69:18, 155:9
**cross** [4] - 9:25, 41:25, 44:16, 147:1
**cross-examination** [1] - 44:16
**CROSS-EXAMINATION** [2] - 69:18, 155:9
**cross-examined** [1] - 9:25
**crouching** [1] - 52:9
**CRR** [1] - 1:23
**customer** [9] - 24:11, 105:4, 105:5, 105:12, 105:22, 106:1, 106:6, 106:9, 144:18
**customers** [2] - 75:24, 141:1
**cut** [1] - 91:17

## D

**Dad** [1] - 71:5
**dad** [31] - 47:25, 48:9, 50:4, 50:7, 50:21, 53:7, 53:13, 53:16, 54:20, 57:9, 57:18, 58:13, 59:16, 60:7, 60:17, 61:23, 62:4, 62:6, 62:9, 62:20, 63:9, 63:25, 64:24, 65:20, 66:2, 66:11, 67:22, 68:1, 68:24, 70:7, 70:10
**dad's** [12] - 47:23, 48:22, 49:1, 49:5, 49:9, 54:22, 57:10, 59:24, 62:16, 67:15, 68:11, 68:15
**daily** [1] - 24:6
**Dan** [3] - 66:8, 66:9, 66:11
**dash** [2] - 61:18, 91:22
**dashed** [1] - 124:5
**data** [7] - 82:9, 82:13, 82:19, 98:19, 103:2, 103:14, 103:17
**databases** [1] - 82:9
**date** [27] - 49:14, 58:18, 61:5, 61:7, 61:14, 61:17, 61:22, 97:2, 99:24, 108:15, 108:16, 108:19, 108:23, 109:6, 110:16, 113:4, 113:24, 115:15, 118:8, 119:23, 123:6, 130:16, 133:23, 137:3, 138:3, 143:1, 147:25
**date-line** [1] - 58:18
**dated** [1] - 147:13
**day-to-day** [4] - 21:4, 23:13, 23:15, 27:16
**days** [1] - 4:3
**DBA** [1] - 148:25
**DBAs** [1] - 148:21
**deaf** [1] - 68:19
**dealings** [1] - 9:13

**dear** [1] - 131:7
**deceive** [1] - 18:7
**deceiving** [1] - 23:24
**December** [1] - 27:20
**decide** [7] - 6:2, 7:2, 8:6, 8:22, 9:1, 12:4, 136:6
**decided** [4] - 2:19, 20:25, 22:8
**deciders** [1] - 6:1
**deciding** [2] - 8:20, 10:20
**decision** [2] - 7:14, 10:25
**decisions** [2] - 103:17, 136:9
**declaration** [3] - 57:23, 58:1, 59:4
**declared** [1] - 58:19
**declining** [1] - 49:23
**deep** [1] - 104:3
**defendant** [56] - 1:8, 12:23, 13:6, 16:1, 17:13, 17:18, 17:21, 17:23, 18:4, 18:6, 18:9, 18:14, 18:16, 18:23, 18:25, 19:6, 19:25, 20:7, 21:3, 21:6, 21:9, 21:25, 22:5, 22:7, 22:14, 22:19, 22:23, 23:2, 23:3, 23:9, 23:22, 23:23, 24:5, 24:7, 24:15, 24:20, 24:24, 25:5, 25:10, 25:17, 25:22, 26:2, 26:6, 26:11, 26:12, 26:14, 26:23, 26:25, 27:3, 27:6, 27:11, 27:15, 27:18, 28:19, 28:23, 73:17
**Defendant** [2] - 1:19, 26:18
**defendant's** [11] - 17:16, 17:20, 18:21, 20:14, 20:24, 21:22, 23:20, 24:12, 24:19, 25:13, 27:13
**defense** [3] - 12:12, 55:9, 153:22
**definitely** [3] - 49:4, 66:20, 139:8
**definition** [1] - 45:19
**defraud** [1] - 27:2
**defrauded** [1] - 31:19
**delay** [2] - 104:11, 114:5
**deliberate** [1] - 16:10
**deliberations** [9] - 3:15, 3:24, 4:4, 4:20, 9:14, 12:18, 14:1, 14:8, 151:23
**deliver** [1] - 40:6
**delivered** [3] - 40:19, 138:20, 138:24
**delivery** [2] - 104:19, 106:21
**dementia** [15] - 28:9, 35:17, 36:23, 42:2, 49:19, 49:21, 70:16, 70:18, 70:19, 70:21, 70:22, 70:23, 71:1, 71:15
**denies** [1] - 13:6
**DENISE** [1] - 1:23
**DeniseParisi72@gmail.com** [1] - 1:23
**Denkberg** [6] - 23:10, 75:15, 75:18, 79:20, 79:24, 84:20
**Denkberg's** [3] - 83:5, 86:2, 141:6
**department** [4] - 25:16, 95:7, 134:15, 138:11
**Department** [1] - 56:6
**deposit** [1] - 25:12
**deposited** [3] - 22:13, 44:9, 44:11
**depositing** [1] - 134:10
**DEPUTY** [8] - 46:18, 46:21, 46:24, 64:9, 64:12, 74:4, 74:7, 74:10
**deputy** [1] - 14:13
**described** [1] - 22:2
**deserve** [1] - 16:16
**designation** [1] - 131:10
**designed** [1] - 20:19
**despite** [1] - 13:4
**destroyed** [1] - 14:18
**detail** [2] - 71:3, 132:15
**detailed** [2] - 5:17, 103:2
**details** [2] - 131:10, 151:25
**determine** [2] - 5:24, 8:4
**determined** [1] - 71:11
**determining** [1] - 9:7
**detract** [1] - 33:4
**detracts** [1] - 35:5
**device** [1] - 3:20
**diagnosed** [1] - 70:19
**died** [1] - 42:2
**difference** [2] - 40:18, 76:16
**different** [33] - 6:13, 10:1, 14:22, 17:12, 19:6, 19:14, 19:17, 21:9, 22:2, 22:3, 22:25, 23:12, 31:5, 35:9, 37:14, 64:10, 76:18, 98:14, 108:23, 117:20, 117:24, 117:25, 118:12, 118:23, 128:15, 128:21, 129:6, 129:7, 129:8, 129:10, 129:12, 149:11
**differentiate** [1] - 88:10
**differs** [1] - 12:19
**difficult** [2] - 20:19, 31:4
**digital** [1] - 54:15
**direct** [8] - 8:14, 8:20, 42:21, 48:18, 59:12, 75:22, 75:23, 104:8
**DIRECT** [4] - 47:5, 74:17, 155:7, 155:13
**Direct** [1] - 8:16
**direction** [2] - 75:20, 152:13
**directives** [12] - 30:22, 38:13, 38:17, 58:19, 59:14, 66:24, 67:6, 103:3, 104:17, 131:17, 132:1, 132:14
**directly** [7] - 20:20, 29:8, 30:5, 38:17, 46:6, 83:12, 102:18
**director** [4] - 66:6, 66:8, 107:10
**disclaimer** [7] - 93:11, 93:12, 124:15, 126:8, 126:10, 126:13
**disclaimers** [1] - 126:4
**discuss** [2] - 13:25, 140:10
**discussed** [2] - 16:14, 153:22
**discussing** [3] - 7:6, 124:12, 141:16
**dispatch** [1] - 56:17
**displayed** [2] - 76:10, 86:13
**dispute** [1] - 33:24
**disregard** [3] - 10:19, 11:18, 11:25
**disregarded** [1] - 12:4
**disruptive** [1] - 4:11
**dissatisfied** [3] - 36:4, 36:21, 37:1
**distance** [1] - 26:3
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [1] - 1:14
**disturbance** [1] - 4:15
**disturbing** [1] - 4:14
**division** [4] - 101:5, 101:6, 101:10, 111:16
**DMCS** [4] - 76:8, 76:12, 76:17, 76:22
**DNM** [2] - 37:8, 38:1
**doctor** [2] - 70:23
**document** [71] - 30:15, 31:8, 31:11, 32:5, 32:16, 32:17, 32:18, 38:4, 38:11, 54:2, 54:6, 55:6, 55:18, 55:25, 56:5, 56:10, 56:20, 56:23, 57:1, 57:22, 58:18, 58:25, 60:7, 60:11, 60:20, 61:24, 61:25, 62:4, 62:11, 62:19, 63:2, 63:9, 63:13, 64:8, 64:11, 64:19, 64:21, 64:24, 65:14, 68:3, 68:10, 69:12, 86:17, 90:12, 91:7, 92:22, 93:24, 96:2, 106:17, 108:13, 109:14, 109:23, 110:22, 112:18, 113:7, 114:17, 114:22, 117:17, 118:17, 119:12, 122:12, 124:21, 128:10, 129:18, 133:4, 133:18, 136:18, 137:21, 142:2, 147:11
**documentation** [2] - 59:13, 60:3
**documents** [14] - 8:11, 9:17, 49:5, 54:12, 54:13, 54:15, 54:20, 54:22, 55:13, 58:3, 90:20, 100:11, 111:4, 128:9
**dollar** [7] - 18:15, 19:11, 31:5, 78:24, 94:22, 103:4, 112:7
**Dollar** [1] - 19:15
**dollars** [13] - 17:19, 18:8, 18:11, 18:16, 19:10, 19:22, 31:2, 31:24, 35:13, 43:2, 44:21, 44:22, 71:5
**Don** [2] - 107:16, 107:17
**done** [4] - 44:7, 66:15, 119:6, 143:19
**door** [1] - 76:11
**doors** [1] - 9:11
**dossier** [2] - 91:23, 92:10
**doubt** [8] - 14:8, 18:18, 18:23, 28:19, 29:25, 44:6, 45:17, 45:20
**down** [20] - 4:4, 14:12, 15:3, 35:1, 58:16, 60:20, 69:11, 70:5, 72:6, 92:12, 98:20, 105:1, 105:4, 107:1, 120:23, 121:2, 123:17, 147:14, 151:3, 151:5
**dozen** [3] - 19:6, 19:14, 23:4
**draw** [2] - 7:22, 10:24
**dream** [1] - 31:5
**Dulude** [1] - 106:24
**duly** [2] - 47:3, 74:15
**dumb** [1] - 40:15
**DUNN** [1] - 1:17
**DuPont** [1] - 149:23
**duration** [1] - 5:15
**DURHAM** [1] - 1:13
**During** [4] - 2:10, 6:19, 10:9, 19:5
**during** [24] - 5:15, 5:25, 6:16, 7:18, 8:9, 13:18, 14:1, 14:8, 14:14, 21:2, 29:7, 29:15, 29:19, 31:13, 31:18, 33:19, 44:16, 48:14, 48:16, 48:21, 50:8, 80:21, 81:18, 83:14
**duties** [1] - 75:4
**duty** [1] - 6:7
**DVD** [2] - 145:15, 146:5

## E


**E-mail** [1] - 1:23
**e-mail** [60] - 96:3, 96:5, 96:7, 96:13, 96:14, 97:12, 97:16, 97:19, 98:8, 98:14, 105:19, 105:23, 106:1, 109:24, 110:2, 113:8, 113:13, 114:23, 115:1, 119:13, 119:15, 119:24, 120:5, 120:15, 120:20, 120:24, 121:16, 122:13, 129:19, 129:22, 129:25, 130:5, 133:5, 133:24, 134:1, 134:13, 136:3, 136:19, 136:21, 137:5, 138:7, 138:9, 139:18, 139:23, 140:6, 142:3, 142:10, 142:12, 147:12, 147:15, 147:17, 148:14, 148:16, 148:19, 149:3, 150:1, 150:3, 150:4, 150:15, 150:22
**e-mailing** [1] - 148:14
**early** [3] - 5:8, 22:18, 121:15
**easier** [2] - 92:2, 114:15
**easily** [1] - 50:2
**EASTERN** [1] - 1:1
**Eastern** [1] - 1:14
**EDELSTEIN** [4] - 1:21, 32:13, 42:15, 154:20
**Edelstein** [6] - 2:11, 29:16, 29:17, 32:4, 38:3, 42:10
**edit** [4] - 135:5, 135:24, 136:1, 136:2
**edits** [3] - 136:4, 139:6, 139:23
**Education** [1] - 75:3
**educational** [1] - 74:24
**effect** [1] - 20:17
**eight** [5] - 15:1, 80:23, 126:17, 130:3, 130:7
**either** [8] - 14:1, 35:25, 46:1, 50:15, 56:11, 132:12, 136:15, 152:15
**elderlies** [1] - 44:20
**elderly** [3] - 18:7, 41:8, 41:9
**electronic** [1] - 15:11
**elevator** [1] - 152:17
**eligible** [6] - 63:16, 66:21, 92:11, 131:8, 138:15, 138:25
**Ellen** [7] - 81:19, 142:6, 142:7, 142:13, 142:15, 144:6, 144:7
**Ellen's** [1] - 81:21
**Ellen@dmcsinc.com** [1] - 142:4
**ELMO** [4] - 61:10, 62:23, 114:8, 114:19
**Elmo** [8] - 2:11, 2:12, 2:18, 32:6, 32:8, 32:9, 32:11, 38:4
**email** [19] - 26:9, 27:13, 76:15, 76:24, 76:25, 86:18, 86:21, 87:3, 87:7, 87:20, 87:21, 87:24, 89:21, 89:23, 90:1, 90:6, 93:25, 94:3, 137:22
**emergencies** [1] - 48:25
**emphasize** [1] - 10:5
**employee** [2] - 81:25
**employees** [3] - 23:12, 23:15, 27:14
**enclosed** [9] - 20:5, 38:1, 38:12, 38:16, 67:5, 90:20, 104:13, 105:6, 105:7
**enclosing** [1] - 132:20
**end** [28] - 5:8, 5:9, 5:16, 9:8, 14:14, 14:24, 16:12, 16:13, 17:17, 21:7, 21:15, 21:17, 28:18, 45:19, 46:7, 68:13, 81:4, 85:13, 85:16, 85:19, 86:7, 86:11, 120:9, 120:12, 121:19, 121:20, 121:22, 122:2
**ends** [1] - 52:17
**engage** [1] - 152:13
**engaged** [2] - 12:24, 31:17
**ensure** [1] - 13:19
**enter** [7] - 13:8, 20:13, 30:23, 40:23, 140:16, 145:20, 145:21
**entered** [1] - 29:22
**entering** [1] - 152:10
**enters** [2] - 3:10, 73:22
**entire** [7] - 5:15, 32:19, 37:25, 58:19, 104:9, 104:17, 107:6
**entities** [2] - 42:22, 151:19
**entitled** [1] - 17:3
**entitlement** [1] - 131:10
**entitles** [1] - 14:6
**entrant** [4] - 66:23, 103:3, 104:16, 123:12
**entry** [4] - 30:22, 33:13, 34:12, 39:6
**Entwistle** [11] - 28:25, 30:14, 31:12, 31:14, 32:14, 38:25, 39:13, 41:4, 126:9, 130:19, 146:16
**ENTWISTLE** [136] - 1:16, 2:23, 3:1, 3:5, 3:7, 16:20, 72:11, 72:14, 72:25, 73:16, 74:1, 74:18, 86:12, 86:15, 87:10, 87:16, 87:19, 89:3, 89:4, 90:9, 90:11, 91:5, 91:6, 92:21, 92:24, 93:8, 93:9, 93:13, 93:15, 93:20, 93:23, 94:11, 94:17, 94:18, 94:24, 95:4, 95:13, 96:1, 96:21, 97:3, 97:16, 100:1, 100:9, 100:13, 100:18, 101:16, 101:24, 102:14, 104:20, 104:25, 105:12, 106:12, 107:1, 108:8, 108:25, 109:7, 109:11, 110:11, 110:17, 111:1, 112:10, 112:23, 113:5, 113:18, 113:25, 114:4, 114:12, 114:15, 114:18, 114:21, 115:3, 115:6, 115:10, 115:20, 117:15, 118:2, 118:9, 119:10, 119:17, 119:25, 122:10, 122:25, 123:7, 123:17, 124:19, 126:17, 126:22, 128:2, 128:6, 128:20, 129:4, 129:15, 130:2, 130:10, 130:17, 130:21, 133:2, 133:7, 133:11, 133:15, 133:21, 135:14, 136:16, 136:23, 137:8, 137:19, 137:24, 138:4, 139:11, 139:15, 139:20, 140:2, 140:8, 141:25, 142:21, 143:2, 143:6, 143:23, 144:4, 145:7, 146:14, 146:20, 146:23, 147:2, 147:7, 147:9, 147:20, 148:1, 148:4, 149:25, 150:7, 150:25, 153:14, 154:4, 154:11, 155:14
**envelope** [26] - 19:3, 36:8, 37:7, 37:12, 37:15, 38:1, 41:1, 86:25, 87:4, 87:8, 90:13, 90:15, 90:16, 90:19, 105:6, 105:7, 105:8, 105:9, 110:7, 129:23, 129:24, 130:8, 130:9, 143:19
**envelopes** [5] - 24:1, 24:2, 78:1, 78:8, 121:12
**equal** [1] - 8:21
**error** [1] - 7:4
**ESQ** [6] - 1:13, 1:16, 1:17, 1:17, 1:19, 1:21
**essentially** [1] - 31:1
**establish** [1] - 7:21
**Estrada** [4] - 134:2, 138:8, 138:10, 139:5
**evaluate** [3] - 8:25, 9:5, 10:4
**event** [3] - 9:22, 9:24, 9:25
**events** [1] - 9:16
**eventually** [1] - 93:6
**everyday** [1] - 9:13
**evidence** [144] - 4:7, 4:18, 4:21, 5:18, 5:25, 6:2, 7:2, 7:3, 7:22, 8:7, 8:9, 8:10, 8:11, 8:13, 8:14, 8:16, 8:18, 8:20, 8:23, 9:6, 9:19, 10:7, 10:11, 10:15, 10:17, 10:22, 11:3, 11:4, 11:8, 11:10, 11:11, 11:12, 11:21, 11:25, 12:3, 12:5, 12:6, 12:7, 12:9, 12:10, 12:13, 12:14, 12:16, 13:17, 14:4, 15:18, 15:20, 16:2, 16:7, 16:8, 16:14, 18:3, 18:20, 18:22, 18:25, 19:21, 21:16, 21:18, 22:6, 22:16, 22:18, 23:17, 23:23, 23:25, 24:5, 24:15, 24:21, 25:4, 25:9, 25:15, 25:22, 26:2, 26:25, 27:10, 27:24, 28:18, 28:22, 30:7, 30:8, 31:14, 31:16, 32:2, 32:24, 33:21, 35:11, 36:1, 37:5, 37:20, 38:11, 40:1, 41:10, 44:4, 45:12, 46:8, 55:2, 55:7, 55:13, 55:16, 65:2, 65:4, 65:12, 87:11, 87:15, 94:16, 97:2, 109:6, 110:16, 113:4, 113:24, 115:15, 118:8, 119:23, 123:6, 130:16, 133:23, 137:3, 138:3, 143:1, 147:25, 151:9, 151:20, 152:5, 156:4, 156:5, 156:6, 156:7, 156:8, 156:9, 156:10, 156:11, 156:12, 156:13, 156:14, 156:15, 156:16, 156:17, 156:18, 156:19, 156:20, 156:21, 156:22, 156:23, 156:24
**exact** [5] - 25:3, 39:3, 49:14, 61:14, 61:25
**exactly** [3] - 35:24, 45:19, 66:7
**EXAMINATION** [6] - 47:5, 69:18, 74:17, 155:7, 155:9, 155:13
**examination** [1] - 44:16
**examined** [3] - 9:25, 47:4, 74:16
**example** [7] - 5:3, 12:11, 19:20, 41:7, 137:4, 144:19, 145:6
**examples** [1] - 53:22
**exceed** [1] - 44:18
**exceeded** [1] - 44:17
**Exchange** [1] - 19:16
**exchange** [5] - 17:4, 28:15, 30:8, 35:14, 36:6
**excited** [1] - 102:17
**excluded** [1] - 11:24
**exclusive** [1] - 58:5
**excuse** [3] - 6:22, 30:20, 30:24
**Excuse** [1] - 38:23

**excused** [1] - 72:8
**executed** [1] - 27:20
**exhibit** [26] - 42:11, 42:12, 95:3, 97:4, 108:9, 108:18, 108:19, 109:9, 110:20, 115:22, 118:10, 120:3, 122:22, 123:8, 124:11, 130:23, 133:13, 133:15, 137:9, 138:5, 140:9, 143:4, 146:17, 146:21, 147:4, 148:2
**Exhibit** [98] - 53:25, 55:2, 55:6, 55:7, 55:10, 55:16, 56:2, 61:10, 61:18, 62:10, 64:15, 65:2, 65:4, 65:7, 65:12, 86:13, 87:10, 87:15, 87:18, 89:25, 93:21, 94:12, 94:16, 95:15, 96:21, 97:1, 108:10, 108:25, 109:5, 109:12, 110:11, 110:15, 112:11, 112:12, 112:23, 113:3, 113:5, 113:18, 113:23, 115:10, 115:14, 117:16, 118:3, 118:7, 119:11, 119:17, 119:22, 122:11, 122:25, 123:5, 124:20, 128:7, 128:8, 128:10, 128:20, 129:15, 130:3, 130:10, 130:15, 133:3, 133:7, 133:19, 133:20, 133:22, 135:12, 136:17, 136:23, 137:2, 137:19, 138:2, 141:25, 142:21, 142:25, 146:14, 147:9, 147:20, 147:24, 156:4, 156:5, 156:6, 156:7, 156:8, 156:9, 156:10, 156:11, 156:12, 156:13, 156:14, 156:15, 156:16, 156:17, 156:18, 156:19, 156:20, 156:21, 156:22, 156:23, 156:24
**exhibits** [6] - 2:21, 2:22, 3:4, 8:11, 9:6, 114:7
**existing** [2] - 33:13, 34:13
**exiting** [2] - 152:10, 152:17
**exits** [1] - 73:2
**expect** [3] - 12:13, 46:2, 153:17
**expenses** [3] - 44:17, 45:3, 45:7
**experience** [8] - 9:10, 9:21, 28:10, 40:8, 117:14, 124:16, 141:16, 144:17
**expires** [1] - 145:20
**explain** [2] - 18:21, 45:18
**explained** [1] - 45:10
**explaining** [1] - 24:13
**express** [2] - 7:20, 152:12
**expressions** [1] - 152:14
**extend** [1] - 104:7
**extension** [2] - 76:24, 98:12
**extensions** [1] - 76:15
**eyed** [1] - 70:7

## F

**fabulous** [1] - 54:9
**face** [1] - 40:16
**faces** [1] - 26:20
**facial** [1] - 152:14
**facing** [1] - 26:20
**fact** [2] - 8:19, 14:5
**facts** [13] - 5:24, 6:1, 6:3, 6:4, 6:9, 7:21, 7:25, 8:2, 8:4, 8:6, 8:12, 8:19, 12:19
**fail** [3] - 35:18, 35:20, 36:2
**fair** [2] - 45:24, 46:4
**faithfully** [1] - 5:14
**fake** [8] - 18:5, 18:6, 22:2, 22:3, 22:25, 26:6
**fallen** [1] - 23:18
**falsely** [2] - 13:1, 31:22
**familiar** [1] - 49:1
**family** [3] - 24:17, 28:1, 28:12
**far** [3] - 84:12, 86:2, 89:1
**faster** [1] - 114:8
**father** [5] - 42:1, 63:21, 71:4, 88:3, 88:14
**father's** [1] - 69:21
**federal** [3] - 27:20, 33:14, 34:13
**Federal** [1] - 1:15
**fee** [18] - 16:25, 18:12, 20:6, 31:25, 35:14, 36:6, 38:10, 38:13, 38:16, 38:20, 60:2, 60:4, 67:6, 68:17, 94:22, 104:19, 140:12
**fees** [2] - 13:2, 13:4
**FELDMAN** [29] - 1:17, 2:5, 46:14, 47:6, 53:3, 53:24, 54:1, 54:7, 54:11, 55:1, 55:8, 55:12, 55:17, 55:19, 55:23, 56:3, 64:7, 64:10, 64:13, 65:1, 65:5, 65:13, 65:16, 69:3, 69:6, 72:1, 72:3, 73:6, 155:8
**fell** [4] - 17:20, 21:20, 23:20, 28:11
**fellow** [1] - 16:14
**few** [7] - 25:17, 41:4, 50:20, 69:9, 69:15, 70:20, 70:25
**FIA** [1] - 129:23
**field** [1] - 116:24
**figure** [2] - 128:22, 150:23
**figured** [1] - 43:25
**file** [5] - 63:8, 86:23, 110:4, 121:13, 121:14
**filed** [6] - 29:23, 56:23, 58:4, 101:23, 106:20, 106:21
**files** [2] - 98:21, 116:12
**filing** [1] - 58:2
**Filing** [1] - 56:6
**fill** [1] - 20:5
**filled** [2] - 22:23, 54:20
**final** [1] - 136:13
**Finally** [1] - 27:25
**finally** [4] - 12:6, 26:16, 67:4, 132:24
**financial** [1] - 48:22
**fine** [6] - 4:16, 49:19, 52:8, 146:24, 153:24, 153:25
**finish** [4] - 5:4, 83:1, 117:4, 154:5
**finishing** [1] - 5:3
**first** [30] - 3:7, 13:15, 21:5, 21:19, 21:21, 34:4, 46:12, 47:3, 56:14, 56:21, 57:6, 59:10, 64:18, 66:16, 66:18, 74:15, 77:3, 88:17, 102:15, 111:2, 118:2, 118:25, 124:11, 131:5, 133:25, 145:15, 148:22, 151:8, 153:21
**First** [2] - 11:7, 15:17
**five** [8] - 5:4, 21:17, 26:20, 28:20, 106:12, 108:11, 129:4, 145:22
**flashed** [2] - 30:14, 31:8
**flew** [1] - 68:21
**flip** [1] - 68:10
**flow** [1] - 4:3
**flowing** [1] - 6:22
**flyer** [1] - 68:22
**focal** [1] - 32:19
**focus** [2] - 42:6, 151:7
**focused** [1] - 4:17
**fold** [1] - 143:16
**folded** [2] - 143:15, 143:17
**folks** [1] - 3:20
**follow** [5] - 4:3, 6:14, 11:22, 13:16, 15:20
**followed** [1] - 17:8
**following** [5] - 33:5, 86:8, 95:17, 134:16, 138:12
**follows** [3] - 41:11, 47:4, 74:16
**font** [4] - 19:11, 100:4, 100:20, 100:23
**food** [1] - 153:6
**FOR** [1] - 1:9
**forbid** [2] - 36:23, 52:4
**Force** [1] - 48:13
**forever** [1] - 37:10
**forgetful** [1] - 49:24
**forgetting** [1] - 50:1
**form** [23] - 20:5, 20:6, 39:12, 39:15, 39:19, 78:11, 79:1, 87:1, 87:9, 91:8, 91:9, 91:12, 91:19, 92:5, 92:15, 93:5, 94:19, 110:6, 117:10, 131:15, 132:2, 132:17, 151:25
**formal** [2] - 102:17, 106:17
**formed** [1] - 50:22
**former** [1] - 27:14
**forms** [8] - 67:22, 78:1, 78:5, 78:8, 87:22, 93:5, 93:18, 121:12
**formula** [1] - 9:5
**forth** [2] - 33:13, 34:12
**forward** [6] - 5:10, 15:4, 97:25, 98:15, 119:16, 120:24
**forwarded** [11] - 96:15, 120:20, 121:17, 122:15, 122:17, 122:19, 133:25, 134:1, 135:6, 138:7, 139:7
**forwarding** [1] - 137:4
**four** [5] - 27:3, 102:15, 129:1, 144:12, 145:7
**fourth** [2] - 12:2, 104:12
**fraud** [11] - 12:24, 18:2, 18:18, 19:1, 26:21, 26:24, 27:4, 27:8, 31:18, 37:2, 41:2
**Fraud** [1] - 18:2
**fraudulent** [4] - 13:7, 19:2, 24:22, 27:10
**fraudulently** [1] - 13:2
**free** [1] - 153:6
**Friday** [3] - 5:9, 113:8, 114:23
**Froccaro** [10] - 29:1, 29:12, 46:11, 65:9, 69:8, 69:12, 69:20, 70:3, 73:7, 154:13
**FROCCARO** [51] - 1:19, 2:7, 2:10, 2:14, 29:2, 29:6, 32:14, 42:16, 45:2, 51:1, 52:3, 52:8, 52:11, 55:4, 55:11, 65:10,

69:9, 69:14, 69:19, 70:9, 71:23, 73:8, 73:18, 87:13, 94:14, 96:24, 109:3, 110:13, 113:1, 113:21, 115:12, 118:5, 119:20, 123:3, 125:2, 125:5, 126:2, 126:11, 126:16, 126:21, 126:23, 126:25, 130:13, 133:9, 136:25, 137:25, 142:23, 147:22, 154:14, 154:19, 155:10
**front** [18] - 10:8, 15:1, 21:7, 21:15, 21:17, 76:11, 85:13, 85:16, 85:19, 86:7, 91:18, 101:3, 120:9, 121:19, 121:20, 121:22, 122:2, 143:20
**front-end** [7] - 21:7, 21:15, 21:17, 85:13, 85:16, 85:19, 86:7
**fulfillment** [9] - 140:11, 140:23, 141:3, 141:21, 142:16, 142:20, 144:8, 144:10, 149:15
**full** [12] - 36:7, 36:21, 41:1, 58:22, 59:14, 92:21, 94:10, 95:13, 123:12, 124:6, 124:9, 132:14
**fully** [3] - 16:17, 67:3, 92:11
**funds** [9] - 19:19, 25:13, 26:16, 91:25, 92:7, 116:10, 130:25, 131:12, 139:24
**future** [2] - 25:1, 37:7

## G

**Game** [9] - 86:19, 90:3, 90:4, 94:1, 109:25, 113:9, 113:11, 114:24, 129:20
**game** [2] - 145:12, 145:23
**Gary** [8] - 23:10, 75:15, 75:17, 79:20, 83:5, 83:7, 86:2, 141:6
**gather** [1] - 9:16
**GDM** [13] - 120:9, 120:11, 122:1, 122:21, 122:24, 123:21, 128:13, 128:14, 128:15, 129:2, 129:5, 129:9
**gears** [1] - 50:3
**general** [3] - 20:13, 24:18, 49:14
**generally** [1] - 54:19
**generation** [1] - 69:23
**generic** [1] - 148:21
**Gentian** [3] - 95:7, 95:8, 95:11
**gentleman** [1] - 80:3
**gentlemen** [11] - 29:6, 32:2, 35:11, 37:5, 38:24, 39:23, 40:1, 42:19, 44:5, 45:9, 142:5
**given** [3] - 13:5, 20:21, 79:4
**God** [3] - 36:23, 52:4, 68:22
**Goertler** [3] - 116:15, 117:5, 118:19
**Google** [1] - 20:11
**govern** [1] - 5:23
**government** [12] - 24:24, 55:7, 55:16, 65:4, 65:12, 87:15, 94:16, 147:5, 153:13, 153:15, 153:18, 154:11
**Government** [92] - 1:13, 2:4, 2:5, 2:16, 2:21, 12:12, 16:19, 29:24, 35:21, 41:22, 42:12, 42:21, 44:8, 45:21, 46:14, 71:25, 72:9, 72:11, 73:5, 73:6, 73:15, 73:25, 74:1, 96:21, 97:1, 108:10, 108:25, 109:5, 109:12, 110:11, 110:15, 112:11, 112:12, 112:23, 113:3, 113:5, 113:18, 113:23, 115:10, 115:14, 117:16, 118:3, 118:7, 119:11, 119:17, 119:22, 122:11, 122:25, 123:5, 124:20, 128:7, 128:8, 129:15, 130:10, 130:15, 133:3, 133:7, 133:22, 135:12, 136:17, 136:23, 137:2, 137:19, 138:2, 141:25, 142:21, 142:25, 146:14, 147:9, 147:20, 147:24, 156:4, 156:5, 156:6, 156:7, 156:8, 156:9, 156:10, 156:11, 156:12, 156:13, 156:14, 156:15, 156:16, 156:17, 156:18, 156:19, 156:20, 156:21, 156:22, 156:23, 156:24
**Government 's** [22] - 2:23, 3:3, 33:19, 42:11, 46:12, 53:24, 55:2, 55:10, 61:9, 61:17, 62:10, 64:15, 65:2, 65:7, 73:24, 86:12, 87:10, 87:16, 89:25, 93:20, 94:11, 95:15
**GPI** [1] - 63:24
**grand** [1] - 145:13
**grant** [4] - 7:13, 7:14, 59:12
**graphic** [1] - 102:7
**Great** [1] - 3:9
**greater** [1] - 14:6
**greatest** [1] - 69:23
**greet** [1] - 29:8
**group** [1] - 140:20
**Group** [14] - 22:21, 42:23, 75:9, 75:11, 75:13, 75:21, 76:2, 76:5, 76:9, 76:17, 76:20, 77:7, 78:15, 141:13
**guarantee** [2] - 35:2, 35:8
**guaranteed** [13] - 25:21, 30:12, 40:23, 58:17, 100:12, 104:16, 111:5, 131:4, 131:23, 131:25, 134:20, 134:21, 135:18
**guess** [1] - 120:21
**guesstimate** [1] - 154:2
**guidelines** [1] - 9:7
**guilty** [6] - 18:23, 27:1, 28:20, 28:23, 29:23, 46:3
**guy** [1] - 44:19
**guys** [3] - 32:20, 34:4, 42:18

## H

**half** [19] - 5:9, 76:6, 87:20, 92:1, 92:22, 95:1, 97:17, 100:2, 100:19, 104:22, 106:13, 123:17, 131:22, 133:3, 135:19, 143:23, 147:14, 148:4, 153:17
**half-day** [1] - 5:9
**hall** [1] - 152:11
**halls** [1] - 152:17
**hand** [5] - 26:17, 46:19, 67:2, 74:8, 119:3
**handful** [3] - 28:3, 50:19
**handled** [1] - 82:11
**handwriting** [8] - 49:1, 49:6, 54:22, 54:24, 57:10, 64:22, 67:15, 68:11
**happy** [4] - 29:9, 36:9, 38:21, 128:11
**hard** [6] - 56:24, 120:17, 120:18, 120:19, 154:2
**Harley** [4] - 102:18, 104:8, 104:18, 106:24
**head** [1] - 34:5
**heading** [1] - 104:23
**headings** [1] - 19:17
**health** [3] - 41:13, 41:20, 49:9
**hear** [29] - 6:2, 9:22, 12:11, 15:21, 18:20, 21:2, 22:15, 23:17, 23:24, 24:20, 25:4, 25:9, 26:18, 27:14, 27:16, 27:22, 27:25, 28:2, 28:9, 28:14, 30:17, 36:11, 46:6, 46:12, 50:12, 52:14, 57:4, 126:9, 126:10
**heard** [16] - 8:17, 9:18, 10:23, 12:2, 16:17, 28:23, 31:6, 35:10, 50:11, 58:10, 60:15, 64:3, 66:9, 66:13, 151:19, 151:20
**hearing** [5] - 6:16, 9:24, 52:2, 152:3, 152:6
**hearsay** [1] - 52:5
**heavy** [1] - 45:21
**height** [1] - 52:10
**held** [6] - 19:19, 52:1, 130:25, 131:17, 138:17, 139:2
**hello** [2] - 46:7, 46:16
**help** [4] - 12:9, 15:20, 21:3, 23:13
**helped** [1] - 27:15
**helpful** [1] - 4:12
**hereby** [6] - 58:17, 59:12, 59:13, 59:19, 59:20, 104:7
**herein** [3] - 60:4, 66:21, 67:3
**hereto** [1] - 39:21
**hesitate** [1] - 139:4
**hi** [6] - 134:15, 137:16, 138:11, 142:15, 144:7, 148:17
**hide** [1] - 26:3
**high** [1] - 74:25
**highlight** [3] - 5:19, 39:2, 105:2
**highlighted** [1] - 119:2
**himself** [3] - 26:3, 26:18, 79:24
**hip** [2] - 49:12, 49:15
**hire** [1] - 141:19
**hm** [2] - 67:16, 68:9
**hmm** [11] - 48:20, 50:6, 53:12, 59:7, 61:21, 62:12, 62:17, 64:20, 67:10, 121:6, 135:4
**hold** [1] - 11:13
**holding** [1] - 131:12
**home** [7] - 16:21, 40:9, 54:24, 57:17, 57:18, 62:8, 68:20
**Honor** [26] - 2:6, 46:14, 55:1, 55:8, 55:12, 55:23, 65:1, 69:4, 69:6, 72:1, 72:3, 72:25, 73:16, 73:18, 87:13, 110:13, 114:4, 114:6, 130:22, 133:21, 147:2, 147:8, 151:1, 153:15, 154:12, 154:19
**HONORABLE** [1] - 1:10
**hope** [2] - 2:15, 3:13
**Horizon** [1] - 79:21
**hour** [2] - 4:9, 153:18
**hourly** [1] - 81:24

**hours** [1] - 72:16
**House** [1] - 31:7
**house** [2] - 134:5, 134:6
**household** [1] - 47:15
**huge** [3] - 31:23, 40:23, 45:3
**hundred** [4] - 43:15, 43:16, 44:1
**hundreds** [1] - 45:4
**husband** [1] - 47:16

## I

**ID** [2] - 102:21, 117:2
**identification** [6] - 55:10, 65:6, 100:16, 101:22, 111:8, 131:8
**identified** [6] - 14:24, 66:20, 66:21, 67:3, 103:1, 131:9
**identify** [2] - 49:7, 90:1
**identity** [3] - 116:7, 116:8, 131:12
**II** [4] - 48:14, 48:16, 68:20, 68:21
**Image** [1] - 120:9
**immediate** [1] - 132:21
**immediately** [7] - 57:11, 57:15, 57:22, 59:18, 68:5, 132:17, 152:21
**impairment** [2] - 35:16, 36:1
**impairments** [1] - 35:22
**impartial** [1] - 45:24
**imply** [1] - 7:20
**important** [6] - 3:25, 8:24, 15:13, 33:7, 100:11, 111:4
**importantly** [2] - 39:5, 39:8
**impression** [2] - 20:21, 26:1
**impressions** [1] - 9:16
**impressive** [1] - 9:23
**improper** [1] - 11:12
**Inc** [2] - 76:8, 76:12
**include** [3] - 26:9, 44:15, 144:1
**included** [5] - 24:8, 36:8, 37:8, 37:12, 41:1
**including** [5] - 18:7, 19:18, 21:11, 151:18, 151:19
**incoming** [1] - 27:18
**indicate** [3] - 7:25, 104:14
**indicated** [5] - 6:6, 6:7, 12:21, 65:17, 67:8
**indicating** [1] - 60:7
**indication** [2] - 7:15, 7:19
**indictment** [3] - 12:23, 13:1, 45:11
**indirect** [1] - 8:18
**indisputable** [3] - 32:23, 33:21, 41:10
**individual** [10] - 20:22, 60:4, 66:21, 82:6, 83:2, 100:12, 101:22, 103:1, 111:5, 149:21
**individually** [5] - 19:9, 19:24, 20:22, 91:2, 119:2
**individuals** [8] - 12:25, 13:5, 79:23, 80:1, 80:9, 80:12, 81:9, 140:12
**induced** [1] - 13:2
**indulge** [1] - 36:16
**industry** [3] - 75:21, 78:4, 84:13
**inference** [1] - 10:24
**inferences** [1] - 7:22
**influenced** [1] - 11:14
**info** [2] - 149:20, 150:10
**inform** [2] - 19:23, 152:21
**Information** [4] - 32:5, 32:25, 33:6, 36:15
**information** [37] - 3:24, 7:2, 10:19, 10:21, 12:15, 13:17, 20:11, 20:16, 20:17, 28:17, 33:5, 33:8, 34:25, 37:21, 37:22, 38:21, 39:1, 39:4, 39:25, 41:11, 53:20, 78:5, 82:10, 91:3, 93:12, 93:17, 94:21, 97:10, 98:23, 99:20, 104:24, 105:13, 105:14, 126:5, 126:12, 152:2
**informing** [1] - 17:2
**initial** [1] - 32:16
**initials** [2] - 14:20, 34:20
**initiate** [1] - 104:19
**ink** [1] - 93:3
**innocent** [2] - 45:13, 45:15
**inside** [1] - 90:16
**Inspector** [1] - 154:6
**instant** [2] - 145:12, 145:23
**instruct** [8] - 5:23, 6:6, 6:14, 8:13, 10:13, 10:19, 11:21, 16:9
**instructed** [3] - 16:12, 26:5, 26:12
**instruction** [2] - 11:23, 13:11
**instructions** [10] - 5:11, 5:16, 5:17, 6:8, 6:14, 15:5, 16:4, 59:3, 62:11, 152:23
**intended** [1] - 116:10
**intends** [1] - 15:19
**interested** [2] - 37:18, 37:19
**interfere** [1] - 13:21
**International** [2] - 22:14, 149:22
**interpretation** [1] - 16:6
**introduce** [6] - 42:21, 45:2, 47:9, 47:11, 55:2, 116:10
**introduced** [4] - 3:14, 12:16, 29:11, 80:20
**introduction** [1] - 80:18
**invite** [1] - 7:11
**invoicing** [2] - 81:23, 142:8
**invoke** [1] - 41:23
**involved** [2] - 48:21, 152:1
**involvement** [1] - 26:4
**Island** [6] - 19:1, 19:4, 25:14, 26:11, 26:17, 74:22
**Islandia** [2] - 84:4, 84:6
**Islip** [2] - 1:4, 1:15
**issuance** [3] - 66:24, 90:20, 92:5
**issue** [4] - 6:25, 7:12, 7:16, 63:3
**issued** [2] - 58:21, 106:16
**issues** [5] - 5:19, 6:9, 41:4, 105:4, 105:5
**issuing** [1] - 102:17
**item** [2] - 11:21, 75:25
**itself** [1] - 61:24

## J

**J-A-C-Q-U-A-R-D** [1] - 74:13
**Jack** [1] - 68:23
**jacks** [2] - 4:14, 4:15
**Jacquard** [53] - 72:12, 72:15, 72:19, 72:20, 74:2, 74:12, 74:13, 74:19, 86:16, 93:1, 93:24, 96:2, 100:10, 101:19, 101:20, 102:1, 102:15, 103:6, 105:15, 106:14, 108:13, 109:14, 109:15, 112:18, 113:7, 114:14, 114:22, 115:16, 115:24, 116:16, 117:17, 118:12, 119:1, 119:12, 120:5, 122:12, 123:10, 124:12, 124:21, 128:9, 129:18, 130:4, 131:20, 132:23, 133:4, 133:24, 136:6, 137:21, 140:10, 143:8, 145:10, 151:3, 154:5
**JACQUARD** [2] - 74:14, 155:12
**Jacquard's** [1] - 153:21
**James** [2] - 29:12, 69:20
**JAMES** [1] - 1:19
**Japan** [1] - 68:21
**Jason** [3] - 147:12, 147:18, 148:6
**JASON** [1] - 1:17
**Jeep** [2] - 145:13, 146:5
**Jeff** [24] - 22:7, 22:8, 22:11, 22:14, 22:19, 23:5, 23:9, 23:14, 86:19, 88:1, 88:2, 88:11, 88:13, 88:14, 88:16, 88:18, 88:22, 89:5, 89:11, 89:13, 89:16, 89:22, 94:1, 148:19
**JeffNovis@gmail.com** [1] - 96:20
**Jeffrey** [9] - 109:25, 113:9, 114:24, 122:14, 129:20, 140:13, 147:13, 147:18, 148:15
**JeffreyNovis@gmail.com** [1] - 98:6
**Jim** [3] - 60:14, 60:15, 60:17
**job** [13] - 5:24, 48:16, 75:4, 75:8, 77:18, 77:21, 78:19, 103:7, 103:21, 135:6, 135:25, 136:6, 139:7
**JOHN** [1] - 1:13
**John** [23] - 16:20, 16:21, 17:8, 17:11, 17:15, 17:21, 17:25, 32:12, 36:19, 38:22, 39:17, 42:14, 44:10, 47:24, 57:9, 57:14, 58:7, 59:11, 59:12, 59:23, 63:17, 66:19, 67:3
**Johnson** [9] - 27:17, 27:21, 83:21, 83:22, 83:25, 84:9, 84:18, 98:9, 154:8
**JONATHAN** [1] - 1:21
**Jonathan** [1] - 29:16
**Joseph** [1] - 154:6
**Jr** [1] - 29:12
**JRF** [1] - 34:19
**judge** [4] - 32:8, 125:2, 126:19, 126:21
**JUDGE** [1] - 1:10
**Judge** [16] - 2:7, 29:2, 29:3, 34:6, 44:7, 45:10, 45:18, 51:1, 52:3, 55:4, 69:9, 69:14, 71:23, 73:8, 126:25, 154:14
**judges** [3] - 5:22, 8:2, 8:3
**judgment** [1] - 10:4
**Jumping** [1] - 4:14
**jumping** [1] - 4:15
**juries** [1] - 5:22
**juror** [10] - 13:25, 14:5, 14:7, 14:20, 14:22, 14:25, 15:1, 15:2, 15:3
**juror's** [2] - 14:6, 152:22
**jurors** [4] - 5:24, 8:25, 16:14, 151:6

**jury** [60] - 2:2, 2:9, 3:12, 3:14, 3:24, 4:4, 4:20, 6:17, 13:10, 14:1, 15:1, 16:14, 29:18, 47:9, 47:11, 52:2, 55:24, 57:13, 65:15, 68:16, 73:1, 73:13, 73:20, 87:17, 87:24, 92:3, 94:25, 97:3, 97:5, 97:18, 100:10, 101:19, 109:8, 109:10, 110:17, 110:21, 115:21, 115:23, 118:9, 118:11, 120:1, 120:4, 123:7, 123:9, 130:20, 130:24, 137:8, 137:10, 138:4, 138:6, 142:5, 143:3, 143:5, 143:7, 148:3, 151:12, 151:25, 152:7, 153:5, 153:9
**Jury** [4] - 3:10, 73:2, 73:22, 153:10
**JURY** [1] - 1:9
**jury's** [1] - 146:18
**justice** [1] - 5:22

## K

**Kalamazoo** [1] - 145:24
**Kapoor** [2] - 112:2, 112:3
**keep** [13] - 3:16, 4:24, 6:20, 6:21, 7:1, 9:18, 10:6, 16:15, 34:15, 40:16, 53:21, 90:21, 107:3
**keeping** [1] - 78:3
**Kellogg's** [3] - 31:7, 145:8, 145:11
**kept** [4] - 22:19, 23:7, 24:7, 77:25
**key** [9] - 85:11, 99:2, 99:3, 99:5, 99:9, 99:13, 99:17, 99:20, 117:1
**keys** [1] - 78:24
**kids** [1] - 43:25
**killing** [2] - 43:1, 44:21
**kind** [7] - 3:20, 15:10, 15:11, 26:24, 33:7, 45:8, 134:22
**kindly** [1] - 139:3
**kinds** [1] - 8:14
**Kip** [2] - 90:3, 113:9
**knowledge** [11] - 68:24, 99:15, 106:3, 106:5, 106:8, 106:11, 126:15, 126:20, 141:10, 141:12, 141:14
**known** [2] - 10:23, 58:2
**knows** [2] - 40:3, 71:20

## L

**L73173** [1] - 63:6
**labeled** [1] - 20:15
**Ladies** [3] - 29:6, 35:11, 39:23
**ladies** [8] - 32:1, 37:5, 38:24, 40:1, 42:19, 44:4, 45:9, 142:5
**laid** [1] - 37:21
**language** [6] - 56:15, 56:21, 56:25, 58:9, 134:24, 135:18
**laptop** [2] - 64:9, 128:3
**large** [14] - 16:23, 17:3, 18:10, 19:9, 19:11, 20:16, 28:14, 30:2, 50:8, 111:2, 111:10, 132:24, 143:16, 143:18
**Largent** [3] - 60:14, 60:15, 60:18
**larger** [1] - 100:20
**laser** [2] - 119:6, 136:11
**Laser** [7] - 96:15, 96:18, 97:12, 98:3, 98:4, 120:8, 121:2
**lasered** [10] - 91:11, 102:6, 108:14, 110:23, 115:9, 116:21, 117:11, 122:24, 124:22, 130:1
**lasering** [4] - 78:9, 94:10, 94:23, 136:11
**last** [10] - 2:18, 60:20, 62:23, 67:4, 80:4, 80:6, 105:1, 105:2, 132:11, 150:16
**late** [1] - 22:6
**law** [18] - 5:11, 5:17, 5:23, 6:3, 6:6, 6:8, 6:10, 8:21, 11:3, 16:4, 16:10, 16:13, 16:16, 28:23, 45:13, 45:14
**lawyer's** [1] - 12:19
**Lawyers** [1] - 11:10
**lawyers** [7] - 6:16, 7:10, 8:12, 11:13, 12:8, 12:12, 152:6
**learn** [1] - 18:9
**least** [4] - 4:11, 40:5, 69:23, 136:3
**leave** [6] - 9:11, 14:16, 101:24, 114:15, 150:25, 151:11
**leaves** [1] - 153:10
**ledger** [1] - 66:23
**left** [12] - 36:18, 56:14, 57:21, 59:4, 91:19, 92:1, 92:25, 100:5, 107:5, 108:13, 111:3, 117:5
**Legal** [1] - 19:22
**legal** [5] - 6:9, 6:13, 45:19, 59:20, 63:16
**legally** [1] - 68:19
**legitimate** [1] - 31:7
**length** [1] - 7:8
**lengthy** [1] - 7:12
**less** [2] - 21:17, 153:17
**letter** [24] - 16:22, 17:1, 20:22, 24:3, 25:21, 26:6, 28:5, 36:24, 37:25, 41:15, 56:5, 57:8, 66:4, 78:6, 78:7, 78:13, 82:21, 83:18, 92:18, 97:14, 97:18, 102:17, 113:12, 144:14
**letters** [36] - 12:25, 13:1, 13:6, 19:8, 19:13, 19:18, 22:4, 24:1, 24:9, 24:11, 24:13, 24:17, 25:2, 27:12, 33:3, 35:4, 37:22, 38:1, 42:5, 43:13, 43:17, 50:4, 50:7, 50:10, 50:18, 50:19, 50:22, 53:7, 53:9, 53:17, 53:22, 56:8, 69:1, 83:19, 91:2
**liaisons** [1] - 75:5
**LICsign** [1] - 122:18
**LICsign-off@optumline.net** [1] - 122:18
**lied** [1] - 34:21
**lies** [2] - 22:24, 23:12
**life** [2] - 30:2, 41:3
**likely** [1] - 152:11
**Lilienkamp** [3] - 81:20, 96:4, 98:16
**limit** [1] - 7:8
**limited** [1] - 11:22
**Limited** [1] - 145:13
**Lincoln** [3] - 58:4, 58:10, 58:14
**Lindenhurst** [1] - 74:21
**line** [19] - 39:24, 58:18, 87:21, 90:1, 90:21, 91:21, 96:5, 98:21, 99:5, 99:7, 101:5, 103:22, 107:15, 119:15, 120:23, 124:5, 135:2, 136:21, 146:1
**lips** [1] - 52:12
**list** [4] - 11:5, 21:22, 31:1, 37:11
**listed** [4] - 58:22, 85:6, 144:23, 149:21
**listen** [4] - 4:7, 36:25, 40:1, 152:18
**listened** [1] - 31:12
**listening** [1] - 46:5
**listing** [3] - 20:10, 30:10, 40:22
**lists** [7] - 21:10, 21:12, 22:9, 23:18, 25:1, 103:17, 103:20
**live** [3] - 47:13, 68:19, 74:20
**lived** [2] - 66:2, 74:22
**lives** [1] - 9:11
**living** [3] - 16:21, 57:18, 75:1
**local** [5] - 25:13, 26:17, 30:3, 33:14, 34:13
**located** [1] - 58:22
**location** [1] - 124:16
**locked** [1] - 151:12
**look** [28] - 13:21, 38:14, 40:11, 40:12, 40:16, 44:19, 54:20, 59:16, 61:11, 64:18, 87:2, 87:20, 96:9, 97:10, 102:7, 102:9, 103:22, 108:15, 112:11, 114:7, 120:23, 129:13, 135:9, 139:20, 139:25, 145:5, 149:6, 150:17
**looked** [4] - 19:12, 40:14, 62:1, 93:18
**looking** [25] - 78:22, 79:6, 85:4, 94:17, 94:20, 97:23, 104:25, 108:18, 110:8, 111:18, 112:21, 115:19, 117:21, 118:21, 128:16, 129:9, 131:22, 133:18, 135:16, 135:25, 143:12, 144:15, 144:24, 148:8, 150:17
**looks** [20] - 37:3, 57:6, 67:13, 67:19, 87:8, 90:5, 93:4, 107:16, 112:2, 112:3, 114:12, 115:8, 122:24, 128:21, 129:6, 142:19, 145:4, 147:17, 148:11, 149:8
**lose** [1] - 7:16
**lost** [1] - 109:19
**lotteries** [1] - 20:7
**loud** [1] - 29:3
**loved** [4] - 28:9, 28:10, 28:11, 36:23
**low** [2] - 21:17, 31:3
**Lucky** [7] - 22:21, 42:23, 81:15, 108:2, 108:6, 140:20, 141:13
**Lugo** [4] - 115:18, 116:1, 116:15, 116:20
**lunch** [5] - 3:13, 4:9, 4:19, 5:12, 88:21
**lying** [2] - 18:2, 26:21

## M

**ma'am** [3] - 70:16, 70:18, 71:22
**Mail** [6] - 96:15, 96:18, 97:12, 98:3, 98:4, 121:3
**mail** [99] - 1:23, 16:22, 18:18, 19:1, 20:6, 21:1, 21:9, 25:2, 26:12, 26:24, 27:2, 27:4, 27:6, 27:7, 27:8, 27:18, 27:22, 30:6, 33:1, 33:8, 33:13, 36:5, 37:10, 37:24, 75:22, 75:23, 77:8, 78:11, 78:12, 78:13, 83:19, 83:23, 84:14, 96:3, 96:5, 96:7, 96:13, 96:14, 97:12,

97:16, 97:19, 98:8, 98:14, 105:10, 105:19, 105:23, 106:1, 109:24, 110:2, 113:8, 113:13, 114:23, 115:1, 119:13, 119:15, 119:24, 120:5, 120:15, 120:20, 120:24, 121:13, 121:16, 122:3, 122:13, 129:19, 129:22, 129:25, 130:5, 133:5, 133:24, 134:1, 134:13, 136:3, 136:19, 136:21, 137:5, 138:7, 138:9, 139:18, 139:23, 140:6, 142:3, 142:10, 142:12, 145:21, 145:23, 147:12, 147:15, 147:17, 148:14, 148:16, 148:19, 149:3, 150:1, 150:3, 150:4, 150:15, 150:22

**mailed** [11] - 17:12, 18:5, 19:25, 21:20, 26:10, 27:11, 37:15, 85:17, 85:19, 103:18, 121:24

**mailer** [2] - 33:9, 39:5

**mailers** [1] - 21:13

**mailing** [130] - 12:24, 20:21, 21:4, 21:5, 21:7, 21:12, 21:15, 21:19, 21:22, 22:22, 23:6, 23:15, 25:1, 27:16, 33:16, 33:23, 34:24, 35:1, 35:15, 36:8, 36:15, 36:24, 37:8, 37:10, 37:11, 42:21, 77:23, 77:25, 78:2, 79:7, 79:9, 79:12, 79:14, 79:18, 81:11, 81:14, 82:14, 82:20, 82:22, 82:23, 83:3, 83:5, 83:16, 84:25, 85:1, 85:3, 85:4, 85:7, 85:16, 85:19, 86:25, 87:1, 87:8, 90:13, 90:15, 91:16, 94:10, 95:14, 98:24, 98:25, 99:4, 99:9, 99:15, 99:17, 99:22, 100:19, 100:21, 100:25, 101:13, 102:2, 102:5, 102:8, 103:17, 103:23, 107:14, 107:21, 108:1, 108:4, 108:23, 110:7, 110:9, 110:23, 111:12, 111:13, 111:18, 112:7, 112:19, 112:20, 113:17, 115:8, 115:16, 115:24, 116:3, 116:25, 117:12, 117:18, 117:21, 118:13, 118:14, 118:20, 119:5, 119:8, 122:24, 128:12, 129:9, 129:24, 130:1, 130:6, 130:8, 134:12, 135:2, 135:16, 136:2, 136:12, 136:14, 139:10, 139:12, 139:18, 140:13, 140:18, 140:20, 141:24, 144:2, 144:12, 144:19, 144:21, 144:23, 148:14

**mailings** [53] - 19:2, 19:3, 19:12, 21:17, 23:7, 24:6, 24:23, 25:6, 26:1, 31:22, 36:2, 37:6, 37:14, 37:20, 42:6, 43:19, 45:4, 50:4, 70:2, 70:10, 77:9, 77:24, 78:13, 78:25, 82:18, 82:22, 82:23, 82:25, 83:20, 85:13, 85:14, 86:9, 86:10, 86:11, 90:14, 92:19, 93:6, 99:10, 103:9, 103:13, 107:24, 116:18, 116:24, 117:13, 136:7, 140:11, 140:17, 141:4, 141:6, 144:15, 144:19, 144:20, 149:11

**main** [7] - 24:11, 75:14, 75:15, 75:16, 101:1, 101:6, 101:14

**Main** [5] - 56:6, 58:4, 58:11, 58:14, 61:4

**maintaining** [1] - 82:9

**major** [2] - 102:24, 103:8

**man** [1] - 42:2

**man's** [1] - 41:2

**manager** [8] - 75:10, 77:20, 77:22, 78:19, 79:23, 81:10, 82:12, 86:5

**March** [2] - 1:6, 154:22

**mark** [1] - 67:12

**marked** [4] - 37:8, 55:9, 65:6, 66:19

**market** [1] - 34:16

**Marketing** [11] - 75:9, 75:11, 75:13, 75:21, 76:2, 76:5, 76:9, 76:17, 76:20, 77:6, 78:14

**marketing** [4] - 37:20, 40:2, 40:3, 40:6

**Martha** [4] - 115:18, 116:1, 116:15, 116:20

**Marvel** [1] - 145:15

**Mary** [7] - 81:20, 82:6, 82:13, 96:3, 98:16, 98:17, 103:20

**Mary's** [2] - 82:8, 98:13

**Mary@qdmservices.com** [3] - 96:19, 98:5, 98:11

**mass** [1] - 31:22

**matched** [1] - 79:6

**material** [5] - 34:15, 34:18, 34:21, 40:20

**materials** [2] - 75:7, 116:10

**math** [2] - 146:8, 146:11

**matter** [11] - 52:15, 58:1, 71:8, 90:25, 100:17, 101:21, 102:19, 104:9, 106:20, 106:21, 111:9

**McDermott** [1] - 81:19

**McKinley** [3] - 116:15, 117:5, 118:19

**mean** [18] - 49:21, 66:6, 69:21, 69:22, 70:17, 71:20, 97:7, 98:23, 99:2, 99:7, 103:10, 111:15, 111:20, 117:8, 122:1, 143:10, 143:11, 150:19

**meaning** [1] - 35:1

**means** [13] - 10:20, 11:16, 32:7, 43:17, 99:8, 117:9, 122:2, 140:24, 141:1, 146:3, 146:9, 146:12, 153:5

**meant** [2] - 50:23, 53:9

**media** [2] - 15:11, 151:24

**medical** [1] - 3:20

**Meechum** [1] - 19:16

**meet** [9] - 29:10, 45:16, 45:22, 80:14, 88:4, 88:6, 88:15, 88:20, 89:6

**meeting** [3] - 7:10, 80:17, 89:16

**meetings** [2] - 89:8, 89:10

**member** [1] - 20:13

**members** [5] - 24:17, 28:1, 28:12, 47:9, 47:11

**memory** [1] - 126:2

**men** [1] - 40:11

**men's** [1] - 40:10

**mental** [4] - 41:13, 41:20, 49:18, 49:19

**mention** [4] - 37:9, 58:13, 64:1, 66:11

**mentioned** [19] - 3:15, 26:14, 76:24, 79:12, 80:22, 81:24, 82:6, 83:18, 97:4, 109:9, 110:20, 115:22, 118:10, 120:3, 123:8, 130:23, 137:9, 138:5, 143:4

**message** [1] - 122:15

**met** [1] - 95:11

**meticulous** [1] - 131:7

**mic** [1] - 29:3

**microphone** [1] - 57:5

**mid** [1] - 4:22

**mid-afternoon** [1] - 4:22

**middle** [4] - 4:9, 56:21, 90:18, 121:2

**might** [6] - 61:23, 62:4, 70:22, 75:25, 109:19, 126:2

**military** [1] - 48:10

**million** [19] - 17:18, 18:11, 18:14, 19:10, 19:23, 20:6, 30:15, 31:10, 43:2, 44:9, 44:11, 44:21, 44:22, 56:12, 63:17, 71:5, 104:17

**Million** [1] - 19:15

**millions** [4] - 18:8, 18:16, 31:23, 35:13

**mind** [8] - 9:18, 10:6, 16:11, 16:15, 34:15, 36:19, 53:20, 64:7

**mindful** [1] - 146:18

**minimal** [2] - 25:25, 45:5

**minimum** [1] - 6:20

**miniscule** [1] - 44:3

**minute** [1] - 109:18

**minutes** [5] - 5:4, 70:25, 73:10, 146:21, 147:2

**misleading** [1] - 44:13

**missions** [1] - 68:21

**Missouri** [1] - 145:24

**mistakenly** [1] - 35:13

**mm-hm** [2] - 67:16, 68:9

**modified** [1] - 137:17

**moment** [9] - 55:18, 61:22, 65:17, 69:3, 72:1, 101:25, 124:25, 129:9, 135:17

**moments** [1] - 70:20

**Monday** [2] - 121:14, 122:13

**Money** [1] - 22:12

**money** [41] - 17:10, 18:3, 20:18, 22:16, 23:25, 25:21, 26:22, 31:2, 33:17, 34:14, 36:7, 36:10, 36:12, 37:1, 37:3, 37:19, 39:9, 39:22, 39:23, 43:4, 44:12, 45:8, 53:16, 53:19, 53:21, 58:20, 59:15, 60:9, 62:20, 63:22, 67:22, 67:24, 68:25, 71:10, 71:14, 100:23, 108:16, 132:11, 132:20

**moneys** [1] - 116:11

**Monica** [5] - 134:2, 134:23, 138:8, 138:9, 139:5

**monies** [3] - 38:13, 38:17, 67:6

**Montgomery** [1] - 19:16

**month** [12] - 21:7, 21:14, 21:24, 23:3, 23:5, 61:20, 83:17, 85:21, 85:22, 86:8, 99:17, 148:23

**monthly** [1] - 23:19

**months** [2] - 17:7, 132:11

**Moore** [1] - 131:7

**Morabito** [23] - 3:14, 3:25, 4:5, 4:20, 5:12, 13:9, 14:13, 55:17, 64:7, 65:13, 69:11, 69:17, 73:20, 87:17, 94:24, 114:18, 115:21, 120:2, 128:3, 151:14, 152:21, 152:24, 153:3

**morning** [9] - 2:16, 2:19, 3:8, 4:5, 4:10, 120:8, 147:6, 151:14, 154:18

**Most** [1] - 39:5
**most** [4] - 4:12, 8:24, 39:8, 40:4
**mouth** [1] - 80:24
**move** [31] - 2:16, 34:6, 35:7, 36:18, 55:2, 55:13, 57:21, 58:24, 61:3, 65:2, 65:8, 87:10, 94:11, 96:21, 108:25, 109:11, 110:11, 112:23, 113:18, 114:8, 115:10, 118:2, 119:17, 122:25, 129:14, 130:10, 133:7, 136:23, 137:24, 142:21, 147:20
**moved** [2] - 84:4, 84:6
**movie** [2] - 145:17, 146:6
**moving** [3] - 5:10, 116:2, 123:17
**MR** [81] - 2:5, 2:7, 2:10, 2:14, 29:2, 29:6, 32:13, 32:14, 42:15, 42:16, 45:2, 46:14, 47:6, 51:1, 52:3, 52:8, 52:11, 53:3, 53:24, 54:1, 54:7, 54:11, 55:1, 55:4, 55:8, 55:11, 55:12, 55:17, 55:19, 55:23, 56:3, 64:7, 64:10, 64:13, 65:1, 65:5, 65:10, 65:13, 65:16, 69:3, 69:6, 69:9, 69:14, 69:19, 70:9, 71:23, 72:1, 72:3, 73:6, 73:8, 73:18, 87:13, 94:14, 96:24, 109:3, 110:13, 113:1, 113:21, 115:12, 118:5, 119:20, 123:3, 125:2, 125:5, 126:2, 126:11, 126:16, 126:21, 126:23, 126:25, 130:13, 133:9, 136:25, 137:25, 142:23, 147:22, 154:14, 154:19, 154:20, 155:8, 155:10
**MS** [135] - 2:23, 3:1, 3:5, 3:7, 16:20, 72:11, 72:14, 72:25, 73:16, 74:1, 74:18, 86:12, 86:15, 87:10, 87:16, 87:19, 89:3, 89:4, 90:9, 90:11, 91:5, 91:6, 92:21, 92:24, 93:8, 93:9, 93:13, 93:15, 93:20, 93:23, 94:11, 94:17, 94:18, 94:24, 95:4, 95:13, 96:1, 96:21, 97:3, 97:16, 100:1, 100:9, 100:13, 100:18, 101:16, 101:24, 102:14, 104:20, 104:25, 105:12, 106:12, 107:1, 108:8, 108:25, 109:7, 109:11, 110:11, 110:17, 111:1, 112:10, 112:23, 113:5, 113:18, 113:25, 114:4, 114:12, 114:15, 114:18, 114:21, 115:3, 115:6, 115:10, 115:20, 117:15, 118:2, 118:9, 119:10, 119:17, 119:25, 122:10, 122:25, 123:7, 123:17, 124:19, 126:17, 126:22, 128:2, 128:6, 128:20, 129:4, 129:15, 130:2, 130:10, 130:17, 130:21, 133:2, 133:7, 133:11, 133:15, 133:21, 135:14, 136:16, 136:23, 137:8, 137:19, 137:24, 138:4, 139:11, 139:15, 139:20, 140:2, 140:8, 141:25, 142:21, 143:2, 143:6, 143:23, 144:4, 145:7, 146:14, 146:20, 146:23, 147:2, 147:7, 147:9, 147:20, 148:1, 148:4, 149:25, 150:7, 150:25, 153:14, 154:4, 154:11, 155:14
**multiple** [6] - 19:12, 20:3, 21:2, 79:14, 79:16, 84:25
**must** [14] - 6:9, 6:14, 7:18, 8:4, 8:8, 8:9, 10:6, 10:21, 10:22, 11:22, 11:25, 12:3, 13:24, 116:11
**Myrna** [3] - 116:15, 117:5, 118:19

## N

**name** [57] - 14:20, 20:2, 21:21, 22:13, 22:21, 26:7, 29:11, 29:16, 38:2, 41:18, 45:9, 46:21, 46:25, 47:23, 54:25, 56:4, 57:16, 57:25, 58:6, 60:13, 63:21, 63:22, 69:20, 74:11, 76:9, 76:12, 78:23, 79:17, 80:3, 80:4, 80:6, 81:13, 92:19, 94:5, 94:21, 95:5, 101:3, 102:20, 107:20, 107:23, 108:3, 108:6, 112:3, 112:4, 112:5, 116:20, 117:1, 117:24, 117:25, 118:13, 131:16, 144:1, 144:14, 145:22, 148:20, 149:14, 149:18
**named** [6] - 39:21, 60:15, 60:17, 66:21, 82:6, 101:22
**names** [27] - 19:15, 21:10, 21:13, 23:12, 23:18, 26:7, 41:12, 41:15, 76:7, 82:10, 85:17, 86:23, 99:23, 110:5, 116:14, 117:4, 118:16, 118:18, 118:20, 121:22, 121:23, 122:3, 122:4, 123:23, 123:24, 151:19
**nationwide** [6] - 30:6, 30:9, 31:20, 33:1, 33:23, 36:3
**Nearly** [1] - 25:18
**necessary** [1] - 6:15
**need** [22] - 2:10, 3:20, 6:21, 13:16, 29:4, 36:25, 52:4, 70:4, 74:8, 75:7, 78:17, 82:18, 82:21, 110:19, 137:16, 139:9, 145:1, 146:17, 146:25, 148:19, 153:2, 153:6
**needed** [5] - 16:24, 42:8, 82:20, 132:19
**needs** [2] - 4:1, 94:22
**neglected** [1] - 44:15
**never** [17] - 10:23, 17:10, 18:14, 24:22, 26:7, 26:8, 26:12, 29:24, 37:3, 37:11, 37:15, 45:21, 58:15, 66:12, 70:11, 85:17
**new** [9] - 15:12, 83:16, 89:3, 120:9, 121:21, 121:22, 121:23, 122:3, 124:25
**NEW** [1] - 1:1
**New** [11] - 1:4, 1:14, 1:15, 1:20, 1:22, 23:2, 26:7, 74:21, 101:2, 101:7
**news** [1] - 152:18
**next** [22] - 21:24, 33:15, 38:1, 44:23, 46:5, 51:5, 52:18, 58:16, 58:24, 60:21, 63:2, 63:7, 67:1, 72:9, 73:25, 91:21, 91:24, 99:17, 104:20, 115:3, 125:6, 127:3
**Next** [1] - 27:3
**nice** [2] - 29:9, 148:18
**nine** [4] - 15:2, 76:6, 130:3, 130:7
**nineties** [1] - 16:21
**Niwot** [1] - 47:14
**Noberto** [4] - 147:12, 147:18, 148:6, 148:14
**nobody** [2] - 37:2, 71:10
**noise** [2] - 3:21, 6:18
**nominee** [1] - 39:21
**None** [1] - 23:1
**none** [4] - 8:22, 28:14, 69:2, 118:5
**nonelectronic** [1] - 15:12
**nontransferable** [1] - 60:3
**nontransferrable** [2] - 100:17, 111:9
**normal** [1] - 4:2
**notation** [1] - 60:7
**notations** [2] - 61:23, 62:5
**note** [11] - 13:11, 13:20, 24:2, 57:15, 64:22, 67:12, 68:6, 68:7, 68:8, 68:15, 152:24
**note-taking** [2] - 13:11, 13:20
**notebook** [2] - 13:13, 14:21
**notebooks** [6] - 13:9, 13:10, 14:14, 14:15, 14:18, 15:2
**noted** [4] - 11:18, 12:1, 118:12, 126:24
**notes** [17] - 13:14, 13:16, 13:18, 13:20, 13:24, 14:2, 14:3, 14:5, 14:17, 14:18, 14:19, 24:1, 24:17, 63:9, 139:3, 151:11
**nothing** [9] - 25:25, 33:4, 35:5, 71:15, 73:6, 73:16, 104:3, 154:11
**Nothing** [3] - 2:5, 3:5, 41:12
**notice** [17] - 17:6, 19:18, 20:3, 20:4, 21:5, 21:8, 21:21, 25:19, 27:5, 27:7, 33:2, 39:1, 42:8, 56:17, 91:20, 130:25, 139:23
**Notice** [3] - 32:5, 32:25, 34:16
**notices** [35] - 17:9, 17:16, 17:21, 17:24, 18:5, 18:7, 19:6, 19:7, 19:17, 19:20, 19:24, 20:1, 20:15, 20:25, 21:8, 21:12, 21:23, 21:25, 22:1, 22:8, 22:10, 22:23, 22:24, 23:4, 23:6, 23:11, 23:20, 23:21, 23:24, 24:19, 25:18, 26:5, 26:8, 27:11
**Notification** [1] - 19:22
**notification** [11] - 16:22, 19:13, 35:2, 35:8, 57:3, 57:7, 60:23, 90:22, 90:24, 100:12, 111:6
**notify** [1] - 3:25
**notifying** [2] - 16:23, 19:8
**November** [2] - 147:13, 147:17
**Novis** [66] - 22:8, 22:11, 22:15, 22:19, 23:5, 23:10, 23:12, 23:14, 27:15, 75:12, 75:17, 76:1, 76:21, 76:23, 77:1, 77:3, 77:7, 77:12, 77:16, 77:19, 79:11, 79:13, 79:18, 79:22, 80:22, 81:5, 81:18, 82:3, 82:7, 83:4, 83:15, 84:18, 85:12, 86:19, 88:1, 88:2, 88:4, 88:6, 88:10, 88:11, 88:13, 88:14, 88:16, 88:18, 88:23, 89:5, 89:11, 89:13, 89:16, 89:22, 92:17, 94:1, 103:7, 103:19, 104:2, 109:25, 113:9, 114:24, 122:14, 129:20, 147:13, 147:19, 148:15
**Novis's** [9] - 23:9, 83:25, 85:23, 86:4, 88:22, 106:2, 106:7, 140:13, 141:3
**NPB** [3] - 137:16, 138:11, 139:17
**NPF** [26] - 66:8, 66:13, 67:23, 96:6, 96:11, 97:6, 98:22, 98:25, 99:11, 99:16, 101:4, 101:5, 101:6, 101:8, 101:10, 101:12, 107:10, 107:11,

107:13, 108:14, 108:22, 120:10, 121:11, 121:25, 122:5, 144:19
**NRS** [4] - 113:17, 115:9, 117:18, 117:21
**Number** [1] - 55:6
**number** [24] - 7:8, 14:20, 15:3, 24:7, 26:9, 31:18, 31:19, 43:9, 54:25, 63:3, 67:13, 99:21, 101:15, 102:10, 102:12, 102:21, 105:14, 105:22, 106:6, 106:9, 117:2, 133:12, 145:22
**numbers** [2] - 14:23, 14:25
**numerous** [3] - 15:14, 30:10, 40:22
**NUSRAT** [1] - 1:10
**nuts** [1] - 40:14

## O

**oath** [4] - 5:13, 5:14, 70:25
**objected** [1] - 11:2
**objection** [38] - 10:9, 10:14, 11:15, 11:16, 51:1, 52:5, 52:14, 55:3, 55:4, 65:9, 65:10, 87:12, 94:13, 94:14, 96:23, 96:24, 109:2, 109:3, 110:13, 112:25, 113:1, 113:20, 113:21, 115:12, 118:4, 119:19, 119:20, 123:2, 123:3, 126:24, 130:12, 130:13, 133:9, 136:25, 137:25, 142:23, 147:22, 153:23
**objections** [3] - 11:9, 11:11, 11:14
**obligation** [3] - 11:10, 13:18, 16:1
**observe** [1] - 49:25
**obsessed** [1] - 71:14
**obtain** [2] - 31:24, 131:13
**obvious** [2] - 29:22, 42:2
**October** [1] - 122:13
**odds** [1] - 31:3
**OF** [3] - 1:1, 1:2, 1:9
**off@optumline.net** [1] - 122:18
**offense** [1] - 7:5
**offered** [4] - 11:12, 15:20, 30:12, 52:15
**office** [13] - 27:21, 27:24, 56:4, 56:17, 76:10, 80:19, 81:2, 81:4, 81:16, 84:1, 88:7, 89:5, 89:9
**Office** [5] - 56:6, 58:5, 58:11, 58:14, 61:4
**officers** [2] - 27:20, 27:23
**offices** [3] - 101:1, 101:6, 101:14
**official** [5] - 14:9, 19:12, 90:22, 90:23, 123:12
**officially** [2] - 101:21, 102:25
**officials** [2] - 19:25, 24:24
**often** [5] - 21:17, 83:16, 85:19, 88:18, 88:19
**Ohio** [9] - 50:15, 54:24, 57:17, 57:18, 58:23, 59:21, 62:8, 66:1, 68:19
**old** [7] - 15:12, 40:12, 41:14, 41:19, 48:2, 68:18, 70:17
**Oliver** [3] - 118:15, 118:19, 118:24
**once** [11] - 17:20, 29:11, 53:13, 53:14, 78:7, 80:15, 83:17, 83:18, 83:19, 85:21, 85:22
**Once** [1] - 21:20
**once-a-month** [1] - 85:22
**one** [83] - 4:9, 8:18, 9:22, 14:16, 15:1, 17:7, 17:20, 18:13, 19:10, 19:20, 20:16, 25:4, 26:10, 27:22, 28:4, 29:6, 33:2, 36:23, 38:23, 39:10, 39:12, 40:17, 43:25, 44:3, 54:24, 61:2, 61:14, 61:20, 61:25, 62:8, 62:21, 67:13, 67:19, 79:5, 79:7, 79:13, 85:4, 91:17, 91:18, 92:12, 93:18, 94:20, 96:12, 103:5, 108:11, 109:12, 113:6, 114:16, 116:12, 116:20, 116:21, 117:13, 117:24, 118:23, 119:7, 121:9, 122:5, 122:6, 122:7, 122:19, 124:23, 135:3, 136:1, 136:2, 137:7, 140:2, 140:13, 143:12, 143:16, 143:18, 143:20, 144:5, 144:18, 145:5, 146:20, 148:7, 149:6, 150:8, 150:11, 150:19, 151:12, 153:15
**One** [4] - 8:14, 8:24, 16:21, 30:24
**one's** [1] - 28:10
**one-hour** [1] - 4:9
**one-tenth** [1] - 44:3
**ones** [3] - 28:10, 28:11, 151:19
**online** [1] - 145:20
**open** [7] - 2:2, 9:18, 10:6, 16:15, 53:1, 128:1, 151:14
**opened** [3] - 27:21, 83:23, 84:17
**opening** [12] - 11:7, 12:11, 15:18, 16:7, 16:18, 32:15, 33:19, 41:7, 42:4, 84:14, 126:3
**operate** [1] - 20:7
**operated** [2] - 18:18, 18:25
**operation** [4] - 21:4, 22:22, 23:13, 27:16
**operations** [1] - 23:15
**operator** [1] - 30:3
**opinion** [2] - 7:15, 7:25
**opinions** [1] - 7:20
**opportunities** [2] - 33:12, 34:11
**opportunity** [14] - 16:2, 16:17, 58:3, 58:20, 59:14, 66:23, 70:11, 104:10, 104:16, 132:1, 134:22, 135:1, 135:22, 138:22
**opposing** [1] - 65:5
**ops** [1] - 92:10
**options** [2] - 62:19, 67:23
**oral** [1] - 12:7
**order** [14] - 10:17, 13:2, 14:23, 15:23, 40:4, 43:3, 60:9, 62:20, 67:24, 82:21, 104:9, 104:19, 116:9, 132:20
**organizations** [2] - 33:11, 34:10
**original** [4] - 25:20, 55:12, 65:7, 96:12
**OTC** [2] - 87:22, 92:16
**OTCUR** [1] - 94:6
**outline** [2] - 15:15, 15:19
**outside** [6] - 2:2, 6:24, 9:11, 12:3, 90:15, 90:17
**overall** [2] - 20:20, 25:25
**overnight** [1] - 132:13
**overruled** [2] - 11:19, 55:5
**oversee** [1] - 77:23
**overview** [1] - 18:19
**owes** [1] - 140:13
**own** [12] - 21:22, 22:20, 23:6, 23:11, 25:12, 26:7, 33:4, 81:10, 84:10, 84:17
**owner** [2] - 30:3, 42:22
**owner-operator** [1] - 30:3

## P

**p.m** [2] - 5:8, 5:9
**PacNet** [8] - 134:2, 134:4, 134:13, 134:25, 136:3, 137:18, 138:8, 138:10
**PacNet's** [1] - 140:5
**Page** [2] - 155:3, 156:2
**page** [105] - 33:4, 35:5, 44:23, 51:5, 52:18, 54:10, 60:21, 61:9, 61:15, 61:17, 62:6, 62:10, 62:23, 64:18, 64:19, 86:14, 86:17, 87:2, 90:9, 90:10, 91:5, 91:18, 92:2, 92:23, 93:8, 93:10, 93:22, 94:7, 94:17, 95:1, 95:16, 95:17, 98:20, 100:1, 100:2, 104:21, 106:12, 106:13, 107:7, 108:11, 110:8, 110:18, 111:25, 113:25, 114:16, 115:3, 115:19, 116:3, 117:19, 118:16, 118:25, 121:2, 122:22, 122:23, 123:11, 123:18, 124:10, 124:11, 124:14, 125:6, 127:3, 128:8, 128:20, 128:25, 129:1, 129:4, 129:16, 130:17, 131:22, 132:25, 133:3, 135:14, 135:15, 135:19, 139:16, 140:2, 142:17, 143:2, 143:3, 143:7, 143:12, 143:13, 143:17, 143:22, 143:24, 144:5, 144:11, 144:24, 145:1, 145:7, 147:14, 148:5, 150:2, 150:14, 150:16
**pages** [12] - 54:6, 54:8, 87:5, 91:15, 108:22, 109:12, 113:6, 128:11, 130:2, 130:7, 143:9, 143:14
**paid** [4] - 31:9, 36:12, 83:14, 140:12
**pak** [1] - 124:6
**Pamela** [2] - 153:16, 154:4
**paper** [6] - 20:9, 20:10, 28:16, 114:7, 128:4, 143:20
**papers** [3] - 100:16, 111:8, 123:12
**paragraph** [12] - 58:16, 66:16, 66:18, 67:1, 67:4, 67:9, 102:22, 104:6, 104:12, 116:6, 121:8, 131:5
**paragraphs** [1] - 102:16
**parents** [1] - 47:21
**PARISI** [1] - 1:23
**part** [11] - 22:22, 30:2, 34:15, 40:20, 45:12, 57:22, 63:13, 63:21, 63:23, 78:19, 135:6
**participate** [1] - 59:21
**participated** [1] - 103:24
**participating** [1] - 72:5
**participation** [4] - 102:24, 103:8, 133:1, 138:21
**particular** [10] - 8:1, 14:5, 40:19, 75:25, 83:3, 85:1, 99:22, 99:24, 135:11, 136:1
**parties** [9] - 15:7, 15:21, 16:5, 16:16,

73:4, 151:18, 152:6, 152:9, 152:15
**partner** [6] - 17:18, 18:16, 22:7, 23:10, 75:14, 75:19
**partners** [5] - 23:19, 79:13, 86:4, 88:24, 92:18
**party** [1] - 15:19
**pass** [2] - 47:25, 152:11
**passed** [3] - 28:8, 48:2, 48:4
**passing** [1] - 69:21
**past** [3] - 4:24, 5:5, 5:6
**patience** [1] - 114:14
**patiently** [1] - 72:21
**pause** [7] - 61:12, 73:21, 100:7, 109:20, 114:2, 114:10, 145:2
**Pause** [2] - 69:5, 72:2
**pay** [9] - 8:8, 13:2, 13:22, 32:21, 34:20, 36:10, 83:12, 91:22, 131:14
**payable** [4] - 60:4, 63:24, 92:13, 132:21
**paychecks** [4] - 76:13, 76:14, 81:23, 81:24
**payee** [2] - 92:15, 92:19
**paying** [5] - 18:8, 31:24, 38:6, 38:7, 53:21
**payment** [36] - 13:4, 16:25, 17:4, 17:5, 17:9, 17:10, 20:9, 24:2, 24:4, 24:8, 24:10, 25:6, 25:11, 25:15, 25:18, 27:6, 28:4, 28:15, 30:9, 39:19, 42:20, 58:21, 86:7, 104:15, 105:10, 131:15, 131:16, 133:1, 138:17, 138:18, 138:19, 138:22, 138:23, 139:2, 141:2
**payments** [18] - 17:7, 17:12, 17:25, 23:8, 26:12, 27:18, 28:3, 28:13, 68:25, 84:15, 84:24, 102:19, 131:11, 131:24, 131:25, 132:12, 134:20, 134:22
**Payments** [1] - 17:24
**payroll** [2] - 81:23, 142:8
**PDF** [1] - 139:3
**Peggy** [1] - 131:7
**pen** [1] - 13:13
**Pence** [3] - 153:16, 153:20, 154:4
**pending** [4] - 58:21, 66:24, 103:3, 107:4
**pension** [2] - 68:20, 68:21
**people** [34] - 13:15, 13:16, 18:3, 18:6, 18:8, 18:10, 18:15, 20:1, 21:6, 21:10, 21:11, 21:13, 21:15, 22:3, 22:9, 22:25, 23:20, 23:24, 25:3, 26:21, 27:1, 35:22, 37:18, 43:18, 47:15, 81:19, 122:7, 122:8, 123:25, 124:2, 141:17, 148:7, 152:1, 152:5
**People** [3] - 3:17, 43:22
**people's** [1] - 40:4
**peopler** [1] - 124:2
**per** [2] - 132:1, 148:23
**percent** [3] - 21:18, 44:2, 44:3
**percentage** [1] - 43:24
**percentage-wise** [1] - 43:24
**perfect** [2] - 115:7, 147:7
**perfectly** [1] - 4:16
**period** [11] - 48:4, 48:19, 48:21, 49:14, 50:5, 57:19, 80:21, 81:1, 81:16, 81:18, 83:14
**permission** [2] - 4:25, 5:1
**permit** [3] - 3:19, 10:12, 13:10
**permits** [1] - 8:21
**permitted** [3] - 14:15, 14:16, 29:7
**person** [21] - 9:22, 9:25, 17:13, 17:15, 17:25, 31:10, 35:14, 35:15, 35:17, 35:23, 36:5, 36:6, 39:20, 60:13, 82:13, 83:23, 88:18, 98:19, 112:5, 116:11, 116:25
**person's** [1] - 9:24
**personal** [2] - 126:15, 126:20
**personalized** [2] - 19:8, 20:2
**personally** [1] - 8:17
**personnel** [4] - 3:18, 15:8, 151:18, 152:2
**perspective** [1] - 37:17
**Phil** [35] - 22:8, 84:22, 86:20, 88:1, 89:13, 89:16, 89:19, 92:17, 94:2, 96:18, 98:5, 105:21, 108:1, 109:25, 113:9, 114:24, 119:13, 120:13, 120:22, 121:5, 129:20, 133:5, 134:2, 134:15, 136:15, 136:19, 137:4, 137:16, 137:22, 138:8, 138:10, 138:11, 149:22, 150:5, 150:19
**PHILIP** [1] - 1:7
**Philip** [18] - 12:24, 17:14, 18:18, 22:11, 23:14, 23:17, 24:25, 26:20, 28:19, 29:12, 29:14, 29:22, 29:25, 45:13, 45:22, 46:3, 80:2, 80:5
**Philip's** [1] - 30:2
**phone** [6] - 26:9, 105:14, 105:22, 106:6, 106:9, 145:22
**phones** [1] - 3:19
**phrase** [2] - 103:11, 146:11
**physical** [1] - 41:13
**picture** [1] - 5:19
**piece** [50] - 10:11, 20:9, 20:10, 20:21, 28:16, 85:1, 85:7, 86:8, 96:11, 98:24, 98:25, 99:22, 101:13, 107:14, 108:14, 110:23, 111:20, 112:8, 112:19, 112:20, 115:8, 117:18, 117:21, 120:9, 121:21, 122:3, 122:5, 122:7, 122:24, 124:22, 124:24, 124:25, 128:12, 128:14, 128:15, 129:9, 129:13, 130:1, 130:6, 135:2, 135:11, 136:10, 136:12, 136:14, 139:10, 143:20, 144:22, 144:24
**pieces** [6] - 83:2, 85:4, 122:5, 129:5, 134:12, 140:14
**pink** [1] - 119:2
**place** [6] - 2:11, 32:5, 34:19, 34:20, 38:3, 42:10
**placed** [3] - 42:7, 93:17, 124:17
**placement** [1] - 93:16
**places** [2] - 31:6, 152:5
**plainly** [1] - 37:21
**Plainview** [2] - 101:1, 101:7
**plan** [4] - 14:19, 140:18, 140:21, 148:21
**Plan** [9] - 86:19, 90:3, 90:4, 94:1, 109:25, 113:9, 113:11, 114:24, 129:20
**planning** [1] - 72:14
**plans** [1] - 42:21
**play** [1] - 84:12
**Plaza** [1] - 1:15
**plea** [1] - 29:23
**pleasure** [1] - 102:23
**pledge** [1] - 4:24
**plenty** [1] - 131:19
**PO** [7] - 19:4, 26:11, 26:15, 101:1, 101:6, 101:15, 145:24
**podcasts** [1] - 152:19
**point** [8] - 4:13, 5:19, 29:20, 32:19, 49:22, 55:8, 67:14, 84:3
**polite** [1] - 29:8
**poll** [2] - 5:1, 5:5
**poor** [2] - 35:17, 42:1
**Port** [1] - 1:20
**Portion** [1] - 36:15
**portion** [4] - 8:5, 36:17, 39:20, 57:24
**portions** [3] - 32:22, 32:23
**posed** [1] - 10:10
**position** [1] - 75:8
**possible** [2] - 4:18, 92:11
**possibly** [1] - 35:12
**Postal** [1] - 154:6
**potentially** [1] - 31:2
**practice** [2] - 43:14, 43:20
**pre** [1] - 55:9
**pre-marked** [1] - 55:9
**preferably** [1] - 121:14
**prejudice** [1] - 43:3
**prepared** [1] - 131:16
**preprint** [3] - 87:22, 117:6, 117:8
**preprinted** [6] - 91:3, 91:4, 93:3, 93:4, 93:5, 116:22
**presence** [1] - 2:2
**present** [2] - 16:1, 89:10
**presented** [5] - 8:7, 9:17, 9:20, 12:5, 151:20
**president** [1] - 60:14
**presumed** [2] - 45:13, 45:15
**preview** [2] - 18:20, 31:13
**previous** [1] - 75:8
**previously** [3] - 117:21, 128:16, 135:13
**prey** [1] - 28:11
**price** [2] - 36:20, 40:24
**principle** [1] - 6:13
**print** [2] - 78:9, 145:21
**printed** [5] - 19:11, 119:8, 143:9, 143:11, 143:20
**printer** [3] - 90:5, 113:12, 119:6
**Priolo** [62] - 12:24, 17:14, 18:18, 22:8, 22:11, 23:14, 23:17, 24:25, 26:18, 26:19, 26:20, 28:20, 29:13, 29:22, 29:25, 31:17, 33:1, 41:8, 42:7, 42:22, 43:1, 44:12, 45:13, 46:3, 69:20, 80:2, 80:5, 80:14, 83:12, 84:22, 85:12, 86:20, 88:1, 89:13, 89:17, 89:19, 92:17, 94:2, 95:9, 96:18, 98:5, 99:16, 103:6, 104:2, 105:21, 107:18, 110:1,

113:10, 114:25, 119:14, 121:5, 121:17, 124:3, 129:21, 133:6, 134:3, 136:19, 137:23, 138:8, 138:10, 149:23, 150:19
**PRIOLO** [1] - 1:7
**Priolo's** [16] - 36:2, 40:19, 45:12, 45:22, 81:13, 83:8, 83:11, 85:25, 106:4, 106:10, 107:20, 107:23, 108:1, 136:12, 140:13, 141:8
**Priolo08@Yahoo.com** [1] - 150:5
**Prize** [3] - 17:23, 19:15
**prize** [75] - 13:3, 16:22, 16:23, 16:24, 17:3, 17:8, 17:10, 17:16, 17:20, 18:5, 18:6, 18:11, 18:13, 19:6, 19:7, 19:10, 19:18, 19:20, 20:1, 20:14, 20:18, 20:23, 20:25, 21:5, 21:8, 21:12, 21:21, 21:23, 21:25, 22:1, 22:8, 22:10, 22:23, 22:24, 23:4, 23:6, 23:11, 23:20, 23:21, 23:24, 24:4, 24:10, 24:14, 24:19, 25:18, 25:19, 26:5, 27:5, 27:7, 27:11, 28:6, 28:14, 33:17, 34:14, 38:13, 39:9, 57:3, 57:7, 60:23, 66:22, 67:6, 91:22, 95:7, 100:12, 100:16, 102:19, 103:2, 104:10, 104:15, 111:5, 111:8, 132:11, 141:9, 145:13
**prizes** [15] - 13:5, 13:7, 18:14, 20:8, 31:23, 39:22, 40:23, 50:8, 59:15, 145:15, 145:17, 145:19, 146:2, 146:3, 146:12
**problem** [4] - 2:13, 3:9, 150:18, 150:24
**procedure** [2] - 36:12, 104:17
**procedures** [2] - 131:18, 132:15
**proceed** [4] - 15:15, 73:24, 104:13, 153:20
**Proceedings** [1] - 1:24
**proceedings** [7] - 14:10, 73:11, 100:8, 109:21, 114:3, 114:11, 145:3
**proceeds** [2] - 9:15, 22:12
**process** [9] - 6:17, 14:24, 20:25, 25:7, 25:24, 82:14, 82:25, 84:13, 132:16
**processed** [2] - 27:17, 27:22
**processing** [5] - 18:11, 25:11, 66:17, 84:14, 84:24
**processor** [4] - 25:7, 25:16, 25:18, 26:15
**produced** [1] - 1:25
**producing** [1] - 75:25
**production** [9] - 75:10, 77:20, 77:22, 78:19, 79:23, 81:10, 82:12, 82:25, 86:5
**profit** [1] - 45:5
**profits** [2] - 23:5, 23:7
**promise** [4] - 34:17, 34:18, 36:14, 40:17
**promised** [5] - 13:3, 13:5, 13:7, 40:7, 40:20
**promising** [1] - 31:22
**promo** [2] - 98:22, 98:23
**promotion** [4] - 32:17, 33:1, 38:24, 99:11
**promotions** [3] - 30:5, 30:13, 37:14
**promptly** [1] - 152:25
**proof** [20] - 8:18, 31:14, 31:15, 45:11, 45:16, 45:20, 78:18, 79:2, 79:10, 94:6, 97:8, 97:9, 97:13, 110:9, 119:16, 129:23, 135:7, 135:16, 143:9
**proofing** [1] - 141:22
**proofs** [5] - 78:20, 78:22, 83:19, 87:22, 87:23
**properly** [1] - 71:12
**prosecution** [2] - 45:16, 69:24
**prosecutor** [2] - 41:7, 42:4
**protection** [1] - 40:17
**prove** [7] - 15:20, 18:17, 18:22, 27:9, 28:18, 29:24, 45:16
**provide** [2] - 12:22, 131:11
**provided** [9] - 3:24, 12:21, 13:9, 24:20, 32:25, 33:2, 34:24, 36:2, 39:3
**public** [3] - 3:17, 20:13, 153:2
**publicly** [2] - 20:10, 28:16
**publish** [15] - 69:16, 87:17, 94:25, 97:3, 109:7, 110:17, 115:21, 118:9, 120:1, 123:7, 130:20, 137:8, 138:4, 143:3, 148:1
**published** [15] - 56:2, 87:18, 95:3, 97:5, 109:10, 110:21, 115:23, 118:11, 120:4, 123:9, 130:24, 137:10, 138:6, 143:5, 148:3
**Publishers** [1] - 31:6
**publishing** [1] - 140:8
**pull** [6] - 53:24, 64:14, 92:22, 93:20, 101:18, 145:8
**purchase** [3] - 33:13, 34:12, 36:20
**purchased** [1] - 30:9
**purchasers** [1] - 44:2
**purported** [2] - 60:11, 66:4
**purportedly** [1] - 56:5
**purpose** [7] - 7:24, 11:22, 21:19, 36:9, 42:24, 42:25, 82:17
**purposes** [3] - 7:1, 72:15, 153:18
**put** [14] - 4:4, 32:9, 39:17, 40:3, 40:15, 41:25, 42:24, 55:23, 61:9, 62:23, 80:24, 129:16, 136:7, 141:19

**Q**

**quantity** [3] - 99:6, 99:8, 99:23
**quarter** [1] - 100:5
**questioning** [1] - 147:5
**questions** [17] - 6:7, 7:23, 8:2, 11:8, 11:9, 50:4, 54:5, 58:9, 62:3, 62:24, 69:6, 69:15, 71:23, 72:3, 139:5, 152:23, 153:3
**quickly** [3] - 29:20, 51:2, 93:13
**quite** [2] - 46:3, 50:20

**R**

**radio** [1] - 152:19
**raise** [2] - 46:18, 74:8
**raised** [1] - 153:23
**rare** [1] - 88:20
**rate** [1] - 21:18
**rates** [1] - 21:16
**reach** [2] - 6:4, 10:7
**reaching** [2] - 10:25, 12:17
**read** [88] - 14:10, 20:20, 32:20, 33:23, 33:24, 35:15, 35:23, 35:25, 36:16, 36:24, 54:18, 56:15, 56:21, 56:24, 57:13, 57:24, 58:16, 59:9, 59:18, 60:1, 60:2, 60:13, 61:1, 61:7, 63:4, 63:13, 66:16, 68:15, 70:11, 87:24, 90:18, 90:23, 91:1, 91:19, 92:4, 95:5, 96:14, 98:21, 99:5, 100:3, 100:10, 100:15, 101:5, 101:19, 101:20, 102:15, 104:6, 106:14, 107:15, 108:16, 108:19, 110:24, 111:2, 111:16, 112:3, 116:6, 116:14, 118:18, 119:24, 120:5, 120:18, 120:19, 121:7, 123:10, 123:19, 124:5, 130:18, 131:3, 131:5, 131:22, 132:3, 133:24, 134:13, 134:18, 135:18, 137:5, 138:9, 138:13, 138:14, 142:12, 143:22, 145:10, 148:16, 149:20, 149:24, 150:11, 152:18
**reading** [6] - 52:12, 66:15, 90:21, 107:3, 134:24, 137:12
**ready** [5] - 16:18, 61:11, 106:21, 123:15, 128:4
**realize** [1] - 98:13
**really** [4] - 3:25, 32:2, 103:10, 140:3
**reason** [5] - 25:19, 36:4, 36:25, 40:18, 40:25
**reasonable** [8] - 18:18, 18:23, 28:19, 29:25, 44:5, 44:6, 45:17, 45:20
**reasons** [1] - 10:18
**rebooting** [1] - 114:6
**receipt** [1] - 132:17
**receive** [24] - 13:3, 17:3, 18:10, 20:23, 21:1, 21:25, 22:9, 28:14, 28:16, 37:6, 37:11, 37:24, 82:4, 83:16, 86:8, 86:9, 91:16, 92:10, 103:1, 131:9, 138:16, 139:1, 140:14, 140:17
**received** [76] - 8:11, 11:22, 16:22, 17:1, 17:8, 18:13, 20:9, 22:12, 22:16, 24:5, 24:8, 24:10, 24:15, 25:10, 27:5, 28:5, 30:9, 33:1, 33:22, 33:23, 34:17, 34:24, 36:5, 36:15, 50:7, 50:10, 53:8, 55:7, 55:16, 65:4, 65:12, 78:7, 87:15, 94:16, 97:1, 109:5, 110:15, 113:3, 113:23, 115:14, 118:7, 119:22, 121:12, 123:5, 130:5, 130:15, 133:22, 137:2, 138:2, 140:15, 142:25, 143:14, 144:18, 147:15, 147:24, 156:4, 156:5, 156:6, 156:7, 156:8, 156:9, 156:10, 156:11, 156:12, 156:13, 156:14, 156:15, 156:16, 156:17, 156:18, 156:19, 156:20, 156:21, 156:22, 156:23, 156:24
**receiver** [10] - 59:2, 62:10, 64:23, 66:5, 66:22, 100:11, 104:13, 106:16, 107:4, 111:4
**receiver's** [1] - 65:18
**receiving** [8] - 20:22, 23:21, 24:23,

33:18, 34:22, 84:14, 132:7, 141:1
**recent** [2] - 102:23, 103:24
**recently** [2] - 23:18, 40:9
**recess** [2] - 7:11, 73:11
**recipient** [14] - 19:8, 20:4, 20:18, 24:3, 25:20, 33:16, 39:9, 117:25, 118:13, 118:14, 138:16, 138:19, 138:23, 139:1
**recipients** [4] - 13:2, 103:9, 103:23, 116:13
**recognition** [1] - 153:8
**recognize** [6] - 53:23, 54:12, 54:14, 62:15, 98:7, 123:24
**recollection** [3] - 12:19, 12:20, 14:3
**recommended** [2] - 77:4
**record** [18] - 10:14, 10:15, 10:16, 10:18, 11:19, 38:24, 46:22, 52:1, 57:24, 58:1, 61:7, 74:11, 88:9, 88:15, 101:22, 101:23, 102:20, 133:17
**Record** [1] - 56:7
**recorded** [4] - 1:24, 58:4, 65:22, 65:24
**records** [3] - 27:13, 42:20, 45:3
**red** [4] - 56:12, 91:24, 92:4, 131:3
**redacted** [1] - 106:25
**refer** [2] - 84:16, 97:8
**referenced** [1] - 148:2
**referred** [1] - 85:13
**referring** [4] - 20:2, 67:14, 139:18, 149:2
**refers** [1] - 121:19
**refund** [3] - 36:7, 36:11, 41:2
**refunded** [2] - 36:7, 36:20
**refunds** [2] - 24:21, 24:25
**regard** [3] - 84:8, 88:12, 90:14
**regarding** [2] - 24:18, 52:5
**regardless** [1] - 15:25
**regards** [3] - 102:18, 134:22, 139:5
**registered** [4] - 23:2, 26:8, 102:20, 106:18
**registration** [1] - 101:23
**registry** [1] - 56:23
**regular** [1] - 35:23
**regularly** [1] - 26:18
**regulation** [1] - 131:14
**regulations** [2] - 33:14, 34:13
**reject** [1] - 9:4
**related** [1] - 27:5
**relationship** [3] - 88:23, 89:1, 89:14
**relaying** [1] - 53:8
**release** [20] - 56:17, 59:13, 66:24, 92:5, 100:22, 103:3, 104:9, 104:15, 106:21, 111:11, 116:9, 123:15, 124:6, 131:15, 132:21, 133:1, 138:18, 138:19, 138:22
**relevant** [1] - 15:24
**remain** [2] - 5:14, 6:20
**remember** [17] - 15:3, 33:6, 45:7, 49:13, 50:7, 76:25, 79:17, 80:3, 80:4, 80:5, 80:16, 81:1, 81:7, 81:13, 89:13, 104:1, 107:25
**Remember** [1] - 32:15
**remind** [3] - 9:17, 142:5, 151:9
**reminders** [1] - 151:10
**remittance** [2] - 60:5, 60:6
**remitted** [1] - 62:18
**remote** [1] - 153:16
**removed** [3] - 25:1, 29:3, 37:10
**render** [2] - 45:25, 46:2
**renew** [1] - 52:5
**rent** [1] - 21:10
**rented** [1] - 26:11
**repeat** [2] - 53:4, 88:10
**reply** [6] - 20:6, 39:12, 39:15, 106:18, 106:22, 107:4
**report** [35] - 30:10, 33:12, 34:12, 35:14, 36:5, 36:10, 36:21, 38:11, 38:13, 38:16, 38:20, 40:21, 40:25, 60:2, 60:4, 67:6, 91:22, 94:22, 103:2, 104:16, 104:19, 124:9, 132:14, 132:22, 138:19, 138:22, 141:15, 141:21, 144:1, 144:18, 148:20, 148:22, 149:14, 149:15
**reportage** [1] - 95:7
**reported** [2] - 66:23, 106:24
**Reporter** [1] - 1:23
**reporter** [2] - 70:5, 133:12
**reporters** [1] - 14:11
**reporting** [4] - 30:4, 33:10, 34:1, 34:8
**reports** [7] - 39:6, 39:8, 101:5, 101:6, 101:10, 111:16, 152:19
**represent** [2] - 69:20, 111:19
**request** [10] - 7:13, 10:10, 14:9, 25:13, 36:7, 59:14, 65:8, 104:8, 132:16, 139:23
**requested** [3] - 106:19, 106:22, 138:12
**requesting** [2] - 134:25, 136:4
**required** [6] - 38:12, 38:16, 67:5, 68:17, 104:19, 134:16
**requirements** [3] - 33:13, 34:12, 39:7
**requires** [1] - 16:16
**research** [10] - 15:6, 33:10, 34:1, 34:8, 34:19, 34:20, 141:17, 149:9, 149:10, 152:4
**researcher** [1] - 148:10
**researchers** [2] - 148:8, 148:9
**researching** [3] - 33:11, 34:2, 34:9
**resolve** [1] - 6:24
**respect** [1] - 9:25
**respond** [1] - 11:17
**responded** [3] - 11:17, 70:10, 86:7
**Responders** [2] - 36:18, 36:20
**responders** [1] - 36:19
**responding** [1] - 24:12
**response** [12] - 17:9, 21:16, 21:18, 21:21, 27:7, 27:12, 42:6, 63:22, 68:25, 91:20, 140:12, 147:15
**responses** [4] - 24:6, 24:7, 83:20, 84:24
**responsibilities** [1] - 77:21
**responsible** [1] - 132:8
**rest** [6] - 60:1, 134:18, 136:2, 147:5, 150:1, 154:17
**restrictions** [1] - 132:7
**result** [1] - 46:4
**retire** [1] - 16:10
**retired** [2] - 48:4, 48:7
**return** [18] - 19:3, 24:1, 24:2, 28:21, 37:25, 38:10, 58:18, 86:25, 87:4, 90:15, 104:18, 105:8, 105:9, 107:6, 110:7, 129:23, 130:8, 151:13
**returned** [2] - 2:23, 94:23
**reveals** [1] - 43:17
**review** [4] - 14:17, 78:20, 86:16, 134:11
**reviewed** [3] - 78:17, 134:15, 138:11
**reviewing** [2] - 79:3, 134:12
**revise** [5] - 134:20, 138:15, 138:18, 138:21, 138:25
**risk** [2] - 25:16, 138:11
**robbing** [2] - 44:20
**role** [9] - 5:22, 75:4, 81:21, 82:4, 82:8, 82:12, 82:14, 84:12, 141:20
**roles** [1] - 5:22
**room** [14] - 3:15, 3:16, 3:24, 4:4, 4:20, 13:10, 14:1, 16:14, 54:25, 151:12, 151:14, 152:6, 153:5
**rotate** [1] - 115:6
**routed** [1] - 26:15
**row** [2] - 14:25, 15:1
**RPR** [1] - 1:23
**ruin** [1] - 41:2
**rules** [2] - 7:3, 11:12
**ruling** [3] - 11:3, 11:15, 52:14
**run** [6] - 21:3, 22:19, 23:13, 23:15, 27:15, 152:16
**running** [4] - 22:7, 22:20, 23:11, 128:3


## S


**S-O-L-T-I-S** [1] - 47:1
**sad** [1] - 35:19
**safe** [3] - 35:18, 35:20, 36:3
**safeguard** [1] - 14:13
**sake** [3] - 43:12, 43:16
**salaried** [2] - 81:25, 82:1
**salary** [1] - 82:2
**salesman** [1] - 48:8
**salutation** [1] - 120:12
**sample** [3] - 78:16, 79:4, 79:9
**Sandusky** [2] - 58:23, 66:1
**Sary** [1] - 112:2
**saw** [5] - 8:17, 13:8, 13:10, 50:11, 67:21
**scam** [3] - 18:12, 20:6, 23:11
**scans** [1] - 25:10
**scenario** [1] - 35:20
**schedule** [18] - 4:1, 79:7, 79:14, 79:18, 81:14, 82:15, 82:17, 82:19, 82:20, 83:3, 83:5, 85:1, 85:3, 85:5, 85:7, 85:22, 136:13, 144:2
**scheduled** [3] - 100:22, 111:11, 153:15
**schedules** [11] - 77:23, 77:25, 79:12, 79:15, 81:11, 82:14, 82:15, 83:16, 84:25, 99:16, 108:2
**scheme** [22] - 12:24, 18:19, 18:21, 19:1, 21:4, 21:20, 22:7, 22:12, 22:20, 23:7, 23:14, 23:16, 23:19, 24:12, 24:22,

25:9, 26:4, 27:16, 28:1, 28:7, 28:11
**school** [3] - 15:12, 74:25
**screen** [26] - 39:17, 40:10, 42:11, 42:14, 42:15, 54:2, 54:14, 55:20, 55:24, 62:25, 64:14, 69:11, 69:13, 86:14, 91:15, 93:22, 95:16, 96:9, 108:9, 109:16, 110:19, 112:14, 113:14, 114:16, 128:8, 129:17
**scroll** [6] - 54:7, 87:5, 105:1, 107:1, 108:21, 150:6
**seal** [1] - 116:4
**Sean** [53] - 23:12, 75:12, 75:14, 75:15, 75:17, 75:20, 76:1, 76:21, 76:23, 77:1, 77:3, 77:7, 77:12, 77:16, 77:18, 79:11, 79:13, 79:18, 79:22, 80:4, 80:5, 80:10, 80:11, 80:18, 80:22, 81:5, 81:18, 82:3, 82:7, 83:4, 83:7, 83:9, 83:15, 83:25, 84:18, 85:12, 85:23, 86:4, 88:8, 88:10, 88:17, 88:23, 89:7, 89:11, 92:17, 103:7, 103:19, 104:2, 106:2, 106:7, 136:15, 141:3
**Sean's** [3] - 88:3, 88:14, 89:9
**search** [4] - 20:12, 27:21, 27:23, 131:8
**seat** [8] - 3:11, 46:22, 73:4, 73:13, 73:23, 74:4, 74:8, 153:12
**seated** [3] - 6:21, 29:13, 74:10
**seats** [1] - 14:25
**second** [13] - 22:22, 38:23, 61:9, 102:22, 103:22, 112:4, 117:19, 117:24, 121:8, 139:15, 143:7, 145:17, 150:2
**Second** [2] - 11:9, 52:4
**section** [5] - 58:25, 60:2, 62:11, 62:18, 66:17
**secure** [2] - 3:16, 14:15
**see** [77] - 5:5, 6:4, 18:20, 19:5, 19:21, 20:14, 22:16, 23:25, 24:16, 24:21, 25:24, 27:10, 27:11, 27:12, 27:23, 33:7, 34:4, 34:5, 35:20, 37:3, 38:4, 38:14, 38:18, 42:17, 42:18, 43:8, 45:6, 50:14, 52:11, 53:22, 54:2, 55:20, 56:11, 57:6, 57:16, 59:2, 60:22, 61:4, 62:5, 62:6, 62:9, 62:18, 65:22, 67:23, 68:7, 73:9, 76:12, 86:21, 88:8, 88:18, 89:5, 92:12, 92:25, 94:7, 95:1, 96:7, 97:6, 97:16, 98:15, 100:25, 113:13, 114:13, 115:16, 119:1, 120:23, 128:12, 137:16, 139:13, 140:7, 144:3, 149:25, 150:4, 150:6, 150:7, 150:17, 153:4, 154:17
**See** [1] - 68:8
**seeing** [1] - 140:3
**seem** [1] - 10:1
**Seip** [1] - 154:6
**select** [1] - 103:14
**selected** [5] - 19:9, 20:22, 103:13, 103:15, 131:9
**selection** [4] - 6:17, 14:23, 14:24, 63:17
**selections** [1] - 58:21
**sell** [2] - 75:24, 77:9
**Send** [1] - 36:25
**send** [18] - 16:24, 21:6, 21:15, 36:10, 36:24, 37:7, 37:15, 37:19, 40:25, 63:22, 78:14, 78:16, 80:10, 99:16, 105:9, 137:17, 141:2
**sending** [21] - 20:25, 21:12, 23:3, 23:5, 23:11, 23:25, 24:10, 41:15, 42:9, 45:4, 53:19, 56:5, 67:22, 75:24, 77:9, 78:5, 82:15, 82:17, 97:12, 97:19, 136:11
**senior** [1] - 75:2
**sense** [5] - 4:23, 9:11, 10:3, 103:16, 154:3
**sent** [41] - 12:25, 16:25, 17:7, 17:9, 18:11, 18:14, 19:1, 19:6, 21:11, 22:9, 22:17, 22:23, 23:25, 24:4, 24:9, 24:11, 24:18, 24:25, 25:10, 27:6, 27:12, 28:3, 28:4, 28:5, 28:13, 30:5, 37:13, 38:17, 42:5, 53:16, 53:17, 68:17, 78:1, 82:16, 87:25, 103:13, 115:17, 122:7, 122:8, 132:2, 139:13
**sentence** [4] - 33:15, 39:3, 105:1, 105:3
**separate** [5] - 5:22, 43:7, 43:10, 43:11, 143:14
**September** [1] - 145:20
**serious** [1] - 15:13
**seriously** [1] - 5:2
**serve** [2] - 48:9, 101:22
**service** [15] - 3:13, 24:12, 33:10, 34:1, 34:8, 75:2, 105:4, 105:5, 105:22, 106:1, 106:6, 106:9, 131:11, 151:25, 152:8
**Service** [1] - 19:15
**Services** [2] - 134:2, 134:4
**Sesame** [1] - 32:9
**session** [1] - 4:21
**set** [5] - 58:19, 75:5, 82:2, 117:13, 145:15
**sets** [3] - 33:12, 34:12, 146:5
**settle** [1] - 4:5
**shared** [1] - 23:17
**sharing** [1] - 23:4
**Sharon** [3] - 46:15, 46:23, 47:12
**SHARON** [2] - 47:2, 155:6
**Shawn** [3] - 23:10, 27:15
**shop** [6] - 78:7, 83:18, 97:14, 97:19, 113:12, 119:7
**shops** [3] - 78:6, 82:21, 136:11
**short** [3] - 6:20, 7:11, 37:9
**shot** [1] - 31:4
**show** [41] - 11:1, 12:13, 13:24, 18:3, 18:25, 21:16, 21:18, 22:6, 22:18, 23:23, 24:5, 24:15, 25:15, 25:22, 26:2, 26:25, 27:10, 30:7, 30:8, 32:2, 32:24, 35:12, 36:2, 37:6, 37:20, 38:11, 40:2, 44:4, 50:15, 53:22, 54:5, 64:10, 65:14, 93:21, 105:12, 117:19, 124:10, 124:24, 128:11, 130:2, 143:6
**showed** [5] - 38:25, 39:10, 39:13, 42:12, 49:5
**showing** [7] - 44:14, 45:3, 55:9, 65:5, 109:15, 122:10, 125:1
**shown** [1] - 22:1
**side** [22] - 3:17, 6:17, 10:2, 15:17, 46:1, 56:11, 56:20, 57:21, 59:4, 60:24, 67:16, 91:15, 91:16, 92:23, 93:17, 95:1, 96:9, 111:25, 113:14, 115:5, 115:19, 152:16
**sidebar** [10] - 6:18, 6:20, 6:22, 6:25, 7:9, 7:14, 7:15, 51:3, 125:3, 125:4
**Sidebar** [5] - 51:4, 52:1, 52:17, 126:1, 127:2
**sidebars** [2] - 6:19, 7:5
**sides** [1] - 33:20
**sign** [13] - 38:9, 38:15, 38:16, 60:11, 63:11, 68:3, 96:6, 97:6, 97:7, 97:9, 123:21, 135:7
**sign-off** [4] - 97:7, 97:9, 123:21, 135:7
**signal** [1] - 109:18
**signatories** [2] - 22:15, 123:21
**signatory** [1] - 56:17
**signature** [22] - 39:20, 49:3, 49:6, 59:22, 59:24, 62:15, 62:16, 63:15, 68:5, 68:13, 92:25, 93:3, 95:2, 95:6, 104:14, 106:15, 107:5, 107:6, 107:8, 107:15, 112:1, 128:13
**signatured** [1] - 106:18
**signatures** [1] - 123:23
**signed** [5] - 18:5, 19:24, 22:3, 38:5, 60:3
**significance** [1] - 15:23
**silence** [1] - 3:21
**similar** [1] - 138:22
**Similarly** [1] - 10:14
**simple** [2] - 17:23, 43:17
**simply** [6] - 11:2, 31:24, 32:3, 35:14, 46:4, 65:7
**Sinclair** [1] - 19:16
**single** [8] - 20:10, 28:16, 33:2, 37:22, 44:14, 44:15, 151:10
**Single** [22] - 16:20, 16:21, 16:25, 17:1, 17:4, 17:8, 17:11, 17:15, 17:21, 18:1, 18:8, 47:24, 57:9, 57:14, 58:7, 59:11, 59:12, 59:23, 63:18, 66:20, 67:3, 68:23
**sisters** [1] - 47:17
**sit** [2] - 116:16, 148:6
**situation** [1] - 40:6
**size** [1] - 143:19
**skimmed** [1] - 32:14
**Skip** [5] - 86:19, 94:1, 109:25, 114:24, 129:19
**skipped** [1] - 33:19
**slow** [1] - 70:22
**slowly** [2] - 49:23, 70:17
**small** [7] - 16:25, 17:4, 31:25, 36:6, 38:10, 40:24, 100:4
**Snacks** [2] - 145:9, 145:11
**social** [2] - 15:11, 151:24
**socioeconomic** [2] - 41:14, 41:19
**sole** [3] - 8:2, 8:3, 58:5
**solely** [2] - 12:4, 14:2
**solicitations** [3] - 37:25, 75:24, 78:3

**Soltis** [18] - 46:15, 46:16, 46:23, 47:7, 47:12, 53:4, 54:2, 54:8, 54:12, 55:20, 56:4, 62:25, 64:14, 66:15, 68:11, 68:24, 70:4, 72:5
**SOLTIS** [2] - 47:2, 155:6
**Solutions** [1] - 75:3
**someone** [9] - 35:12, 60:15, 60:17, 86:7, 91:16, 95:8, 135:9, 146:3, 146:5
**someplace** [1] - 39:14
**sometime** [1] - 4:23
**sometimes** [3] - 25:16, 75:20, 120:20
**Somewhere** [1] - 4:9
**son** [1] - 23:9
**soon** [1] - 92:10
**Soon** [1] - 17:1
**sorry** [11] - 34:5, 47:10, 57:4, 65:13, 69:21, 70:3, 80:3, 87:22, 111:14, 111:17, 133:11
**sort** [4] - 60:7, 63:3, 67:11, 135:24
**sorted** [1] - 83:23
**sorts** [1] - 139:6
**sound** [2] - 25:20, 43:1
**sounds** [2] - 9:23, 41:23
**source** [2] - 78:24, 85:11
**spaces** [2] - 91:9, 91:10
**speaking** [3] - 15:6, 15:7, 148:18
**special** [2] - 90:25, 101:21
**specialist** [1] - 75:2
**specialize** [2] - 34:2, 34:9
**specialized** [1] - 33:10
**specific** [7] - 25:1, 25:17, 27:3, 27:4, 27:5, 102:12, 144:18
**specifically** [5] - 30:22, 35:19, 49:14, 57:22, 77:7
**specified** [1] - 58:19
**speculate** [2] - 7:6, 10:18
**spell** [2] - 46:24, 74:11
**split** [8] - 86:14, 93:22, 95:16, 108:9, 110:19, 114:16, 128:7, 129:16
**sponsored** [3] - 33:11, 34:2, 34:9
**sponsors** [2] - 40:24, 131:12
**spot** [2] - 61:14, 67:21
**SSME** [1] - 79:19
**stages** [1] - 15:16
**stamp** [7] - 56:14, 56:16, 56:19, 56:25, 60:23, 60:24, 91:2
**stamps** [1] - 56:11
**stand** [12] - 4:13, 7:11, 29:14, 29:17, 41:24, 41:25, 46:15, 46:17, 52:14, 73:1, 74:6, 153:8
**standing** [1] - 4:15
**stands** [1] - 149:1
**start** [11] - 29:20, 33:9, 43:5, 43:6, 59:10, 66:18, 76:1, 82:25, 137:12, 153:19, 154:4
**started** [3] - 77:11, 84:10, 88:17
**starting** [5] - 59:19, 96:15, 137:11, 149:9, 149:10
**starts** [2] - 36:19, 121:9
**state** [10] - 24:18, 33:14, 34:13, 46:21, 49:18, 49:19, 59:21, 68:17, 74:11, 74:19
**statement** [8] - 15:18, 20:20, 32:15, 33:19, 41:8, 42:5, 58:2
**statements** [8] - 11:8, 12:11, 16:7, 16:18, 44:13, 46:8, 53:8
**states** [1] - 6:13
**STATES** [3] - 1:1, 1:2, 1:10
**States** [7] - 1:4, 1:14, 1:18, 12:25, 17:19, 18:17, 19:2
**status** [5] - 41:14, 41:19, 49:9, 107:3, 107:4
**stay** [1] - 139:22
**steal** [3] - 18:3, 26:21, 37:3
**stenography** [1] - 1:24
**step** [6] - 9:20, 72:6, 82:24, 151:3
**step-by-step** [1] - 9:20
**steps** [3] - 26:3, 131:13, 151:5
**Steven** [2] - 90:3, 113:9
**sticker** [1] - 102:1
**still** [6] - 44:10, 47:21, 68:22, 99:17, 112:14, 154:7
**stop** [4] - 57:25, 58:6, 60:2, 140:8
**stopping** [1] - 148:24
**story** [2] - 10:2, 17:25
**Street** [1] - 32:9
**stretch** [4] - 4:10, 4:13, 6:21, 7:11
**stretching** [1] - 4:16
**stricken** [4] - 10:13, 10:21, 10:22, 11:19
**strike** [1] - 10:15
**strongly** [1] - 10:5
**struck** [1] - 10:17
**students** [1] - 75:6
**stuff** [2] - 34:16, 40:4
**subject** [6] - 87:21, 96:5, 119:15, 120:23, 131:18, 136:21
**submitted** [1] - 8:3
**substitute** [1] - 14:3
**sudden** [1] - 2:19
**suffer** [1] - 28:8
**suffered** [1] - 35:15
**suggested** [7] - 31:17, 41:7, 41:22, 42:4, 42:7, 42:25, 44:8
**suggesting** [1] - 45:7
**suggestion** [1] - 43:22
**Suite** [3] - 1:15, 1:19, 1:21
**summarize** [2] - 15:16, 16:6
**summary** [2] - 12:22, 42:20
**summation** [1] - 126:3
**supposed** [1] - 78:12
**sustain** [3] - 10:9, 10:14, 11:16
**swear** [1] - 74:8
**sweeps** [4] - 124:6, 148:20, 149:14, 149:15
**sweepstakes** [63] - 20:8, 20:12, 28:17, 30:4, 30:11, 30:13, 30:16, 30:23, 30:25, 31:2, 31:7, 33:11, 33:12, 34:2, 34:9, 34:11, 34:17, 35:2, 35:3, 35:7, 35:9, 36:5, 38:10, 39:6, 39:8, 40:21, 40:22, 40:25, 59:21, 66:22, 71:6, 77:9, 102:19, 102:24, 103:1, 103:8, 103:24, 140:15, 141:5, 141:7, 141:15, 141:18, 141:19, 141:21, 141:23, 142:19, 143:25, 144:1, 144:9, 144:17, 144:21, 144:23, 145:5, 145:8, 145:12, 148:8, 148:9, 148:10, 148:11, 148:12, 149:5, 149:10
**switch** [5] - 50:3, 55:17, 65:14, 114:18, 128:2
**switching** [1] - 64:8
**sworn** [2] - 46:20, 74:9
**sworn/affirmed** [2] - 47:4, 74:16
**sympathy** [2] - 41:24, 45:25
**symptoms** [1] - 49:25
**Syosset** [5] - 80:19, 81:2, 81:17, 84:5, 84:6
**system** [2] - 5:21, 114:7

## T

**table** [1] - 2:17
**tag** [1] - 101:21
**targeted** [3] - 17:21, 41:8, 41:22
**task** [1] - 24:12
**tasks** [1] - 8:24
**taxes** [1] - 132:9
**teams** [1] - 152:15
**teary** [1] - 70:7
**teary-eyed** [1] - 70:7
**technology** [2] - 114:6, 153:19
**television** [1] - 152:19
**ten** [7] - 5:4, 23:6, 30:25, 106:22, 107:4, 145:4, 145:5
**ten-day** [2] - 106:22, 107:4
**tenth** [1] - 44:3
**term** [5] - 78:4, 84:13, 85:10, 86:10, 126:9
**terms** [5] - 9:16, 33:3, 35:5, 54:14, 104:14
**test** [5] - 120:10, 121:19, 121:20, 121:21, 122:3
**testified** [5] - 16:3, 47:4, 70:20, 74:16, 108:1
**testify** [5] - 9:1, 28:8, 28:12, 69:24, 72:15
**testifying** [3] - 13:22, 126:14, 126:19
**testimony** [21] - 4:7, 4:11, 4:23, 8:1, 8:5, 8:10, 8:16, 9:3, 9:6, 10:4, 10:20, 10:21, 11:24, 12:7, 14:9, 15:24, 22:16, 27:14, 27:17, 27:22, 153:21
**tests** [2] - 9:12, 9:13
**text** [51] - 20:15, 20:16, 20:17, 60:1, 90:18, 90:23, 91:1, 91:19, 92:4, 100:3, 100:14, 100:20, 101:20, 103:5, 106:15, 107:5, 110:24, 111:2, 111:7, 111:10, 116:4, 116:17, 119:1, 119:24, 120:5, 121:19, 123:10, 123:19, 123:22, 124:5, 124:17, 130:18, 131:3, 131:23, 132:24, 133:24, 134:13, 137:5, 138:9, 138:18, 138:21, 139:23, 140:4, 140:5, 142:12, 144:6, 145:10,

148:16, 150:9, 150:16
**thankfully** [1] - 45:10
**THE** [107] - 1:10, 2:3, 2:8, 2:13, 2:15, 2:25, 3:2, 3:6, 3:9, 3:11, 28:25, 29:5, 46:11, 46:16, 46:18, 46:21, 46:23, 46:24, 47:1, 51:3, 52:7, 52:9, 52:13, 53:2, 55:3, 55:5, 55:15, 55:25, 64:9, 64:12, 65:3, 65:9, 65:11, 69:7, 69:10, 69:16, 70:3, 70:6, 70:8, 71:24, 72:4, 72:7, 72:9, 72:13, 72:17, 73:1, 73:3, 73:7, 73:9, 73:12, 73:17, 73:19, 73:23, 74:3, 74:4, 74:7, 74:10, 74:12, 87:12, 87:14, 94:13, 94:15, 96:23, 96:25, 109:2, 109:4, 110:14, 112:25, 113:2, 113:20, 113:22, 114:9, 114:20, 115:13, 118:4, 118:6, 119:19, 119:21, 123:2, 123:4, 125:4, 126:7, 126:14, 126:24, 127:1, 128:5, 130:12, 130:14, 130:19, 133:10, 133:14, 133:20, 137:1, 138:1, 142:24, 146:16, 146:22, 146:25, 147:3, 147:23, 151:2, 151:6, 153:11, 153:24, 154:9, 154:13, 154:15
**theory** [2] - 31:21, 32:1
**thinking** [1] - 71:12
**third** [3] - 67:9, 104:6, 139:16
**Third** [1] - 11:24
**thoroughly** [2] - 35:15, 36:1
**thousand** [6] - 43:7, 43:10, 43:11, 43:15, 44:1, 104:18
**thousands** [7] - 17:19, 20:1, 21:6, 21:15, 25:2, 28:2, 45:4
**three** [24] - 26:6, 47:20, 48:1, 62:19, 92:18, 100:1, 108:11, 113:6, 113:25, 116:13, 116:14, 118:16, 118:18, 122:22, 122:23, 128:20, 142:17, 143:2, 143:3, 143:13, 144:11, 144:14, 144:25, 145:22
**throughout** [6] - 6:12, 12:25, 19:2, 19:4, 19:21, 20:3
**Thursday** [2] - 5:8, 109:24
**ticket** [1] - 145:17
**tickets** [1] - 146:6
**tie** [1] - 85:8
**Timothy** [3] - 95:7, 95:8, 95:11
**title** [4] - 77:18, 95:5, 107:8, 143:22
**to-from** [1] - 96:14
**today** [7] - 3:5, 49:5, 72:5, 75:1, 116:16, 148:6, 151:20
**tomorrow** [3] - 3:8, 147:5, 153:16
**ton** [1] - 43:3
**tongue** [1] - 30:20
**took** [3] - 17:18, 26:3, 26:14
**top** [37] - 14:25, 19:17, 33:6, 56:4, 56:9, 63:2, 85:3, 87:20, 91:19, 92:4, 97:16, 98:15, 100:2, 100:4, 100:5, 100:14, 100:19, 100:20, 104:22, 104:23, 106:13, 111:2, 116:4, 120:6, 120:24, 121:19, 123:10, 124:14, 126:4, 130:18, 133:3, 139:24, 143:22, 143:23, 150:4
**total** [8] - 19:22, 44:18, 59:14, 91:25, 92:7, 99:8, 103:3, 124:8
**totaling** [4] - 131:11, 132:1, 134:21, 134:22
**totals** [1] - 144:21
**touch** [1] - 41:5
**town** [1] - 74:19
**track** [4] - 24:7, 78:3, 78:25, 99:4
**tracked** [1] - 83:24
**tracking** [4] - 83:20, 99:22, 117:2
**transaction** [1] - 40:21
**transactions** [7] - 42:20, 43:7, 43:9, 43:10, 43:11, 43:15, 44:1
**Transcript** [1] - 1:24
**TRANSCRIPT** [1] - 1:9
**transcript** [1] - 14:10
**Transcription** [1] - 1:25
**transfer** [1] - 132:13
**transportation** [1] - 153:3
**treat** [2] - 10:22, 11:20
**treated** [1] - 7:3
**trend** [1] - 29:21
**tri** [1] - 143:17
**tri-folded** [1] - 143:17
**trial** [38] - 4:3, 5:15, 5:16, 5:25, 6:12, 7:19, 8:9, 9:1, 9:15, 10:6, 10:9, 12:16, 13:18, 14:17, 15:16, 16:12, 18:17, 19:5, 19:21, 21:3, 21:18, 29:8, 29:15, 29:19, 30:18, 32:19, 33:22, 36:11, 38:4, 41:5, 41:10, 42:21, 46:9, 128:3, 151:8, 151:23, 154:21
**TRIAL** [1] - 1:9
**tricked** [2] - 17:16, 18:9
**triple** [1] - 116:13
**TRL** [8] - 129:23, 130:1, 130:6, 130:8, 132:21, 134:16, 135:16, 137:16
**true** [4] - 46:1, 85:22, 85:25, 86:4
**truly** [1] - 5:14
**Trust** [1] - 19:16
**trust** [4] - 19:19, 130:25, 131:13, 139:24
**truth** [3] - 22:4, 32:3, 52:15
**try** [4] - 6:19, 29:19, 115:6, 154:17
**trying** [3] - 128:22, 150:17, 150:23
**Tuesday** [3] - 86:18, 93:25, 96:3
**turn** [2] - 124:13, 140:10
**turned** [1] - 115:5
**turning** [5] - 89:25, 115:3, 118:16, 119:11, 122:22
**TV** [1] - 40:9
**twister** [1] - 30:21
**two** [39] - 8:14, 17:18, 19:6, 19:14, 29:7, 31:1, 31:18, 33:20, 43:1, 44:9, 44:11, 44:21, 56:11, 81:19, 91:15, 109:13, 110:8, 110:18, 116:21, 117:4, 118:16, 118:20, 123:19, 128:8, 128:9, 128:21, 128:25, 129:1, 129:16, 130:17, 135:15, 142:17, 143:9, 143:14, 146:21, 148:22
**type** [5] - 21:11, 22:1, 22:23, 77:8, 141:22
**types** [3] - 9:12, 22:24, 24:6
**typical** [1] - 93:16
**typically** [2] - 116:23, 124:16

## U

**Ultron** [2] - 145:11, 145:23
**um-hmm** [2] - 121:6, 135:4
**unaffiliated** [1] - 34:11
**unanswered** [1] - 10:25
**uncertain** [2] - 33:3, 35:5
**under** [12] - 5:14, 7:3, 11:12, 22:20, 57:22, 58:3, 66:16, 70:25, 107:8, 132:3, 140:18, 152:12
**underneath** [9] - 90:23, 95:5, 99:5, 108:15, 123:14, 123:19, 123:22, 124:5, 131:1
**understood** [4] - 28:15, 52:7, 52:13, 126:21
**Unfortunately** [1] - 28:7
**unhappy** [1] - 40:24
**UNITED** [3] - 1:1, 1:2, 1:10
**United** [7] - 1:4, 1:14, 1:18, 12:25, 17:19, 18:17, 19:2
**universities** [1] - 75:5
**unless** [2] - 3:20, 45:15
**unredeemed** [1] - 116:10
**up** [45] - 4:13, 4:16, 5:3, 5:4, 8:22, 9:1, 16:11, 21:25, 29:14, 29:17, 30:14, 31:8, 34:6, 40:18, 41:5, 42:24, 43:8, 43:9, 44:10, 46:16, 53:24, 54:10, 57:17, 58:25, 63:16, 64:14, 64:16, 64:17, 75:5, 77:25, 80:21, 93:20, 98:15, 104:23, 109:15, 122:3, 128:3, 132:7, 143:12, 144:4, 144:24, 146:4, 146:6, 150:6, 154:3
**upcoming** [1] - 146:17
**updated** [1] - 2:21
**updates** [1] - 3:3
**urgent** [2] - 19:23, 91:20
**US** [1] - 124:8
**USD** [2] - 91:25, 92:7

## V

**VA** [2] - 49:11, 49:22
**valid** [1] - 148:12
**validate** [2] - 103:8, 103:23
**validated** [2] - 102:25, 103:22
**valuable** [1] - 31:11
**value** [7] - 39:7, 145:14, 145:16, 145:18, 145:19, 146:2, 146:12
**valued** [1] - 63:16
**Vanderventer** [1] - 1:19
**variable** [3] - 116:17, 116:20, 116:24
**various** [6] - 19:13, 19:17, 20:12, 30:13, 148:21, 149:11
**venerable** [1] - 41:9
**verbal** [1] - 70:4
**verbiage** [4] - 78:10, 91:11, 91:13, 102:9
**verdict** [10] - 6:5, 7:17, 7:19, 12:17, 16:10, 16:11, 28:21, 45:25, 46:2, 46:3

**verification** [2] - 116:6, 116:8
**Verification** [1] - 19:15
**verified** [3] - 90:25, 138:17, 139:2
**verify** [4] - 67:2, 116:11, 116:12, 132:18
**version** [2] - 9:22, 9:24
**vet** [3] - 54:24, 68:20, 68:21
**vet's** [4] - 57:17, 57:18, 62:8, 68:19
**veterans** [1] - 16:21
**via** [1] - 89:22
**victim** [14] - 17:20, 17:22, 20:2, 21:20, 21:23, 21:24, 22:4, 23:8, 23:20, 25:7, 25:10, 26:16, 27:18, 27:22
**victim's** [1] - 21:21
**victims** [31] - 17:19, 18:7, 18:15, 19:2, 19:7, 20:8, 21:20, 22:12, 22:17, 23:18, 23:25, 24:14, 24:17, 24:21, 24:25, 25:1, 26:3, 26:5, 26:10, 26:12, 27:4, 27:5, 27:12, 27:25, 28:2, 28:3, 28:4, 28:7, 28:9, 28:12, 28:13
**Victims** [2] - 24:9, 24:10
**view** [1] - 4:7
**views** [1] - 14:6
**violations** [1] - 152:22
**virtual** [1] - 75:6
**visible** [1] - 97:18
**visited** [1] - 50:15
**vulnerable** [3] - 18:7, 41:23, 44:20

## W

**wait** [1] - 72:20
**waiting** [4] - 7:7, 112:14, 112:15, 121:13
**walk** [1] - 6:23
**walked** [1] - 4:2
**War** [4] - 48:14, 48:16, 68:20, 68:21
**warrant** [1] - 27:21
**wash** [1] - 30:3
**Washington** [1] - 1:20
**waste** [1] - 37:19
**Watch** [1] - 41:24
**watch** [1] - 3:21
**watching** [1] - 40:9
**website** [2] - 26:9, 105:17
**Wednesday** [1] - 154:22
**week** [1] - 2:18
**weight** [5] - 7:25, 8:5, 8:21, 8:22, 14:6
**welcome** [1] - 4:14
**whatsoever** [1] - 43:18
**white** [1] - 6:18
**whole** [11] - 32:17, 39:2, 43:14, 83:14, 84:7, 93:14, 101:5, 105:12, 111:18, 124:10, 139:12
**wife** [2] - 40:9, 40:14
**willing** [1] - 132:12
**win** [17] - 7:16, 19:9, 25:21, 31:2, 31:9, 35:3, 35:8, 40:23, 54:21, 59:21, 71:5, 92:10, 102:24, 104:15, 138:22, 145:12, 145:23
**win-ops** [1] - 92:10
**winnable** [2] - 39:22, 39:24
**winner** [4] - 16:23, 17:3, 53:10, 58:21
**Winners** [14] - 22:14, 22:19, 23:4, 42:23, 81:15, 108:2, 108:3, 140:18, 141:11, 142:15, 144:7, 144:10, 144:12, 149:22
**winning** [3] - 20:5, 31:3, 63:17
**winnings** [3] - 24:4, 31:24, 68:18
**wins** [1] - 31:10
**wire** [2] - 25:13, 26:24
**wired** [1] - 26:16
**wires** [1] - 27:2
**wise** [1] - 43:24
**wish** [2] - 37:24, 92:10
**wishes** [1] - 104:7
**Witness** [3] - 46:20, 72:8, 151:5
**witness** [56] - 5:3, 8:1, 8:16, 8:17, 9:6, 9:21, 10:10, 10:12, 11:16, 11:17, 15:22, 41:25, 46:1, 46:13, 47:3, 53:25, 69:8, 72:10, 73:25, 74:6, 74:9, 74:15, 86:13, 92:2, 93:21, 93:22, 95:16, 101:18, 105:2, 108:8, 109:12, 112:11, 113:6, 114:1, 117:15, 119:10, 122:10, 124:20, 126:6, 126:7, 126:8, 126:14, 128:5, 128:6, 133:2, 133:18, 136:16, 137:20, 142:1, 146:15, 147:1, 147:10, 152:16
**WITNESS** [5] - 46:23, 47:1, 70:6, 72:7, 74:12
**witness's** [3] - 9:3, 10:2, 10:4
**witness-by-witness** [1] - 9:21
**witnesses** [20] - 7:20, 8:4, 8:8, 8:10, 8:25, 9:2, 9:8, 9:17, 12:8, 13:21, 15:21, 15:23, 15:24, 16:3, 21:2, 21:5, 152:16, 153:16, 154:1
**Witnesses** [1] - 155:3
**woman** [2] - 27:17, 42:1
**won** [12] - 20:18, 24:14, 25:21, 31:23, 33:16, 34:14, 35:13, 39:9, 39:24, 132:10, 146:3, 146:5
**wonderful** [1] - 14:11
**word** [11] - 44:5, 46:1, 57:6, 58:6, 135:1, 135:3, 135:22, 138:15, 138:25, 140:23, 140:24
**wording** [3] - 24:23, 25:5, 25:20
**words** [6] - 10:1, 25:17, 80:24, 102:5, 136:7, 136:13
**works** [2] - 2:15, 52:4
**World** [4] - 48:14, 48:16, 68:20
**worry** [1] - 3:7
**worthless** [1] - 31:9
**write** [3] - 14:19, 15:2, 152:24
**writing** [2] - 62:4, 105:5
**written** [5] - 44:14, 57:1, 62:5, 91:24, 107:9
**wrongdoing** [1] - 45:12
**wrote** [1] - 24:24
**www.kfr.com/avengersprizes** [1] - 145:21

## X

**X's** [2] - 62:13, 62:14

## Y

**year** [1] - 81:7
**years** [16] - 30:3, 31:18, 31:19, 32:8, 40:11, 40:12, 48:1, 68:18, 68:22, 74:23, 76:6, 80:23, 126:18, 132:6
**yesterday** [2] - 2:19, 4:2
**Yesterday** [1] - 5:21
**YORK** [1] - 1:1
**York** [11] - 1:4, 1:14, 1:15, 1:20, 1:22, 23:2, 26:7, 74:21, 101:2, 101:7
**younger** [1] - 40:16
**yourself** [2] - 47:9, 47:11

## Z

**zoom** [16] - 57:16, 62:6, 67:8, 92:1, 93:13, 94:25, 100:6, 100:18, 101:16, 107:2, 110:24, 111:1, 112:1, 139:11, 143:23, 149:25
**zooming** [3] - 95:13, 100:13, 135:24

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEWYORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, : 21-CR-00566(NJC)
:
: United States Courthouse
-against- : Central Islip, New York
:
: March 12, 2025
: 10:00 a.m.
PHILIP PRIOLO, :
:
Defendant. :
- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE NUSRAT J. CHOUDHURY
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government: JOHN J. DURHAM, ESQ.
United States Attorney
Eastern District of New York
100 Federal Plaza, Suite 570
Central Islip, New York 11722

BY: ANN F. ENTWISTLE, ESQ.
CHARLES B. DUNN, ESQ.
JASON FELDMAN, ESQ.
Assistant United States Attorneys

For the Defendant: JAMES FROCCARO, ESQ.
20 Vanderventer Avenue, Suite 103W
Port Washington, New York 11050

JONATHAN I. EDELSTEIN, ESQ.
501 5th Avenue, Suite 514
New York, New York 10017

Court Reporter: DENISE PARISI, RPR, CRR
E-mail: DeniseParisi72@gmail.com

Proceedings recorded by computerized stenography. Transcript produced by Computer-aided Transcription.





(Trial continues.)

(In open court; jury not present.)

THE COURT: Good morning, everyone. Have a seat.

THE COURTROOM DEPUTY: Good morning.

This is 21-CR-566, USA verse Philip Priolo.

Counsel, please state your appearances for the record.

MS. ENTWISTLE: Good morning, Your Honor.

Ann Entwistle for the United States. With me at counsel table are Jason Feldman, Charles Dunn, and Department of Justice Paralegal Tiara Johnson. And United States Postal Inspector Christine Reins-Jarin is also with us at table.

THE COURT: Okay. Good morning.

MR. FROCCARO: Good morning, Your Honor.

James Froccaro for Mr. Priolo, who is next to me. Mr. Edelstein is going to be here a little late today, Judge.

THE COURT: Okay. That's fine. Wonderful.

Any applications from the Government this morning?

MS. ENTWISTLE: One from the Government, Your Honor. And I will let you know we have already discussed this with defense counsel and reached agreement.

There are certain questions that defense counsel may ask on cross of Ms. Jacquard, and potentially other witnesses, where an honest answer to that question might elicit a response about legal advice to Sean Novis and Gary Denkberg.





I have discussed with defense counsel, he's not planning to get into that, he's not intending to ask about that legal advice --

THE COURT: Legal advise provided to Sean Novis and Gary Denkberg --

MS. ENTWISTLE: Exactly.

THE COURT: -- conveyed to the witness.

MS. ENTWISTLE: Correct.

MR. FROCCARO: Or that she was aware of it. I'm not going to ask anything about it. That's the bottom line.

MS. ENTWISTLE: For example, a question about, did you believe you were committing a fraud. Her honest answer, she might reference lawyers.

In light of Your Honor's ruling about derivative advice of counsel, I have advised the witness that I am not intending to ask her about lawyers and on direct she should not address it. I have discussed with Mr. Froccaro, he is not intending to discuss derivative advice of counsel on cross or get into those issues.

So I'm just asking for permission to instruct our witnesses, to include Ms. Jacquard, and potentially other witnesses, that on cross they should not mention legal advice given to Sean Novis and Gary Denkberg, to honestly answer all questions, but not to specifically reference that legal advice.





I also -- and defense counsel has no objection to us instructing our witnesses in that way. Because, you know, we didn't think to raise this with Court before Ms. Jacquard began testifying, it would be fine with the Government if Your Honor would prefer to instruct Ms. Jacquard in court outside the presence of the jury of that, or Mr. Froccaro says he has no objection to an attorney for the Government relaying just that specific instruction to Ms. Jacquard, but because she is mid- testimony, we wanted to raise that issue before the Court.

THE COURT: Okay. Thank you for raising it and thank you for conferring in advance. I do think it's problematic if she refers to lawyers in any way given my ruling on derivative advice of counsel and the authorities I relied on, including the decision of the Southern District of New York, Judge Cote in the *Lek* case as well as Judge Kaplan's decision in *Bankman-Fried*, which I've cited and discussed earlier.

Mr. Froccaro, do you have a preference as to how this instruction is given?

MR. FROCCARO: Judge, I have no preference. I always think you have more juice than we lawyers, so if it comes from you, it may have a little more power, but whatever works.

THE COURT: I'm happy to do it. I would like the

parties to agree on language.

MS. ENTWISTLE: Of course, Your Honor. Happy to do so.

THE COURT: Okay.

And, Mr. Froccaro, you will consult with Ms. Entwistle on that and make sure that you agree with the precise instruction given?

MR. FROCCARO: Of course.

THE COURT: Okay. Great. So that's fine. If you can give that to me -- we are going to start with the video at 10:00 a.m. and then we will move back to Ms. Jacquard, so I would like her -- I'm thinking about when to do this so that the timing is appropriate.

When will she be here, Ms. Entwistle?

MS. ENTWISTLE: She's here now.

MR. FROCCARO: Judge, I apologize, but if we can go back to the other issue.

I just want to make sure -- this witness, I think, testified she doesn't know that my client even used an attorney.

MS. ENTWISTLE: I have not asked her about attorneys. I don't intend to ask her --

MR. FROCCARO: I'm just saying -- okay.

MS. ENTWISTLE: -- about legal advice for anyone. I just wanted to -- in the event a question on cross elicited





that answer without Mr. Froccaro intending to elicit that testimony, I wanted to make sure the instructions were clear.

THE COURT: Exactly.

Why don't we bring her here a little early at 9:45 and handle that without the witnesses who are starting at 10:00 a.m. I don't want them hearing any of this, obviously, so we would need to do the test for the remote AV shortly after I get off the bench. Then we will bring Ms. Jacquard in -- we can even bring her in at 9:40, handle this instruction, then she can go back to the instruction room, and we will start at 10:00 a.m. with the remote testimony.

Any concerns with that?

MS. ENTWISTLE: No concerns, Your Honor.

THE COURT: Mr. Froccaro?

MR. FROCCARO: No, Your Honor.

THE COURT: Any further applications?

MR. DUNN: Yes, Your Honor, from the Government, we have several more, but I believe they're brief.

Concerning the stipulation about evidence at Government's Exhibit 100, in other cases in this district, we have simply read that to the jury, the substance of the stipulation, rather than admitting it as an actual exhibit for their consideration.

THE COURT: What is the stipulation? Let me pull up Exhibit 100.





MR. DUNN: It is our intention to use that in whatever form the Court prefers at some point during testimony today. But, as I said, in prior cases, we've merely read it. We don't provide it to the jury for their consideration.

THE COURT: So this concerns the business records.

MR. DUNN: I'm sorry, Your Honor?

THE COURT: This concerns the business records?

MR. DUNN: Yes, Your Honor. It touches on potentially all of the documentary exhibits.

THE COURT: I'm so glad you raised this because I had a question about whether there were stipulations on authenticity and a foundation for the business records that were used yesterday. And this governs those records as well.

MR. DUNN: It's the Government's position that it does, Your Honor.

THE COURT: Okay.

And, Mr. Froccaro, I didn't get any objections from you as to the admissibility of those --

MR. FROCCARO: -- because my client was on them. He's on the emails, that's why I didn't object.

THE COURT: Exactly.

I don't see that there's a concern about authenticity or foundation, but I was wondering if there was a stipulation, so I appreciate that.

MR. FROCCARO: I did preserve certain issues --





relevancy and certain things that I can address -- but -- that's how they got them.

THE COURT: Understood.

I think it's fine to read this.

When do you plan on doing that?

MR. DUNN: Probably either during the testimony of Inspector Bizzarro or during Cathy Johnson's testimony depending on what seems appropriate in the moment, but I would venture to guess probably Inspector Bizzarro.

THE COURT: I think you should do it earlier rather than later because it covers all of the documents that witnesses are being asked questions about. I didn't specifically focus on this exhibit prior to the commencement of trial; it wasn't brought to my attention. But in terms of how the questioning of witnesses has proceeded with respect to the business records, it hasn't followed the traditional formula of authentication in laying the foundation for business records and this actually solves a lot of those issues.

MR. DUNN: Yes, Your Honor, we will incorporate it early in the day.

THE COURT: Thank you so much.

MR. DUNN: The next issue, we could potentially reach Ms. Johnson today and that is the witness for whom Your Honor has ordered immunity. And we just wanted to bring to

the Court's attention that, as you are aware, the statute requires her to invoke her Fifth Amendment right, and then the Court to call that order to her attention and convey the immunity there in the moment.

So I believe it is her intention to answer basic identifying questions and then invoke her Fifth Amendment right. Just so the Court is prepared for that, in whatever manner the Court wishes to convey the order, I have a copy, if that's useful --

THE COURT: Yes, that would be useful. Thank you so much.

MR. DUNN: May I approach, Your Honor?

THE COURT: Yes.

MR. DUNN: I'm going to hand Counsel a copy as well.

MR. FROCCARO: She's obviously doing it outside the presence of the jury; right? That's what she's doing?

THE COURT: Yes, this should be outside the presence of the jury.

MR. FROCCARO: You've never had an immunity before? You don't usually do it outside the presence of the jury.

MR. DUNN: The intention is for her to do that during her testimony. If the Court's preference is otherwise -- and certainly this is impeachment information as well --

MR. FROCCARO: I'm not touching on it, Judge.

THE COURT: In terms of her --





MR. FROCCARO: Her cross.

THE COURT: -- her invocation of the Fifth Amendment.

MR. FROCCARO: Right, her immunity.

THE COURT: So she would not go on until end of the day; is that right?

MR. DUNN: She would probably be the last witness of the day if we get to her, and then she would carry over until tomorrow, otherwise she would be early tomorrow is our anticipated timeline.

THE COURT: Okay. Thank you for bringing this to my attention now. Let's revisit this at luncheon terms of the precise mechanics and what is done in front of the jury and what is done outside of the jury.

MR. DUNN: Thank you, Your Honor.

One more matter is the issue of a limiting instruction concerning -- and this is, again, in the event we get to Ms. Johnson today. I believe she will be the first witness to address pre-indictment conduct and what we've been referring to as, you know, the late '90s, early 2000s conduct.

We have exchanged proposals for limiting instruction. I do not mean to represent we have exhausted the ability to discuss and agree on language, but we wanted to raise that this morning. And if the Court wanted to shortcut that process, we have -- I have a copy of our different





proposals if that would be useful to the Court. Or does the Court wish us to continue to confer on that matter?

THE COURT: Have the parties reached an impasse, Mr. Froccaro?

MR. FROCCARO: No, we really haven't Judge. Unfortunately, Mr. Edelstein's cat passed away and the funeral is this morning and I told him of course you don't have to come, and he and I have been dealing with the issue. Of course I have the final word. I think we are close. I liked your last suggestion, the Government's. But I think we are real close, that's the bottom line. We will have it resolved I believe on our own before she takes the stand.

THE COURT: Okay. So if there's an issue, I want you to raise it with me at lunch.

MR. FROCCARO: Yes, Your Honor.

MR. DUNN: Of course, Your Honor.

THE COURT: Thank you so much.

Anything else from the Government?

MR. DUNN: That's all from the Government this morning.

THE COURT: Okay.

Mr. Froccaro?

MR. FROCCARO: Nothing from me, Your Honor.

THE COURT: Okay. Thank you all so much. So you will work on this language for the instruction for





Ms. Jacquard and I will come back and deliver it to her.

MR. FROCCARO: Judge, he's not going to get here until 12:30, do we may need a few more minutes.

THE COURT: That's fine. Lunch will end at 1:30, so if you need to chat, why don't I -- we will resume a little early, at like 1:15, and we will handle this issue then.

MR. FROCCARO: Understood. Thank you.

THE COURT: Thank you so much.

(A recess in the proceedings was taken.)

THE COURT: Okay. Counsel, I have your proposed instruction and it's absolutely fine with me.

So, Ms. Entwistle, will you bring in your witness?

MS. ENTWISTLE: Yes.

MR. FELDMAN: Should we go ahead and deactivate --

THE COURT: They can't hear.

THE COURTROOM DEPUTY: They can't hear us and we have it set so they cannot see the courtroom. They are actually only able to see what you see on those screens right there.

THE COURT: This is why my mic is off and your mics are off. The mics are all off. The witness cannot hear what we are saying right now.

Come on in, Ms. Jacquard. Please take the witness stand.

(Witness enters the courtroom.)

THE COURTROOM DEPUTY: Please raise your right hand.

CHERYL JACQUARD,

called as a witness, having been previously duly sworn/affirmed, was examined and testified as follows:

THE COURTROOM DEPUTY: Please restate and spell your name for the record. Thank you.

THE WITNESS: Cheryl Jacquard, C-H-E-R-Y-L, Jacquard, J-A-C-Q-U-A-R-D.

THE COURT: Hi, Ms. Jacquard. Good morning.

So yesterday you testified in response to the Government's questions, and later today you will be cross-examined by Mr. Froccaro. In light of this, I want to give you an instruction.

I am instructing you that in your answers to questions, either on direct questioning by Ms. Entwistle for the Government or on cross-examination by Mr. Froccaro, you are not to reference any legal advice given to Sean Novis, Philip Priolo, or Jeff Novis. I'm also instructing you not to reference anything you knew about whether or not Sean Novis, Gary Denkberg, Philip Priolo or Jeffrey Novis had their mailings reviewed by lawyers.

Thank you so much. You can step down.

And we are not starting with you today, so if you can hang out in the witness room for a little bit.

(Witness exits the courtroom.)





THE COURTROOM DEPUTY: Hello. Can you hear us? Hello, can you hear us?

MS. ENTWISTLE: She cannot.

THE COURTROOM DEPUTY: Can you hear us?

MS. PENCE: Yes, I can.

THE COURTROOM DEPUTY: Excellent. Thank you. Hold on, please.

MS. PENCE: Okay.

THE COURTROOM DEPUTY: Can you now see us?

MS. PENCE: Yeah, I can see you from a small amount where it says something about remote.

THE COURTROOM DEPUTY: Okay. Thank you.

MS. PENCE: You're welcome.

(Pause.)

MR. FELDMAN: Your Honor, just one issue. Are we not on the record?

THE COURT: We are on the record.

THE COURTROOM DEPUTY: The witness can hear everything, so should they be muted again?

MR. FELDMAN: Yes.

THE COURTROOM DEPUTY: Let me mute everything again. Hold on, please.

(Pause.)

THE COURTROOM DEPUTY: Is it okay that the camera -- she can see us; is that all right?





MR. FELDMAN: Yes. It's okay with the Government.

May I proceed?

THE COURT: Yes.

MR. FELDMAN: Your Honor, just a very minor issue. I know Your Honor was clear with the parties that you don't want us referencing stipulations on the fly during trial. Because of the technology issues that we were facing, I spoke to Mr. Froccaro. He's not going to object to Exhibit 63 and 64, and so normally I would have those shown to the witness only to identify the documents. I'm not going to do that today. I'm just going to move those in and with the Court's permission, I may reference that I've spoken to defense counsel beforehand and he doesn't object, or the Court can tell me how the Court would prefer that we handle that.

THE COURT: Are these exhibits covered by Exhibit Number 100?

MR. FELDMAN: Yes, Your Honor.

The stip.

THE COURT: So I actually don't have Exhibit 63 and 64 in the binder you provided me, so I don't know what these exhibits are.

MR. FELDMAN: Brief moment, Your Honor.

(Pause.)

MR. FELDMAN: They're actually a part of Exhibit 174, pages 41 to 43. They are just broken out. We





have paper copies that we're collecting for the Court.

THE COURT: Yes. I think you were going to replace some documents this morning.

Which pages of Exhibit 174?

MR. FELDMAN: I believe it's pages 41 to 43. And we have them in paper now if Ms. Entwistle can approach.

THE COURT: Okay. I see. So these are documents that were obtained through the search warrants that were covered by Exhibit 100.

MR. FELDMAN: Yes, Your Honor.

THE COURT: If you could please give those paper copies, I will stick them in my binder.

Thank you so much.

Mr. Feldman, are you moving for admission of these two exhibits?

MR. FELDMAN: I think that's the easiest thing to do. So when the jury comes in, I will say before we even get started, I will formally move to admit 63 and 64 and Mr. Froccaro has told me he has no objection.

MR. FROCCARO: I have no objection.

Judge, I'm going to get the same courtesy. There may be two exhibits that I want to introduce and I'm just going to say, I'm showing you on the screen what's identified as Defendant's exhibit whatever.

THE COURT: I deem them admitted. They are

admitted, so the documents are in.

(Government Exhibits 63 and 64 were received in evidence.)

MR. FELDMAN: If it's okay with the Court, I will make a formal application to Your Honor before the jury.

THE COURT: I don't believe you need to because I have admitted them right now. They're admitted. It's on the record.

Mr. Froccaro, do we have the defense exhibits?

MR. FROCCARO: Judge, I never know what I'm going to do until they open up their mouths.

THE COURT: Understood. So you will let me know at the close of the Government's case --

MR. FROCCARO: Before we start, when we had the Rule 15 deposition, I think I did introduce two exhibits. I'm just not sure of my lettering, Judge.

So, in other words, I don't know that it may be out of order when I introduce it to this witness. It should be C where I'm marking it as A. If we can just adjust that at some point. How do we do that?

THE COURT: Is this the Teshale deposition?

MR. FROCCARO: Yeah, I think I had two exhibits that I introduced there, so whatever I guess my next exhibit would be, it would be C then.

THE COURT: You will figure it out. Mr. Edelstein





will look at them.

Are you planning on using them this morning in your cross?

MR. FROCCARO: Yes. Judge, I know there were two we introduced at Tashale's. I haven't introduced any others, so it will make sense they are C and D.

THE COURT: Understood.

And on the issue of the instruction to Ms. Johnson, I will give her an instruction outside the presence of the jury. At the lunch break, the Government, you will let us know before we resume before the jury comes back in at 1:30 your estimated time as to when she will be going on. I will give her the instruction outside the presence of the jury, then I will have her go back to the witness room and then come in as all other witnesses are.

MR. FELDMAN: One technicality, Your Honor.

I'm also formally moving in, or would formally offer Exhibit 63-OE and 64-OE, which are the original copies of 63 and 64.

THE COURT: And since there's no objection, they are admitted.

(Government Exhibits 63-OE and 64-OE were received in evidence.)

THE COURT: Ms. Entwistle, you moved for the admission of a number of documents yesterday for which you did





not also move for the admission of the originals. I don't know if that was intentional.

MS. ENTWISTLE: It was intentional, Your Honor, just for flow with that witness, and the original evidence will come in later through another witness.

THE COURT: Okay. Thank you.

And then in terms of my plan to instruct Ms. Johnson, any concerns from the Government?

Mr. Dunn? That is the issue you raised earlier.

MR. DUNN: Briefly, Your Honor.

So it's my understanding we are instructing her outside the presence of the jury.

Would the Court similarly restrict any reference to something such as a proffer letter?

MR. FROCCARO: I have no intention. Their proffer letter is one I've never seen before. It says, you are talking about all criminal conduct about whoever you are talking about. It's the last thing in the world I want to introduce, Judge.

THE COURT: The parties can question her about -- I don't see how that's a problem. It sounds like Mr. Froccaro is not going to go there.

MR. FROCCARO: I'm not going there.

THE COURT: So if Mr. Froccaro is not going there, I'm not sure why the Government wants to, but should you wish





to, I don't see why you couldn't.

MR. FROCCARO: But they are not going to seek to introduce that document.

MR. DUNN: We're not -- no, we do not introduce that, and nor would we introduce the Court's immunity order.

MR. FROCCARO: Okay.

MR. DUNN: Our contention is that these things are relevant to the witness's credibility. It helps us have a very clean record about why the witness is testifying. In the event that Mr. Priolo is convicted, it could also assist with our defense of ineffective assistance of counsel claims. There's a number of reasons why we would want that on the record.

But I understand the Court's order, but I wanted to clarify, if similar concerns would surround asking her if she signed the proffer letter and what her understanding of that is, and her expected answer is that may -- answers from interviews she gave with the Government over the course of the last year could not be used against her. It goes to her credibility.

MR. FROCCARO: I don't know why we need that. Just ask her, did she sign the proffer agreement. That's it.

THE COURT: I see your point that it is relevant to her credibility and why she's testifying. I think there's a line at which going into it too much could become a 403 issue,

so you need to be careful with how far you go with that.

MR. DUNN: Understood, Your Honor.

THE COURT: And this is why I'm instructing her outside the presence of the jury.

MR. DUNN: Of course.

THE COURT: To avoid a problem under Rule 403.

MR. DUNN: It's very brief.

THE COURT: So your plan is simply to ask whether she has ever been given a proffer letter?

MR. DUNN: Yes, Your Honor. I will discuss with her beforehand -- because she's prepared to answer questions about the immunity order. I will instruct her not to address that during her testimony.

MR. FROCCARO: Just so I'm clear, Judge -- I'm not clear on what she's going to be testifying about.

THE COURT: Mr. Froccaro, your concern is that if she testifies about the immunity order that this is unfairly prejudicial. You are making a 403 argument.

MR. FROCCARO: Certainly, yes.

THE COURT: And as I understand it, Mr. Dunn, you are saying that her credibility and the truthfulness of her testimony is at issue and that her granted immunity is relevant to that. Why do you need to show that she's testifying based on a grant of immunity in order to show that she's a credible witness?





MR. DUNN: That also goes to her credibility, Your Honor.

MR. FROCCARO: I'm not going to challenge it. I'm certainly -- Judge, I'm always up front when I think it makes sense. I have to be.

I'm not going to be portraying her as a criminal. I don't think she did anything wrong. In fact, I think -- I question the good faith in giving her immunity because there's a five-year statute of limitations on this. They closed up in September of '16. Why does she need an immunity order nine years later? There's no statute of limitations that I know of. I think it's just to portray her as a bad person because they haven't gotten anybody else in the whole business that's ever, you know, the workers who have been charged with anything. That's the support staff that he used.

THE COURT: Mr. Dunn?

MR. DUNN: Your Honor, it should not surprise anybody in the courtroom that, from the Government's perspective, she was a long-term member of the conspiracy whether she thought she was violating the law or not, and so her credibility is, of course, at issue, otherwise we would not be cross-examining her and we would just take her direct testimony as the absolute truth.

So under Rule 607, either party, including the sponsoring party may, impeach the witness. I don't think this





is necessarily complicated.

If the Court's ruling is still that we will convey the immunity order to her outside the presence of the jury, I will follow that order. The proffer letter is a different matter. And I just wanted to raise that to see if Court felt similarly about the proffer letter. We are not going to introduce it. It's going to be a couple very short questions. It's just that it happened and that was her understanding of that.

MR. FROCCARO: Judge, with all due respect to him, the statute of limitations has run for years. There's no reason for the immunity. It's just to prejudice my client.

And the proffer agreement, I don't understand why it has to come in. She can simply testify that she was interviewed previously. I'm certainly not going to challenge the -- or bring out the fact that it was pursuant to a proffer agreement.

THE COURT: I'm going to reserve decision on this issue. Anything further that either party wants to tell me?

MR. DUNN: Briefly about the statute of limitations issue, Your Honor. I agree, it's five years for mail fraud and wire fraud, but she is represented by independent counsel who have had additional concerns, including money laundering. She handled all of the cash, checks, et cetera, related to this scheme and that's a ten-year statute.





MR. FROCCARO: Money laundering is a ten-year statute? No it's not. It's five years. It's not a ten-year statute. I've worked on enough of these cases, I know them.

THE COURT: At lunch, the Government can provide me authority if they think it's ten years.

MR. DUNN: Of course, Your Honor, I would be happy to.

THE COURT: Okay.

And I'm going to ask both sides to notify me of any cites supporting your position before Ms. Johnson is called so I can make a ruling on this issue. You don't have to write a legal argument. Just notify me of the cases that you think support your position --

MR. DUNN: Yes, Your Honor.

THE COURT: -- and I will look at them over lunch.

If we don't get to Ms. Johnson today, you can provide those to me by the end of the day and I will look at them later this afternoon.

MR. FROCCARO: Thank you, Your Honor.

THE COURT: Thank you so much.

With that, Mr. Morabito, we are ready for our jury.

THE COURTROOM DEPUTY: Judge, can I patch in the witness first again to make sure she's un-muted and all of that?

THE COURT: Yes.

THE COURTROOM DEPUTY: Can you hear us?
MS. PENCE: Testing.
THE COURTROOM DEPUTY: Can you hear us?
MS. PENCE: Yes, I can.
THE COURTROOM DEPUTY: Thank you. Please hold.
(Pause.)
(Jury enters.)
THE COURT: Thank you, everyone. You may be seated.
Good morning, jurors. I hope you are well rested. Again, we thank you for your service and for coming here on time today.
I had a few legal issues to work out with the parties, so thank you for your patience.
We are ready to go with a new witness who will be testifying remotely, and then we will return to Ms. Jacquard who we heard from yesterday.
Thank you so much.
And with that, I will turn it over to the Government.
MR. FELDMAN: Thank you, Your Honor.
The United States calls Pamela Pence to the stand.
THE COURTROOM DEPUTY: If the witness could stand and please raise your right hand.
(Witness testifying via videoconference.)
THE COURTROOM DEPUTY: Please raise your right hand.





(Witness sworn.)
THE COURTROOM DEPUTY: Please state and spell your name for the record and have a seat.
THE WITNESS: Pamela Kay Pence.
Thank you.
PAMELA KAY PENCE,
called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:
DIRECT EXAMINATION
BY MR. FELDMAN:
Q Good morning, Ms. Pence.
Can you hear me okay?
A Yes, I can.
Q If at any point you can't hear me during the questioning, just let me know, okay?
A Okay.
Q What town and city do you currently live in?
A Right now I'm in Williamstown, Kentucky, and I am originally from Williamstown, Kentucky.
Q How old are you?
A I'm 71.
Q I want to direct your attention to the 2015/2016 time period for a moment, if I could.
Do you remember receiving letters in the mail around that time about large cash prizes?





A Yes, I do.
Q So I want to make sure we're talking about the same thing, so I'm going to put a document that's been introduced as Government's Exhibit 63-OE on the screen and I just want you to tell me if you can see it okay.
(Exhibit published.)
A Okay.
Yes, I can. I need it brought back up larger again. I can see it when you first put it up there.
Q Okay. Great. I'm going to zoom in for you in a moment.
Looking at the letter that I just put on the screen, is this an example of the mail that we were just speaking about a moment ago?
A Yes. Yes, it was.
Q I'm going to zoom in for you and I'm going to ask you a couple questions about the document.
A Okay.
Q Who is this letter addressed to?
A It was addressed to my PO box. After my mother died, I went to a PO box in Florence, Kentucky.
Q So it's addressed to you; correct?
A Yeah. For security reasons, 41022 for security reasons.
Q And what's the amount reported right under your name?
A Right under my name?
Q Yes.





A It looks like a million $200,000, if I said that properly.
Q I'm going to move the document up.
And do you see that there's a processing section in the document?
A Yes, I do.
Q And there's some handwritten checkmarks -- three of them -- on the left side of the document.
Do you see those?
A Yes. Yes, I do.
Q Okay. Did you add those checkmarks?
A Yes. Best I remember, I added those checkmarks, yes.
Q Do you see in the second paragraph under "completion," right next to your name, "By my hand below, I verify that I'm the Pamela Pence." you've written a note below that.
Do you see that?
A The note below it?
Q Yes.
A I believe I do. Where it said that I had a stroke and -- the handwriting was stroke handwriting affected by the stroke.
Q And so before we get to there, I was actually talking about the note immediately above it.
Do you see you added a notation next to your name? Right here.
A Oh. Yeah -- yeah.

Q What does that say?
A I think I put a middle -- my middle name is Kay, K-A-Y. It looks like that's what I put there, from what I can tell.
Q Thank you, ma'am.
You already answered my next question, which is this note down here that you added below your name.
Did you suffer a stroke at some point before the 2015/2016 time period?
A Before I -- before I wrote that, I had suffered a stroke due to sun basal cancer I had off and on on the main blood vessel on my face.
Q I'm sorry to hear that.
When you got this letter in the mail, what was your reaction to it?
A Well, when I got the fact that they hadn't really done what they said they were going to do, I asked them for my money back. They had asked for $20, which I thought was for handling and I asked for my money back.
Q Handling of what?
A I didn't hear you on that one.
Q No problem. I will repeat it.
You said you thought the $20 was for handling. What did you think it was for handling --
A Right.
Q Handling of what?





A Well, like when you put money in a bank, they require $50 to open an account. I thought that was part of opening the account and I thought it was for some of the handling of the paperwork.
Q So you said a moment ago they didn't do -- they didn't do what they said they were going to do. How did you interpret this letter? What did you think it meant?
A Well, they didn't send me a check and they didn't put the money in the bank. They didn't offer to put it in the bank. So I said, if they're going to give me that -- if they're going to scam me, I want my $20 back because it doesn't seem real.
Q So when you paid the $20, you thought you had won the $1.2 million prize?
A Right. Right. I was going to use that for running for public office.
Q After you paid the $20, do you remember if you received other letters that were similar to the one that's on the screen right now offering large cash prizes?
A I did try for other sweepstakes, but it wasn't similar to this one. It was United Purchasing Exchange, and they said I won a sweepstakes with them and they -- they did mail me my suitcases, but the only way you could use what your award was is if you bought something. I did buy those suitcases. They are in my -- in my Toyota in my trunk of my car, those





suitcases are.
Q And so, ma'am, at some point, you indicated a moment ago, you realized that you didn't get the prize; correct?
A Yeah, they -- they hadn't sent it to me, they hadn't sent me a check. They didn't send me no more information. To the best of my knowledge, they didn't send me my $20 back, but I had a stroke and I don't recall getting back anything at all and it didn't go in my bank account in any way, shape, or form.
Q Okay. I am going to switch documents here and ask you a couple more questions, okay?
I'm now putting on the screen --
THE COURT: Mr. Feldman, I'm going to call a brief sidebar.
(Sidebar.)
(Continued on next page.)





(Sidebar conference held on the record out of the hearing of the jury.)
THE COURT: Before you go to the next document, you've echoed the witness's answer twice. You are not to do that. I instructed you about that at my pretrial conference. You are not to echo the witness's answer.
MR. FELDMAN: Okay. I will not do that.
(Sidebar ends.)
(Continued on next page.)

(In open court.)
BY MR. FELDMAN:
Q So Ms. Pence, I'm going to put on the screen a document that's been introduced into evidence as Government's Exhibit 64-OE?
(Exhibit published.)
A Okay.
Q Whose handwriting is on that document?
A Yes, that's my handwriting on that document.
Q Can you read that note to the jury?
A Yes, I can.
I, Pam, I want my $20 back.
And if I read below that, they said: Your scamming me.
Somebody told me they're scamming you. And I put on the side of that nobody scams -- in other words, nobody scams me and they're not going to get by with it. I'm for God's justice.
Q Okay. I'm going to flip the exhibit over and go page 2 here.
Whose handwriting is on that page?
A That is mine. After I had that stroke, I did put that.
Q So can you --
A That's my handwriting.
Q Can you read that page into the record?





A Yes, I can.
Avoid a lawsuit. I want money back. And I put my initials PK Pence. That's for Pamela Kay Pence. PK Pence is my initials.
Q Thank you.
A And I circled it.
Q After you wrote these notes, do you remember if you got refunded the $20 that you sent earlier?
A I have no recollection of getting $20 back.
Q Is it possible that the company or a company sent you a $20 check years ago and you don't remember it?
A With having a light stroke, it could have went to my mother's mail -- mailbox. I don't know. My mother died in 2014 -- or -- 2013. I stand corrected. 2013 is when she passed, so at that point, that's when I went to the PO Box 6652, Florence, Kentucky 41022 for security reasons.
Q So, Ms. Pence, did you ever win any type of cash prize in response to the $20 that you sent in?
A Not that I recollect. I do not remember any of that.
MR. FELDMAN: No further questions, Your Honor.
CROSS-EXAMINATION
BY MR. FROCCARO:
Q Can you see me, Ms. Pence? Ms. Pence, can you see me?
A I see a small area. That's not brought up close.
Q My name is James Froccaro and I represent the defendant





here, Philip Priolo.
Can you hear me?
A Yes.
Q Okay.
Madam, just a few moments ago you talked about how you had a stroke and how it had affected your memory that you're not remembering things; correct?
A I just don't remember getting that check at all.
Q But you said --
A So I don't remember that.
Q But you said just a few moments ago that it was because of your stroke, that your stroke had affected your memory; correct?
A It -- I just don't remember getting a check, so I'm assuming that the stroke might have -- might have, but I don't remember cashing that check or getting a check in any way, shape, or form.
Q So the stroke only affected your ability to remember whether you got a check, but nothing else from nine years ago?
A It affected me like I didn't remember two of my brothers' birthdays after the stroke. It was almost like a little slight amnesia. That's the only thing. I remember most everything, but I didn't remember by brother Ronnie Mae's birthday. I didn't remember Terri's birthday. But it came back to me one day. And I said, "Weren't you born in January,





Ronnie?" to my brother.
And he said, "Yes, that's the month."
"Terry is born in September."
And he said, "Yes."
So my memory has come back to me on that kind of a basis.
Q Except for the check?
A I couldn't remember how to play -- I couldn't remember how to play the piano, so it attacked this side of my brain, if you can see me, so it did affect some things, but not all my -- I got -- I've got long-term memory and I've got the short-term memory back. I can't play the piano like I used to.
Q But you can't remember whether you got a check; correct?
A I don't remember that check at all.
Q Ms. Pence, you were approached and interviewed by postal inspectors about this for the very first time last month where you reside in Kentucky; correct?
A If I heard you right, I do reside in Kentucky, yes.
Q You didn't hear the rest --
A I have lived on both sides -- I have lived on both sides of the river, but I don't remember having an address in Ohio when I got my first job there.
Q Ma'am, what I'm asking --
A But I am a Kentucky girl. I am a Kentucky girl.

Q Ma'am, what I asked you was you were first approached by the postal inspectors in connection with this case for the very first time about a month ago.
Do you recall that interview?
A Yes, I do.
Q Okay. Are you --
A Yes, I do.
Q Are you aware that they wrote down what you told them during that interview?
A I'm sure they wrote it down or were listening to me or recorded it, I'm sure of it.
Q They showed you this document --
MR. FROCCARO: And I'm going to place it on the screen, Your Honor.
A Okay.
THE COURT: Which exhibit is this, sir?
MR. FROCCARO: This is Government's Exhibit 63 --
MR. FELDMAN: 63-0E.
MR. FROCCARO: Did you hear that, Judge?
THE COURT: Yes, I did. Thank you. Government's Exhibit 63-OE has already been admitted.
Thanks.
(Exhibit published.)
BY MR. FROCCARO:
Q Mr. Feldman showed you this document which is entitled





Authorized Receivers Certificate that you had received sometime in the year 2016.
Do you recall him showing that to you, madam, a few moments ago?
A I remember them showing what they're showing here. What they're showing me now on the screen, I remember seeing that.
Q And the postal inspectors, when they interviewed you about a month ago, they showed you this same document; correct?
A Yes, they did. Yes. I do remember that.
Q Okay. You told the postal inspectors that you recalled receiving the letter, this certificate, a long time ago, and that you knew you had sent money as a result of receiving it.
Yes?
A I sent 20 -- yes. I sent $20 for the handling to receive that money.
Q Okay. Right.
So you told them that you had sent the $20 because you believed it was meant to pay shipping and handling of your prize money; correct?
A Right, right. Plus putting that in a bank.
Q Ma'am, if you can just look at the document, I'm going to focus you at the -- right above your signature why it says, Pamela Kay Pence, please sign. It says in the box that you checked nine years ago: I have enclosed the required $20





report fee for all of the monies and prize directives to me.
So you were -- you checked that the money was provided for a report fee; correct?
A Can you blow that up so I can read that?
Q Sure.
A It's small print at this particular moment.
Q Can you see it now?
If you can read it out loud for the ladies and gentlemen of the jury, please.
A If you can make that a little larger, I would appreciate it.
Q Sure, I'll try.
A My eyes are watering. I have severe allergies. I'm sorry.
Q Can you see it now?
A I will try -- yes, I will try to read it.
Yes, I, Pamela Pence, am --
Q No. Ma'am, ma'am, right above where your signature is, so to save you some time. It starts with "I have enclosed."
A I'm sorry, I don't -- my eyes are blurry. I'm not sure I know even where you're at at this particular point.
Q I'm going to point to where you start. Right there.
You see it?
A Okay.
(Continued on the following page.)





BY MR. FROCCARO:
Q. If you could read that out loud and the box that you checked?
A. Okay.
I have enclosed and then it gets blurry, sir. I have enclosed and then -- for all of the moneys and prize --
Q. Ma'am --
A. I think it says prize --
Q. I'll try --
A. Anyway, it's blurry to me.
If you could read it to me it would be better.
Q. Okay.
It says, again, I have enclosed the required $20 report fee for all of the moneys and prize directives to me.
You gave the $20 for a report fee, madame, not for shipping and handling.
A. Yes.
Q. Okay.
A. Okay.
Q. Now, with respect to these handwritten notes, and I'm going to place them on the screen, madame, where you said --
A. Okay.

Q. -- to avoid a lawsuit, I want my money back and this other letter over here, when you were interviewed by the postal inspectors a month ago, you told them that you believed you saw a news story about scams and realized that the mailing you had received a while back was probably a scam.
Do you recall telling them that, madame?
A. Yeah, when I sent this I didn't think it was going to be a scam.
When they didn't send me the money then they had told me they were scamming me.
Q. Madame, I'm going to go a little slower because perhaps you are not understanding my question.
When you were interviewed by these postal inspectors one month ago, you told them that you believe you saw a news story about scams and that made you realize that the mailing you had received and sending this $20 check into was probably a scam.
Isn't that what you told them, ma'am?
A. To the best of my knowledge, the best I can remember, I can remember talking about the scam, yes.
Q. You told them exactly what I just said, correct, ma'am?
If you need something to refresh your recollection about what you told them, there is a document





that I believe is with you. It's been identified as Government Exhibit 3500-PP2. If you take a look at it and read it if you need it to refresh your recollection that that's what you told them take a look at it, unless you are telling me that that is what you told them a month ago.
A. That's what I told them a month ago as best I can remember.
Q. Okay, ma'am.
Ms. Pence, has anyone from the government ever shown you the mailing that you received which caused you to send your $20 in? No, right?
A. No.
Somebody told me that they were scamming me, and --
Q. Ma'am, if you can just answer my question, please.
Has anyone from the government ever showed you the mailing that you received which caused you to send your $20 in, yes or no?
A. I don't recall ever really what you are saying exactly.
Q. So you don't recall them ever showing you the document that you received in the mail.
This certificate --
A. They --





Q. -- is not the only document you received.
You received the promotion. That was the certificate was you sending in your $20 saying you wanted the report. That's what I'm asking. Nobody's ever showed it to you, right, ma'am?
You don't recall that in the last month.
A. I don't recall -- I don't recall at this particular minute, I don't recall that.
I just remember them saying --
Q. Ma'am, ma'am --
A. They are scamming you and I reacted.
Q. The government told you that they were -- that he was scamming you?
Is that what you are saying? The postal inspector --
A. I don't know that it was the government. I don't know that it was the government.
Somebody told me they were scamming you.
Q. Are you saying --
A. Because I didn't receive the money.
Q. Are you saying during your interview a month ago people told you you were being scammed because you didn't get your $20 back?
A. The paperwork that I have proves that I was being scammed.





MR. FROCCARO: Judge, I move to strike. That's unresponsive.
THE COURT: Sidebar.
(Continued on next page.)

(Sidebar.)
THE COURT: What is the basis for your motion?
MR. FROCCARO: I'm asking simple yes or no questions and she's bringing up other subject matters.
THE COURT: She's clearly having some difficulty understanding you.
You are using lengthy sentences.
MR. FROCCARO: I'll shorten them.
THE COURT: I'm not striking anything she has said so far and I'm also going to caution you that you are raising your voice.
I understand that --
MR. FROCCARO: I thought she can't hear.
THE COURT: Well, you are also doing it in a manner that is borderline argumentative.
MR. FROCCARO: Judge, really, that's not my directive, but it's cross.
THE COURT: I'm just cautioning you right now.
MR. FROCCARO: I'm cross-examining her.
(Sidebar concluded.)
(Continued on next page.)





(In open court.)
THE COURT: The application is overruled.
You may resume, Mr. Froccaro.
Q. Ms. Pence, did anyone in the last month show you any other paperwork other than the certificate, than this certificate from the government, other than what your --
A. Yes.
Q. -- your handwritten notes.
A. Yes.
They showed me that and I saw was mailed that material with FedEx.
Q. Okay.
Madame, I'm going to ask you a question. I'm going to put this on the screen.
MR. FROCCARO: We have agreed, your Honor, that it's going to be admitted as Defense Exhibit C.
MR. FELDMAN: No objection.
THE COURT: It is admitted.
(Whereupon, Defense Exhibit C was received in evidence, as of this date.)
Q. Ms. Pence, this is a consumer information document that accompanied the mailing that you received from my client's business which was part of the mailing you received that caused you to send the $20 in.
Have you ever seen it before, madame?





A. I saw it before when they showed me some paperwork but it's blurry now and I can't even read it.
I can't read it, sir. It's small and it's blurry.
Q. Can you read it now, ma'am?
A. It's all blurry.
Q. Can you read it now, ma'am?
I made it much bigger.
A. It's something regarding research.
Q. Okay.
A. I can tell that about it.
Q. I'm going to ask if you recall way back when you received the mailing if you recall reading this and hearing these statements in the promotion that you received.
At the top it says consumer information. It says:
NPF is a research and reporting service. We specialize in researching sweepstakes sponsored and conducted by corporate organizations with which NPF is completely unaffiliated. We have compiled these sweepstakes opportunities in a report which sets forth all no purchase entry requirements based on existing federal, state, and local regulations. Why you have not won any money or prize.





Ms. Pence, do you recall seeing that nine years ago when you sent in your $20, yes or no?
A. I don't really remember it.
Actually, I don't remember it. I did ask for my money back.
Q. Okay.
A. Because it didn't seem to be real.
Q. Okay.
A. But somebody says they give you something they should send it.
Q. Ma'am, I just have a few more questions.
All right?
A. Yes.
Q. Now, you testified a few moments ago that you have -- you couldn't recall whether you got your $20 back, correct?
A. Yeah, I don't remember getting $20 back.
Q. In your note that you sent, which I believe was in May of 2016, you made a request for a refund of your money.
Correct?
A. I'm sure I did.
MR. FROCCARO: Judge, I'm going to be placing on the screen Defense Exhibit D.
MR. FELDMAN: No objection.

THE COURT: It is admitted.

(Whereupon, Defense Exhibit D was received in evidence, as of this date.)

Q. Ms. Pence, this is a check that you received from my client's business on June 9, 2016, refunding your entire $20.

Do you agree?

A. I'm looking at what you are talking about.

THE COURT: Mr. Froccaro, why don't you make it bigger?

MR. FROCCARO: Judge, I don't know how to make it even bigger than that.

If somebody could help me. I know my limits.

A. I could see where it says Pamela Pence, PO Box 66524 Kentucky 41022 for security reasons it's due that my mother died --

MR. FROCCARO: Judge --

A. The address was changed that was in 2013.

MR. FROCCARO: Judge, my understanding is the government will stipulate she received this check.

THE COURT: Okay.

MR. FELDMAN: Can I confer with counsel?

THE COURT: Yes.

Hold on one moment.

(Whereupon, there was a pause in the





proceedings.)

A. I see the check.

I don't recall, check, getting the check.

Q. So in reality, within a month you got a full refund of the $20 that you sent to my client's company, correct?

A. I don't recall getting it at all.

MR. FROCCARO: I have no further --

A. If they sent it to me I didn't cash it, that I remember.

I don't remember cashing a $20 check.

Q. Understood, ma'am.

MR. FROCCARO: I have no further questions.

Thank you.

THE COURT: Thank you.

MR. Feldman, do you need redirect?

MR. FELDMAN: No redirect, your Honor.

THE COURT: Thank you.

Thank you, Ms. Pence.

THE WITNESS: Yes.

Thank you.

THE COURT: The government may call its next witness.

Mr. Morabito, you can take the witness off of Zoom.

MS. ENTWISTLE: The government recalls Cheryl





Jacquard.

THE COURT: Thank you.

(Whereupon, there was a pause in the proceedings.)

THE COURT: Ms. Jacquard, you remain under oath.

You took the oath with Mr. Morabito earlier this morning and you remain under oath. Please have a seat. Thank you, so much.

CHERYL JACQUARD,

having been previously sworn, resumed the stand and testified further as follows:

DIRECT EXAMINATION

BY MS. ENTWISTLE:

Q. Good morning, Ms. Jacquard.

A. Good morning.

MS. ENTWISTLE: Can I have Government Exhibit 138, just for the witness.

Q. Ms. Jacquard, what is this document?

A. This is an e-mail from April 1, 2015, from Phil Priolo to myself.

MS. ENTWISTLE: Move to admit Government Exhibit 138.

MR. FROCCARO: No objection, your Honor.

THE COURT: It is admitted.

(Whereupon, Government Exhibit 138 was received





in evidence, as of this date.)

MS. ENTWISTLE: Please publish for the jury.

(Whereupon, the above-mentioned exhibit was published to the jury.)

Q. And if you could read, starting the bottom half of the page, your e-mail from March 31, 2015 beginning, hi, Phil.

A. Hi, Phil. The charges per fulfillment will be $300. Let me know if you have a book designed yet. I can of course, do that and I can quote you if needed.

Call me tomorrow to discuss.

Q. And above that slightly can you read Mr. Priolo's response to you?

A. Our pieces go from $1,200,000 to $1,731,000, please confirm.

Q. And what does that mean?

A. It means in this case with a fulfillment booklet it would mean that the sweepstakes that are inside a booklet would have to be within those ranges of dollar amounts.

Q. And when it says our pieces, what are the pieces being referred to?

A. Those are mailing pieces, the documents that are being mailed out.

Q. Okay.

A. Solicitations.

Q. So the types of mailing pieces that we looked at proofs yesterday, NPF, the letter acronyms, those pieces?
A. Correct.
MS. ENTWISTLE: Can we pull up Government Exhibit 105 that was previously admitted side by side with Government Exhibit 138.
And for Government Exhibit 105, page three.
Q. Ms. Jacquard, on the left side of your screen I'm showing you the NPF mailing that we talked about yesterday.
Do you recall that?
A. Yes.
Q. What is the dollar amount of the NPF mailing?
A. $1,200,000.
Q. And, just to be clear, when we were discussing the e-mail in Government Exhibit 138, that's what you are referencing when it says a piece goes from $1.2 million to $1.7 million?
A. Correct.
Q. And what is the relationship between that number and the sweepstakes report?
A. The sweepstakes booklet reports, that number would -- the sweepstakes within the booklet would have to be at least that number or higher.
Q. Who taught you this system that the total value of





the sweepstakes report had to equal the number on the mailing piece?
A. Sean Novis.
Q. Was that type of calculation of the relationship between the value of the sweepstakes report and the sweepstakes of the mailing the same math used for Mr. Priolo's mailings?
A. Correct.
Q. And for Mr. Gary Denkberg's mailings?
A. Yes.
Q. And was that math the same for any of Sean Novis's partners that you did work for?
A. Did you say not the same or the same?
Q. Was that calculation the same?
A. Correct.
MS. ENTWISTLE: Please pull up already in evidence Government Exhibit 124, page four.
THE COURT: Counsel --
MS. ENTWISTLE: 121, page four, I apologize.
I misspoke.
THE COURT: 121?
MS. ENTWISTLE: Government Exhibit 121, page four.
THE COURT: Go ahead.
MS. ENTWISTLE: Thank you.





Q. And, Ms. Jacquard, do you remember this sweepstakes fulfillment booklet that we were discussing yesterday?
A. Yes.
MS. ENTWISTLE: And if we could zoom in again on the Kellogg's snacks Avengers sweepstakes.
Q. We discussed this yesterday and we won't go on at length but we want to understand.
When we discussed the line the approximate value of all prizes, $140,000, that's your understanding -- what is your understanding of that number?
A. That this sweepstakes, if they won all the prizes, or some of the prizes, the approximate value would be $140,000.
Q. And for this sweepstakes, are all of those prizes cash prizes?
A. The top one looks like it's for a 2015 Jeep Cherokee Limited, and the other one is a Marvel DVD set and the third one is a movie ticket.
So they would equal cash prizes, but they are actual physical prizes.
Q. Just to make sure I'm understanding the math, in this sweepstakes, for a person to win prizes valued at $140,000, they would have to enter and win all of the prizes, the Jeep Cherokee, 500 DVD sets and 2,000 movie tickets?





A. Correct.
Yeah, if they win $140,000, correct.
Q. Okay.
A. They would have to win all of that.
Q. They would have to win all those prizes?
A. Yeah.
Q. And looking back at the main document and, just briefly, I believe we looked at this and there are nine total sweepstakes in this document.
MS. ENTWISTLE: If you could just highlight the sweepstakes below, the Bass Master Fantasy Fishing Challenge Sweepstakes.
THE COURT: One moment.
Sidebar.
(Continued on next page.)

(Sidebar.)

THE COURT: Yesterday the witness testified that there were ten sweepstakes listed in the booklet and you said right now nine and that is a fact not in evidence.

MS. ENTWISTLE: Apologies.

THE COURT: You can reask the question.

MS. ENTWISTLE: Thank you, your Honor.

THE COURT: Thank you.

(Sidebar concluded.)

(Continued on next page.)





(In open court.)

THE COURT: I will strike that last question from the record.

Go forward, Ms. Entwistle.

MS. ENTWISTLE: Thank you.

If we could zoom back out.

Q. Ms. Jacquard, could you count the number of sweepstakes on this page of the sweepstakes mailing?

A. That looks like four.

MS. ENTWISTLE: And could we go to page three.

Q. And could you count the number of sweepstakes on this page.

A. It looks like six, I think.

Yeah, that looks like six.

Q. Okay.

And I'm not going to ask you to do math, but these two pages have all of the sweepstakes in this booklet.

A. Yes.

Q. Okay.

MS. ENTWISTLE: Going back to page four and if we could zoom in on the Bass Master Fantasy Fishing Sweepstakes.

Q. Do you see approximate total value of all prizes for this sweepstakes?





A. Yes.

Q. And what is that approximate total value?

A. $67,793.

Q. And what would someone have to win to win prizes totaling that value?

A. It's the total value of all the prizes.

So they would have to win each one of those.

Q. Okay.

For someone to win the total value of prizes in this sweepstakes report, as you were taught to calculate that value, what would that person have to win?

A. The $1,200,000, right? Yeah.

Q. Right.

A. Which was on the mailing piece.

Q. So that value, what actual prizes listed in this sweepstakes fulfillment would that person have to win?

A. You mean as far as all of them, any of them?

Well, one of them is $1 million already.

Q. Let me ask my question a different way.

How are you taught to calculate the value of this sweepstakes report?

A. Well, each one of them has a total dollar, you know, grand prize amount.

So you would look at each grand prize amount.

Q. And add them up?





A. Yes.

Q. And so for a person to win prizes equalling that $1.2 million, would that person have to win just one of these sweepstakes?

A. Well, maybe a partial of each one, or maybe -- one of them is $1 million already, like I said, the Quicken Loans one.

And then you can look and see all the others that have other amounts that you could win. So it could be -- it could be one from each one.

Q. Okay.

MS. ENTWISTLE: Moving on to Government Exhibit 176 just for the witness.

May I approach, your Honor, to hand the witness one document?

THE COURT: Yes.

(Whereupon, there was a pause in the proceedings.)

Q. Ms. Jacquard, I just handed you a copy of Government Exhibit 176OE.

What is this document? Feel free to open it and take a look and read through it.

A. It's a fulfillment mailing piece.

Q. Does this appear to be a different sweepstakes report but similar in kind to the one we have just been

discussing?
A. Yes.
MS. ENTWISTLE: Move to admit Government Exhibit 176 OE.
MR. FROCCARO: No objection.
THE COURT: It is admitted.
Thank you.
(Whereupon, Government Exhibit 176 OE was received in evidence, as of this date.)
Q. Ms. Jacquard, could you just hold up that document and show the jury how it would be folded to be mailed.
And could you just state briefly in words for the record a description of how that document would be folded to be mailed.
A. It would be a tri-fold and it would be mailed like that.
Q. And, Ms. Jacquard, viewing that document, what contact information for the company sending the sweepstakes report is on that document?
A. The contact -- what do you mean by the contact, the name and address?
Q. Any contact information for the company.
A. Oh, the fulfillment center, PO Box 27 Plainview, New York, 11803.
MS. ENTWISTLE: And could we display the digital





copy for the jury of Government Exhibit 176.
Please zoom in on the top half.
THE COURT: This is Government Exhibit 176?
MS. ENTWISTLE: 176, your Honor.
THE COURT: Sidebar.
MS. ENTWISTLE: I'm happy to use the document camera but this seemed easiest.
THE COURT: This document has not yet been admitted.
MS. ENTWISTLE: I admitted OE.
I move to admit the digital exhibit as well, your Honor.
THE COURT: It's admitted.
MR. FROCCARO: I had no objection anyway.
THE COURT: Thank you.
MS. ENTWISTLE: Thank you, your Honor.
(Whereupon, Government Exhibit 176 was received in evidence, as of this date.)
Q. So, Ms. Jacquard, the contact information you were referencing was this information in the top left, fulfillment center, PO Box 27 Plainview, New York?
A. Correct.
Q. Is there any other contact information on this sweepstakes report, front or back side?
You can look at the one in your hand. That's





just a copy for the jury that we are projecting.
A. No.
Q. Is there any other company name?
A. No.
Q. Are there any of the three-letter names of any of the mailing pieces we discussed yesterday?
A. No.
Q. So how would a person who received this report in the mail know why they were receiving it?
What payment they were receiving it as a fulfillment for?
A. I don't know.
Q. So if a person had sent payments in response to ten of Mr. Priolo's mailings, how would that person know which of those payments this piece of paper was connected to?
A. I don't know.
Q. What if a person sent payments in response to five of Mr. Priolo's mailings and five of Mr. Sean Novis's mailings?
How would that person know which of those payments this piece of paper was connected to?
A. I don't know.
MS. ENTWISTLE: May I approach to retrieve the document, or we can just leave it, your Honor, however you prefer?





THE COURT: Yes.
Is there any objection from the defense on this?
MR. FROCCARO: No.
THE COURT: Yes, go ahead.
MS. ENTWISTLE: Government Exhibit 137, just for the witness, and just the top half.
Q. What is this document, Ms. Jacquard?
A. It's an e-mail on March 31, 2015, from Phil Priolo to me.
MS. ENTWISTLE: Move to admit Government Exhibit 137.
MR. FROCCARO: No objection.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 137 was received in evidence, as of this date.)
MS. ENTWISTLE: Please publish for the jury.
(Whereupon, the above-mentioned exhibit was published to the jury.)
Q. Ms. Jacquard, can you read your e-mail from March 31, 2015, beginning hi, Phil.
A. Hi, Phil.
The charges per fulfillment will be $300. Let me know if you have a book designed yet. I can of course do that and I can quote you if needed. Call me tomorrow to discuss.

Q. And above that can you read Mr. Priolo's response to you.
A. I spoke to Sean. We will be using the same fulfillment that you are using.
Thanks.
Q. What does that mean?
A. I believe it means that he's using the same type of fulfillment that Sean's using.
Q. And is the fulfillment in this business the sweepstakes report we were just talking about, that's what the word fulfillment means, a sweepstakes report?
A. Right, a type of sweepstakes report.
Correct.
MS. ENTWISTLE: Government Exhibit 134, just for the witness.
Q. Ms. Jacquard, what is this document?
A. This is an e-mail from May 8, 2015, from myself to Jeffrey Novis and Phil Priolo.
MS. ENTWISTLE: Move to admit Government Exhibit 134.
MR. FROCCARO: No objection.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 134 was received in evidence, as of this date.)
MS. ENTWISTLE: Please publish for the jury and





please show the bottom half of the page.
(Whereupon, the above-mentioned exhibit was published to the jury.)
Q. Ms. Jacquard, can you just read for the jury who this message at the bottom of the page is being sent from and to?
A. It's being sent from me to Jeffrey Novis and Phil Priolo.
Q. And the subject line of the e-mail?
A. I just sent you an e-mail about your fulfillment.
Q. And then please read your e-mail.
A. Please review pricing and let me know how you want to proceed. .435 per piece for first-class postage.
It's how we have always been instructed to mail the newsletters. I agree, if these mailings are not time sensitive, then we would process standard mail. I would estimate a .15 to .17 cents savings per piece in postage by mailing standard mail.
Q. That's fine. You can stop there.
What is first-class postage?
A. A first-class postage is a higher postage and it makes the mailing piece get wherever it's going faster.
Q. And what is standard mail?
A. Standard is just the standard mailing, how many days it would take for a piece to get to wherever, a piece of





mail to get to wherever it needs to go.
Q. And would standard mail get there faster or slower than first-class postage?
A. Slower.
MS. ENTWISTLE: And if we can go to the top of this document.
Q. Can you read your next e-mail to Jeffrey Novis and Phil Priolo.
A. Hi, Jeff. Per our conversation, GP will discontinue using envelopes and mail this standard now.
Q. And do you know who GP is that it's referencing?
A. No.
Q. Or can you tell from context?
A. I can't remember what that GP stood for.
Q. Okay.
And who would be using envelopes and mailing things in this process generally?
A. The letter shops.
Q. So is it reasonable to conclude that GP in this context would be a letter shop?
A. You can assume that, yeah.
Q. What does it mean they will discontinue using the envelopes?
A. It sounds like they were probably putting the fulfillment in an envelope at one time and now they are no





longer doing that.
Q. So how would you mail something without an envelope?
A. The way that you just saw that tri-fold, the way it was folded.
It looks like that would be without an envelope and then they would just seal it with little tabs.
Q. And if this is being mailed standard now, would that arrive to the customer faster or slower than first-class postage?
A. Slower.
MS. ENTWISTLE: And zooming back out.
Q. Based on your e-mail at the bottom, what was the savings to Jeffrey Novis and Mr. Priolo of sending this standard mail?
A. The first class is .435 and it looks like it would be -- .15 -- oh, there is a .15 to .17 cents savings per piece.
So they would be saving, like, .17 cents per piece.
Q. For every sweepstakes report they send out?
A. Correct.
MS. ENTWISTLE: Government Exhibit 112, just for the witness.
MR. FROCCARO: No objection.
THE COURT: It is admitted.

(Whereupon, Government Exhibit 112 was received in evidence, as of this date.)
MS. ENTWISTLE: Please publish for the jury and please go to page two.
Actually, go to page one just to give Ms. Jacquard a chance to see what it's attached to.
(Whereupon, the above-mentioned exhibit was published to the jury.)
Q. What's the subject line of this e-mail, Ms. Jacquard?
A. WCS proof.
Q. And who are the recipients of this e-mail?
A. Myself, Jeffrey Novis and Phil Priolo.
MS. ENTWISTLE: Please go to page two.
Q. What is the dollar amount on this mailing?
A. $1,392,892 and -- is that 45 cents? It looks like 45 cents, right?
Q. And if you can read it here or --
MS. ENTWISTLE: Can we just have the left side of the page, actually.
Q. Can you read, and we can make it bigger if you need to, the first paragraph, this is an urgent attempt to inform you?
A. This is an urgent attempt to inform you of -- inform you of your declared status with regard to the over $1,392,892.45 US dollar figure. So far your luck is





holding.
Our firm has decided to notify you in writing that you have received this official letter of advisement with instructions for claiming of said moneys that may be available to you. Amount $1,392,892.45 about to be awarded.
Q. All right.
MS. ENTWISTLE: And zoom back out.
Q. And I just briefly want you to look at the four bullet points.
Can you read the four bullet points, Ms. Jacquard?
A. No taxes withheld by US on any moneys awarded.
No fees extracted from any winnings by our firm.
No one else notified. If you wish to keep any money won secret from your spouse or family please consult your lawyer.
$1,392,892.45 about to be awarded.
Q. So that third bullet point, no one else notified, is that true, that no one else was notified?
A. I have no idea.
Q. What do you understand that to mean?
A. Yeah, I don't know. I don't know what it means.
I mean, it sounds like they are saying that no one else notified from their family or something. So it





sounds like this solicitation is only going to the person they mailed it to.
Q. And you didn't write these solicitations, Ms. Jacquard, the text of the mailings?
A. No.
Q. You didn't make any decisions about why certain words were put in the mailings?
A. No.
Q. And, very briefly, if we zoom back out, you see the signature in the bottom left of the page?
Can you read that signature?
A. It looks like T. Jarvey.
Q. And what is the title of that person?
A. WCS executive director.
MS. ENTWISTLE: And can we go to page four of this document, please.
Q. What is this, Ms. Jacquard?
A. This is a mailing envelope.
Q. So the outside envelope?
A. Yes.
Q. Do you see a signature appearing on this outside envelope?
A. Yes.
Q. Does that appear to be the same signature we just saw on the letter inside?





A. Yes.
Q. And, again, is this hand written on the envelope?
A. No, it's lasered.
MS. ENTWISTLE: Government Exhibit 114, just for the witness.
MR. FROCCARO: No objection.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 114 was received in evidence, as of this date.)
MS. ENTWISTLE: Please publish.
(Whereupon, the above-mentioned exhibit was published to the jury.)
Q. Ms. Jacquard, very briefly, can you read the subject line of the e-mail?
A. CBS proofs.
Q. And who is this being sent to?
A. Myself, Jeffrey Novis and Phil Priolo.
MS. ENTWISTLE: And page four of the document, please.
Please publish for the jury.
(Whereupon, the above-mentioned exhibit was published to the jury.)
Q. What is this document, Ms. Jacquard?
A. This is a mailing envelope, the outside envelope.
Q. Can you tell what mailing or what promotion this is

for?
A. It says CBS on the envelope.
Q. Where do you see that?
A. In the left-hand top corner and also down into the body below the official document, do not open over there, you see CBS.
Q. So in the top left corner, is that the return address?
A. Yes.
Q. And what is this text that you mentioned below the official document?
Do you know why that's on the form?
A. It looks like coding that tells it that it's a CBS envelope.
It's on outer envelope, OE.
Q. Just coding so you know what that document is?
A. Yeah.
Q. And to the right do you see a signature on this document?
A. Yes.
Q. Does that look like the signature that we were just seeing on the prior mailing?
A. Yes.
MS. ENTWISTLE: Go to page two, please.
Can you zoom in on the signature and title on





the bottom left.
Q. Ms. Jacquard, is that that same signature again?
A. Yes.
Q. And what is the title under that person's name?
A. CBS executive director.
Q. Did you work with anyone who is the executive director of CBS and the executive director of WCS?
A. No.
MS. ENTWISTLE: And zooming out just to the whole mailing.
Q. On the left side, can you read the large text at the very top?
MS. ENTWISTLE: No need to highlight.
A. Corporate legal notification.
Q. Is this document a corporate legal notification?
A. I don't know.
MS. ENTWISTLE: Government Exhibit 3 just for the witness.
Q. Ms. Jacquard, does this appear to be another copy of that same mailing we were just looking at?
A. Yes.
MS. ENTWISTLE: Move to admit Government Exhibit 3.
THE COURT: Any objection?
MR. FROCCARO: None.





THE COURT: It is admitted.
(Whereupon, Government Exhibit 3 was received in evidence, as of this date.)
MS. ENTWISTLE: Please publish.
(Whereupon, the above-mentioned exhibit was published to the jury.)
MS. ENTWISTLE: Government Exhibit 113 just for the witness.
Q. Ms. Jacquard, what is this document?
A. This is an e-mail from April 14, 2015, from Skip at Game Plan Advertising to myself, Jeffrey Novis and Phil Priolo.
MS. ENTWISTLE: Move to admit Government Exhibit 113.
MR. FROCCARO: No objection.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 113 was received in evidence, as of this date.)
MS. ENTWISTLE: Please publish and move to page two.
(Whereupon, the above-mentioned exhibit was published to the jury.)
Q. What appears here at page two?
A. This is a lasered mailing piece.
Q. Can you tell what mailing it is?





A. CPC.
MS. ENTWISTLE: Government Exhibit 8 just for the witness.
MR. FROCCARO: No objection.
MS. ENTWISTLE: Government Exhibit 8 move for admission.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 8 was received in evidence, as of this date.)
MS. ENTWISTLE: Please publish for the jury.
(Whereupon, the above-mentioned exhibit was published to the jury.)
Q. Is this, Ms. Jacquard, just another copy of that same CPC mailing we were looking at?
A. Correct.
MS. ENTWISTLE: Government Exhibit 115, just for the witness.
MR. FROCCARO: No objection.
MS. ENTWISTLE: Move to admit Government Exhibit 115.
THE COURT: It is admitted.
(Whereupon, Government Exhibit 115 was received in evidence, as of this date.)
MS. ENTWISTLE: Please publish and go to page two.

(Whereupon, the above-mentioned exhibit was published to the jury.)
Q. Ms. Jacquard, what is this document?
A. This is a lasered mailing piece.
Q. Can you tell which mailing piece it is?
A. From my experience it's AAA.
Q. And can you please read the large black text at the top?
A. Aggregate $1,675,000 major money awards.
Q. Can you please read the text beginning Martha Lugo eligible awardee?
A. Martha Lugo, eligible awardee, 100 percent proof positive nominated as 100 percent guaranteed feasible candidate.
MS. ENTWISTLE: Zooming back out.
Q. Can you read the paragraph just above the list of five names.
A. There is no mistake vie for $1,673,000 in United States dollars which are guaranteed to be awarded to abeyant candidates.
Q. And keep reading.
A. Martha Lugo, the clock is running out.
If for any reason you do not wish to have the $1,675,000 material sent to you, your name will be stricken from the list and one or more of the following





people receive the eligibility letter in your place according to entrants list.
Q. And then it lists one, two, three, four, five potential alternate winners.
A. Yes.
Q. And is that your understanding of how this mailing company you are working for worked, that if someone didn't respond there were alternate winners identified?
A. No.
MS. ENTWISTLE: Government Exhibit 14 just for the witness.
THE COURT: Before we move on, Ms. Entwistle, how much more time do you need with this witness?
I am thinking about our morning break for the jury.
MS. ENTWISTLE: Yes.
I believe I have maybe 15 or 20 minutes, but I have no problem giving the jury a break.
THE COURT: Let's take a ten-minute break for the jury.
Please stand.
(Jury leaves the courtroom.)
THE COURT: Thank you, everyone. Please have a seat.
Any applications from the government at this





time?
MS. ENTWISTLE: No. Nothing from the government, your Honor.
THE COURT: Mr. Froccaro?
MR. FROCCARO: No, your Honor.
THE COURT: Thank you.
Please take a break and I'll see you back here in ten minutes.
(Recess.)
(Continued on next page.)





(Continued.)
THE COURT: Before we bring in the jury, I want to ask. It seems that the parties are practically stipulating to the admission of the e-mails and mailings in this case. If the parties were to so stipulate, we wouldn't have to go through this process of showing the documents to the witness and admitting them.
Mr. Froccaro, do you have a position?
MR. FROCCARO: I had the discussion. I'm not -- there's no basis to object so why would I? Let's move, if we can. But, again, I don't want to tell them how to conduct their case.
THE COURT: Do you have a list the documents that fall under the, I believe it's Exhibit 110 that we looked at this morning.
MS. ENTWISTLE: I believe we can assemble that over lunch, your Honor.
MR. FROCCARO: It depends on the witness now. I know -- this witness I knew. But I prepare for witnesses as they go along. I do have one issue.
THE COURT: One moment.
Do you know which exhibits that you're using for the next 20 minutes? Do you want to stipulate to those and we can have them admitted?
MS. ENTWISTLE: Absolutely, your Honor.

THE COURT: What are the numbers?

MS. ENTWISTLE: Numbers are Government Exhibit 14, Government Exhibit 116, Government Exhibit 117, Government Exhibit 7. That's the original 117. Government Exhibit 122, these are e-mails with mailing schedules. Counsel is representing he has no objection, but I'll continue the list. Government Exhibit 123, Government Exhibit 124, Government Exhibit 125, Government Exhibit 301, Government Exhibit 133, and Government Exhibit 158.

THE COURT: Okay. You have no objection, Mr. Froccaro? They're all mailings.

MR. FROCCARO: I have none. Judge, I have one question. It's an issue that may come up with Johnson, but I don't know the answer and I should have conferred with them beforehand. They're -- apparently, they want to introduce complaint letters from the 90's and 2000's. How are those coming in? You know, that's my -- how are they, number one, fair. How are they going to prove my client saw them and how do those come in?

THE COURT: Are these covered by my earlier Motion in Limine rulings?

MR. FROCCARO: They're not. It's something they sprung on me a day or two ago.

THE COURT: Ms. Entwistle, what's your answer





to that question?

MS. ENTWISTLE: For context, briefly, these were -- well, I'll let Mr. Dunn respond because he knows the details. I believe they were previously provided and we just focused Mr. Froccaro's attention on a couple of pages.

MR. DUNN: Yes, your Honor. I'm a little caught off guard by the objection. I agree that this type of thing was covered by the Court's previous order on, you know, background of the conspiracy type evidence. This is Exhibit 395. If memory serves, this was Exhibit 3 to the January 10th Motion in Limine. It was an oversight not to initially include it in our list of exhibits. And in the printed exhibits that were provided at the beginning of, or at the end of January. But this is part and parcel of the same evidence that the scheme back then. In that iteration ration was receiving consumer complaints of a similar nature and that, over time, they, you know, made no adjustments. And this includes, if memory serves from 395, Sweepstakes Advisory Network complaints, which is the company, as the Court will recall, for which Mr. Priolo was an officer or director. I forget exactly what the exhibits say.

THE COURT: There's just one exhibit at issue?

MR. DUNN: There's one issue with multiple





documents in. It's 395.

THE COURT: I'm not going to rule on that right now, you notified me, you've raised it, you notified me, thank you for doing that. I understand the Government, Ms. Entwhistle, did you move to admit Exhibits 14, 116, 117, 7, 122, 123, 124, 125, 301, 133, and 158?

MS. ENTWISTLE: I do move their admission, your Honor.

THE COURT: Mr. Froccaro, any objection?

MR. FROCCARO: No.

THE COURT: They are admitted.

(Government's Exhibit 14, 116, 117, 7, 122, 123, 124, 125, 301, 133, and 158 received in evidence.)

THE COURT: 395. Take a look at it right now. This is a 17 page document. Now, I don't know, I will have to look at my ruling to see if this is squarely covered. If you didn't attach it to your motion, then I didn't squarely address it in --

MR. DUNN: It was attached to the motion. My error was not initially including it in the trial exhibit disclosure. But we updated that, I forget exactly the date, approximately ten days ago.

THE COURT: Okay. And Mr. Froccaro?

MR. FROCCARO: My greatest concern is there's no proof whatsoever that my client has ever seen these. So





what probative value do they have? 403 should, you know, override that. We have enough complaint letters from the charged case that may be coming in.

THE COURT: Okay. I'll take a look at the document.

MR. FROCCARO: It would just be the same issue of hearsay as well, and I can't confront whoever is sending them in. It's the same argument I said before. And I apologize, I didn't focus on this early like Mr. Dunn said. I only learned it was going to be a government exhibit a few days ago.

THE COURT: I guess I'm just confused because I'm hearing from the Government that it was physically attached to the January Motion in Limine, the 404B motion.

MR. DUNN: Yes, your Honor, it was Exhibit 3.

THE COURT: Okay.

MR. DUNN: It was an oversight that we didn't include it in the production of trial exhibits initially.

MR. FROCCARO: That doesn't -- I didn't expect that as a trial exhibit. There's been millions of documents, Judge.

THE COURT: I guess the reason why I'm confused is that, if the Government attached it to the motion and the defense had the chance to object to it as proof of the uncharged conspiracy because that was the issue with the

January Motion in Limine, what information could the Government bring that was proof related to the uncharged sweepstakes from the late 90's and 2000's, then it was on the defense to raise a specific objection in opposition to that motion. And then, I could have ruled on it in my Motion in Limine.

MR. FROCCARO: Honestly, Judge, I was sick at the time. I don't remember what John did, I don't have the motion in front of me. That's the honest answer.

THE COURT: Okay. I'll take a look at it during lunch. What timing -- what's the intention of the party as to when they would use this?

MR. DUNN: This would be testimony of the postal inspector towards the end of the case. I don't think that's going to come up today, your Honor.

THE COURT: Okay. Okay. So we have some time, I will think about that today and I will give you a ruling tomorrow morning. On the exhibits that were just admitted; 14, 116, 117, 7, 122, 123, 124, 125, 301, is 33, and 158 a number of them have originals. Is the Government moving for admissions of the originals as well?

MS. ENTWISTLE: Yes, your Honor, if counsel has no objections.

MR. FROCCARO: I have no objection.

THE COURT: That's admitted.





MR. FROCCARO: Judge, what time is lunch? I forgot.

THE COURT: Well, it's supposed to be at 12:30 but I'm going to ask the jury if we can go a little bit longer because we've taken this break and worked on a couple of issues. And I know that you have some issues. You have a concern, Mr. Froccaro, with what time?

MR. FROCCARO: If I do, when your Honor is not looking, I sneak a little chocolate in my mouth.

THE COURT: You can sneak the chocolate when I'm looking, it's fine. Thank you.

Mr. Morabito, bring in the jury, please.

MR. FROCCARO: Thank you, Judge, I appreciate it.

THE COURT: Ms. Entwhistle, can you bring the witness.

MS. ENTWISTLE: Yes, of course, your Honor.

(Jury enters the courtroom.)

THE COURT: Everyone please have a seat. Before we continue, I will ask the jury. Normally, we will break for lunch at 12:30, which is in about 45 minutes. We took a little longer break than normal because I had to work out a couple of legal issues with counsel and it didn't make sense for you to come in here and wait with white noise on while I was doing that. I'm going to poll the





jury. Who would like to take a break at 12:30 for lunch, raise your hand, and the other option is to wait a little bit longer until 12:45. Who would like 12:30? Okay. 12:45? Okay, we will take our break at 12:45. And thank you all for being accommodating and understanding.

Continue with your questioning, Ms. Entwhistle.

MS. ENTWISTLE: Thank you, your Honor.

BY: MS. ENTWHISTLE:

MS. ENTWISTLE: Government Exhibit 116, which has been previously admitted, please publish and go to page two.

(The above-referenced exhibit was published to the jury.)

Q. What is this document, Ms. Jacquard?
A. This is a mailing piece.
Q. Can you tell which mailing piece it is?
A. PDA.

MS. ENTWHISTLE: And Government Exhibit 117, which has previously been admitted, just for the witness. I apologize, please publish. It's admitted; please publish and go to page two.

(The above-referenced exhibit was published to the jury.)

Q. Ms. Jacquard, what is this document?
A. It's another mailing piece.





Q. And can you read the large orange text up towards the top?
A. Notice of cash funds held in trust.
Q. And down on the lower half in the blue portion of the document, can you read the large blue text?
A. Participation for cash payment release.
Q. And text underneath that, just the italic text?
A. You are guaranteed access to cash payments totalling $1,731,000 per the directives you will be sent upon completing this form.
Q. Thank you, Ms. Jacquard.

Ms. Jacquard, I want to switch topics and ask you about mailing schedules. What is a mailing schedule?
A. It's a schedule that lists all of the mailings that are going out for the month by promotions mailing pieces.

MS. ENTWISTLE: Can I have Government Exhibit 122 previously admitted? Please publish.

(The above-referenced exhibit was published to the jury.)

Q. What is the subject line of this e-mail?
A. Winner circle schedule back end cutoff 4/1/15.
Q. Who is that e-mail going from and to?
A. It's going coming from Skip@Gameplanadvertising.dom to myself and CCing Jeff Novis and Phil Priolo.
Q. And if we can go to page three, please.

And what is this document on page three? This is the attachment to this e-mail.
A. This looks like a mailing schedule.
Q. Okay. And so, we're just going to go through, if you can read them at this size, the column headers along the top.
What is the column header on the left.
A. D date.
Q. What is the D date?
A. It's the drop date.
Q. What does drop date mean?
A. The mailing date. The date that it should be mailed.
Q. So make sure we're understanding. Underneath drop date, the first one 4/3/15, that's the date that mailing would go in the mail?
A. Correct.
Q. And what's the next column name?
A. Description.
Q. What's in that column?
A. That would be the name of the mailing piece and the price of what the mailing piece would be selling for.
Q. So all of the acronyms, the three letters in that column, those are all mailing pieces?
A. Correct.
Q. Okay.





And what's the next column?
A. File at shop.
Q. What does that mean?
A. That means that the file of data would need to be at the letter shop at that time.
Q. Okay. And the column next to that?
A. The key.
Q. What is the key? What does that mean?
A. It's a key code that is on the each mailing piece. That's how they track the piece.
Q. That's how who tracks the piece?
A. Whoever is tracking it. Usually, the caging person who is taking in the information.
Q. Okay.
So that key code would appear on every copy of that mailing piece; is that correct?
A. Yes. Correct.
Q. There's nothing in the weight or quantity column. So the next column after that, letter shop?
A. That would be the letter shop that would be lasering and mailing the piece.
Q. And then the final column says report amount and what do you see below that?
A. BE number one. Through 11.
Q. Okay. What does BE stand for?





A. Back end.
Q. Okay.
So to make sure it's clear. This the list of all of the back end mailings that would be mailed during this month during April of 2015?
A. Yes.
Q. And if we go back up to the e-mail at the top, just to make sure we have the company name right. So for Winners Circle, would these be all of the Winner Circle back end for that month?
A. Yes.
Q. For each of the different companies or individuals we've discussed that you were being the production manager for their mailings, would they each have their own mailing schedule?
A. Yes.
Q. So Sean Novis would have his own mailing schedule?
A. Yes.
Q. And Gary Denkberg would have his own mailing schedule?
A. Yes.
MS. ENTWHISTLE: Government Exhibit 123 that's previously been admitted, please publish.
(The above-referenced exhibit was published to the jury.)





BY MS. ENTWHISTLE:
Q. What's the subject line of this e-mail, Ms. Jacquard?
A. May 2015 US Winners Circle schedule.
Q. If we can go to the bottom of the page. So that's the first e-mails in the chain. Sorry, can you zoom out to the whole page so I can make sure I'm pointing to the right portion?
If you can read towards the top of the page where it says on Monday, April 20, 2015, from laser mail.
A. Read that e-mail?
Q. Yes.
A. Yes, we have everything we need. So who is doing the form, envelope, sign offs, and sign offs to laser? Is this done by Sheryl? Anthony.
Q. And then we're going to go to the response to that e-mail just above that. We'll get that so you can read -- so dated 4/20/2015.
A. It says, hi, Anthony. Please continue to send all correspondence to all and you and will receive your sign offs. Jeff Novis; Winners Circle International.
MS. ENTWHISTLE: Thank you. Government Exhibit 124 previously admitted. Please publish.
(The above-referenced exhibit was published to the jury.)
BY MS. ENTWHISTLE:

Q. Can you read the subject line of this e-mail?
A. Winners inventory update.
Q. And so going down first e-mail, so, on --
MS. ENTWHISTLE: Can I have the whole page, please.
Q. So on July 20, 2015, and we can just leave it as this size if the witness can read it.
On July 20, 2015, Sheryl wrote, hi Jeff, Phil. Can you read that e-mail?
A. Hi Jeff, Phil. Based on usage, you will need to order this for August.
Q. Okay. And keep reading.
A. NPF 80,000 all, BNO 25,000 all, GDM one page 25,000 all. Take price off the this piece to move up in the back end cycle. Note, the reason I'm saying to order the 25,000 now for the BNO and GDM back end piece is because it's working in back end cycle, and you will get a better price for printing. Please advise, thanks. And then Sheryl.
Q. What is Phil Priolo's response to you up at the top?
A. That's fine, please order it. Thanks.
MS. ENTWHISTLE: Government Exhibit 125 previously admitted, so please publish.
(The above-referenced exhibit was published to the jury.)





Q. If you can just look at the bottom half of the page. And so looking at the very bottom of the page, the bottom e-mail, who is that e-mail going from and to?
A. It's coming from Cathy Johnson to myself.
Q. Can you remind the jury who is Cathy Johnson?
A. She does, it's called caging. It's opening of the mail, sorting the documents, and sorting out the money and recording any responses.
Q. What's the subject line of the e-mail?
A. Feel Lucky activity.
Q. And what's the -- can you read the text? The e-mail?
A. Are you playing the same role for lucky that you currently play for winners?
Q. What is your response above that?
A. Yes, I am.
Q. And can you read Cathy Johnson's response to you just above that?
A. Okay. So I'll be requesting the spreadsheet from you to update everyday, like I do with winners.
Q. What spreadsheet is she talking about? What type of spreadsheet would you send back and forth with Cathy Johnson?
A. It would have columns on it that she would be entering in responses, and money into. And it would track. It looks similar to the mailing schedule, but it





would have more columns, which she would fill in.
MS. ENTWISTLE: Can we pull up Government Exhibit 158, previously admitted, so please publish.
(The above-referenced exhibit was published to the jury.)
Q. And can you see the to/from on this top e-mail?
A. Yes.
Q. Who is this e-mail from?
A. From Cathy Johnson at Preciseservicesinc@yahoo.com to winnerscircle@gmail.com.
Q. Do you see there are two attachments?
A. Yes.
Q. Can you read the file name of that first attachment?
A. Lucky 201609011524-34.XLS.
Q. What does dot XLS mean?
A. An Excel spreadsheet.
MS. ENTWISTLE: Please go to page two and maybe zoom in on the top half of the page.
Q. Does this look like that type of spreadsheet that you would send to Cathy Johnson for her to fill in?
A. Correct.
Q. We were looking at mailing schedules. What information on this spreadsheet is Cathy Johnson adding?
A. The dollar response, the zero response, the returns. The anything past, I would say, the -- I think anything





past the quantity, I think.
Q. Okay. So if we can highlight the columns or just, let's just go one by one since this has more information, we'll do it very briefly.
So description on the left, what's in that column?
A. That's the mailing piece.
Q. Okay. The mailing piece being sent out?
A. Mm-hmm.
Q. The D date?
A. That's the date it's being mailed, the drop date.
Q. The L shop?
A. That's the letter shop that the piece is being lasered and mailed from.
Q. What's the name of the letter shop here?
A. Did it.
Q. And the key?
A. Is the -- that's that code that they track the mailing piece with.
Q. And here I see a whole list of key codes, not just one. Why is there a whole list of key codes?
A. That's because there's multiple lists in that particular mailing.
Q. So this MMS is being sent to multiple mailing lists?
A. Right. It's mailing out to those names.

Q. And is there a term for a mailing list that would be sent --
MS. ENTWHISTLE: Let me ask the question a different way.
Q. Is that an indication that this is a front end mailing?
A. Correct.
Q. Okay.
So what is the key code tracking for a front end mailing?
A. The list of names that are being used for that mailing piece it's tracking.
Q. Okay /so it's tracking the MMS20 mails and, for the first line, and that's it's being mailed to the mailing list; the feel lucky house file; is that right?
A. That's correct.
Q. So continuing on from there, the next column.
A. Quantity.
Q. So that's how many specific names being sent out from that list?
A. Correct.
Q. And then next to that, the next column to the right?
A. From what I understand, those are the columns that are being entered. That looks like a dollar amount from the responses that are coming in.





Q. Got it.
So that's the additional data that Cathy Johnson doing the caging is filling in?
A. Mm-hmm.
Q. What time period would these mailing schedules you would send with Cathy Johnson cover?
A. This particular one looks like it's in June. So it would be the June mailings that month.
Q. Can we scroll down to page two? Page three. This is continuing on into July of 2016?
A. Correct.
Q. Page -- next page. So essentially it's covering multiple months. It's not just one month of mailing schedule, it's continuing on?
A. Right. These types of spreadsheets would be ongoing.
MS. ENTWISTLE: Government Exhibit 133 previously admitted. Please publish and just the top half of the page.
(The above-referenced exhibit was published to the jury.)
Q. The e-mail down below from Phil Priolo, can you read the text of that e-mail?
A. I'm over at did it. Can you give me an idea what we will net out for winners and lucky?
Q. Based on that last e-mail we were looking at, do you





know what did it is?
A. That's a letter shop.
Q. Okay.
So Mr. Priolo is saying he's at a letter shop. Is that your understanding of that first line?
A. Yes.
Q. And do you know what it means to net out? Where he says what we will net out for winners and lucky?
A. Yeah, I don't remember.
MS. ENTWISTLE: Okay. You can take down that exhibit, thank you.
Q. Ms. Jacquard, do you remember when you stopped working for Sean Novis?
A. I don't remember the exact date. Maybe 2012. Something like that.
Q. Very briefly, how did you come to stop working for Sean Novis? What happened?
A. We went to work one day and we couldn't go into the building so they told us that we couldn't go in, that was it. Company was being shut down.
Q. Who told you you couldn't go in?
A. There were people there with guns and badges and said you couldn't go into the office. And then later on, Sean had told us -- Sean told us and Gary told us that the company was being shut down.





MS. ENTWISTLE: Thank you, Ms. Jacquard. No further questions.
MR. FROCCARO: Judge, I just need one minute to get a couple of exhibits.
THE COURT: Okay.
CROSS EXAMINATION
BY MR. FROCCARO:
Q. Hi, Ms. Jacquard. My name is Joseph Froccaro and I represent Mr. Priolo. I'm going to have a few questions for you. If there's anything you don't understand, just tell me and I'll try to rephrase. It if I'm going too fast, I'll slow down, okay?
A. Okay.
Q. Thank you.
Ms. Jacquard, you have a lot of experience working in the direct mailing industry. Do you agree?
A. Yes.
Q. I mean, how many years would you say you've been working there?
A. I worked for a long time. Well over 20 years.
Q. Okay.
Including working for companies that were doing a type of promotion or solicitation where they're trying to sell something to a consumer through the mail, correct?
A. Well, the other companies I worked for, they did

different types of solicitations. Like CDs DVD's, coins. You know, things like that.
Q. That's what I was --
A. Yeah.
Q. That's what I was asking.
A. Yeah, yeah.
Q. People that want to sell things through the mail?
A. Yes.
Q. And, of course, you're familiar with the term marketing, correct?
A. Yes.
Q. People do things to attract attention so they can sell what they're promising their going to sell, correct?
A. Correct.
Q. You began working for Sean Novis and Gary Denkberg in the direct mail business in, I believe, around 2007 or 2008?
A. Yeah, 2007, 2008.
Q. You never met Mr. Priolo until, when would you say? Like, 2015?
A. Correct. Like, yeah, briefly.
Q. And your title while you worked for Sean and Gary was product manager, I think you said?
A. Correct.
Q. You provided the same production manager support





services to other outside direct mailers for a short period of time while you were working for Gary and for Sean, correct?
A. Yes.
Q. Including Mr. Priolo, correct?
A. Correct.
Q. I believe it was during the years 2015 and 2016; would you agree?
A. I'm a little fuzzy on the dates, but that might be in the ballpark.
Q. Mr. Priolo's businesses were bill for your services through EC Logistics, correct?
A. I don't remember.
Q. Just so we're clear and the jury is clear.
Mr. Priolo wasn't partners with Sean or Gary with their business. Essentially, what Mr. Priolo was doing, he was using his their support services, correct? In order to operate his direct mail business. He was using you, he would use Cathy Johnson if there was an occasion. He used Mary Lillenkamp who was in data. All of the people that worked for Sean and Gary, correct.
A. To my knowledge, I don't know what their full relationship was. I can't really say yes or no to that.
Q. But you know that Sean didn't own those businesses. Winner Circle and Feel Lucky was owned by Mr. Priolo,





correct?
A. As I'm going to say, again, I don't know for sure exactly what their relationships were. So I can't say yes or no to that.
Q. Well, can I just ask. All of the e-mails that Ms. Entwhistle showed you, Sean wasn't on any of them, correct?
A. Correct.
Q. Now, you provided support services to Mr. Priolo in connection with his own, like I said, separate direct mail entities. They were named Winner Circle, I believe, International Incorporated, and the Feel Lucky Group, Incorporated. You remember that, right?
A. Yes.
Q. They conducted promotions through the mail that were sent directly to consumers nationwide, correct?
A. Yes.
Q. Among other things, you were responsible for making sure that the correct mail pieces were being sent to the letter shops that were going to be mailed for Mr. Priolo, right?
A. Yes.
Q. You would also proofread, and I'm not suggesting you wrote anything. You proofread the pieces to make sure everything was wrote correctly, right?





A. Yeah. There would be certain parts of those mailings that I had to make sure were correct, based on the schedules.
Q. And in reviewing the pieces that be mailed to consumers nationwide, you always made sure the phrase; you have not won anything, was in there, right, Ms. Jacquard?
A. That was a line that was specifically added to mailings and made sure that it was in them.
Q. You made sure that --
A. For Gary and Sean.
Q. You made sure that what Mr. Priolo sent had that language in it?
A. I don't remember exactly if I checked his pieces also the same way.
Q. There was no difference in the way your services were provided to Mr. Priolo than to Mr. Novis or Mr. Denkberg, correct?
A. Yes. It was similar to them.
Q. And you proofread the documents for those phrases, correct?
A. I remember reviewing them for that phrase for Gary and Sean. I don't remember these pieces being proofed that way.
Q. Okay, but you may have?
A. Yes.

Q. It was embedded in you, wasn't it, that language; you have not won anything, had to be in every mail piece or promotion that went out, correct?
A. That's correct.
Q. Mr. Priolo never suggested otherwise, right?
A. No. Not that I know of, no.
Q. And all of the promotions which you were involved with and were mailed out nationwide, advised the consumer of cash and award opportunities, correct?
A. That was also another phrase inside the mailings, correct.
Q. So when Ms. Entwhistle took you through all of those promotions, she didn't even ask you that question once, correct? If you recall?
A. That's correct.
Q. She asked you about the three letter acronyms, correct? She asked you about the signatures at the bottom, remember?
A. Yes.
Q. All of these things that were part of the marketing process at these direct mailing places?
A. Yes.
MR. FROCCARO: I'm going to place a document on the ELMO. It's been previously admitted, your Honor, as Defendant's Exhibit C. Give me a minute to get into





focus.
THE COURT: It may be published to the jury, it's admitted.
(The above-referenced exhibit was published to the jury.)
Now, you recognize this document, right, Ms. Jacquard?
A. Yes.
Q. It's entitled the consumer information, correct?
A. Correct.
Q. It's a notice, a document, that informed every consumer who received a promotion nationwide in no uncertain terms that you have not won any money or prize, correct?
A. Is that line in there.
Q. Yes. If you go down, and if you can go down 1, 2, 3, 4 lines and on the right hand side, if you read it out loud, it starts with you have?
A. There it is, okay. You have not won any money or prize.
Q. And, again, that was -- every single mailing that went out, every single promotion that she showed you, had this consumer information notice in it, correct?
A. Correct.
Q. It was on its own little page in these big letters; if you recall?





A. Yes. Usually on the back of the first page, the page that the consumer would keep.
Q. There was nothing else, you know, on the page with it to detract attention from it?
A. Correct.
Q. Like you said, it's connected to the front page as well?
A. Correct.
Q. What this consumer information notice also advised every consumer nationwide that received it was that what was being offered was sweepstakes opportunities, including entry details and a report, correct?
A. Yes.
Q. If you can read that first, the first, I guess it's now the first two sentences, I believe it may be the first. And I'll tell you when to stop, if you don't mind, for the jury.
A. Start after NPF?
Q. If you could, please.
A. NPF is a research and reporting service. We specialize in sweepstakes sponsored and conducted by corporate organizations with which NPF is completely unaffiliated. We compile these sweepstakes opportunities in a report which set forth all, no purchase entry requirements, based on existing federal, state, and local





regulations. And then you go onto the, you have not won any money or prize.
Q. You can hold right there.
Now, this was standard language, like I explained, in every single one. Down below, and I'm going to direct your attention. I brought my own pen this time. I'm going to point right here, madam, if you can read this sentence out loud. Starts with this communication.
A. This communication is not a sweepstakes or a notification, and does guarantee that you will win any sweepstakes.
Q. Thank you.
Ms. Jacquard, whenever a consumer purchased a promotion or mailing, they always received a booklet with entry directives for a number of sweepstakes that a consumer could enter and possibly win, correct?
A. Correct.
Q. What is exactly what that consumer information notice says, correct?
A. Correct.
Q. And they called it a fulfillment book. Meaning, that it fulfilled Mr. Priolo's end of the bargain to the consumer, correct?
A. Yes.
Q. They gave him a small processing fee and they would

get the sweepstakes report book, correct?
A. Yes.
Q. And I know they talked about the number, but there probably would be about 10 to 12 separate sweepstakes listed in any of the books to the consumer to enter, and, along with the specific directives on how to enter each, correct?
A. Yes.
Q. The total value of a sweepstakes or fulfillment book was calculated in the aggregate on the value of them all together, right?
A. Correct.
Q. So I got this better this time. It was an aggregate accounting, correct?
A. Correct.
Q. Never lied, right?
A. Excuse me?
Q. Nobody lied about it, right?
A. No.
Q. Exactly.
And you would verify that the sweepstakes prize number matched the mail pieces to be sent out, correct?
A. I wouldn't be fully responsible for that. The person who was doing the research and sending in these sweepstakes would be sending them in. And someone would





be checking them. From time to time, it may have been something I may have done, but it wasn't a regular procedure of mine.
Q. You never heard a mistake where someone got an additional one, right?
A. No.
Q. And the question I have for you. You talked about this outside research place that would bring in -- they actually had somebody that was doing the research to make sure these sweepstakes were available, the people got the right entry directives, the numbers were right, etcetera?
A. Correct.
Q. So when Ms. Entwhistle showed you that $300 billing thing, that was for copying for something, right? It wasn't the research and everything that went into it, right?
A. I can't remember exactly what it entailed.
Q. Forget it. I'll move on.
Ms. Jacquard, when the mailings or promotions use language such as time sensitive mail and you have to respond quickly, there was a reason for this, correct?
A. Correct.
Q. And the reason was that the sweepstakes promotions all had expiration dates, correct?
A. Correct.





Q. So if the people didn't respond in time, their eligibility to enter that would have expired?
A. Correct.
Q. So that's why they were urgent, time sensitive, and all of these notations. That, again, was truthful, correct?
A. Yes.
Q. Ms. Jacquard, to your knowledge, whoever was creating the mail piece for a particular promotion decided what words were put on Mr. Priolo mailings, correct?
A. Correct.
Q. Yesterday during your testimony you suggested that the final say on what words went into Mr. Priolo's mailing pieces was he and Sean Novis. Do you recall that or maybe I didn't hear it right.
A. I just know that Sean was always involved in most of the day-to-day workings within his company. So anything that went through anything would go through Sean also.
Q. Okay.
Ma'am, did you ever make a prior statement under oath that Sean Novis ever reviewed any of Mr. Priolo's meaning, the Winner Circle or Feel Lucky Group mailings? Do you recall making that statement under oath?
A. No, I don't remember it.
MR. FROCCARO: Judge, I'm going to ask if I can





refresh. And, Judge, it's 3500CJ13 at pages 271 to 272 lines 23 through 21. And Judge, I'm going to put it on the screen for Ms. Jacquard.
Q. Ma'am, I'd like you to take a look at it and see if it refreshes your recollection that you made that comment.
THE COURT: That's only being shown to the witness.
MR. FROCCARO: Of course, Judge.
THE COURT: Thank you.
MR. FROCCARO: For now. If I can just have one second, Judge.
BY MR. FROCCARO:
Q. I don't know if you need to read the whole thing, so I'm going to point you to the exact location. Right here on line 19 through 20?
A. I can only see up to 17.
Q. It's really 19 through 21?
THE COURT: Can you push that up? She can't see it.
MR. FROCCARO: I'm sorry.
A. Okay. So read 19.
Q. Read 19 through 21?
A. So the --
THE COURT: Don't read it out loud.
MR. FROCCARO: Judge, I'm going to -- I'm going

to make you just read the whole thing. Judge, can I just approach?

THE COURT:

Q. Yes, please. It starts here and then you're just ending there.

THE COURT: Ms. Jacquard, don't read it out loud.

THE WITNESS: I understand now.

MR. FROCCARO: I just want you to review that, see if it refreshes your recollection, that's it.

THE COURT: Ma'am, don't say anything, just read the document.

BY MR. FROCCARO:

Q. After reading that, does it refresh your recollection that you previously testified under oath that you don't have any knowledge of Sean Novis ever receiving Mr. Priolo's -- reviewing Mr. Priolo's mailings?

A. Well, after reading that, there's other things in there that, I'm kind, of trying to remember. But we're not supposed to talk about that.

Q. Just, that all I want. Is that --

A. Yeah, so I from what that says in there, it says that I did say that he didn't. But my experience at the company is everything always went through Sean. So that's why I would be answering that way. But yes, that





refreshes my memory that I did say that.

Q. You previously testified under oath that Sean never reviewed the mailings?

A. Yes.

Q. And you were being truthful when you made the statements?

A. Yes.

Q. Ms. Jacquard, just a few more questions and we will be done.

You always believed that the mailings or promotions that you were involved in sending out to consumer nationwide were truthful, correct?

A. Yes.

Q. You believed that the mailings were selling booklets based on research of various sweepstakes and the people who purchased them were looking for this type of information, correct?

A. Yes.

Q. If the consumer wasn't happy for any reason, all they had to do was ask and their money would be refunded, correct?

A. That was the policy of the company, correct.

Q. It's right in the consumer information?

A. Correct.

Q. If somebody didn't want another mailing, all they had





to do was send in another envelope that said DNM; do not mail, correct?

A. Yes.

Q. They would be taken off the list forever?

A. Correct.

Q. One last question, ma'am.

I know you didn't handle data, Mary did. You know all they were provided with was the names and the addresses of the consumer, correct? To your knowledge?

A. Correct.

MR. FROCCARO: I have nothing further, Judge, thank you.

THE COURT: Thank you. Any redirect from the Government?

MS. ENTWISTLE: Can I just confer very briefly, your Honor?

THE COURT: Yes.

MS. ENTWISTLE: Just very briefly, Ms. Jacquard, then we'll get you out of here.

REDIRECT EXAMINATION

BY MS. ENTWHISTLE:

Q. When you -- were you ever in meetings with Sean Novis and Phil Priolo where they discussed the nature of their business arrangement?

A. No.





Q. At the time Sean Novis was directing you to do work for Phil Mr. Priolo, do you know what their business arrangement was?

A. No.

Q. To your memory, did Sean Novis ever give you direction related to work that you were doing for Mr. Phil Priolo?

A. Yes.

Q. And one other topic, Ms. Jacquard.

With regard to the fulfillment sweepstakes reports, I know we've discussed them a lot. Do you remember how often those were typically mailed out? Did they have their own mailing schedule?

A. I believe they did have a mailing schedule.

Q. And, generally, do you remember how often those were mailed out?

A. I can't remember exactly. But they had to be on a timely basis, based on when the mailings were coming back in, when people were purchasing.

Q. Was it every day, once a month, twice a month? Do you remember, generally?

A. I think it was probably once a month.

Q. Okay. So not in response to each individual order --

MS. ENTWISTLE: Let me rephrase.

Q. When a payment would come in in response to a

mailing, was it the process that immediately a sweepstakes report would be sent to that specific person immediately?
A. I don't remember it being handled that way. I think it was within a month or something. It wasn't like instantaneously.
Q. So within your memory, a sweepstakes report would go out roughly once a month?
A. Correct.
Q. So if an individual sent in purchases to multiple of Mr. Priolo's mailings in one month, if they made three purchases, what is your understanding of when they would receive three sweepstakes reports?
A. Within that month. If they bought that month, they would get it that month, after the month was over. If they bought it at the beginning of the month, they would get it at the end of the month.
Q. They would get three copies of the same sweepstakes report?
A. I don't know that.
Q. You don't know that. And, just briefly, and I can put it up if we need to. But you're an expert on mailing. The e-mail that we were discussing; standard mail versus first class mail. And standard mail you said was slower?
A. Correct.
Q. And I can pull it up if we need to. Can you remember





which speed of mail in that e-mail Winner Circle was selecting for their mailings?
A. I can't remember what was on that stamp.
Q. Let me just pull it up. One exhibit and then you're out of here, Ms. Jacquard.
A. Sure.
Q. I apologize. Government Exhibit 134, last document, and please publish. It's previously admitted then we'll get you out of here.

(The above-referenced exhibit was published to the jury.)

Q. If you can read the text of your e-mail to Jeff Novis and Phil Priolo at the top of the screen. Top half of page, just the very first text at the top of the page. Hi Jeff, per our conversation.
A. Hi Jeff, per our conversation, GP will discontinue using envelopes and mail this standard now.
Q. And the subject line of the e-mail?
A. Is I just sent you an e-mail about your fulfillment.
Q. So sending them standard mail, would that get the fulfillments to the customers faster or slower, Ms. Jacquard?
A. Slower.

MS. ENTWISTLE: Thank you, Ms. Jacquard, that's all I have.





MR. FROCCARO: Judge, I just have one follow up.

RECROSS EXAMINATION
BY MR. FROCCARO:

Q. Just real quick. You said Mr. Priolo didn't pay you, right?
A. No.
Q. Mr. Priolo was using their support staff. Do you know, and if you don't know, you don't know.
Cathy Johnson, do you know, Mr. Priolo didn't pay her either, correct? If you know.
A. I don't know.
Q. Mary Lillenkamp, Mr. Priolo didn't pay her, right?
A. Right, no.
Q. He was just using their support group. He was doing his own creative stuff, right?
A. Yes.

MR. FROCCARO: Thank you. No further questions.

THE COURT: Thank you Ms. Jacquard. You may step down.

(Witness leaves the witness stand.)

THE COURT: Thank you. We will now take a lunch break and I have my reminders for our jurors. Please do not speak with each other about the case. Any of the evidence you heard today or yesterday or earlier. Anything about this matter, the allegations, the counsel,





the parties, the court personnel, nothing about this with each other. Or with anyone else you know in any other way. Whether through the normal means of communication or electronic or otherwise. Please do not let anyone speak to you. So as you're coming and going from your lunch break, and stretching in the hallway as we encourage people to do. Please do not engage in any way, with the parties, the counsel, the witnesses, anyone having anything it do with this case, including me or my staff.

Do not read any news articles or listen to any radio or television reports, podcasts, anything about this case that you may come across outside of what's happening in this courtroom because your deliberations need to be focused only on the evidence that you're receiving through the witnesses and the documents that you receive here in court.

And again, no research or investigation about the case, or anyone associated with it, or anything that you're hearing about in any way on your own. You know, through Google, the internet or through any other means. Inform me immediately through Mr. Morabito if you have observed another juror violating any of these rules. Please hand him a note. And, again, if you have any concerns that require my attention, please communicate those through Mr. Morabito as well.

It is 12:45. We may have a couple of things to address with the attorneys. So I'm going to ask the jurors to come back here at 2:00 P.M. and you will get an hour and 15 minutes for lunch. And I thank you again for your focus and attention. And all of the notebooks should be left in your room, the jury deliberations room at all times, and Mr. Morabito will assist you in collecting them for safekeeping. Thank you so much.

(Jury exits the courtroom.)

THE COURT: Thank you, everyone, have a seat. I understand there are a number of outstanding applications and I want to make sure that we're all on the same page about what they are. One is the admissibility of exhibit, Government Exhibit 395, which I will address tomorrow. But I'm just noting for you that's on my list.

The other has to do with Ms. Johnson and whether direct questioning of her or cross examination could concern information about immunity or the Government's proffer. And I think what I need is just more precise information about what the relevance, what exactly the Government wants to question her about and what the relevance is, and I'll hear from the defense.

MR. DUNN: It is potentially impeachment information under Rule 607. Either side may impeach a witness. It doesn't matter if it's the sponsoring party





or not. We would like that information on the record and in front of the jury for any number of appellate reasons. And I wish offer Mr. Froccaro an apology. He was correct in the money laundering statute of limitations. It is five years. And in my edeled brain in the middle of trial, I times confuse RICO, the money laundering statute, they're right next to each other. I was thinking of was 18 U.S.C. 3293; financial institutional offences, which often comes up in this context, which includes Section 1341 or 1343, mail or wire fraud. If the affects the financial institution, that statute of limitations is ten years. And I would advise the Court's attention to United States V. Reyes. 2012 Westlaw 300379, which discusses that language from the statute. It's fairly, loosely interpretive.

THE COURT: Again, I'm not hearing that you want to elicit any testimony about the immunity grant or the Government's proffer on direct. It's only, should the Government wish to cross her later, for impeachment purposes; is that correct?

MR. DUNN: No. We would like to address it on direct.

THE COURT: So she's your witness. Why is her immunity grant or the Government's proffer relevant to her credibility? You're offering her as a witness. I'm still





not following your argument.

MR. DUNN: It is common practice to draw any sting out of potential witnesses testimony by fronting any credibility matters during their direct testimony. This is expressly permissible under Rule 607. Should Mr. Priolo -- I understand he has -- defense counsel represented he doesn't intend to cross on this point. But it could come up on appeal that he did not if Mr. Priolo is convicted. So we wish for that information to be on record.

THE COURT: Mr. Froccaro?

MR. FROCCARO: I got to be honest, Judge, in 35 years I have never heard -- he's worried about our appellate rights if I don't go into it? My client is here if your Honor wants to do an allocution. He understands what I'm doing. If they're worried about his ineffective assistance of counsel. I'm not going into it. If I did it, I opened the door and I would allow your Honor, and you can do whatever you want, I don't mean to phrase it that way, to give an instruction that they purposefully didn't disclose it because Mr. Froccaro represented he wasn't going to do that. I don't have a problem with it, that's how honest I am.

And with respect to his ten-year statute argument, how did this case affect a banking institution?





I could have opened the book and said oh, let's charge RICO, it's 20 years. There's no reason for the immunity, other than the fact they want the jury to hear she has criminal problems because she worked for him. And there's no reason to bring up the proffer. She's never been charged with a crime.

THE COURT: Okay. The Government is relying on a case United States versus Reyes. It was 2003 Westlaw 300379; is that correct?

MR. DUNN: Yes, your Honor. What I can briefly do during court, I haven't had a chance to do research on this. May I respond briefly to counsel?

THE COURT: I will let you respond, but I want to ask two questions. One is given where we are currently in the schedule with trial, we're not going to resume with witness testimony until 2:00 P.M. at the earliest. It is likely that Ms. Johnson would be called to testify today as opposed to tomorrow?

MR. DUNN: It becomes increasingly unlikely, but it is possible.

THE COURT: Well, I can also require you to not call her until tomorrow so I get sufficient information to resolve this information. I'm letting you know that. I don't want to make a decision that's not grounded in the law.

Mr. Froccaro, I understand that Mr. Edelstein is not here because his cat passed away. But I will allow you to provide an authority that you wish to on this issue as well.

MR. FROCCARO: He will be here. He's my legal beagle. He's my lexus. I'll be honest.

THE COURT: So the Government will have to substitute a different witness for today. Do you have somebody else on deck?

MR. FELDMAN: Your Honor, the witnesses we have that are going to be testifying in order are Ashley Seip. We don't expect her testimony to take -- I would estimate her direct examination testimony to be definitely under a half hour. It could be as short as 20 minutes. Marilyn Burks who is another -- I'm sorry. Ashley Seip is a victim relative. Marilyn Burks is a victim. We expect her testimony to be also under half an hour. And then Postal Inspector Joseph Bizzarro, who I would expect his testimony to be on direct anywhere between 45 minutes and an hour. So if we start at two, our best guess is that that would probably bring us somewhere close to 4:00 or 4:30.

Ms. Johnson was going to be our next witness. So we don't have, after Ms. Johnson, another witness that we would call, but I think we would be pretty close to the





end of the day.

THE COURT: I think this is an important enough issue that the defense gets a chance to respond to the arguments and the legal authority that you've notified me of. So we will end a little early today, if we have to. Ms. Johnson will not be called today until I can make that resolution.

This means that, Mr. Froccaro, I need any legal authority that you have by 6:00 P.M. today.

MR. FROCCARO: I got it, Judge.

THE COURT: Can you do it earlier?

MR. FROCCARO: It's not practical. If we end at 4:30, it takes me an hour to get home.

THE COURT: Well, you have Mr. Edelstein who is your legal beagle.

MR. FROCCARO: Can we get a little later? 7:30 or something like that, Judge. I know it's not fair to your Honor.

THE COURT: Exactly, because who is reading the late filings?

MR. FROCCARO: We will. I'll try my absolute best.

THE COURT: I'm going to require it by 6:30.

MR. FROCCARO: You got it. It may just require me to read their case. I don't have access to get that.





MR. DUNN: I wish to respond to the allegation that there is no reason for the immunity. This is not the Government's idea. This is a result of -- I began working on these cases in 2021. I reached out to Ms. Johnson's counsel then so that she could testify in the 2022 trial of Sean Novis and Gary Denkberg. We were refused. It was only a year ago that she agreed to talk to us for the first time. She is represented by very old counsel, Mr. Mark Durant, who is in the exhibit that we're not offering. But, if the Court wishes to reach out to him, the Court certainly could. Exhibit 168 and 169, he is the attorney who filed that certificate of service in 2016.

It was expressly clear that the only basis on which she would testify was if the Court ordered immunity. This is her independent legal advice. It has nothing to do with us.

MR. FROCCARO: Judge, I can answer that one in a second because I've dealt with this issue a lot. They should have given her immunity before the Denkberg trial. Are they kidding me? That's the same thing he's doing today. I don't know how he makes the arguments that he makes.

THE COURT: Regardless, the issue me is whether she has been given the grant of immunity now. And whether, you know, I have already issued an order





requiring her to testify here. The only question really is the scope of what can be asked of her, and I have heard of defense argument they believe there's a 403 issue. Right, Mr. Froccaro?

MR. FROCCARO: Absolutely.

THE COURT: That's the issue that I'm determining. So this relates to whether she can be asked, on direct or cross, about the grant of immunity, and also, about the proffer. And I see those as two separate but related issues, but they're also separate.

MR. FROCCARO: The issue is, Judge, because I've done a lot of cooperating witness cases is, I would want to do that to show my motivation for lying. I don't want to do that. It's not -- doesn't affect them at all. It only, potentially, can hurt me, but I don't want to go that way. So I don't know how the Government would be prejudiced in any way.

THE COURT: I'm having trouble seeing prejudice as well. I really am. Is there anything additional the Government wants to address on that point?

MR. DUNN: Not at this time, but if we might provide additional authority to the Court on the same timeline?

THE COURT: Well, are you going to have a different witness ready to go in the morning if you're

giving me authority so late that I don't have time to make a ruling on Ms. Johnson? And I will just note for the record, that these are issues that could have been raised with me far earlier than today, the day that you're planning on calling Ms. Johnson.

MR. DUNN: In my experience, your Honor, this is not unusual that we have this stuff in the direct examination. It was defense counsel who raised it today. This is normal.

MR. FROCCARO: I raised it a while back, I did. I was waiting for this answer.

THE COURT: I will let both sides provide any legal authority they wish. I'm not going to impose any page limits or anything. But I want Second Circuit authority on this issue; the scope of questioning that can be asked of an individual that's being called to testify under a grant of immunity and the scope of that, particularly, with respect to Rule 403 and the prejudicial or unfair prejudice that could result to a defendant. From disclosure that the witness was granted immunity.

And Mr. Dunn, you're telling me this is routine, and happens all of the time. I haven't looked at the law because the parties haven't shown it to me. I'm happy to look at it, I'm happy to look at Rule 607, which I believe you indicated is the operative rule here. 607?





MR. DUNN: Yes.

THE COURT: 607.

MR. DUNN: Impeachment of witnesses.

THE COURT: I'll look at 607, I'll look at United States versus Reyes, and I'll look at whatever both parties will provide to me by 6:30 p.m.

I'm going to instruct the Government you should have a different witness ready to go, in case she's not going to be our first witness at 10:00 a.m.

MR. FELDMAN: Yes, your Honor, we will.

THE COURT: Okay --

MR. FELDMAN: You're talking about tomorrow morning, correct?

THE COURT: She's not going to go today.

MR. FELDMAN: She's not going to go tomorrow morning. Sorry, I think I understand the Court. We will have a different person ready to go first thing tomorrow morning.

THE COURT: Exactly. Thank you so much, have a good lunch break.

(A recess was taken at this time.)



A F T E R N O O N S E S S I O N

(In open court; jury not present.)

THE COURT: I did look at the case that the Government provided, *United States vs. Reyes*, and that appears to go only to the statute of limitation question. It doesn't go to the question that I asked the parties to provide their authority on, which is the application of Rule 403 in the context of questioning a witness who has been compelled to testify on the basis of a grant of immunity, about the immunity grant, about any proffer from the Government, et cetera.

So that is what I'm really looking for, and I wanted to just pinpoint that because I'm not concerned about the statute of limitations question. I understand that the parties agree that the statute of limitations for money laundering, that would be at issue here, is five years.

Is that right, Mr. Dunn?

MR. DUNN: Yes, Your Honor.

THE COURT: Thank you so much.

So I just be wanted to put a fine point on what I am thinking about, so I'm looking for cases that are on point on that specific issue.

Thank you.

With that, we are ready to bring our jury in.





And, Counsel, in light of the time sensitivity and the fact that I want good briefing from you today, I am going to give you until 7:30 to provide your submissions, but they do need to be on time at 7:30.

MR. FROCCARO: Thanks so much, Your Honor.

MR. DUNN: Thank you, Your Honor.

(Jury enters.)

THE COURT: Thank you very much. Please be seated.

We will proceed with the Government's next witness.

MS. ENTWISTLE: The Government calls Ms. Ashley Seip.

THE COURT: Thank you.

(Witness takes the stand.)

THE COURTROOM DEPUTY: You can have a seat in the box, please.

Before you take your seat, I'm just going to need to swear you in. If you can just raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Please state your name and spell your name as you take your seat for the record.

Thank you.

THE WITNESS: My name is Ashley Seip, spelled

A-S-H-L-E-Y, last name is S, as in "Sam," E as in "elephant," I as in "igloo," P as in "Paul."

ASHLEY SEIP,

called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ENTWISTLE:

Q. Good afternoon, Ms. Seip.
A. Good afternoon.
Q. Where do you live?
A. I live in Williamstown, Kentucky.
Q. What is your profession?
A. I am a nurse for the VA in White River Junction.

THE COURT: Could you please raise the microphone a little closer to your mouth?

Thank you so much.

THE WITNESS: Is that better?

THE COURT: That is better.

Thank you.

BY MS. ENTWISTLE:

Q. Who lives with you in your household, Ms. Seip?
A. So I live in a duplex, and my daughter and my husband live directly with me and we have an adjoining door and I help care for my mother-in-law and my father-in-law.
Q. And do you have other family that lives nearby to





you?
A. Yes.

So my sister-in-law lives next door and then my parents and grandfather live nearby and I have a -- two sisters and a brother that live nearby.
Q. And what is your grandfather's name?
A. My grandfather's name is Wendell Brooks.
Q. And how old is your grandfather?
A. My grandfather is 86. He will be 87 this summer.
Q. And I assume he's retired?
A. He is retired. Still very active at times, but retired.
Q. And what did he do for a living when he was still working?
A. So the majority of his life he was in construction, carpentry, built houses, but he did logging for some time when he was really young, he did some farming. And then when he and my grandmother, like, officially retired, they didn't retire. They had a dog and cat boarding kennel on their property at their house that they took care of animals from.
Q. Have you always lived in close proximity to your grandfather?
A. Yes. So at a young age, we lived next door to my grandparents. And then when I was about 13 years old, the





roof on our home fell in, so my grandparents had my parents and the four of us children move in with them. And I lived there until I was in my early 20s. I went to college and started working and I met my husband and I moved out, but was always very close and lived nearby.
Q. And at some point, did you move back to move closer to your grandfather?
A. Yes. So in that statement, I always lived nearby except for about a year and a half when my husband had decided he wanted to become a truck driver and went to Indiana to take some schooling and become -- get his Class A CDL, so I followed him to Indiana where he got his Class A CDL and started working for a truck driving company. And I worked as a nurse out there.

And then my grandmother became very ill and had some lung issues and I was always very close with my grandparents, so when she -- it was clear that she was doing very poorly, I told my husband I wanted to go back to help care for her.

So we came back to Vermont at that point in time. And my grandmother only lived for about a day and a half or two days once I returned, but I decided at that point to stay.
Q. What year was that, if you remember?
A. Sure.





So she passed away in January of 2012, and that's when we returned to Vermont.
Q. And at that point, did you get involved in your grandfather's finances?
A. Yeah.

So at that point, my grandparents originally had, like, their will all set up together, and my grandfather and grandmother had my father listed for, like, power of attorney and everything at that point in time, but my grandfather decided that because my father has some depression issues and has severe PTSD where he's a hundred percent disabled through the military, that he wanted to appoint someone else to take that position and he asked me at that point in time if I would be willing to take over as power of attorney, his health care proxy, and executor of estate since I was really close with him and he felt was a better role.
Q. Just to be clear, Ms. Seip, that was to take over those roles for your grandfather, Wendell Brooks?
A. Correct.

So I took over as power of attorney, executor of estate, and health care proxy in 2012 for my grandfather, Wendell Brooks.
Q. And at that time, did you have specific health concerns about your grandfather?

A. At that time, I didn't have a lot of health concerns for him. Like, he -- he was pretty stable at that point in time. My grandmother was very involved with the finances and things prior to her death, so we, like -- he had me added to his checking account and I became more familiarized with, like, what his bills were and what he had for life insurance and just those general things that somebody would want to become familiarized when they're asked to take on a position like that.

But it became apparent, after a couple years he started having more memory issues, forgetfulness --
Q. I'm going to ask you about specific time periods. Not to interrupt you --
A. Nope, go ahead.
Q. -- just to keep you focused on certain time periods.
A. Sure.
Q. I'm going to ask you specifically about the 2015/2016 time period.
A. Sure.
Q. During that time, do you remember your grandfather receiving letters in the mail referencing prizes?
A. Yes.

So he was receiving many letters in the mail regarding prizes, whether it be cash value or cars or different things, sweepstakes or things that would say,





like, you've won, or you could win, or things like that line.
Q. And how do you know that your grandfather received letters referencing prizes?
A. Because I would help him go through his bills and his mail and it was addressed to him on the outside of the envelope. And also many times within the letter, it was specifically written to Wendell Brooks.
Q. And I do, Ms. Seip, want to let you go back and continue your answer about your grandfather's health. I just wanted to make sure we were clear about time periods.
A. Sure.
Q. In this 2015/2016 time period that we're talking about, what did you observe at that time about your grandfather's health?
A. So this is when he was much more forgetful, started having more memory issues, would forget to -- that a bill was due and would forget to pay it, or would lose track of things, so that's when I started to become more involved with his bills and just getting involved with his overall health care and things in general.
Q. Was your grandfather given any diagnosis related to his memory or his mental health at that time?
A. No, he wasn't given any type of medical diagnosis or anything at that time.





Q. So turning back to those letters referencing prizes that we were talking about, did your grandfather send payments in response to any of those letters?
A. Yeah. He would often put either cash or checks in with the requests or -- I don't know how you -- whatever you want to call them. The prize notices sometimes or things that you would fill out at, like, the bottom and you would tear it off and return it. So, yeah, he would often put either cash or checks in with them.

THE COURT: I'm going to call a sidebar.

(Sidebar.)

(Continued on next page.)





(Sidebar conference held on the record out of the hearing of the jury.)

THE COURT: Mr. Froccaro, if you have an objection, you have to voice it.

MR. FROCCARO: I'm sorry, Judge.

THE COURT: I saw you sort of signaling.

MR. FROCCARO: I just don't like to interrupt her.

I think this is askew of Your Honor's ruling. We're talking about other prizes. I thought we were going to keep it limited to what he did with my client. He's just saying checks and letters and it's not --

THE COURT: She's testified based on her personal knowledge and experience that she saw certain items in the home and she's using various words to describe what they are. She used "prize notices" once. I believe she also used "mailings" or something to the effect of "whatever they are." So she is testifying based on her personal knowledge.

I did note, Ms. Entwistle, you used the word "prize notice" in your question.

MS. ENTWISTLE: I apologize. I'm intending to use "prize letter" or "letter referencing a prize" as just a neutral term. I'm happy to use any --

THE COURT: We talked about the neutral term.

My order said the neutral term is "mailings," not "prize something." If the document you're questioning someone about actually uses the terms "prize notification," then you can say "prize notice," or a synonym thereof, and I've identified the exhibits that qualify. I don't know if you're about to question her on one of those exhibits or something else.

MS. ENTWISTLE: I absolutely understand, Your Honor. My question, because of Mr. Froccaro's concern, I do want to focus her, so I don't want to just say "Did your grandfather receive mailings?" I want to use a neutral term that focuses her on the types of mailings we're talking about. I don't want to say it's a notice of a prize, but just to put us in the ballpark.

MR. FROCCARO: But then how are you going to limit it and connect it to my client?

MS. ENTWISTLE: I'm going to show her a document.

MR. FROCCARO: Why didn't you start there to begin with instead of going through all of the other areas?

THE COURT: I think you've done enough background that you can start working with a specific --

MS. ENTWISTLE: Happy to.

THE COURT: -- document. When there's a





document that uses the terms that are identified in my order, you can say "prize notice." And if those magic words aren't there --

MS. ENTWISTLE: Happy to.

THE COURT: -- you can just call them "mailings."

MS. ENTWISTLE: Of course.

THE COURT: Thank you.

MS. ENTWISTLE: Of course, Your Honor.

(Sidebar ends.)

(Continued on next page.)





(In open court.)

THE COURT: You may proceed, Ms. Entwistle.

MS. ENTWISTLE: Thank you, Your Honor.

Can I have Government's Exhibit 59 just for the witness.

BY MS. ENTWISTLE:

Q. Ms. Seip, do you see the document on the screen?

A. I do.

Q. And I will direct your attention to the signature toward the bottom.

A. Yes, I see the signature at the bottom where it says: Please sign. And I see my grandfather Wendell Brooks's signature with a date of 9/15/16.

MS. ENTWISTLE: The Government offers Government's Exhibit 59.

MR. FROCCARO: No objection, Judge.

THE COURT: It is admitted.

(Government Exhibit 59 was received in evidence.)

MS. ENTWISTLE: Please publish.

(Exhibit published.)

MS. ENTWISTLE: Thank you.

If we can just show the bottom half.

BY MS. ENTWISTLE:

Q. Now that it's visible for the jury, toward the above,





above the two barcodes, that signature, based on your experience, can you identify that? Is that your grandfather's signature?

A. It is his signature.

Q. How are you familiar with your grandfather's signature?

A. As I said, I've been involved with his finances since 2012, and I helped him since about 2014/'15 with filling out his checks and sending in his payments for his bills and so I've seen him write -- sign his name to checks since then, so that's how I would be able to identify his signature.

Q. Do you see in the paragraph just above that --

A. Yes.

Q. -- where it says, "I have enclosed the required $20 report fee for all of the monies and prize directives to me"? And do you see if there's a check mark in one of those three boxes?

A. Yes. And it's checked in the box for cash. Also, it looks like it's initialed off to the side with his initials WB for Wendell Brooks.

Q. Okay. And can you direct my attention to where you're seeing his initials off to the left side?

A. Just before the "I have enclosed," there is a WB, which are his initials.

Q. Thank you, Ms. Seip.
MS. ENTWISTLE: If we can go back to the whole document.
BY MS. ENTWISTLE:
Q. Ms. Seip, have you seen this? Do you remember seeing this document when your grandfather received it?
A. I don't remember this specific document, no.
Q. Do you remember seeing documents that appeared similar to this?
A. Yeah. He would receive documents like this every week. Sometimes every day he would get documents similar to this one.
Q. And when you say similar, what are you referencing? What makes it similar to you?
A. So they would be bright, colorful. They would reference some type of money award or a prize. They would allude to the fact that you could be winning this money or that you were going to win this money.
But the big thing was that they were usually brightly colored and have, like, bold writing, things of that nature on them.
Q. How did you know your grandfather was receiving these mailings?
A. Because I would go through his mail with him when -- to be able to help him pay his bills.





Q. And do you know whether your grandfather sent payments in response to some of those mailings we're talking about?
A. So, yes. When he started -- when I noticed he started sending the mailings, I would find that he had written checks in between the times that we wrote checks together. And I would question why -- who the checks were to, why he was sending them, and he would tell me that he was going to be winning things; or he was going to be hitting the big time; he was going to be getting, you know -- his load of money was coming in, things along that nature.
And so we, as a family, started monitoring the mail that was coming in.
Did I answer your question or do you have further --
Q. You did answer my question.
What do you mean by monitoring the mail that was coming in?
A. So as I had stated, my parents had moved in with my grandfather when I was, like, 13 years old. They, to this day, still live there with him. My sister lives next door to him, and I would visit frequently, so we would try to get to the mailbox before he received his mail to try and go through the mail and limit these types of mailing





prizes, requests for you to fill out things and send in money to be able to win something. And often he was an early riser and he didn't work, so he would be able to get the mail before the rest of us. And, in that case, we would try to then monitor the outgoing mail, and if he had filled something out and put it in the mailbox, we would try to go through the mailbox to see what was in there and what was pertinent to actually be sent out and eliminate the things going out at that point in time.
Q. Ms. Seip, did your grandfather ever win a large cash prize?
A. No, he never won any prizes.
Q. And how would you know whether or not your grandfather won a prize?
A. Because he has vocalized many times that that cash prize never came in, or that it got delayed at the border, or there must have been a mistake with the delivery, or -- there's lots of different excuses that he's given me over the years as to why the prizes or the money never made it. Or it must have been deposited in someone else's account.
Q. Ms. Seip, are you a signatory on your grandfather's bank account?
A. I am.
Q. So you would have seen --
A. If a large sum of money hit that account, I would





have been aware of it.
Q. Did you -- do you know whether your grandfather ever sought a refund?
A. Did he ever seek a refund from --
Q. For any of these payments.
A. No, not that I'm aware of. I don't know that he would know how to, but not that I'm aware of, no.
Q. Did you ever seek a refund on your grandfather's behalf?
A. No, because I didn't know it was on option, to be honest with you.
Q. Did you ever ask to have your grandfather removed from any of these mailing lists?
A. So, yes. Any of -- not any. Some of the mailings that came in or come in will have a postage paid by the person that's sending it to you so you don't have to put a stamp on the envelope to send it in. So any of those that we received, we would write on the envelope, please do not send us any more mailings or please remove us from your list, things of that nature. And I didn't send it back to anyone that I had to pay postage for because I didn't want to give them any more of my money or my grandfather's money.
Q. And did the mailings ever stop arriving?
A. No. We still get mailings at his address.

Q. I have no further questions for you, Ms. Seip.
Thank you.
A. Thank you.
THE COURT: Mr. Froccaro, your witness.
MR. FROCCARO: Thanks, Judge.
I will put this on the screen for now.
(Exhibit published.)
CROSS-EXAMINATION
BY MR. FROCCARO:
Q. Ms. Seip, my name is James Froccaro and I represent Mr. Priolo sitting over here.
A. Mm-hmm.
Q. I just have a few questions for you.
A. Sure.
Q. In around 2014/2015 is when your grandfather started to have more of a cognitive decline and forgetfulness; correct?
A. Sure, yeah.
Q. He wasn't the same mentally.
A. No.
Q. You've never seen the specific mailing that your grandfather responded to in connection with this case; correct?
A. This mailing, no. I can't be sure that I ever saw it.





Q. But if you had, you would have known that there was a consumer information document accompanying it that said that it was a sweepstakes report, that's what you were getting for your $20. It also said that you can get a full refund, you just have to ask, and there was an envelope in there that you could send right back, and you would have also would have known -- and, of course, I'm not blaming you. I'm just telling you --
MS. ENTWISTLE: Objection, Your Honor.
THE COURT: Sidebar.
(Sidebar.)
(Continued on next page.)





(Sidebar conference held on the record out of the hearing of the jury.)
THE COURT: Mr. Froccaro, I'm hearing a lot of facts that are not -- you are putting facts to the witness; your not asking a question.
Is that your objection?
MS. ENTWISTLE: There needs to be a question.
MR. FROCCARO: I will ask her if she ever saw the document.
THE COURT: Yes, you can't do exposition.
MR. FROCCARO: Got it.
THE COURT: You can't do exposition.
(Sidebar ends.)
(Continued on next page.)





(In open court.)
THE COURT: We'll strike that question.
BY MR. FROCCARO:
Q. Madam, this is Defendant's Exhibit C.
Do you recall ever seeing this document before in connection with the mailing that your grandfather got?
MR. FROCCARO: Oh, it's not on.
THE COURT: Let's publish it for the jury, please.
(Exhibit published.)
THE WITNESS: I was going to say, I don't see it.
THE COURTROOM DEPUTY: The jury and the witness, Judge?
THE COURT: The jury and the witness, yes.
A. Can you ask me your question again? I apologize.
MR. FROCCARO: If she could just repeat it, if that's possible.
(Record read.)
A. I have not -- don't recall seeing this document, but I remember seeing documents similar to this.
Q. You didn't read it, did you?
A. Did I read this one right now?
Q. Yes.
A. I didn't read the whole thing.

Q. Well --
A. Do you want me to read the whole thing right this second?
Q. If you could, if you told me you've seen that before, yeah, sure.
A. No, I don't remember ever seeing this one, but I remember seeing similar ones.
Q. Got it, okay.
I just have one more question, all right?
BY MR. FROCCARO:
Q. This exhibit that --
THE COURTROOM DEPUTY: Judge, am I displaying this?
THE COURT: Which exhibit is this?
MR. FROCCARO: Government's Exhibit 59, Your Honor.
THE COURT: Okay. You may publish it to the jury.
MR. FROCCARO: Thank you, Judge.
(Exhibit published.)
BY MR. FROCCARO:
Q. Just above your grandfather's signature, it says that he's giving the $20 -- the required $20 for a report fee.
That's what it says; correct?
A. Yeah. For all of the monies and prizes directives to





me.
Q. Ma'am, where --
A. Yes.
Q. It says I've enclosed the required $20 report fee; correct?
A. Report fee for all of the monies and prizes, correct.
Q. Got it.
You got it.
MR. FROCCARO: No further questions, Judge. I'm done.
THE COURT: Thank you.
Any redirect the Government?
MS. ENTWISTLE: No, Your Honor.
THE COURT: Thank you, Ms. Seip. You may step down.
(Witness excused.)
THE COURT: The Government may call its next witness.
MR. FELDMAN: Thank you, Your Honor.
The Government calls Marilyn Burks.
THE COURT: Please come to the witness stand, Ms. Burks.
THE COURTROOM DEPUTY: Before you take your seat, if you can just please raise your right hand.
(Witness sworn.)





THE COURTROOM DEPUTY: Please take a seat and state your name and spell your name for the record into the microphone.
THE WITNESS: My name is Marilyn Burks. It's spelled M-A-R-I-L-Y-N. Last name Burks, B-U-R-K-S.
MR. FELDMAN: May I proceed, Your Honor.
MARILYN BURKS,
called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:
DIRECT EXAMINATION
BY MR. FELDMAN:
Q. Good afternoon, Ms. Burks.
A. Good afternoon.
Q. Where do you live?
A. Greenville, South Carolina.
Q. How old are you?
A. Sixty-one.
Q. How did you get here today?
A. I flew.
Q. When was the last time before today that you had gone on an airplane?
A. Forty-one years ago.
Q. What was that experience like?
A. Very scary.
Q. We appreciate you being here today.





What do you do for work?
A. I work at a hotel.
Q. I want to direct your attention, if I could, to the 2015/2016 time period.
Do you remember receiving a letter in the mail about a large cash prize?
A. I do.
MR. FELDMAN: Okay. I want to make sure we're talking about the same thing, so just for the witness, can we pull up Government's Exhibit 62?
BY MR. FELDMAN:
Q. Ms. Burks, is this the letter that you were referring to?
A. Yes, sir.
MR. FELDMAN: At this time, the Government would move into evidence Government's Exhibit 62.
MR. FROCCARO: No objection, Your Honor.
THE COURT: It's admitted.
(Government Exhibit 62 was received in evidence.)
BY MR. FELDMAN:
Q. Ms. Burks, do you notice anything unusual about -- oh, I'm sorry, can we show Government's Exhibit 62 to the jury?
(Exhibit published.)

MR. FELDMAN: Thank you.
BY MR. FELDMAN:
Q. Ms. Burks, do you notice anything unusual about Government's Exhibit 62, the letter that you got in terms of any damage to the document?
A. Yes.
Q. What do you observe?
A. From where I'm sitting, the right side there's an amount that is supposed to be up there.
MR. FELDMAN: Can we go to page 2 of Government's Exhibit 62?
(Continued on the following page.)





(Continued.)
Q. Do you see same damage on page two?
A. I do.
Q. If we could, we go back to the first page. Can we do a split screen with Government Exhibit 1 on the first page?
Ms. Burks, prior to your testimony here today, did you have a chance to review Government Exhibit 1?
A. No.
Q. Do you remember just before you testified, you looked at two documents? One was the letter addressed to you and one was a letter addressed to Andrew, actually, I can't read the last name. Do you remember that just a few minutes ago?
A. Yes.
Q. Did you get a chance to compare the two documents?
A. Yes.
Q. Does Government's Exhibit 1, is it another version of the same letter that you got, but this one is sent to someone named Andrew?
A. Yes.
MR. FELDMAN: Can we go to page two? I'm sorry, can we stay on split screen, thank you. Then just page two of Government's Exhibit 1. Thank you very much.
Q. Does that also look like the full section of the





consumer information section in the mailing?
A. Yes, sir.
MR. FELDMAN: Let's go back to just Government's Exhibit 62, page one, thank you.
(The above-referenced exhibit was published to the jury.)
Q. Ms. Burks, when you got this letter what was your reaction to it; if you can remember?
A. I seen money.
Q. Can you explain what you mean by that?
A. Well, I seen that there was a possibility that I could win some money.
Q. Okay. And did you end up sending any kind of money in response to this letter?
A. Yes, I did. A $20 money order.
Q. Why did you do that?
A. Because I thought I was going to win some money and I thought that if I sent the $20, like they asked me, then I would win some money.
MR. FELDMAN: Can we do split screen again between 62 page two and Government's Exhibit 1 page two.
Q. Do you remember seeing this consumer information section on the back of the letter back this 2015, 2016?
A. I don't remember.
MR. FELDMAN: Can we go back to Government's





Exhibit 62?
(The above-referenced exhibit was published to the jury.)
Q. At some point after you sent in the $20, did you receive any type of prize?
A. No.
Q. When you didn't receive a prize, what do you do?
A. I wrote a letter.
MR. FELDMAN: Can we go it page three of the same exhibit?
Q. Ms. Burks, do you recognize this?
A. Yes, sir. I do.
Q. Is this a letter that you wrote?
A. Yes, sir.
Q. Can you read this letter to the jury?
A. To whom it may concern, I have a copy of the money order that I sent to your company and that is very bogus. I will be reporting you unless you sent me my $20 back. I will let the Better Business Bureau know. Signed Marilyn Burks.
MR. FELDMAN: Can we pull up Government Exhibit 62 just for the witness? Can we pull up Government Exhibit 61 just for the witness.
(The above-referenced exhibit was published to the witness.)

Q. Ms. Burks, what is that document?
A. That's another letter I wrote.
Q. And do you recognize your signature on that letter?
A. Yes, sir.
MR. FELDMAN: Your Honor, we would offer Government's 61 into evidence your Honor.
MR. FROCCARO: No objection.
THE COURT: It's admitted.
MR. FELDMAN: Permission to show to the jury?
THE COURT: Yes.
(The above-referenced exhibit was published to the jury.)
Q. Ms. Burks, does this letter have a date on it?
A. Yes.
Q. What's the date?
A. May 12, 2016.
Q. Can you go ahead and read that letter to the jury?
A. To whom it may concern, you need to refund me my $20 quick, fast, and in a hurry because we are up on the scams you're running. PS: This is the first notice and there will be others to follow. Signed Marilyn Burks.
Q. Ms. Burks, do you remember if the letter that you received that we just saw, the first page of Government's Exhibit 62, if there was any phone number that was there that you could call to complain? Do you remember that?





A. I don't remember.
Q. What about any e-mail that you could write to to ask for your money back?
A. I don't remember.
Q. So here you're requesting a refund. Do you remember getting a refund of your $20?
A. I don't recall.
Q. Is it possible that the, that a company sent you a $20 check as a refund and you just don't remember receiving it? Is that possible?
A. It's possible.
Q. Now, have you ever heard of a company outside of this letter called NPF?
A. No.
Q. And no one from NPF gave you any sort of cash prize?
A. No.
MR. FELDMAN: Brief indulgence, your Honor. One more question, your Honor.
Q. Ms. Burks, have you ever heard of a company called Winners Circle International?
A. No.
MR. FELDMAN: Nothing further.
THE COURT: Thank you.
Mr. Froccaro, your witness.
MR. FROCCARO: Yes, thank you.





CROSS EXAMINATION
BY MR. FROCCARO:
Q. Hi, Ms. Burks. My name is James Froccaro. I represent Mr. Priolo who is seated over at the table. I just have a few questions for you, madam. If we can put on Defendant's Exhibit C. Please publish.
THE COURT: Publish it to the jury.
(The above-referenced exhibit was published to the jury.)
Q. This was attached to the NPF letter that you got in the mail. You never saw this before, or you never read it?
A. I never read it.
Q. Okay. You testified that you requested a refund of the $20 you sent in May of 2016. Yes?
A. Yes.
Q. Are you aware that you received a full refund the next month, in the month of June, of your $20?
A. No.
MR. FROCCARO: Judge, if I can just show the Government. Judge, I have to mark it. Can I just ask what I'm up to in Defendant's Exhibit?
THE COURT: I believe you're on D.
MR. FROCCARO: I guess the Government has no objection, Judge, so we can move for admission.





THE COURT: This is Defendant's Exhibit E. Just make that correction.
MR. FELDMAN: No objection, your Honor.
THE COURT: It is admitted.
MR. FROCCARO: Thank you, Judge.
(Defendant's Exhibit E received in evidence.)
(The above-referenced exhibit was published to the jury.)
BY MR. FROCCARO:
Q. Ms. Burks, on June 10, 2016, you received a $20 refund check from Winners Circle International, Inc. Do you agree?
A. I don't remember.
Q. Okay. Well, you may not have been familiar with the name Winners Circle International, Inc. But you got a full refund from your request within a month. Just so you're aware of that.
MR. FROCCARO: I just have one more question.
Q. Are you aware that you received -- because you sent two letters, right?
A. Yes, I did.
Q. And you sent the two letters. There was a separation of time between the two of them, right?
A. Yes, sir.
Q. Well, the following month in July, you received

another $20 check from Winners Circle International, which was more than you paid them, right?
A. I don't remember.
Q. Well, you only sent them one check in response to that initial mailing, right? The $20?
A. Yes.
MR. FROCCARO: If I can just, judge, again, I'm up to Defendant's Exhibit F. Judge, they have agreed to its admission, Defendant's Exhibit F.
THE COURT: It's admitted. It may be published to the witness and the jury.
(Defendant's Exhibit F received in evidence.)
(The above-referenced exhibit was published to the jury.).
BY MR. FROCCARO:
Q. Ma'am, they even sent you an additional $20 check, correct?
A. I don't remember.
Q. Okay.
MR. FROCCARO: Okay. Well, it's in evidence, Judge, so I have no further questions.
THE COURT: Okay, thank you.
Any redirect from the Government?
MR. FELDMAN: Briefly, your Honor.
REDIRECT EXAMINATION





BY MR. FELDMAN:
Q. Good afternoon again, Ms. Burks.
A. Good afternoon.
Q. Defense counsel showed you -- do you remember when he was asking you questions about the consumer information?
A. Yes.
Q. Do you remember why you didn't read it or why you passed over that language?
A. I don't remember.
MR. FELDMAN: The only other thing that I neglected to do, your Honor, is just move, formally, for admission, 61-OE and 62-OE into evidence.
MR. FROCCARO: I have no objection.
THE COURT: They're admitted.
(Government's Exhibit 61-OE, 62-OE received in evidence.)
MR. FELDMAN: I have no further questions from Ms. Burks.
THE COURT: Ms. Burks, you may step down, we appreciate your testimony today.
(Witness leaves the witness stand.)
THE COURT: We are ready for the next government witness.
MR. FELDMAN: Yes, your Honor. Just before we call the next Government witness, can we just read to the





jury a stipulation between the parties as Government Exhibit 100?
THE COURT: Yes.
MR. FELDMAN: The exhibit is titled stipulation regarding exhibits. And it reads: It is hereby stipulated and agreed by and between the United States of America and the defendant, Philip Priolo, through his attorney as follows. The parties admit the chain of custody and the authenticity of documents and records marked as government and defense exhibits. And obtained through subpoena, execution of electronic and premises search warrants. Voluntary production from businesses, voluntary production by public officials, and obtained by government personnel from businesses and government offices. Such records are the business or public records of the relevant entities, including the defendant's corporations, with the meeting of federal evidence 8036 and 8038, respectively. It's dated January 28, 2025, and signed by a member of the Government and Mr. Froccaro.
Your Honor, the Government now calls Postal Inspector Joseph Bizzarro.
JOSEPH BIZZARRO,
called as a witness having been first duly sworn, was examined and testified as follows:
THE COURTROOM DEPUTY: Please, state and spell





your name for the record.
THE WITNESS: Joseph Bizzarro. Spelling B-I-Z-Z-A-R-R-O.
DIRECT EXAMINATION
BY MR. FELDMAN:
Q. Good afternoon.
A. Good afternoon.
Q. Inspector Bizzarro, where do you work?
A. I work with the United States Postal Inspection Service.
Q. What is your title?
A. I'm a United States Postal Inspector.
Q. How long have you worked for the postal inspection service?
A. A little bit over 17 years.
Q. Have you had the title of postal inspector that entire time?
A. Yes.
Q. What are the duties of a United States Postal Inspector?
A. We conduct criminal investigations surrounding the use of the United States mail.
Q. Are Postal Inspector federal law enforcement agents?
A. Yes, we are.
Q. I want to direct your attention, if I could, to this

case.
Back in 2015 and 2016, were you investigating prize solicitations that were sent out through the mail?
A. Yes.
Q. And as part of that investigation, did a postal inspection team seek search warrants of two locations?
A. Yes.
Q. What is a search warrant?
A. A search warrant is a court order allowing law enforcement to enter a facility and to search for evidence related to a crime.
Q. In this case, what were the two locations that were at issue with the search warrants?
A. 5 Owen Street and 575 Underhill Boulevard.
Q. When did the searchs occur?
A. September 22, 2016.
Q. Did they occur at the same time?
A. Concurrently, yes.
Q. Why is that?
A. Just so that we don't lose fruits of the crime. So we send out two different teams to conduct the search warrants at the same time.
Q. Are search warrants proved by a federal judge?
A. Yes, they are.
Q. For these particular warrants, what was the





inspection team looking for?
A. We were looking for anything related to prize solicitations, documents, checks, anything related to prize solicitations.
Q. Were you involved in searchs of one of the locations more than the other one?
A. Yes.
Q. Which location was your primary responsibility that day?
A. 5 Owen Street.
Q. I want to get to the Owen Street search, but I want to briefly touch on the search at the Underhill address.
A. Yes.
Q. What type of building is the Underhill address?
A. Typical office building.
Q. Do you remember the name of the business that was the subject of the search at that office building?
A. Yes, PMCS. Direct Marketing Consulting Services.
Q. Did you ever visit the Underhill location on September 22, 2016?
A. I did.
Q. Why was that?
A. When we enter the locations, actually, both locations, we noticed they had computers and a safe. I'll say electronic equipment and a safe. The original search





warrant did not allow us to seize any electronic equipment or any -- or enter into the safe. So we got a second search warrant that same day for the electronic equipment.
Q. Why did you have to go back to the original -- to the Underhill location?
A. So, ultimately, after we received a search warrant signed by a judge here in the Eastern District of New York, I went over to drop off the search warrant that was signed by the judge.
Q. Let's move to the Owen Street location.
Describe for the jury what type of building the Owen Street location was?
A. It's a private residence.
Q. When you arrived, what was the first thing you and your team did?
A. The first thing we would do is we would gather up the team, make sure everybody arrived at the location, and then we would create a perimeter around the house to secure the outside of the house before we made entrance.
Q. Why do you need to secure a location before you search it?
A. It's for officers safety issue.
Q. Did you eventually enter the house?
A. Yes.
Q. Just to be clear. Was it just you executing the





search warrant on Owen Street that day or were there other Postal Inspectors there?
A. There's a team of numerous Postal Inspectors.
Q. When you got into the house, was there anyone there?
A. Yes.
Q. Who was there?
A. Cathy Johnson and her husband.
Q. What is Cathy Johnson's connection to 5 Owen Street street?
A. She was a resident of 5 Owen Street.
Q. So after you entered the home, please walk the jury through the steps you and your team took in terms of how you searched this location?
A. So first thing when we entered the home, we conduct just a safety search of the entire building. In this matter, basically, we search, make sure there's nobody hiding anywhere. If we see any weapons out, we'll secure them for our safety. And then, at that point, we will begin the search process.
Q. Just to be clear, there were no weapons involved.
A. None at all.
Q. Did you follow that procedure in this case?
A. Yes.
Q. Did you or another member of your team create any diagram of the home to assist the team in identifying

where different pieces of evidence were recovered from?
A. Yes.
Q. Is that something that's standard when you're executing a search warrant?
A. Yes.
MR. FELDMAN: Can we pull up Government's Exhibit 251 just for the witness?
Your Honor defense counsel is indicating there's no objection to the exhibit.
MR. FROCCARO: Absolutely.
THE COURT: It may be admitted.
MR. FELDMAN: Thank you, Judge. Can we show the jury Government Exhibit 251?
THE COURT: Yes.
(Government's Exhibit 251 received in evidence.)
(The above-referenced exhibit was published to the jury.)
MR. FELDMAN: Your Honor, may I approach the witness?
THE COURT: Yes.
BY MR. FELDMAN:
Q. Inspector Bizzarro, I'm handing you a document that's marked 251-OE, what is that document?
A. This is the original of the schematic that was taken at the search warrant.





MR. FELDMAN: So I would move in 251-OE as well.
MR. FROCCARO: No objection.
THE COURT: It's admitted.
(Government's Exhibit 251-OE received in evidence.)
BY MR. FELDMAN:
Q. Mr. Bizzarro, I want to use the original here because, on the document camera, if we could, Mr. Morbito, because I think it's more clear.
So, Inspector, these diagrams that you create and, specifically, the diagram that we see on the screen now, are they to scale?
A. They're not to scale.
Q. Do they, nevertheless, fairly and accurately show the layout of the residence?
A. Yes.
Q. Where did your team recover the majority of the evidence that was taken as part of that search warrant? What floor of the home?
A. It was the basement of the home.
Q. Just to give the jury a sense, how many floors were there?
A. There was three floors. There was a top floor, a ground floor area, and then the lower floor area, the basement.





Q. Inspector Bizzarro, is the portion of this schematic drawing that shows the basement?
A. Yes.
Q. There's a lot of letters and numbers that are on this exhibit. Please explain to the members of the jury what this reason behind this is.
A. Sure. So, if you notice everything started with the letter E. When we conduct a search warrant, we give a specific room a letter that indicates for that specific room. In this case, the basement floor received the letter E. The numbers are then positionless that we also given numbers to. For example, you'll see the E13 is a garbage can that was located in that basement floor.
Q. So when you're recovering evidence during a search, is your team recording what location they're recovering the evidence for using these numbers and these letters?
A. That is correct.
Q. Did the postal inspection team that executed this search capture, in any way, the way the home looked prior to searching the location?
A. Yes.
Q. How did you guys go about doing that?
A. We do a video to capture, exactly what you said, what the place looked like before we did the search.
MR. FELDMAN: Can I pull up or can we pull up





Government Exhibit 255 just for the witness? My understanding, your Honor, defense counsel is not going to object to this exhibit, so I would formally offer 255 into evidence.
THE COURT: It's admitted.
(Government's Exhibit 255 received in evidence.)
MR. FELDMAN: Can we show 255 to the jury?
(The above-referenced exhibit was published to the jury.)
BY MR. FELDMAN:
Q. Inspector Bizzarro, I want to play this video from start to finish and I want to go back and ask you some questions about portions of the video. But for now, we can just play the video for the jury.
(Video played in open court.)
THE COURT: The sound is off on the application.
Q. Before we go back and I ask you certain questions about the video, why do you take a video like this? What's the purpose of this?
A. The purpose is basically to show what the location of the search warrant would look like before we conducted our search.
Q. Why is that important?
A. It's important just for liability reasons, as well as in case somebody says we wrecked the place. And also, to

show where different items were before they were seized.

MR. FELDMAN: Can we go back to time stamp 3:18 in this video? And before you play it, we're going to play it and then I'm going to ask you just to stop the video at time stamp 3:24. Thank you very much.

(Video played in open court.)

Q. So inspector, these garbage cans, were they something that your team seized and searched as part of what happened on September 2, 2016?

A. Yes.

MR. FELDMAN: I'm putting it back up for a moment, if we can switch back to the document camera. This is a page of Government Exhibit 251, which shows the basement.

Q. Inspector Bizzarro, are those garbage cans that we just saw in the video, are they labelled in this schematic?

A. Yeah. You can see, I guess in the top left hand corner right below stairs, E13 and E14.

Q. What did you do with those garbage cans as part of this search?

A. We seized them.

MR. FELDMAN: I'm sorry. It's my fault. Can we show the juror the schematic? I apologize.

Q. Can you point again, Inspector Bizzarro, to where the





garbage cans are?

A. So in the upper left hand corner where it says E13, E14, those are the garbage cans.

MR. FELDMAN: Thank you. Can we go back to the video? Thank you very much. If we can just play until time stamp three minutes and 31 seconds. Thank you very much.

(Video played in open court.)

Q. Inspector, what are the containers called that are at the very top of the screen that we see now?

A. Sure. So the little ones are called trays. And then the big ones that look like a container that you would hold on, we call them postal tubs.

Q. Do you see both postal tubs and postal trays in this snapshot?

A. Yes.

Q. Let's just talk for a moment about a postal tray. Not looking for an exact number, but about how many items of mail might a postal tray hold?

A. So the really long ones, they would hold over 300 pieces of letter mail.

MR. FELDMAN: Can we play the video and stop at time stamp four minutes and 2 seconds?

(Video played in open court.)

Q. Inspector, can you read the writing that we see on





the screen now, on the outside of that envelope?

A. Sure. The envelope on the tray says please, please take me off your list. Do not send any more, please no more.

MR. FELDMAN: Can we play the video and stop at four minutes and 13 seconds?

(Video played in open court.)

Q. Inspector, what do we see in the video now?

A. Right above that water bottle, is a cash counter.

Q. Did you and your team recover any cash from Cathy Johnson's home?

A. Yes.

Q. About how much cash did you recover from the home?

A. About $22,000.

Q. Where was the majority of that cash located?

A. Inside the safe.

MR. FELDMAN: All right. Next time stamp is five minutes and 12 seconds. Thank you so much.

(Video played in open court.)

Q. Inspector Mr. Bizzarro, I know it's a little blurry, can you read the label right above what looks like a smoke or CO2 detector?

A. Yes, it says lucky.

Q. During your search, did you recover any corporate documents relating to a company that has lucky in the





name?

A. Yes.

Q. What company is that?

A. Feel Lucky Group.

MR. FELDMAN: Can you play the video and stop at time stamp 5 minutes 23 seconds?

(Video played in open court.)

Q. Inspector, what's the label here above that either tray or tub of mail?

A. WINC.

Q. Did your team seize all of the mail that we saw in the basement of 5 Owen Street?

A. Yes.

Q. Following your search, did you take a second video of the property?

A. Yes.

Q. Is that standard procedure when you're conducting a search?

A. Yes.

Q. Why is that?

A. So we conduct what we call an exit interview and, basically, we take a video of the location that we just executed the search warrant for. Just to show the condition that we left the location. It's also a liability thing if somebody says we wrecked the place.

MR. FELDMAN: Your Honor, I would offer Government Exhibit 256 into evidence.

MR. FROCCARO: No objection.

THE COURT: It's admitted.

MR. FELDMAN: I apologize, your Honor. Permission to publish to the jury.

THE COURT: Yes, it could be published.

(Government's Exhibit 256 received in evidence.)

(The above-referenced exhibit was published to the jury.)

MR. FELDMAN: Can we play 256?

(Video played in open court.)

BY MR. FELDMAN:

Q. Inspector Bizzarro, at various points in that exit video, did you notice Post-It notes with letters and numbers?

A. Yes.

Q. Is that what you were referring to earlier when you're tracking where different things are recovered from?

A. Yeah. Those are our location pointers.

Q. When the search was done, what did you do with the evidence?

A. We returned it to our office to an evidence room.

Q. And was there some kind of review process that took place?





A. So right after we do the -- we conduct a search warrant, we go back to the office and we begin the process of entering the evidence of what was seized into our -- if I get this right. Our system that property evidence acquisition program. That's our system. And we enter it into a computer to say what we seized and what location it was seized from.

Q. I want to ask you some questions about the type of things that you found at 5 Owen Street. Did you find solicitation during the search?

A. Yes.

Q. Did you find complaint letters?

A. Yes.

Q. Did you find payments that were sent?

A. Yes.

Q. Was any of that mail that you found associated with a company called Feel Lucky Group?

A. Yes.

Q. Just to be clear. Was some of the mail that you team recovered opened?

A. Yes.

Q. And was other mail unopened?

A. Yes.

Q. When you and your team were done going through the evidence, at some point, do you know if it was sent off to





an online review form /TPOPL?

A. Yes.

Q. Are you familiar with the term bates number?

A. Yes.

Q. What is a bates number?

A. It's actually an identifier number that's given to a page that's scanned into a computer system, so each page would have its own individual bates numbers.

Q. Was there anything about the bates numbers that was used here that would indicate where certain evidence was from?

A. Yes.

Q. What was that?

A. Because we had the two locations, inside the numbering system, how they were identified, we used an SWO; that's for the search warrant of the Owens location. And then SWU, which was the search warrant for the Underhill location.

Q. Inspector, if someone were to go back a month ago and rescan the evidence, would that have a bates number?

A. No.

THE COURT: Counsel, how much for time do you need with this witness?

MR. FELDMAN: I would estimate at least a half hour.





THE COURT: Okay. We're going to take our afternoon break, a ten-minute break, and then -- before the jury goes. I need to always remind you of how important it is not to speak to one another during this break, like every other break that you have; short or long that you have. Not to do any research on this case in any way, shape, or form, or anyone associated with it; whether a witness, party, counsel, the Court, or anyone. Not to engage with any of the parties, or counsel, or witnesses, or court personnel in this case, other than Mr. Morbito who is your go-to for any questions and concerns. To apprise me through Mr. Morbito if you learn of any juror that does not follow these instructions. And do not let anyone talk to you. So you will not talk to them and they will not talk to you. If they try, make a break for it. Find Mr. Morbito, drop me a note. And no research or investigation about the case or anything having to do with it. Thank you so much, we will stand for our jury.

(Jury exits the courtroom.)

THE COURT: Thank you, everyone. You may be seated. We will all take a ten-minute break and be back here, ready to go.

(A recess was taken at this time.)

(Continued on the next page.)

(Following a recess.)

THE COURT: Thank you, everyone. Please have a seat.

We will call in our jury.

(Jury enters the courtroom.)

THE COURT: Please have a seat. We will resume with the questioning of the witness.

Go ahead, Mr. Feldman.

MR. FELDMAN: Thank you, your Honor.

BY MR. FELDMAN:

Q. Inspector, at the time the search was conducted, September 22, 2016, what was your role on this case?

A. I was the lead inspector on the case at the time.

Q. Did that change at any point?

A. Yes.

Q. When did that change?

A. Around May, June 2017 I had rotated off the team and transferred to case on and went on to another assignment.

Q. So less than a year after the search was conducted you transferred off the case?

A. Yes, that's correct.

MR. FELDMAN: Your Honor, I'm going to offer what's been pre-marked for identification as Government Exhibits 10 through 14 into evidence.





MR. FROCCARO: No objection.

THE COURT: They are admitted.

(Government Exhibits 10-14 were received in evidence.)

MR. FELDMAN: And I'll also offer the originals, 10-OE through 14-OE.

THE COURT: They are admitted also.

MR. FELDMAN: Thank you.

(Government Exhibits 10-OE through 14-OE were received in evidence.)

BY MR. FELDMAN:

Q. Inspector, before we display the exhibits to the jury, have you had a chance to review the originals, Government Exhibits 10-OE through 14-OE?

A. Yes.

Q. Where were those mailings recovered from?

A. Room E.

Q. From where?

A. Room E.

Q. From the location you were speaking about?

A. Yes, sorry.

MR. FELDMAN: Can we show the jury Government Exhibit 10, and let's go to the next page.

And if we can zoom out.





BY MR. FELDMAN:

Q. Inspector, is this typical what we see in Government Exhibit 10-OE of the solicitations you were referring to earlier that were recovered from 5 Owen Street?

A. Yes.

Q. Where is this particular solicitation from?

A. Prize verification service.

Q. And what is the amount listed on it?

A. $1,400,000.

MR. FELDMAN: Let's go ahead and show the jury Government Exhibit 11.

Please go to page two. Thank you. Just up a little higher, please. Thank you.

BY MR. FELDMAN:

Q. Inspector, what about this mailing, where is this one from?

A. Prize advisory board.

Q. Immediately under prize advisory board, what does it say?

A. Specialist agents for unclaimed cash obligation prize reported.

Q. I want to invite your attention to the right side of the top of the document.

Can you just read off what the third X down from





the top says?

A. The one that says unanimous approval determination?

Q. You got it.

MR. FELDMAN: Brief indulgence, your Honor?

THE COURT: Yes.

MR. FELDMAN: Thank you, Judge.

(Whereupon, there was a pause in the proceedings.)

MR. FELDMAN: Can we go to Government Exhibit 12-OE.

BY MR. FELDMAN:

Q. Inspector, we are on page one of 12 OE.

What does that stamp or notation that seems to be added to the envelope mean?

A. Refused?

Q. Yes.

So what does that mean?

A. That means that the recipient refused the piece of mail that was coming to their house and they are having it returned to sender.

MR. FELDMAN: Let's go to page two.

BY MR. FELDMAN:

Q. What's the name of this company?

A. Prize Payment Resources.

Q. And what's the amount?

A. $1,180,350.
Q. Can you go ahead and read the first paragraph to the jury.
A. Our records department at Prize Payment Resources has completed full verification procedures from the independent sponsors guaranteeing full payment of $1,180,350.
Determination has been reached that you are legally qualified to receive eligibility for all cash amounts. This participation right is guaranteed upon receiving your response, following all instructions to this notice.
MR. FELDMAN: Can we zoom out so the jury can see the entire first page?
We are zoomed out. Can we scroll down, then. Thank you. Go up just to the part of the notice -- the part of the letter that the jury hasn't seen yet, a little lower. Right there.
BY MR. FELDMAN:
Q. Inspector, can you read the paragraph second from the bottom that starts, upon following all necessary procedure.
A. Upon following all necessary procedure, and being declared the rightful recipient, you will be free to do with all amounts as you wish.





Please be prepared with proper identification. This form cannot be used for identification purposes. Your only obligation will be for taxes on the amounts won.
MR. FELDMAN: Let's go to the next page.
BY MR. FELDMAN:
Q. Inspector, we are on a section titled consumer information.
Do you remember seeing this consumer information section when you recovered the evidence in this case?
A. Yes.
MR. FELDMAN: Can we go down to page three -- I'm sorry -- page four.
Thank you.
BY MR. FELDMAN:
Q. Inspector, do you see where it says source on the left side right underneath the amount?
A. Yes.
Q. Can you read the text underneath source?
A. Sure.
It says compiled sponsor funds, payment guaranteed.
MR. FELDMAN: May we please show Government Exhibit 13 to the jury, 13- -- 13, sorry.
And let's go to page one -- sorry -- page two. Thank you.





BY MR. FELDMAN:
Q. Inspector, where is this letter purporting to be from?
A. 2016 public prize funds report.
Q. And can you read right below that where it starts with important?
Can you read that?
A. Sure.
Important. This may be the only notification you receive. If you are able to participate and in need of free cash prizes, please act immediately.
MR. FELDMAN: Let's zoom out just so the jury can look at the entire document for a moment and I'll just wait a second.
Let's go to page four of this one. Actually this page -- no -- I was right, page four. Form PPF, 2015.
BY MR. FELDMAN:
Q. Do you see where it says that, Inspector?
A. Yes.
Q. Can you read the text next to form PPF 2015?
A. Please read all sections carefully and complete as indicated.
Return in preaddressed envelope provided for your convenience.





Q. Section one, what's the text to the right of section one?
A. Required.
Q. I'm not going to have you read that. I actually want to go down to section two.
Can you read the text starting with section two, and stop at section three.
A. Sure.
Upon receiving a cash prize, I would use it to: Pay bills, vacation, save, help family, friends, start business.
If I could have a new model of any of these makes of vehicles I would choose: Toyota, Mercedes, BMW, Ford truck, Audi, Chevy SUV, Porsche.
The place I would like to visit -- I would most like to visit is: Australia, Brazil, France, Japan.
I believe that attitude can determine success: Strongly agree, agree, disagree and strongly disagree.
Q. And, finally, let's go down to section three.
Can you go ahead and read that and you can stop at directions.
A. Sure.
I want to begin the process of eligible access to over $1,850,000. I am willing to accept any prize payments by either certified check or direct transfer --

and has overnight in parentheses -- I am requesting full prize access through the 2016 edition public prize reports.

MR. FELDMAN: Finally, let's just briefly put Government Exhibit 14 on the screen for the jury, if we could.

BY MR. FELDMAN:

**Q.** Let's start with this page.

What is in the seal here in the upper left-hand corner of the envelope?

**A.** Official seal, official seal?

Is that the one you are asking about?

**Q.** What's in the middle?

**A.** Triple A, AAA.

**Q.** Can you read the text in red.

**A.** Sure.

Notice is hereby final.

**Q.** Let's go down to page two of Government Exhibit 14 and what's the text at the very top of Government Exhibit 14, page two?

**A.** Aggregate, $1,675,000, major money awards.

MR. FELDMAN: We can take it down.

BY MR. FELDMAN:

**Q.** Inspector --

MR. FELDMAN: Permission, your Honor, to





approach the witness with several exhibits?

THE COURT: Are they already admitted?

MR. FELDMAN: They are not and I will not be seeking to admit them at this point.

THE COURT: Okay.

MR. FELDMAN: I just want to ask him a single question about them.

THE COURT: Yes.

MR. FELDMAN: And for the record the exhibits I am approaching Inspector Bizzarro with are 160-OE, 162-OE, 171-OE, 173-OE, 175-OE, 175A-OE, 176-OE and 177-OE.

May I approach, your Honor?

THE COURT: Yes.

BY MR. FELDMAN:

**Q.** Inspector Bizzarro, I'm handing you several exhibits.

I want you to review them to yourself for a moment and let me know when you are done. You don't have to open them, just the evidence labels themselves.

**A.** Yes.

(Whereupon, there was a pause in the proceedings.)

BY MR. FELDMAN:

**Q.** Inspector, are all of those exhibits that I just handed you, are they part of the assorted mailings and paper that you and your team seized from 5 Owen Street?





**A.** Yes, they are.

**Q.** Did you recover any corporation documents for Feel Lucky Group --

**A.** Yes.

**Q.** -- during your search?

**A.** Yes, we did.

MR. FELDMAN: I am showing opposing counsel what's been pre-marked as --

MR. FROCCARO: No objection.

MR. FELDMAN: Okay.

THE COURT: What is the number of the exhibit?

MR. FELDMAN: 263-OE.

And I would move into evidence that exhibit, as well as the digital copy, 263.

THE COURT: It's admitted.

(Government Exhibits 263 and 263-OE were received in evidence.)

MR. FELDMAN: Permission to approach the witness with this exhibit?

THE COURT: Yes.

MR. FELDMAN: Can we display digitally the first page of 263 for the jury.

(Whereupon, the above-mentioned exhibit was published to the jury.)





BY MR. FELDMAN:

**Q.** Inspector, looking at that binder, does that appear to be the binder that's displayed to the jury right now and on your screen, a picture of that binder?

**A.** Yes.

**Q.** Okay.

Can you open the binder?

**A.** Sure.

**Q.** First of all, looking at the spine of the binder, what does it say?

**A.** Feel Lucky Group Incorporated.

MR. FELDMAN: Can we display page six of the digital copy of 263.

**Q.** Inspector, is there some sort of corporate seal in that binder?

**A.** Yes.

**Q.** Is the binder in the same or substantially the same condition as when you and your team recovered it?

**A.** Yes.

**Q.** Is the seal put together, is it assembled?

**A.** No, it's not.

MR. FELDMAN: Can we display for the jury page three of 263.

BY MR. FELDMAN:

**Q.** Inspector, is there stock certificates for the Feel

Lucky Group corporation on one side of the binder?
A. Yes.
Q. Can you just silently review them for a moment for yourself and just look up when you are done.
A. Okay.
Q. Did any of the certificates appear to be filled out?
A. No.
MR. FELDMAN: Can we display page seven of 263 for the jury.
BY MR. FELDMAN:
Q. Are there tabs in that binder?
A. Yes.
Q. Can you just go ahead and read the headings on those tabs into the record.
A. Sure.
Certificate, articles of incorporation, amendments, qualifications, bylaws, minutes consents, shareholder agreements, state filing reports, licenses, approvals, permits, miscellaneous, certificates, transfer ledger.
Q. So my next question is about all of the tabs except for the certificate and article of incorporation.
Okay?
A. Okay.
Q. Is there any documents contained in any of those





tabs?
A. No.
Q. On the inside folder of the binder, it might be three or four pages from the top, can you pull out a document that is titled certificate of incorporator's action.
MR. FELDMAN: And can you display page four of Government Exhibit 263.
Can we actually zoom or, actually, blow up the document, just the one next to the e-mail. So at the very bottom row -- yes, exactly.
BY MR. FELDMAN:
Q. Inspector, does this appear to be a certificate of incorporator's action for Feel Lucky Group Incorporated?
A. Yes.
Q. Can you just read that document into the record and stop when you get to the end of paragraph two.
A. Sure.
The undersigned, being the sole incorporator of the corporation, hereby consents to, certificates, and has taken the following action.
Number one. Bylaws in the form of annexed to the certificate are adopted as the bylaws of the corporation.
Two. The following persons, each of whom has previously indicated willingness to serve, are elected





directors to the corporation.
Q. And so if we can jump down to the signature line really quickly.
Who is the person that is serving -- who is the undersigned in this document?
A. Trudi Winter.
Q. And who is the sole person listed as an elected director of Feel Lucky Group in the document?
A. Phil Priolo.
MR. FELDMAN: Your Honor, brief indulgence to confer with cocounsel.
(Whereupon, there was a pause in the proceedings.)
MR. FELDMAN: No further questions, your Honor.
THE COURT: Thank you.
Mr. Froccaro, your witness.
MR. FROCCARO: I have no questions, Mr. Bizzarro.
THE COURT: Thank you, very much, Mr. Bizzarro.
We appreciate your time. You may step down.
THE WITNESS: Thank you.
(Witness steps down.)
THE COURT: Sidebar with counsel.
(Continued on next page.)





(Sidebar.)
THE COURT: No further witnesses today?
MR. FELDMAN: Not today. Cathy Johnson was on deck for us.
THE COURT: We can call it a day a little early and you will give me your letters by 7 because you have extra time.
MR. FROCCARO: You got it, when I wake up from my nap.
THE COURT: You don't need a nap.
MR. FELDMAN: One scheduling issue we can raise outside the presence of the jury before we are released for the day.
THE COURT: Okay.
I do want to talk to counsel before I release all of you but I will release the jury now.
MR. FROCCARO: Thank you.
(Sidebar concluded.)
(Continued on next page.)

(In open court.)

THE COURT: Members of the jury, we are ending early today.

Thank you for your attention and your focus today and for coming on time. We will resume tomorrow morning promptly at 10. So please be on time in the jury room at 9:45 a.m. and I will give you, again, even though you just heard it about an hour and a half ago, my instructions that you are not to speak with each other. You are not to speak with any friends or family or anyone else. You are not to communicate through social media or any other mechanism about this case, anyone or anything having to do with it, a defendant, counsel, the court, any of the facts or evidence that you have received here in this courtroom, or to do any research about any of these issues as well.

Please send Mr. Morabito a note or let him know you would like to give him a note if you would like to send something to me. Please leave your notebooks in the jury room. We will take care of them and lock the room so that no one else goes in there and please take care and rest up. We are going to have a very full day tomorrow. Thank you, all, so much.

Please stand for the jury.

(Jury leaves the courtroom.)





THE COURT: Thank you, counsel. Have a seat, please.

I'd like to talk about the schedule for tomorrow, and I mentioned to Mr. Froccaro, and I believe it was Mr. Feldman, who was just at the sidebar with me that I would like each party's position on the questions relating to Ms. Johnson's testimony by 7 p.m., and that will help me to get an answer to all of you soon so that we can proceed with all of the witnesses who remain. We will all meet here at 9:15. So I will do my best to look up the law before then. If I need additional time I will need to revisit the questions during lunch.

So the government will need to have other witnesses lined up to go. I'd like to hear about who's on deck for tomorrow.

MR. FELDMAN: So, your Honor, the scheduling issue we wanted to raise was that, consistent with what we discussed earlier, we are going to have a virtual victim relative as the first witness tomorrow.

So if Mr. Morabito might be able to do the same thing that he did today that ensured that we worked out all the technology kinks, that would be really helpful for us and set a Zoom link for 9.

THE COURT: You said a Zoom link for 9 a.m. tomorrow for testing?





MR. FELDMAN: Yes.

THE COURT: I think that makes sense and I also think the parties should get here at 9 to make sure the kinks get worked out and in case I need to hear from you on the Cathy Johnson issue and I will try to give you a ruling before 10. If I can't get a ruling to you before 10 I will get a ruling to you latter but to the extent I can I want to try to do so.

Mr. Froccaro, any concerns?

MR. FROCCARO: Of course, Judge. I'll be here at 9 o'clock.

THE COURT: Thank you.

MR. FELDMAN: And our next witness will be Mary Lilienkamp.

We expect her to be, I would say the direct examination would be anywhere from an hour and a half to two hours, could be a little more than that. We were planning on calling Ms. Johnson as our next witness, but we also have the deposition, the Rule 15 deposition that we intend to play, and that is about 20 minutes, I believe.

THE COURT: Okay.

Ms. Lilienkamp should be prepared to go first, if necessary. So she should be here early ready to go right after the video testimony, if necessary, not clear





yet whether that will be necessary but, if so, she should be ready to go.

MR. FELDMAN: And we confirmed, your Honor, she will be here first thing.

So she'll be here at 9 a.m. ready to go with the remote testimony.

THE COURT: Okay.

Any further applications?

MR. FELDMAN: Not from the government, your Honor.

THE COURT: Thank you.

Mr. Froccaro?

MR. FROCCARO: Just goodnight, Judge.

THE COURT: Thank you all, so much.

See you tomorrow.

(Whereupon, the trial was adjourned until Thursday, March 13, 2025, at 9:15 a.m.)

I N D E X


| WITNESS | PAGE |
|---|---|
| CHERYL JACQUARD | 169 |
| PAMELA KAY PENCE | |
| DIRECT EXAMINATION BY MR. FELDMAN | 182 |
| CROSS-EXAMINATION BY MR. FROCCARO | 190 |
| CHERYL JACQUARD (Continued) | 207 |
| DIRECT EXAMINATION BY MS. ENTWISTLE | 207 |
| CROSS EXAMINATION BY MR. FROCCARO | 256 |
| REDIRECT EXAMINATION BY MS. ENTWHISTLE | 271 |
| RECROSS EXAMINATION BY MR. FROCCARO | 275 |
| ASHLEY SEIP | |
| DIRECT EXAMINATION BY MS. ENTWISTLE | 289 |
| CROSS-EXAMINATION BY MR. FROCCARO | 305 |
| MARILYN BURKS | |
| DIRECT EXAMINATION BY MR. FELDMAN | 311 |
| CROSS EXAMINATION BY MR. FROCCARO | 319 |
| REDIRECT EXAMINATION BY MR. FELDMAN | 321 |
| JOSEPH BIZZARRO | |
| DIRECT EXAMINATION BY MR. FELDMAN: | 324 |






E X H I B I T S


| | |
|---|---|
| GOVERNMENT EXHIBITS 63 AND 64 WERE RECEIVED IN EVIDENCE | 173 |
| GOVERNMENT EXHIBITS 63-OE AND 64-OE WERE RECEIVED IN EVIDENCE | 174 |
| GOVERNMENT'S EXHIBIT 14, 116, 117, 7, 122, 123, 124, 125, 301, 133, AND 158 | 239 |
| GOVERNMENT EXHIBIT 59 WAS RECEIVED IN EVIDENCE | 299 |
| GOVERNMENT EXHIBIT 62 WAS RECEIVED IN EVIDENCE | 312 |
| DEFENDANT'S EXHIBIT E | 320 |
| DEFENDANT'S EXHIBIT F | 321 |
| GOVERNMENT'S EXHIBIT 61-OE, 62-OE | 322 |
| GOVERNMENT'S EXHIBIT 251 | 329 |







| | |
|---|---|
| GOVERNMENT'S EXHIBIT 251-OE | 330 |
| GOVERNMENT'S EXHIBIT 255 | 332 |
| GOVERNMENT'S EXHIBIT 256 | 337 |
| DEFENSE EXHIBIT C WAS RECEIVED IN EVIDENCE | 202 |
| DEFENSE EXHIBIT D WAS RECEIVED IN EVIDENCE | 205 |

## $

**$1,180,350** [2] - 345:1, 345:7
**$1,200,000** [3] - 208:14, 209:14, 215:12
**$1,392,892** [1] - 225:15
**$1,392,892.45** [3] - 225:25, 226:5, 226:18
**$1,400,000** [1] - 343:10
**$1,673,000** [1] - 233:18
**$1,675,000** [3] - 233:9, 233:24, 349:21
**$1,731,000** [2] - 208:14, 244:9
**$1,850,000** [1] - 348:24
**$140,000** [4] - 211:9, 211:13, 211:23, 212:2
**$20** [46] - 185:17, 185:22, 186:11, 186:13, 186:17, 187:6, 189:12, 190:8, 190:9, 190:11, 190:18, 194:15, 194:18, 194:25, 196:14, 196:17, 197:17, 198:12, 198:19, 199:3, 199:23, 202:24, 204:2, 204:15, 204:17, 205:6, 206:5, 206:10, 300:15, 306:4, 309:23, 310:4, 315:15, 315:18, 316:4, 316:18, 317:18, 318:6, 318:9, 319:15, 319:18, 320:10, 321:1, 321:5, 321:16
**$200,000** [1] - 184:1
**$22,000** [1] - 335:14
**$300** [3] - 208:8, 220:22, 266:13
**$50** [1] - 186:1
**$67,793** [1] - 215:3

## '

**'16** [1] - 178:10
**'90S** [1] - 166:20

## /

**/SO** [1] - 253:13
**/TPOPL** [1] - 339:1

## 1

**1** [9] - 207:19, 215:18, 216:6, 262:15, 314:5, 314:8, 314:18, 314:24, 315:21
**1.2** [3] - 186:14, 209:17, 216:2
**1.7** [1] - 209:18
**10** [7] - 265:4, 320:10, 341:25, 342:23, 357:6, 359:6, 359:7
**10-14** [1] - 342:3
**10-OE** [4] - 342:6, 342:9, 342:14, 343:3
**100** [8] - 157:15, 162:20, 162:25, 171:16, 172:9, 233:12, 233:13, 323:2
**10017** [1] - 157:22
**103W** [1] - 157:19
**105** [2] - 209:5, 209:7
**10:00** [5] - 157:6, 161:11, 162:6, 162:11, 286:9
**10TH** [1] - 238:12
**11** [2] - 246:24, 343:12
**110** [1] - 236:14
**11050** [1] - 157:20
**112** [2] - 224:22, 225:1
**113** [3] - 231:7, 231:14, 231:17
**114** [2] - 228:4, 228:8
**115** [3] - 232:16, 232:20, 232:22
**116** [6] - 237:3, 239:5, 239:12, 241:19, 243:9, 362:9
**117** [7] - 237:4, 237:5, 239:6, 239:12, 241:19, 243:18, 362:9
**11722** [1] - 157:15
**11803** [1] - 217:24
**12** [5] - 157:6, 265:4, 317:16, 335:18, 344:12
**12-OE** [1] - 344:10
**121** [3] - 210:19, 210:21, 210:22
**122** [6] - 237:5, 239:6, 239:12, 241:19, 244:17, 362:9
**123** [6] - 237:8, 239:6, 239:12, 241:19, 247:22, 362:10
**124** [7] - 210:17, 237:8, 239:6, 239:13, 241:19, 248:22, 362:10
**125** [6] - 237:9, 239:6, 239:13, 241:19, 249:22, 362:10
**12:30** [5] - 168:3, 242:3, 242:21, 243:1, 243:3
**12:45** [4] - 243:3, 243:4, 277:1
**13** [7] - 290:25, 302:21, 335:6, 346:23, 360:17
**133** [5] - 237:10, 239:6, 239:13, 254:16, 362:10
**134** [4] - 221:14, 221:20, 221:23, 274:7
**1341** [1] - 278:10
**1343** [1] - 278:10
**137** [3] - 220:5, 220:11, 220:14
**138** [5] - 207:17, 207:22, 207:25, 209:6, 209:16
**14** [11] - 231:10, 234:10, 237:3, 239:5, 239:12, 241:19, 341:25, 349:5, 349:18, 349:20, 362:9
**14-OE** [3] - 342:6, 342:9, 342:14
**15** [7] - 173:15, 222:17, 224:16, 234:17, 277:4, 359:19
**158** [6] - 237:10, 239:6, 239:13, 241:20, 251:3, 362:10
**160-OE** [1] - 350:10
**162-OE** [1] - 350:10
**168** [1] - 283:11
**169** [2] - 283:11, 361:5
**17** [6] - 222:17, 224:16, 224:18, 239:15, 268:16, 324:15
**171-OE** [1] - 350:11
**173** [1] - 362:4
**173-OE** [1] - 350:11
**174** [3] - 171:25, 172:4, 362:7
**175-OE** [1] - 350:11
**175A** [1] - 350:11
**175A-OE** [1] - 350:11
**176** [7] - 216:13, 217:4, 217:8, 218:1, 218:3, 218:4, 218:17
**176-OE** [1] - 350:11
**176OE** [1] - 216:20
**177-OE** [1] - 350:11
**18** [1] - 278:8
**182** [1] - 361:7
**19** [4] - 268:15, 268:17, 268:21, 268:22
**190** [1] - 361:8
**1:15** [1] - 168:6
**1:30** [2] - 168:4, 174:11

## 2

**2** [5] - 189:19, 262:15, 313:10, 333:9, 334:23
**2,000** [1] - 211:24
**20** [12] - 157:19, 194:15, 234:17, 236:23, 248:9, 249:6, 249:8, 256:20, 268:15, 280:2, 281:14, 359:20
**2000'S** [2] - 237:17, 241:3
**2000S** [1] - 166:20
**2003** [1] - 280:8
**2007** [2] - 257:16, 257:18
**2008** [2] - 257:17, 257:18
**2012** [5] - 255:14, 278:13, 292:1, 292:22, 300:8
**2013** [3] - 190:14, 205:18
**2014** [1] - 190:14
**2014/'15** [1] - 300:8
**2014/2015** [1] - 305:15
**2015** [18] - 207:19, 208:6, 211:16, 220:8, 220:20, 221:17, 231:10, 247:5, 248:3, 248:9, 249:6, 249:8, 257:20, 258:7, 315:23, 325:2, 347:17, 347:21
**2015/2016** [5] - 182:22, 185:8, 293:17, 294:13, 312:4
**2016** [17] - 194:2, 204:19, 205:5, 254:10, 258:7, 283:12, 315:23, 317:16, 319:15, 320:10, 325:2, 325:16, 326:20, 333:9, 341:13, 347:4, 349:2
**201609011524-34.XLS** [1] - 251:14
**2017** [1] - 341:18
**202** [1] - 363:10
**2021** [1] - 283:4
**2022** [1] - 283:5
**2025** [3] - 157:6, 323:18, 360:17
**205** [1] - 363:12
**207** [2] - 361:9, 361:10
**20S** [1] - 291:3
**21** [3] - 268:2, 268:17, 268:22
**21-CR-00566(NJC** [1] - 157:2
**21-CR-566** [1] - 158:5
**22** [3] - 325:16, 326:20, 341:13
**23** [2] - 268:2, 336:6
**239** [1] - 362:10
**25,000** [3] - 249:13, 249:16
**251** [5] - 329:7, 329:13, 329:15, 333:13, 362:24
**251-OE** [4] - 329:23, 330:1, 330:4, 363:2
**255** [5] - 332:1, 332:3, 332:6, 332:7, 363:4
**256** [5] - 337:2, 337:8, 337:11, 361:11, 363:6
**263** [7] - 351:14, 351:16, 351:22,

352:13, 352:23, 353:8, 354:7
**263-OE** [2] - 351:12, 351:16
**27** [2] - 217:23, 218:21
**271** [2] - 268:1, 361:13
**272** [1] - 268:1
**275** [1] - 361:14
**28** [1] - 323:18
**289** [1] - 361:16
**299** [1] - 362:13
**2:00** [2] - 277:3, 280:16

## 3

**3** [6] - 230:17, 230:23, 231:2, 238:11, 240:15, 262:15
**300** [1] - 334:21
**300379** [2] - 278:13, 280:9
**301** [5] - 237:9, 239:6, 239:13, 241:19, 362:10
**305** [1] - 361:17
**31** [4] - 208:6, 220:8, 220:19, 334:6
**311** [1] - 361:19
**312** [1] - 362:16
**319** [1] - 361:20
**320** [1] - 362:18
**321** [2] - 361:21, 362:20
**322** [1] - 362:22
**324** [1] - 361:23
**329** [1] - 362:24
**3293** [1] - 278:8
**33** [1] - 241:19
**330** [1] - 363:2
**332** [1] - 363:4
**337** [1] - 363:6
**35** [1] - 279:12
**3500-PP2** [1] - 198:2
**3500CJ13** [1] - 268:1
**395** [5] - 238:11, 238:20, 239:1, 239:14, 277:14
**3:18** [1] - 333:2
**3:24** [1] - 333:5

## 4

**4** [1] - 262:16
**4/1/15** [1] - 244:21
**4/20/2015** [1] - 248:17
**4/3/15** [1] - 245:14
**403** [7] - 176:25, 177:6, 177:18, 240:1, 284:3, 285:18, 287:8
**404B** [1] - 240:14
**41** [2] - 171:25, 172:5
**41022** [3] - 183:22, 190:16, 205:15
**43** [2] - 171:25, 172:5
**435** [2] - 222:13, 224:15
**45** [4] - 225:15, 242:21, 281:19
**4:00** [1] - 281:21
**4:30** [2] - 281:22, 282:13

## 5

**5** [9] - 325:14, 326:10, 328:8, 328:10, 336:6, 336:12, 338:9, 343:4, 350:25
**500** [1] - 211:24
**501** [1] - 157:21
**514** [1] - 157:21
**570** [1] - 157:15
**575** [1] - 325:14
**59** [5] - 299:4, 299:15, 299:18, 309:15, 362:12
**5TH** [1] - 157:21

## 6

**607** [7] - 178:24, 277:24, 279:5, 285:24, 285:25, 286:2, 286:4
**61** [2] - 316:23, 317:6
**61-OE** [3] - 322:12, 322:15, 362:22
**62** [12] - 312:10, 312:16, 312:19, 312:23, 313:4, 313:11, 315:4, 315:21, 316:1, 316:22, 317:24, 362:15
**62-OE** [3] - 322:12, 322:15, 362:22
**63** [7] - 171:8, 171:19, 172:18, 173:2, 174:18, 193:17, 362:3
**63-0E** [1] - 193:18
**63-OE** [5] - 174:18, 174:22, 183:4, 193:21, 362:6
**64** [6] - 171:9, 171:20, 172:18, 173:2, 174:19, 362:3
**64-OE** [4] - 174:18, 174:22, 189:5, 362:6
**6652** [1] - 190:16
**66524** [1] - 205:14
**6:00** [1] - 282:9
**6:30** [2] - 282:23, 286:6

## 7

**7** [7] - 237:4, 239:6, 239:12, 241:19, 356:6, 358:7, 362:9
**71** [1] - 182:21
**7:30** [3] - 282:16, 288:3, 288:4

## 8

**8** [4] - 221:17, 232:2, 232:5, 232:8
**80,000** [1] - 249:13
**8036** [1] - 323:17
**8038** [1] - 323:18
**86** [1] - 290:9
**87** [1] - 290:9

## 9

**9** [6] - 205:5, 358:23, 358:24, 359:3, 359:11, 360:5
**9/15/16** [1] - 299:13
**90'S** [2] - 237:17, 241:3
**9:15** [2] - 358:10, 360:17
**9:40** [1] - 162:9
**9:45** [2] - 162:4, 357:7

## A

**A.M** [9] - 157:6, 161:11, 162:6, 162:11, 286:9, 357:7, 358:24, 360:5, 360:17
**AAA** [2] - 233:6, 349:14
**ABEYANT** [1] - 233:20
**ABILITY** [2] - 166:23, 191:18
**ABLE** [7] - 168:18, 300:11, 301:25, 303:2, 303:3, 347:10, 358:20
**ABOVE-MENTIONED** [11] - 208:3, 220:17, 222:2, 225:7, 228:11, 228:21, 231:5, 231:21, 232:11, 233:1, 351:23
**ABOVE-REFERENCED** [20] - 243:12, 243:22, 244:18, 247:24, 248:23, 249:24, 251:4, 254:19, 262:4, 274:10, 315:5, 316:2, 316:24, 317:11, 319:8, 320:7, 321:13, 329:16, 332:8, 337:9
**ABSOLUTE** [2] - 178:23, 282:21
**ABSOLUTELY** [5] - 168:11, 236:25, 284:5, 297:8, 329:10
**ACCEPT** [1] - 348:24
**ACCESS** [4] - 244:8, 282:25, 348:23, 349:2
**ACCOMMODATING** [1] - 243:5
**ACCOMPANIED** [1] - 202:22
**ACCOMPANYING** [1] - 306:2
**ACCORDING** [1] - 234:2
**ACCOUNT** [7] - 186:2, 186:3, 187:8, 293:5, 303:20, 303:22, 303:25
**ACCOUNTING** [1] - 265:14
**ACCURATELY** [1] - 330:14
**ACQUISITION** [1] - 338:5
**ACRONYMS** [3] - 209:2, 245:22, 261:16
**ACT** [1] - 347:11
**ACTION** [3] - 354:5, 354:13, 354:20
**ACTIVE** [1] - 290:11
**ACTIVITY** [1] - 250:10
**ACTUAL** [3] - 162:22, 211:20, 215:15
**ADD** [2] - 184:11, 215:25
**ADDED** [6] - 184:12, 184:23, 185:6, 260:7, 293:5, 344:14
**ADDING** [1] - 251:23
**ADDITIONAL** [7] - 179:23, 254:2, 266:5, 284:19, 284:22, 321:16, 358:11
**ADDRESS** [16] - 159:17, 164:1, 166:19, 177:12, 192:22, 205:18, 217:21, 229:8, 239:18, 277:2, 277:14, 278:21, 284:20, 304:25, 326:12, 326:14
**ADDRESSED** [6] - 183:18, 183:19, 183:21, 294:6, 314:11, 314:12
**ADDRESSES** [1] - 271:9
**ADJOINING** [1] - 289:23
**ADJOURNED** [1] - 360:16
**ADJUST** [1] - 173:19
**ADJUSTMENTS** [1] - 238:19
**ADMISSIBILITY** [2] - 163:18, 277:13
**ADMISSION** [9] - 172:14, 174:25, 175:1, 232:6, 236:4, 239:7, 319:25, 321:9, 322:12
**ADMISSIONS** [1] - 241:21
**ADMIT** [12] - 172:18, 207:21, 217:3,

218:11, 220:10, 221:19, 230:22, 231:13, 232:19, 239:5, 323:8, 350:4
**ADMITTED** [53] - 172:25, 173:1, 173:7, 174:21, 193:21, 202:16, 202:18, 205:1, 207:24, 209:5, 217:6, 218:9, 218:10, 218:13, 220:13, 221:22, 224:25, 228:7, 231:1, 231:16, 232:7, 232:21, 236:24, 239:11, 241:19, 241:25, 243:10, 243:19, 243:20, 244:17, 247:23, 248:22, 249:23, 251:3, 254:17, 261:24, 262:3, 274:8, 299:17, 312:18, 317:8, 320:4, 321:10, 322:14, 329:11, 330:3, 332:5, 337:4, 342:2, 342:7, 350:2, 351:15
**ADMITTING** [2] - 162:22, 236:7
**ADOPTED** [1] - 354:22
**ADVANCE** [1] - 160:12
**ADVERTISING** [1] - 231:11
**ADVICE** [10] - 158:25, 159:3, 159:15, 159:18, 159:22, 159:25, 160:14, 161:24, 169:17, 283:15
**ADVISE** [3] - 159:4, 249:18, 278:12
**ADVISED** [3] - 159:15, 261:8, 263:9
**ADVISEMENT** [1] - 226:3
**ADVISORY** [1] - 238:20
**ADVISORY** [2] - 343:18, 343:19
**AFFECT** [3] - 192:10, 279:25, 284:14
**AFFECTED** [5] - 184:20, 191:6, 191:12, 191:18, 191:20
**AFFECTS** [1] - 278:10
**AFTERNOON** [10] - 180:18, 289:8, 289:9, 311:12, 311:13, 322:2, 322:3, 324:6, 324:7, 340:2
**AGE** [1] - 290:24
**AGENTS** [2] - 324:23, 343:21
**AGGREGATE** [4] - 233:9, 265:10, 265:13, 349:21
**AGO** [27] - 183:13, 186:5, 187:2, 190:11, 191:5, 191:11, 191:19, 193:3, 194:4, 194:8, 194:12, 194:25, 197:3, 197:15, 198:6, 198:7, 199:21, 204:2, 204:14, 237:24, 239:22, 240:11, 283:7, 311:22, 314:14, 339:19, 357:8
**AGREE** [13] - 161:1, 161:6, 166:23, 179:21, 205:7, 222:15, 238:8, 256:16, 258:8, 287:15, 320:12, 348:18
**AGREED** [4] - 202:15, 283:7, 321:8, 323:6
**AGREEMENT** [4] - 158:21, 176:22, 179:13, 179:17
**AGREEMENTS** [1] - 353:18
**AHEAD** [10] - 168:14, 210:24, 220:4, 293:14, 317:17, 341:9, 343:11, 345:2, 348:20, 353:13
**AIDED** [1] - 157:25
**AIRPLANE** [1] - 311:21
**ALLEGATION** [1] - 283:1
**ALLEGATIONS** [1] - 275:25
**ALLERGIES** [1] - 195:13
**ALLOCUTION** [1] - 279:15
**ALLOW** [3] - 279:18, 281:2, 327:1
**ALLOWING** [1] - 325:9
**ALLUDE** [1] - 301:17
**ALMOST** [1] - 191:21
**ALTERNATE** [2] - 234:4, 234:8
**AMENDMENT** [3] - 165:2, 165:6, 166:3
**AMENDMENTS** [1] - 353:17
**AMERICA** [1] - 157:2
**AMERICA** [1] - 323:7
**AMNESIA** [1] - 191:22
**AMOUNT** [13] - 170:10, 183:23, 209:13, 215:23, 215:24, 225:14, 226:5, 246:22, 253:24, 313:9, 343:9, 344:25, 346:16
**AMOUNTS** [5] - 208:19, 216:9, 345:10, 345:25, 346:3
**AND** [3] - 362:3, 362:6, 362:10
**ANDREW** [2] - 314:12, 314:20
**ANIMALS** [1] - 290:21
**ANN** [1] - 158:9
**ANN** [1] - 157:16
**ANNEXED** [1] - 354:21
**ANSWER** [19] - 158:24, 159:12, 159:23, 162:1, 165:5, 176:17, 177:11, 188:4, 188:6, 198:16, 237:15, 237:25, 241:9, 283:17, 285:11, 294:10, 302:15, 302:17, 358:8
**ANSWERED** [1] - 185:5
**ANSWERING** [1] - 269:25
**ANSWERS** [2] - 169:14, 176:17
**ANTHONY** [1] - 248:14
**ANTHONY** [1] - 248:18
**ANTICIPATED** [1] - 166:10
**ANYWAY** [2] - 196:11, 218:14
**APOLOGIES** [1] - 213:5
**APOLOGIZE** [9] - 161:16, 210:19, 240:9, 243:20, 274:7, 296:22, 308:16, 333:24, 337:5
**APOLOGY** [1] - 278:3
**APPARENT** [1] - 293:10
**APPEAL** [1] - 279:8
**APPEAR** [7] - 216:24, 227:24, 230:19, 246:15, 352:2, 353:6, 354:12
**APPEARANCES** [1] - 158:6
**APPEARED** [1] - 301:8
**APPEARING** [1] - 227:21
**APPELLATE** [2] - 278:2, 279:14
**APPLICATION** [4] - 173:5, 202:2, 287:7, 332:16
**APPLICATIONS** [5] - 158:18, 162:16, 234:25, 277:11, 360:8
**APPOINT** [1] - 292:13
**APPRECIATE** [6] - 163:24, 195:10, 242:13, 311:25, 322:20, 355:20
**APPRISE** [1] - 340:12
**APPROACH** [9] - 165:12, 172:6, 216:14, 219:23, 269:2, 329:18, 350:1, 350:12, 351:18
**APPROACHED** [2] - 192:16, 193:1
**APPROACHING** [1] - 350:10
**APPROPRIATE** [2] - 161:13, 164:8
**APPROVAL** [1] - 344:2
**APPROVALS** [1] - 353:19
**APPROXIMATE** [4] - 211:8, 211:12, 214:24, 215:2
**APRIL** [4] - 207:19, 231:10, 247:5, 248:9
**AREA** [3] - 190:24, 330:24
**AREAS** [1] - 297:21
**ARGUMENT** [6] - 177:18, 180:12, 240:8, 279:1, 279:25, 284:3
**ARGUMENTATIVE** [1] - 201:15
**ARGUMENTS** [2] - 282:4, 283:21
**ARRANGEMENT** [2] - 271:24, 272:3
**ARRIVE** [1] - 224:8
**ARRIVED** [2] - 327:14, 327:17
**ARRIVING** [1] - 304:24
**ARTICLE** [1] - 353:22
**ARTICLES** [2] - 276:10, 353:16
**ASHLEY** [3] - 289:1, 289:3, 361:15
**ASHLEY** [4] - 281:11, 281:15, 288:12, 288:25
**ASKEW** [1] - 296:9
**ASSEMBLE** [1] - 236:16
**ASSEMBLED** [1] - 352:20
**ASSIGNMENT** [1] - 341:19
**ASSIST** [3] - 176:10, 277:7, 328:25
**ASSISTANCE** [2] - 176:11, 279:17
**ASSISTANT** [1] - 157:18
**ASSOCIATED** [3] - 276:18, 338:16, 340:7
**ASSORTED** [1] - 350:24
**ASSUME** [2] - 223:21, 290:10
**ASSUMING** [1] - 191:15
**ATTACH** [1] - 239:17
**ATTACHED** [5] - 225:6, 239:19, 240:14, 240:23, 319:10
**ATTACHMENT** [2] - 245:2, 251:13
**ATTACHMENTS** [1] - 251:11
**ATTACKED** [1] - 192:9
**ATTEMPT** [2] - 225:21, 225:23
**ATTENTION** [18] - 164:14, 165:1, 165:3, 166:12, 182:22, 238:5, 257:12, 263:4, 264:6, 276:24, 277:5, 278:12, 299:9, 300:22, 312:3, 324:25, 343:23, 357:4
**ATTITUDE** [1] - 348:17
**ATTORNEY** [1] - 157:14
**ATTORNEY** [7] - 160:7, 161:20, 283:12, 292:9, 292:15, 292:21, 323:8
**ATTORNEYS** [1] - 157:18
**ATTORNEYS** [2] - 161:22, 277:2
**ATTRACT** [1] - 257:12
**AUDI** [1] - 348:14
**AUGUST** [1] - 249:11
**AUSTRALIA** [1] - 348:16
**AUTHENTICATION** [1] - 164:17
**AUTHENTICITY** [3] - 163:12, 163:23, 323:9
**AUTHORITIES** [1] - 160:14
**AUTHORITY** [9] - 180:5, 281:3, 282:4, 282:9, 284:22, 285:1, 285:13, 285:15, 287:7

**AUTHORIZED** [1] - 194:1
**AV** [1] - 162:7
**AVAILABLE** [2] - 226:5, 266:10
**AVENGERS** [1] - 211:5
**AVENUE** [2] - 157:19, 157:21
**AVOID** [3] - 177:6, 190:2, 197:1
**AWARD** [3] - 186:23, 261:9, 301:16
**AWARDED** [4] - 226:6, 226:13, 226:18, 233:19
**AWARDEE** [2] - 233:11, 233:12
**AWARDS** [2] - 233:9, 349:21
**AWARE** [9] - 159:9, 165:1, 193:8, 304:1, 304:6, 304:7, 319:17, 320:17, 320:19

## B

**B-I-Z-Z-A-R-R-O** [1] - 324:3
**B-U-R-K-S** [1] - 311:5
**BACKGROUND** [2] - 238:10, 297:23
**BAD** [1] - 178:12
**BADGES** [1] - 255:22
**BALLPARK** [2] - 258:10, 297:14
**BANK** [6] - 186:1, 186:9, 187:8, 194:21, 303:22
**BANKING** [1] - 279:25
**BANKMAN** [1] - 160:17
**BANKMAN-FRIED** [1] - 160:17
**BARCODES** [1] - 300:1
**BARGAIN** [1] - 264:22
**BASAL** [1] - 185:10
**BASED** [12] - 177:24, 203:23, 224:12, 249:10, 254:25, 260:2, 263:25, 270:15, 272:18, 296:13, 296:18, 300:1
**BASEMENT** [7] - 330:20, 330:25, 331:2, 331:10, 331:13, 333:14, 336:12
**BASIC** [1] - 165:5
**BASIS** [6] - 192:6, 201:2, 236:10, 272:18, 283:13, 287:9
**BASS** [2] - 212:11, 214:22
**BATES** [5] - 339:3, 339:5, 339:8, 339:9, 339:20
**BE** [2] - 246:24, 246:25
**BEAGLE** [2] - 281:6, 282:15
**BECAME** [3] - 291:15, 293:5, 293:10
**BECOME** [5] - 176:25, 291:10, 291:11, 293:8, 294:19
**BECOMES** [1] - 280:19
**BEFORE** [1] - 157:10
**BEFOREHAND** [3] - 171:13, 177:11, 237:16
**BEGAN** [3] - 160:4, 257:15, 283:3
**BEGIN** [4] - 297:20, 328:19, 338:2, 348:23
**BEGINNING** [5] - 208:6, 220:20, 233:10, 238:14, 273:15
**BEHALF** [1] - 304:9
**BEHIND** [1] - 331:6
**BELOW** [13] - 184:14, 184:15, 184:17, 185:6, 189:13, 212:11, 229:5, 229:10, 246:23, 254:21, 264:5, 333:19, 347:5
**BENCH** [1] - 162:8
**BEST** [8] - 184:12, 187:6, 197:20, 198:7, 281:20, 282:22, 358:10
**BETTER** [6] - 196:12, 249:17, 265:13, 289:17, 289:18, 292:17
**BETTER** [1] - 316:19
**BETWEEN** [8] - 209:20, 210:5, 281:19, 302:6, 315:21, 320:23, 323:1, 323:6
**BIG** [4] - 262:24, 301:19, 302:10, 334:12
**BIGGER** [4] - 203:8, 205:10, 205:12, 225:20
**BILL** [2] - 258:11, 294:17
**BILLING** [1] - 266:13
**BILLS** [6] - 293:6, 294:5, 294:20, 300:9, 301:25, 348:10
**BINDER** [12] - 171:20, 172:12, 352:2, 352:3, 352:4, 352:7, 352:9, 352:15, 352:17, 353:1, 353:11, 354:3
**BIRTHDAY** [2] - 191:24
**BIRTHDAYS** [1] - 191:21
**BIT** [4] - 169:24, 242:4, 243:3, 324:15
**BIZZARRO** [2] - 323:22, 361:22
**BIZZARRO** [18] - 164:7, 164:9, 281:18, 323:21, 324:2, 324:8, 329:22, 330:7, 331:1, 332:11, 333:15, 333:25, 335:20, 337:14, 350:10, 350:15, 355:18, 355:19
**BLACK** [1] - 233:7
**BLAMING** [1] - 306:8
**BLOOD** [1] - 185:10
**BLOW** [2] - 195:4, 354:8
**BLUE** [2] - 244:4, 244:5
**BLURRY** [7] - 195:20, 196:5, 196:11, 203:2, 203:4, 203:6, 335:20
**BMW** [1] - 348:13
**BNO** [2] - 249:13, 249:16
**BOARD** [2] - 343:18, 343:19
**BOARDING** [1] - 290:19
**BODY** [1] - 229:5
**BOGUS** [1] - 316:17
**BOLD** [1] - 301:20
**BOOK** [6] - 208:9, 220:23, 264:21, 265:1, 265:9, 280:1
**BOOKLET** [8] - 208:17, 208:18, 209:22, 209:23, 211:2, 213:3, 214:18, 264:14
**BOOKLETS** [1] - 270:14
**BOOKS** [1] - 265:5
**BORDER** [1] - 303:16
**BORDERLINE** [1] - 201:15
**BORN** [2] - 191:25, 192:3
**BOTTLE** [1] - 335:9
**BOTTOM** [19] - 159:10, 167:11, 208:5, 222:1, 222:5, 224:12, 227:10, 230:1, 248:4, 250:1, 250:2, 261:18, 295:7, 299:10, 299:11, 299:23, 345:21, 354:10
**BOUGHT** [3] - 186:24, 273:13, 273:15
**BOULEVARD** [1] - 325:14
**BOX** [6] - 183:19, 183:20, 194:24, 196:2, 288:17, 300:19
**BOX** [4] - 190:16, 205:14, 217:23, 218:21
**BOXES** [1] - 300:18
**BRAIN** [2] - 192:9, 278:5
**BRAZIL** [1] - 348:16
**BREAK** [19] - 174:10, 234:14, 234:18, 234:19, 235:7, 242:5, 242:20, 242:22, 243:1, 243:4, 275:22, 276:6, 286:20, 340:2, 340:5, 340:15, 340:21
**BRIEF** [7] - 162:18, 171:22, 177:7, 187:13, 318:17, 344:4, 355:10
**BRIEFING** [1] - 288:2
**BRIEFLY** [19] - 175:10, 179:20, 212:8, 217:12, 226:9, 227:9, 228:13, 238:2, 252:4, 255:16, 257:21, 271:15, 271:18, 273:20, 280:10, 280:12, 321:24, 326:12, 349:4
**BRIGHT** [1] - 301:15
**BRIGHTLY** [1] - 301:20
**BRING** [14] - 162:4, 162:8, 162:9, 164:25, 168:12, 179:16, 236:2, 241:2, 242:12, 242:15, 266:8, 280:5, 281:21, 287:25
**BRINGING** [2] - 166:11, 201:4
**BROKEN** [1] - 171:25
**BROOKS** [5] - 290:7, 292:19, 292:23, 294:8, 300:21
**BROOKS'S** [1] - 299:12
**BROTHER** [3] - 191:23, 192:1, 290:5
**BROTHERS'** [1] - 191:20
**BROUGHT** [4] - 164:14, 183:8, 190:24, 264:6
**BUILDING** [6] - 255:19, 326:14, 326:15, 326:17, 327:11, 328:15
**BUILT** [1] - 290:16
**BULLET** [3] - 226:10, 226:11, 226:19
**BUREAU** [1] - 316:19
**BURKS** [23] - 281:15, 281:16, 310:20, 310:22, 311:4, 311:5, 311:12, 312:12, 312:22, 313:3, 315:7, 316:11, 316:20, 317:1, 317:13, 317:21, 317:22, 318:19, 319:3, 320:10, 322:2, 322:18, 322:19
**BURKS** [2] - 311:7, 361:18
**BURKS** [1] - 314:7
**BUSINESS** [17] - 163:5, 163:7, 163:12, 164:16, 164:18, 178:13, 202:23, 205:5, 221:9, 257:16, 258:16, 258:18, 271:24, 272:2, 323:15, 326:16, 348:11
**BUSINESS** [1] - 316:19
**BUSINESSES** [4] - 258:11, 258:24, 323:12, 323:14
**BUY** [1] - 186:24
**BY** [68] - 157:16, 182:10, 189:2, 190:22, 193:24, 196:1, 207:13, 243:8, 248:1, 248:25, 256:7, 268:12, 269:13, 271:21, 275:3, 289:7, 289:20, 299:6, 299:24, 301:4, 305:9, 308:3, 309:10, 309:21, 311:11, 312:11, 312:21, 313:2, 319:2, 320:9, 321:15, 322:1, 324:5, 329:21, 330:6, 332:10, 337:13, 341:11, 342:11, 343:1, 343:15,

344:11, 344:22, 345:19, 346:5, 346:14, 347:1, 347:18, 349:7, 349:23, 350:14, 350:22, 352:1, 352:24, 353:10, 354:11, 361:7, 361:8, 361:10, 361:11, 361:12, 361:14, 361:16, 361:17, 361:19, 361:20, 361:21, 361:23
**BYLAWS** [3] - 353:17, 354:21, 354:22

## C

**CAGING** [3] - 246:12, 250:6, 254:3
**CALCULATE** [2] - 215:10, 215:20
**CALCULATED** [1] - 265:10
**CALCULATION** [2] - 210:4, 210:14
**CAMERA** [4] - 170:24, 218:7, 330:8, 333:12
**CANCER** [1] - 185:10
**CANDIDATE** [1] - 233:14
**CANDIDATES** [1] - 233:20
**CANNOT** [4] - 168:17, 168:21, 170:3, 346:2
**CANS** [5] - 333:7, 333:15, 333:20, 334:1, 334:3
**CAPTURE** [2] - 331:19, 331:23
**CAR** [1] - 186:25
**CARE** [8] - 289:24, 290:20, 291:19, 292:15, 292:22, 294:21, 357:20, 357:21
**CAREFUL** [1] - 177:1
**CAREFULLY** [1] - 347:22
**CAROLINA** [1] - 311:15
**CARPENTRY** [1] - 290:16
**CARRY** [1] - 166:8
**CARS** [1] - 293:24
**CASE** [34] - 160:16, 173:13, 193:2, 208:17, 236:5, 236:12, 240:3, 241:14, 275:23, 276:9, 276:12, 276:18, 279:25, 280:8, 282:25, 286:8, 287:3, 303:4, 305:22, 325:1, 325:12, 328:22, 331:10, 332:25, 340:6, 340:10, 340:17, 341:13, 341:14, 341:19, 341:21, 346:9, 357:12, 359:4
**CASES** [7] - 162:20, 163:3, 180:3, 180:12, 283:4, 284:12, 287:22
**CASH** [27] - 179:24, 182:25, 186:19, 190:17, 206:8, 211:15, 211:19, 244:3, 244:6, 244:8, 261:9, 293:24, 295:4, 295:9, 300:19, 303:10, 303:15, 312:6, 318:15, 335:9, 335:10, 335:13, 335:15, 343:21, 345:9, 347:11, 348:9
**CASHING** [2] - 191:16, 206:10
**CAT** [3] - 167:6, 281:2, 290:19
**CATHY** [17] - 164:7, 250:4, 250:5, 250:16, 250:21, 251:9, 251:20, 251:23, 254:2, 254:6, 258:19, 275:9, 328:7, 328:8, 335:10, 356:3, 359:5
**CAUGHT** [1] - 238:7
**CAUSE** [1] - 157:9
**CAUSED** [3] - 198:11, 198:18, 202:24
**CAUTION** [1] - 201:10
**CAUTIONING** [1] - 201:18
**CBS** [6] - 228:15, 229:2, 229:6, 229:13, 230:5, 230:7
**CCING** [1] - 244:24
**CDL** [2] - 291:12, 291:13
**CDS** [1] - 257:1
**CENTER** [2] - 217:23, 218:21
**CENTRAL** [2] - 157:4, 157:15
**CENTS** [5] - 222:17, 224:16, 224:18, 225:15, 225:16
**CERTAIN** [9] - 158:22, 163:25, 164:1, 227:6, 260:1, 293:15, 296:14, 332:17, 339:10
**CERTAINLY** [5] - 165:23, 177:19, 178:4, 179:15, 283:11
**CERTIFICATE** [1] - 194:1
**CERTIFICATE** [11] - 194:12, 198:24, 199:3, 202:5, 202:6, 283:12, 353:16, 353:22, 354:5, 354:12, 354:22
**CERTIFICATES** [4] - 352:25, 353:6, 353:19, 354:19
**CERTIFIED** [1] - 348:25
**CETERA** [2] - 179:24, 287:11
**CHAIN** [2] - 248:5, 323:8
**CHALLENGE** [1] - 212:12
**CHALLENGE** [2] - 178:3, 179:15
**CHANCE** [7] - 225:6, 240:24, 280:11, 282:3, 314:8, 314:16, 342:13
**CHANGE** [2] - 341:15, 341:17
**CHANGED** [1] - 205:18
**CHARGE** [1] - 280:1
**CHARGED** [3] - 178:14, 240:3, 280:6
**CHARGES** [2] - 208:8, 220:22
**CHARLES** [1] - 158:10
**CHARLES** [1] - 157:17
**CHAT** [1] - 168:5
**CHECK** [25] - 186:8, 187:5, 190:11, 191:8, 191:14, 191:16, 191:19, 192:7, 192:14, 192:15, 197:18, 205:4, 205:20, 206:2, 206:3, 206:10, 300:17, 318:9, 320:11, 321:1, 321:4, 321:16, 348:25
**CHECKED** [5] - 194:25, 195:2, 196:3, 260:13, 300:19
**CHECKING** [2] - 266:1, 293:5
**CHECKMARKS** [3] - 184:7, 184:11, 184:12
**CHECKS** [10] - 179:24, 295:4, 295:9, 296:12, 300:9, 300:10, 302:6, 302:7, 326:3
**CHEROKEE** [2] - 211:16, 211:24
**CHERYL** [5] - 169:2, 169:7, 207:9, 361:5, 361:9
**CHERYL** [2] - 169:7, 206:25
**CHEVY** [1] - 348:14
**CHILDREN** [1] - 291:2
**CHOCOLATE** [2] - 242:9, 242:10
**CHOOSE** [1] - 348:13
**CHOUDHURY** [1] - 157:10
**CHRISTINE** [1] - 158:12
**CIRCLE** [12] - 247:9, 248:3, 248:20, 258:25, 259:11, 267:22, 274:1, 318:20, 320:11, 320:15, 321:1
**CIRCLE** [1] - 244:21
**CIRCLED** [1] - 190:6
**CIRCUIT** [1] - 285:14
**CITED** [1] - 160:17
**CITES** [1] - 180:10
**CITY** [1] - 182:17
**CLAIMING** [1] - 226:4
**CLAIMS** [1] - 176:11
**CLARIFY** [1] - 176:15
**CLASS** [2] - 291:11, 291:12
**CLASS** [7] - 222:13, 222:20, 222:21, 223:3, 224:8, 224:15, 273:23
**CLEAN** [1] - 176:9
**CLEAR** [17] - 162:2, 171:5, 177:14, 177:15, 209:15, 247:3, 258:14, 283:13, 291:17, 292:18, 294:11, 327:25, 328:20, 330:9, 338:19, 359:25
**CLEARLY** [1] - 201:5
**CLIENT** [8] - 161:19, 163:19, 179:12, 237:19, 239:25, 279:14, 296:11, 297:16
**CLIENT'S** [3] - 202:23, 205:5, 206:5
**CLOCK** [1] - 233:22
**CLOSE** [10] - 167:9, 167:11, 173:13, 190:24, 281:21, 281:25, 290:22, 291:5, 291:16, 292:16
**CLOSED** [1] - 178:9
**CLOSER** [2] - 289:15, 291:6
**CO2** [1] - 335:22
**COCOUNSEL** [1] - 355:11
**CODE** [4] - 246:9, 246:15, 252:18, 253:9
**CODES** [2] - 252:20, 252:21
**CODING** [2] - 229:13, 229:16
**COGNITIVE** [1] - 305:16
**COINS** [1] - 257:1
**COLLECTING** [2] - 172:1, 277:7
**COLLEGE** [1] - 291:4
**COLORED** [1] - 301:20
**COLORFUL** [1] - 301:15
**COLUMN** [13] - 245:5, 245:7, 245:17, 245:19, 245:23, 246:1, 246:6, 246:18, 246:19, 246:22, 252:6, 253:17, 253:22
**COLUMNS** [4] - 250:23, 251:1, 252:2, 253:23
**COMING** [13] - 181:10, 237:18, 240:3, 244:23, 250:4, 253:25, 272:18, 276:5, 302:11, 302:14, 302:19, 344:19, 357:5
**COMMENCEMENT** [1] - 164:13
**COMMENT** [1] - 268:5
**COMMITTING** [1] - 159:12
**COMMON** [1] - 279:2
**COMMUNICATE** [2] - 276:24, 357:11
**COMMUNICATION** [3] - 264:8, 264:9, 276:3
**COMPANIES** [3] - 247:12, 256:22, 256:25
**COMPANY** [23] - 190:10, 206:5, 217:18,

217:22, 219:3, 234:7, 238:21, 247:8, 255:20, 255:25, 267:17, 269:24, 270:22, 291:13, 316:17, 318:8, 318:12, 318:19, 335:25, 336:3, 338:17, 344:23
**COMPARE** [1] - 314:16
**COMPELLED** [1] - 287:9
**COMPILE** [1] - 263:23
**COMPILED** [2] - 203:21, 346:20
**COMPLAIN** [1] - 317:25
**COMPLAINT** [3] - 237:17, 240:2, 338:12
**COMPLAINTS** [2] - 238:17, 238:20
**COMPLETE** [1] - 347:22
**COMPLETED** [1] - 345:5
**COMPLETELY** [2] - 203:21, 263:22
**COMPLETING** [1] - 244:10
**COMPLETION** [1] - 184:13
**COMPLICATED** [1] - 179:1
**COMPUTER** [2] - 338:6, 339:7
**COMPUTER** [1] - 157:25
**COMPUTER-AIDED** [1] - 157:25
**COMPUTERIZED** [1] - 157:24
**COMPUTERS** [1] - 326:24
**CONCERN** [8] - 163:22, 177:16, 239:24, 242:7, 277:18, 297:9, 316:16, 317:18
**CONCERNED** [1] - 287:13
**CONCERNING** [2] - 162:19, 166:17
**CONCERNS** [12] - 162:12, 162:13, 163:5, 163:7, 175:8, 176:15, 179:23, 276:24, 292:25, 293:1, 340:11, 359:9
**CONCLUDE** [1] - 223:19
**CONCLUDED** [3] - 201:20, 213:9, 356:18
**CONCURRENTLY** [1] - 325:18
**CONDITION** [2] - 336:24, 352:18
**CONDUCT** [10] - 166:19, 166:20, 175:17, 236:12, 324:21, 325:21, 328:14, 331:8, 336:21, 338:1
**CONDUCTED** [6] - 203:20, 259:15, 263:21, 332:21, 341:12, 341:20
**CONDUCTING** [1] - 336:17
**CONFER** [4] - 167:2, 205:22, 271:15, 355:11
**CONFERENCE** [4] - 188:1, 188:5, 296:1, 307:1
**CONFERRED** [1] - 237:15
**CONFERRING** [1] - 160:12
**CONFIRM** [1] - 208:15
**CONFIRMED** [1] - 360:3
**CONFRONT** [1] - 240:7
**CONFUSE** [1] - 278:6
**CONFUSED** [2] - 240:12, 240:22
**CONNECT** [1] - 297:16
**CONNECTED** [3] - 219:15, 219:21, 263:6
**CONNECTION** [5] - 193:2, 259:10, 305:22, 308:6, 328:8
**CONSENTS** [2] - 353:17, 354:19
**CONSIDERATION** [2] - 162:23, 163:4
**CONSISTENT** [1] - 358:17
**CONSPIRACY** [3] - 178:19, 238:10, 240:25
**CONSTRUCTION** [1] - 290:15
**CONSULT** [2] - 161:5, 226:16
**CONSULTING** [1] - 326:18
**CONSUMER** [26] - 202:21, 203:16, 238:17, 256:24, 261:8, 262:8, 262:11, 262:22, 263:2, 263:9, 263:10, 264:13, 264:16, 264:18, 264:23, 265:5, 270:12, 270:19, 270:23, 271:9, 306:2, 315:1, 315:22, 322:5, 346:6, 346:8
**CONSUMERS** [2] - 259:16, 260:5
**CONTACT** [6] - 217:18, 217:20, 217:22, 218:19, 218:23
**CONTAINED** [1] - 353:25
**CONTAINER** [1] - 334:12
**CONTAINERS** [1] - 334:9
**CONTENTION** [1] - 176:7
**CONTEXT** [5] - 223:13, 223:20, 238:2, 278:9, 287:8
**CONTINUE** [5] - 167:2, 237:7, 242:20, 248:18, 294:10
**CONTINUE** [1] - 243:6
**CONTINUED** [19] - 187:16, 188:9, 195:25, 200:4, 201:21, 212:15, 213:10, 235:10, 236:1, 295:12, 298:11, 306:12, 307:14, 313:12, 314:1, 340:24, 355:24, 356:19, 361:9
**CONTINUES** [1] - 158:1
**CONTINUING** [3] - 253:17, 254:10, 254:14
**CONVENIENCE** [1] - 347:25
**CONVERSATION** [3] - 223:9, 274:15, 274:16
**CONVEY** [3] - 165:3, 165:8, 179:2
**CONVEYED** [1] - 159:7
**CONVICTED** [2] - 176:10, 279:9
**COOPERATING** [1] - 284:12
**COPIES** [4] - 172:1, 172:12, 174:18, 273:17
**COPY** [12] - 165:8, 165:14, 166:25, 216:19, 218:1, 219:1, 230:19, 232:13, 246:15, 316:16, 351:14, 352:13
**COPYING** [1] - 266:14
**CORNER** [5] - 229:4, 229:7, 333:19, 334:2, 349:10
**CORPORATE** [6] - 203:20, 230:14, 230:15, 263:22, 335:24, 352:14
**CORPORATION** [5] - 351:2, 353:1, 354:19, 354:23, 355:1
**CORPORATIONS** [1] - 323:17
**CORRECT** [113] - 159:8, 183:21, 187:3, 191:7, 191:13, 192:14, 192:18, 194:9, 194:20, 195:3, 197:22, 204:16, 204:21, 206:5, 209:3, 209:19, 210:8, 210:15, 212:1, 212:2, 218:22, 221:13, 224:21, 232:15, 245:16, 245:24, 246:16, 246:17, 251:21, 253:7, 253:16, 253:21, 254:11, 256:24, 257:10, 257:13, 257:14, 257:21, 257:24, 258:3, 258:5, 258:6, 258:12, 258:17, 258:21, 259:1, 259:7, 259:8, 259:16, 259:19, 260:2, 260:17, 260:20, 261:3, 261:4, 261:9, 261:11, 261:14, 261:15, 261:17, 262:8, 262:9, 262:13, 262:22, 262:23, 263:5, 263:8, 263:12, 264:16, 264:17, 264:19, 264:20, 264:23, 265:1, 265:7, 265:12, 265:14, 265:15, 265:22, 266:12, 266:21, 266:22, 266:24, 266:25, 267:3, 267:6, 267:10, 267:11, 270:12, 270:17, 270:21, 270:22, 270:24, 271:2, 271:5, 271:9, 271:10, 273:8, 273:24, 275:10, 278:3, 278:20, 280:9, 286:13, 292:20, 305:17, 305:23, 309:24, 310:5, 310:6, 321:17, 331:17, 341:22
**CORRECTED** [1] - 190:14
**CORRECTION** [1] - 320:2
**CORRECTLY** [1] - 259:25
**CORRESPONDENCE** [1] - 248:19
**COTE** [1] - 160:16
**COUNSEL** [2] - 165:14, 288:1
**COUNSEL** [37] - 158:6, 158:10, 158:21, 158:22, 159:1, 159:15, 159:18, 160:1, 160:14, 168:10, 171:13, 176:11, 179:22, 205:22, 210:18, 237:6, 241:22, 242:23, 275:25, 276:8, 279:6, 279:17, 280:12, 283:5, 283:8, 285:8, 322:4, 329:8, 332:2, 339:22, 340:8, 340:9, 351:7, 355:23, 356:15, 357:13, 358:1
**COUNT** [2] - 214:7, 214:11
**COUNTER** [1] - 335:9
**COUPLE** [9] - 179:7, 183:16, 187:11, 238:5, 242:6, 242:23, 256:4, 277:1, 293:10
**COURSE** [18] - 161:2, 161:8, 167:7, 167:9, 167:16, 176:18, 177:5, 178:21, 180:6, 208:10, 220:23, 242:17, 257:9, 268:8, 298:7, 298:9, 306:7, 359:10
**COURT** [23] - 157:23, 160:3, 160:10, 163:2, 165:3, 165:7, 165:8, 166:24, 167:1, 167:2, 171:13, 171:14, 172:1, 173:4, 175:13, 179:5, 238:21, 283:10, 283:11, 283:14, 284:22, 286:16, 340:8
**COURT** [270] - 157:1, 157:10, 158:3, 158:13, 158:17, 159:4, 159:7, 160:11, 160:25, 161:4, 161:9, 162:3, 162:14, 162:16, 162:24, 163:5, 163:7, 163:10, 163:16, 163:21, 164:3, 164:10, 164:22, 165:10, 165:13, 165:17, 165:25, 166:2, 166:5, 166:11, 167:3, 167:13, 167:17, 167:21, 167:24, 168:4, 168:8, 168:10, 168:15, 168:20, 169:9, 170:17, 171:3, 171:15, 171:19, 172:2, 172:7, 172:11, 172:25, 173:6, 173:12, 173:21, 173:25, 174:7, 174:20, 174:24, 175:6, 175:20, 175:24, 176:23, 177:3, 177:6, 177:8, 177:16, 177:20, 178:16, 179:18, 180:4, 180:8, 180:15, 180:20, 180:25,

181:8, 187:13, 188:3, 193:16, 193:20, 200:3, 201:2, 201:5, 201:9, 201:14, 201:18, 202:2, 202:18, 205:1, 205:9, 205:21, 205:23, 206:14, 206:17, 206:21, 207:2, 207:5, 207:24, 210:18, 210:21, 210:24, 212:13, 213:2, 213:6, 213:8, 214:2, 216:16, 217:6, 218:3, 218:5, 218:8, 218:13, 218:15, 220:1, 220:4, 220:13, 221:22, 224:25, 228:7, 230:24, 231:1, 231:16, 232:7, 232:21, 234:12, 234:19, 234:23, 235:4, 235:6, 236:2, 236:13, 236:21, 237:1, 237:11, 237:21, 237:25, 238:24, 239:2, 239:9, 239:11, 239:14, 239:23, 240:4, 240:12, 240:16, 240:22, 241:10, 241:16, 241:25, 242:3, 242:10, 242:15, 242:19, 256:5, 262:2, 268:6, 268:9, 268:18, 268:24, 269:3, 269:6, 269:11, 271:13, 271:17, 275:18, 275:21, 277:10, 278:16, 278:23, 279:11, 280:7, 280:13, 280:21, 281:7, 282:2, 282:11, 282:14, 282:19, 282:23, 283:23, 284:6, 284:18, 284:24, 285:12, 286:2, 286:4, 286:11, 286:14, 286:19, 287:3, 287:20, 288:8, 288:14, 289:14, 289:18, 295:10, 296:3, 296:6, 296:13, 296:25, 297:22, 297:25, 298:5, 298:8, 299:2, 299:17, 305:4, 306:10, 307:3, 307:10, 307:12, 308:2, 308:8, 308:15, 309:14, 309:17, 310:11, 310:14, 310:17, 310:21, 312:18, 317:8, 317:10, 318:23, 319:7, 319:23, 320:1, 320:4, 321:10, 321:22, 322:14, 322:19, 322:22, 323:3, 329:11, 329:14, 329:20, 330:3, 332:5, 332:16, 337:4, 337:7, 339:22, 340:1, 340:20, 341:3, 341:7, 342:2, 342:7, 344:5, 350:2, 350:5, 350:8, 350:13, 351:11, 351:15, 351:20, 355:15, 355:19, 355:23, 356:2, 356:5, 356:10, 356:14, 357:2, 358:1, 358:24, 359:2, 359:12, 359:22, 360:7, 360:11, 360:14

**COURT** [23] - 158:2, 160:5, 189:1, 202:1, 214:1, 276:1, 276:16, 280:11, 287:2, 299:1, 308:1, 325:9, 332:15, 333:6, 334:8, 334:24, 335:7, 335:19, 336:7, 337:12, 340:10, 357:1, 357:13

**COURT'S** [8] - 165:1, 165:22, 171:11, 176:5, 176:14, 179:2, 238:9, 278:12

**COURTESY** [1] - 172:21

**COURTHOUSE** [1] - 157:4

**COURTROOM** [12] - 168:17, 168:25, 169:25, 178:18, 234:22, 242:18, 276:13, 277:9, 340:19, 341:6, 357:15, 357:25

**COURTROOM** [26] - 158:4, 168:16, 169:1, 169:5, 170:1, 170:4, 170:6, 170:9, 170:12, 170:18, 170:21, 170:24, 180:22, 181:1, 181:3, 181:5, 181:22, 181:25, 182:2, 288:16, 288:22, 308:13, 309:12, 310:23, 311:1, 323:25

**COVER** [1] - 254:6

**COVERED** [5] - 171:15, 172:9, 237:21, 238:9, 239:17

**COVERING** [1] - 254:12

**COVERS** [1] - 164:11

**CPC** [2] - 232:1, 232:14

**CREATE** [3] - 327:18, 328:24, 330:10

**CREATING** [1] - 267:8

**CREATIVE** [1] - 275:15

**CREDIBILITY** [8] - 176:8, 176:20, 176:24, 177:21, 178:1, 178:21, 278:25, 279:4

**CREDIBLE** [1] - 177:25

**CRIME** [3] - 280:6, 325:11, 325:20

**CRIMINAL** [1] - 157:9

**CRIMINAL** [4] - 175:17, 178:6, 280:4, 324:21

**CROSS** [8] - 190:21, 256:6, 305:8, 319:1, 361:8, 361:11, 361:17, 361:20

**CROSS** [15] - 158:23, 159:18, 159:22, 161:25, 166:1, 169:12, 169:16, 174:3, 178:22, 201:17, 201:19, 277:17, 278:19, 279:7, 284:8

**CROSS-EXAMINATION** [1] - 169:16

**CROSS-EXAMINATION** [4] - 190:21, 305:8, 361:8, 361:17

**CROSS-EXAMINED** [1] - 169:12

**CROSS-EXAMINING** [2] - 178:22, 201:19

**CRR** [1] - 157:23

**CUSTODY** [1] - 323:9

**CUSTOMER** [1] - 224:8

**CUSTOMERS** [1] - 274:21

**CUTOFF** [1] - 244:21

**CYCLE** [2] - 249:15, 249:17

## D

**DAMAGE** [2] - 313:5, 314:2

**DATA** [4] - 246:4, 254:2, 258:20, 271:7

**DATE** [29] - 202:20, 205:3, 208:1, 217:9, 218:18, 220:15, 221:24, 225:2, 228:9, 231:3, 231:18, 232:9, 232:23, 239:22, 245:8, 245:9, 245:10, 245:11, 245:12, 245:14, 252:10, 252:11, 255:14, 299:13, 317:13, 317:15

**DATED** [2] - 248:17, 323:18

**DATES** [2] - 258:9, 266:24

**DAUGHTER** [1] - 289:22

**DAY-TO-DAY** [1] - 267:17

**DAYS** [4] - 222:24, 239:22, 240:11, 291:22

**DEACTIVATE** [1] - 168:14

**DEALING** [1] - 167:8

**DEALT** [1] - 283:18

**DEATH** [1] - 293:4

**DECIDED** [5] - 226:2, 267:9, 291:10, 291:22, 292:10

**DECISION** [4] - 160:15, 160:17, 179:18, 280:24

**DECISIONS** [1] - 227:6

**DECK** [3] - 281:9, 356:4, 358:15

**DECLARED** [2] - 225:24, 345:24

**DECLINE** [1] - 305:16

**DEEM** [1] - 172:25

**DEFENDANT** [5] - 157:8, 190:25, 285:19, 323:7, 357:13

**DEFENDANT** [1] - 157:19

**DEFENDANT'S** [1] - 323:16

**DEFENDANT'S** [2] - 362:18, 362:20

**DEFENDANT'S** [10] - 172:24, 261:25, 308:4, 319:6, 319:22, 320:1, 320:6, 321:8, 321:9, 321:12

**DEFENSE** [19] - 158:21, 158:22, 159:1, 160:1, 171:12, 173:9, 176:11, 220:2, 240:24, 241:4, 277:22, 279:6, 282:3, 284:3, 285:8, 322:4, 323:10, 329:8, 332:2

**DEFENSE** [4] - 202:16, 202:19, 204:24, 205:2

**DEFENSE** [2] - 363:9, 363:11

**DEFINITELY** [1] - 281:13

**DELAYED** [1] - 303:16

**DELIBERATIONS** [2] - 276:13, 277:6

**DELIVER** [1] - 168:1

**DELIVERY** [1] - 303:17

**DENISE** [1] - 157:23

**DENISEPARISI72@GMAIL.COM** [1] - 157:23

**DENKBERG** [9] - 158:25, 159:5, 159:23, 169:20, 247:19, 257:15, 260:16, 283:6, 283:19

**DENKBERG'S** [1] - 210:9

**DEPARTMENT** [1] - 345:4

**DEPARTMENT** [1] - 158:10

**DEPOSITED** [1] - 303:20

**DEPOSITION** [4] - 173:15, 173:21, 359:19

**DEPRESSION** [1] - 292:11

**DEPUTY** [26] - 158:4, 168:16, 169:1, 169:5, 170:1, 170:4, 170:6, 170:9, 170:12, 170:18, 170:21, 170:24, 180:22, 181:1, 181:3, 181:5, 181:22, 181:25, 182:2, 288:16, 288:22, 308:13, 309:12, 310:23, 311:1, 323:25

**DERIVATIVE** [3] - 159:14, 159:18, 160:14

**DESCRIBE** [2] - 296:16, 327:11

**DESCRIPTION** [3] - 217:13, 245:18, 252:5

**DESIGNED** [2] - 208:9, 220:23

**DETAILS** [2] - 238:4, 263:12

**DETECTOR** [1] - 335:22

**DETERMINATION** [2] - 344:2, 345:8

**DETERMINE** [1] - 348:17

**DETERMINING** [1] - 284:7

**DETRACT** [1] - 263:4

**DIAGNOSIS** [2] - 294:22, 294:24

**DIAGRAM** [2] - 328:25, 330:11

**DIAGRAMS** [1] - 330:10

**DIED** [3] - 183:19, 190:13, 205:16
**DIFFERENCE** [1] - 260:15
**DIFFERENT** [17] - 166:25, 179:4, 215:19, 216:24, 247:12, 253:4, 257:1, 281:8, 284:25, 286:8, 286:17, 293:25, 303:18, 325:21, 329:1, 333:1, 337:19
**DIFFICULTY** [1] - 201:5
**DIGITAL** [4] - 217:25, 218:11, 351:14, 352:13
**DIGITALLY** [1] - 351:21
**DIRECT** [10] - 182:9, 207:12, 289:6, 311:10, 324:4, 361:7, 361:10, 361:16, 361:19, 361:23
**DIRECT** [26] - 159:16, 169:15, 178:22, 182:22, 256:16, 257:16, 258:1, 258:18, 259:10, 261:21, 264:6, 277:17, 278:18, 278:22, 279:4, 281:13, 281:19, 284:8, 285:7, 299:9, 300:22, 312:3, 324:25, 326:18, 348:25, 359:15
**DIRECTING** [1] - 272:1
**DIRECTION** [1] - 272:6
**DIRECTIONS** [1] - 348:21
**DIRECTIVE** [1] - 201:17
**DIRECTIVES** [8] - 195:1, 196:15, 244:9, 264:15, 265:6, 266:11, 300:16, 309:25
**DIRECTLY** [2] - 259:16, 289:23
**DIRECTOR** [6] - 227:14, 230:5, 230:7, 238:22, 355:8
**DIRECTORS** [1] - 355:1
**DISABLED** [1] - 292:12
**DISAGREE** [2] - 348:18
**DISCLOSE** [1] - 279:21
**DISCLOSURE** [2] - 239:21, 285:20
**DISCONTINUE** [3] - 223:9, 223:22, 274:16
**DISCUSS** [5] - 159:18, 166:23, 177:10, 208:11, 220:25
**DISCUSSED** [11] - 158:20, 159:1, 159:17, 160:17, 211:6, 211:8, 219:6, 247:13, 271:23, 272:11, 358:18
**DISCUSSES** [1] - 278:13
**DISCUSSING** [4] - 209:15, 211:2, 217:1, 273:22
**DISCUSSION** [1] - 236:9
**DISPLAY** [7] - 217:25, 342:12, 351:21, 352:12, 352:22, 353:8, 354:6
**DISPLAYED** [1] - 352:3
**DISPLAYING** [1] - 309:12
**DISTRICT** [3] - 157:1, 157:1, 157:10
**DISTRICT** [1] - 162:20
**DISTRICT** [3] - 157:14, 160:15, 327:7
**DNM** [1] - 271:1
**DOCUMENT** [79] - 176:3, 183:3, 183:16, 184:3, 184:5, 184:8, 188:3, 189:3, 189:8, 189:9, 193:12, 193:25, 194:8, 194:22, 197:25, 198:23, 199:1, 202:21, 207:18, 212:7, 212:9, 216:15, 216:21, 217:10, 217:13, 217:17, 217:19, 218:6, 218:8, 219:24, 220:7, 221:16, 223:6, 227:16, 228:18, 228:23, 229:5, 229:11, 229:16, 229:19, 230:15, 231:9, 233:3, 239:15, 240:5, 243:14, 243:24, 244:5, 245:1, 261:23, 262:6, 262:10, 269:12, 274:7, 297:2, 297:18, 297:25, 298:1, 299:7, 301:3, 301:6, 301:7, 306:2, 307:9, 308:5, 308:20, 313:5, 317:1, 329:22, 329:23, 330:8, 333:12, 343:24, 347:13, 354:4, 354:9, 354:15, 355:5, 355:8
**DOCUMENTARY** [1] - 163:9
**DOCUMENTS** [26] - 164:11, 171:10, 172:3, 172:7, 173:1, 174:25, 187:10, 208:22, 236:7, 236:13, 239:1, 240:21, 250:7, 260:19, 276:15, 301:8, 301:10, 301:11, 308:21, 314:11, 314:16, 323:9, 326:3, 335:25, 351:2, 353:25
**DOG** [1] - 290:19
**DOLLAR** [7] - 208:19, 209:13, 215:22, 225:14, 225:25, 251:24, 253:24
**DOLLARS** [1] - 233:19
**DONE** [13] - 166:13, 166:14, 185:15, 248:14, 266:2, 270:9, 284:12, 297:22, 310:10, 337:21, 338:24, 350:17, 353:4
**DOOR** [5] - 279:18, 289:23, 290:3, 290:24, 302:22
**DOT** [1] - 251:15
**DOWN** [29] - 169:22, 185:6, 193:8, 193:10, 229:4, 244:4, 249:3, 254:9, 254:21, 255:10, 255:20, 255:25, 256:12, 262:15, 264:5, 275:19, 310:15, 322:19, 343:25, 345:15, 346:11, 348:5, 348:19, 349:18, 349:22, 355:2, 355:20, 355:22
**DRAW** [1] - 279:2
**DRAWING** [1] - 331:2
**DRIVER** [1] - 291:10
**DRIVING** [1] - 291:13
**DROP** [6] - 245:10, 245:11, 245:13, 252:11, 327:8, 340:16
**DUE** [4] - 179:10, 185:10, 205:15, 294:18
**DULY** [5] - 169:3, 182:7, 289:4, 311:8, 323:23
**DUNN** [46] - 157:17, 162:17, 163:1, 163:6, 163:8, 163:14, 164:6, 164:20, 164:23, 165:12, 165:14, 165:21, 166:7, 166:15, 167:16, 167:19, 175:10, 176:4, 176:7, 177:2, 177:5, 177:7, 177:10, 178:1, 178:17, 179:20, 180:6, 180:14, 238:7, 238:25, 239:19, 240:15, 240:17, 241:13, 277:23, 278:21, 279:2, 280:10, 280:19, 283:1, 284:21, 285:6, 286:1, 286:3, 287:19, 288:6
**DUNN** [5] - 158:10, 175:9, 177:20, 178:16, 287:18
**DUNN** [3] - 238:3, 240:10, 285:21
**DUPLEX** [1] - 289:22
**DURANT** [1] - 283:9
**DURHAM** [1] - 157:13
**DURING** [23] - 163:2, 164:6, 164:7, 165:22, 171:6, 177:13, 182:14, 193:9, 199:21, 241:10, 247:4, 247:5, 258:7, 267:12, 279:4, 280:11, 293:20, 331:14, 335:24, 338:10, 340:4, 351:5, 358:12
**DUTIES** [1] - 324:19
**DVD** [2] - 211:17, 211:24
**DVD'S** [1] - 257:1

## E

**E-MAIL** [41] - 207:19, 208:6, 209:16, 220:8, 220:19, 221:17, 222:9, 222:10, 222:11, 223:7, 224:12, 225:9, 225:11, 228:14, 231:10, 244:20, 244:22, 245:2, 247:7, 248:2, 248:10, 248:16, 249:1, 249:3, 249:9, 250:3, 250:9, 250:11, 251:6, 251:8, 254:21, 254:22, 254:25, 273:22, 274:1, 274:12, 274:18, 274:19, 318:2, 354:9
**E-MAIL** [1] - 157:23
**E-MAILS** [4] - 236:4, 237:5, 248:5, 259:5
**E13** [3] - 331:12, 333:19, 334:2
**E14** [2] - 333:19, 334:3
**EARLIEST** [1] - 280:16
**EARLY** [12] - 162:4, 164:21, 166:9, 166:20, 168:6, 240:9, 282:5, 291:3, 303:3, 356:5, 357:3, 359:24
**EASIEST** [2] - 172:16, 218:7
**EASTERN** [1] - 157:1
**EASTERN** [2] - 157:14, 327:7
**EC** [1] - 258:12
**ECHO** [1] - 188:6
**ECHOED** [1] - 188:4
**EDELED** [1] - 278:5
**EDELSTEIN** [2] - 158:16, 173:25
**EDELSTEIN** [2] - 281:1, 282:14
**EDELSTEIN** [1] - 157:21
**EDELSTEIN 'S** [1] - 167:6
**EDITION** [1] - 349:2
**EFFECT** [1] - 296:18
**EITHER** [10] - 164:6, 169:15, 178:24, 179:19, 275:10, 277:24, 295:4, 295:9, 336:8, 348:25
**ELECTED** [2] - 354:25, 355:7
**ELECTRONIC** [5] - 276:4, 323:11, 326:25, 327:1, 327:3
**ELEPHANT** [1] - 289:2
**ELICIT** [3] - 158:24, 162:1, 278:17
**ELICITED** [1] - 161:25
**ELIGIBILITY** [3] - 234:1, 267:2, 345:9
**ELIGIBLE** [3] - 233:11, 233:12, 348:23
**ELIMINATE** [1] - 303:8
**ELMO** [1] - 261:24
**EMAILS** [1] - 163:20
**EMBEDDED** [1] - 261:1
**ENCLOSED** [8] - 194:25, 195:19, 196:5, 196:6, 196:14, 300:15, 300:24, 310:4
**ENCOURAGE** [1] - 276:6

**END** [21] - 166:5, 168:4, 180:17, 238:15, 241:14, 244:21, 247:1, 247:4, 247:10, 249:15, 249:16, 249:17, 253:5, 253:9, 264:22, 273:16, 282:1, 282:5, 282:12, 315:13, 354:16
**ENDING** [2] - 269:5, 357:2
**ENDS** [3] - 188:8, 298:10, 307:13
**ENFORCEMENT** [2] - 324:23, 325:10
**ENGAGE** [2] - 276:7, 340:9
**ENSURED** [1] - 358:21
**ENTAILED** [1] - 266:17
**ENTER** [10] - 211:23, 264:16, 265:5, 265:6, 267:2, 325:10, 326:23, 327:2, 327:23, 338:5
**ENTERED** [3] - 253:24, 328:11, 328:14
**ENTERING** [2] - 250:24, 338:3
**ENTERS** [5] - 168:25, 181:7, 242:18, 288:7, 341:6
**ENTIRE** [5] - 205:5, 324:17, 328:15, 345:14, 347:13
**ENTITIES** [2] - 259:11, 323:16
**ENTITLED** [2] - 193:25, 262:8
**ENTRANCE** [1] - 327:19
**ENTRANTS** [1] - 234:2
**ENTRY** [5] - 203:23, 263:12, 263:24, 264:15, 266:11
**ENTWHISTLE** [5] - 242:15, 243:6, 259:6, 261:12, 266:13
**ENTWHISTLE** [2] - 237:25, 239:5
**ENTWHISTLE** [11] - 243:8, 243:18, 247:22, 248:1, 248:21, 248:25, 249:4, 249:22, 253:3, 271:21, 361:13
**ENTWISTLE** [11] - 158:9, 161:6, 161:14, 168:12, 169:15, 172:6, 174:24, 214:4, 234:12, 296:20, 299:2
**ENTWISTLE** [117] - 157:16, 158:8, 158:19, 159:6, 159:8, 159:11, 161:2, 161:15, 161:21, 161:24, 162:13, 168:13, 170:3, 175:3, 206:25, 207:13, 207:16, 207:21, 208:2, 209:4, 210:16, 210:19, 210:22, 210:25, 211:4, 212:10, 213:5, 213:7, 214:5, 214:10, 214:21, 216:12, 217:3, 217:25, 218:4, 218:6, 218:10, 218:16, 219:23, 220:5, 220:10, 220:16, 221:14, 221:19, 221:25, 223:5, 224:11, 224:22, 225:3, 225:13, 225:18, 226:8, 227:15, 228:4, 228:10, 228:18, 229:24, 230:9, 230:13, 230:17, 230:22, 231:4, 231:7, 231:13, 231:19, 232:2, 232:5, 232:10, 232:16, 232:19, 232:24, 233:15, 234:10, 234:16, 235:2, 236:16, 236:25, 237:2, 238:2, 239:7, 241:22, 242:17, 243:7, 243:9, 244:16, 251:2, 251:17, 254:16, 255:10, 256:1, 271:15, 271:18, 272:24, 274:24, 288:12, 289:7, 289:20, 296:22, 297:8, 297:17, 297:24, 298:4, 298:7, 298:9, 299:3, 299:6, 299:14, 299:20, 299:22, 299:24, 301:2, 301:4, 306:9, 307:7, 310:13, 361:10, 361:16
**ENVELOPE** [23] - 223:25, 224:2, 224:5, 227:18, 227:19, 227:22, 228:2, 228:24, 229:2, 229:14, 229:15, 248:13, 271:1, 294:7, 304:17, 304:18, 306:6, 335:1, 335:2, 344:14, 347:24, 349:10
**ENVELOPES** [4] - 223:10, 223:16, 223:23, 274:17
**EQUAL** [2] - 210:1, 211:19
**EQUALLING** [1] - 216:2
**EQUIPMENT** [3] - 326:25, 327:1, 327:3
**ERROR** [1] - 239:20
**ESQ** [6] - 157:13, 157:16, 157:17, 157:17, 157:19, 157:21
**ESSENTIALLY** [2] - 254:12, 258:16
**ESTATE** [2] - 292:16, 292:22
**ESTIMATE** [3] - 222:17, 281:12, 339:24
**ESTIMATED** [1] - 174:12
**ET** [2] - 179:24, 287:11
**ETCETERA** [1] - 266:11
**EVENT** [3] - 161:25, 166:17, 176:10
**EVENTUALLY** [1] - 327:23
**EVERYDAY** [1] - 250:19
**EVIDENCE** [61] - 162:19, 173:3, 174:23, 175:4, 189:4, 202:20, 205:3, 208:1, 210:17, 213:4, 217:9, 218:18, 220:15, 221:24, 225:2, 228:9, 231:3, 231:18, 232:9, 232:23, 238:10, 238:16, 239:13, 275:24, 276:14, 299:19, 312:16, 312:20, 317:6, 320:6, 321:12, 321:20, 322:12, 322:16, 323:17, 325:10, 329:1, 329:15, 330:5, 330:18, 331:14, 331:16, 332:4, 332:6, 337:2, 337:8, 337:22, 337:23, 338:3, 338:4, 338:25, 339:10, 339:20, 341:25, 342:4, 342:10, 346:9, 350:18, 351:13, 351:17, 357:14
**EVIDENCE** [6] - 362:4, 362:7, 362:13, 362:16, 363:9, 363:11
**EXACT** [3] - 255:14, 268:14, 334:18
**EXACTLY** [18] - 159:6, 162:3, 163:21, 197:22, 198:21, 238:22, 239:21, 259:3, 260:13, 264:18, 265:20, 266:17, 272:17, 277:20, 282:19, 286:19, 331:23, 354:10
**EXAMINATION** [5] - 169:16, 277:17, 281:13, 285:8, 359:16
**EXAMINATION** [24] - 182:9, 190:21, 207:12, 256:6, 271:20, 275:2, 289:6, 305:8, 311:10, 319:1, 321:25, 324:4, 361:7, 361:8, 361:10, 361:11, 361:12, 361:14, 361:16, 361:17, 361:19, 361:20, 361:21, 361:23
**EXAMINED** [6] - 169:4, 169:12, 182:8, 289:5, 311:9, 323:24
**EXAMINING** [2] - 178:22, 201:19
**EXAMPLE** [3] - 159:11, 183:12, 331:12
**EXCEL** [1] - 251:16
**EXCELLENT** [1] - 170:6
**EXCEPT** [3] - 192:7, 291:9, 353:21
**EXCHANGE** [1] - 186:21
**EXCHANGED** [1] - 166:21
**EXCUSE** [1] - 265:17
**EXCUSED** [1] - 310:16
**EXCUSES** [1] - 303:18
**EXECUTED** [2] - 331:18, 336:23
**EXECUTING** [2] - 327:25, 329:4
**EXECUTION** [1] - 323:11
**EXECUTIVE** [4] - 227:14, 230:5, 230:6, 230:7
**EXECUTOR** [2] - 292:16, 292:21
**EXHAUSTED** [1] - 166:22
**EXHIBIT** [139] - 162:20, 162:25, 171:8, 171:15, 171:19, 171:25, 172:4, 172:9, 174:18, 183:4, 189:5, 189:6, 193:17, 193:21, 193:23, 198:2, 202:16, 202:19, 204:24, 205:2, 207:16, 207:21, 207:25, 209:5, 209:6, 209:7, 209:16, 210:17, 210:22, 216:12, 216:20, 217:3, 217:8, 218:1, 218:3, 218:17, 220:5, 220:10, 220:14, 221:14, 221:19, 221:23, 224:22, 225:1, 228:4, 228:8, 230:17, 230:22, 231:2, 231:7, 231:13, 231:17, 232:2, 232:5, 232:8, 232:16, 232:19, 232:22, 234:10, 236:14, 237:3, 237:4, 237:5, 237:8, 237:9, 237:10, 238:11, 239:12, 240:15, 243:9, 243:18, 244:17, 247:22, 248:22, 249:22, 251:3, 254:16, 261:25, 274:7, 277:14, 283:11, 299:4, 299:15, 299:18, 299:21, 308:4, 308:10, 309:15, 309:20, 312:10, 312:16, 312:19, 312:23, 312:25, 313:4, 313:11, 314:5, 314:8, 314:18, 314:24, 315:4, 315:21, 316:1, 316:22, 316:23, 317:24, 319:6, 319:22, 320:1, 320:6, 321:8, 321:9, 321:12, 322:15, 323:2, 329:7, 329:13, 329:15, 330:4, 332:1, 332:6, 333:13, 337:2, 337:8, 342:23, 343:3, 343:12, 344:9, 346:23, 349:5, 349:18, 349:19, 354:7
**EXHIBIT** [12] - 362:9, 362:12, 362:15, 362:18, 362:20, 362:22, 362:24, 363:2, 363:4, 363:6, 363:9, 363:11
**EXHIBIT** [58] - 162:22, 164:13, 172:24, 173:23, 183:6, 189:19, 193:16, 208:3, 218:11, 220:17, 222:2, 225:7, 228:11, 228:21, 231:5, 231:21, 232:11, 233:1, 238:24, 239:20, 240:11, 240:20, 243:12, 243:22, 244:18, 247:24, 248:23, 249:24, 251:4, 254:19, 255:11, 262:4, 274:4, 274:10, 277:13, 283:9, 305:7, 309:11, 309:14, 315:5, 316:2, 316:10, 316:24, 317:11, 319:8, 320:7, 321:13, 323:4, 329:9, 329:16, 331:5, 332:3, 332:8, 337:9, 351:11, 351:13, 351:19, 351:23
**EXHIBITS** [8] - 173:2, 174:22, 239:5, 341:25, 342:3, 342:9, 342:14, 351:16
**EXHIBITS** [24] - 163:9, 171:15, 171:21, 172:15, 172:22, 173:9, 173:15,

173:22, 236:22, 238:13, 238:14, 238:23, 240:18, 241:18, 256:4, 297:5, 297:6, 323:5, 323:10, 342:12, 350:1, 350:9, 350:15, 350:23
**EXHIBITS** [2] - 362:3, 362:6
**EXISTING** [2] - 203:23, 263:25
**EXIT** [2] - 336:21, 337:14
**EXITS** [3] - 169:25, 277:9, 340:19
**EXPECT** [5] - 240:19, 281:12, 281:16, 281:18, 359:15
**EXPECTED** [1] - 176:17
**EXPERIENCE** [7] - 233:6, 256:15, 269:23, 285:6, 296:14, 300:2, 311:23
**EXPERT** [1] - 273:21
**EXPIRATION** [1] - 266:24
**EXPIRED** [1] - 267:2
**EXPLAIN** [2] - 315:10, 331:5
**EXPLAINED** [1] - 264:5
**EXPOSITION** [2] - 307:10, 307:12
**EXPRESSLY** [2] - 279:5, 283:13
**EXTENT** [1] - 359:7
**EXTRA** [1] - 356:7
**EXTRACTED** [1] - 226:14
**EYES** [2] - 195:13, 195:20

## F

**FACE** [1] - 185:11
**FACILITY** [1] - 325:10
**FACING** [1] - 171:7
**FACT** [7] - 178:7, 179:16, 185:15, 213:4, 280:3, 288:2, 301:17
**FACTS** [3] - 307:4, 357:14
**FAIR** [2] - 237:19, 282:17
**FAIRLY** [2] - 278:14, 330:14
**FAITH** [1] - 178:8
**FALL** [1] - 236:14
**FAMILIAR** [4] - 257:9, 300:5, 320:14, 339:3
**FAMILIARIZED** [2] - 293:6, 293:8
**FAMILY** [6] - 226:16, 226:25, 289:25, 302:13, 348:10, 357:10
**FANTASY** [2] - 212:11, 214:22
**FAR** [5] - 177:1, 201:10, 215:17, 225:25, 285:4
**FARMING** [1] - 290:17
**FAST** [2] - 256:12, 317:19
**FASTER** [4] - 222:22, 223:2, 224:8, 274:21
**FATHER** [3] - 289:24, 292:8, 292:10
**FATHER-IN-LAW** [1] - 289:24
**FAULT** [1] - 333:23
**FEASIBLE** [1] - 233:13
**FEDERAL** [1] - 157:15
**FEDERAL** [5] - 203:23, 263:25, 323:17, 324:23, 325:23
**FEDEX** [1] - 202:11
**FEE** [9] - 195:1, 195:3, 196:15, 196:17, 264:25, 300:16, 309:23, 310:4, 310:6
**FEES** [1] - 226:14
**FELDMAN** [7] - 158:10, 172:14, 187:13, 193:25, 206:15, 341:9, 358:5
**FELDMAN** [140] - 157:17, 168:14, 170:15, 170:20, 171:1, 171:4, 171:17, 171:22, 171:24, 172:5, 172:10, 172:16, 173:4, 174:16, 181:20, 182:10, 188:7, 189:2, 190:20, 193:18, 202:17, 204:25, 205:22, 206:16, 281:10, 286:10, 286:12, 286:15, 310:19, 311:6, 311:11, 312:8, 312:11, 312:15, 312:21, 313:1, 313:2, 313:10, 314:22, 315:3, 315:20, 315:25, 316:9, 316:21, 317:5, 317:9, 318:17, 318:22, 320:3, 321:24, 322:1, 322:10, 322:17, 322:24, 323:4, 324:5, 329:6, 329:12, 329:18, 329:21, 330:1, 330:6, 331:25, 332:7, 332:10, 333:2, 333:11, 333:23, 334:4, 334:22, 335:5, 335:17, 336:5, 337:1, 337:5, 337:11, 337:13, 339:24, 341:10, 341:11, 341:23, 342:5, 342:8, 342:11, 342:22, 343:1, 343:11, 343:15, 344:4, 344:6, 344:9, 344:11, 344:21, 344:22, 345:13, 345:19, 346:4, 346:5, 346:11, 346:14, 346:22, 347:1, 347:12, 347:18, 349:4, 349:7, 349:22, 349:23, 349:25, 350:3, 350:6, 350:9, 350:14, 350:22, 351:7, 351:10, 351:12, 351:18, 351:21, 352:1, 352:12, 352:22, 352:24, 353:8, 353:10, 354:6, 354:11, 355:10, 355:14, 356:3, 356:11, 358:16, 359:1, 359:13, 360:3, 360:9, 361:7, 361:19, 361:21, 361:23
**FELL** [1] - 291:1
**FELT** [2] - 179:5, 292:17
**FEW** [13] - 168:3, 181:12, 191:5, 191:11, 194:3, 204:11, 204:14, 240:11, 256:9, 270:8, 305:13, 314:13, 319:5
**FIFTH** [3] - 165:2, 165:6, 166:2
**FIGURE** [2] - 173:25, 225:25
**FILE** [4] - 246:2, 246:4, 251:13, 253:15
**FILED** [1] - 283:12
**FILING** [1] - 353:18
**FILINGS** [1] - 282:20
**FILL** [4] - 251:1, 251:20, 295:7, 303:1
**FILLED** [2] - 303:6, 353:6
**FILLING** [2] - 254:3, 300:8
**FINAL** [4] - 167:9, 246:22, 267:13, 349:17
**FINALLY** [2] - 348:19, 349:4
**FINANCES** [3] - 292:4, 293:4, 300:7
**FINANCIAL** [2] - 278:8, 278:11
**FINE** [10] - 158:17, 160:4, 161:9, 164:4, 168:4, 168:11, 222:19, 242:11, 249:21, 287:21
**FINISH** [1] - 332:12
**FIRM** [2] - 226:2, 226:14
**FIRST** [48] - 166:18, 180:23, 182:7, 183:9, 192:17, 192:23, 193:1, 193:3, 222:13, 222:20, 222:21, 223:3, 224:8, 224:15, 225:21, 245:14, 248:5, 249:3, 251:13, 253:14, 255:5, 263:1, 263:14, 263:15, 263:16, 273:23, 274:14, 283:8, 286:9, 286:17, 289:4, 311:8, 314:4, 314:5, 317:20, 317:23, 323:23, 327:14, 327:16, 328:14, 345:2, 345:14, 351:21, 352:9, 358:19, 359:23, 360:4
**FIRST-CLASS** [5] - 222:13, 222:20, 222:21, 223:3, 224:8
**FISHING** [2] - 212:11, 214:22
**FIVE** [10] - 178:9, 179:21, 180:2, 219:17, 219:18, 233:17, 234:3, 278:5, 287:16, 335:18
**FIVE-YEAR** [1] - 178:9
**FLEW** [1] - 311:19
**FLIP** [1] - 189:19
**FLOOR** [6] - 330:19, 330:23, 330:24, 331:10, 331:13
**FLOORS** [2] - 330:21, 330:23
**FLORENCE** [2] - 183:20, 190:16
**FLOW** [1] - 175:4
**FLY** [1] - 171:6
**FOCUS** [7] - 164:13, 194:23, 240:9, 262:1, 277:5, 297:10, 357:4
**FOCUSED** [3] - 238:5, 276:14, 293:15
**FOCUSES** [1] - 297:12
**FOLD** [2] - 217:15, 224:3
**FOLDED** [3] - 217:11, 217:14, 224:4
**FOLDER** [1] - 354:3
**FOLLOW** [5] - 179:4, 275:1, 317:21, 328:22, 340:13
**FOLLOWED** [2] - 164:16, 291:12
**FOLLOWING** [12] - 195:25, 233:25, 279:1, 313:12, 320:25, 336:14, 341:1, 345:11, 345:21, 345:23, 354:20, 354:24
**FOLLOWS** [7] - 169:4, 182:8, 207:11, 289:5, 311:9, 323:8, 323:24
**FOR** [1] - 157:9
**FORD** [1] - 348:14
**FOREVER** [1] - 271:4
**FORGET** [5] - 238:22, 239:21, 266:18, 294:17, 294:18
**FORGETFUL** [1] - 294:16
**FORGETFULNESS** [2] - 293:11, 305:16
**FORGOT** [1] - 242:2
**FORM** [12] - 163:2, 187:9, 191:17, 229:12, 244:10, 248:13, 339:1, 340:7, 346:2, 347:16, 347:21, 354:21
**FORMAL** [1] - 173:5
**FORMALLY** [5] - 172:18, 174:17, 322:11, 332:3
**FORMULA** [1] - 164:17
**FORTH** [3] - 203:22, 250:21, 263:24
**FORTY** [1] - 311:22
**FORTY-ONE** [1] - 311:22
**FORWARD** [1] - 214:4
**FOUNDATION** [3] - 163:12, 163:23, 164:17
**FOUR** [18] - 210:17, 210:19, 210:23, 214:9, 214:21, 226:9, 226:11, 227:15,

228:18, 234:3, 291:2, 334:23, 335:6, 346:12, 347:15, 347:16, 354:4, 354:6
**FRANCE** [1] - 348:16
**FRAUD** [4] - 159:12, 179:21, 179:22, 278:10
**FREE** [3] - 216:21, 345:24, 347:11
**FREQUENTLY** [1] - 302:23
**FRIED** [1] - 160:17
**FRIENDS** [2] - 348:10, 357:10
**FROCCARO** [9] - 236:8, 237:12, 239:9, 239:23, 278:3, 279:11, 279:21, 281:1, 284:4
**FROCCARO** [153] - 157:19, 158:14, 159:9, 160:21, 161:8, 161:16, 161:23, 162:15, 163:19, 163:25, 165:15, 165:19, 165:24, 166:1, 166:4, 167:5, 167:15, 167:23, 168:2, 168:7, 172:20, 173:10, 173:14, 173:22, 174:4, 175:15, 175:23, 176:2, 176:6, 176:21, 177:14, 177:19, 178:3, 179:10, 180:1, 180:19, 190:22, 193:13, 193:17, 193:19, 193:24, 196:1, 200:1, 201:3, 201:8, 201:13, 201:16, 201:19, 202:15, 204:23, 205:11, 205:17, 205:19, 206:7, 206:12, 207:23, 217:5, 218:14, 220:3, 220:12, 221:21, 224:24, 228:6, 230:25, 231:15, 232:4, 232:18, 235:5, 236:9, 236:18, 237:13, 237:23, 239:10, 239:24, 240:6, 240:19, 241:7, 241:24, 242:1, 242:8, 242:13, 256:3, 256:7, 261:23, 267:25, 268:8, 268:10, 268:12, 268:20, 268:25, 269:9, 269:13, 271:11, 275:1, 275:3, 275:17, 279:12, 281:5, 282:10, 282:12, 282:16, 282:21, 282:24, 283:17, 284:5, 284:11, 285:10, 288:5, 296:5, 296:7, 297:15, 297:19, 299:16, 305:5, 305:9, 307:8, 307:11, 308:3, 308:7, 308:17, 309:10, 309:15, 309:19, 309:21, 310:9, 312:17, 317:7, 318:25, 319:2, 319:20, 319:24, 320:5, 320:9, 320:18, 321:7, 321:15, 321:20, 322:13, 329:10, 330:2, 337:3, 342:1, 351:9, 355:17, 356:8, 356:17, 359:10, 360:13, 361:8, 361:11, 361:14, 361:17, 361:20
**FROCCARO** [36] - 158:15, 159:17, 160:6, 160:19, 161:5, 162:1, 162:14, 163:17, 167:4, 167:22, 169:12, 169:16, 171:8, 172:19, 173:9, 175:21, 175:24, 177:16, 190:25, 202:3, 205:9, 235:4, 242:7, 256:8, 282:8, 296:3, 305:4, 305:10, 307:3, 318:24, 319:3, 323:19, 355:16, 358:4, 359:9, 360:12
**FROCCARO 'S** [1] - 238:5
**FROCCARO 'S** [1] - 297:9
**FRONT** [8] - 166:13, 178:4, 218:24, 241:9, 253:5, 253:9, 263:6, 278:2
**FRONTING** [1] - 279:3
**FRUITS** [1] - 325:20
**FULFILLED** [1] - 264:22
**FULFILLMENT** [19] - 208:8, 208:17, 211:2, 215:16, 216:23, 217:23, 218:21, 219:11, 220:22, 221:4, 221:8, 221:9, 221:11, 222:10, 223:25, 264:21, 265:9, 272:10, 274:19
**FULFILLMENTS** [1] - 274:21
**FULL** [10] - 206:4, 258:22, 306:5, 314:25, 319:17, 320:15, 345:5, 345:6, 349:1, 357:22
**FULLY** [1] - 265:23
**FUNDS** [3] - 244:3, 346:20, 347:4
**FUNERAL** [1] - 167:6
**FUZZY** [1] - 258:9

## G

**GAME** [1] - 231:11
**GARBAGE** [6] - 331:13, 333:7, 333:15, 333:20, 334:1, 334:3
**GARY** [15] - 158:25, 159:5, 159:23, 169:20, 210:9, 247:19, 255:24, 257:15, 257:22, 258:2, 258:15, 258:21, 260:10, 260:21, 283:6
**GATHER** [1] - 327:16
**GDM** [2] - 249:13, 249:16
**GENERAL** [2] - 293:7, 294:21
**GENERALLY** [3] - 223:17, 272:15, 272:21
**GENTLEMEN** [1] - 195:9
**GIRL** [2] - 192:25
**GIVEN** [14] - 159:23, 160:13, 160:20, 161:7, 169:17, 177:9, 280:14, 283:19, 283:24, 294:22, 294:24, 303:18, 331:12, 339:6
**GLAD** [1] - 163:10
**GO-TO** [1] - 340:11
**GOD'S** [1] - 189:17
**GOODNIGHT** [1] - 360:13
**GOOGLE** [1] - 276:20
**GOVERNMENT** [26] - 198:10, 198:17, 199:12, 199:16, 199:17, 202:6, 205:20, 206:21, 206:25, 234:25, 235:3, 237:5, 237:7, 240:10, 243:9, 247:22, 248:21, 249:22, 254:16, 274:7, 322:22, 323:10, 323:14, 358:13, 360:9
**GOVERNMENT** [4] - 362:3, 362:6, 362:12, 362:15
**GOVERNMENT** [123] - 157:13, 158:18, 158:19, 160:4, 160:7, 162:17, 167:18, 167:19, 169:16, 171:1, 173:2, 174:10, 174:22, 175:8, 175:25, 176:18, 180:4, 181:19, 198:2, 207:16, 207:21, 207:25, 209:5, 209:6, 209:7, 209:16, 210:17, 210:22, 216:12, 216:20, 217:3, 217:8, 218:1, 218:3, 218:17, 220:5, 220:10, 220:14, 221:14, 221:19, 221:23, 224:22, 225:1, 228:4, 228:8, 230:17, 230:22, 231:2, 231:7, 231:13, 231:17, 232:2, 232:5, 232:8, 232:16, 232:19, 232:22, 234:10, 237:2, 237:3, 237:4, 237:8, 237:9, 237:10, 239:4, 240:13, 240:23, 241:2, 241:21, 243:18, 244:16, 251:2, 271:14, 277:14, 277:21, 278:19, 280:7, 281:7, 284:16, 284:20, 286:7, 287:4, 287:11, 288:12, 299:14, 299:18, 310:12, 310:17, 310:20, 312:15, 312:19, 314:5, 314:8, 316:21, 316:23, 319:21, 319:24, 321:23, 322:25, 323:1, 323:19, 323:20, 329:13, 332:1, 333:13, 337:2, 341:25, 342:3, 342:9, 342:14, 342:23, 343:3, 343:12, 344:9, 346:23, 349:5, 349:18, 349:19, 351:16, 354:7
**GOVERNMENT 'S** [37] - 162:20, 163:14, 167:10, 169:11, 173:13, 178:18, 183:4, 189:4, 193:17, 193:20, 239:12, 277:18, 278:18, 278:24, 283:3, 288:10, 299:4, 299:15, 309:15, 312:10, 312:16, 312:23, 313:4, 313:11, 314:18, 314:24, 315:3, 315:21, 315:25, 317:6, 317:23, 322:15, 329:6, 329:15, 330:4, 332:6, 337:8
**GOVERNMENT 'S** [6] - 362:9, 362:22, 362:24, 363:2, 363:4, 363:6
**GOVERNS** [1] - 163:13
**GP** [5] - 223:9, 223:11, 223:14, 223:19, 274:16
**GRAND** [2] - 215:23, 215:24
**GRANDFATHER** [27] - 290:4, 290:8, 290:9, 290:23, 291:7, 292:8, 292:10, 292:19, 292:22, 292:25, 293:20, 294:3, 294:22, 295:2, 297:11, 299:12, 301:6, 301:22, 302:1, 302:21, 303:10, 303:14, 304:2, 304:12, 305:15, 305:22, 308:6
**GRANDFATHER 'S** [11] - 290:6, 290:7, 292:4, 294:10, 294:15, 300:3, 300:5, 303:21, 304:8, 304:22, 309:22
**GRANDMOTHER** [5] - 290:18, 291:15, 291:21, 292:8, 293:3
**GRANDPARENTS** [4] - 290:25, 291:1, 291:17, 292:6
**GRANT** [8] - 177:24, 278:17, 278:24, 283:24, 284:8, 285:17, 287:9, 287:10
**GRANTED** [2] - 177:22, 285:20
**GREAT** [2] - 161:9, 183:10
**GREATEST** [1] - 239:24
**GREENVILLE** [1] - 311:15
**GROUND** [1] - 330:24
**GROUNDED** [1] - 280:24
**GROUP** [1] - 275:14
**GROUP** [9] - 259:12, 267:22, 336:4, 338:17, 351:3, 352:11, 353:1, 354:13, 355:8
**GUARANTEE** [1] - 264:10
**GUARANTEED** [5] - 233:13, 233:19, 244:8, 345:10, 346:21
**GUARANTEEING** [1] - 345:6
**GUARD** [1] - 238:8

**GUESS** [8] - 164:9, 173:23, 240:12, 240:22, 263:14, 281:20, 319:24, 333:18
**GUNS** [1] - 255:22
**GUYS** [1] - 331:22

## H

**HALF** [17] - 208:5, 218:2, 220:6, 222:1, 244:4, 250:1, 251:18, 254:17, 274:13, 281:14, 281:17, 291:9, 291:22, 299:23, 339:24, 357:8, 359:16
**HALLWAY** [1] - 276:6
**HAND** [17] - 165:14, 169:1, 181:23, 181:25, 184:14, 216:14, 218:25, 228:2, 229:4, 243:2, 262:16, 276:23, 288:20, 310:24, 333:18, 334:2, 349:9
**HANDED** [2] - 216:19, 350:24
**HANDING** [2] - 329:22, 350:15
**HANDLE** [5] - 162:5, 162:9, 168:6, 171:14, 271:7
**HANDLED** [2] - 179:24, 273:3
**HANDLING** [9] - 185:18, 185:19, 185:22, 185:23, 185:25, 186:3, 194:15, 194:19, 196:18
**HANDWRITING** [6] - 184:20, 189:8, 189:9, 189:21, 189:24
**HANDWRITTEN** [3] - 184:7, 196:22, 202:8
**HANG** [1] - 169:24
**HAPPY** [8] - 160:25, 161:2, 180:6, 218:6, 270:19, 285:23, 285:24, 296:24
**HAPPY** [2] - 297:24, 298:4
**HEADER** [1] - 245:7
**HEADERS** [1] - 245:5
**HEADINGS** [1] - 353:13
**HEALTH** [8] - 292:15, 292:22, 292:24, 293:1, 294:10, 294:15, 294:21, 294:23
**HEAR** [22] - 168:15, 168:16, 168:21, 170:1, 170:2, 170:4, 170:18, 181:1, 181:3, 182:12, 182:14, 185:12, 185:20, 191:2, 192:20, 193:19, 201:13, 267:15, 277:22, 280:3, 358:14, 359:4
**HEARD** [9] - 181:16, 192:19, 266:4, 275:24, 279:13, 284:2, 318:12, 318:19, 357:8
**HEARING** [9] - 162:6, 188:2, 203:14, 240:13, 276:19, 278:16, 296:2, 307:2, 307:3
**HEARSAY** [1] - 240:7
**HELD** [4] - 188:1, 244:3, 296:1, 307:1
**HELLO** [2] - 170:1, 170:2
**HELP** [7] - 205:13, 289:24, 291:19, 294:5, 301:25, 348:10, 358:8
**HELPED** [1] - 300:8
**HELPFUL** [1] - 358:22
**HELPS** [1] - 176:8
**HEREBY** [3] - 323:5, 349:17, 354:19
**HI** [13] - 169:9, 208:6, 208:8, 220:20, 220:21, 223:9, 248:18, 249:8, 249:10, 256:8, 274:14, 274:16, 319:3
**HIDING** [1] - 328:17
**HIGHER** [3] - 209:24, 222:21, 343:14
**HIGHLIGHT** [3] - 212:10, 230:13, 252:2
**HIT** [1] - 303:25
**HITTING** [1] - 302:10
**HMM** [3] - 252:9, 254:4, 305:12
**HOLD** [9] - 170:7, 170:22, 181:5, 205:24, 217:10, 264:3, 334:13, 334:19, 334:20
**HOLDING** [1] - 226:1
**HOME** [11] - 282:13, 291:1, 296:15, 328:11, 328:14, 328:25, 330:19, 330:20, 331:19, 335:11, 335:13
**HONEST** [7] - 158:24, 159:12, 241:9, 279:12, 279:23, 281:6, 304:11
**HONESTLY** [2] - 159:23, 241:7
**HONOR** [105] - 158:8, 158:14, 158:19, 160:5, 161:2, 162:13, 162:15, 162:17, 163:6, 163:8, 163:15, 164:20, 164:25, 165:12, 166:15, 167:15, 167:16, 167:23, 170:15, 171:4, 171:5, 171:17, 171:22, 172:10, 173:5, 174:16, 175:3, 175:10, 177:2, 177:10, 178:2, 178:17, 179:21, 180:6, 180:14, 180:19, 181:20, 190:20, 193:14, 202:15, 206:16, 207:23, 213:7, 216:14, 218:4, 218:12, 218:16, 219:24, 235:3, 235:5, 236:17, 236:25, 238:7, 239:8, 240:15, 241:15, 241:22, 242:8, 242:17, 243:7, 261:24, 271:16, 279:15, 279:18, 280:10, 281:10, 282:18, 285:6, 286:10, 287:19, 288:5, 288:6, 297:9, 298:9, 299:3, 306:9, 309:16, 310:13, 310:19, 311:6, 312:17, 317:5, 317:6, 318:17, 318:18, 320:3, 321:24, 322:11, 322:24, 323:20, 329:8, 329:18, 332:2, 337:1, 337:5, 341:10, 341:23, 344:4, 349:25, 350:12, 355:10, 355:14, 358:16, 360:3, 360:10
**HONOR'S** [2] - 159:14, 296:9
**HONORABLE** [1] - 157:10
**HOPE** [1] - 181:9
**HOTEL** [1] - 312:2
**HOUR** [8] - 277:4, 281:14, 281:17, 281:20, 282:13, 339:25, 357:8, 359:16
**HOURS** [1] - 359:17
**HOUSE** [7] - 253:15, 290:20, 327:18, 327:19, 327:23, 328:4, 344:19
**HOUSEHOLD** [1] - 289:21
**HOUSES** [1] - 290:16
**HUNDRED** [1] - 292:12
**HURRY** [1] - 317:19
**HURT** [1] - 284:15
**HUSBAND** [5] - 289:22, 291:4, 291:9, 291:18, 328:7

## I

**IDEA** [3] - 226:21, 254:23, 283:3
**IDENTIFICATION** [3] - 341:24, 346:1, 346:2
**IDENTIFIED** [6] - 172:23, 198:1, 234:8, 297:5, 298:1, 339:15
**IDENTIFIER** [1] - 339:6
**IDENTIFY** [3] - 171:10, 300:2, 300:11
**IDENTIFYING** [2] - 165:6, 328:25
**IGLOO** [1] - 289:2
**ILL** [1] - 291:15
**IMMEDIATELY** [6] - 184:22, 273:1, 273:2, 276:21, 343:19, 347:11
**IMMUNITY** [26] - 164:25, 165:4, 165:19, 166:4, 176:5, 177:12, 177:17, 177:22, 177:24, 178:8, 178:10, 179:3, 179:12, 277:18, 278:17, 278:24, 280:2, 283:2, 283:14, 283:19, 283:24, 284:8, 285:17, 285:20, 287:10
**IMPASSE** [1] - 167:3
**IMPEACH** [2] - 178:25, 277:24
**IMPEACHMENT** [4] - 165:23, 277:23, 278:19, 286:3
**IMPORTANT** [6] - 282:2, 332:23, 332:24, 340:4, 347:6, 347:9
**IMPOSE** [1] - 285:13
**IN** [6] - 362:4, 362:7, 362:12, 362:15, 363:9, 363:11
**INC** [2] - 320:11, 320:15
**INCLUDE** [3] - 159:21, 238:13, 240:18
**INCLUDES** [2] - 238:19, 278:9
**INCLUDING** [9] - 160:15, 178:24, 179:23, 239:20, 256:22, 258:5, 263:11, 276:9, 323:16
**INCORPORATE** [1] - 164:20
**INCORPORATED** [4] - 259:12, 259:13, 352:11, 354:13
**INCORPORATION** [2] - 353:16, 353:22
**INCORPORATOR** [1] - 354:18
**INCORPORATOR'S** [2] - 354:5, 354:13
**INCREASINGLY** [1] - 280:19
**INDEPENDENT** [3] - 179:22, 283:15, 345:6
**INDIANA** [2] - 291:11, 291:12
**INDICATE** [1] - 339:10
**INDICATED** [4] - 187:2, 285:25, 347:23, 354:25
**INDICATES** [1] - 331:9
**INDICATING** [1] - 329:8
**INDICATION** [1] - 253:5
**INDICTMENT** [1] - 166:19
**INDIVIDUAL** [4] - 272:23, 273:9, 285:16, 339:8
**INDIVIDUALS** [1] - 247:12
**INDULGENCE** [3] - 318:17, 344:4, 355:10
**INDUSTRY** [1] - 256:16
**INEFFECTIVE** [2] - 176:11, 279:16
**INFORM** [4] - 225:22, 225:23, 276:21
**INFORMATION** [32] - 165:23, 187:5, 202:21, 203:16, 217:18, 217:22, 218:19, 218:20, 218:23, 241:1, 246:13, 251:23, 252:3, 262:8, 262:22,

263:9, 264:18, 270:17, 270:23, 277:18, 277:20, 277:24, 278:1, 279:9, 280:22, 280:23, 306:2, 315:1, 315:22, 322:5, 346:7, 346:8
**INFORMED** [1] - 262:10
**INITIAL** [1] - 321:5
**INITIALED** [1] - 300:20
**INITIALS** [5] - 190:3, 190:4, 300:21, 300:23, 300:25
**INSIDE** [6] - 208:18, 227:25, 261:10, 335:16, 339:14, 354:3
**INSPECTION** [1] - 324:9
**INSPECTION** [4] - 324:13, 325:6, 326:1, 331:18
**INSPECTOR** [14] - 158:12, 164:7, 164:9, 281:18, 323:21, 324:8, 324:12, 324:20, 324:23, 330:10, 333:25, 347:19, 350:10, 350:15
**INSPECTOR** [31] - 199:15, 241:14, 324:16, 329:22, 331:1, 332:11, 333:7, 333:15, 334:9, 334:25, 335:8, 335:20, 336:8, 337:14, 339:19, 341:12, 341:14, 342:12, 343:2, 343:16, 344:12, 345:20, 346:6, 346:15, 347:2, 349:24, 350:23, 352:2, 352:14, 352:25, 354:12
**INSPECTORS** [6] - 192:17, 193:2, 194:7, 194:11, 197:3, 197:15
**INSPECTORS** [2] - 328:2, 328:3
**INSTANTANEOUSLY** [1] - 273:5
**INSTEAD** [1] - 297:20
**INSTITUTION** [2] - 278:11, 279:25
**INSTITUTIONAL** [1] - 278:8
**INSTRUCT** [5] - 159:20, 160:5, 175:7, 177:12, 286:7
**INSTRUCTED** [2] - 188:5, 222:14
**INSTRUCTING** [5] - 160:2, 169:14, 169:18, 175:11, 177:3
**INSTRUCTION** [14] - 160:8, 160:20, 161:7, 162:9, 162:10, 166:17, 166:22, 167:25, 168:11, 169:13, 174:8, 174:9, 174:13, 279:20
**INSTRUCTIONS** [5] - 162:2, 226:4, 340:13, 345:11, 357:9
**INSURANCE** [1] - 293:7
**INTEND** [3] - 161:22, 279:7, 359:20
**INTENDING** [5] - 159:2, 159:16, 159:18, 162:1, 296:22
**INTENTION** [5] - 163:1, 165:5, 165:21, 175:15, 241:11
**INTENTIONAL** [2] - 175:2, 175:3
**INTERNATIONAL** [6] - 248:20, 259:12, 318:20, 320:11, 320:15, 321:1
**INTERNET** [1] - 276:20
**INTERPRET** [1] - 186:6
**INTERPRETIVE** [1] - 278:15
**INTERRUPT** [2] - 293:13, 296:7
**INTERVIEW** [4] - 193:4, 193:9, 199:21, 336:21
**INTERVIEWED** [5] - 179:15, 192:16, 194:7, 197:2, 197:14
**INTERVIEWS** [1] - 176:18
**INTRODUCE** [9] - 172:22, 173:15, 173:18, 175:19, 176:3, 176:4, 176:5, 179:7, 237:17
**INTRODUCED** [5] - 173:23, 174:5, 183:3, 189:4
**INVENTORY** [1] - 249:2
**INVESTIGATING** [1] - 325:2
**INVESTIGATION** [3] - 276:17, 325:5, 340:17
**INVESTIGATIONS** [1] - 324:21
**INVITE** [1] - 343:23
**INVOCATION** [1] - 166:2
**INVOKE** [2] - 165:2, 165:6
**INVOLVED** [10] - 261:7, 267:16, 270:11, 292:3, 293:3, 294:19, 294:20, 300:7, 326:5, 328:20
**ISLIP** [2] - 157:4, 157:15
**ISSUE** [38] - 160:9, 161:17, 164:23, 166:16, 167:8, 167:13, 168:6, 170:15, 171:4, 174:8, 175:9, 176:25, 177:22, 178:21, 179:19, 179:21, 180:11, 236:20, 237:14, 238:24, 238:25, 240:6, 240:25, 281:3, 282:3, 283:18, 283:23, 284:3, 284:6, 284:11, 285:15, 287:16, 287:23, 325:13, 327:22, 356:11, 358:17, 359:5
**ISSUED** [1] - 283:25
**ISSUES** [15] - 159:19, 163:25, 164:19, 171:7, 181:12, 242:6, 242:23, 284:10, 285:3, 291:16, 292:11, 293:11, 294:17, 357:16
**ITALIC** [1] - 244:7
**ITEMS** [3] - 296:15, 333:1, 334:18
**ITERATION** [1] - 238:17

## J

**J-A-C-Q-U-A-R-D** [1] - 169:8
**JACQUARD** [2] - 268:3, 271:18
**JACQUARD** [61] - 158:23, 159:21, 160:3, 160:5, 160:8, 161:11, 162:8, 168:1, 168:23, 169:7, 169:8, 169:9, 181:15, 207:1, 207:5, 207:14, 207:18, 209:8, 211:1, 214:7, 216:19, 217:10, 217:17, 218:19, 220:7, 220:19, 221:16, 222:4, 225:6, 225:9, 226:12, 227:4, 227:17, 228:13, 228:23, 230:2, 230:19, 231:9, 232:13, 233:3, 243:14, 243:24, 244:11, 244:12, 248:2, 255:12, 256:1, 256:8, 256:15, 260:6, 262:6, 264:13, 266:19, 267:8, 269:6, 270:8, 272:9, 274:5, 274:22, 274:24, 275:18
**JACQUARD** [4] - 169:2, 207:9, 361:5, 361:9
**JAMES** [1] - 157:19
**JAMES** [4] - 158:15, 190:25, 305:10, 319:3
**JANUARY** [7] - 191:25, 238:12, 238:15, 240:14, 241:1, 292:1, 323:18
**JAPAN** [1] - 348:16
**JARIN** [1] - 158:12
**JARVEY** [1] - 227:12
**JASON** [1] - 157:17
**JASON** [1] - 158:10
**JEEP** [2] - 211:16, 211:24
**JEFF** [9] - 169:18, 223:9, 244:24, 248:20, 249:8, 249:10, 274:12, 274:15, 274:16
**JEFFREY** [8] - 169:20, 221:18, 222:7, 223:7, 224:13, 225:12, 228:17, 231:11
**JOB** [1] - 192:23
**JOHN** [1] - 241:8
**JOHN** [1] - 157:13
**JOHNSON** [2] - 282:6, 285:2
**JOHNSON** [27] - 158:11, 164:24, 166:18, 174:8, 175:8, 180:10, 180:16, 237:14, 250:4, 250:5, 250:22, 251:9, 251:20, 251:23, 254:2, 254:6, 258:19, 275:9, 277:16, 280:17, 281:23, 281:24, 285:5, 328:7, 356:3, 359:5, 359:18
**JOHNSON 'S** [6] - 164:7, 250:16, 283:4, 328:8, 335:11, 358:7
**JONATHAN** [1] - 157:21
**JOSEPH** [4] - 256:8, 281:18, 323:21, 324:2
**JOSEPH** [2] - 323:22, 361:22
**JUDGE** [1] - 157:10
**JUDGE** [41] - 158:16, 160:16, 165:24, 167:5, 172:21, 173:16, 174:4, 175:19, 177:14, 178:4, 179:10, 193:19, 237:13, 240:21, 241:7, 242:13, 268:1, 268:2, 268:8, 268:11, 271:11, 275:1, 279:12, 282:10, 282:17, 284:11, 296:5, 299:16, 305:5, 308:14, 309:12, 309:19, 310:9, 319:25, 320:5, 321:21, 329:12, 344:6, 359:10, 360:13
**JUDGE** [24] - 160:21, 161:16, 168:2, 173:10, 180:22, 200:1, 201:16, 204:23, 205:11, 205:17, 205:19, 242:1, 256:3, 267:25, 268:25, 269:1, 283:17, 319:20, 319:21, 321:7, 321:8, 325:23, 327:7, 327:9
**JUICE** [1] - 160:22
**JULY** [4] - 249:6, 249:8, 254:10, 320:25
**JUMP** [1] - 355:2
**JUNCTION** [1] - 289:13
**JUNE** [6] - 205:5, 254:7, 254:8, 319:18, 320:10, 341:18
**JUROR** [3] - 276:22, 333:24, 340:12
**JURORS** [3] - 181:9, 275:22, 277:3
**JURY** [121] - 158:2, 160:6, 162:21, 163:4, 165:16, 165:18, 165:20, 166:13, 166:14, 172:17, 173:5, 174:10, 174:11, 174:13, 175:12, 177:4, 179:3, 180:21, 188:2, 189:10, 195:9, 208:2, 208:4, 217:11, 218:1, 219:1, 220:16, 220:18, 221:25, 222:3, 222:4, 225:3, 225:8, 228:12, 228:20,

228:22, 231:6, 231:22, 232:10, 232:12, 233:2, 234:15, 234:18, 234:20, 236:2, 242:4, 242:12, 242:20, 243:1, 243:13, 243:23, 244:19, 247:25, 248:24, 249:25, 250:5, 251:5, 254:20, 258:14, 262:2, 262:5, 263:17, 274:11, 277:6, 278:2, 280:3, 287:2, 287:25, 296:2, 299:25, 307:2, 308:8, 308:13, 308:15, 309:18, 312:24, 315:6, 316:3, 316:15, 317:9, 317:12, 317:17, 319:7, 319:9, 320:8, 321:11, 323:1, 327:11, 328:11, 329:13, 329:17, 330:21, 331:5, 332:7, 332:9, 332:14, 337:6, 337:10, 340:3, 340:18, 341:5, 342:13, 342:22, 343:11, 345:3, 345:13, 345:17, 346:23, 347:12, 349:5, 351:22, 351:24, 352:3, 352:22, 353:9, 356:12, 356:16, 357:2, 357:6, 357:20, 357:24

**JURY** [8] - 181:7, 234:22, 242:18, 277:9, 288:7, 340:19, 341:6, 357:25

**JURY** [1] - 157:9

**JURY.)** [1] - 321:14

**JUSTICE** [1] - 189:18

**JUSTICE** [1] - 158:11

## K

**K-A-Y** [1] - 185:2

**KAPLAN'S** [1] - 160:16

**KAY** [4] - 182:4, 185:2, 190:3, 194:24

**KAY** [2] - 182:6, 361:6

**KEEP** [6] - 226:15, 233:21, 249:12, 263:2, 293:15, 296:11

**KELLOGG 'S** [1] - 211:5

**KENNEL** [1] - 290:19

**KENTUCKY** [10] - 182:18, 182:19, 183:20, 190:16, 192:18, 192:19, 192:25, 205:15, 289:11

**KEY** [8] - 246:7, 246:8, 246:9, 246:15, 252:17, 252:20, 252:21, 253:9

**KIDDING** [1] - 283:20

**KIND** [5] - 192:5, 216:25, 269:19, 315:13, 337:24

**KINKS** [2] - 358:22, 359:4

**KNOWLEDGE** [8] - 187:6, 197:20, 258:22, 267:8, 269:16, 271:9, 296:14, 296:19

**KNOWN** [2] - 306:1, 306:7

**KNOWS** [1] - 238:3

## L

**LABEL** [2] - 335:21, 336:8

**LABELLED** [1] - 333:16

**LABELS** [1] - 350:18

**LADIES** [1] - 195:8

**LANGUAGE** [9] - 161:1, 166:23, 167:25, 260:12, 261:1, 264:4, 266:20, 278:14, 322:8

**LARGE** [9] - 182:25, 186:19, 230:11, 233:7, 244:1, 244:5, 303:10, 303:25, 312:6

**LARGER** [2] - 183:8, 195:10

**LASER** [2] - 248:9, 248:13

**LASERED** [4] - 228:3, 231:24, 233:4, 252:14

**LASERING** [1] - 246:20

**LAST** [14] - 166:7, 167:10, 175:18, 176:19, 192:17, 199:6, 202:4, 214:2, 254:25, 271:6, 274:7, 289:1, 311:20, 314:13

**LAST** [1] - 311:5

**LATE** [5] - 158:16, 166:20, 241:3, 282:20, 285:1

**LATTER** [1] - 359:7

**LAUNDERING** [5] - 179:23, 180:1, 278:4, 278:6, 287:16

**LAW** [9] - 178:20, 280:25, 285:22, 289:24, 290:3, 324:23, 325:9, 358:11

**LAWSUIT** [2] - 190:2, 197:1

**LAWYER** [1] - 226:17

**LAWYERS** [5] - 159:13, 159:16, 160:13, 160:22, 169:21

**LAYING** [1] - 164:17

**LAYOUT** [1] - 330:15

**LEAD** [1] - 341:14

**LEARN** [1] - 340:12

**LEARNED** [1] - 240:10

**LEAST** [2] - 209:24, 339:24

**LEAVE** [3] - 219:24, 249:6, 357:19

**LEAVES** [4] - 234:22, 275:20, 322:21, 357:25

**LEDGER** [1] - 353:20

**LEFT** [18] - 184:8, 209:8, 218:20, 225:18, 227:10, 229:4, 229:7, 230:1, 230:11, 245:7, 252:5, 277:6, 300:23, 333:18, 334:2, 336:24, 346:16, 349:9

**LEFT-HAND** [2] - 229:4, 349:9

**LEGAL** [18] - 158:25, 159:2, 159:4, 159:22, 159:24, 161:24, 169:17, 180:12, 181:12, 230:14, 230:15, 242:23, 281:5, 282:4, 282:8, 282:15, 283:15, 285:13

**LEGALLY** [1] - 345:9

**LEK** [1] - 160:16

**LENGTH** [1] - 211:7

**LENGTHY** [1] - 201:7

**LESS** [1] - 341:20

**LETTER** [56] - 175:14, 175:16, 176:16, 177:9, 179:4, 179:6, 183:11, 183:18, 185:13, 186:7, 194:12, 197:2, 209:2, 219:5, 223:18, 223:20, 226:3, 227:25, 234:1, 246:5, 246:19, 246:20, 252:13, 252:15, 255:2, 255:4, 259:20, 261:16, 294:7, 296:23, 312:5, 312:12, 313:4, 314:11, 314:12, 314:19, 315:7, 315:14, 315:23, 316:8, 316:13, 316:15, 317:2, 317:3, 317:13, 317:17, 317:22, 318:13, 319:10, 331:8, 331:9, 331:11, 334:21, 345:17, 347:2

**LETTERING** [1] - 173:16

**LETTERS** [19] - 182:24, 186:18, 237:17, 240:2, 245:22, 262:24, 293:21, 293:23, 294:4, 295:1, 295:3, 296:12, 320:20, 320:22, 331:4, 331:16, 337:15, 338:12, 356:6

**LETTING** [1] - 280:23

**LEXUS** [1] - 281:6

**LIABILITY** [2] - 332:24, 336:25

**LICENSES** [1] - 353:18

**LIED** [2] - 265:16, 265:18

**LIFE** [2] - 290:15, 293:7

**LIGHT** [4] - 159:14, 169:12, 190:12, 288:1

**LIKELY** [1] - 280:17

**LILIENKAMP** [2] - 359:14, 359:23

**LILLENKAMP** [2] - 258:20, 275:12

**LIMINE** [5] - 237:22, 238:12, 240:14, 241:1, 241:6

**LIMIT** [2] - 297:16, 302:25

**LIMITATION** [1] - 287:5

**LIMITATIONS** [8] - 178:9, 178:11, 179:11, 179:20, 278:4, 278:11, 287:14, 287:15

**LIMITED** [1] - 296:11

**LIMITED** [1] - 211:17

**LIMITING** [2] - 166:16, 166:21

**LIMITS** [2] - 205:13, 285:14

**LINE** [19] - 159:10, 167:11, 176:25, 211:8, 222:9, 225:9, 228:14, 244:20, 248:2, 249:1, 250:9, 253:14, 255:5, 260:7, 262:14, 268:15, 274:18, 294:2, 355:2

**LINED** [1] - 358:14

**LINES** [2] - 262:16, 268:2

**LINK** [2] - 358:23, 358:24

**LIST** [17] - 233:16, 233:25, 234:2, 236:13, 237:7, 238:13, 247:3, 252:20, 252:21, 253:1, 253:11, 253:15, 253:20, 271:4, 277:15, 304:20, 335:3

**LISTED** [6] - 213:3, 215:15, 265:5, 292:8, 343:9, 355:7

**LISTEN** [1] - 276:10

**LISTENING** [1] - 193:10

**LISTS** [5] - 234:3, 244:14, 252:22, 252:24, 304:13

**LIVE** [9] - 182:17, 289:10, 289:11, 289:22, 289:23, 290:4, 290:5, 302:22, 311:14

**LIVED** [8] - 192:21, 290:22, 290:24, 291:3, 291:5, 291:8, 291:21

**LIVES** [4] - 289:21, 289:25, 290:3, 302:22

**LIVING** [1] - 290:13

**LOAD** [1] - 302:11

**LOANS** [1] - 216:6

**LOCAL** [2] - 203:24, 263:25

**LOCATED** [2] - 331:13, 335:15

**LOCATION** [19] - 268:14, 326:8, 326:19, 327:5, 327:10, 327:12, 327:17, 327:20, 328:13, 331:15, 331:20,

332:20, 336:22, 336:24, 337:20, 338:6, 339:16, 339:18, 342:20
**LOCATIONS** [6] - 325:6, 325:12, 326:5, 326:23, 326:24, 339:14
**LOCK** [1] - 357:20
**LOGGING** [1] - 290:16
**LOGISTICS** [1] - 258:12
**LONG-TERM** [2] - 178:19, 192:11
**LOOK** [31] - 174:1, 180:15, 180:17, 194:22, 198:2, 198:4, 215:24, 216:8, 216:22, 218:25, 226:9, 229:21, 239:14, 239:16, 240:4, 241:10, 250:1, 251:19, 268:4, 285:24, 286:4, 286:5, 287:3, 314:25, 332:21, 334:12, 347:13, 353:4, 358:10
**LOOKED** [7] - 209:1, 212:8, 236:15, 285:22, 314:10, 331:19, 331:24
**LOOKING** [18] - 183:11, 205:8, 212:7, 230:20, 232:14, 242:9, 242:11, 250:2, 251:22, 254:25, 270:16, 287:12, 287:22, 326:1, 326:2, 334:18, 352:2, 352:9
**LOOKS** [17] - 184:1, 185:3, 211:16, 214:9, 214:13, 214:14, 224:5, 224:15, 225:15, 227:12, 229:13, 245:3, 250:25, 253:24, 254:7, 300:20, 335:21
**LOOSELY** [1] - 278:14
**LOSE** [2] - 294:18, 325:20
**LOUD** [6] - 195:8, 196:2, 262:17, 264:8, 268:24, 269:7
**LOWER** [3] - 244:4, 330:24, 345:18
**LUCK** [1] - 225:25
**LUCKY** [11] - 250:10, 258:25, 259:12, 267:22, 336:4, 338:17, 351:3, 352:11, 353:1, 354:13, 355:8
**LUCKY** [7] - 250:12, 251:14, 253:15, 254:24, 255:8, 335:23, 335:25
**LUGO** [3] - 233:10, 233:12, 233:22
**LUNCH** [15] - 167:14, 168:4, 174:10, 180:4, 180:15, 236:17, 241:11, 242:1, 242:21, 243:1, 275:21, 276:5, 277:4, 286:20, 358:12
**LUNCHEON** [1] - 166:12
**LUNG** [1] - 291:16
**LYING** [1] - 284:13

## M

**M-A-R-I-L-Y-N** [1] - 311:5
**MA'AM** [25] - 185:4, 187:2, 192:24, 193:1, 194:22, 195:18, 196:8, 197:19, 197:23, 198:9, 198:16, 199:5, 199:10, 203:5, 203:7, 204:11, 206:11, 267:20, 268:4, 269:11, 271:6, 310:2, 321:16
**MADAM** [5] - 191:5, 194:3, 264:7, 308:4, 319:5
**MADAME** [6] - 196:17, 196:23, 197:7, 197:12, 202:13, 202:25
**MAE'S** [1] - 191:23
**MAGIC** [1] - 298:2
**MAIL** [103] - 157:23, 179:21, 182:24, 183:12, 185:13, 186:22, 190:13, 198:23, 207:19, 208:6, 209:16, 219:9, 220:8, 220:19, 221:17, 222:9, 222:10, 222:11, 222:14, 222:16, 222:18, 222:23, 223:1, 223:2, 223:7, 223:10, 224:2, 224:12, 224:14, 225:9, 225:11, 228:14, 231:10, 244:20, 244:22, 245:2, 245:15, 247:7, 248:2, 248:9, 248:10, 248:16, 249:1, 249:3, 249:9, 250:3, 250:7, 250:9, 250:11, 251:6, 251:8, 254:21, 254:22, 254:25, 256:24, 257:7, 257:16, 258:18, 259:10, 259:15, 259:19, 261:2, 265:22, 266:20, 267:9, 271:2, 273:22, 273:23, 274:1, 274:12, 274:17, 274:18, 274:19, 274:20, 278:10, 293:21, 293:23, 294:6, 301:24, 302:14, 302:18, 302:24, 302:25, 303:4, 303:5, 312:5, 318:2, 319:11, 324:22, 325:3, 334:19, 334:21, 336:9, 336:11, 338:16, 338:19, 338:22, 344:19, 354:9
**MAILBOX** [4] - 190:13, 302:24, 303:6, 303:7
**MAILED** [17] - 202:10, 208:23, 217:11, 217:14, 217:15, 224:7, 227:2, 245:12, 247:4, 252:11, 252:14, 253:14, 259:20, 260:4, 261:8, 272:12, 272:16
**MAILERS** [1] - 258:1
**MAILING** [86] - 197:5, 197:17, 198:11, 198:18, 202:22, 202:23, 203:13, 208:22, 209:1, 209:9, 209:13, 210:2, 210:6, 214:8, 215:14, 216:23, 219:6, 222:18, 222:22, 222:24, 223:16, 225:14, 227:18, 228:24, 228:25, 229:22, 230:10, 230:20, 231:24, 231:25, 232:14, 233:4, 233:5, 234:6, 237:6, 243:15, 243:16, 243:25, 244:13, 244:15, 245:3, 245:12, 245:14, 245:20, 245:21, 245:23, 246:9, 246:16, 246:21, 247:14, 247:17, 247:19, 250:25, 251:22, 252:7, 252:8, 252:19, 252:23, 252:24, 252:25, 253:1, 253:6, 253:10, 253:12, 253:14, 254:5, 254:13, 256:16, 261:21, 262:20, 264:14, 267:13, 270:25, 272:13, 272:14, 273:1, 273:21, 302:25, 304:13, 305:21, 305:24, 308:6, 315:1, 321:5, 343:16
**MAILINGS** [42] - 169:21, 210:7, 210:9, 219:14, 219:18, 219:19, 222:15, 227:4, 227:7, 236:4, 237:12, 244:14, 247:4, 247:14, 254:8, 260:1, 260:8, 261:10, 266:19, 267:10, 267:22, 269:17, 270:3, 270:10, 270:14, 272:18, 273:10, 274:2, 296:17, 297:1, 297:11, 297:12, 298:6, 301:23, 302:2, 302:5, 304:14, 304:19, 304:24, 304:25, 342:16, 350:24
**MAILS** [5] - 236:4, 237:5, 248:5, 253:13, 259:5
**MAIN** [2] - 185:10, 212:7
**MAJOR** [2] - 233:9, 349:21
**MAJORITY** [3] - 290:15, 330:17, 335:15
**MANAGER** [3] - 247:13, 257:23, 257:25
**MANNER** [2] - 165:8, 201:15
**MARCH** [5] - 157:6, 208:6, 220:8, 220:19, 360:17
**MARILYN** [2] - 311:7, 361:18
**MARILYN** [6] - 281:14, 281:16, 310:20, 311:4, 316:19, 317:21
**MARK** [3] - 283:9, 300:17, 319:21
**MARKED** [4] - 323:10, 329:23, 341:24, 351:8
**MARKETING** [2] - 257:10, 261:20
**MARKETING** [1] - 326:18
**MARKING** [1] - 173:19
**MARTHA** [3] - 233:10, 233:12, 233:22
**MARVEL** [1] - 211:17
**MARY** [4] - 258:20, 271:7, 275:12, 359:13
**MASTER** [2] - 212:11, 214:22
**MATCHED** [1] - 265:22
**MATERIAL** [2] - 202:11, 233:24
**MATH** [4] - 210:6, 210:11, 211:21, 214:16
**MATTER** [6] - 166:16, 167:2, 179:5, 275:25, 277:25, 328:16
**MATTERS** [2] - 201:4, 279:4
**MEAN** [19] - 166:22, 208:16, 208:18, 215:17, 217:20, 221:6, 223:22, 226:22, 226:24, 245:11, 246:3, 246:8, 251:15, 256:18, 279:19, 302:18, 315:10, 344:14, 344:17
**MEANING** [2] - 264:21, 267:22
**MEANS** [10] - 208:17, 221:7, 221:11, 226:23, 246:4, 255:7, 276:3, 276:20, 282:8, 344:18
**MEANT** [2] - 186:7, 194:19
**MECHANICS** [1] - 166:13
**MECHANISM** [1] - 357:12
**MEDIA** [1] - 357:11
**MEDICAL** [1] - 294:24
**MEET** [1] - 358:10
**MEETING** [1] - 323:17
**MEETINGS** [1] - 271:22
**MEMBER** [3] - 178:19, 323:19, 328:24
**MEMBERS** [2] - 331:5, 357:2
**MEMORY** [13] - 191:6, 191:12, 192:5, 192:11, 192:12, 238:11, 238:19, 270:1, 272:5, 273:6, 293:11, 294:17, 294:23
**MENTAL** [1] - 294:23
**MENTALLY** [1] - 305:19
**MENTION** [1] - 159:22
**MENTIONED** [13] - 208:3, 220:17, 222:2, 225:7, 228:11, 228:21, 229:10, 231:5, 231:21, 232:11, 233:1, 351:23, 358:4
**MERCEDES** [1] - 348:13
**MERELY** [1] - 163:3

**MESSAGE** [1] - 222:5
**MET** [2] - 257:19, 291:4
**MIC** [1] - 168:20
**MICROPHONE** [2] - 289:15, 311:3
**MICS** [2] - 168:20, 168:21
**MID** [1] - 160:9
**MIDDLE** [4] - 185:2, 278:5, 349:13
**MIGHT** [9] - 158:24, 159:13, 191:15, 258:9, 284:21, 334:19, 354:3, 358:20
**MILITARY** [1] - 292:12
**MILLION** [7] - 184:1, 186:14, 209:17, 209:18, 215:18, 216:3, 216:6
**MILLIONS** [1] - 240:20
**MIND** [1] - 263:16
**MINE** [2] - 189:22, 266:3
**MINOR** [1] - 171:4
**MINUTE** [6] - 199:8, 234:19, 256:3, 261:25, 340:2, 340:21
**MINUTES** [16] - 168:3, 234:17, 235:8, 236:23, 242:21, 277:4, 281:14, 281:19, 314:14, 334:6, 334:23, 335:6, 335:18, 336:6, 353:17, 359:20
**MISCELLANEOUS** [1] - 353:19
**MISSPOKE** [1] - 210:20
**MISTAKE** [3] - 233:18, 266:4, 303:17
**MMS** [1] - 252:24
**MMS20** [1] - 253:13
**MODEL** [1] - 348:12
**MOMENT** [17] - 164:8, 165:4, 171:22, 182:23, 183:10, 183:13, 186:5, 187:2, 195:6, 205:24, 212:13, 236:21, 333:12, 334:17, 347:13, 350:17, 353:3
**MOMENTS** [4] - 191:5, 191:11, 194:4, 204:14
**MONDAY** [1] - 248:9
**MONEY** [46] - 179:23, 180:1, 185:17, 185:18, 186:1, 186:9, 190:2, 194:13, 194:16, 194:20, 195:2, 197:1, 197:10, 199:20, 203:25, 204:5, 204:20, 226:16, 233:9, 250:7, 250:24, 262:12, 262:18, 264:2, 270:20, 278:4, 278:6, 287:16, 301:16, 301:17, 301:18, 302:11, 303:2, 303:19, 303:25, 304:22, 304:23, 315:9, 315:12, 315:13, 315:15, 315:17, 315:19, 316:16, 318:3, 349:21
**MONEYS** [4] - 196:6, 196:15, 226:4, 226:13
**MONIES** [4] - 195:1, 300:16, 309:25, 310:6
**MONITOR** [1] - 303:5
**MONITORING** [2] - 302:13, 302:18
**MONTH** [34] - 192:2, 192:17, 193:3, 194:8, 197:3, 197:15, 198:5, 198:7, 199:6, 199:21, 202:4, 206:4, 244:15, 247:5, 247:10, 254:8, 254:13, 272:20, 272:22, 273:4, 273:7, 273:10, 273:13, 273:14, 273:15, 273:16, 319:18, 320:16, 320:25, 339:19
**MONTHS** [1] - 254:13
**MORABITO** [4] - 242:12, 276:21, 276:25, 277:7
**MORABITO** [5] - 180:21, 206:23, 207:6, 357:17, 358:20
**MORBITO** [4] - 330:8, 340:10, 340:12, 340:16
**MORNING** [25] - 158:3, 158:4, 158:8, 158:13, 158:14, 158:18, 166:24, 167:7, 167:20, 169:9, 172:3, 174:2, 181:9, 182:11, 207:7, 207:14, 207:15, 234:14, 236:15, 241:18, 284:25, 286:13, 286:16, 286:18, 357:6
**MOST** [3] - 191:22, 267:16, 348:15
**MOTHER** [4] - 183:19, 190:13, 205:16, 289:24
**MOTHER'S** [1] - 190:13
**MOTHER-IN-LAW** [1] - 289:24
**MOTION** [5] - 237:22, 238:12, 240:14, 241:1, 241:6
**MOTION** [7] - 201:2, 239:17, 239:19, 240:14, 240:23, 241:5, 241:9
**MOTIVATION** [1] - 284:13
**MOUTH** [2] - 242:9, 289:15
**MOUTHS** [1] - 173:11
**MOVE** [31] - 161:11, 171:11, 172:18, 175:1, 184:3, 200:1, 207:21, 217:3, 218:11, 220:10, 221:19, 230:22, 231:13, 231:19, 232:5, 232:19, 234:12, 236:10, 239:5, 239:7, 249:14, 266:18, 291:2, 291:6, 312:16, 319:25, 322:11, 327:10, 330:1, 351:13
**MOVED** [3] - 174:24, 291:5, 302:20
**MOVIE** [2] - 211:18, 211:24
**MOVING** [4] - 172:14, 174:17, 216:12, 241:21
**MR** [337] - 158:14, 159:9, 160:21, 161:8, 161:16, 161:23, 162:15, 162:17, 163:1, 163:6, 163:8, 163:14, 163:19, 163:25, 164:6, 164:20, 164:23, 165:12, 165:14, 165:15, 165:19, 165:21, 165:24, 166:1, 166:4, 166:7, 166:15, 167:5, 167:15, 167:16, 167:19, 167:23, 168:2, 168:7, 168:14, 170:15, 170:20, 171:1, 171:4, 171:17, 171:22, 171:24, 172:5, 172:10, 172:16, 172:20, 173:4, 173:10, 173:14, 173:22, 174:4, 174:16, 175:10, 175:15, 175:23, 176:2, 176:4, 176:6, 176:7, 176:21, 177:2, 177:5, 177:7, 177:10, 177:14, 177:19, 178:1, 178:3, 178:17, 179:10, 179:20, 180:1, 180:6, 180:14, 180:19, 181:20, 182:10, 188:7, 189:2, 190:20, 190:22, 193:13, 193:17, 193:18, 193:19, 193:24, 196:1, 200:1, 201:3, 201:8, 201:13, 201:16, 201:19, 202:15, 202:17, 204:23, 204:25, 205:11, 205:17, 205:19, 205:22, 206:7, 206:12, 206:15, 206:16, 207:23, 217:5, 218:14, 220:3, 220:12, 221:21, 224:24, 228:6, 230:25, 231:15, 232:4, 232:18, 235:5, 236:9, 236:18, 237:13, 237:23, 238:7, 238:25, 239:10, 239:19, 239:24, 240:6, 240:15, 240:17, 240:19, 241:7, 241:13, 241:24, 242:1, 242:8, 242:13, 256:3, 256:7, 261:23, 267:25, 268:8, 268:10, 268:12, 268:20, 268:25, 269:9, 269:13, 271:11, 275:1, 275:3, 275:17, 277:23, 278:21, 279:2, 279:12, 280:10, 280:19, 281:5, 281:10, 282:10, 282:12, 282:16, 282:21, 282:24, 283:1, 283:17, 284:5, 284:11, 284:21, 285:6, 285:10, 286:1, 286:3, 286:10, 286:12, 286:15, 287:19, 288:5, 288:6, 296:5, 296:7, 297:15, 297:19, 299:16, 305:5, 305:9, 307:8, 307:11, 308:3, 308:7, 308:17, 309:10, 309:15, 309:19, 309:21, 310:9, 310:19, 311:6, 311:11, 312:8, 312:11, 312:15, 312:17, 312:21, 313:1, 313:2, 313:10, 314:22, 315:3, 315:20, 315:25, 316:9, 316:21, 317:5, 317:7, 317:9, 318:17, 318:22, 318:25, 319:2, 319:20, 319:24, 320:3, 320:5, 320:9, 320:18, 321:7, 321:15, 321:20, 321:24, 322:1, 322:10, 322:13, 322:17, 322:24, 323:4, 324:5, 329:6, 329:10, 329:12, 329:18, 329:21, 330:1, 330:2, 330:6, 331:25, 332:7, 332:10, 333:2, 333:11, 333:23, 334:4, 334:22, 335:5, 335:17, 336:5, 337:1, 337:3, 337:5, 337:11, 337:13, 339:24, 341:10, 341:11, 341:23, 342:1, 342:5, 342:8, 342:11, 342:22, 343:1, 343:11, 343:15, 344:4, 344:6, 344:9, 344:11, 344:21, 344:22, 345:13, 345:19, 346:4, 346:5, 346:11, 346:14, 346:22, 347:1, 347:12, 347:18, 349:4, 349:7, 349:22, 349:23, 349:25, 350:3, 350:6, 350:9, 350:14, 350:22, 351:7, 351:9, 351:10, 351:12, 351:18, 351:21, 352:1, 352:12, 352:22, 352:24, 353:8, 353:10, 354:6, 354:11, 355:10, 355:14, 355:17, 356:3, 356:8, 356:11, 356:17, 358:16, 359:1, 359:10, 359:13, 360:3, 360:9, 360:13, 361:7, 361:8, 361:11, 361:14, 361:17, 361:19, 361:20, 361:21, 361:23
**MS** [133] - 158:8, 158:19, 159:6, 159:8, 159:11, 161:2, 161:15, 161:21, 161:24, 162:13, 168:13, 170:3, 170:5, 170:8, 170:10, 170:13, 175:3, 181:2, 181:4, 206:25, 207:13, 207:16, 207:21, 208:2, 209:4, 210:16, 210:19, 210:22, 210:25, 211:4, 212:10, 213:5, 213:7, 214:5, 214:10, 214:21, 216:12, 217:3, 217:25, 218:4, 218:6, 218:10, 218:16, 219:23, 220:5, 220:10, 220:16, 221:14, 221:19, 221:25, 223:5, 224:11, 224:22, 225:3, 225:13, 225:18, 226:8, 227:15, 228:4, 228:10,

228:18, 229:24, 230:9, 230:13, 230:17, 230:22, 231:4, 231:7, 231:13, 231:19, 232:2, 232:5, 232:10, 232:16, 232:19, 232:24, 233:15, 234:10, 234:16, 235:2, 236:16, 236:25, 237:2, 238:2, 239:7, 241:22, 242:17, 243:7, 243:8, 243:9, 243:18, 244:16, 247:22, 248:1, 248:21, 248:25, 249:4, 249:22, 251:2, 251:17, 253:3, 254:16, 255:10, 256:1, 271:15, 271:18, 271:21, 272:24, 274:24, 288:12, 289:7, 289:20, 296:22, 297:8, 297:17, 297:24, 298:4, 298:7, 298:9, 299:3, 299:6, 299:14, 299:20, 299:22, 299:24, 301:2, 301:4, 306:9, 307:7, 310:13, 361:10, 361:12, 361:16

**MULTIPLE** [5] - 238:25, 252:22, 252:24, 254:13, 273:9

**MUST** [2] - 303:17, 303:20

**MUTE** [1] - 170:21

**MUTED** [2] - 170:19, 180:23

## N

**NAME** [38] - 169:6, 182:3, 183:23, 183:24, 184:14, 184:23, 185:2, 185:6, 190:25, 217:21, 219:3, 230:4, 233:24, 245:17, 245:20, 247:8, 251:13, 252:15, 256:8, 288:22, 288:23, 288:25, 289:1, 290:6, 290:7, 300:10, 305:10, 311:2, 311:4, 311:5, 314:13, 319:3, 320:15, 324:1, 326:16, 336:1, 344:23

**NAMED** [2] - 259:11, 314:20

**NAMES** [6] - 219:5, 233:17, 252:25, 253:11, 253:19, 271:8

**NAP** [2] - 356:9, 356:10

**NATIONWIDE** [6] - 259:16, 260:5, 261:8, 262:11, 263:10, 270:12

**NATURE** [5] - 238:18, 271:23, 301:21, 302:12, 304:20

**NEARBY** [5] - 289:25, 290:4, 290:5, 291:5, 291:8

**NECESSARILY** [1] - 179:1

**NECESSARY** [5] - 345:21, 345:23, 359:24, 359:25, 360:1

**NEED** [37] - 162:7, 168:3, 168:5, 173:6, 176:21, 177:1, 177:23, 178:10, 183:8, 197:24, 198:3, 206:15, 225:20, 230:13, 234:13, 246:4, 248:12, 249:10, 256:3, 268:13, 273:21, 273:25, 276:13, 277:19, 282:8, 288:4, 288:19, 317:18, 327:20, 339:23, 340:3, 347:10, 356:10, 358:11, 358:12, 358:13, 359:4

**NEEDED** [2] - 208:10, 220:24

**NEEDS** [2] - 223:1, 307:7

**NEGLECTED** [1] - 322:11

**NET** [3] - 254:24, 255:7, 255:8

**NETWORK** [1] - 238:20

**NEUTRAL** [4] - 296:24, 296:25, 297:1, 297:12

**NEVER** [17] - 165:19, 173:10, 175:16, 257:19, 261:5, 265:16, 266:4, 270:2, 279:13, 280:5, 303:12, 303:16, 303:19, 305:21, 319:11, 319:13

**NEVERTHELESS** [1] - 330:14

**NEW** [2] - 181:14, 348:12

**NEW** [1] - 157:1

**NEW** [10] - 157:4, 157:14, 157:15, 157:20, 157:22, 160:16, 217:24, 218:21, 327:7

**NEWS** [3] - 197:4, 197:16, 276:10

**NEWSLETTERS** [1] - 222:15

**NEXT** [50] - 158:15, 164:23, 173:23, 184:14, 184:23, 185:5, 187:16, 188:3, 188:9, 200:4, 201:21, 206:21, 212:15, 213:10, 223:7, 235:10, 236:23, 245:17, 246:1, 246:6, 246:19, 253:17, 253:22, 254:12, 278:7, 281:23, 288:10, 290:3, 290:24, 295:12, 298:11, 302:22, 306:12, 307:14, 310:17, 319:18, 322:22, 322:25, 335:17, 340:24, 342:23, 346:4, 347:21, 353:21, 354:9, 355:24, 356:19, 359:13, 359:18

**NINE** [6] - 178:10, 191:19, 194:25, 204:1, 212:8, 213:4

**NOBODY** [4] - 189:16, 265:18, 328:16

**NOBODY'S** [1] - 199:4

**NOISE** [1] - 242:25

**NOMINATED** [1] - 233:13

**NONE** [3] - 230:25, 237:13, 328:21

**NORMAL** [3] - 242:22, 276:3, 285:9

**NORMALLY** [2] - 171:9, 242:20

**NOTATION** [2] - 184:23, 344:13

**NOTATIONS** [1] - 267:5

**NOTE** [13] - 184:15, 184:17, 184:22, 185:6, 189:10, 204:18, 249:15, 276:23, 285:2, 296:20, 340:16, 357:17, 357:18

**NOTEBOOKS** [2] - 277:5, 357:19

**NOTES** [4] - 190:7, 196:22, 202:8, 337:15

**NOTHING** [9] - 167:23, 191:19, 235:2, 246:18, 263:3, 271:11, 276:1, 283:15, 318:22

**NOTICE** [17] - 244:3, 262:10, 262:22, 263:9, 264:18, 296:21, 297:4, 297:13, 298:2, 312:22, 313:3, 317:20, 331:7, 337:15, 345:12, 345:16, 349:17

**NOTICED** [2] - 302:4, 326:24

**NOTICES** [2] - 295:6, 296:16

**NOTIFICATION** [5] - 230:14, 230:15, 264:10, 297:3, 347:9

**NOTIFIED** [7] - 226:15, 226:19, 226:20, 226:25, 239:3, 282:4

**NOTIFY** [3] - 180:9, 180:12, 226:2

**NOTING** [1] - 277:15

**NOVIS** [30] - 158:25, 159:4, 159:23, 169:17, 169:18, 169:19, 169:20, 210:3, 221:18, 222:7, 223:7, 224:13, 225:12, 228:17, 231:11, 244:24, 247:17, 248:20, 255:13, 255:17, 257:15, 260:16, 267:14, 267:21, 269:16, 271:22, 272:1, 272:5, 274:12, 283:6

**NOVIS'S** [2] - 210:11, 219:18

**NPF** [12] - 203:18, 203:20, 209:2, 209:9, 209:13, 249:13, 263:18, 263:20, 263:22, 318:13, 318:15, 319:10

**NUMBER** [25] - 174:25, 176:12, 209:20, 209:22, 209:24, 210:1, 211:10, 214:7, 214:11, 237:19, 241:20, 246:24, 264:15, 265:3, 265:22, 277:11, 278:2, 317:24, 334:18, 339:3, 339:5, 339:6, 339:20, 351:11, 354:21

**NUMBER** [1] - 171:16

**NUMBERING** [1] - 339:15

**NUMBERS** [10] - 237:1, 237:2, 266:11, 331:4, 331:11, 331:12, 331:16, 337:16, 339:8, 339:9

**NUMEROUS** [1] - 328:3

**NURSE** [2] - 289:13, 291:14

**NUSRAT** [1] - 157:10

## O

**O'CLOCK** [1] - 359:11

**OATH** [7] - 207:5, 207:6, 207:7, 267:21, 267:23, 269:15, 270:2

**OBJECT** [6] - 163:20, 171:8, 171:13, 236:10, 240:24, 332:3

**OBJECTION** [39] - 160:1, 160:7, 172:19, 172:20, 174:20, 202:17, 204:25, 207:23, 217:5, 218:14, 220:2, 220:12, 221:21, 224:24, 228:6, 230:24, 231:15, 232:4, 232:18, 237:7, 237:11, 238:8, 239:9, 241:4, 241:24, 296:4, 299:16, 306:9, 307:6, 312:17, 317:7, 319:25, 320:3, 322:13, 329:9, 330:2, 337:3, 342:1, 351:9

**OBJECTIONS** [2] - 163:17, 241:23

**OBLIGATION** [2] - 343:21, 346:3

**OBSERVE** [2] - 294:14, 313:7

**OBSERVED** [1] - 276:22

**OBTAINED** [3] - 172:8, 323:10, 323:13

**OBVIOUSLY** [2] - 162:6, 165:15

**OCCASION** [1] - 258:20

**OCCUR** [2] - 325:15, 325:17

**OE** [6] - 217:4, 217:8, 218:10, 229:15, 344:12, 350:11

**OF** [3] - 157:1, 157:2, 157:9

**OFFENCES** [1] - 278:8

**OFFER** [8] - 174:17, 186:9, 278:3, 317:5, 332:3, 337:1, 341:23, 342:5

**OFFERED** [1] - 263:11

**OFFERING** [3] - 186:19, 278:25, 283:10

**OFFERS** [1] - 299:14

**OFFICE** [6] - 186:16, 255:23, 326:15, 326:17, 337:23, 338:2

**OFFICER** [1] - 238:22

**OFFICERS** [1] - 327:22

**OFFICES** [1] - 323:15
**OFFICIAL** [5] - 226:3, 229:5, 229:11, 349:11
**OFFICIALLY** [1] - 290:18
**OFFICIALS** [1] - 323:13
**OFFS** [3] - 248:13, 248:20
**OFTEN** [6] - 272:12, 272:15, 278:9, 295:4, 295:9, 303:2
**OHIO** [1] - 192:22
**OLD** [6] - 182:20, 283:8, 290:8, 290:25, 302:21, 311:16
**ONCE** [6] - 261:13, 272:20, 272:22, 273:7, 291:22, 296:16
**ONE** [94] - 158:19, 166:16, 170:15, 174:16, 175:16, 185:20, 186:18, 186:21, 191:25, 197:15, 205:24, 211:16, 211:17, 211:18, 212:13, 215:7, 215:18, 215:22, 216:3, 216:5, 216:7, 216:10, 216:15, 216:25, 218:25, 223:25, 225:5, 226:15, 226:19, 226:20, 226:25, 233:25, 234:3, 236:20, 236:21, 237:13, 237:19, 238:24, 238:25, 245:14, 246:24, 249:13, 252:3, 252:21, 254:7, 254:13, 255:18, 256:3, 264:5, 266:5, 268:10, 271:6, 272:9, 273:10, 274:4, 275:1, 277:13, 280:14, 283:17, 297:6, 300:17, 301:12, 308:23, 309:6, 309:9, 311:17, 311:22, 314:11, 314:12, 314:19, 315:4, 318:15, 318:17, 320:18, 321:4, 326:5, 326:6, 340:4, 343:16, 344:2, 344:12, 346:24, 347:15, 348:1, 348:2, 349:12, 353:1, 354:9, 354:21, 356:11, 357:21
**ONES** [4] - 309:7, 334:11, 334:12, 334:20
**ONGOING** [1] - 254:15
**ONLINE** [1] - 339:1
**OPEN** [22] - 158:2, 173:11, 186:2, 189:1, 202:1, 214:1, 216:21, 229:5, 287:2, 299:1, 308:1, 332:15, 333:6, 334:8, 334:24, 335:7, 335:19, 336:7, 337:12, 350:18, 352:7, 357:1
**OPENED** [3] - 279:18, 280:1, 338:20
**OPENING** [2] - 186:2, 250:6
**OPERATE** [1] - 258:18
**OPERATIVE** [1] - 285:25
**OPPORTUNITIES** [4] - 203:22, 261:9, 263:11, 263:23
**OPPOSED** [1] - 280:18
**OPPOSING** [1] - 351:7
**OPPOSITION** [1] - 241:4
**OPTION** [2] - 243:2, 304:10
**ORANGE** [1] - 244:1
**ORDER** [24] - 165:3, 165:8, 173:18, 176:5, 176:14, 177:12, 177:17, 177:24, 178:10, 179:3, 179:4, 238:9, 249:11, 249:15, 249:21, 258:18, 272:23, 281:11, 283:25, 297:1, 298:2, 315:15, 316:17, 325:9
**ORDERED** [2] - 164:25, 283:14
**ORGANIZATIONS** [2] - 203:20, 263:22
**ORIGINAL** [7] - 174:18, 175:4, 237:4, 326:25, 327:4, 329:24, 330:7
**ORIGINALLY** [2] - 182:19, 292:6
**ORIGINALS** [5] - 175:1, 241:20, 241:21, 342:5, 342:13
**OTHERWISE** [5] - 165:22, 166:9, 178:21, 261:5, 276:4
**OUTER** [1] - 229:15
**OUTGOING** [1] - 303:5
**OUTSIDE** [21] - 160:5, 165:15, 165:17, 165:20, 166:14, 174:9, 174:13, 175:12, 177:4, 179:3, 227:19, 227:21, 228:24, 258:1, 266:8, 276:12, 294:6, 318:12, 327:19, 335:1, 356:12
**OUTSTANDING** [1] - 277:11
**OVERALL** [1] - 294:20
**OVERNIGHT** [1] - 349:1
**OVERRIDE** [1] - 240:2
**OVERRULED** [1] - 202:2
**OVERSIGHT** [2] - 238:12, 240:17
**OWEN** [12] - 325:14, 326:10, 326:11, 327:10, 327:12, 328:1, 328:8, 328:10, 336:12, 338:9, 343:4, 350:25
**OWENS** [1] - 339:16
**OWN** [12] - 167:12, 247:14, 247:17, 247:19, 258:24, 259:10, 262:24, 264:6, 272:13, 275:15, 276:19, 339:8
**OWNED** [1] - 258:25

## P

**P.M** [2] - 286:6, 358:7
**P.M** [3] - 277:3, 280:16, 282:9
**PAGE** [104] - 187:16, 188:9, 189:19, 189:21, 189:25, 195:25, 200:4, 201:21, 208:6, 209:7, 210:17, 210:19, 210:22, 212:15, 213:10, 214:8, 214:10, 214:12, 214:21, 222:1, 222:5, 225:4, 225:5, 225:13, 225:19, 227:10, 227:15, 228:18, 229:24, 231:19, 231:23, 232:24, 235:10, 239:15, 243:11, 243:21, 244:25, 245:1, 248:4, 248:6, 248:8, 249:4, 249:13, 250:1, 250:2, 251:17, 251:18, 254:9, 254:12, 254:18, 262:24, 263:1, 263:3, 263:6, 274:14, 277:12, 285:14, 295:12, 298:11, 306:12, 307:14, 313:10, 313:12, 314:2, 314:4, 314:6, 314:22, 314:23, 315:4, 315:21, 316:9, 317:23, 333:13, 339:7, 340:24, 342:23, 343:13, 344:12, 344:21, 345:14, 346:4, 346:11, 346:12, 346:24, 347:15, 347:16, 349:8, 349:18, 349:20, 351:22, 352:12, 352:22, 353:8, 354:6, 355:24, 356:19
**PAGE** [1] - 361:3
**PAGES** [7] - 171:25, 172:4, 172:5, 214:17, 238:6, 268:1, 354:4
**PAID** [4] - 186:13, 186:17, 304:15, 321:2
**PAM** [1] - 189:12
**PAMELA** [7] - 181:21, 182:4, 184:15, 190:3, 194:24, 195:17, 205:14
**PAMELA** [2] - 182:6, 361:6
**PAPER** [6] - 172:1, 172:6, 172:11, 219:15, 219:21, 350:25
**PAPERWORK** [4] - 186:4, 199:24, 202:5, 203:1
**PARAGRAPH** [7] - 184:13, 225:21, 233:16, 300:13, 345:2, 345:20, 354:16
**PARALEGAL** [1] - 158:11
**PARCEL** [1] - 238:15
**PARENTHESES** [1] - 349:1
**PARENTS** [3] - 290:4, 291:2, 302:20
**PARISI** [1] - 157:23
**PART** [12] - 171:24, 186:2, 202:23, 238:15, 261:20, 325:5, 330:18, 333:8, 333:20, 345:16, 345:17, 350:24
**PARTIAL** [1] - 216:5
**PARTICIPATE** [1] - 347:10
**PARTICIPATION** [2] - 244:6, 345:10
**PARTICULAR** [8] - 195:6, 195:21, 199:7, 252:23, 254:7, 267:9, 325:25, 343:7
**PARTICULARLY** [1] - 285:18
**PARTIES** [17] - 161:1, 167:3, 171:5, 175:20, 181:13, 236:3, 236:5, 276:1, 276:8, 285:23, 286:6, 287:6, 287:15, 323:1, 323:8, 340:9, 359:3
**PARTNERS** [2] - 210:12, 258:15
**PARTS** [1] - 260:1
**PARTY** [6] - 178:24, 178:25, 179:19, 241:11, 277:25, 340:8
**PARTY'S** [1] - 358:6
**PASSED** [5] - 167:6, 190:15, 281:2, 292:1, 322:8
**PAST** [2] - 251:25, 252:1
**PATCH** [1] - 180:22
**PATIENCE** [1] - 181:13
**PAUL** [1] - 289:2
**PAUSE** [6] - 205:25, 207:3, 216:17, 344:7, 350:20, 355:12
**PAUSE** [4] - 170:14, 170:23, 171:23, 181:6
**PAY** [8] - 194:19, 275:4, 275:10, 275:12, 294:18, 301:25, 304:21, 348:10
**PAYMENT** [5] - 219:10, 244:6, 272:25, 345:6, 346:20
**PAYMENT** [2] - 344:24, 345:4
**PAYMENTS** [11] - 219:13, 219:15, 219:17, 219:21, 244:8, 295:3, 300:9, 302:2, 304:5, 338:14, 348:25
**PDA** [1] - 243:17
**PEN** [1] - 264:6
**PENCE** [8] - 170:5, 170:8, 170:10, 170:13, 181:2, 181:4, 182:6, 361:6
**PENCE** [21] - 181:21, 182:4, 182:11, 184:15, 189:3, 190:3, 190:17, 190:23, 192:16, 194:24, 195:17, 198:10, 202:4, 202:21, 204:1, 205:4, 205:14, 206:18

**PEOPLE** [11] - 199:22, 234:1, 255:22, 257:7, 257:12, 258:21, 266:10, 267:1, 270:15, 272:19, 276:7
**PER** [10] - 208:8, 220:22, 222:13, 222:17, 223:9, 224:16, 224:18, 244:9, 274:15, 274:16
**PERCENT** [3] - 233:12, 233:13, 292:12
**PERHAPS** [1] - 197:13
**PERIMETER** [1] - 327:18
**PERIOD** [7] - 182:23, 185:8, 254:5, 258:2, 293:18, 294:13, 312:4
**PERIODS** [3] - 293:12, 293:15, 294:11
**PERMISSIBLE** [1] - 279:5
**PERMISSION** [6] - 159:20, 171:12, 317:9, 337:6, 349:25, 351:18
**PERMITS** [1] - 353:19
**PERSON** [20] - 178:12, 211:22, 215:11, 215:16, 216:2, 216:3, 219:8, 219:13, 219:14, 219:17, 219:20, 227:1, 227:13, 246:12, 265:23, 273:2, 286:17, 304:16, 355:4, 355:7
**PERSON 'S** [1] - 230:4
**PERSONAL** [2] - 296:14, 296:19
**PERSONNEL** [3] - 276:1, 323:14, 340:10
**PERSONS** [1] - 354:24
**PERSPECTIVE** [1] - 178:19
**PERTINENT** [1] - 303:8
**PHIL** [22] - 207:19, 208:7, 208:8, 220:8, 220:20, 220:21, 221:18, 222:7, 223:8, 225:12, 228:17, 231:11, 244:24, 249:8, 249:10, 249:20, 254:21, 271:23, 272:2, 272:6, 274:13, 355:9
**PHILIP** [5] - 158:5, 169:18, 169:20, 191:1, 323:7
**PHILIP** [1] - 157:7
**PHONE** [1] - 317:24
**PHRASE** [4] - 260:5, 260:21, 261:10, 279:19
**PHRASES** [1] - 260:19
**PHYSICAL** [1] - 211:20
**PHYSICALLY** [1] - 240:13
**PIANO** [2] - 192:9, 192:12
**PICTURE** [1] - 352:4
**PIECE** [36] - 209:17, 210:2, 215:14, 216:23, 219:15, 219:21, 222:13, 222:17, 222:22, 222:25, 224:17, 224:19, 231:24, 233:4, 233:5, 243:15, 243:16, 243:25, 245:20, 245:21, 246:9, 246:10, 246:11, 246:16, 246:21, 249:14, 249:16, 252:7, 252:8, 252:13, 252:19, 253:12, 261:2, 267:9, 344:18
**PIECES** [18] - 208:14, 208:20, 208:22, 209:1, 209:2, 219:6, 244:15, 245:23, 259:19, 259:24, 260:4, 260:13, 260:22, 265:22, 267:14, 329:1, 334:21
**PINPOINT** [1] - 287:13
**PK** [2] - 190:3
**PLACE** [10] - 193:13, 196:23, 234:1, 261:23, 266:8, 331:24, 332:25, 336:25, 337:25, 348:15
**PLACES** [1] - 261:21
**PLACING** [1] - 204:23
**PLAINVIEW** [2] - 217:23, 218:21
**PLAN** [1] - 231:11
**PLAN** [3] - 164:5, 175:7, 177:8
**PLANNING** [4] - 159:1, 174:2, 285:5, 359:18
**PLAY** [14] - 192:8, 192:9, 192:12, 250:13, 332:11, 332:14, 333:3, 333:4, 334:5, 334:22, 335:5, 336:5, 337:11, 359:20
**PLAYED** [8] - 332:15, 333:6, 334:8, 334:24, 335:7, 335:19, 336:7, 337:12
**PLAYING** [1] - 250:12
**PLAZA** [1] - 157:15
**PLUS** [1] - 194:21
**PMCS** [1] - 326:18
**PO** [6] - 183:19, 183:20, 190:15, 205:14, 217:23, 218:21
**PODCASTS** [1] - 276:11
**POINT** [31] - 163:2, 173:20, 176:23, 182:14, 185:7, 187:2, 190:15, 195:21, 195:22, 226:19, 264:7, 268:14, 279:7, 284:20, 287:21, 287:23, 291:6, 291:20, 291:23, 292:3, 292:6, 292:9, 292:14, 293:2, 303:9, 316:4, 328:18, 333:25, 338:25, 341:15, 350:4
**POINTERS** [1] - 337:20
**POINTING** [1] - 248:6
**POINTS** [3] - 226:10, 226:11, 337:14
**POLICY** [1] - 270:22
**POLL** [1] - 242:25
**POORLY** [1] - 291:18
**PORSCHE** [1] - 348:14
**PORT** [1] - 157:20
**PORTION** [3] - 244:4, 248:7, 331:1
**PORTIONS** [1] - 332:13
**PORTRAY** [1] - 178:12
**PORTRAYING** [1] - 178:6
**POSITION** [7] - 163:14, 180:10, 180:13, 236:8, 292:13, 293:9, 358:6
**POSITIONLESS** [1] - 331:11
**POSITIVE** [1] - 233:13
**POSSIBILITY** [1] - 315:11
**POSSIBLE** [6] - 190:10, 280:20, 308:18, 318:8, 318:10, 318:11
**POSSIBLY** [1] - 264:16
**POST** [1] - 337:15
**POST-IT** [1] - 337:15
**POSTAGE** [9] - 222:13, 222:17, 222:20, 222:21, 223:3, 224:9, 304:15, 304:21
**POSTAL** [9] - 158:11, 281:18, 323:20, 324:9, 324:12, 324:19, 324:23, 328:2, 328:3
**POSTAL** [17] - 192:16, 193:2, 194:7, 194:11, 197:3, 197:14, 199:14, 241:13, 324:13, 324:16, 325:5, 331:18, 334:13, 334:14, 334:17, 334:19
**POTENTIAL** [2] - 234:4, 279:3
**POTENTIALLY** [6] - 158:23, 159:21, 163:9, 164:23, 277:23, 284:15
**POWER** [4] - 160:23, 292:9, 292:15, 292:21
**PPF** [2] - 347:16, 347:21
**PRACTICAL** [1] - 282:12
**PRACTICALLY** [1] - 236:3
**PRACTICE** [1] - 279:2
**PRE** [3] - 166:19, 341:24, 351:8
**PRE-INDICTMENT** [1] - 166:19
**PRE-MARKED** [2] - 341:24, 351:8
**PREADDRESSED** [1] - 347:24
**PRECISE** [3] - 161:7, 166:13, 277:19
**PRECISESERVICESINC @YAHOO.COM** [1] - 251:9
**PREFER** [3] - 160:5, 171:14, 219:25
**PREFERENCE** [3] - 160:19, 160:21, 165:22
**PREFERS** [1] - 163:2
**PREJUDICE** [3] - 179:12, 284:18, 285:19
**PREJUDICED** [1] - 284:17
**PREJUDICIAL** [2] - 177:18, 285:18
**PREMISES** [1] - 323:11
**PREPARE** [1] - 236:19
**PREPARED** [4] - 165:7, 177:11, 346:1, 359:23
**PRESENCE** [10] - 160:6, 165:16, 165:17, 165:20, 174:9, 174:13, 175:12, 177:4, 179:3, 356:12
**PRESENT** [2] - 158:2, 287:2
**PRESERVE** [1] - 163:25
**PRETRIAL** [1] - 188:5
**PRETTY** [2] - 281:25, 293:2
**PREVIOUS** [1] - 238:9
**PREVIOUSLY** [18] - 169:3, 179:15, 207:10, 209:5, 238:4, 243:10, 243:19, 244:17, 247:23, 248:22, 249:23, 251:3, 254:17, 261:24, 269:15, 270:2, 274:8, 354:25
**PRICE** [3] - 245:21, 249:14, 249:18
**PRICING** [1] - 222:12
**PRIMARY** [1] - 326:8
**PRINT** [1] - 195:6
**PRINTED** [1] - 238:14
**PRINTING** [1] - 249:18
**PRIOLO** [45] - 158:5, 158:15, 169:18, 169:20, 176:10, 191:1, 207:20, 220:8, 221:18, 222:8, 223:8, 224:13, 225:12, 228:17, 231:12, 238:21, 244:24, 254:21, 255:4, 256:9, 257:19, 258:5, 258:15, 258:16, 258:25, 259:9, 259:20, 260:11, 260:16, 261:5, 267:10, 271:23, 272:2, 272:7, 274:13, 275:4, 275:7, 275:9, 275:12, 279:6, 279:8, 305:11, 319:4, 323:7, 355:9
**PRIOLO** [1] - 157:7
**PRIOLO 'S** [11] - 208:12, 210:7, 219:14,

219:18, 221:1, 249:20, 258:11, 267:21, 269:17, 273:10
**PRIOLO'S** [2] - 264:22, 267:13
**PRIVATE** [1] - 327:13
**PRIZE** [46] - 186:14, 187:3, 190:17, 194:20, 195:1, 196:7, 196:9, 196:15, 203:25, 215:23, 215:24, 262:12, 262:19, 264:2, 265:21, 295:6, 296:16, 296:21, 296:23, 297:1, 297:3, 297:4, 297:14, 298:2, 300:16, 301:16, 303:11, 303:14, 303:16, 312:6, 316:5, 316:7, 318:15, 325:3, 326:2, 326:4, 343:8, 343:18, 343:19, 343:21, 347:4, 348:9, 348:24, 349:2
**PRIZE** [2] - 344:24, 345:4
**PRIZES** [29] - 182:25, 186:19, 211:9, 211:11, 211:12, 211:14, 211:15, 211:19, 211:20, 211:22, 211:24, 212:5, 214:24, 215:4, 215:6, 215:9, 215:15, 216:2, 293:21, 293:24, 294:4, 295:1, 296:10, 303:1, 303:12, 303:19, 309:25, 310:6, 347:11
**PROBATIVE** [1] - 240:1
**PROBLEM** [5] - 175:21, 177:6, 185:21, 234:18, 279:22
**PROBLEMATIC** [1] - 160:13
**PROBLEMS** [1] - 280:4
**PROCEDURE** [5] - 266:3, 328:22, 336:17, 345:22, 345:23
**PROCEDURES** [1] - 345:5
**PROCEED** [6] - 171:2, 222:13, 288:10, 299:2, 311:6, 358:9
**PROCEEDED** [1] - 164:15
**PROCEEDINGS** [7] - 168:9, 206:1, 207:4, 216:18, 344:8, 350:21, 355:13
**PROCEEDINGS** [1] - 157:24
**PROCESS** [10] - 166:25, 222:16, 223:17, 236:6, 261:21, 273:1, 328:19, 337:24, 338:2, 348:23
**PROCESSING** [2] - 184:4, 264:25
**PRODUCED** [1] - 157:25
**PRODUCT** [1] - 257:23
**PRODUCTION** [5] - 240:18, 247:13, 257:25, 323:12, 323:13
**PROFESSION** [1] - 289:12
**PROFFER** [15] - 175:14, 175:15, 176:16, 176:22, 177:9, 179:4, 179:6, 179:13, 179:16, 277:19, 278:18, 278:24, 280:5, 284:9, 287:10
**PROGRAM** [1] - 338:5
**PROJECTING** [1] - 219:1
**PROMISING** [1] - 257:13
**PROMOTION** [9] - 199:2, 203:14, 228:25, 256:23, 261:3, 262:11, 262:21, 264:14, 267:9
**PROMOTIONS** [7] - 244:15, 259:15, 261:7, 261:13, 266:19, 266:23, 270:11
**PROMPTLY** [1] - 357:6
**PROOF** [5] - 225:10, 233:12, 239:25, 240:24, 241:2
**PROOFED** [1] - 260:22
**PROOFREAD** [3] - 259:23, 259:24, 260:19
**PROOFS** [2] - 209:2, 228:15
**PROPER** [1] - 346:1
**PROPERLY** [1] - 184:2
**PROPERTY** [3] - 290:20, 336:15, 338:4
**PROPOSALS** [2] - 166:21, 167:1
**PROPOSED** [1] - 168:10
**PROVE** [1] - 237:19
**PROVED** [1] - 325:23
**PROVES** [1] - 199:24
**PROVIDE** [9] - 163:4, 180:4, 180:17, 281:3, 284:22, 285:12, 286:6, 287:7, 288:3
**PROVIDED** [11] - 159:4, 171:20, 195:3, 238:4, 238:14, 257:25, 259:9, 260:16, 271:8, 287:4, 347:24
**PROXIMITY** [1] - 290:22
**PROXY** [2] - 292:15, 292:22
**PS** [1] - 317:20
**PTSD** [1] - 292:11
**PUBLIC** [5] - 186:16, 323:13, 323:15, 347:4, 349:2
**PUBLISH** [26] - 208:2, 220:16, 221:25, 225:3, 228:10, 228:20, 231:4, 231:19, 232:10, 232:24, 243:10, 243:20, 243:21, 244:17, 247:23, 248:22, 249:23, 251:3, 254:17, 274:8, 299:20, 308:8, 309:17, 319:6, 319:7, 337:6
**PUBLISHED** [42] - 183:6, 189:6, 193:23, 208:4, 220:18, 222:3, 225:8, 228:12, 228:22, 231:6, 231:22, 232:12, 233:2, 243:12, 243:22, 244:18, 247:24, 248:23, 249:24, 251:4, 254:19, 262:2, 262:4, 274:10, 299:21, 305:7, 308:10, 309:20, 312:25, 315:5, 316:2, 316:24, 317:11, 319:8, 320:7, 321:10, 321:13, 329:16, 332:8, 337:7, 337:9, 351:24
**PULL** [13] - 162:24, 209:4, 210:16, 251:2, 273:25, 274:4, 312:10, 316:21, 316:22, 329:6, 331:25, 354:4
**PURCHASE** [2] - 203:23, 263:24
**PURCHASED** [2] - 264:13, 270:16
**PURCHASES** [2] - 273:9, 273:11
**PURCHASING** [1] - 186:21
**PURCHASING** [1] - 272:19
**PURPORTING** [1] - 347:2
**PURPOSE** [2] - 332:19, 332:20
**PURPOSEFULLY** [1] - 279:20
**PURPOSES** [2] - 278:20, 346:2
**PURSUANT** [1] - 179:16
**PUSH** [1] - 268:18
**PUT** [27] - 183:3, 183:9, 183:11, 185:2, 185:3, 186:1, 186:8, 186:9, 189:3, 189:15, 189:22, 190:2, 202:14, 227:7, 267:10, 268:2, 273:21, 287:21, 295:4, 295:9, 297:14, 303:6, 304:16, 305:6, 319:5, 349:4, 352:20
**PUTTING** [5] - 187:12, 194:21, 223:24, 307:4, 333:11

## Q

**QUALIFICATIONS** [1] - 353:17
**QUALIFIED** [1] - 345:9
**QUALIFY** [1] - 297:5
**QUANTITY** [3] - 246:18, 252:1, 253:18
**QUESTIONING** [9] - 164:15, 169:15, 182:14, 243:6, 277:17, 285:15, 287:8, 297:2, 341:8
**QUESTIONS** [34] - 158:22, 159:24, 164:12, 165:6, 169:11, 169:15, 177:11, 179:7, 183:16, 187:11, 190:20, 201:4, 204:11, 206:12, 256:2, 256:9, 270:8, 275:17, 280:14, 305:1, 305:13, 310:9, 319:5, 321:21, 322:5, 322:17, 332:13, 332:17, 338:8, 340:11, 355:14, 355:17, 358:6, 358:12
**QUICK** [2] - 275:4, 317:19
**QUICKEN** [1] - 216:6
**QUICKLY** [2] - 266:21, 355:3
**QUOTE** [2] - 208:10, 220:24

## R

**RADIO** [1] - 276:11
**RAISE** [15] - 160:3, 160:9, 166:24, 167:14, 169:1, 179:5, 181:23, 181:25, 241:4, 243:2, 288:19, 289:14, 310:24, 356:11, 358:17
**RAISED** [6] - 163:10, 175:9, 239:3, 285:3, 285:8, 285:10
**RAISING** [2] - 160:11, 201:11
**RANGES** [1] - 208:19
**RATHER** [2] - 162:22, 164:10
**RATION** [1] - 238:17
**REACH** [2] - 164:24, 283:10
**REACHED** [4] - 158:21, 167:3, 283:4, 345:8
**REACTED** [1] - 199:11
**REACTION** [2] - 185:14, 315:8
**READ** [87] - 162:21, 163:3, 164:4, 189:10, 189:13, 189:25, 195:4, 195:8, 195:16, 196:2, 196:12, 198:3, 203:2, 203:3, 203:5, 203:7, 208:5, 208:12, 216:22, 220:19, 221:1, 222:4, 222:11, 223:7, 225:17, 225:20, 226:11, 227:11, 228:13, 230:11, 233:7, 233:10, 233:16, 244:1, 244:5, 245:5, 248:8, 248:10, 248:16, 249:1, 249:7, 249:9, 250:11, 250:16, 251:13, 254:21, 262:16, 263:14, 264:7, 268:13, 268:21, 268:22, 268:24, 269:1, 269:6, 269:11, 274:12, 276:10, 282:25, 308:19, 308:22, 308:23, 308:25, 309:2, 314:13, 316:15, 317:17, 319:11, 319:13, 322:7, 322:25, 334:25, 335:21, 343:25, 345:2, 345:20, 346:18, 347:5, 347:7, 347:21, 347:22, 348:4, 348:6, 348:20, 349:15, 353:13, 354:15
**READING** [6] - 203:13, 233:21, 249:12, 269:14, 269:18, 282:19

**READS** [1] - 323:5
**READY** [11] - 180:21, 181:14, 284:25, 286:8, 286:17, 287:25, 322:22, 340:22, 359:24, 360:2, 360:5
**REAL** [4] - 167:11, 186:12, 204:7, 275:4
**REALITY** [1] - 206:4
**REALIZE** [1] - 197:16
**REALIZED** [2] - 187:3, 197:4
**REALLY** [15] - 167:5, 185:15, 198:20, 201:16, 204:3, 258:23, 268:17, 284:1, 284:19, 287:12, 290:17, 292:16, 334:20, 355:3, 358:22
**REASK** [1] - 213:6
**REASON** [11] - 179:12, 233:23, 240:22, 249:15, 266:21, 266:23, 270:19, 280:2, 280:5, 283:2, 331:6
**REASONABLE** [1] - 223:19
**REASONS** [7] - 176:12, 183:22, 190:16, 205:15, 278:2, 332:24
**RECALLED** [1] - 194:11
**RECEIVE** [12] - 194:15, 199:20, 234:1, 248:19, 273:12, 276:15, 297:11, 301:10, 316:5, 316:7, 345:9, 347:10
**RECEIVED** [6] - 362:3, 362:7, 362:12, 362:15, 363:9, 363:11
**RECEIVED** [60] - 173:2, 174:22, 186:17, 194:1, 197:5, 197:17, 198:11, 198:18, 198:23, 199:1, 199:2, 202:19, 202:22, 202:24, 203:13, 203:15, 205:2, 205:4, 205:20, 207:25, 217:9, 218:17, 219:8, 220:14, 221:23, 225:1, 226:3, 228:8, 231:2, 231:17, 232:8, 232:22, 239:13, 262:11, 263:10, 264:14, 294:3, 299:18, 301:6, 302:24, 304:18, 312:19, 317:23, 319:17, 320:6, 320:10, 320:19, 320:25, 321:12, 322:15, 327:6, 329:15, 330:4, 331:10, 332:6, 337:8, 342:3, 342:10, 351:17, 357:14
**RECEIVERS** [1] - 194:1
**RECEIVING** [15] - 182:24, 194:12, 194:13, 219:9, 219:10, 238:17, 269:16, 276:14, 293:21, 293:23, 301:22, 312:5, 318:10, 345:11, 348:9
**RECESS** [1] - 235:9
**RECESS** [4] - 168:9, 286:21, 340:23, 341:1
**RECIPIENT** [2] - 344:18, 345:24
**RECIPIENTS** [1] - 225:11
**RECOGNIZE** [3] - 262:6, 316:11, 317:3
**RECOLLECT** [1] - 190:19
**RECOLLECTION** [6] - 190:9, 197:25, 198:3, 268:5, 269:10, 269:14
**RECORD** [24] - 158:7, 169:6, 170:16, 170:17, 173:8, 176:9, 176:13, 182:3, 188:1, 189:25, 214:3, 217:13, 278:1, 279:10, 285:3, 288:23, 296:1, 307:1, 308:19, 311:2, 324:1, 350:9, 353:14, 354:15
**RECORDED** [2] - 157:24, 193:11
**RECORDING** [2] - 250:8, 331:15
**RECORDS** [10] - 163:5, 163:7, 163:12, 163:13, 164:16, 164:18, 323:9, 323:15, 345:4
**RECOVER** [5] - 330:17, 335:10, 335:13, 335:24, 351:2
**RECOVERED** [7] - 329:1, 337:19, 338:20, 342:16, 343:4, 346:9, 352:18
**RECOVERING** [2] - 331:14, 331:15
**RECROSS** [2] - 275:2, 361:14
**RED** [1] - 349:15
**REDIRECT** [5] - 206:15, 206:16, 271:13, 310:12, 321:23
**REDIRECT** [4] - 271:20, 321:25, 361:12, 361:21
**REFERENCE** [7] - 159:13, 159:24, 169:17, 169:19, 171:12, 175:13, 301:16
**REFERENCED** [20] - 243:12, 243:22, 244:18, 247:24, 248:23, 249:24, 251:4, 254:19, 262:4, 274:10, 315:5, 316:2, 316:24, 317:11, 319:8, 320:7, 321:13, 329:16, 332:8, 337:9
**REFERENCING** [9] - 171:6, 209:17, 218:20, 223:11, 293:21, 294:4, 295:1, 296:23, 301:13
**REFERRED** [1] - 208:21
**REFERRING** [4] - 166:20, 312:12, 337:18, 343:4
**REFERS** [1] - 160:13
**REFRESH** [4] - 197:24, 198:3, 268:1, 269:14
**REFRESHES** [3] - 268:5, 269:10, 270:1
**REFUND** [14] - 204:19, 206:4, 304:3, 304:4, 304:8, 306:5, 317:18, 318:5, 318:6, 318:9, 319:14, 319:17, 320:11, 320:16
**REFUNDED** [2] - 190:8, 270:20
**REFUNDING** [1] - 205:5
**REFUSED** [3] - 283:6, 344:15, 344:18
**REGARD** [2] - 225:24, 272:10
**REGARDING** [3] - 203:9, 293:24, 323:5
**REGARDLESS** [1] - 283:23
**REGULAR** [1] - 266:2
**REGULATIONS** [2] - 203:24, 264:1
**REINS** [1] - 158:12
**REINS-JARIN** [1] - 158:12
**RELATED** [8] - 179:24, 241:2, 272:6, 284:10, 294:22, 325:11, 326:2, 326:3
**RELATES** [1] - 284:7
**RELATING** [2] - 335:25, 358:7
**RELATIONSHIP** [3] - 209:20, 210:4, 258:23
**RELATIONSHIPS** [1] - 259:3
**RELATIVE** [2] - 281:16, 358:19
**RELAYING** [1] - 160:7
**RELEASE** [3] - 244:6, 356:15, 356:16
**RELEASED** [1] - 356:12
**RELEVANCE** [2] - 277:20, 277:22
**RELEVANCY** [1] - 164:1
**RELEVANT** [5] - 176:8, 176:23, 177:23, 278:24, 323:16
**RELIED** [1] - 160:15
**RELYING** [1] - 280:7
**REMAIN** [3] - 207:5, 207:7, 358:9
**REMEMBER** [82] - 182:24, 184:12, 186:17, 190:7, 190:11, 190:19, 191:8, 191:10, 191:14, 191:16, 191:18, 191:20, 191:22, 191:23, 191:24, 192:8, 192:14, 192:15, 192:22, 194:5, 194:6, 194:10, 197:20, 197:21, 198:8, 199:9, 204:3, 204:4, 204:17, 206:9, 206:10, 211:1, 223:14, 241:8, 255:9, 255:12, 255:14, 258:13, 259:13, 260:13, 260:21, 260:22, 261:18, 266:17, 267:24, 269:19, 272:12, 272:15, 272:17, 272:21, 273:3, 273:25, 274:3, 291:24, 293:20, 301:5, 301:7, 301:8, 308:21, 309:6, 309:7, 312:5, 314:10, 314:13, 315:8, 315:22, 315:24, 317:22, 317:25, 318:1, 318:4, 318:5, 318:9, 320:13, 321:3, 321:18, 322:4, 322:7, 322:9, 326:16, 346:8
**REMEMBERING** [1] - 191:7
**REMIND** [2] - 250:5, 340:3
**REMINDERS** [1] - 275:22
**REMOTE** [4] - 162:7, 162:11, 170:11, 360:6
**REMOTELY** [1] - 181:15
**REMOVE** [1] - 304:19
**REMOVED** [1] - 304:12
**REPEAT** [2] - 185:21, 308:17
**REPHRASE** [2] - 256:11, 272:24
**REPLACE** [1] - 172:2
**REPORT** [32] - 195:1, 195:3, 196:15, 196:17, 199:4, 203:22, 209:21, 210:1, 210:5, 215:10, 215:21, 216:24, 217:19, 218:24, 219:8, 221:10, 221:11, 221:12, 224:20, 246:22, 263:12, 263:24, 265:1, 273:2, 273:6, 273:18, 300:16, 306:3, 309:23, 310:4, 310:6, 347:4
**REPORTED** [2] - 183:23, 343:22
**REPORTER** [1] - 157:23
**REPORTING** [3] - 203:18, 263:20, 316:18
**REPORTS** [6] - 209:22, 272:11, 273:12, 276:11, 349:3, 353:18
**REPRESENT** [5] - 166:22, 190:25, 256:9, 305:10, 319:4
**REPRESENTED** [4] - 179:22, 279:7, 279:21, 283:8
**REPRESENTING** [1] - 237:6
**REQUEST** [2] - 204:19, 320:16
**REQUESTED** [1] - 319:14
**REQUESTING** [3] - 250:18, 318:5, 349:1
**REQUESTS** [2] - 295:5, 303:1
**REQUIRE** [5] - 186:1, 276:24, 280:21, 282:23, 282:24
**REQUIRED** [6] - 194:25, 196:14, 300:15, 309:23, 310:4, 348:3

**REQUIREMENTS** [2] - 203:23, 263:25
**REQUIRES** [1] - 165:2
**REQUIRING** [1] - 284:1
**RESCAN** [1] - 339:20
**RESEARCH** [13] - 203:9, 203:18, 263:20, 265:24, 266:8, 266:9, 266:15, 270:15, 276:17, 280:11, 340:6, 340:16, 357:15
**RESEARCHING** [1] - 203:19
**RESERVE** [1] - 179:18
**RESIDE** [2] - 192:18, 192:19
**RESIDENCE** [2] - 327:13, 330:15
**RESIDENT** [1] - 328:10
**RESOLUTION** [1] - 282:7
**RESOLVE** [1] - 280:23
**RESOLVED** [1] - 167:11
**RESOURCES** [2] - 344:24, 345:4
**RESPECT** [5] - 164:15, 179:10, 196:22, 279:24, 285:18
**RESPECTIVELY** [1] - 323:18
**RESPOND** [8] - 234:8, 238:3, 266:21, 267:1, 280:12, 280:13, 282:3, 283:1
**RESPONDED** [1] - 305:22
**RESPONSE** [20] - 158:25, 169:10, 190:18, 208:13, 219:13, 219:17, 221:1, 248:15, 249:20, 250:14, 250:16, 251:24, 272:23, 272:25, 295:3, 302:2, 315:14, 321:4, 345:11
**RESPONSES** [3] - 250:8, 250:24, 253:25
**RESPONSIBILITY** [1] - 326:8
**RESPONSIBLE** [2] - 259:18, 265:23
**REST** [3] - 192:20, 303:4, 357:22
**RESTATE** [1] - 169:5
**RESTED** [1] - 181:9
**RESTRICT** [1] - 175:13
**RESULT** [3] - 194:13, 283:3, 285:19
**RESUME** [6] - 168:5, 174:11, 202:3, 280:15, 341:7, 357:5
**RESUMED** [1] - 207:10
**RETIRE** [1] - 290:19
**RETIRED** [4] - 290:10, 290:11, 290:12, 290:18
**RETRIEVE** [1] - 219:23
**RETURN** [4] - 181:15, 229:7, 295:8, 347:24
**RETURNED** [4] - 291:22, 292:2, 337:23, 344:20
**RETURNS** [1] - 251:24
**REVIEW** [8] - 222:12, 269:9, 314:8, 337:24, 339:1, 342:13, 350:16, 353:3
**REVIEWED** [3] - 169:21, 267:21, 270:3
**REVIEWING** [3] - 260:4, 260:21, 269:17
**REVISIT** [2] - 166:12, 358:12
**REYES** [4] - 278:13, 280:8, 286:5, 287:4
**RICO** [2] - 278:6, 280:2
**RIGHTFUL** [1] - 345:24
**RIGHTS** [1] - 279:14
**RISER** [1] - 303:3
**RIVER** [1] - 289:13
**RIVER** [1] - 192:22
**ROLE** [3] - 250:12, 292:17, 341:13
**ROLES** [1] - 292:19
**RONNIE** [2] - 191:23, 192:1
**ROOF** [1] - 291:1
**ROOM** [1] - 342:19
**ROOM** [12] - 162:10, 169:24, 174:14, 277:6, 331:9, 331:10, 337:23, 342:17, 357:7, 357:20
**ROTATED** [1] - 341:18
**ROUGHLY** [1] - 273:7
**ROUTINE** [1] - 285:21
**ROW** [1] - 354:10
**RPR** [1] - 157:23
**RULE** [2] - 239:2, 285:25
**RULE** [9] - 173:15, 177:6, 178:24, 277:24, 279:5, 285:18, 285:24, 287:8, 359:19
**RULED** [1] - 241:5
**RULES** [1] - 276:22
**RULING** [11] - 159:14, 160:14, 179:2, 180:11, 239:16, 241:17, 285:2, 296:9, 359:6, 359:7
**RULINGS** [1] - 237:22
**RUN** [1] - 179:11
**RUNNING** [3] - 186:15, 233:22, 317:20

## S

**SAFE** [4] - 326:24, 326:25, 327:2, 335:16
**SAFEKEEPING** [1] - 277:8
**SAFETY** [3] - 327:22, 328:15, 328:18
**SAM** [1] - 289:1
**SAVE** [2] - 195:19, 348:10
**SAVING** [1] - 224:18
**SAVINGS** [3] - 222:17, 224:13, 224:16
**SAW** [15] - 197:4, 197:16, 202:10, 203:1, 224:3, 227:24, 237:20, 296:6, 296:14, 305:24, 307:8, 317:23, 319:11, 333:16, 336:11
**SCALE** [2] - 330:12, 330:13
**SCAM** [5] - 186:11, 197:6, 197:9, 197:18, 197:21
**SCAMMED** [2] - 199:22, 199:25
**SCAMMING** [7] - 189:13, 189:15, 197:11, 198:14, 199:11, 199:13, 199:18
**SCAMS** [5] - 189:16, 197:4, 197:16, 317:19
**SCANNED** [1] - 339:7
**SCARY** [1] - 311:24
**SCHEDULE** [14] - 244:13, 244:14, 244:21, 245:3, 247:15, 247:17, 247:20, 248:3, 250:25, 254:14, 272:13, 272:14, 280:15, 358:3
**SCHEDULES** [5] - 237:6, 244:13, 251:22, 254:5, 260:3
**SCHEDULING** [2] - 356:11, 358:16
**SCHEMATIC** [4] - 329:24, 331:1, 333:17, 333:24
**SCHEME** [2] - 179:25, 238:16
**SCHOOLING** [1] - 291:11
**SCOPE** [3] - 284:2, 285:15, 285:17
**SCREEN** [24] - 172:23, 183:4, 183:11, 186:19, 187:12, 189:3, 193:14, 194:6, 196:23, 202:14, 204:24, 209:8, 268:3, 274:13, 299:7, 305:6, 314:5, 314:23, 315:20, 330:11, 334:10, 335:1, 349:5, 352:4
**SCREENS** [1] - 168:18
**SCROLL** [2] - 254:9, 345:15
**SEAL** [6] - 224:6, 349:9, 349:11, 352:14, 352:20
**SEAN** [34] - 158:25, 159:4, 159:23, 169:17, 169:19, 210:3, 210:11, 219:18, 221:3, 247:17, 255:13, 255:17, 255:23, 255:24, 257:15, 257:22, 258:3, 258:15, 258:21, 258:24, 259:6, 260:10, 260:22, 267:14, 267:16, 267:18, 267:21, 269:16, 269:24, 270:2, 271:22, 272:1, 272:5, 283:6
**SEAN'S** [1] - 221:8
**SEARCH** [43] - 172:8, 323:12, 325:6, 325:8, 325:9, 325:10, 325:13, 325:21, 325:23, 326:11, 326:12, 326:17, 326:25, 327:3, 327:6, 327:8, 327:21, 328:1, 328:15, 328:16, 328:19, 329:4, 329:25, 330:18, 331:8, 331:14, 331:19, 331:24, 332:21, 332:22, 333:21, 335:24, 336:14, 336:18, 336:23, 337:21, 338:1, 338:10, 339:16, 339:17, 341:12, 341:20, 351:5
**SEARCHED** [2] - 328:13, 333:8
**SEARCHING** [1] - 331:20
**SEARCHS** [2] - 325:15, 326:5
**SEAT** [14] - 158:3, 182:3, 207:7, 234:24, 242:19, 277:10, 288:16, 288:18, 288:23, 310:24, 311:1, 341:4, 341:7, 358:1
**SEATED** [4] - 181:8, 288:9, 319:4, 340:21
**SECOND** [8] - 184:13, 268:11, 283:18, 309:3, 327:2, 336:14, 345:20, 347:14
**SECOND** [1] - 285:14
**SECONDS** [5] - 334:6, 334:23, 335:6, 335:18, 336:6
**SECRET** [1] - 226:16
**SECTION** [12] - 184:4, 314:25, 315:1, 315:23, 346:6, 346:9, 348:1, 348:5, 348:6, 348:7, 348:19
**SECTION** [1] - 278:9
**SECTIONS** [1] - 347:22
**SECURE** [3] - 327:19, 327:20, 328:17
**SECURITY** [4] - 183:22, 190:16, 205:15
**SEE** [68] - 163:22, 168:17, 168:18, 170:9, 170:10, 170:25, 172:7, 175:21, 176:1, 176:23, 179:5, 183:5, 183:9, 184:4, 184:9, 184:13, 184:16, 184:23, 190:23, 190:24, 192:10, 195:7, 195:15, 195:23, 205:14, 206:2,

214:24, 216:8, 225:6, 227:9, 227:21, 229:3, 229:6, 229:18, 235:7, 239:16, 246:23, 251:6, 251:11, 252:20, 268:4, 268:16, 268:18, 269:10, 284:9, 299:7, 299:11, 299:12, 300:13, 300:17, 303:7, 308:11, 314:2, 328:17, 330:11, 331:12, 333:18, 334:10, 334:14, 334:25, 335:8, 343:2, 345:14, 346:15, 347:19, 360:15
**SEEING** [14] - 194:6, 204:1, 229:22, 284:18, 300:23, 301:5, 301:8, 308:5, 308:20, 308:21, 309:6, 309:7, 315:22, 346:8
**SEEK** [4] - 176:2, 304:4, 304:8, 325:6
**SEEKING** [1] - 350:4
**SEEM** [2] - 186:11, 204:7
**SEIP** [16] - 281:11, 281:15, 288:13, 288:25, 289:8, 289:21, 292:18, 294:9, 299:7, 301:1, 301:5, 303:10, 303:21, 305:1, 305:10, 310:14
**SEIP** [2] - 289:3, 361:15
**SEIZE** [2] - 327:1, 336:11
**SEIZED** [7] - 333:1, 333:8, 333:22, 338:3, 338:6, 338:7, 350:25
**SELECTING** [1] - 274:2
**SELL** [4] - 256:24, 257:7, 257:13
**SELLING** [2] - 245:21, 270:14
**SEND** [24] - 186:8, 187:5, 187:6, 197:10, 198:12, 198:18, 202:24, 204:10, 224:20, 248:18, 250:21, 251:20, 254:6, 271:1, 295:2, 303:1, 304:17, 304:19, 304:20, 306:6, 325:21, 335:3, 357:17, 357:19
**SENDER** [1] - 344:20
**SENDING** [14] - 197:17, 199:3, 217:18, 224:13, 240:8, 265:24, 265:25, 270:11, 274:20, 300:9, 302:5, 302:8, 304:16, 315:13
**SENSE** [5] - 174:6, 178:5, 242:24, 330:21, 359:2
**SENSITIVE** [3] - 222:16, 266:20, 267:4
**SENSITIVITY** [1] - 288:1
**SENT** [49] - 187:4, 190:8, 190:10, 190:18, 194:13, 194:15, 194:18, 197:8, 204:2, 204:18, 206:5, 206:8, 219:13, 219:17, 222:5, 222:7, 222:10, 228:16, 233:24, 244:9, 252:8, 252:24, 253:2, 253:19, 259:16, 259:19, 260:11, 265:22, 273:2, 273:9, 274:19, 302:1, 303:8, 314:19, 315:18, 316:4, 316:17, 316:18, 318:8, 319:15, 320:19, 320:22, 321:4, 321:16, 325:3, 338:14, 338:25
**SENTENCE** [1] - 264:8
**SENTENCES** [2] - 201:7, 263:15
**SEPARATE** [4] - 259:10, 265:4, 284:9, 284:10
**SEPARATION** [1] - 320:22
**SEPTEMBER** [6] - 178:10, 192:3, 325:16, 326:20, 333:9, 341:13
**SERVE** [1] - 354:25
**SERVES** [2] - 238:11, 238:19
**SERVICE** [6] - 181:10, 203:18, 263:20, 283:12, 324:14, 343:8
**SERVICE** [1] - 324:10
**SERVICES** [5] - 258:1, 258:11, 258:17, 259:9, 260:15
**SERVICES** [1] - 326:18
**SERVING** [1] - 355:4
**SET** [5] - 168:17, 211:17, 263:24, 292:7, 358:23
**SETS** [2] - 203:22, 211:24
**SEVEN** [1] - 353:8
**SEVERAL** [3] - 162:18, 350:1, 350:15
**SEVERE** [2] - 195:13, 292:11
**SHAPE** [3] - 187:8, 191:17, 340:7
**SHAREHOLDER** [1] - 353:18
**SHERYL** [3] - 248:14, 249:8, 249:19
**SHIPPING** [2] - 194:19, 196:18
**SHOP** [10] - 223:20, 246:2, 246:5, 246:19, 246:20, 252:12, 252:13, 252:15, 255:2, 255:4
**SHOPS** [2] - 223:18, 259:20
**SHORT** [5] - 179:7, 192:12, 258:1, 281:14, 340:5
**SHORT-TERM** [1] - 192:12
**SHORTCUT** [1] - 166:24
**SHORTEN** [1] - 201:8
**SHORTLY** [1] - 162:7
**SHOW** [21] - 177:23, 177:24, 202:4, 217:11, 222:1, 284:13, 297:17, 299:23, 312:23, 317:9, 319:20, 329:12, 330:14, 332:7, 332:20, 333:1, 333:24, 336:23, 342:22, 343:11, 346:22
**SHOWED** [11] - 193:12, 193:25, 194:8, 198:17, 199:4, 202:10, 203:1, 259:6, 262:21, 266:13, 322:4
**SHOWING** [9] - 172:23, 194:3, 194:5, 194:6, 198:22, 209:9, 236:6, 351:7
**SHOWN** [4] - 171:9, 198:11, 268:6, 285:23
**SHOWS** [2] - 331:2, 333:13
**SHUT** [2] - 255:20, 255:25
**SICK** [1] - 241:7
**SIDE** [17] - 184:8, 189:16, 192:9, 209:5, 209:6, 209:8, 218:24, 225:18, 230:11, 262:16, 277:24, 300:20, 300:23, 313:8, 343:23, 346:16, 353:1
**SIDEBAR** [8] - 187:14, 200:3, 212:14, 218:5, 295:10, 306:10, 355:23, 358:5
**SIDEBAR** [15] - 187:15, 188:1, 188:8, 201:1, 201:20, 213:1, 213:9, 295:11, 296:1, 298:10, 306:11, 307:1, 307:13, 356:1, 356:18
**SIDES** [4] - 180:9, 192:21, 285:12
**SIGN** [7] - 176:22, 194:24, 248:13, 248:19, 299:12, 300:10
**SIGNALING** [1] - 296:6
**SIGNATORY** [1] - 303:21
**SIGNATURE** [21] - 194:23, 195:18, 227:10, 227:11, 227:21, 227:24, 229:18, 229:21, 229:25, 230:2, 299:9, 299:11, 299:13, 300:1, 300:3, 300:4, 300:6, 300:12, 309:22, 317:3, 355:2
**SIGNATURES** [1] - 261:17
**SIGNED** [6] - 176:16, 316:19, 317:21, 323:19, 327:7, 327:9
**SILENTLY** [1] - 353:3
**SIMILAR** [13] - 176:15, 186:18, 186:20, 216:25, 238:18, 250:25, 260:18, 301:9, 301:11, 301:13, 301:14, 308:21, 309:7
**SIMILARLY** [2] - 175:13, 179:6
**SIMPLE** [1] - 201:3
**SIMPLY** [3] - 162:21, 177:8, 179:14
**SINGLE** [4] - 262:20, 262:21, 264:5, 350:6
**SISTER** [2] - 290:3, 302:22
**SISTER-IN-LAW** [1] - 290:3
**SISTERS** [1] - 290:5
**SITTING** [2] - 305:11, 313:8
**SIX** [3] - 214:13, 214:14, 352:12
**SIXTY** [1] - 311:17
**SIXTY-ONE** [1] - 311:17
**SIZE** [2] - 245:5, 249:7
**SKIP** [1] - 231:10
**SKIP@GAMEPLANADVERTISING.DOM** [1] - 244:23
**SLIGHT** [1] - 191:22
**SLIGHTLY** [1] - 208:12
**SLOW** [1] - 256:12
**SLOWER** [8] - 197:12, 223:2, 223:4, 224:8, 224:10, 273:23, 274:21, 274:23
**SMALL** [5] - 170:10, 190:24, 195:6, 203:3, 264:25
**SMOKE** [1] - 335:21
**SNACKS** [1] - 211:5
**SNAPSHOT** [1] - 334:15
**SNEAK** [2] - 242:9, 242:10
**SOCIAL** [1] - 357:11
**SOLE** [2] - 354:18, 355:7
**SOLICITATION** [4] - 227:1, 256:23, 338:10, 343:7
**SOLICITATIONS** [7] - 208:25, 227:3, 257:1, 325:3, 326:3, 326:4, 343:3
**SOLVES** [1] - 164:18
**SOMEONE** [10] - 215:4, 215:9, 234:7, 265:25, 266:4, 292:13, 297:2, 303:20, 314:20, 339:19
**SOMETIME** [1] - 194:2
**SOMETIMES** [2] - 295:6, 301:11
**SOMEWHERE** [1] - 281:21
**SOON** [1] - 358:8
**SORRY** [16] - 163:6, 185:12, 195:14, 195:20, 248:5, 268:20, 281:15, 286:16, 296:5, 312:23, 314:22, 333:23, 342:21, 346:12, 346:23, 346:24
**SORT** [3] - 296:6, 318:15, 352:14
**SORTING** [2] - 250:7

**SOUGHT** [1] - 304:3
**SOUND** [1] - 332:16
**SOUNDS** [4] - 175:21, 223:24, 226:24, 227:1
**SOURCE** [2] - 346:15, 346:18
**SOUTH** [1] - 311:15
**SOUTHERN** [1] - 160:15
**SPEAKING** [2] - 183:12, 342:20
**SPECIALIST** [1] - 343:21
**SPECIALIZE** [2] - 203:19, 263:21
**SPECIFIC** [13] - 160:8, 241:4, 253:19, 265:6, 273:2, 287:23, 292:24, 293:12, 297:23, 301:7, 305:21, 331:9
**SPECIFICALLY** [6] - 159:24, 164:13, 260:7, 293:17, 294:8, 330:11
**SPEED** [1] - 274:1
**SPELL** [5] - 169:5, 182:2, 288:23, 311:2, 323:25
**SPELLED** [2] - 288:25, 311:5
**SPELLING** [1] - 324:2
**SPINE** [1] - 352:9
**SPLIT** [3] - 314:5, 314:23, 315:20
**SPOKEN** [1] - 171:12
**SPONSOR** [1] - 346:20
**SPONSORED** [2] - 203:19, 263:21
**SPONSORING** [2] - 178:25, 277:25
**SPONSORS** [1] - 345:6
**SPOUSE** [1] - 226:16
**SPREADSHEET** [6] - 250:18, 250:20, 250:21, 251:16, 251:19, 251:23
**SPREADSHEETS** [1] - 254:15
**SPRUNG** [1] - 237:24
**SQUARELY** [2] - 239:16, 239:18
**STABLE** [1] - 293:2
**STAFF** [3] - 178:15, 275:7, 276:9
**STAIRS** [1] - 333:19
**STAMP** [9] - 274:3, 304:17, 333:2, 333:5, 334:6, 334:23, 335:17, 336:6, 344:13
**STAND** [14] - 167:12, 168:24, 181:21, 181:22, 190:14, 207:10, 234:21, 246:25, 275:20, 288:15, 310:21, 322:21, 340:18, 357:24
**STANDARD** [16] - 222:16, 222:18, 222:23, 222:24, 223:2, 223:10, 224:7, 224:14, 264:4, 273:22, 273:23, 274:17, 274:20, 329:3, 336:17
**START** [11] - 161:10, 162:11, 173:14, 195:22, 263:18, 281:20, 297:19, 297:23, 332:12, 348:10, 349:8
**STARTED** [11] - 172:18, 291:4, 291:13, 293:11, 294:16, 294:19, 302:4, 302:5, 302:13, 305:15, 331:7
**STARTING** [4] - 162:5, 169:23, 208:5, 348:6
**STARTS** [6] - 195:19, 262:17, 264:8, 269:4, 345:21, 347:5
**STATE** [9] - 158:6, 182:2, 203:24, 217:12, 263:25, 288:22, 311:2, 323:25, 353:18
**STATEMENT** [3] - 267:20, 267:23, 291:8
**STATEMENTS** [2] - 203:14, 270:6
**STATES** [3] - 157:1, 157:2, 157:10
**STATES** [16] - 157:4, 157:14, 157:18, 158:9, 158:11, 181:21, 233:19, 278:13, 280:8, 286:5, 287:4, 323:6, 324:9, 324:12, 324:19, 324:22
**STATUS** [1] - 225:24
**STATUTE** [16] - 165:1, 178:9, 178:11, 179:11, 179:20, 179:25, 180:2, 180:3, 278:4, 278:6, 278:11, 278:14, 279:24, 287:5, 287:14, 287:15
**STAY** [2] - 291:23, 314:23
**STENOGRAPHY** [1] - 157:24
**STEP** [5] - 169:22, 275:19, 310:14, 322:19, 355:20
**STEPS** [2] - 328:12, 355:22
**STICK** [1] - 172:12
**STILL** [6] - 179:2, 278:25, 290:11, 290:13, 302:22, 304:25
**STING** [1] - 279:3
**STIP** [1] - 171:18
**STIPULATE** [3] - 205:20, 236:5, 236:23
**STIPULATED** [1] - 323:6
**STIPULATING** [1] - 236:4
**STIPULATION** [6] - 162:19, 162:22, 162:24, 163:24, 323:1, 323:4
**STIPULATIONS** [2] - 163:11, 171:6
**STOCK** [1] - 352:25
**STOOD** [1] - 223:14
**STOP** [11] - 222:19, 255:16, 263:16, 304:24, 333:4, 334:22, 335:5, 336:5, 348:7, 348:20, 354:16
**STOPPED** [1] - 255:12
**STORY** [2] - 197:4, 197:16
**STREET** [1] - 328:9
**STREET** [12] - 325:14, 326:10, 326:11, 327:10, 327:12, 328:1, 328:8, 328:10, 336:12, 338:9, 343:5, 350:25
**STRETCHING** [1] - 276:6
**STRICKEN** [1] - 233:25
**STRIKE** [3] - 200:1, 214:2, 308:2
**STRIKING** [1] - 201:9
**STROKE** [14] - 184:19, 184:20, 185:7, 185:9, 187:7, 189:22, 190:12, 191:6, 191:12, 191:15, 191:18, 191:21
**STRONGLY** [2] - 348:18
**STUFF** [2] - 275:15, 285:7
**SUBJECT** [10] - 201:4, 222:9, 225:9, 228:13, 244:20, 248:2, 249:1, 250:9, 274:18, 326:17
**SUBMISSIONS** [1] - 288:4
**SUBPOENA** [1] - 323:11
**SUBSTANCE** [1] - 162:21
**SUBSTANTIALLY** [1] - 352:17
**SUBSTITUTE** [1] - 281:8
**SUCCESS** [1] - 348:17
**SUFFER** [1] - 185:7
**SUFFERED** [1] - 185:9
**SUFFICIENT** [1] - 280:22
**SUGGESTED** [2] - 261:5, 267:12
**SUGGESTING** [1] - 259:23
**SUGGESTION** [1] - 167:10
**SUITCASES** [3] - 186:23, 186:24, 187:1
**SUITE** [3] - 157:15, 157:19, 157:21
**SUM** [1] - 303:25
**SUMMER** [1] - 290:9
**SUN** [1] - 185:10
**SUPPORT** [7] - 178:15, 180:13, 257:25, 258:17, 259:9, 275:7, 275:14
**SUPPORTING** [1] - 180:10
**SUPPOSED** [3] - 242:3, 269:20, 313:9
**SURPRISE** [1] - 178:17
**SURROUND** [1] - 176:15
**SURROUNDING** [1] - 324:21
**SUV** [1] - 348:14
**SWEAR** [1] - 288:19
**SWEEPSTAKES** [57] - 186:20, 186:22, 203:19, 203:22, 208:18, 209:21, 209:22, 209:23, 210:1, 210:5, 210:6, 211:1, 211:5, 211:11, 211:14, 211:22, 212:9, 212:11, 213:3, 214:8, 214:11, 214:17, 214:25, 215:10, 215:16, 215:21, 216:4, 216:24, 217:19, 218:24, 221:10, 221:11, 221:12, 224:20, 241:3, 263:11, 263:21, 263:23, 264:9, 264:11, 264:15, 265:1, 265:4, 265:9, 265:21, 265:25, 266:10, 266:23, 270:15, 272:10, 273:1, 273:6, 273:12, 273:17, 293:25, 306:3
**SWEEPSTAKES** [3] - 212:12, 214:23, 238:20
**SWITCH** [3] - 187:10, 244:12, 333:12
**SWO** [1] - 339:16
**SWORN** [5] - 182:1, 207:10, 288:21, 310:25, 323:23
**SWORN/AFFIRMED** [4] - 169:4, 182:8, 289:5, 311:9
**SWU** [1] - 339:17
**SYNONYM** [1] - 297:4
**SYSTEM** [5] - 209:25, 338:4, 338:5, 339:7, 339:15

## T

**TABLE** [3] - 158:10, 158:12, 319:4
**TABS** [5] - 224:6, 353:11, 353:14, 353:21, 354:1
**TASHALE'S** [1] - 174:5
**TAUGHT** [3] - 209:25, 215:10, 215:20
**TAXES** [2] - 226:13, 346:3
**TEAM** [19] - 325:6, 326:1, 327:15, 327:17, 328:3, 328:12, 328:24, 328:25, 330:17, 331:15, 331:18, 333:8, 335:10, 336:11, 338:19, 338:24, 341:18, 350:25, 352:18
**TEAMS** [1] - 325:21
**TEAR** [1] - 295:8
**TECHNICALITY** [1] - 174:16
**TECHNOLOGY** [2] - 171:7, 358:22
**TELEVISION** [1] - 276:11

**TEN** [13] - 179:25, 180:1, 180:2, 180:5, 213:3, 219:13, 234:19, 235:8, 239:22, 278:11, 279:24, 340:2, 340:21
**TEN-MINUTE** [3] - 234:19, 340:2, 340:21
**TEN-YEAR** [4] - 179:25, 180:1, 180:2, 279:24
**TERM** [10] - 178:19, 192:11, 192:12, 253:1, 257:9, 296:24, 296:25, 297:1, 297:12, 339:3
**TERMS** [9] - 164:14, 165:25, 166:12, 175:7, 262:12, 297:3, 298:1, 313:4, 328:12
**TERRI'S** [1] - 191:24
**TERRY** [1] - 192:3
**TESHALE** [1] - 173:21
**TEST** [1] - 162:7
**TESTIFIED** [15] - 161:19, 169:4, 169:10, 182:8, 204:14, 207:11, 213:2, 269:15, 270:2, 289:5, 296:13, 311:9, 314:10, 319:14, 323:24
**TESTIFIES** [1] - 177:17
**TESTIFY** [7] - 179:14, 280:17, 283:5, 283:14, 284:1, 285:16, 287:9
**TESTIFYING** [9] - 160:4, 176:9, 176:24, 177:15, 177:24, 181:15, 181:24, 281:11, 296:18
**TESTIMONY** [25] - 160:9, 162:2, 162:11, 163:2, 164:6, 164:7, 165:22, 177:13, 177:22, 178:23, 241:13, 267:12, 278:17, 279:3, 279:4, 280:16, 281:12, 281:13, 281:17, 281:19, 314:7, 322:20, 358:7, 359:25, 360:6
**TESTING** [2] - 181:2, 358:25
**TEXT** [19] - 227:4, 229:10, 230:11, 233:7, 233:10, 244:1, 244:5, 244:7, 250:11, 254:22, 274:12, 274:14, 346:18, 347:21, 348:1, 348:6, 349:15, 349:19
**THE** [305] - 157:10, 158:3, 158:4, 158:13, 158:17, 159:4, 159:7, 160:11, 160:25, 161:4, 161:9, 162:3, 162:14, 162:16, 162:24, 163:5, 163:7, 163:10, 163:16, 163:21, 164:3, 164:10, 164:22, 165:10, 165:13, 165:17, 165:25, 166:2, 166:5, 166:11, 167:3, 167:13, 167:17, 167:21, 167:24, 168:4, 168:8, 168:10, 168:15, 168:16, 168:20, 169:1, 169:5, 169:7, 169:9, 170:1, 170:4, 170:6, 170:9, 170:12, 170:17, 170:18, 170:21, 170:24, 171:3, 171:15, 171:19, 172:2, 172:7, 172:11, 172:25, 173:6, 173:12, 173:21, 173:25, 174:7, 174:20, 174:24, 175:6, 175:20, 175:24, 176:23, 177:3, 177:6, 177:8, 177:16, 177:20, 178:16, 179:18, 180:4, 180:8, 180:15, 180:20, 180:22, 180:25, 181:1, 181:3, 181:5, 181:8, 181:22, 181:25, 182:2, 182:4, 187:13, 188:3, 193:16, 193:20, 200:3, 201:2, 201:5, 201:9, 201:14, 201:18, 202:2, 202:18, 205:1, 205:9, 205:21, 205:23, 206:14, 206:17, 206:19, 206:21, 207:2, 207:5, 207:24, 210:18, 210:21, 210:24, 212:13, 213:2, 213:6, 213:8, 214:2, 216:16, 217:6, 218:3, 218:5, 218:8, 218:13, 218:15, 220:1, 220:4, 220:13, 221:22, 224:25, 228:7, 230:24, 231:1, 231:16, 232:7, 232:21, 234:12, 234:19, 234:23, 235:4, 235:6, 236:2, 236:13, 236:21, 237:1, 237:11, 237:21, 237:25, 238:24, 239:2, 239:9, 239:11, 239:14, 239:23, 240:4, 240:12, 240:16, 240:22, 241:10, 241:16, 241:25, 242:3, 242:10, 242:15, 242:19, 256:5, 262:2, 268:6, 268:9, 268:18, 268:24, 269:3, 269:6, 269:8, 269:11, 271:13, 271:17, 275:18, 275:21, 277:10, 278:16, 278:23, 279:11, 280:7, 280:13, 280:21, 281:7, 282:2, 282:11, 282:14, 282:19, 282:23, 283:23, 284:6, 284:18, 284:24, 285:12, 286:2, 286:4, 286:11, 286:14, 286:19, 287:3, 287:20, 288:8, 288:14, 288:16, 288:22, 288:25, 289:14, 289:17, 289:18, 295:10, 296:3, 296:6, 296:13, 296:25, 297:22, 297:25, 298:5, 298:8, 299:2, 299:17, 305:4, 306:10, 307:3, 307:10, 307:12, 308:2, 308:8, 308:11, 308:13, 308:15, 309:12, 309:14, 309:17, 310:11, 310:14, 310:17, 310:21, 310:23, 311:1, 311:4, 312:18, 317:8, 317:10, 318:23, 319:7, 319:23, 320:1, 320:4, 321:10, 321:22, 322:14, 322:19, 322:22, 323:3, 323:25, 324:2, 329:11, 329:14, 329:20, 330:3, 332:5, 332:16, 337:4, 337:7, 339:22, 340:1, 340:20, 341:3, 341:7, 342:2, 342:7, 344:5, 350:2, 350:5, 350:8, 350:13, 351:11, 351:15, 351:20, 355:15, 355:19, 355:21, 355:23, 356:2, 356:5, 356:10, 356:14, 357:2, 358:1, 358:24, 359:2, 359:12, 359:22, 360:7, 360:11, 360:14
**THEMSELVES** [1] - 350:18
**THEREOF** [1] - 297:4
**THINKING** [4] - 161:12, 234:14, 278:7, 287:22
**THIRD** [3] - 211:18, 226:19, 343:25
**THREE** [22] - 184:7, 209:7, 214:10, 219:5, 234:3, 244:25, 245:1, 245:22, 254:9, 261:16, 273:10, 273:12, 273:17, 300:18, 316:9, 330:23, 334:6, 346:11, 348:7, 348:19, 352:23, 354:3
**THREE-LETTER** [1] - 219:5
**THURSDAY** [1] - 360:17
**TIARA** [1] - 158:11
**TICKET** [1] - 211:18
**TICKETS** [1] - 211:25
**TIMELINE** [2] - 166:10, 284:23
**TIMELY** [1] - 272:18
**TIMING** [2] - 161:13, 241:11
**TITLE** [6] - 227:13, 229:25, 230:4, 257:22, 324:11, 324:16
**TITLED** [3] - 323:4, 346:6, 354:5
**TO/FROM** [1] - 251:6
**TODAY** [32] - 158:16, 163:3, 164:24, 166:18, 169:11, 169:23, 171:11, 180:16, 181:11, 241:15, 241:17, 275:24, 280:17, 281:8, 282:5, 282:6, 282:9, 283:21, 285:4, 285:8, 286:14, 288:2, 311:18, 311:20, 311:25, 314:7, 322:20, 356:2, 356:3, 357:3, 357:5, 358:21
**TOGETHER** [4] - 265:11, 292:7, 302:7, 352:20
**TOMORROW** [18] - 166:9, 208:11, 220:24, 241:18, 277:14, 280:18, 280:22, 286:12, 286:15, 286:17, 357:5, 357:22, 358:4, 358:15, 358:19, 358:25, 360:15
**TOOK** [7] - 207:6, 242:21, 261:12, 290:20, 292:21, 328:12, 337:24
**TOP** [28] - 203:16, 211:16, 218:2, 218:20, 220:6, 223:5, 229:4, 229:7, 230:12, 233:8, 244:2, 245:6, 247:7, 248:8, 249:20, 251:6, 251:18, 254:17, 274:13, 274:14, 330:23, 333:18, 334:10, 343:24, 344:1, 349:19, 354:4
**TOPIC** [1] - 272:9
**TOPICS** [1] - 244:12
**TOTAL** [8] - 209:25, 212:9, 214:24, 215:2, 215:6, 215:9, 215:22, 265:9
**TOTALING** [1] - 215:5
**TOTALLING** [1] - 244:8
**TOUCH** [1] - 326:12
**TOUCHES** [1] - 163:8
**TOUCHING** [1] - 165:24
**TOWARD** [2] - 299:10, 299:25
**TOWARDS** [3] - 241:14, 244:1, 248:8
**TOWN** [1] - 182:17
**TOYOTA** [2] - 186:25, 348:13
**TRACK** [4] - 246:10, 250:25, 252:18, 294:18
**TRACKING** [5] - 246:12, 253:9, 253:12, 253:13, 337:19
**TRACKS** [1] - 246:11
**TRADITIONAL** [1] - 164:16
**TRANSCRIPT** [1] - 157:24
**TRANSCRIPT** [1] - 157:9
**TRANSCRIPTION** [1] - 157:25
**TRANSFER** [2] - 348:25, 353:19
**TRANSFERRED** [2] - 341:19, 341:21
**TRAY** [4] - 334:17, 334:19, 335:2, 336:9
**TRAYS** [2] - 334:11, 334:14
**TRI** [2] - 217:15, 224:3
**TRI-FOLD** [2] - 217:15, 224:3
**TRIAL** [1] - 158:1
**TRIAL** [1] - 157:9
**TRIAL** [10] - 164:14, 171:6, 239:20,

240:18, 240:20, 278:6, 280:15, 283:5, 283:19, 360:16
**TRIPLE** [1] - 349:14
**TROUBLE** [1] - 284:18
**TRUCK** [3] - 291:10, 291:13, 348:14
**TRUDI** [1] - 355:6
**TRUE** [1] - 226:20
**TRUNK** [1] - 186:25
**TRUST** [1] - 244:3
**TRUTH** [1] - 178:23
**TRUTHFUL** [3] - 267:5, 270:5, 270:12
**TRUTHFULNESS** [1] - 177:21
**TRY** [14] - 186:20, 195:12, 195:16, 196:10, 256:11, 282:21, 302:23, 302:24, 303:5, 303:7, 340:15, 359:5, 359:8
**TRYING** [2] - 256:23, 269:19
**TUB** [1] - 336:9
**TUBS** [2] - 334:13, 334:14
**TURN** [1] - 181:18
**TURNING** [1] - 295:1
**TWICE** [2] - 188:4, 272:20
**TWO** [51] - 172:15, 172:22, 173:15, 173:22, 174:4, 191:20, 214:17, 225:4, 225:13, 229:24, 231:20, 231:23, 232:25, 234:3, 237:24, 243:11, 243:21, 251:11, 251:17, 254:9, 263:15, 280:14, 281:20, 284:9, 290:4, 291:22, 300:1, 314:2, 314:11, 314:16, 314:22, 314:24, 315:21, 320:20, 320:22, 320:23, 325:6, 325:12, 325:21, 339:14, 343:13, 344:21, 346:24, 348:5, 348:6, 349:18, 349:20, 354:16, 354:24, 359:17
**TYPE** [16] - 190:17, 210:4, 221:7, 221:12, 238:8, 238:10, 250:20, 251:19, 256:23, 270:16, 294:24, 301:16, 316:5, 326:14, 327:11, 338:8
**TYPES** [5] - 209:1, 254:15, 257:1, 297:12, 302:25
**TYPICAL** [2] - 326:15, 343:2
**TYPICALLY** [1] - 272:12

## U

**U.S.C** [1] - 278:8
**ULTIMATELY** [1] - 327:6
**UN-MUTED** [1] - 180:23
**UNAFFILIATED** [2] - 203:21, 263:23
**UNANIMOUS** [1] - 344:2
**UNCERTAIN** [1] - 262:12
**UNCHARGED** [2] - 240:25, 241:2
**UNCLAIMED** [1] - 343:21
**UNDER** [19] - 177:6, 178:24, 183:23, 183:24, 184:13, 207:5, 207:7, 230:4, 236:14, 267:20, 267:23, 269:15, 270:2, 277:24, 279:5, 281:13, 281:17, 285:17, 343:19
**UNDERHILL** [6] - 325:14, 326:12, 326:14, 326:19, 327:5, 339:18
**UNDERNEATH** [4] - 244:7, 245:13, 346:16, 346:18
**UNDERSIGNED** [2] - 354:18, 355:5
**UNDERSTOOD** [6] - 164:3, 168:7, 173:12, 174:7, 177:2, 206:11
**UNFAIR** [1] - 285:19
**UNFAIRLY** [1] - 177:17
**UNFORTUNATELY** [1] - 167:6
**UNITED** [3] - 157:1, 157:2, 157:10
**UNITED** [17] - 157:4, 157:14, 157:18, 158:9, 158:11, 181:21, 186:21, 233:19, 278:12, 280:8, 286:5, 287:4, 323:6, 324:9, 324:12, 324:19, 324:22
**UNLESS** [2] - 198:4, 316:18
**UNLIKELY** [1] - 280:19
**UNOPENED** [1] - 338:22
**UNRESPONSIVE** [1] - 200:2
**UNUSUAL** [3] - 285:7, 312:22, 313:3
**UP** [52] - 162:24, 173:11, 178:4, 178:9, 183:8, 183:9, 184:3, 190:24, 195:4, 201:4, 209:4, 210:16, 215:25, 217:10, 237:14, 241:15, 244:1, 247:7, 249:14, 249:20, 251:2, 268:16, 268:18, 273:21, 273:25, 274:4, 275:1, 278:9, 279:8, 280:5, 292:7, 312:10, 313:9, 315:13, 316:21, 316:22, 317:19, 319:22, 321:8, 327:16, 329:6, 331:25, 333:11, 343:13, 345:16, 353:4, 354:8, 356:8, 357:22, 358:11, 358:14
**UPDATE** [2] - 249:2, 250:19
**UPDATED** [1] - 239:21
**UPPER** [2] - 334:2, 349:9
**URGENT** [3] - 225:21, 225:23, 267:4
**US** [3] - 225:25, 226:13, 248:3
**USA** [1] - 158:5
**USAGE** [1] - 249:10
**USEFUL** [3] - 165:9, 165:10, 167:1
**USES** [2] - 297:3, 298:1

## V

**VA** [1] - 289:13
**VACATION** [1] - 348:10
**VALUE** [16] - 209:25, 210:5, 211:8, 211:12, 214:24, 215:2, 215:5, 215:6, 215:9, 215:11, 215:15, 215:20, 240:1, 265:9, 265:10, 293:24
**VALUED** [1] - 211:22
**VANDERVENTER** [1] - 157:19
**VARIOUS** [3] - 270:15, 296:15, 337:14
**VEHICLES** [1] - 348:13
**VENTURE** [1] - 164:9
**VERIFICATION** [2] - 343:8, 345:5
**VERIFY** [2] - 184:14, 265:21
**VERMONT** [2] - 291:20, 292:2
**VERSE** [1] - 158:5
**VERSION** [1] - 314:18
**VERSUS** [3] - 273:22, 280:8, 286:5
**VESSEL** [1] - 185:11
**VIA** [1] - 181:24
**VICTIM** [3] - 281:16, 358:18
**VIDEO** [5] - 334:24, 335:7, 335:19, 336:7, 337:12
**VIDEO** [22] - 161:10, 331:23, 332:11, 332:13, 332:14, 332:15, 332:18, 333:3, 333:5, 333:6, 333:16, 334:5, 334:8, 334:22, 335:5, 335:8, 336:5, 336:14, 336:22, 337:15, 359:25
**VIDEOCONFERENCE** [1] - 181:24
**VIE** [1] - 233:18
**VIEWING** [1] - 217:17
**VIOLATING** [2] - 178:20, 276:22
**VIRTUAL** [1] - 358:18
**VISIBLE** [1] - 299:25
**VISIT** [4] - 302:23, 326:19, 348:15, 348:16
**VOCALIZED** [1] - 303:15
**VOICE** [2] - 201:11, 296:4
**VOLUNTARY** [2] - 323:12, 323:13
**VS** [1] - 287:4

## W

**WAIT** [3] - 242:24, 243:2, 347:14
**WAITING** [1] - 285:11
**WAKE** [1] - 356:8
**WALK** [1] - 328:11
**WANTS** [5] - 175:25, 179:19, 277:21, 279:15, 284:20
**WARRANT** [16] - 325:8, 325:9, 327:1, 327:3, 327:6, 327:8, 328:1, 329:4, 329:25, 330:18, 331:8, 332:21, 336:23, 338:2, 339:16, 339:17
**WARRANTS** [7] - 172:8, 323:12, 325:6, 325:13, 325:22, 325:23, 325:25
**WAS** [4] - 362:12, 362:15, 363:9, 363:11
**WASHINGTON** [1] - 157:20
**WATER** [1] - 335:9
**WATERING** [1] - 195:13
**WB** [2] - 300:21, 300:24
**WCS** [3] - 225:10, 227:14, 230:7
**WEAPONS** [2] - 328:17, 328:20
**WEEK** [1] - 301:11
**WEIGHT** [1] - 246:18
**WELCOME** [1] - 170:13
**WENDELL** [6] - 290:7, 292:19, 292:23, 294:8, 299:12, 300:21
**WERE** [2] - 362:3, 362:6
**WESTLAW** [2] - 278:13, 280:8
**WHATSOEVER** [1] - 239:25
**WHITE** [1] - 242:24
**WHITE** [1] - 289:13
**WHOLE** [11] - 178:13, 230:10, 248:6, 249:4, 252:20, 252:21, 268:13, 269:1, 301:2, 308:25, 309:2
**WILLIAMSTOWN** [3] - 182:18, 182:19, 289:11
**WILLING** [2] - 292:14, 348:24
**WILLINGNESS** [1] - 354:25
**WIN** [24] - 190:17, 211:22, 211:23, 212:2, 212:4, 212:5, 215:4, 215:7, 215:9, 215:11, 215:16, 216:2, 216:3, 216:9, 264:10, 264:16, 294:1, 301:18,

303:2, 303:10, 315:12, 315:17, 315:19
**WINC** [1] - 336:10
**WINNER** [5] - 247:9, 258:25, 259:11, 267:22, 274:1
**WINNER** [1] - 244:21
**WINNERS** [7] - 234:4, 234:8, 249:2, 250:13, 250:19, 254:24, 255:8
**WINNERS** [7] - 247:9, 248:3, 248:20, 318:20, 320:11, 320:15, 321:1
**WINNERSCIRCLE @GMAIL.COM** [1] - 251:10
**WINNING** [2] - 301:17, 302:9
**WINNINGS** [1] - 226:14
**WINTER** [1] - 355:6
**WIRE** [2] - 179:22, 278:10
**WISH** [11] - 167:2, 175:25, 226:15, 233:23, 278:3, 278:19, 279:9, 281:3, 283:1, 285:13, 345:25
**WISHES** [2] - 165:8, 283:10
**WITHHELD** [1] - 226:13
**WITNESS** [6] - 182:1, 275:20, 288:21, 310:16, 322:21, 355:22
**WITNESS** [98] - 159:7, 159:15, 161:18, 164:24, 166:7, 166:19, 168:12, 168:21, 168:23, 168:25, 169:3, 169:24, 169:25, 170:18, 171:9, 173:18, 174:14, 175:4, 175:5, 176:9, 177:25, 178:25, 180:23, 181:14, 181:22, 181:24, 182:7, 206:22, 206:23, 207:17, 213:2, 216:13, 216:14, 220:6, 221:15, 224:23, 228:5, 230:18, 231:8, 232:3, 232:17, 234:11, 234:13, 236:7, 236:18, 236:19, 242:16, 243:19, 249:7, 268:7, 275:20, 277:25, 278:23, 278:25, 280:16, 281:8, 281:23, 281:24, 284:12, 284:25, 285:20, 286:8, 286:9, 287:8, 288:11, 288:15, 289:4, 299:5, 305:4, 307:5, 308:13, 308:15, 310:18, 310:21, 310:25, 311:8, 312:9, 316:22, 316:23, 316:25, 318:24, 321:11, 322:21, 322:23, 322:25, 323:23, 329:7, 329:19, 332:1, 339:23, 340:8, 341:8, 350:1, 351:18, 355:16, 358:19, 359:13, 359:18
**WITNESS** [11] - 169:7, 182:4, 206:19, 269:8, 288:25, 289:17, 308:11, 311:4, 324:2, 355:21, 361:3
**WITNESS'S** [3] - 176:8, 188:4, 188:6
**WITNESSES** [18] - 158:23, 159:21, 159:22, 160:2, 162:5, 164:12, 164:15, 174:15, 236:19, 276:8, 276:15, 279:3, 281:10, 286:3, 340:9, 356:2, 358:9, 358:14
**WON** [14] - 186:13, 186:22, 203:24, 211:11, 226:16, 260:6, 261:2, 262:12, 262:18, 264:1, 294:1, 303:12, 303:14, 346:3
**WONDERFUL** [1] - 158:17
**WONDERING** [1] - 163:23
**WORD** [3] - 167:9, 221:11, 296:20
**WORDS** [8] - 173:17, 189:16, 217:12, 227:6, 267:10, 267:13, 296:15, 298:3
**WORKERS** [1] - 178:14
**WORKINGS** [1] - 267:17
**WORKS** [1] - 160:24
**WORLD** [1] - 175:18
**WORRIED** [2] - 279:13, 279:16
**WRECKED** [2] - 332:25, 336:25
**WRITE** [5] - 180:11, 227:3, 300:10, 304:18, 318:2
**WRITING** [3] - 226:2, 301:20, 334:25
**WRITTEN** [4] - 184:15, 228:2, 294:8, 302:6
**WROTE** [11] - 185:9, 190:7, 193:8, 193:10, 249:8, 259:24, 259:25, 302:6, 316:8, 316:13, 317:2

## X

**XLS** [1] - 251:15

## Y

**YEAR** [11] - 176:19, 178:9, 179:25, 180:1, 180:2, 194:2, 279:24, 283:7, 291:9, 291:24, 341:20
**YEARS** [23] - 178:11, 179:11, 179:21, 180:2, 180:5, 190:11, 191:19, 194:25, 204:1, 256:18, 256:20, 258:7, 278:5, 278:12, 279:13, 280:2, 287:17, 290:25, 293:10, 302:21, 303:19, 311:22, 324:15
**YESTERDAY** [12] - 163:13, 169:10, 174:25, 181:16, 209:2, 209:10, 211:2, 211:6, 213:2, 219:6, 267:12, 275:24
**YORK** [1] - 157:1
**YORK** [10] - 157:4, 157:14, 157:15, 157:20, 157:22, 160:16, 217:24, 218:21, 327:8
**YOUNG** [2] - 290:17, 290:24
**YOURSELF** [2] - 350:16, 353:4

## Z

**ZERO** [1] - 251:24
**ZOOM** [16] - 183:10, 183:15, 206:24, 211:4, 214:6, 214:22, 218:2, 226:8, 227:9, 229:25, 248:5, 251:18, 342:24, 345:13, 347:12, 354:8
**ZOOM** [2] - 358:23, 358:24
**ZOOMED** [1] - 345:15
**ZOOMING** [3] - 224:11, 230:9, 233:15

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 21-CR-00566(NJC)

-against- : United States Courthouse, Central Islip, New York

: March 13, 2025, 10:00 a.m.

PHILIP PRIOLO,

Defendant.

- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE NUSRAT J. CHOUDHURY
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government: JOHN J. DURHAM, ESQ.
United States Attorney
Eastern District of New York
100 Federal Plaza, Suite 570
Central Islip, New York 11722
BY: ANN F. ENTWISTLE, ESQ.
CHARLES B. DUNN, ESQ.
JASON FELDMAN, ESQ.
Assistant United States Attorneys

For the Defendant: JAMES FROCCARO, ESQ.
20 Vanderventer Avenue, Suite 103W
Port Washington, New York 11050

JONATHAN I. EDELSTEIN, ESQ.
501 5th Avenue, Suite 514
New York, New York 10017

Court Reporter: DENISE PARISI, RPR, CRR
E-mail: DeniseParisi72@gmail.com

Proceedings recorded by computerized stenography. Transcript produced by Computer-aided Transcription.





(In open court.)

THE COURT: Good morning, everyone. Please have a seat.

THE COURTROOM DEPUTY: 21-CR-566. USA v. Philip Priolo.

Counsel, please state your appearances for the record.

MR. DUNN: Good morning, your Honor. Charles Dunn for the United States. With my at counsel table is Jason Feldman and Ann Entwhistle. Ms. Entwhistle is attending other matters with the Court's permission.

MR. FROCCARO: Good morning, your Honor. Joseph Froccaro for Mr. Priolo, who is beside me, and Mr. Edelstein, who is also here today as well.

THE COURT: Good morning, and I hope you all are well. Thank you so much for coming early for the testing on the AV and thank you for waiting for me as I've prepared my rulings on various issues that were raised yesterday.

Just a mechanical issue. We're checking ECF every few hours to see if you all are filing anything. But when you do sent courtesy copies to chambers, do send it to the chambers inbox rather than Mr. Morabito. That way everyone gets it and we don't have to forward it. Mr. Froccaro?

MR. FROCCARO: I looked at your rules, I don't remember seeing courtesy copies.





THE COURT: You do not need to --

MR. FROCCARO: That's why I didn't understand it. When I saw it, you know, I'm saying I hope I'm not violating the rules.

THE COURT: You're not violating the rules. We check ECF every couple hours. But, to the extent you want us to see something and we're not checking ECF, which we don't mind at all, just please send to the chambers inbox, tat way all of us get a copy. There's no requirement to send courtesy copies. I was expecting your filings last night, and we were checking to see when they got in, and they were in timely. So thank you so much, and we appreciate getting your input in on time for the issues that were raised.

So the first ruling I want to issue involved Mr. Froccaro's motion made yesterday to preclude the Government's reliance on Government Exhibit 395. I just want to make sure the court reporter can hear me. We don't have the mics on because we don't want the remote witness to hear anything. Just speak loud enough, I don't think anyone will have an issue with that.

So yesterday, the defense raised an objection to government proposed trial Exhibit 359, which is a 17 page compilation of complaint letters, sent by mailing recipients regarding mailings sent in the late 1990s and early 2000s by Sweepstakes Advisory Network and Justin Grant Limited. Mr.





Froccaro argued on behalf Mr. Priolo that there is no evidence that Mr. Priolo has ever seen these exhibits and that the complaints were, therefore, inadmissible hearsay and violate Mr. Priolo's right to confrontation under the 6th Amendment to the United States Constitution.

In my March 5, 2025, opinion and order on the parties Motions in Limine, which is at docket number 130. On pages 72 to 75, I overruled Mr. Priolo's previous objection that complaint letters from recipients of mailings associated with Mr. Priolo and related State Attorney General letters are hearsay. I found that this evidence is not offered for the truth of the matter asserted, but instead, is offered as evidence that Mr. Priolo was on notice that the charged scheme was unlawfully deceptive and that the mailings deceived recipients that Mr. Priolo lacked good faith -- sorry. That the mailings deceived recipients and that Mr. Priolo lacked good faith and intended to defraud.

For this reason, I found that the complaint letters from State Attorney General notices are not precluded under the confrontation clause or under Rule 801 under the Federal Rules of Evidence. And again, this is set forth of page 72 on my March 5, 2025, opinion and order.

I found that these letters are probative of two different elements that the Government must prove at trial. First, whether the mailings conveyed material

misrepresentations. Meaning, that they had a quote; natural tendency to influence, closed quote, the recipient, as the Second Circuit claimed in United States versus Weaver. 860 F.3d 90 at page 94, 2017.

And number two, whether Mr. Priolo acted with an intent to defraud. I do not see any reason why the complaints regarding Sweepstakes Advisory Network and Justin Grant are not covered by this ruling. The Government has proffered evidence of Mr. Priolo's involvement with both of these corporations at the time these complaint letters in the late 1990's or early 2000s. I did not rest my previous ruling on whether the Government could establish direct evidence that Mr. Priolo reviewed each individual complaint the Government seeks to admit. The Government has proffered sufficient circumstantial evidence of Mr. Priolo's role in these corporations to make these complaint letters probative of his intent and the materiality of any misrepresentations in the companies mailings.

So, I find that Government proposed Exhibit 395, which contains complaints related to Sweepstakes Advisory Network and Justin Grant is relevant evidence and not precluded by the confrontation clause, or Rule 801 for the reasons I explained in my opinion and order. And, as I ruled in my opinion and order, I find that this evidence is admissible as direct evidence of the charged conspiracy, even





though it related to a period of time that was not charged in the indictment. And I rely on Second Circuit precedent as set forth in United States versus Kaiser. 609 F.3d 556, Second Circuit 2010. And United States versus Lingat. Docket number 21-CR-573, 2024 Westlaw 1051633 Southern District of New York, March 11, 2024. Among other cases.

As I additionally ruled in that opinion and order, this evidence is also admissible under Rule 404(b)(2) as proof of Mr. Priolo's knowledge of the charged conspiracy and intent to defraud. And is not precluded by Rule 403 because its probative value is not substantially outweighed by the risk of unfair prejudice to Mr. Priolo, or confusion to, or misleading the jury. And here I'm referring to pages 38, 242 of my opinion in order.

I also want to note that yesterday we discussed whether or not Mr. Froccaro should have raised this concern to the response to the Government's Motion in Limine and, Mr. Froccaro, you indicated that you didn't have a chance to properly raise this particular issue because you were out ill during the relevant time period. What I actually looked at the schedule, that did not comport with my recollection. So I looked at the schedule on timing, just to see if that was true. And I do recognize, Mr. Froccaro, there was a period of time in February where you were dealing with health concerns. And you did have time to raise these issues in your response





to the Motion in Limine. So I'll walk you through the procedural history here.

On January 10, 2025, the Government initially attached the proposed exhibit at issue, which is Government Exhibit 395 as Exhibit 3 to the Government's Motion in Limine. This is at docket number 78-3 which was re-filed at docket number 99-3. The Government discussed these complaints through their motion and indicated their intent to introduce these complaints. For example, on page six, the Government argued as follows. Quote; exhibits to the motion that include prize notice mailings, complaints, or responses to complaints, or similar evidence are representative of the types of evidence the Government intends to introduce at trial. But do not represent the entire universe of such evidence that the Government may offer, closed quote. This is at page six of docket number 99 of the Government's motion. It is true that the Government did not include the particular exhibits that are now in Government Exhibit 395 in their initial proposed trial exhibits, and I noted this in my opinion and order at page 38, footnote 21. But my opinion and order did not draw a distinction between the admissibility of complaints relating Winners Circle and Feel Lucky Corporation mailings, and those related to other companies to which Mr. Priolo was associated.

On January 13, 2025, defense moved for an extension of time and filed a response as in opposition to the





Government's Motion in Limine. That motion is at ECF number 79. I granted that motion on February 14, 2025, in an electronic order and ordered that Mr. Priolo file any response by January 24, 2025. And, on that date, Mr. Priolo filed a timely response in opposition to the Government's Motion in Limine. This is at docket number 85. In this response, Mr. Priolo objected to the introduction of evidence of his involvement in the uncharged Sweepstakes scheme in the late 1990's and early 2000's, but he did not specifically object to the complaint letters, aside from his more general arguments. Nor, did Mr. Froccaro raise this on February 4, 2025, when I held oral argument on this motion.

On February 9, 2025, which was more than two weeks later, in the defense motion to continue the February 18th trial due to Mr. Froccaro's health concerns, Mr. Froccaro represented that, quote, for the past near week, I have been very ill and in bed, closed quote, with the flu. And that he had fallen and injured his head a few days ago. This is at ECF number 105. And as these representations indicate, Mr. Froccaro did not have those health concerns until after he filed his response to the Government's Motion in Limine, which have attached the exhibit that is now at issue; Government Exhibit 395. And as the parties are aware, Mr. Priolo then filed his own affirmative Motion in Limine on February 10, 2025, that is at docket number 106.

On page 5 of Mr. Priolo's motion, Mr. Priolo argues the following. Defendant will submit that that any complaint letters and/or notices from state or local officials are of marginal relevance, at most. And that any such relevance is vastly outweighed by the potential for unfair prejudice arising from the risk that the jurors would treat the complaints as substantive proof of fraud, and/or complaint the subjective feelings expressed by the complainants would be the objective standard mandated by Nadar, Star, and their progeny, closed quote.

In neither that motion, or on oral argument on February 27, 2025 after Mr. Froccaro had recovered did the defense attempt to draw a distinction between the complaint letters and the 1990's and 2000's, concerning Justin Grant or Sweepstakes Advisory Network and the ones relating to mailings sent in 2015 and 2016.

I also note that on March 7, 2025, the Friday before trial began, the Government sent the Court copying defense counsel there updated exhibit list which included government proposed trial exhibit 395.

All that to say, that there were times when the defense could have raised the issue concerning Exhibit 395 and whether their arguments concerning that exhibit were different from or similar to in any way their argument about the other complaint letters and Attorney General notices concerning





mailings sent in the 2015, 2016 time period. Nevertheless, I looked closely at the exhibit yesterday, conducted a DeNovo review and essentially land in the same place. These letters and notices are probative of intent to defraud, so they are admissible.

So that's my ruling on the 395 issue. Any concerns or discussion that you wish to reserve?

MR. FROCCARO: I just renew my objection and I'm amazed that you did all of that between last night and this morning.

THE COURT: And there's more, I have two more rulings for you. Thank you so much. Anything the Government wishes to day?

MR. DUNN: No, your Honor.

THE COURT: Let's go on. So now I turn to the question of Cathy Johnson and the motion that defense filed first -- first, made orally yesterday and elaborated on in a letter and I did look at both party's letters very closely, as well as the case law cited therein. And we also did some additional research. I take very seriously the arguments that the defense is rasing here and I think, Mr. Froccaro, you're absolutely doing your job to raise objections when you should. When there are issues of concern. I needed more time just to think through this issue, particularly in the context of the unfair prejudice concerns that you raise. And trying to find





a case on point as to that issue, and here's where I land.

MR. EDELSTEIN: Your Honor, may we briefly be heard additionally on that?

MR. FROCCARO: Something to respond to the Government.

THE COURT: Okay.

MR. EDELSTEIN: Just briefly to address the case of US versus Runner that the Government cited.

THE COURT: Which case, sir, I'm sorry?

MR. EDELSTEIN: United states verse Runner. R-U-N-N-E-R. It's an Eastern District of New York case. There is only a Westlaw citation, which is 2023, WL, 3727532. And it was cited in the Government's submission of last night. And I just would like to point out a couple of things about the Runner case.

First of all, that, in the Runner case, the three witnesses in question whose cooperation agreements and guilty pleas the Government wanted to elicit, are people who pled guilty. And the Government, among the relevance, items of relevance that the Government advocated for this bringing this out on direct, was to, quote; prevent any jury confusion about whether the witnesses have been criminally charged and the reasons surrounding that decision, unquote. I'm reading from page star 3 of the case in Westlaw.

And in addition, the representation made by the





defendant in Runner, and I'm reading from the same page of the case, was that, quote; he does not currently intend to impeach them, meaning, the witnesses, nor attack their credibility because they pled guilty or are trying to curry the Government's favor, unquote. So first of all, the defendant in Runner, unlike Mr. Priolo, hedged bets. He said he doesn't currently intend to impeach the witnesses concerning these cooperations agreements, meaning, maybe, you know, during cross he's going to change his mind. We, on the other hand, are going to make -- you know. We've offered and irrevocable decision that we will not only not impeach Ms. Johnson based on the grant of immunity and/or the proffer agreement, but we will not mention that at all. The words immunity and proffer are never going to come out of Mr. Froccaro's lips during the cross examination. Nor, if, you know, lighting strikes and for some reason I do the cross, which we don't anticipate, those words will never cross my lips. And furthermore in contrast to Runner where these are witnesses who pled guilty, they admittedly committed criminal acts and there was an arguable need to prevent confusion about whether they had been charged of a crime. That is not present with Ms. Johnson. She's never been charged at this point, she can't be charged. When the immunity was granted, she couldn't be charged. And we would submit that she's no different from either of the other women who work in the Novis office, you know,

Ms. Lillenkamp or Ms. Jacquard. All of them, Ms. Jacquard testified without any mention of whether she was charged with a crime or not because she never was. We don't anticipate there's going to be any testimony of that sort from Ms. Lillenkamp. And there should not be either from Ms. Johnson. She's never been charged with anything, there's no confusion that needs to be prevented. And, on the contrary, if the jury hears from about immunity, the impression they're going to get is that Ms. Johnson got immunity because she needed it.

So I would submit that, again, the Rule 403 considerations in this case are far more compelling than in Runner. And that, instead, the Court, this court should be guided by the Silverman case in the Second Circuit which we cited sating, you know, there are circumstances where the implication of criminal conduct against the defendant from mention of these type of agreements or grants of immunity outweighs the relevance to the credibility of the witness. And that, given the waivers that we are proposing here, there should be a preclusion. Thank you, Judge.

THE COURT: Thank you so much. Does the Government wish to add anything?

MR. DUNN: I believe we will just stand on our paper at this point. I would make a very short observation that the quote selected from Silverman is indicia that, in fact, the





court in that case and the case it pulled that language from, if I'm remembering it correctly from my question quick reading of these cases was from 1962. In neither of those cases did they do as the defense is suggesting here. That's all I wanted to add, your Honor.

THE COURT: Okay. I thought deeply about this and I read all of the cases, including Silverman. Here is where I land. Start from the beginning.

Mr. Priolo filed a motion to preclude the Government from eliciting the testimony -- well, I just want to stop.

Mr. Dunn, I want to confirm that the testimony that you seek to elicit is limited to the following.

That Ms. Johnson is testifying under the grant of immunity from prosecution and that she previously met with the Government on several occasions in proffer meetings so-to-speak. But without eliciting any testimony about those proffer agreements or any agreements she may have entered into for those sessions or any testimony about what was said in those proffer sessions because that's all hearsay.

MR. DUNN: That is exactly right. And should the door be opened to further questioning about that during cross examination, we would certainly request a sidebar before getting further into any of those issues.

THE COURT: You don't intend to, for example, elicit testimony about any truth telling because that would be





inadmissible bolstering.

MR. DUNN: Of course, your Honor.

MR. FROCCARO: Judge, the question when you ask about immunity is because -- the only thing you're not precluded from is from telling the truth.

THE COURT: That's in my order, right?

MR. FROCCARO: But the jury is going to hear that.

THE COURT: The jury going to hear that and you're going to hear my ruling. And the main issue here is that no one has cited me a case indicating that under Rule 403, that the party offering a witness who is compelled to testify under grant of immunity that, on direct, you can't elicit testimony about the fact that the person is testifying under a grant of immunity. I have not seen that case.

MR. FROCCARO: There may be a reason for that because I never heard anybody ask for that or rejected on the Government's side. Normally, they wouldn't want to show that a witness has an incentive to lie.

THE COURT: But under Silverman, the Second Circuit made very clear that it doesn't matter whether a witness's testimony is favorable to one side or the other. Either side can seek to impeach the witness. It doesn't matter that -- what I'm hearing from the Government is you don't want to impeach her credibility because you think she might say things favorable to you. No desire to impeach her credibility, but





that don't change the fact that under Rule 607, the Government can try to impeach her credibility. And, frankly, it doesn't change the fact that the issue of her credibility is part of the entire circumstances of her testimony and highly relevant to the jury's determination of her credibility and to how weigh the weight of her testimony. Go ahead, Mr. Froccaro.

MR. FROCCARO: But her credibility to be impeached without the fact that had proffer agreements or without the fact that she had immunity, to be impeached by any prior statements she may have made. They don't have to bring up anything about immunity.

THE COURT: There may be a number of ways to impeach a witness, but it doesn't change the Second Circuit's preference in this case. Indicating that what they're trying to do is not unfairly prejudicial.

MR. FROCCARO: Once they say she's testifying under a grant of immunity, it puts me then in a bad position because they're going to suggest that she's telling the truth because immunity. And, listen, Judge, I do --

THE COURT: I want to correct that because I just asked Mr. Dunn if there's an intention to bolster or indicate that she is required to tell the truth and make statements of that kind. I didn't hear that you were planning on doing that, Mr. Dunn.

MR. DUNN: That is correct, your Honor. We don't

intend to ask that question.

MR. FROCCARO: So how does the jury understand why she's granted immunity? What is the basis for that? That she had Fifth Amendment concerns and that's why she's got immunity concerns? What is the jury left with?

THE COURT: Okay. I've heard you Mr. Froccaro, I'm going to regroup right now. So now I'm going to be very clear about why I'm landing where I'm landing.

Is there anything further that you want to add before I do that?

MR. FROCCARO: There isn't, Judge. Just my concern that once they bring that up, they put me in a bad position. But so be it. I don't know what she's going to say.

THE COURT: Well, I mean, you have the 3500 material from Ms. Johnson.

MR. FROCCARO: That's true, and -- yeah. I mean, that's true.

THE COURT: So Mr. Priolo filed a motion to preclude the Government from eliciting testimony from Cathy Johnson concerning the fact that she's testifying under a grant of immunity and that she was interviewed pursuant to one or more proffer agreements. And to preclude the Government from introducing any grant of immunity or proffer agreement into evidence. And this is at docket number 144.

Mr. Dunn, was there one or more proffer agreements





at issue?

MR. DUNN: I have a copy if it in the Court wishes to see it.

THE COURT: I don't believe it's in the 3500 material.

MR. DUNN: It was sent separately to defense counsel in late January so they have it. I'm happy to show it to the Court. It's one proffer agreement and it's signed by the parties on two different occasions.

THE COURT: I don't need to see it right now, but I may. Because we will see how things unfold. The defense does not object to the Government eliciting that Ms. Johnson was interviewed, as long as the proffer and/or immunity are not mentioned. Mr. Priolo argues that the testimony should be precluded because the defense agreed not to refer to the proffer agreement and/or immunity during cross examination of Ms. Johnson. They agreed not to attack Ms. Johnson's credibility or to characterize her as a criminal. The defense agrees not to accuse the Government, either expressly or by implication, of concealing Johnson's immunity and/or the proffer agreement, and Mr. Priolo agrees to allocate his consent to these restrictions.

Contrary to Mr. Priolo's contention, the jury does need to know that Cathy Johnson is testifying under immunity because that information is highly probative of her





credibility, regardless of whether she is facing favorable to the Government or to the defense. A witness's receipt of a benefit for testifying is relevant to the jury's evaluation of their credibility. A witness's grant of immunity can also be probative of the witness's reluctance to testify, which is further relevant to the jury's evaluation of their credibility. I'm relying on United States Versus Silverman. 430 F.2d. 106 at page 125 Second Circuit 2007 where the Second Circuit stated, quote; each reference to the immunity was to emphasize the reluctance of the witnesses to testify. This reluctance was relevant to the jury's evaluation of the witness's credibility, closed quote.

The fact that Mr. Priolo may anticipate that Ms. Johnson will provide testimony favorable to the defense and that he does not want to impeach her testimony does not change the fact that the jury needs to know the circumstances under which she is testifying in order to assess her credibility. The Second Circuit has recognized that, quote; credibility concerns attend a grant of immunity, closed quote, whether the witness testifies favorably for the defense or the prosecution. I'm citing United States Versus Dixon. 511 at appendix 48 at page 51. This is a 2013 Second Circuit decision where the Court is citing its previous decision in United States Versus Gleason. 616 F.2d 2 at page 15. Second Circuit 1979. In Dixon, the Second Circuit upheld an





instruction to scrutinize a defense witness's testimony with particular care based on her immunity that she had been granted by the Government. This is at page 51 of the Dixon decision. The defense has not identified a case in which, under Rule 403, the Federal Rules of Evidence, the Court is precluded -- where the Court precluded a party from examining a witness on direct about the circumstances of their grant of immunity from prosecution or their testimony.

Mr. Priolo argues that the impeaching aspect of an agreement that provides a benefit to a witness may not be introduced unless the defendant opens the door. Mr. Priolo relies on Certified Services Incorporated, 753 F.3d 72. Second Circuit 2014. This case is -- because it concerns testimony by a cooperator, the question of bolstering the witness's testimony, and offering into evidence the complete agreement by which the cooperating witness testified in that case. That is not what is at issue here.

The Government's intention to elicit limited questioning on direct examination that Johnson is testifying pursuant to a grant of immunity and has been interviewed by the Government in proffer sessions is not bolstering. By contrast, in Certified Services, the Government impermissibly bolstered the cooperating witness during direct examination by eliciting testimony about and offering evidence of agreements by which the cooperating witness testified. The agreements

include so-called, quote; truth-telling provisions, closed quote, provisions, which set out the cooperating witnesses promises to testify truthfully, and provisions setting out the penalties for failing to do so. Such as prosecution for perjury and reinstatement for any charge dropped pursuant to the agreement. In Certified, the Government also impermissibly bolstered the witnesses when it relied upon these cooperation agreements and those truth-telling provisions in opening and summation. This is set forth on pages 85 to 897 of the agreement. Here, the Government does not seek to offer any proffer agreements it made with Johnson into evidence, or to elicit testimony on direct regarding the truth telling provisions in any such agreements. And for this I'm citing docket number 143 at page 2. Nor, has the Government made any comments in opening that it, in any way, improperly vouched for the truthfulness of Johnson's testimony.

Mr. Priolo also relies on United States versus Silverman, 430 F.2d 106 at page 125, Second Circuit 2007. This case supports the Government's position. In Silverman, the Second Circuit found that the trial court did not err in permitting the Government to elicit on direct examination that witnesses were testifying pursuant to a grant of immunity. This is at pages 124 to 125. The Second Circuit recognized that testimony about the grant of immunity to government





witnesses was probative of the witness's credibility, because it tended to show the reluctance to testify, as I noted earlier.

Thus, the Second Circuit held that evidence of a grant of immunity may be brought out on direct evidence examination, provided that the jury is cautioned that the testimony is not evidence of the defendant's guilt. In his motion, Mr. Priolo also cited from United States versus Freeman, 302 F.2d 347 at page 350, Second Circuit 1962, which the Second Circuit cited in Silverman. Which provides the following. Quote, there may be circumstances where, on proper request of the defense, the trial judge did limit or even bar such testimony, or allow it only under cautionary instructions because the prejudice to the defendant of the witness's admission of crime in would outweigh the advantages of full knowledge of the witnesses criminal background. And this is Freeman 302 F.2d at page 350. Second Circuit 1962. In Freeman, the Second Circuit found no such likelihood of prejudice where an alleged coconspirator testified that she had been convicted of possession of narcotics pertaining to the same case as the case in which she was testifying. In Silverman, the Second Circuit did not reach the issue of prejudice because it found that the defense failed to preserve an objection. The defense has not pointed to a case where, under Rule 403, a court precluded a witness's testimony about





the fact that the witness was testifying under a grant of immunity from prosecution.

While the defense argues there is a risk of prejudice here, the risk of unfair prejudice to Mr. Priolo does not substantially outweigh the probative value of this evidence for six reasons.

First, under the Second Circuit precedence, the fact this a witness is testifying under an immunity is highly probative of the witness's credibility, whether the witness is testifying favorably for the defense or prosection. Again, this is Dixon. 511 F appendix at page 51. Citing Gleason. 616 F.2d at page 15.

Second, the risk of unfair prejudice here is less than the arguable unfair prejudice in Freeman because Johnson has not been convicted of a crime related to this case, nor was she ever charged or named as a coconspirator prior to her grant of immunity.

Third, the risk of unfair prejudice is also minimized because the Government does not intend to offer Johnson's proffer agreement itself as evidence. The provisions of the agreement that mention Johnson was providing information to the Government about the criminal activity of others would not be presented to the jury.

Fourth, unfair prejudice is further reduced because the Government's intended questioning to elicit testimony





about Johnson's grant of immunity and meeting with the Government in one or more proffer sessions about any substance of those sessions is narrow in scope and duration.

Fifth, the defense will have a full and fair opportunity to cross examine Ms. Johnson.

And six, I will consider any limiting instruction the defense proposes with respect to these questions.

And finally, I emphasize that my ruling should not be interpreted to imply that the Government may elicit testimony from Ms. Johnson about the substance of what was discussed during her proffer sessions with the Government or the substance of her proffer agreement. That information is hearsay it is not admissible on the exception to the rule of when hearsay applies.

Moreover, unless the defense seeks to attack Johnson's credibility, the Government may not bolster Johnson's testimony in any way. Including by eliciting testimony referring to any proffer agreement with the Government.

Finally, my ruling is also supported by United States versus Visa Industries Incorporated. There, the Second Circuit found no error in prosecutions questioning of a witness about their claim of privilege and testimony pursuant to a grant of immunity where the prosecution, quote; merely asked a series of four neutral questions so the jury would

understand the circumstances under which the witness was testifying. The Government did not comment on that witness's claim of privilege in its summation. Pursuant to the witness's grant of immunity, the witness testified at length, and was subject to cross examination by defendants attorneys, and the judge instructed the jury, quote; that it was not to consider the witness's assertion of its privilege in any way against the defendants. This is 775 F.2d 196 at page 496 to 497. Second Circuit 1985.

So for these reasons, the Government can question Johnson on direct to elicit testimony about the fact that she is testifying pursuant to a grant of immunity from prosecution, and the fact that she met with the Government for more proffer sessions prior to her decision to testify. But, number two, the Government cannot question Johnson on direct about the substance of what was discussed during any proffer sessions with the Government because the statements made during those sessions are hearsay, and the Government would have to show that any statements fall under the hearsay exception.

Mr. Froccaro, I've noted your objection, I understand it, but that's my ruling.

MR. FROCCARO: Can I ask a question, Judge? Once they bring up the fact that she has immunity, I can certainly go into that fact without opening any doors. The prior





proffer agreement can't come in on that basis.

THE COURT: I do not see the prior proffer agreement coming in.

MR. FROCCARO: So I can do whatever I want. That's the bottom line.

THE COURT: What do you mean you can do whatever you want?

MR. FROCCARO: I apologize. When I say that, I don't mean whatever I want. I mean, I can challenge her credibility, I can challenge the fact that she got immunity and why she may have needed it for whatever reasons, and there's nothing more because that can come in. If they want, they can certainly say there are no prior interview. She -- you know, she was required to tell the truth. Right?

THE COURT: If you attack her credibility, that opens the door for them to provide the truth-telling provisions of the agreement and eliciting testimony about that. Is that what you're asking?

MR. FROCCARO: But there's really a truth telling provision anyway because any interview with a federal agent, you're subject to criminal -- it's a crime if you lie to a federal agent. So that's the bottom line. So my point, Judge, is once immunity comes in, everything is fair game for me then in terms of challenging her credibility.

THE COURT: Yes, I think that you can challenge her





credibility, absolutely. I don't see why you can't challenge credibility. That then opens the door for them to counter and try to bolster, and we would need to have a sidebar, just to make sure that we're staying in scope. I mean, the Government also, in terms of what they can say on impeachment, I gave them pretty strict parameters on what they're allowed to do on direct. Like, they can't go into substance, they can't go into agreements, etcetera. Now, once you attack credibility, we will need to have a sidebar to discuss the scope of what they anticipate trying to elicit to respond to that.

MR. FROCCARO: I understand. I don't think there's anything that they can go into. We'll argue at the appropriate time. The question I have, Judge, is what promises have been made to her because she's testifying, she's never been charge. I have a right to know under Brady where there's been any promise made, why hasn't she been charged with things from the Government? There certainly should have been discussions about that if she has immunity concerns. I haven't heard a thing from them about any kind of promises that's been made to her.

THE COURT: Mr. Dunn?

MR. DUNN: I think the immunity order speaks for itself in that regard. It's a court order that she cannot be charged. The fact that she never was charged is self-evident.

THE COURT: Well, I think he's raising a different





issue. The defendant wants to know why the grant of immunity was even given in the first place.

MR. DUNN: Because her lawyer required it, your Honor.

THE COURT: Well, and that might be her answer.

MR. FROCCARO: Judge, that's not what the question I had was. Why hasn't she been charged with a crime? Immunity is just when she testifies. What she says can't be used directly or indirectly against her. What about the nine years I think it's been that she hasn't been charged with a crime. Was that part of the discussions that she wouldn't be charged with a crime? A promise of immunity is a benefit if she's going to testify.

THE COURT: I understand the distinction. And Mr. Dunn, do you have a concern about that line of questioning?

MR. DUNN: He's free to inquire, but I will be very plain about this with the facts are. Just so everybody is operating on the same set of information. We approached Ms. Johnson, called her through counsel, she's always been represented by counsel, in 2021 about testifying against Sean Novis and Gary Denkberg. There are no circumstances under which we were able to seek immunity for her at that time because she would not even proffer to be -- she would not interview without a court ordered grant of immunity. So that's where that discussion ended. Approximately two years

after the Sean and Gary Denkberg trial, we approached her again with counsel. And they agreed to an interview under the protection of the subject proffer letter. And so, that is what began a more productive discussion about securing her testimony. So that continued, you know, over the course of 2024. And we eventually filed a motion that your Honor granted, I believe, in January or, potentially, February, I forget the date, the immunity.

THE COURT: In response to Mr. Froccaro's question, your answer, what I heard, is that he's free to inquire and ask her. Did you get something and is that why they have never prosecuted you.

MR. DUNN: He's free to ask whatever he wishes.

MR. FROCCARO: That's not their Brady obligation. Apparently he doesn't understand Brady. If she had concerns about immunity, your Honor, she could have been changed with something. Was there was a promise made that she would not be charged with something, and they will give her immunity if she wants to testify. That's what Brady is. I'm astounded that a prosecutor will say, I asked that question. It's their obligation to tell me, was there an implicit promise, was there an expressed promise? Why hasn't she been charged? Why does she need immunity if she committed a crime and she hasn't been charged? It's a promise they make.

THE COURT: Do you disagree with that position, Mr.





Dunn, that though would be Brady material.

MR. FELDMAN: If we promise a witness that we wouldn't charge her, I agree that would be Brady. But, in this case, it was her lawyer who demanded that she would not testify without a grant of immunity. And so there were no promises about charging or not charging Ms. Johnson. The Government makes charging decisions for all sorts of reasons. Who we charge in different cases, resource issues, you know. The decision in this case was made to charge initially in one indictment; Sean Novis and Gary Denkberg. And a second indictment, Mr. Priolo, Sean Novis and Sean Philips. The decision was made not to charge the employees that worked under those individuals. There was no promise not to charge anyone. It was a decision that was made based on the evidence and it was a decision that was made based on, based on resources and who we felt was the most culpable -- who the office at the time felt was culpable to prosecute.

THE COURT: Yes. But if a promise would have been given, would it be in the proffer agreement.

MR. FELDMAN: Yes, and I think --

MR. FROCCARO: No --

MR. FELDMAN: I haven't read the proffer, but I've seen a lot of standard proffer agreements. But my understanding is the proffer agreement --

MR. FROCCARO: Judge, the answer is no. What it





says specifically in everyone I've ever seen in my whole life is this is not a promise that you'll ever get a cooperation agreement. That's what it says. And it's, again, to reach the point where the lawyer says I have to have immunity, you need a good faith basis for that so they can challenge it, if the person had a good faith basis to assert. They have be telling the lawyer we're not going to charge her, we'll get her an agreement. So they can try to couch it any way they want, that's the bottom line. She got a benefit by testifying. She never got charged or they would have --

THE COURT: Mr. Froccaro, I'm just hearing that you're just doubtful of the representation from the Government that she didn't get a benefit, right?

MR. FROCCARO: I'm not doubtful. There is no doubt, your Honor, I'll be honest with you. There is no doubt because I've dealt with immunity situations where I have to appear before duty judges where I tell them my client is going to assert the fifth. And they have challenged it, the Government, saying he has no good faith basis. Well what's the good faith basis the lawyer has that says, hey, she has real concerns. She's not going to testify unless you give her immunity. Well, the Government response has not to, she's not going to be charged with anything, we'll give her immunity. There's no way around that.

THE COURT: I need to stop for a second because I





think I'm missing something. Her lawyer insists she needs immunity in order to testify. I issue an order that compelled her to testify on the basis of that immunity grant. So she got a benefit, the benefit is already there. It's the product of immunity.

MR. FROCCARO: The real benefit is she didn't get charged with a crime or there wouldn't be a good faith basis for the assertion that she needed immunity, Judge.

THE COURT: So what you want to know is what crime they didn't --

MR. FROCCARO: Charge her with, exactly.

THE COURT: Is that standard Brady material?

MR. FROCCARO: Absolutely.

MR. FELDMAN: Your Honor, we agree with Mr. Froccaro that the statute on the charges that we charged his client with had run. She is represented by very able and experienced counsel; Mark Durant. We had no intention of charging Ms. Johnson, but, at the same time, her lawyer insisted that she technically had exposure under a RICO statute, and that statute had not run. And so he would not allow her to testify without a grant of immunity. So we filed the immunity motion, it was unopposed at the time. If counsel had an issue with this particular point, he could have raised it at that time. We haven't hidden anything from the defense. All of this has been turn over. So I don't quite see how this is Brady

material.
MR. FROCCARO: Judge, first of all, yesterday it was a five-year statue of limitations, then it's a ten-year, now it's RICO that they're claiming? And apparently they don't understand the RICO statue as well. The RICO stature, you can only be subject to prosecution if there's a predicate out within five years, or, if someone else commits -- there's a conspiracy that they committed within five years. That doesn't exist here. So you're absolutely wrong. There is no basis for a RICO prosecution. The key is here what charges -- they should be disclosing what charges could she have been charged with that are giving rise to the immunity assertion. What charges? It's a benefit. She had to have received a benefit if there are charges out there she could have gotten and she didn't. Instead, she got an immunity letter. That's the key.
THE COURT: So at that point, what is the relief that you're seeking?
MR. FROCCARO: I want to know what crimes she would have been charged with under the statue because, when she takes the stand and says she needs immunity, I have a right to say you didn't need immunity. I do. What charges could they have charged you with? Let's hear from the Government what they are so I can take her through.
MR. FELDMAN: Your Honor, the other issue is --





THE COURT: Can you answer that question before you move on to another issue? Is there information about a charge that could have been levied against Ms. Johnson prior to the application that was not disclosed to defense?
MR. DUNN: We discussed this yesterday, your Honor. One; the potential charges. And it can be, I'm fairly sure that can also be brought through the RICO statute as a predicate offense. But bank fraud, mail fraud, and wire fraud affecting a financial institution, which would be a 10 year statute of limitations. So this, you know --
MR. FROCCARO: What financial -- I apologize, Judge. What financial institution?
THE COURT: Mr. Froccaro, just let him finish, please.
MR. DUNN: So the longer statute of limitations, whether it's directly through the mail or wire or bank fraud statues or RICO is what prompted Mr. Durant to insist on the immunity order. And, as Mr. Feldman said, and, as I think I've already said several times this morning, it is self-evident that we did not charge Ms. Johnson in, I believe, 2020, when we initially -- and it was not me, I did not initially indict the case. But when the department first indicted Sean Novis and Gary Denkberg. She was not charged. And those are -- that is for the reasons that Mr. Feldman expressed, concerning prosecutorial discretion and those sorts





of decisions. So I am at a loss to understand how the defense does not have the information they need to conduct whatever cross examination. None of that is Brady at this point.
THE COURT: I just want to note one thing. Is that I did, at the February 4, 2025, conference with the parties prior to granted this motion, I did ask for the defense position. At that time, I remember Mr. Froccaro you said something to the effect of I don't think I have a basis to oppose this motion, given the statute language. At that time, you did not raise a concern that the Government's decision to move the Court for an order compelling her to testify under a grant of immunity signaled a lack of disclosure of Brady information.
MR. FROCCARO: I didn't know I have standing. I have no authority to challenge that. I didn't know I would have standing.
THE COURT: I'm making clear that, at that time, it didn't raise alarm bells at that time.
MR. FROCCARO: It's DC based. I can always move your Honor to exclude evidence under 403 that should not come in, or under relevancy. I can't prevent them from making a motion.
THE COURT: That's fair. I'm just simply noting that I raised it with the parties just to get a sense of whether there would be concerns in some way. And at that





time, they didn't arise. I understand they have since arisen. And that you raise a 403 issue, which I ruled on. I also, on that note, just want to mention that with respect to Mr. Edelstein, your arguments about United States versus Runner, I don't think that decision changes my ruling. It does not change my ruling because, as I mentioned, my ruling is based on the fact that regardless of whether or not the Government would like to impeach Ms. Johnson, the Government does have the right to do that under Rule 607. And, more importantly, Ms. Johnson's credibility is important for the jury to assess. And the fact that her testimony is being made pursuant to a grant of immunity. Included in a that evaluation. So I'm sorry I didn't note that earlier I wanted to add that additional analysis.
I need the parties to meet and confer on this. Because, Mr. Froccaro, I'm hearing that you believe there is some kind of Brady material that the Government has not provided in light of the grant of immunity from Ms. Johnson. I'm hearing from the Government that they insist that no such material exists and that -- of Mr. Durant, who is not present here today. I did ask the Government to let me know if he was going to be here today in case an issue like this arose, and he is not here.
MR. FROCCARO: Judge, I just don't understand the bank statute, honestly. While they're sitting here, my

credibility, your Honor, is very important. I always try with every federal judge, and I like to think that my representation is good. They're giving you three separate scenarios. He said five years yesterday, money laundering. Then we came up with RICO Mr. Feldman said. Now we're at bank fraud. I want a list of what crimes she could probably be charged with because I can't rely on her for that. If she gives the answer well, I don't know. Well, what, am I stuck with that? I need to know what benefit she received and why she needed immunity from them. What is her exposure? I can't just rely on her answer. That's not how Brady works.

THE COURT: But if the reality is that it's the insistence of her counsel in an abundance of caution, that's the reality.

MR. FROCCARO: But you need a good faith basis. They gave her a benefit that she had no good faith basis to assert the Fifth. That's a benefit and a real big benefit.

THE COURT: But that was an issue that should have been raised earlier because I already issued the order compelling her to testify, and I had the motion which indicated, and I have it right here, that it was the judgment of the undersigned that the witness is likely to refuse to testify on the basis of her privilege against self-incrimination. That's the Government's representation in their motion. I had no opposition or concern on the other





side, so I granted the order.

MR. FROCCARO: But, again, I'm doing it now because I --

THE COURT: So you want me to take back my order compelling to testify? Is that what you want?

MR. FROCCARO: I'm sorry, Judge?

THE COURT: You want me to take back my order compelling her to testify?

(Continued on the next page.)





(Continuing.)

MR. FROCCARO: No. Listen I wish you could, but no, I'm not -- honestly, does she have a good faith basis? Yeah. I really think it could, but I don't know that I have a standing to ask Your Honor to do that.

In order to assert, she needs a good faith basis. They should be required to say, what benefit is she getting, what exposure does she have, why the immunity grant was given.

THE COURT: What case law are you relying on for this?

MR. FROCCARO: Judge, I've never heard of the things that have gone on so far in this case. I can't tell you a case off the top of my head, but they should know what benefits -- what hasn't she been charged with to this point she needs an immunity order? It's simple on their end. Her lawyer -- it's not up to her lawyer. It's up to them. The lawyer doesn't make prosecuting decisions. As far as I know, in all my experience, it's the prosecutors. They shouldn't have given her immunity if there's nothing they're exposed to, but they did so it will color her testimony like she's being much more credible.

But what charge is she not being charged with? That's the key.





THE COURT: I heard you, Mr. Froccaro, and I believe I'm going to take a recess so the parties can meet and confer on this.

MR. FELDMAN: Can we just raise one very short unrelated issue just to put it on the record? It's totally unrelated to this, Your Honor. It won't take very long, but just to avoid delay.

THE COURT: We've already gotten delayed. It's 10:30 and my jury is not here, so the delay has happened.

MR. FELDMAN: This is completely unrelated, but one of the postal inspectors found a printed out filing in the public parking lot in connection with this case. It was ECF number 136. I have a copy of the actual filing. It had some handwritten notes on it. It was no member of the Government's teams handwriting. We conferred with defense counsel and it seems that this morning, Mr. Edelstein might have had a paper blow away.

They recovered something identified as his handwriting. We asked them whether they think there is any issue, whether the Court needs to voir dire the members of the jury to make sure that they haven't seen it. It's my understanding they're not requesting that, but I will let the Court inquire, and the Government defers to the Court and defense counsel on how to handle the issue.

I think there's a very small chance, perhaps very close to none at all, that anyone saw it, but I defer to the Court and defense counsel.

THE COURT: Okay. Thank you.

MR. FROCCARO: John got here at 8:30. I don't think any jurors were here. It was an accident.

MR. EDELSTEIN: When I was getting out of my car this morning, it was windy. Some papers blew away. I thought I retrieved all of them. Evidently there was one that blew further away that I missed.

That was -- I definitely recognized my handwriting on what the postal inspector recovered. There are a couple of handwritten notes which are very cryptic which refer basically to page numbers which are not privileged. They're not strategic. They do not reveal any work product. I don't think that there is even the -- a slight chance that any juror would have seen it.

If the Court, in an excess of caution, wants to ask the jurors --

MR. FROCCARO: We don't need to ask the jurors.

MR. EDELSTEIN: Okay. Then we don't. I agree with Mr. Froccaro. We don't request that.

THE COURT: I understand you don't request it. I would still like to see the document.

MR. FELDMAN: May I approach?





THE COURT: Yes.

I am going to poll the jurors to see whether they have seen this.

I agree with you, Mr. Edelstein. It's not clear to me that this includes privileged information necessarily, but it does include juror names and numbers, and circles and Xs, so in an abundance of caution, I will poll the jury and see if any individuals saw this even though it may be unlikely.

Okay. Thank you for raising that. A couple more things before I let the parties meet and confer.

I noted that yesterday the parties were discussing a proposed limited instruction on testimony or evidence concerning pre-indictment conduct.

Did the parties reach an agreement there?

MR. DUNN: I believe so, Your Honor.

May I approach with a copy?

THE COURT: Yes.

The paper I'm handing to the courtroom deputy, Your Honor, has a defense proposal and a Government proposal; however, the parties have agreed that the Government proposal is appropriate.

THE COURT: Okay.

MR. DUNN: So that reflects our agreement. If the Court wishes to confirm with defense counsel.





THE COURT: Mr. Froccaro?

MR. FROCCARO: I thought we both agreed on it. I don't understand his last comment. I thought we both agreed subject to preserving our rights on the underlying issue.

THE COURT: Exactly.

MR. EDELSTEIN: Your Honor, the Government's proposed language is acceptable to us without prejudice to, without waiving, without abandoning and subject to our prior objections to pre-2015 evidence at all.

THE COURT: Understood.

MR. EDELSTEIN: We still maintain those objections.

THE COURT: I understand. Thank you for making the record clear, and I appreciate that the parties reached an agreement here. Thank you so much.

On the procedures that we're following for seeking admission of evidence and publication to the jury, things are getting a little messy and I'm worried that something is going to be published inadvertently because for the mechanisms of how it's happening. I just want to make clear what the standard mechanism is.

There are a lot of documents for which Mr. Froccaro does not have an objection and they fall within Exhibit Number 110. When we reconvene with the





jury, to streamline things, I suggest that the parties make sure that they know which exhibits are going to be used and that the Government move for admission of those exhibits. I grant it. It's done super clean. And then you can simply say, ask for permission to publish exhibit number X, I will grant it, and then either the Government's paralegal, or Mr. Morabito, depending on which twice is being used, will then publish it for the jury.

There have been a couple instances where nothing has been incorrectly published, but it wasn't clear who was doing the publishing because there wasn't a formal request to me to publish the document and that is done just to make sure that I see exactly what's going to be published before it's actually published to the jury.

Is that clear?

MR. DUNN: Yes, Your Honor.

THE COURT: Thank you.

Mr. Froccaro, does that make sense?

MR. FROCCARO: Yes, Judge.

THE COURT: Thank you so much.

I just want to streamline that.

And I'm happy for the parties, to the extent you reach agreement on these exhibits, just start the trial day with all the exhibits you want admitted, we will just

admit them all, and then you don't have to ask for permission sequentially. It will be much more smooth.

Okay. And then I understand that there's going to be a video deposition shown today of Ms. Teshale, so the Government and defense need to ensure that those exhibits that were used in that deposition were admitted before we do that, and I will have a limiting instruction on the deposition that I need to give as well.

We've taken care of everything other than Cathy Johnson.

I'm going to give you a 10-minute break to meet and confer and determine what a potential solution to this will be. If you can't come up with a solution, I will come up with a solution.

Thank you all so much.

(A recess in the proceedings was taken.)

THE COURT: Thank you, everyone. Please have a seat.

MR. FROCCARO: Judge, I have great news.

THE COURT: Okay.

MR. FROCCARO: We met, conferred, and agreed.

THE COURT: Wow. See, sometimes you just need a couple minutes.

MR. FROCCARO: Miracles do happen.

THE COURT: What have you agreed upon,





Mr. Froccaro?

MR. FROCCARO: In essence -- and I don't know if Jason wants to take the thunder on this one, but the bottom line is -- is it we're doing a stipulation today? You take it.

MR. FELDMAN: Your Honor, we're going to come up with words for a stipulation to address Mr. Froccaro's concerns that he can then read to, in the presence of the jury, either before his cross-examination of Ms. Johnson or after his cross-examination of Ms. Johnson, whenever he wants, so we are going to come up with the exact wording during the lunch break that we agree on and we will come back and give it to the Court.

It will essentially be a stipulation indicating that Ms. Johnson was not charged with mail and wire fraud and that she, at this point, at the point of her testimony, could not be charged with mail and wire fraud, I believe is the essence of the stipulation.

MR. FROCCARO: That's the essence. That's great.

THE COURT: Okay.

MR. FELDMAN: I should add, defense counsel has represented, as a condition of the stipulation, there's going to be no argument during closing that the Government simply provided Ms. Johnson with immunity for the sole





purpose of bolstering her testimony.

MR. FROCCARO: Absolutely.

THE COURT: Okay. Understood. Thank you so much.

So the parties had also raised before me the process for my instruction of Ms. Johnson, so here is how we will proceed.

We'll call Ms. Johnson in outside the presence of the jury, she'll take the stand, and I will just lay out for her the procedural history. The Government moved me for an order compelling her to testify based on a -- actually, why don't I just tell you exactly what I plan to say to her.

So here is what my instruction would be to Cathy Johnson:

In late January I received a motion from the Government and a proposed order pursuant to 18 United States Code, Sections 6002 and 6003 regarding the Government's decision to call you to testify as a witness in this criminal trial against Mr. Philip Priolo.

It is the position of the United States Attorney that your testimony or other information is necessary to the public interest. I am satisfied that the Government made an appropriate showing that you are likely to refuse to testimony or to provide other information on the basis





of your privilege against self-incrimination. For that reason, I approved the Government's request to issue an order compelling you to testify and granting you immunity from prosecution. I therefore order that you testify and provide other information that you would otherwise refuse to provide based on your privilege against self-incrimination as to all matters about which you are questioned at this trial and in any pertaining ancillary to this trial.

I also order that no testimony or other information you are compelled to give under my order or any information directly or indirectly derived from that testimony may be used against you in a criminal case, except it may be used against you in a prosecution for perjury, giving a false statement, obstruction of justice, or otherwise failing to comply with my order.

That is what I plan to instruct her and then to ask whether she has consulted with her counsel about the order that I issued compelling her to testify, and I would also ask to ensure that she understands that if she refuses to answer my questions, she could be held in contempt and put in jail and that I will also ask her whether she plans to comply with my order.

So this is what I will question her about outside the presence of the jury. Outside the presence of

the jury.

Any questions or concerns from the Government?

MR. DUNN: No, Your Honor.

THE COURT: Mr. Froccaro?

MR. FROCCARO: No, Judge.

THE COURT: Now, she would then leave the courtroom and then when the jury comes in, she would come back in just like any other witness, as they have been, and I will then provide this instruction to the jury:

We will now hear the testimony of a witness who will testify under a granted immunity from this court after invoking her constitutional right against self-incrimination. What this means is that testimony of the witness may not be used against her in a criminal case except in a prosecution for perjury, making a false statement, obstruction of justice, or otherwise failing to comply with the immunity order. Under the law, Congress has granted the right to request that a witness be prepared to testify after exercising her right against self-incrimination. I issued an order compelling the witness to testify and granting her immunity from prosecution at the request of the lawyers for the Government.

Now, is there any further -- first, any concerns with that instruction? Anything further that the parties





suggest that I say to the jury?

MR. DUNN: Nothing from the Government, Your Honor.

THE COURT: I will say that based on the *Lizza* decision, which I cited to you earlier, I could also indicate I'm instructing you as a matter of law that you may not consider Ms. Johnson's testimony under a grant of immunity against the defendant, Mr. Priolo. This information is provided to you in order to assess her credibility. The fact that she is testifying under a grant of immunity does not indicate that she has done anything wrong.

I got that language from the *Lizza* decision. I am not wedded to it. I simply --

MR. FROCCARO: I love that. That's perfect.

THE COURT: -- and it's similar to what the Court did in *Lizza*.

MR. FROCCARO: That's fine, Your Honor.

MR. DUNN: The Government has no objection to such an instruction.

THE COURT: Okay. And the defense like it, so there we go. That is what I will say.

Okay. So our remote witness has been waiting for some time. Let's call in the jury and we will start with our next remote witness.





THE COURTROOM DEPUTY: Can I patch in the remote witness before we bring the jury in?

THE COURT: Yes.

(A recess in the proceedings was taken.)

THE COURTROOM DEPUTY: Are you going to be utilizing the document camera first or the laptop?

MS. ENTWISTLE: We're going to be using the laptop first. I believe then just on cross Mr. Froccaro will be using the document camera.

THE COURTROOM DEPUTY: Okay.

MS. ENTWISTLE: I have one document just to refresh recollection that will be handed to her in paper, but Mr. Froccaro has a copy.

MR. FROCCARO: Yes. Whatever you are introducing, I have no objection.

MS. ENTWISTLE: Remind me, Bryan, we can't display things just for the witness on video; is that right?

MR. FROCCARO: You don't have to, I'm not going to object, so why?

MS. ENTWISTLE: Agreed. I was just confirming, because I don't -- I could have a copy of that for the Court.

THE COURTROOM DEPUTY: We're unable to display stuff privately to the witness on Zoom.





MS. ENTWISTLE: Of course. If the Court would like a copy of the document I'm going to show Ms. Montilla, it's a piece of her Jencks, but I will give that number so that you will have it for the one document I will show her to refresh recollection.

THE COURT: And it should be in my binder, my Jencks binder.

MS. ENTWISTLE: It should be in your binder, exactly. It is in the Jencks binder, or I have a paper copy here, 3500-MM -- I'm just making sure I have the right document. Oh, these are as one document. Okay. It's MM6. It's also marked -- I apologize -- as Government Exhibit 56. We will not be seeking to admit it. I will just be showing it to her to refresh recollection.

THE COURT: Understood.

MS. ENTWISTLE: And she has paper in person.

THE COURT: Ms. Entwistle, what is the name of our Government witness?

MS. ENTWISTLE: Marlene Montilla.

THE COURTROOM DEPUTY: Please rise for the jury.

(Jury enters.)

THE COURT: You may all be seated.

Jurors, good morning. Thank you for coming on time and then waiting patiently while we resolved some

issues so that you could wait in the jury deliberation room rather than being inconvenienced here.

We are going to start with a number of things. We have our witness for the Government who is testifying remotely, and then we have a number of witnesses who will testify before you live.

Before we do those things, I need to ask you some questions.

A certain document that is a court filing in this case was inadvertently blown by the wind into the parking lot of our courthouse sometime around 8:00 or 8:30 this morning. It may be that this happened so early in the morning that none of you were close enough to come across it and read it, but I need to be 100 percent sure that none of you saw this document or read it because it contains information about this case. And, as you know and I've instructed you, your deliberations and your verdict must be based only on what you see and hear and read in this courtroom, what has been admitted as evidence in this case, and this piece of paper does not concern evidence in this case. It looks like a letter that was filed with the Court, and at the top of it it indicates that it was filed by the United States Department of Justice, which, as you know, is representing a party in this action.





So I'm going to ask each of you -- this is a three-page document, single sided. It has some handwriting on the front and some handwriting on the very back of the third page. I'm going to ask each of you one by one whether you came across this document, this three-page document, which is a letter filed by the Government in this case this morning in the parking lot any time before you arrived in this building. And if you did come across this document, whether you read this document. If you did not, please confirm and just state, I did not see this document. I did not read this document.

So I will start with Juror Number 1.

JUROR NUMBER 1: I did not see it or I did not read it.

THE COURT: Thank you so much.

Juror Number 2.

JUROR NUMBER 2: Did not see it. Did not read it.

THE COURT: Juror Number 3.

JUROR NUMBER 3: Did not see it. Did not read it.

THE COURT: Juror Number 4.

JUROR NUMBER 4: Did not see. Did not read.





THE COURT: Juror Number 5.

JUROR NUMBER 5: Did not see or read it.

THE COURT: Juror Number 6.

JUROR NUMBER 6: Did not see it or read it.

THE COURT: Juror Number 7.

JUROR NUMBER 7: Did not see it. Did not read it.

THE COURT: Juror Number 8.

JUROR NUMBER 8: Didn't see it or read it.

THE COURT: Juror Number 9.

JUROR NUMBER 9: Didn't see it or read it.

THE COURT: Juror Number 10.

JUROR NUMBER 10: Didn't see it. Didn't read it.

THE COURT: Juror Number 11.

JUROR NUMBER 11: Did not see it or read it.

THE COURT: Juror Number 12.

JUROR NUMBER 12: Did not see it or read it.

THE COURT: Juror Number 13.

JUROR NUMBER 13: Did not see it. Did not read it.

THE COURT: Juror Number 14.

JUROR NUMBER 14: Did not see it. Did not read it.

THE COURT: Juror Number 15.





JUROR NUMBER 15: Did not see it or read it.

THE COURT: Juror Number 16.

JUROR NUMBER 16: Did not see it. Did not read it.

THE COURT: Thank you all very much.

With that, we will turn to testimony by the Government's first witness of the day and she will be testifying remotely.

Thank you, Ms. Entwistle.

MS. ENTWISTLE: Thank you, Your Honor.

The Government calls Ms. Marlene Montilla.

THE COURTROOM DEPUTY: Good morning.

If the witness could please stand and raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Please state and spell your name for the record and have a seat.

THE WITNESS: Marlene Montilla, M-A-R-L-E-N-E, M-O-N-T-I-L-L-A.

MARLENE MONTILLA,

called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ENTWISTLE:

**Q.** Good morning, Ms. Montilla.

Can you hear me all right?
A. Yes, I can.
Q. All right. Thank you.
What city and state do you live in?
A. Alexandria, Virginia.
Q. Are you speaking with us now from Virginia?
A. Yes.
Q. And how old are you, Ms. Montilla?
A. I'm 82.
Q. And who are your immediate family members, Ms. Montilla?
A. My husband recently passed. I have three daughters: Fida in Denver; Maria in Saskatchewan, Canada; and Nora in Berryville, Virginia.
Q. I'm so sorry for your loss regarding your husband.
How long were you and your husband married?
A. Almost 60 years.
Q. And what was your husband's name?
A. Art.
Q. And, Ms. Montilla, what did you do for a living before you retired?
A. I worked for the Government.
Q. And what did you do in that position?
A. I worked for the Naval Air Systems Command for DOD.
Q. And what did your husband do for work before he





retired?
A. He handled communications and two systems and electronics for Alexandria Hospital.
Q. And when did your husband retire?
A. At the end of 1999.
Q. How did your husband spend his time once he retired?
A. He was at home alone. He watched TV and gardened some and also lived every day for the mail to come.
Q. All right. Ms. Montilla, I'm going to direct your attention to the 2015/2016 time period.
At some point, did you become concerned about mailings he was receiving?
A. Yes, I did.
Q. And what were your concerned about those mailings?
A. I began to see that there were a lot of envelopes and a lot of mail that he was getting. And as he would write checks and put them in envelopes and mail them from home and I didn't really know what he was getting until I was doing the taxes and I asked him for his -- his checkbooks. And I -- so I got the checkbooks and went through them. There were a lot of checks that he had written for 10 or 20 and $25 and such to places with three letters names on the -- on the "to" line. So I asked him what those were and I became concerned.
Q. And what did your husband tell you when you asked him





what those were?
A. Well, he said they were offering him prizes, and he would show them -- he did show them to me after I asked him about them, and I didn't pay a lot of attention to it because I didn't realize that he was answering all of them.
Q. And, Ms. Montilla, I'm going to show you one document. This is Government's Exhibit 2 which has been previously admitted.
MS. ENTWISTLE: Would you display pages 1 and 3 in split screen.
THE COURT: Those may be published for the jury.
If you can just ask me in advance.
MS. ENTWISTLE: Thank you, Your Honor. That was my next question once they were up. Thank you.
THE COURT: When they go up, we don't publish them for the jury. They can't get published until I actually say "granted." You can actually have them shown just to the Court and counsel first.
MS. ENTWISTLE: Yes, just for the Court and counsel.
THE COURT: And then once I grant publication, then they get published for the jury.
MS. ENTWISTLE: Thank you.
If you could display pages 1 and 3.





Permission to publish, Your Honor?
THE COURT: Yes.
MS. ENTWISTLE: Thank you.
(Exhibit published.)
BY MS. ENTWISTLE:
Q. Ms. Montilla, have you -- do you remember seeing this document but addressed to your husband? It has a different name and address. But do you remember seeing this specific document as something that your husband received?
A. No, I don't remember specifically. He received so many that I can't remember them now.
Q. But looking at this document, does this look like the type of letters that we were just discussing?
A. Yes.
Q. And what about this letter looks similar to the letters that you remember seeing?
A. Well, they were always things like authority and awardable and words like that that enhanced that he was going to win some money.
MS. ENTWISTLE: We can take down that exhibit.
Thank you.
Q. So did your husband send money in response to these mailings, Ms. Montilla?
A. He -- he sent money to, I think, almost all of them.

Q. And how do you know that about how many payments he sent?
A. I didn't know until I was doing the taxes and I saw all of these checks -- copies of his checks. He began to receive notifications from the bank that he was overdrawn.
Q. Did you speak to your husband about the number of checks that he was writing?
A. Oh, yes, many times.
Q. And what was his response to you?
A. Well, he told me he sent 10 and 20 or $25. It's just to keep the possibility of winning all this money. He was using social security checks in order to write these.
Q. And, Ms. Montilla, what other steps did you take to speak with your husband about the number of checks that he was writing in that time period?
A. I put together a listing of all of the ones that I could find from his checks books for a year. I did not have the check list, but I did from January to January -- I think it was 2015 -- in order to show him what he was writing and how much money was going out the door and that he was -- he was not winning anything, but he was still responding to -- to these letters that were coming in. Some days he got eight or ten letters.
Q. And, Ms. Montilla, looking at those checkbooks, you were looking at the carbon copies of your husband's





checks?
A. Yes. I made him get checkbooks. As a matter of fact, I was the one who was getting his checks. He thought he couldn't do that, so I always made sure we got ones with the carbon behind them.
Q. Could you repeat that last answer? I just didn't hear the last word you said.
A. We -- I -- when I got his checks for him, I always ordered the kind that had the carbon behind them so that we could go back and look he needed to find a check or something.
Q. And, Ms. Montilla, when you created this list you were just describing, how did you identify which checks you were going to put on the list?
A. I went through every checkbook and wrote them down and -- and wrote how much they were for and then put together a listing, that five page listing that I provided.
Q. When you were looking at the carbon copies of the checks, how did you identify which checks you were concerned about and which checks you were not concerned about?
A. Well, sometimes he would put donation on the bottom left hand corner, but he didn't necessarily know that these were not, in fact, donations, so I just had to look





at every one.
Q. Okay. Ms. Montilla, and as you sit here today, do you remember every check that your husband wrote in response to one of these letters in 2015 from memory?
A. Oh, my goodness, no.
Q. But at the time you wrote the list that we just had been talking about, was that information fresh in your mind?
A. Yes. It was fresh in my mind at the time. I was talking to him and trying to convince him that he shouldn't be doing this; that he was wasting money; that he was never going to get anything from these people; that it was -- that he was -- he wasn't working outside as much anymore. He was sitting inside and the mail was his pleasure of the day.
Q. And, Ms. Montilla, I'm going to ask the person in the room with you to hand you what has been previously marked as Government's Exhibit 56 just for you to look through it.
Can you just look through the five pages of that document?
A. Yes.
Q. And is this --
A. I remember this.
Q. Is this the list you were speaking about a few





moments ago?
A. Yes.
Q. And this is a list that you created in 2016; is that correct?
A. Yes.
Q. Okay. And Ms. Montilla, for the record, I'm just going to ask you about a few specific payments and if you see them reflected on this record, and I'm going to go in alphabetical order.
Do you see payments in this record you created to the entity AAA?
A. Yes. There were two checks -- I'm sorry. Two checks for $24 each.
Q. And, Ms. Montilla, do you see a payment to GDM?
A. Yes, I do. There were two checks for $22 each.
Q. Ms. Montilla, do you see a record of checks to NPB?
A. Yes. There were two for $26 each.
Q. And do you see records of payments to NPF?
A. Yes. There were five checks for $20 each.
Q. And do you see payments to NRS?
A. NRR?
Q. N, as in "Nancy," R as in "Roger," S, as in "Sam."
A. Yes. There's one for $47 and one for $20.
Q. And I just want to make sure we're looking at the same thing. N, as in "Nancy," R, as in "Roger," S, as in

"Sam."
A. No, I'm not seeing that.
Oh, oh, I'm sorry. Yes, there's one NRS for $30.
Q. Thank you.
And just one more.
Do you see a payment for WCS?
A. Yes. There's one for $26.
Q. And Ms. Montilla, did you speak to your husband about this list you had created?
A. Yes. Several times, actually.
Q. And --
A. It did not -- it didn't have the impact that I hoped it would.
Q. And did he say anything to you after seeing this list about his beliefs regarding these letters he had been receiving?
A. I don't remember that we talked about it at that time, but he didn't have much of a memory even then, so we talked about it multiple times.
Q. And you mentioned your husband's memory.
Was your husband ever diagnosed with dementia, Ms. Montilla?
A. Yes. He was diagnosed in 2016. I knew something was going on prior to that, but he was -- he would -- when I





came home in the afternoon, he would want to talk, so we would talk about things that happened years ago, when we met in Vietnam, or when our children were born and things. Nothing that was ever current day; it was based on a long time ago.
Q. And this was during the time period that your husband was receiving the letters we have been discussing?
A. Yes.
Q. And, Ms. Montilla, did you make any attempts to stop these mailings from reaching your husband?
A. Yes. I wrote multiple letters to the companies that sent these things to him and explained that he had memory problems; that he had dementia, please take him off of your list. And few days or a few weeks later, I would get another one, or I would see another one from the same place, but they would have changed the post office box number or something, because it was 800 the first time, second time it was 801. So they just came -- they just came constantly.
Q. Ms. Montilla, after you sent those types of letters, or -- at any point --
MS. ENTWISTLE: Let me ask a different question.
BY MS. ENTWISTLE:
Q. At any point, Ms. Montilla, did your husband stop receiving these types of letters we've been talking about?





A. Probably four or five years later.
Q. Four or five years later --
A. Yes, after this time, it was -- and but he had been, as I said, diagnosed with dementia in 2016. I started watching -- I was -- I was trying to get my hands on the mail whenever I could, and I began to recognize all the envelopes and such and I would set them aside because I knew he would just write another check for them.
Q. Did you ever seek a refund from any of the companies sending these mailings?
A. No.
Q. And, Ms. Montilla, did your husband ever win a large cash prize?
A. No.
MS. ENTWISTLE: Thank you, Ms. Montilla. I don't have any further questions for you.
THE COURT: Mr. Froccaro, your witness.
MR. FROCCARO: Yes, one sec, Judge.
(Pause.)
CROSS-EXAMINATION
BY MR. FROCCARO:
Q. Hi, Ms. -- is it Montilla or Montilla?
A. Montilla.
Q. Ms. Montilla, my name is James Froccaro, and I represent Mr. Philip Priolo. It's nice to meet you,





ma'am.
A. It's nice to meet you.
Q. For starters, Ms. Montilla, Ms. Entwistle had asked you to go over a bunch of checks that were written to various three-letter acronyms.
Do you recall that, madame?
A. Yes.
Q. Those checks in the memo portion all said reports; correct?
A. Yeah. I called those reports when I wrote the -- because I was trying to make it make sense to him.
Q. In the memo portions, it said report fee; correct?
A. I'm sorry, I don't understand.
Q. I'm asking -- you identify it as checks for reports when you made this list up for the Government.
Why did you put checks --
A. No, I didn't make it up for the Government. I made it up for my husband. I was trying to keep -- show him what he was doing; that he was wasting his money, and I was the one who gave it the title reports --
Q. And where did you --
A. -- because I was trying to make it make sense to him.
Q. The checks for reports, it said reports, where did you get that from, the word "reports"? It was on the checks that he wrote out; correct?

A. No. It was not on the checks. The checks said donation on the bottom line or it didn't say anything.
Q. Okay, ma'am. One second.
(Pause.)
BY MR. FROCCARO:
Q. Ms. Montilla, during the 2015 to 2016 time frame, your husband was suffering from dementia, yes?
A. Yes, that's right. Actually he had been suffering from it for a number of years, but I didn't know what was going on until he was actually diagnosed in 2016.
Q. Ms. Montilla, during that time frame, and -- it didn't matter to your husband whether the mailing he received said, this is a sweepstakes, this is an opportunity, this is a gift, this is a whatever, he got it, he opened it up, and if it said send money, he would do that; correct?
A. Yes.
Q. I'm going to be putting something --
MR. FROCCARO: Judge, what do I do, I put it on the ELMO?
THE COURT: Is this already admitted?
MR. FROCCARO: Yes, it is, Judge. Government Exhibit 2.
THE COURT: Yes, go ahead and put it on the ELMO and Mr. Morabito can publish it to the jury.





Go ahead, Mr. Morabito, you can publish that.
(Exhibit published.)
MR. FROCCARO: Wait. Do I still get to see her, Judge?
THE COURTROOM DEPUTY: Yes. Hold on, please. It's a little finicky.
BY MR. FROCCARO:
Q. Ms. Montilla, can you see that document, madame?
A. Yes, I can.
Q. At the top where it says consumer information?
A. Yes.
Q. This was on the back of the document. And if I could just show you the front quickly.
MR. FROCCARO: Can I do that?
THE COURT: Yes, go ahead.
BY MR. FROCCARO:
Q. This was the document she showed you a few moments ago?
A. Yes.
Q. This was the front of it. This is the back of it. If you can take a look at it and if you don't mind, just reading it to yourself, madame, or you can read it out loud, whatever your preference is, madame.
A. You want me to read this out loud?
Q. For starters, if you could. If you can stop after, I





believe, the third sentence. I won't make you go any further, if that's okay, madame.
A. NRS is a research and reporting service. We specialize in researching sweepstakes sponsored and conducted by corporate organizations with which NRS is completely unaffiliated. We compile these sweepstakes opportunities in a report which sets forth all no purchase entry requirements based on existing federal, state, and local regulations. You have not won any money or prize. NRS is not liable for any entries made or attempted by readers of its report --
Q. You can stop there, ma'am. You can stop.
Thank you, Ms. Montilla.
Now, you've seen this consumer information document before; correct, ma'am?
A. Yes, I have, and I -- I took it and marked it in yellow, things for him to read; that you haven't won anything. I tried to explain it to him. I showed it to him many times. Actually, I had a copy of it that I kept with my file and stuff that I was trying to get him off of the -- off the mailing list with.
Q. Ma'am, when you saw it, you repeatedly showed your husband that it said you didn't win something; that it was a means for him to apply to win something; right, Ms. Montilla? That's what you told your husband; correct?





A. Say it again. I told him what?
Q. I will say it slow, ma'am.
You told him when you saw it, you repeatedly showed your husband that it said you didn't win something; that it was a means for him to apply to win something.
That's what you told him, correct, ma'am? Yes or no.
A. I told him that. I also went online to the scams and such things and printed off things and highlighted in yellow to show him that what he was doing was not going to win him any money.
Q. Ma'am, so you told him -- you already said that you repeatedly showed your husband that it said you didn't win something; that it was a means for him to apply to win something. That's what you told him; correct?
A. Yes, basically.
Q. And you've previously made that statement under oath.
Do you recall that madame? Yes or no.
A. No. No, I don't, but I probably did.
MR. FROCCARO: If I could just ask, if we can refer to 3500 MM8 at page -- give me one second.
(Pause.)
MR. FROCCARO: Pages 567 and 568.
If the person with her can have her look at it, please.

BY MR. FROCCARO:
Q. If you can just look at this document, madame, to see if it refreshes your recollection that you previously made that precise statement under oath.
Is somebody going to show it to her there?
(Continued on the following page.)





(Continuing.)
MS. ENTWISTLE: I'm just asking for the person assisting Ms. Montilla, if you could show her the document defense counsel's requesting? You have that in paper.
Mr. Froccaro, would you say the name of it one more time?
MR. FROCCARO: Yes. It's 3500, MM8 and it's on page 568, lines one through four.
BY MR. FROCCARO:
Q. Just look at it, madam --
A. Yes. Yes. I'm looking at it.
Q. So you did say that under oath, correct?
A. Yes.
Q. Okay. My last question -- and I just have one last question -- when you said that under oath, these two prosecutors, Mr. Dunn and Ms. Entwistle, were in there listening to you when you said that, correct? Do you recall that.
A. I assume so. I don't know. I don't recall it.
Q. Well, do you recall who the prosecutor was that was asking you questions during that proceeding?
A. Yes.
Q. Who? Were Mr. Dunn and Ms. Entwistle there? They were, right, madam?
A. Yes. I'm sorry. I can't understand you.





Q. Ma'am --
A. Would you repeat that?
Q. I'm sorry. I'll try to be slow.
You made that statement under oath. When you made that statement under oath, Ms. Entwistle and Mr. Dunn were present listening to you while you said it, correct? They were in there?
A. I'm assuming so.
Q. What?
A. I'm assuming so.
I had these conversations with my husband numerous times over five or six years. I don't remember specific ones. But I would tell you that I know that I did this with him. I remember marking up the pages, and showing him that he was being ripped off.
Q. Ma'am, I'll try to -- I'll ask it another way.
The prosecutors here, Mr. Dunn, Ms. Entwistle, they knew that you told them that numerous times over the years that what he was paying for, the $20, he didn't win something, that it was a means for him to apply to win something. They knew that before they called you under oath here today, correct?
A. I assume. I have no way of knowing.
Q. Well --
THE COURT: Sidebar. I'm calling a sidebar.





(Sidebar.)
THE COURT: Mr. Froccaro, you're asking the witness what she knows about what Government prosecutors did or did not know? How is that admissible?
MR. FROCCARO: What.
THE COURT: You're asking her --
MR. FROCCARO: She said that in front of them.
THE COURT: That's a different question. The question you asked her, was you knew that the Government --
MR. FROCCARO: Oh, I didn't realize that. I thought I said, did you ever say that to them before.
THE COURT: No.
MR. FROCCARO: I apologize.
THE COURT: I'm going to strike the question.
MR. FROCCARO: Yeah. Okay. I'll ask another one.

(In open court.)
THE COURT: The last question and answer are stricken from the record.
BY MR. FROCCARO:
Q. Ms. Montilla, I apologize. I'm going to try to ask it a different way.
What you had been repeatedly telling your husband about, that he didn't win something with those documents, it was a means for him to apply to win something, that's something that you told these prosecutors before you testified here today, correct?
A. If it's written down, I'm assuming I said it.
Q. Thank you.
So the answer is yes to my question, they knew that before you were called as a witness here today? You told them that, correct?
A. I can only say I assume so.
THE COURT: I'm calling a sidebar.
MR. FROCCARO: I have no further questions.
THE COURT: Okay.
MR. FROCCARO: I have nothing else.
THE COURT: Ms. Entwistle, your witness for Redirect.
MS. ENTWISTLE: Thank you, Your Honor.
REDIRECT EXAMINATION





BY MS. ENTWISTLE:
Q. Ms. Montilla, just very briefly, when you testified in a prior proceeding as defense counsel was just referencing, were you on video just as you are today?
A. This is --
Q. You know what? Strike the question. It's not important. No need to answer the question, Ms. Montilla. I'll ask you a different question.
A. Okay.
THE COURT: Hold on one moment. We have lost the witness on the video screen. Hold on one moment, Ms. Entwistle.
COURTROOM DEPUTY: Can somebody take that document down, please? Thank you.
(Pause in proceedings.)
THE COURT: Okay. Go ahead.
MS. ENTWISTLE: Thank you.
BY MS. ENTWISTLE:
Q. Can you hear me, Ms. Montilla?
A. Yes, I can.
Q. All right. Just a few questions.
In your own words, when you would speak to your husband about the mailings that we've been discussing, what would you tell your husband about those mailings, about your view of the mailings?





A. I would tell him that these people were trying to get him to send them money. They were telling him that he was going to win money, that that was not the case. He would get checks from some places for $8,000 and things like that that he thought he needed to take to the bank immediately. He would get telephone calls --
Q. All right. And I'm not --
A. That are not these. I understand.
Q. But just briefly. I hate to interrupt you, Ms. Montilla. I just want to focus -- I'm only asking you about the mailings that we've been discussing. And I apologize --
A. I understand.
Q. -- for interrupting you.
So when you would read language like the consumer information that defense counsel showed you, what would you say to your husband generally? I realize these were multiple conversations, but what would you tell him about your beliefs about these mailings?
A. I would tell him that it says right here on the back that you haven't won anything yet. I would tell him -- I would highlight areas in yellow that I wanted him to read. But it didn't -- he didn't -- he didn't remember it. He didn't consider it something that he needed to worry about. He just wanted to write checks and send them out.





And I ended at one point in time having to go pay the bank 2,300-some dollars for checks that had bounced. And also got other people on the other end trying to get me to pay them because they were not able to cash the checks.
Q. And --
A. So this was not -- this was not a one-year thing. That's what we're talking about here, but I would do this for six, seven, eight years.
Q. Thank you, Ms. Montilla.
Did your husband ever tell you based on one of these mailings that he believes he had ordered a report of available sweepstakes he could enter?
A. Well, he got some -- at one point in time, he got several books about sweepstakes that he could enter. I remember it being a small amount -- not an 8-by-10 book, but a smaller book that talked about things that he could enter.
Q. And when you discussed these mailings that we've been discussing with your husband, what did he tell you about what he believed he would receive in response for his payment?
A. Well, he would tell me whatever they said in the letter. It said 82 -- or said 800,000 or whatever the letter said he was going to win.

Q. Whatever amount of money the letter said?
A. Yes.
MS. ENTWISTLE: Thank you for your time, Ms. Montilla. I have no further questions.
THE COURT: Mr. Froccaro?
MR. FROCCARO: I have nothing further, Judge.
THE COURT: Okay. Thank you very much, Ms. Montilla, for joining us by Zoom. We appreciate it. Take care.
THE WITNESS: Thank you.
THE COURT: Let's give just a minute for Mr. Morabito to clear out the AV, and then we will have the Government call its next witness.
I'm going to give the jury a break. We're going to take a very short break, probably only ten minutes, start to finish. Mr. Morabito will bring you back in when we're ready to proceed.
And as with all of our breaks, please do not speak with each other about the case, do any research or communicate with anyone who you know or through any means of communication, whether cellphone, media, electronic or otherwise about anything in this case or having to do with the case.
Please leave your notes in the jury room and stay in the jury room for this break. It will be fairly





short. Thank you so much.
(Jury exits.)
THE COURT: Everyone, please be seated.
The Government can now bring in Cathy Johnson.
MR. FROCCARO: Judge, I don't think --
MR. FELDMAN: I'm sorry. I think our next witness is going to be Ms. Lilienkamp.
THE COURT: Okay. You flipped the order. That's fine. I gave the jury a break because --
MR. FROCCARO: Are we allowed to take a break?
THE COURT: You are allowed to take a break, but I actually do want to have my conversation with Ms. Johnson. Is she available?
MR. FELDMAN: Yes, Your Honor.
THE COURT: I would like to do that now before we resume.
(Ms. Johnson enters the courtroom.)
THE COURT: Hello, Ms. Johnson.
THE WITNESS: Hi.
THE COURT: I'm Judge Choudhury, the judge presiding over this criminal case.
In late January -- oh, you need to be sworn in. Yes, you do.
(Witness sworn.)
COURTROOM DEPUTY: Please state and spell your





name for the record and have a seat.
THE WITNESS: Cathy Johnson, C-A-T-H-Y, J-O-H-N-S-O-N.
CATHY JOHNSON, having been duly sworn, testified on her oath as follows:
THE COURT: Thank you, Ms. Johnson.
In late January of this year, I received a motion from the Government and a proposed order pursuant to 18 United States Code, Sections 6002 and 6003 regarding the Government's decision to call you to testify as a witness in this criminal trial against Mr. Philip Priolo.
It is the position of the United States Attorney that your testimony or other information is necessary to the public interest. I was satisfied that the Government made an appropriate showing that you were likely to refuse to testify or to provide other information on the basis of your privilege against self-incrimination.
For that reason, I approved the Government's request to issue an order compelling to you testify and granting you immunity from prosecution. I entered that order and it is on the docket for this case.
I therefore order you to testify and provide other information that you would otherwise refuse to provide based on your privilege against self-incrimination as to all matters about which you are questioned at this





trial and in any proceeding ancillary to this trial.
I also order that no testimony or other information you are compelled to give under this order or any information directly or indirectly derived from that testimony may be used against you in a criminal case, except it may be used against you in a prosecution for perjury, giving a false statement, obstruction of justice or otherwise failing to comply with my order.
Ms. Johnson, have you consulted with your attorney, Mr. Mark Durant, about the order that I issued compelling you to testify?
THE WITNESS: Yes.
THE COURT: And do you understand that if you were to refuse to answer questions, you could be held in contempt and put in jail?
THE WITNESS: Yes.
THE COURT: You understand this?
THE WITNESS: Yes.
THE COURT: Do you plan to comply with this order?
THE WITNESS: Yes.
THE COURT: Okay.
Counsel, are you satisfied that Ms. Johnson understands that she's being granted immunity for her testimony during this proceeding?

MR .DUNN: Yes, your Honor.
THE COURT: Thank you.
Mr. Froccaro?
MR. FROCCARO: Yes.
THE COURT: Thank you.
Ms. Johnson, you can now step down. You will be asked to come back to the witness stand later today, but not right now. Thank you so much.
(Ms. Johnson exited the courtroom.)
THE COURT: So with that, counsel I'm granting a five-minute break, and I know you can do it in five because Mr. Froccaro did it in three yesterday.
MR. FROCCARO: Different circumstances.
(Pause in proceedings.)
THE COURT: Okay. Mr. Froccaro, Mr. Dunn, Ms. Entwistle, I want to check in about the schedule for the rest of the day because we have a shorter than normal day.
How much time is Ms. Lilienkamp projected to take?
MR. FELDMAN: Your Honor, you would estimate between an hour and an hour and-a-half.
THE COURT: Okay. So we will obviously start with her, and then I am planning on breaking for lunch at 1:00 rather than 12:30, given it's already noon, and then to have a shorter than normal lunch because we are ending





early at 3:15 today. I want to make sure that no counsel have no.
MR. FELDMAN: No objection from the Government.
MR. FROCCARO: To leaving early?
THE COURT: To having a shorter than normal lunch, so we can get through --
MR. FROCCARO: No objection.
THE COURT: So I'm going to keep lunch to 45 minutes starting at 1:00. We'll see if we're done with Ms. Lilienkamp by then, but I want to start Ms. Johnson today.
MR. FROCCARO: Okay. Of course.
THE COURT: Thank you.
MR. FELDMAN: And Your Honor, before we bring in the jury, we're going to make every effort to confer with counsel about exhibits, and I think we have been trying to do that.
Just for Ms. Lilienkamp -- then I'll proceed the way the Court advised and start by moving in several exhibits.
THE WITNESS: Exactly. Exactly.
Okay. Mr. Morabito?
(Jury enters.)
THE COURT: Mr. Feldman, you can call your next witness.





MR. FELDMAN: Thank you, Your Honor.
The Government calls Mary Lilienkamp.
COURTROOM DEPUTY: Before you take your seat, can you just please raise your right hand.
(Witness sworn.)
THE WITNESS: I do.
COURTROOM DEPUTY: Please state and spell your name for the record, and have a seat.
THE WITNESS: Mary Lilienkamp; M-A-R-Y, L-I-L-I-E-N-K-A-M-P.
THE COURT: Your witness.
MR. FELDMAN: Thank you, Your Honor.
And before I question Ms. Lilienkamp, the Government moves for admission of Exhibits 301 through 310, inclusive, as well as Exhibits 6, 6-0E, 21, 21-OE, and Exhibit 57.
MR. FROCCARO: No objection.
THE COURT: They're admitted. Thank you.
(Government Exhibits 301 through 310, 6, 6-OE, 21 21-EO, 57 were received in evidence.)
MARY LILIENKAMP, after having been duly sworn, testified on her oath as follows:
DIRECT EXAMINATION
BY MR. FELDMAN:
Q. I think it's afternoon, so good afternoon, Ms.





Lilienkamp.
A. Good afternoon.
Q. Would you do me a favor, just keep your voice up and pull that microphone a little bit closer to you? Thank you so much.
Ms. Lilienkamp, where are you from?
A. Port Jefferson Station.
Q. How long have you lived in the Long Island area?
A. Pretty much all my life.
Q. Where did you go to high school?
A. Connetquot.
Q. What do you do for a living?
A. Right now, I'm a senior VDP programmer.
Q. What is VDP stand for?
A. Variable data programmer.
Q. What is company name that you work for?
A. Walen.
Q. What are your duties there?
A. I'm a programmer. I set up letters.
Q. Is your current job in the direct mail industry?
A. Yes.
Q. How long in total have you worked in the direct mail industry?
A. Over 30 years.
Q. Did you work for a company by the Name of U. S. Web?

A. Yes.
Q. When you were working for U. S Web, did you come to know an individual named Sean Novis?
A. Yes, I did.
Q. Can you tell the jury how that came about?
A. He was a client at U. S. Web.
Q. What type of work did you do for Mr. Sean Novis?
A. Data processing work.
Q. And just so we're clear, what time period is this when you first started doing work at U. S. Web for Mr. Sean Novis?
A. Early 2000s.
Q. At some point, did you begin working directly for Sean Novis.
A. Yes.
Q. When was that about?
A. I believe it was in 2008.
Q. What work did you do for Mr. Sean Novis directly?
A. I did data processing for him.
Q. Do you remember the name of Mr. Sean Novis's company when you first joined in 2008.
A. I think it was DMCS, Inc.
Q. Do you -- what does that stand for?
A. I don't recall.
Q. Do you remember what was on the -- in big letters in





the office when you walked in?
A. No.
Q. Do you remember working for The Marketing Group?
A. The Marketing Group? It was DMCS, Inc. As far as I know.
Q. What about a company called EC Logistics?
A. Yes, EC Logistics. I think we changed from DMCS to EC Logistics.
Q. Do you remember when that change happened?
A. No.
Q. Besides EC Logistics and DMCS, were there any other company names that you recall working for when you were working with Sean Novis?
A. Any other company names?
Q. Yes.
A. Horizon, JGS, Multinational, Quantum.
Q. And were these all the same company?
A. No.
Q. Okay. Let's start with Horizon. What was Horizon?
A. Horizon was a list.
Q. So Horizon was the name of a list?
A. It was a name of a list owed by Gary.
Q. When you say Gary, you're talking about Gary Denkberg?
A. Yes.





Q. What was Quantum?
A. Quantum was a name of a list owned by Sean Novis?
Q. When you say Sean, you're talking about Sean Novis?
A. (Nods head affirmatively.)
Q. Is that a yes?
A. Yes.
Q. I'm sorry to be rude. The only reason I ask that is so our court reporter can reflect your answers.
A. That's fine.
Q. What by -- I think you said JGS. Is that a name of a list, a name of a company? What is that?
A. It's the name of a list.
Q. Okay. So as far as companies go, EC Logistics, DMCS, and then there's several lists, correct?
A. Correct.
Q. Okay. How long did you work for Sean Novis?
A. About eight years.
Q. Did you ever perform work for a man by the name of Phil Priolo?
A. Yes.
Q. What work did you do for Mr. Priolo while working --
A. Same thing.
Q. -- at Mr. Novis' company?
A. Same thing, data processing.
Q. So how did Mr. Priolo --





MR. FROCCARO: Judge, apologize. Could we just get a time frame?
MR. FELDMAN: Yeah. Sure.
BY MR. FELDMAN:
Q. Around when do you remember starting to do work for Mr. Priolo.
A. I would think maybe 2015, 2016.
Q. I think I might have already asked this for you and I'm sorry if I did. How long did you work Mr. Sean Novis?
A. Eight years.
Q. And so what was the year you stopped working for him?
A. 2016.
Q. So the work you did for Mr. Priolo was in the years, 2015, 2016, towards the end of your tenure with the company, correct?
A. I believe so, yes.
Q. How did Mr. Priolo -- where did he fit in with EC Logistics and DMCS? What was his role?
A. He didn't work for the company.
Q. So he was more of a client, is that fair?
A. Yes.
Q. All right. I want to ask you some questions about what data processing means.
For someone who doesn't know the first thing about data processing, can you explain generally that

types of duties that entails if you're in the direct mailing mail industry?
A. I work on a computer. So all the data processing is just taking data in, performing different tasks with the data, and then outputting files.
Q. Are you familiar with the term front-end mailing?
A. Yes.
Q. What's a front-end mailing?
A. The front-end mailing is a big list that we would send out at the beginning of every month.
Q. When you're talking about we, are you talking -- was that your job?
A. That was my job.
Q. And that was a job that you were doing for Sean Novis, correct?
A. For Sean, for Gary, for everyone.
Q. So let's talk about that.
So you did this work for Sean Novis, right?
A. Uh-hum (affirmative response).
Q. Is that a yes?
A. Yes.
Q. And you did it for Mr. Gary Denkberg?
A. Yes.
Q. And you indicated that in 2015, 2016, you did it for Mr. Priolo, correct?





A. Yes.
Q. Anyone else that you can remember that you were doing this type of data processing for?
A. Jeff Novis, Shawn Phillips.
Q. Where does Jeff Novis fit in? When do you recall starting to do data processing work for him?
A. I believe it was around the same time frame, 2015, 2016.
Q. Sorry to interrupt you. Can you repeat that answer because I was talking over you?
A. Around the same time frame, 2015, 2016, I believe.
Q. Are Jeff Novis and Sean Novis related, to your knowledge?
A. Yes.
Q. What is the connection?
A. Jeff is Sean's father.
Q. You indicated another name, Shawn Phillips. Was he part of this company DMCS or was he more --
A. He was --
Q. -- with Jeff Novis and Philip Priolo?
A. -- another client.
Q. I want to go back to front-end mailings. What's the first step in terms of your job in preparing to send out a front-end mailing?
A. I would get a schedule of all the files that are





going to come in from various list rentals. I would take all of those files in, convert all of those files into a standard format, bring them all into one big database and process those records.
Q. When you're talking about files, what are the actual files that you're getting that you're then standardizing for a front-end mailing?
A. The files are just names from different lists that come in, name, address, city, state, zip. That's it.
Q. How many lists are you getting for -- is typical for a front-end mailing?
A. They're usually somewhere around 20, I want to say.
Q. Are you familiar with the term merge purge?
A. Yes.
Q. Please explain to the jury what that means.
A. A merge purge is just taking a whole bunch of lists, bringing them together into one big file and then doing a process where it eliminates duplicate records.
So if Mary Smith is on the file on three different files that come in, we only mail to her once, and we get rid of the extras.
Q. Are you familiar with the term presort?
A. Presort? Sure.
Q. Please explain to the jury what presort is?
A. Presort is just putting a file through a piece of





software where it sorts it by zip code. It batches it in batches. You get a postal discount for sorting the mail before it goes to the post office.
Q. Are you familiar with the term back-end mailing?
A. Yes.
Q. Can you explain to jury what a back-end mailing?
A. A back-end mailing is a new mailing that is mailed to people that respond to the front-end.
Q. When you say respond to the front-end, what do you mean by that?
A. So if somebody sent in money and purchased something from the front-end, they then got a back-end.
Q. When you were doing work for the names you mentioned a moment ago, Sean Novis, Gary Denkberg, Mr. Priolo, Mr. Phillips, Mr. Jeff Novis, did you send out both front-end and back-end mailings?
A. Yes.
Q. So the back-end mailings just to people that sent in money, correct?
A. Yes. And of course buyers. If you were a buyer from the front-end, you then got a back-end.
Q. Is that a bigger or a smaller list in total than a front-end mailing?
A. Quantity-wise?
Q. Quantity-wise in terms of the number of people that

are going to receive the mailing?
A. The front-end usually came out to be somewhere around a hundred thousand people that got sent that mailing. The buyers may have been -- could have been anywhere from 2500 to five thousand.
Q. When you were doing work for Mr. Priolo, was it typical that there were just be one back-end mailing or would there be more than one?
A. There would be multiple back-ends.
Q. About how many in a given month?
A. Depending on the schedule, anywhere from ten to 12, usually.
Q. If a person bought in response to a front-end mailing, would they just get the first of the back-ends or would they get more than one back-end?
A. If there were 12 back-ends scheduled for the month, they would get 12.
Q. Even if they didn't send in money in response to back-in number one, they would still get 12?
A. Yes.
Q. Okay. Let's actually take a look at an example here.
MR. FELDMAN: Your Honor, permission to publish Government Exhibit 301?
THE COURT: That's already admitted?
MR. FELDMAN: Yes.





THE COURT: Yes.
(Publishes exhibit to the jury.)
BY MR. FELDMAN:
Q. Ms. Lilienkamp, what is this email? Does it have a date on it?
A. It does, Monday, August 22nd, 2016.
Q. Can you read off the subject?
A. It is Feel Lucky September 2016 mail schedule.
Q. What is Feel Lucky?
A. It's one of the lists.
Q. And who is the -- who's sending this email?
A. It's from Winners Circle.
Q. Is Winners Circle a name you're familiar with?
A. Yes.
Q. What is Winners Circle?
A. Winners Circle is one of the lists that we handled for Philip Priolo.
Q. You said you handled it for who?
A. Phil Priolo.
Q. Who's this email being sent to?
A. To me and to Phil.
Q. Does it have an attachment?
A. It does.
Q. What is the attachment?
A. It's the Feel Lucky letter shop worksheet.





Q. Is that an attachment you would normally get during the course of your job?
A. Yes.
MR. FELDMAN: Can we take a look at the attachment? I believe it's on page two of Government's 301.
BY MR. FELDMAN:
Q. Ms. Lilienkamp, I want to go through the headers on page two of Government's 301. What does D date mean?
A. Due date.
Q. What does that signify?
A. When the files are due.
Q. When the files are due to whom?
A. To the shop, I believe.
Q. What's the shop?
A. The letter shop that's going to do the mailing.
Q. What about description? What kind of information is in that column?
A. That's the promotion code that's going to be assigned to this back-end.
Q. So that's the name of the mailing?
A. It's the promotion that they're sending.
Q. The name of the promotion?
A. Yes.
Q. Do you see a monetary figure next to each of those





promotion names --
A. Yes.
Q. -- in the second column?
What does that signify?
A. I'm assuming that signifies the amount of money that they're asking for on that promotion.
Q. I'm going to skip a couple columns here that we're going to come back to.
What's the letter shop column? What does that mean?
A. Oh, that's the letter shop that's receiving these files.
Q. So that letter -- what is a letter shop?
A. It's company that receives the data that I send out and does the printing of the pieces and does the mailing.
Q. What about the reported amount column?
A. I don't know what that is. I don't know what that's for.
Q. Let's go back to the description column if I could for a moment. Do you see that there's two promotions that are highlighted?
A. Uh-hum (affirmative response).
Q. Is that a yes?
A. Yes.
Q. I'm so sorry. I hate doing that.

Can you tell if those promotions are front-end promotions or back-end promotions?
A. The two that are highlighted are front-ends.
Q. How do you know that?
A. Because there's multiple key codes being mailed in one mailing.
Q. What's a key code?
A. It's just a number that they assign to each list.
Q. When you say a number that they assign to each list, who assigns the number?
A. Whoever writes up the schedule.
Q. And what do the key code numbers represent on a front-end mailing?
A. It represents each list that comes in.
Q. So on a front-end mailing, if you're drawing from 20 different lists, each of those lists would have its own key code, correct?
A. Correct.
Q. What about on a back-end mailing?
A. On the back-end mailing, we assign the key code based on the schedule.
Q. Do back-end mailings have multiple key codes?
A. Well, each back-end mailing has its own key code.
Q. In the description column, the two front-end mailings, what's the price point on those, the ones





highlighted in yellow.
A. Twenty dollars.
Q. Below that, are those back-end mailings? Can we scroll down?
A. The next line is a back-end. The next line is part of the front end.
Q. And what about the lines below those from September 14th, 2016, through October 19th, 2016?
A. Those are part of the back-ends.
Q. You say they're probably back-ends. Are you certain or --
A. No, they're part of the back-ends.
Q. I'm sorry. I misheard you. Part of the back-ends?
A. Anything you see in this right column, BE number four, BE number five, those are back-ends.
Q. Do you notice that the price point on the back-end is higher than the price points on the front-end?
A. I do notice that.
Q. Do you know why that is?
A. No.
Q. Ms. Lilienkamp, I want to talk a little bit about the term list owner. What does that mean to you?
A. Just a person that owns the list of names.
Q. Did Mr. Priolo own a list of names?
A. Yes.





Q. Did Mr. Jeff Novis own a list of names?
A. Yes.
Q. For someone new to the direct mail industry, how do you go about or how does a list owner go about getting new names?
A. They would start something like this, a front-end, where they order lists to do a front-end. And then when they got a response to that front-end, that person became part of their list.
Q. So I just want to make sure I understand. If I'm doing a front-end mailing and I mail to a hundred thousand new names that are not on my list --
A. Uh-hum (affirmative response).
Q. -- and five thousand where people respond. Which of those names are how many names can I now add to my own list?
A. The five thousand that responded.
Q. I'm not allowed to add the 95,000 that did not respond, correct?
A. Right.
Q. Have you ever heard the term "seed" in the direct mail industry?
A. Yeah.
Q. What is a seed?
A. A seed is a name that's usually added to a mailing so





that you would get a copy of whatever is being mailed.
Q. What's the purpose of a seed?
A. Sometimes it's just to track your own mail to make sure that everything that was printed looks accurate and sometimes it's to make sure that if you see a list rental order that somebody is borrowing those names or paying for those names, you want to make sure they're using them in the appropriate way, that's agreed upon.
Q. I want to talk about both of those starting with the first one.

So if Mr. Priolo were to put a seed in his own mailings, would Mr. Priolo get a copy of every single front-end and back-end mailing that was mailed out on his list?
A. Yes.
Q. If Mr. Priolo rented his list to another company, would Mr. Priolo get a copy of what the other company was mailing using Mr. Priolo's list?
A. Yes.
Q. Now, if Mr. Priolo gets a copy of what the other company mailed, and he does not send in money in response to that mailing, and then he gets a back-end mailing from that same company, what does that mean?
A. Can you repeat that?
Q. It's a long question.

A. Yeah.
Q. If Mr. Priolo rents his list out --
A. Uh-hum (affirmative response).
Q. -- and he gets a front-end mailing from another company but he doesn't respond to it with money, he doesn't purchase, and then a few days later, he gets a back-end mailing from that same company, what would that tell Mr. Priolo about how that other company was using his list?
A. I would believe that that's illegal because they only agree upon a one-time mailing.
Q. So it means --
A. If they don't get a response back, then they should not be mailing to that person again.
Q. So it would alert someone that someone else is abusing their list, correct?
A. Right.
Q. If you were in the direct mailing industry and why would you go about giving names to other people to mail to.
MR. FROCCARO: Objection, Your Honor.
THE COURT: Sidebar.





(Sidebar.)
MR. FROCCARO: You want to know the truth? I don't know why I objected, Judge. I thought I heard something --
THE COURT: Speculation?
MR. FROCCARO: Yeah. I think that -- like that, speculation.
THE COURT: Well, I wasn't sure.
MR. FROCCARO: That's really what I think.
MR. FELDMAN: It's just to her acknowledge. If she knows, she can answer it. If she doesn't -- she just testified that she spent 30 years in the direct mail industry.
THE COURT: You're asking a lot of hypotheticals. They're confusing. I'm not sure where you're going with it. You need to round it out quickly. Move onto something else.
MR. FELDMAN: Okay.





(In open court.)
THE COURT: You can answer, and I'll have my court reporter repeat the question.
THE WITNESS: Repeat the question?
THE COURT: Exactly, the court reporter can repeat the question.
(Record read.)
MR. FELDMAN: I that question is capturing the objection. Can I just refuse the question, Your Honor?
THE COURT: Go ahead.
MR. FELDMAN: Okay.
BY MR. FELDMAN:
Q. If you are in the direct mail industry and you don't want to rent out your list, are you going to get names from other people.
A. I don't believe so. I believe it's all reciprocal.
Q. Who decides where a seed mailing -- where to send a seed mailing of a list?
A. Usually the list owner.
MR. FELDMAN: Can we -- Your Honor, permission to publish Government's Exhibit 310?
THE COURT: Granted.
MR. FELDMAN: Can we publish Government Exhibit's 310? Thank you.
(Publishes exhibit to the jury.)





BY MR. FELDMAN:
Q. Ms. Lilienkamp what is this email on your screen.
A. This is Winners Circle list rental seeds for March 2015.
Q. Who sent the email?
A. I sent it to Phil and Jeff.
Q. Is there an attachment to the email?
A. Yes. It's a Winners Circle list rental Excel spreadsheet.
Q. Can you read the subject of the email?
A. Winners Circle list rental seed for March 2015 hotline.
Q. What about the content?
A. See attached list rental spreadsheet for March hotline. We'll be using the same seed going forward unless you tell me otherwise.
MR. FELDMAN: Can we scroll down to page two of that same email, and just blow up page two? Perfect.
BY MR. FELDMAN:
Q. Ms. Lilienkamp, what is this document?
A. This is a list rental spreadsheet for Winners Circle for March 2015, and it lists all the seeds that were put into each list.
Q. Is there an address at the bottom of the document where -- what's the seed address?

A. Jeff Novis, 71 Eagle Chase, Department XXX, Woodbury, New York, 11797.
Q. Do you see where in this second column from the right, it says seed.
A. Yes.
Q. And it says, no seed omitting New York in some of those entries in some of those rows?
A. That's correct.
Q. What does that mean?
A. That just means, for example, Global Notification Systems might have been suppressing New York when they were ordering names, so since Jeff Novis is in New York, we had to suppress that seed also.
MR. FELDMAN: Your Honor, permission to publish Government's Exhibit 309.
THE COURT: Granted.
(Publishes exhibit to the jury.)
MR. FELDMAN: Could we start at the bottom of this email chain? Just scroll up to the first message. Thank you.
BY MR. FELDMAN:
Q. Ms. Lilienkamp, do you see the message from Cathy Johnson?
A. Yes.
Q. What's the date on that?





A. Monday, July 11, 2016.
Q. Who's Ms. Johnson emailing?
A. To me, mary.
Q. What's the subject?
A. Winners Circle seeds.
Q. So it's WINC. Do you understand that to mean Winners Circle?
A. Yes.
Q. Can you read that email?
A. Phil wanted me to tell you to add this name and address into all Winners Circle files going forward, Mike Priolo, 20 Westwood Drive, Apartment 35, Westbury, New York. 11590.
MR. FELDMAN: Could we zoom in and just scroll up. That's perfect.
BY MR. FELDMAN:
Q. Ms. Lilienkamp, did you follow up -- whom did you follow up with after receiving this message from Ms. Johnson?
A. I send the email to Phil directly.
Q. And what did you ask him?
A. I just asked him what lists he wanted his seed to go into?
Q. What was his response? At the very bottom?
A. How about all of them?





MR. FELDMAN: Can we unmaximize and scroll up to the next message? Perfect. Right there.
BY MR. FELDMAN:
Q. Did you seek clarification from Mr. Priolo?
A. Yeah. I asked him an additional question, asking if can see all of them, but what about the list rental orders? And he said whatever works is okay with me.
Q. Can you read the second sentence of your email to Mr. Priolo on July 12th, 2016?
A. You already are using Steve Priolo at the same address. Should I change the name to Mike or leave it as Steve?
Q. And what was Mr. Priolo's response to that?
A. Whatever works is okay with me.
Q. Do you know Mike Priolo?
A. No.
Q. You do know Steven Priolo?
A. No.
Q. So at least as of July 2016, Mr. Priolo was getting a copy of every single mailing he was sended out for Winners Circle, correct.
A. Yes.
Q. Ms. Lilienkamp, I want to switch gears and ask you some questions about sharing of lists.
What's list sharing or list renting?





A. List renting?
Q. Yes.
A. It's -- say you have a database of two hundred thousand names, and somebody wants to order some of your buyers, so that they can mail to them and see if they can get a buyer from that as well.
Q. Did Mr. Sean Novis and Gary Denkberg, did they share their lists with one another?
A. Yes.
Q. What about Jeff Novis, did he share his lists with other people?
A. Yes.
Q. Mr. Priolo?
A. Yes.
Q. And Mr. Shawn Phillips?
A. Yes.
Q. Did they share their lists with one another?
A. Yes.
Q. Each other?
MR. FELDMAN: Permission to publish Government Exhibit's 302?
THE COURT: Granted.
(Publishes exhibit to the jury.)
BY MR. FELDMAN:
Q. Ms. Lilienkamp, what's the date on this top email

here?
A. September 2nd, 2016.
Q. Did you send it?
A. I did.
Q. Who did you send it to?
A. To Winners Circle.
Q. Is there an attachment to the email?
A. Feel Lucky, September 2016 list of lists.
MR. FELDMAN: Could we go down to the attachment?
BY MR. FELDMAN:
Q. Ms. Lilienkamp, what is this attachment?
A. This is a front-end schedule.
Q. For what promotion?
A. For Feel Lucky.
Q. So because it's a front-end promotion, it's a promotion that's sent to multiple lists, correct?
A. Correct.
Q. Are the names of the lists in this attachment? Are they?
A. I didn't understand the question.
Q. No problem.
Are the lists that they're drawing from for this front-end promotion, are they reflected in this --
A. Yes, all this names are list names are listed here.





Q. Is Parkside a list that you recognize from your work for Sean Novis?
A. Yes.
Q. What about Haven?
A. Yes.
Q. What about Quantum?
A. Yes.
Q. Is who owns the Quantum list?
A. Sean Novis.
Q. So for this CBA20 promotion for Feel Lucky Group, that front-end promotion is going to some of Sean Novis's names, correct?
A. Correct.
Q. What does HL stand for?
A. It's a hotline.
Q. What is a hotline?
A. I believe it's their latest buyers, whatever they selected, 30 or 60 day hotlines, which is 30 or 60 day buyers.
MR. FELDMAN: Your Honor, permission to publish Government's Exhibit 308 to the jury?
THE COURT: Granted.
(Publishes exhibit to the jury.)
BY MR. FELDMAN:
Q. Ms. Lilienkamp, do you recognize this document?





A. I do.
Q. Whose handwriting is on it?
A. Mine.
Q. What is it? It's several pages, but what's the first page?
A. It's another type mailing that we did.
Q. For what company?
A. It looks like for Horizon.
MR. FELDMAN: Can we go to page seven?
BY MR. FELDMAN:
Q. Ms. Lilienkamp, what is this?
A. This is a front-end mailing schedule for Winners Circle.
Q. In what month and year?
A. August 2016.
Q. Because it's a front-end, it's drawing names from multiple lists?
A. Correct.
Q. So do you recognize any of the lists that this Winners Circle promotion is going to?
A. Yes.
Q. Which ones do you recognize?
A. Parkside, Haven Quantum, Feel Lucky.
Q. These are all people that are either work at Horizon or are clients of Sean Novis?





A. Correct.
Q. And just to be clear, other than the three individuals we've met or you mentioned, Shawn Phillips, Mr. Priolo and Jeff Novis, did you do work for any other clients that were contracting work out from Sean Novis and Gary Denkberg?
A. No.
Q. Those were the only names of the clients that you can recall?
A. Yes.
Q. What premotion is this schedule referring to?
A. Winners Circle.
Q. But what mailing piece? What promotion?
A. What promotion? NPF20.
Q. And what's that number next to NPF20, that 71,532?
A. Those are how many names and addresses we mailed to.
Q. For the end --
A. For this mailing.
Q. What does multi mean right below it?
A. That's just another file that we created of multi buyers.
Q. What's a multi buyer?
A. It's just people who purchased from multiple files.
Q. So if someone purchased from multiple files, they're going to get a second mailing according to this schedule?

A. According to the schedule, it says, multi three plus. So if you were on at least three of the lists at the same time or more, you would get a multi buyer mailing.
Q. In addition to the NPF mailing?
A. Correct.
Q. NPF.
MR. FELDMAN: Can we move to page nine?
BY MR. FELDMAN:
Q. Ms. Lilienkamp, is this a similar front-end mail schedule?
A. Can you back back out? This is a front-end schedule for Quantum.
Q. And again, whose list is Quantum?
A. Sean Novis.
Q. Is Winners Circle listed in the list name that this front-end mailing is drawing from?
A. Yes.
MR. FELDMAN: Could we go to page 16?
BY MR. FELDMAN:
Q. Ms. Lilienkamp, what is this schedule?
A. This is a back-end schedule for Winners Circle for July, August 2016.
Q. So if someone bought a front-end promotion from Winners Circle at the end of July of 2016, how many back-end mailings would that individual receive?





A. According to this schedule, they were getting 14.
Q. If Winners Circle was also renting their list to Quantum or Horizon for that month, would they also get mailings from those companies as well?
A. If they were responded to front-end, and yes, get back-ends.
Q. But they would at least get front-ends, correct?
A. Correct.
Q. Ms. Lilienkamp, have you heard the term fulfillment?
A. Yes.
MR. FELDMAN: We can actually exit out. Thank you very much.
BY MR. FELDMAN:
Q. What is fulfillment?
A. We did something called a book fulfillment, that any buyers that came in received a book.
Q. How often would you send out -- let me strike that.
What was your job in connection with the fulfillment?
A. I would receive a file of names and process the data and send out a file for book fulfillment.
Q. How often would that occur?
A. Maybe once a month.
Q. So once a month, you're sending out -- you're getting a file or sending out booklets?





A. I believe so.
Q. Have you heard the term TMO?
A. Yes.
Q. What does TMO stand for?
A. It was a list that we built for -- stands for take me off.
Q. Would you occasionally get requests to remove certain people from mailing lists?
A. Yes.
Q. What was your role in that process?
A. Anytime I received PIN numbers for people who wanted to be taken off, I added them to a database and that database was used as a suppression for all mailings, so that we didn't mail those people that wanted to be taken off the list.
MR. FELDMAN: Permission to publish Government's Exhibit 303?
THE COURT: Granted.
(Publishes exhibit to the jury.)
BY MR. FELDMAN:
Q. Ms. Lilienkamp, what is this email?
A. This is an email from me to the letter shop, Laser Mail. CC Phil and Winners Circle, September 2016.
Q. Is there an attachment?
A. Feel Lucky September 16 front-end dot zip.





Q. What does the name of the attachment tell you about what type of mailing it is?
A. It's the front-end mailing.
Q. I want go down to the -- just to your message to Laser Mail. What are YOU emailing to Anthony?
A. I am emailing the results of the front-end process that I did.
Q. How many front-end mailings are you sending to the printer?
A. Looks like three.
Q. Is one of those CBA?
A. Yes.
MR. FELDMAN: Permission to publish Government's Exhibit 303A to the jury?
THE COURT: Granted.
(Publishes exhibit to the jury.)
BY MR. FELDMAN:
Q. Okay. What is this?
A. It's a list of some sort.
Q. You have been talking a lot about lists. Is this what lists look like, whether it was a front-end or back-end list?
A. Yes, it's just a -- it's a database of names.
Q. This list has a column for key codes in column K. Do you see that?

A. Yes.
Q. And do the key codes all the look the same or they're different?
A. They're all different.
Q. Remind us, what's that an indication of, in terms of whether it's a front-end or a back-end?
A. This should be a front-end mailing with multiple key codes.
Q. Can we move to page 160 of this document, and I'm going to ask you to read off the name? It's in row 6049. Can you just read row 6049, just name, address, city and state?
A. Audrey Gibson, Louisville, Kentucky, zip code 40214.
MR. FELDMAN: Can we zoom out?
BY MR. FELDMAN:
Q. What mailing did Ms. Gibson get according to this schedule?
A. CBA20, key code 2248.
MR. FELDMAN: Could we go back up to the first page briefly?
BY MR. FELDMAN:
Q. What does PIN mean in column N?
A. We assigned a sequential number to every person that we mail to.
Q. Do any two people on a mailing list have the same





number?
A. No.
MR. FELDMAN: Can we going in the same document to page 89, row 3370?
(Continued on the next page.)





(Continued.)
BY MR. FELDMAN:
Q. Just go up that entire row, thank you. Can you read that person's name and where they're from?
A. Wilbur Bean, Jonesboro, Georgia.
MR. FELDMAN: Your Honor, I'm going to ask Ms. Lillenkamp to write down a pin number with a lot of digits. If counsel doesn't have any objection, I would just like to approach with a pad and paper.
DEFENSE ATTORNEY: I have no objection.
THE COURT: Go ahead.
Q. Ms. Lillenkamp, can you write down Wilbur Bean's pin number?
A. Okay.
Q. And because Wilbur Bean is on the same exact mailing as Audrey Dixon, would they have gotten the same mailing? They're on the same milling list, correct?
A. Yes.
MR. FELDMAN: Permission to publish Government's Exhibit 21 for the jury.
THE COURT: Granted.
(The above-referenced exhibit was published to the jury.)
Q. Ms. Lillenkamp, who is this promotion sent to?
A. Wilbur Bean.





Q. Do you see at the top left corner that there is a long string of numbers?
A. Yes.
Q. Does that look like the pin number?
A. That is the pin number.
Q. Can you compare it to the number you wrote down? Are they the same?
A. They are the same.
Q. So would this, other than the fact that it's addressed to Wilbur Bean, be the exact promotion that was sent to Audrey Dixon?
A. Yes, it should be, yes.
MR. FELDMAN: Permission to publish Government's Exhibit 305.
THE COURT: Granted.
(The above-referenced exhibit was published to the jury.)
Q. All right. Ms. Lillenkamp, you're sending an e-mail here to who?
A. To Laser Mail, which is a letter shop.
Q. Who are you copying on the e-mail?
A. Phil Priolo, Jeff Novis, and Winners Circle.
Q. Can you tell from the e-mail whether it's a front end or a back end?
A. It's Winners Circle Internation back ends for cut off

date 7/28/2016.
Q. What type of file is the attachment?
A. It is a back end file.
Q. And, to your knowledge, would that back end file that you're sending to the printers, is it one back end or several back ends?
A. It's a lot of back ends. 14. 2, 4, 6, 8, 10, 12, 14.
Q. So the first back end list I want to ask you about, do you see key code as 6746 as one of those files?
A. Yes.
MR. FELDMAN: Permission to publish Government Exhibit 305A.
THE COURT: Granted.
(The above-referenced exhibit was published to the jury.)
Q. Ms. Lillenkamp, do you see the key code in column A?
A. Yes.
Q. Does this look like the back end file for 6746?
A. It is.
Q. What promotion is associated with 6746?
A. BNO 34.
MR. FELDMAN: Can we navigate to page 30, row 1103? It's at the very top row and highlight that entire row for Ms. Lillenkamp.





Q. Can you read that person's name and just where they're from; city and state?
A. Marge Toussaint, Lake Placid, Florida.
MR. FELDMAN: Can we now navigate to page 86, row 3245?
Q. Ms. Lillenkamp, can you read that name into the record and just city and state?
A. Makeba Armstrong. Sacramento, California.
Q. Did she receive the same promotion that Ms. Toussaint received; the BNO promotion?
A. Yes.
Q. Can you write down Ms. Armstrong's pin number?
A. Got it.
MR. FELDMAN: Permission to publish Government's Exhibit 9.
THE COURT: Granted.
(The above-referenced exhibit was published to the jury.)
Q. Ms. Lillenkamp, who is this promotion sent to?
A. Makeba Armstrong, Sacramento.
Q. What is the name of the mailing?
A. BNO.
Q. Do you see a bar code at the bottom right hand corner?
A. Yes, I do.





Q. Can you match up the number at the bottom bar code with the number you wrote down from the mailing list?
A. It matches.
Q. So in terms of what Ms. Toussaint would receive, she would receive this exact mailing, just with her information on it, correct?
A. Correct.
MR. FELDMAN: Your Honor, permission to publish Government's Exhibit 305.
THE COURT: Granted.
(The above-referenced exhibit was published to the jury.)
Q. Ms. Lillenkamp, I think we already looked at this one, so do you see key code 6753 among key codes listed here?
A. Yes.
MR. FELDMAN: Permission to publish Government's Exhibit 305B.
THE COURT: Granted.
(The above-referenced exhibit was published to the jury.)
Q. What promotion is this mailing list for?
A. NNP 28.
Q. Do you notice the key code is 6753?
A. Yes.





MR. FELDMAN: Can we navigate to page 18 row 598.
Q. Ms. Lillenkamp, whose name is listed in that row?
A. Alemu Kore, Springfield Virginia.
Q. Can you go ahead and write down that pin number on your pad?
A. Mm-hmm.
MR. FELDMAN: Permission to publish Government's exhibit 57.
THE COURT: Granted.
(The above-referenced exhibit was published to the jury.)
Q. Ms. Lillenkamp, who is this -- who does it look like the owner of this check is or whose checkbook name is listed there?
A. Alemu Kore, Springfield, Virginia.
Q. Who is the check made out to?
A. MMP.
Q. Do you see in the memo line there's a long number?
A. Yes.
Q. Can you go ahead and compare that number to what you wrote down on your pad?
A. It matches.
MR. FELDMAN: Permission to pull up Government's Exhibit 6 for the jury.

THE COURT: Granted.

(The above-referenced exhibit was published to the jury.)

Q. Ms. Lillenkamp, does this look like -- at the upper right hand corner it says from the office of?

A. MMP, sorry.

Q. Can you read the second paragraph from the bottom of this exhibit? The one that starts with the name of the person and then you can skip the name. But it notice is not.

A. This notice is not being sent to the general public. Using the best data processing technology, it is sent out in limited numbers to specific individuals. It is up to you to take advantage of this information.

Q. Ms. Lillenkamp, did you have any role in preparing the wording or editing the wording of any of the mailings that were sent out?

A. No?

Q. You had no role in that whatsoever?

A. No.

Q. Do you know what they mean here by, the best data processing technology?

A. No. Check.

Q. Do you remember if MMP was a front end or a back end mailing?





A. Back end.

Q. And so how was the list for MMP complied? How were those name the selected?

A. These names were selected from buyers of the front end.

MR. FELDMAN: I promise we're almost done with this part. Permission to publish Government's Exhibit 307.

THE COURT: Granted.

(The above-referenced exhibit was published to the jury.)

Q. Ms. Lillenkamp, what is that e-mail?

A. This is an e-mail from me to the letter shop, Laser Mail. Copying Phil Priolo, Jeffrey Novis, Winners Circle. And it says that it is the Winners Circle September 2016 front ends.

Q. What's the name of the first front end promotion that you're sending the letter shop?

A. NPF 20.

Q. How many people is that front end promotion going to?

A. 63,114.

MR. FELDMAN: Your Honor, permission to approach the witness with a paper copy of Government's Exhibit 307A.

THE COURT: Any objection?





DEFENSE ATTORNEY: No.

THE COURT: Granted. Go ahead.

BY MR. FELDMAN:

Q. Ms. Lillenkamp, what did I just hand you? Can you look at the first page?

A. Looks like a data file or a database of names.

Q. For what promotion?

A. NPF 20.

Q. Can you find page 1443?

A. 1,000 what?

Q. 1443.

A. Okay.

Q. Do you have the page?

A. Yeah, but I'm off the rings now.

Q. It's okay.

Can you read the name of the person in row 51931?

A. Nuby Greene, Los Angeles, California.

Q. Can you also go to page 1328 in that exhibit?

THE COURT: Mr. Feldman, how much more do you have with this?

MR. FELDMAN: I would say I have maybe a half hour.

THE COURT: Okay. The witness can answer the question and then we're taking a lunch break.





A. Okay, 1328.

Q. And I'm looking for the name in row 47798?

A. Andrew Kluczinsky.

MR. FELDMAN: Your Honor, I have about a minute more in this section. Do you want me to continue or take a break now?

THE COURT: Okay, continue and then we will wrap up.

Q. You said, what was that person's name?

A. Andrew Kluczinsky.

Q. Can you write down Mr. Kluczinsky pin number? It's hard? Do you need a hand?

A. Please. It's about to fall out.

Q. It's okay, don't worry about it. Just write down his pin number.

MR. FELDMAN: Permission to just briefly publish Government's Exhibit 1.

THE COURT: Granted.

(The above-referenced exhibit was published to the jury.)

Q. Who is this mailing made out to?

A. Andrew Kluczinsky.

Q. Can you compare the number below the first bar code there in the middle with the number you wrote down?

A. It matches.

Q. Okay.
So would Mr. Kluczinsky receive the exact same mailing that Ms. Nuby Greene would receive?
A. They should, yes.
MR. FELDMAN: It's a good breaking point, your Honor.
THE COURT: Okay, thank you.
To our jury, thank you for being patient and waiting half an hour after our normal lunch time. We're going to enter early today at 3:15 so we'll take a somewhat shorter lunch, and we'll get you out of here at 3:15 P.M. today. So remember, please no speaking to anyone about this case; whether it's each other or anyone else; friends, family, others you communicate with. No social media, no research, no reading about the case, and any materials that you may come across. Do not speak with the parties, attorneys, counsel, any members of the public or witnesses, or anyone else that you may encounter in this building. And do not let anyone speak to you about this matter. If you have any concern that another juror is not respecting my instructions, please notify Mr. Morbito and he will hand me a note.
With that, we're going to take a 45-minute break. You will be back in the jury room by 1:45 and we will join you here for a sprint of an hour and a half of





our final testimony for the day. Thank you so much.
(Jury exits the courtroom.)
THE COURT: Have a seat everyone. Okay. Any applications?
MR. FROCCARO: Judge, can the witness be excused?
THE COURT: Yes, ma'am, you may take a break. Please take a lunch break as well, thank you so much, and you do remain under oath.
(Witness leaves the witness stand.)
THE COURT: Okay. Any applications from the Government?
MS. ENTWISTLE: No, your Honor.
THE COURT: Anything from the defense?
MR. FROCCARO: No, Judge.
THE COURT: Okay. I want to put one thing on the record because I understand the parties came to a resolution on the issue and concerns, Mr. Froccaro, that you raised that potentially Ms. Johnson was provided some kind of benefit in the form of vulnerability for prosecution for some kind of offense that you were not notified of in the Brady material that was disclosed to you. I understand that the parties resolved how to handle those concerns and issues. I just want to make clear for the record that it's my understanding that the Government





is aware of its Brady obligations. I want to state that what I heard was that the Government was not aware of any such benefit provided to Ms. Johnson, other than her immunity from prosecution. I understand, Mr. Froccaro, your concern is prosecution from what. But I just want to make the record very clear that I heard that there was no other benefit of any kind given to her and that it's clear to me that the Government understands its Brady obligations.
Anything further that the Government wishes to say on this point?
MR. DUNN: No, your Honor.
THE COURT: Okay.
Mr. Froccaro, anything else you want to preserve?
MR. FROCCARO: No, your Honor.
THE COURT: Okay. Thank you so much. Enjoy your lunch, we'll be back here at 1:45.
(A recess was taken at this time.)
(Continued on the next page.)



A F T E R N O O N S E S S I O N
(In open court; jury not present.)
THE COURT: Okay. Let's bring in the jury.
Have a seat, everyone.
Why don't you bring the witness in to take the stand.
(Witness resumes the stand.)
THE COURT: Thank you, ma'am.
Counsel, I received an instruction prior to deposition video testimony from the parties; is that right?
MS. ENTWISTLE: That's correct, Your Honor. We don't believe we will reach that today given our timing. We believe Ms. Johnson will begin and carry us through the day, but we have that for, if we reach it, tomorrow or Monday, depending on timing of the witnesses.
THE COURT: I have a standard instruction, but I'm happy to take a look at this. It's probably very similar to what I have, but I will let you know if there's anything I need.
MS. ENTWISTLE: And I'm sure we have no problem. It's just procedural to avoid jury confusion.
THE COURT: Thank you.
THE COURTROOM DEPUTY: All rise for the jury.
(Jury enters.)

THE COURTROOM DEPUTY: Please be seated.
THE COURT: Thank you, Mr. Feldman. You can continue.
MR. FELDMAN: Thank you, Your Honor.
BY MR. FELDMAN:
**Q.** Good afternoon again, Ms. Lilienkamp.
I want to switch gears and ask you some additional questions here.
In 2015, 2016, where was the physical location of your office?
**A.** I believe it was in Syosset.
**Q.** Was it on -- in Underhill --
**A.** Yes.
**Q.** -- do you remember?
Would Mr. Priolo ever come into the office?
**A.** Every once in a blue moon, yeah.
**Q.** So when you say once in a blue moon, how often is that?
**A.** I can't recall. Once every few months maybe.
**Q.** When Mr. Priolo would come into the office, would he ever speak to you about the work you were doing for him?
**A.** I'm sure at some point.
**Q.** Do you recall sitting here today what those conversations were?
**A.** No.





**Q.** What about Mr. Jeff Novis? How often would he come into the office?
**A.** A little more often.
**Q.** When you say a little more often, can you give a very rough estimate for the jury?
**A.** Once every month or two.
**Q.** Would Mr. Jeff Novis talk to you about the work you were doing for him?
**A.** Not much.
**Q.** Do you remember when he did talk to you what you all would speak about?
**A.** Sometimes just changing up different things in his mailing to get a better response rate.
**Q.** And to be clear, this is Jeff Novis; correct?
**A.** Yes.
**Q.** What types of things would Jeff Novis ask to change in his mailings to get a better response rate?
**A.** Adding more multi-buyers, maybe.
**Q.** What's a multi-buyer again?
**A.** If you're on the list more than a certain amount of times.
**Q.** Meaning that you bought a certain amount of times.
**A.** If you bought from three lists, you're a three-time multi-buyer.
MR. FELDMAN: Your Honor, permission to publish





Government's Exhibit 10 to the jury.
THE COURT: Hold on one moment.
(Pause.)
THE COURT: Granted.
(Exhibit published.)
MR. FELDMAN: Can we go to page 2?
BY MR. FELDMAN:
**Q.** Ms. Lilienkamp, did you ever work for a company called Prize Verification Service?
**A.** No.
MR. FELDMAN: Go to the next page of this. And the next page.
BY MR. FELDMAN:
**Q.** Ms. Lilienkamp, do you see someone signed this letter at the bottom?
**A.** Yes.
**Q.** What is that person's name?
**A.** Roger Simpson.
**Q.** Did you ever work with someone named Roger Simpson?
**A.** No.
MR. FELDMAN: Your Honor, permission to publish Government's Exhibit 11 to the jury.
THE COURT: Granted.
MR. FELDMAN: Let's go to page 2.
BY MR. FELDMAN:





**Q.** Ms. Lilienkamp, did you ever work for a company called Prize Advisory Board?
**A.** No.
**Q.** Did you see at the bottom the -- this mailing signed by a Sean Williams?
Do you see that?
**A.** Yes.
**Q.** Did you ever work with a Sean Williams?
**A.** No.
**Q.** I want to invite your attention to the top half, and specifically the third check mark down on the right.
Can you read that check mark?
**A.** The unanimous approval determination.
**Q.** Before you compiled the list for a front-end mailing, were you waiting on any type of communication from anyone about a universal -- I'm sorry, a unanimous approval determination?
**A.** No.
**Q.** What about for a back-end mailing? Was there any type of unanimous approval determination you were waiting for?
**A.** No.
MR. FELDMAN: Can we zoom in on the bottom half?
BY MR. FELDMAN:
**Q.** Ms. Lilienkamp, can you just read in the paragraph

that starts with the approval of your status second from the bottom?
A. The approval of your status to receive this notice has been unanimous. We have prepared documentation of this decision and an official acceptance form in anticipation of your response. Please complete it right away and use our envelope to return it to the attention of PAB Directors Office.
Q. Did you ever get documentation of approval decision before you sent out a list to the printers?
A. No.
MR. FELDMAN: Your Honor, permission to publish Government's Exhibit 12 to the jury?
THE COURT: Granted.
(Exhibit published.)
MR. FELDMAN: And if we can just go to page 2.
BY MR. FELDMAN:
Q. Ms. Lilienkamp, did you ever work for a company called Prize Payment Resources?
A. No.
Q. Did you ever work with someone named John Richie?
A. No.
MR. FELDMAN: Can we move to page 4? If you can just blow up -- yes. Perfect. You are reading my mind.
Thank you.





No, not that part, sorry. The other side of it.
Thank you.
BY MR. FELDMAN:
Q. Ms. Lilienkamp, can you read under where it says optional publicity release?
A. Would you be willing to let us use your name and likeness for publicity purposes? You are not required to. This is optional.
Q. Ms. Lilienkamp, did you ever receive data from Mr. Priolo of people that were willing to have their likeness used for publicity purposes?
A. No.
Q. Did you ever receive any data like that from Jeff Novis?
A. No.
Q. Did you ever receive any data like that from anyone else?
A. No.
Q. Were you aware during your time working there of any sort of publicity that DMCS or Horizon or EC Logistics did in connection with these mailings?
A. No.
MR. FELDMAN: Your Honor, permission to publish Government's Exhibit 13?
THE COURT: Granted.





(Exhibit published.)
MR. FELDMAN: And can we go to page 2?
BY MR. FELDMAN:
Q. Did you work for the Public Prize Funds?
A. No.
Q. Did you work with --
MR. FELDMAN: Can you zoom in on the signature?
Thank you.
BY MR. FELDMAN:
Q. What name does that look like to you?
A. John Zarabel?
Q. Did you work with anyone by that name?
A. No.
Q. Anyone resembling that name?
A. No.
MR. FELDMAN: Can we move to page 4 of this same exhibit? And just if you can zoom in on Section 2.
BY MR. FELDMAN:
Q. Ms. Lilienkamp, will you review this section to yourself for a moment silently, and when you're ready, just look at me.
(Pause.)
BY MR. FELDMAN:
Q. Did you ever receive survey data like what you just read in Section 2 of Government's Exhibit 13 on page 4?





Did you ever receive data of responses --
A. No.
MR. FELDMAN: Finally, permission to publish Government's Exhibit 14?
THE COURT: Granted.
(Exhibit published.)
MR. FELDMAN: Can we just go to page 2 of that exhibit?
BY MR. FELDMAN:
Q. Okay. Can you just read the bottom paragraph that says please take note?
A. Please take note. There is no question whatsoever that Gerald Hyvonen has been researched and is a hundred percent eligible to win. We hope that you are justifiably excited that you are eligible to receive the directives that can be issued in your name.
Q. Ms. Lilienkamp, do you know if there was ever research done to decide whose name was on a mailing list?
A. No.
Q. Just to be clear, you don't know or you don't think any research was done?
A. I don't believe any research was done.
MR. FELDMAN: Brief moment, Your Honor, to confer.
(Pause.)

MR. FELDMAN: No further questions, Your Honor.
THE COURT: Thank you.
Mr. Froccaro, your witness.
MR. FROCCARO: Yes, Judge.
CROSS-EXAMINATION
BY MR. FROCCARO:
Q. Good afternoon, Ms. Lilienkamp.
My names is James Froccaro and I represent Mr. Priolo.
We've never met before; right, ma'am?
A. No.
Q. If you have any questions you don't understand, just ask me to repeat it and I will repeat it for you. I don't have a lot of questions for you.
You said that you worked in the direct mail industry for 30-something years; is that accurate, ma'am?
A. That is accurate.
Q. In working in that industry for 30 years, you've seen a lot of marketing promotions just like that, correct, that he just showed you?
A. Not really.
Q. Well, you worked for Mr. Novis for how many years?
A. For eight total years.
Q. Well, when did you go to work for Mr. Novis directly, madame?





A. I believe it was May of 2008.
Q. Eight.
And you were hired to do data processing work there?
A. That's right.
Q. And no one else at the company did data processing work there; right? Just you?
A. That's correct.
Q. You managed all the data that came in and out of the company; correct?
A. Correct.
Q. And the data -- excuse me one second.
(Pause.)
BY MR. FROCCARO:
Q. And the data inside the files that you created on the consumers who were going to receive direct mailings from Mr. Priolo consisted of just their name, address, city, state, zip, and that's it; correct?
A. Correct.
Q. There was absolutely no information on the ages of the people to be mailed; correct?
A. Ages, did you say?
Q. Ages, A-G-E-S.
A. No.
Q. There was absolutely no information on their mental





or physical health conditions; correct?
A. That's correct.
Q. And there was absolutely no information on their economic status; correct?
A. Correct.
Q. At some point in the year 2015 is when you did some work for Mr. Priolo in his companies; correct?
A. Yes.
Q. Basically you were contracted out to him by Mr. Novis's company to help him with the data processing, et cetera; correct?
A. I don't know what their agreement was.
Q. But you worked for Mr. Novis. You didn't --
A. I worked for Mr. Novis, yes.
Q. Of course.
And you said he used to come into the office once in a blue moon; correct?
A. Correct.
Q. And when he came in, he was always very personable and nice, correct?
A. Yes.
Q. And you were aware at the time that he also owned a car wash and operated a car wash as well.
A. I did know that, yes.
Q. Just a question. They talked to you about all these





charts and everything about front ends, back ends, and all these different things.
Could you provide an estimate of just how many direct mailings in total were sent out by Mr. Priolo's companies during the time you were there? Hundreds of thousands? A million? Just an estimate.
A. Are you talking about records or how many files?
Q. All mailings.
A. All the mailings that we did?
Q. Including front end, back end, just an estimate.
A. Records?
Q. When you say records, what do you mean by that?
A. Names and addresses.
Q. No, I'm talking about actual mailings, like front-end mailings?
A. We did a front-end mailing once a month, so you could assume 24 in two years.
Q. And how many mailings in an individual mailing were sent out to different consumers?
Am I not making myself clear? I'm sorry.
A. Yeah, I don't --
Q. Let's say this was one mailing; right?
A. Mm-hmm.
Q. And this was another mailing; right?
A. Mm-hmm.

Q. How many total mailings went out to consumers?
That's what I'm saying?
A. In two years?
Q. Yeah.
A. I would assume 24 in two years, front ends. And then ten back ends every month.
Q. And how many consumers were sent, would you say? An estimate.
A. Every month was different. Anywhere between 50 and a hundred thousand.
Q. That's what I wanted to know. Perfect.
Fifty and a hundred thousand over whatever the time period was.
A. Right.
Q. Now, every time --
A. Fifty or a hundred thousand per front end.
Q. Per front end.
What about back ends?
A. Approximately 5,000 per back end.
Q. Really? Thank you, ma'am.
Every time a consumer purchased, they needed to receive -- I think it was a booklet or report containing available sweepstakes entry information; correct?
A. That's a book fulfillment, yes.
Q. You guys called it a fulfillment; right?





A. Mm-hmm.
MR. FROCCARO: Would you mind? Do you have the fulfillment things? I apologize. I should have asked you for it.
Judge, may I approach the witness just quickly?
THE COURT: Yes.
MR. FROCCARO: Thank you.
What exhibit is it?
MR. FELDMAN: 176.
BY MR. FROCCARO:
Q. This is Government's Exhibit 176. If you can just identify it for the jury again what it is.
You can hold on to it, ma'am, if you don't mind.
A. I'm not quite sure what it is.
Q. Is that a fulfillment book?
A. I didn't work with what was sent. I only did the data.
Q. Oh, really? Great.
A. So I gave them the names and they printed whatever they printed.
Q. You got it.
You're aware that every person who purchased got a fulfillment book; correct?
A. I was told every buyer got a book fulfillment.
Q. And you believed that the consumers and buyers all





got what they paid for; right, Ms. Lilienkamp?
A. I don't know.
Q. Have you ever made a prior statement under oath that you believe the consumers or buyers all got what they paid for, ma'am?
A. I don't recall.
Q. Just I'm going to show you something to refresh your recollection. It's Government provided 3500 ML-7.
MR. FROCCARO: Judge, if I can approach the witness, it will be quick.
THE COURT: Yes, go ahead.
MR. FROCCARO: Thanks.
It's at page 694 line 7 to 12.
BY MR. FROCCARO:
Q. Madame, if you can just review this and just see if it refreshes your recollection and if it does, you can say that. It's line 7 through 12.
A. Yeah.
Q. So you do recall making that prior statement under oath?
A. Yes.
Q. You were being truthful when you made it, of course; right?
A. Sure.
Q. Thank you.





You testified that you also played a role in removing from the data files any consumer who asked to be removed so that they would never receive another mailing in the future; correct, Ms. Lilienkamp?
A. Any person that wrote in to be removed from the list would get sent to me. I would add it to a database and those names would be suppressed from any future mailings that we did.
Q. Great.
That was anybody and everybody who asked that would be removed?
A. Every name I received got put into that database.
Q. Thank you, ma'am.
And again, so the jury is clear on this, with regard to the various mailing list that you were previously shown today by the prosecutor -- I think it's those books right there. Those are the mailing lists. There wasn't any column on any of those lists for the age of the consumers to be mailed; correct?
A. Correct.
Q. And there also wasn't any column on those lists for the mental or physical health of any consumer to be mailed; correct?
A. Correct.
Q. And there wasn't any column on the mailing list about

the economic status of any person to be mailed as well, yes?
A. Correct.
Q. One last question, ma'am.
Would it be fair to say that you would not do work for any company that was committing illegal acts? Do you agree, Ms. Lilienkamp?
A. Would I work for somebody who I thought was doing illegal acts?
MR. FELDMAN: Objection.
BY MR. FROCCARO:
Q. You would not; right?
THE COURT: Sidebar.
(Sidebar.)
(Continued on next page.)





(Sidebar conference held on the record out of the hearing of the jury.)
THE COURT: Can you read back the question?
(Record read.)
THE COURT: Legal or illegal acts?
MR. FROCCARO: It's a prior statement. Is it fair to say -- I copied word for word.
THE COURT: Thank you.
What's your objection?
MR. FELDMAN: Relevance, Your Honor, as to her state of mind. It's ultimately up to the jury to decide whether the mailings were fraud or not.
THE COURT: Mr. Froccaro?
MR. FROCCARO: Judge, I don't agree with that at all. He took her through everything and she certainly has a right to say I would not work for anybody if I thought they were doing something wrong.
THE COURT: I think that one question is fine. I will limit it to that.
Thank you.
MR. FROCCARO: Thank you, Judge.
(Sidebar ends.)
(Continued on next page.)





(In open court.)
THE COURT: Thank you.
Can you please repeat the question, our court reporter, and then our witness can answer.
(Record read.)
MR. FROCCARO: Illegal. That's the word.
THE COURT: Go ahead.
BY MR. FROCCARO:
Q. Do you agree Ms. Lilienkamp? Yes?
A. I agree.
MR. FROCCARO: I have no further questions, Your Honor.
THE COURT: Thank you so much.
I have one clarifying question.
Ms. Lilienkamp, you testified that you would get names for removal from the list and then you would ensure that they were put on a list for removal.
Who would give you those names?
THE WITNESS: Cathy Johnson.
THE COURT: Okay. Thank you.
Any redirect from the Government?
MR. FELDMAN: Just a moment, Your Honor.
(Pause.)
MR. FELDMAN: Your Honor, no further questions for Ms. Lilienkamp.





THE COURT: Thank you very much for your testimony. You may step down.
(Witness excused.)
MR. FELDMAN: May I retrieve the exhibits?
THE COURT: Yes, go ahead.
And the Government may call the next witness.
MR. DUNN: Your Honor, the United States calls Ms. Cathy Johnson.
THE COURT: Thank you. She may take the stand.
(Witness takes the stand.)
THE COURTROOM DEPUTY: Please stand and raise your right hand.
(Witness sworn.)
CATHY JOHNSON,
called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:
THE COURTROOM DEPUTY: Please state your name for the record.
THE WITNESS: Cathy Johnson, C-A-T-H-Y, J-O-H-N-S-O-N.
THE COURT: I will now give the jury an instruction before we hear questioning of this witness.
You will now hear the testimony of a witness who will testify under a grant of immunity from this Court

after invoking her constitutional right against self-incrimination.

What this means is that testimony of the witness may not be used against her in a criminal case except in a prosecution for perjury, making a false statement, obstruction of justice, or otherwise failing to comply with the immunity order.

Under the law, Congress has granted the right to request that a witness be prepared to testify after exercising their right against self-incrimination.

Earlier this year, I issued an order compelling Ms. Johnson to testify and granting her immunity from prosecution at the request of counsel for the Government.

I'm instructing you, as a matter of law, that you may not consider Ms. Johnson's testimony under a grant of immunity against the defendant, Mr. Priolo. This information is provided to you in order to assess her credibility. The fact that Ms. Johnson is testifying under a grant of immunity does not show that she has done anything wrong.

Thank you.

You may proceed.

(Continued on next page.)





(Continuing.)

MR. FROCCARO: May I have a quick sidebar? I apologize.

THE COURT: Yes.

(Sidebar.)





(Sidebar.)

MR. FROCCARO: Judge, there's two items. First is, I'm not objecting to anything. So I don't know that you have to -- the judge wanted us if we weren't objecting that you would do them all, just offer them, one time. That's my understanding, right?

MR. DUNN: That was my intention, Your Honor.

THE COURT: I'm sorry. Say that again?

MR. FROCCARO: I'm not objecting to any of these exhibits he plans on introducing, so rather than me saying no objection, he's just going to introduce them all, and I'll say no objection I believe once and then we're good to go.

THE COURT: Exactly. We'll start with that.

MR. FROCCARO: The second thing is I wanted to read the stipulation we have regarding her immunity right now. That's what I want to do.

THE COURT: Have you shown the stipulation --

MR. FROCCARO: Yeah. We agree on the language.

THE COURT: Do you agree on the language?

MR. FROCCARO: Yeah. Absolutely.

THE COURT: Do you agree with him reading that now.

MR. DUNN: I have no objection to the request.

THE COURT: Why don't you start with offering





the exhibits, I'll admit them and we'll turn to the stipulation and then you can question.

MR. FROCCARO: Thanks.

(Sidebar concluded.)

(In open court.)

MR. DUNN: Your Honor, the Government moves the following exhibits into evidence, Government Exhibit 151, 152, 153, 156, 157, 159, 160, and 160-EO, 162, and 162-OE, 171, and 171-OE, 172, 173, and 173-OE, 174, 175, and 175-OE, 175A, and 175-AOE, 177, and 177-OE, 180, 181, 182, 183, 184, 185, 186, 188.

Exhibit 394, the file chats dot XLSX, and only that file at the time.

And Government Exhibit 401 -- 401, only page 19 and 20, and the corresponding documents in Government Exhibit in 401-OE.

MR. EDELSTEIN: Subject to our standing objections, Judge, they're no longer objections.

THE COURT: These exhibits are admitted and just give us a moment so we can make sure to update our files prior to the questioning.

MR. DUNN: Of course.

(Pause in proceedings.)

THE COURT: Mr. Dunn, just to confirm, you indicated 394 chats XLSX, and then, 401, pages 19 through 20, and then 401-OE, is that correct?

MR. DUNN: Yes, Your Honor.

THE COURT: Am I missing something anything in that latter part?





MR. DUNN: In the 401 or the chats.

THE COURT: Just after 394, chats XLS?

MR. DUNN: Yes, Your Honor.

THE COURT: Then 401, then 401-EO. Anything else?

MR. DUNN: There's a specific folder in Exhibit 394 that that is in. That folder is called CJ-AND-PRIOLO.

THE COURT: Okay. Thank you.

(Government Exhibits Government Exhibit 151, 152, 153, 156, 157, 159, 160, and 160-EO, 162, and 162-OE, 171, and 171-OE, 172, 173, and 173-OE, 174, 175, and 175-OE, 175A, and 175-AOE, 177, and 177-OE, 180, 181, 182, 183, 184, 185, 186, 188; Exhibit 394, the file chats dot XLSX; Government Exhibit 401, page 19 and 20, Government Exhibit in 401-OE were received in evidence.)

MR. FROCCARO: I have a stipulation to read between the Government and Mr. Priolo. I have to put my glasses on, so I can see it. Just one --

The Government and defendant -- I'm sorry. The Government and defendant, Philip Priolo, agree and stipulate that Cathy Johnson was never charged with mail fraud, wire fraud or conspiracy to commit mail fraud or wire fraud, and cannot as of the time of her testimony be charged with those same offenses.

Thanks, Judge.





THE COURT: Thank you very much.

Go ahead Mr. Dunn.

MR. DUNN: Thank you, Your Honor.

Would the Court please advise the witness she remains under oath or would the court deputy re-swear?

THE COURT: I believe we just swore her in.

MR. DUNN: I apologize.

THE COURT: Yes. He swore her in her. She's good.

MR. DUNN: I apologize.

CATHY JOHNSON, having been previously sworn, testified on her oath as follows:

DIRECT EXAMINATION

BY MR. DUNN:

Q. Good morning or good afternoon. Please state your name.
A. Cathy Johnson.
Q. Where do you live?
A. I currently live in Breinigsville, Pennsylvania.
Q. And when did you move to Pennsylvania?
A. In November of 2016.
Q. Where did you live before?
A. On Long Island.
Q. For how long?
A. My whole life.





Q. How did your family come to be in the area?
A. They have always been in the area.
Q. Did you go to school on Long Island?
A. Yes, in Hicksville.
Q. Where did you go to high school?
A. Hicksville High School.
Q. Did you finish high school?
A. No.
Q. How far did you get in high school?
A. Partially in tenth grade.
Q. And when did you leave high school? What year?
A. 1998.
Q. Have you pursued additional education since then?
A. I received my GED.
Q. When did you receive your GED?
A. In the last few years.
Q. What did you do when you left high school?
A. I was working at an educational supply store for teachers and then a kitchen supply store.
Q. What years did you work at the teacher supply store?
A. That was from '97 to '99.
Q. What did you do at that store?
A. Cashier and then key holder.
Q. Where was that store located in?
A. Westbury.

Q. Did you like that job?
A. Yeah, I enjoyed it.
Q. And how old were you when you started working there?
A. Around 14, fifteen.
Q. Who was your employer?
A. Fred and Renee were the owners of company.
Q. What was their last name?
A. I believe it was King.
Q. And who was that in relation to Sean Novis?
A. Renee was his aunt.
Q. Is this job how you came to first be acquainted with Sean Novis?
A. Yes.
Q. How did you first meet Sean Novis?
A. He come into the store every once in a while with smaller bills to exchange for larger bills in the register.
Q. And when did you first meet him, approximate year?
A. In '97.
Q. Did you get to know him well while you were working there?
A. Just in passing.
Q. How often would you see him?
A. Maybe every couple of weeks.
Q. Did you do any tasks for him besides, exchanging





bills or was it just that?
A. No, it was just that.
Q. And how long did you work at that store?
A. About two years.
Q. When did you leave?
A. In '99.
Q. Why did you leave that job?
A. They had hired on a new manager that I didn't get along with.
Q. Where did you go to work after that?
A. I went to work at Lechters.
Q. What's Lechter?
A. It was a kitchen supply store.
Q. How long did you work there?
A. A little under two years, maybe a year and-a-half.
Q. How did it come to pass that you ended up working for Sean Novis?
A. I had reached out around the holidays to Jen Woska to wish her a Merry Christmas. She was the buyer for Educational Warehouse, which they were dating at the time and he returned the call and had offered me a job.
Q. When was that approximately?
A. The end of '99.
Q. Did you accept that job?
A. Yes.





Q. And what appealed to you about the job Mr. Novis offered?
A. Being able to work in as an office instead of retail.
Q. So when did you actually start working for Mr. Sean Novis?
A. In January of 2000.
Q. What did he hire you to do?
A. I was overseeing the caging room.
Q. What is a caging room?
A. That's where the mail is processed.
Q. Can you describe the process that happens in caging?
A. Sorting the incoming mail, slicing it open, opening the envelopes, marking down of if the responders had paid or not.
Q. How long did you work for Sean Novis?
A. From 2000 until 2015.
Q. Okay. And you then struck out on your own for a year approximately, is that right?
A. Yes.
Q. What did you like about working for Sean Novis?
A. I liked being in an office. It seemed like a more respectable professional-type job than just doing retail.
Q. What part of the job did you like the least?
A. Probably doing the customer service ones. I had started doing that.





Q. Why didn't you like that part?
A. It made it more obvious that the mailings were misleading when it was right in your face. It was easier to block that out when you weren't reading letters from the actual customers.
Q. Why did that bother you?
A. Because I wouldn't want someone to do that to anyone in my family.
Q. How were the pieces misleading?
A. Just from reading them, it made it sound like you won something instead of that you were buying something.
Q. When did you realize that about the mail?
A. I was pretty apparent right from the beginning.
Q. Okay. New topic.
What was the name of Sean Novis's company when you started in 2000?
A. Justin Grant.
Q. What kind of business was Justin Grant conducting?
A. They were doing sweepstakes through the mail.
Q. Direct mail?
A. Yes.
Q. Were there any other company names at that time?
A. There was Sweepstakes Advisory Network.
Q. And did Mr. Novis, Sean Novis, explain what the company did beyond just sweepstakes?

A. They did sweepstakes and they were selling a coupon book.
Q. What kind of coupon book?
A. On the mailings that were for sweepstakes, it was a coupon book that just had like Dunkin Donuts coupons, Jiffy Lube.
Q. Where was Sean Novis' office back in 2000?
A. On Bloomingdale Road in Hicksville.
Q. When you started, did Sean Novis provide any training to you on how to do your job?
A. Not really. It was really just counting checks and making sure all the information and everything was on them, on relaying it for the bank.
Q. Did anybody besides Sean Novis provide you any training on how to do your job?
A. No.
Q. There was a company name on the office door?
A. Not that I remember.
MR. DUNN: Permission to publish Government Exhibit 188, which has been admitted?
THE COURT: Granted.
MR. DUNN: And please publish.
THE COURT: Is it on the document viewer or --
MS. ENTWISTLE: On the computer.
THE COURT: Is it showing up on yours?





MS. ENTWISTLE: It's on document camera, which we just need to switch to the computer.
THE COURT: Understood.
MR. DUNN: Please publish, Mr. Morabito.
COURTROOM DEPUTY: To the witness?
THE COURT: For the jury. It's been admitted.
MR. DUNN: I believe all of the exhibits that I'll be doing with Ms. Johnson have been admitted.
(Exhibit published.)
BY MR. DUNN:
Q. Ms. Johnson, what is this?
A. This is a letter from Justin Grant, dated February of 2000 and signed by Sean Novis.
Q. And this is just after you started working at the company, is that correct?
A. Yes.
Q. Would you please read the text of the letter, starting with to whom it may concern?
A. To whom it may concern, this is to inform you that the following Sportime members are currently employed by Justin Grant, limited, Keara Albert, Robert Kossin, Philip Priolo, Jeffrey Novis, Sean Novis, Jennifer Woska. If I can assist you further, please let me know. Very truly yours, Sean Novis.
Q. Do you remember the name Keara Albert?





A. No.
Q. Do you remember the name Robert Kossin?
A. No.
Q. Do you remember the name Philip Priolo?
A. Yes.
Q. And do you see Mr. Priolo in the courtroom today?
A. Yes.
Q. Would you please describe his clothing?
MR. FROCCARO: Stipulate to the identification.
MR. DUNN: Thank you, Your Honor.
THE COURT: Stipulated.
BY MR. DUNN:
Q. Do you know the name Jeff Novis?
A. Yes.
Q. Who is Jeffrey Novis?
A. He is Sean Novis's father.
Q. When did you first meet Jeffrey Novis?
A. Probably around right when I started in January.
Q. Did Mr. Jeffrey Novis ever tell you what he did for a living?
A. No.
Q. You also already discussed Sean Novis. Who is Jennifer Woska?
A. That is Sean Novis's now wife.
Q. Did Sean Novis have partners in his business over the





years?
A. Yes.
Q. Who were those partners?
A. Phil Priolo, Gary Denkberg.
MR. FROCCARO: Could we get a time frame, Your Honor, on this? A time frame?
THE COURT: If you would like a sidebar, we can do a sidebar, but otherwise, I'm going to allow the question.
MR. FROCCARO: I would like a sidebar.
THE COURT: Okay.
(Sidebar.)

(Sidebar.)
THE COURT: What's the objection?
MR. FROCCARO: What time frame is it, Your Honor, because Your Honor was going to give an instruction.
THE COURT: I'm sorry. I misunderstood. I thought that you mean a time frame for the number of questions he was going to ask.
MR. FROCCARO: No, nothing to do with that.
THE COURT: Okay.
MR. DUNN: I'm happy --
THE COURT: You'll clarify that. Thank you so much.
MR. FROCCARO: Thanks.





(In open court.)
Q. Ms. Johnson, I want to just briefly clarify for you when Mr. Priolo was working with Mr. Sean Novis. Was he working with Mr. Novis around the time you started?
A. Yes.
Q. Do you recall how long he was involved with Mr. Novis at this time in the early 2000s?
A. At least a year, but probably less than two.
Q. Okay. And when do you recall Mr. Priolo coming back into the Sean Novis universe?
A. I believe it was sometime in 2015.
Q. Okay. So let's now talk about other partners of Mr. Sean Novis. You mentioned -- well, who's Gary Denkberg?
A. Gary Denkberg was the owner of Horizon.
Q. And --
A. And was a partner of Sean Novis.
Q. Who was Jason Spector?
A. He was also a partner of Sean Novis.
Q. And who was Sean Phillips?
A. He was another mailer and he also wrote promotions.
Q. Like sweepstakes-type promotions?
A. Yes.
Q. Which company was associated with Mr. Denkberg?
A. Horizon Marketing.
Q. And which company was associated with Mr. Sean Novis?





A. Quantum Marketing.
Q. And what company or companies were associated with Shawn Phillips?
A. Lakeside Promotions and Haven.
Q. Did Shawn Phillips actually work in the office with Mr. Sean Novis?
A. No.
Q. Where did he work?
A. I believe he lived in Canada.
Q. So back in 2000 when you started, who ran the office? Who was the boss?
A. Sean Novis.
Q. Why did he run it. Do you know?
A. No, he just did.
Q. Was that always true in the time you were involved through 2016?
A. Yes.
Q. When you started in 2000, who were Mr. Sean Novis's main partners?
A. Philip Priolo and Jason came along. Not the very beginning, but not too long after.
Q. Would you consider Jeffrey Novis to have been a partner and were involved at that level?
A. I didn't consider him one.
Q. What does it mean to be a partner of Sean Novis?





A. That they would both share profits from the company.
Q. And again this is in 2000. Did the partners have desks in Sean Novis's office?
A. Yes.
Q. And did Mr. Priolo have a desk?
A. Yes.
Q. Where was that?
A. It was in the same office as Sean.
Q. Did Jeffrey Novis have a desk in the office?
A. I don't remember.
Q. What did it mean to you that Mr. Priolo had a desk in the office?
A. That he was a partner.
Q. Did Mr. Priolo and Mr. Jeffrey Novis work in the office regularly back in 2000, 2001?
A. They would come in regularly and help cage the mail.
Q. Did you observe them caging mail?
A. Yes.
Q. How often were they in the office?
A. I would say at least weekly.
Q. Around the time you began working in 2000, you said they were doing sweepstakes. Is that different than sweeps reports?
A. Yes.
Q. Were they also doing sweeps reports at that time?

A. Yes.
Q. Which company was associated with these sweeps reports?
A. Sweepstakes Advisory Network.
Q. And who was that company associated with?
A. Phil Priolo.
MR. DUNN: Government Exhibit 401?
THE COURT: It may be published. Go ahead.
MR. DUNN: Page 19.
Thank you, Your Honor.
(Exhibit published.)
BY MR. DUNN:
Q. Ms. Johnson, what is this document?
A. This is a sweeps report letter for Sweepstakes Advisory Network.
MR. DUNN: Okay. Can you highlight the very bottom of the page below the seal?
MR. FROCCARO: Judge, may we approach?
THE COURT: Yes.
(Sidebar.)





(Sidebar.)
MR. FROCCARO: He's going into -- we need a limiting instruction, Judge, I think before he starts. He's going into what the -- well, withdrawn.
MR. DUNN: If your Honor would like to give that instruction, that's fine, the limiting instruction on --
THE COURT: I didn't get a limited instruction.
MR. FROCCARO: I thought you said you sent it.
MR. DUNN: On --
THE COURT: I did not get a limiting instruction.
MR. DUNN: We handed it to the Court this morning on paper.
THE COURT: That was -- oh, that instruction?
MR. DUNN: Yes, Your Honor. I believe that's --
MR. FROCCARO: Okay. Because he said --
THE COURT: Okay.
MR. DUNN: If the court, whatever is appropriate.
THE COURT: I'm fine with giving it now. You're requesting it now?
MR. FROCCARO: I have no objection to giving it now.
THE COURT: Okay.
MR. DUNN: Of course.





(Sidebar concluded.)





(In open court.)
THE COURT: We just need a minute.
MR. DUNN: I have another copy, Your Honor, if it would that helpful.
THE COURT: That would be great if you have a copy.
MR. DUNN: May I approach?
THE COURT: Yes. Thank you.
Members of the jury, I'm going to give you another instruction.
The time period of the conduct that Mr. Priolo is charged with in this case begins in March 2015, and ends in December 2016. Mr. Priolo is not charged and has never been charged with --
Hold on one moment.
Counsel, please come to the side.
(Sidebar.)

(Sidebar.)

THE COURT: So I just read the first sentence of Mr. Froccaro's proposal, which is not what the parties are going -- the parties are going with the Government's proposal. So I'm going to ask the court to strike whatever I just read and I'll start from the beginning. I'm just letting you know that I made that mistake.

MR. DUNN: Of course.

MR. FROCCARO: I've got to be honest. I thought we agreed on it before.

MR. DUNN: We did. It's this one.

THE COURT: You agreed on the Government's proposal.

MR. DUNN: She started reading --

MR. FROCCARO: Then why did you put defense on --

MR. DUNN: Because this is what I had prepared to hand the Court --

THE COURT: Before you reached agreement.

MR. FROCCARO: Okay. It's not your fault, but I'm --

THE COURT: I'll correct the mistake.

So we're going to ask you to strike that little piece that I just read before.

(Sidebar concluded.)









(In open court.)

THE COURT: Ladies and gentlemen of the jury, I'm going to strike what I just read to you and I'm going to start again.

You have heard testimony and may see evidence about alleged conduct that occurred in the early 2000s. This evidence is being introduced as background information about the nature of the scheme alleged in the indictment, its structure, and the development of the relationships between Mr. Priolo and persons discussed during witness testimony, and in the evidence.

You are not to consider this evidence for any other purpose. I want to remind you that the charged conspiracy in this case is from approximately March 2015 to December 2016. It is up to you to evaluate this evidence and testimony and decide how much weight to give it, if any.

Thank you.

MR. DUNN: Okay. Please publish Government Exhibit 401 at page 19.

(Publishes exhibit to the jury.)

BY MR. DUNN:

**Q.** Ms. Johnson, we were looking at the language at the bottom below the seal. Can you read the text you see at the bottom of this page?





**A.** Official documents sweepstakes advisory network Inc.

**Q.** That's the company you stated is associated with Mr. Priolo, is that correct?

**A.** Yes.

**Q.** How do you remember this document after 25 years?

**A.** I remember the company name, just seeing these pieces of paper over and over. They kind of get embedded in your memory.

**Q.** And do you see the date in the upper right in the block of text below the stamp that says, receiver notice?

**A.** Yes. November 1st, 2000.

MR. DUNN: Can you highlight the first four paragraphs and make them bigger?

BY MR. DUNN:

**Q.** And Ms. Johnson, would you please read?

**A.** Dear John, in this matter letter of notice is to you inform you of your ID number 12345678910, which will now receive special attention as a result of your recent involvement in a national product promotion in which we received filed information about your participation interests.

Our office handles special matters in reporting available moneys and prizes to be entered for as reported in the SANI report now issuable to you.

Letter of notice to John J Smith, SANI real

money and prizes report, code number 12345678910, total amount now reported filed on record by RM and P, two million, four hundred thousand dollars, then two million, four hundred thousand dollars in public available sweepstakes money and prizes.

We have prepared these report request documents for you, John, and our office is now preparing the arrangements for delivery at your request for the report of amount of total sweepstakes money and prizes confirmed, including the complete and easy directions for entry into sweepstakes and contests.

(Continued on the next page.)





(Continued.)

BY MR. DUNN:

Q. Now, you've seen this document before today correct?

A. Yes.

Q. Is this a document that, itself, would have gone through the mail or is this like a sample sort of in the office?

A. This would have been a sample.

MR. DUNN: Can you highlight the third paragraph from the bottom and call it out, please?

Q. Would you please read that?

A. The amount of money and prizes reported are 100 percent confirmed, and you, John, are identified as receiver of this letter of notice for report. As such. When your request is received with a $20 fee, you will be directly advised for full access to the all of the monies and prizes.

MR. DUNN: Can you please highlight the signature at the bottom of the page?

Q. Do you know the name Douglas Bahre?

A. No.

Q. Never heard of that person with that name working with Mr. Novis or Mr. Priolo?

A. No.

MR. DUNN: Can you go to page 20, please? Can





you highlight the next on the right where it says, it is here made final?

Q. Would you please read that, Ms. Johnson.

A. It is here made final I, John J. Smith, have placed my initials here stating that I am a know prospect correctly identified here. My name and address are correct and do here request to receive the report and complete instructions to win the money and prizes totaling $2,400,000 as reported through SANI. I will be provided the complete participating entrance advisement and instructions and have hear enclosed the report fee of $20 with my check, cash, money order, payable to SANI offices. Note, John, please let us know your phone number if we need to call; area code. When using a credit card, do you feel it is more convenient than carrying all of your spendable cash? Yes, no. You do not have a credit card but would like one; yes, no.

Q. Okay. Thank you.

Ms. Johnson we talked about a number of company names including Horizon and Quantum. Do you recall any names that Mr. Sean Novis and Mr. Gary Denkberg used for companies before they used those two particular names?

A. There was SMME. JGS was another company.

Q. While you're thinking, let me ask you what does SMME stand for?





A. Snail Mail Marketing and Entertainment.

Q. Can you recall other names?

A. DNCS, DMLS, EC Logistics.

Q. All of these companies were controlled by whom?

A. Sean Novis.

Q. And his partners?

A. Right.

Q. What did all of these companies do?

A. With the exception of EC Logistics, they were doing sweeps reports.

Q. Did any of those companies have separate offices?

A. No.

Q. Did they have separate employees? Like, separate staff?

A. No.

Q. By what year was Mr. Novis's operation only doing sweeps reports?

A. Probably 2002, 2003.

Q. Was that true for all of the partners in Sean Novis's operation? They were only doing sweeps reports after that time?

A. Yes.

Q. Did you receive a paycheck from any of those companies?

A. Yes.

Q. Which company?
A. In the beginning, it was Justin Grant. And then once EC Logistics was formed, I was paid from there.
Q. So let's talk about EC Logistics. What was that?
A. That was a corporation that Sean Novis had myself and Ellen McDevitt form.
Q. Do you recall when that was?
A. 2001, 20202.
Q. What does EC stand for in EC Logistics?
A. Ellen and Cathy.
Q. Whose idea was it to form this company; EC Logistics?
A. Sean Novis.
Q. How old were you then?
A. 19.
Q. And by form the company, what do you mean?
A. I was the president of the company.
Q. An actual corporation?
A. Yes.
Q. Why were you the president of this company at the age of 19?
A. Because he told me to do it. I didn't really have a reason.
Q. What authority as the president of EC Logistics did you have?
A. None.





Q. Who made all of the decisions for EC Logistics?
A. Sean Novis.
Q. Could you spend money out of EC Logistics?
A. No.
Q. Could you give yourself a raise?
A. No.
Q. Could Ellen, Ellen McDevitt, could she do any of those things?
A. No.
Q. So you said there was a break in 2015 working for Sean Novis versus working for yourself, correct?
A. Yes.
Q. When was that?
A. I went out on my own in August of 2015.
Q. Went out on your own to do what?
A. The caging work.
Q. Why? How did that come about?
A. Sean Novis had approached me that he didn't want to do it in-house anymore, and he asked me if I wanted to do it on my own.
Q. Wanted it to what, specifically?
A. The caging work.

MR. FROCCARO: Judge, can we approach for one second?

(Continued on the next page.)





(Sidebar conference outside the hearing of the jury.)

THE COURT: What is the basis for your objection?

MR. FROCCARO: I'll tell you. Why I'm very familiar with the 3500. In it she says she assumed they told her that and Lustigam, meaning the lawyer. I want to make sure you're not going there.

MR. DUNN: I'm not going there.

MR. FROCCARO: Okay. I wanted to be sure. Thank you.

(Sidebar conference concluded.)

(Continued on the next page.)





(In open court.)

THE COURT: Can the court reporter read the last question and answer, please.

(The requested portion of the record was read back by the Official Court Reporter.)

BY MR. DUNN:
Q. You didn't know why Sean asked you to do this; is that right?
A. No, I wasn't given a reason.
Q. So how did you go about setting up your own caging operation?
A. I formed a corporation with Sean and Gary. Sean Novis and Gary Denkberg helped me do, and just moved out and started doing it.
Q. What was the name of that corporation?
A. Precise Services, Inc.
Q. And you formed that corporation?
A. Yes.
Q. Did you pay to form that corporation?
A. Yes.
Q. Where did you set up operations for that corporation?
A. In the basement of my home.
Q. What street was your home?
A. Owen Street.
Q. In what town?

A. Westbury.
Q. Who were your clients when you started Precise Services?
A. Company name or people?
Q. People is fine.
A. Okay. Phil Priolo, Jeffrey Novis, Sean Novis, Gary Denkberg, Sean Phillips, Patricia Astua, and Josie Rivera.
Q. I think the latter two names may be new. So were they associated with any of these other mailers?
A. With Sean Philips.
Q. Did you have any other clients?
A. No.
Q. What kind of caging work did you do for all of these people?
A. The processing of the mail, customer service, picking up the mail.
Q. And what type of mail was it? Like, what was their business?
A. They were all sweeps reports.
Q. And this is what year?
A. This was 2015.
Q. Until when?
A. 2016.
Q. Were you making about the same kind of money doing this on your own, or more, or less?





A. More.
Q. When did you stop doing this caging work?
A. September 22, 2016.
Q. Why do you remember that date?
A. Because that's the date that the postal inspector showed up at my home.
Q. And they carried out a search warrant; is that right?
A. Yes.
Q. That's when you stopped doing this?
A. Yes.
Q. Were you home when they showed up?
A. Yes.
Q. Was anyone home with you?
A. My husband.
Q. What did you think when they showed up at your house?
A. I was scared.
Q. Did the postal inspector try to speak with you that day?
A. Briefly.
Q. Did you sit for an interview with anybody that day?
A. No.
Q. So what did the agents do at your home on September 22nd?
A. Walk through, recorded, and took everything from my basement.





Q. Anywhere else in the house or just in the basement?
A. Just from the basement.
Q. When was the first time that you agreed to be interviewed by anybody connected with the investigation of a prosecution team?
A. Last year.
Q. Was that first interview and subsequent interviews subject to the terms of what's called a proffer letter?
A. Yes.
Q. What is your understanding of what a proffer letter is?
A. That --

THE COURT: Sidebar.

(Continued on the next page.)





(Sidebar conference outside the hearing of the jury.)

THE COURT: So, Mr. Dunn, my ruling was that you can ask her about being interviewing with the Government in the context of a proffer meeting. But not to testify about the contents of any proffer agreement. Or what was exchanged or said during that proffer meeting. Asking her about her knowledge of this is skirting her close to that and I don't know that she can make a distinction.

MR. DUNN: Her answer will be that what she said cannot be used against her, but I will withdraw the question if the Court wishes.

THE COURT: If that's the limited answer, I'm fine with that.

MR. DUNN: That's the answer. That is what I felt I presented to the Court.

MR. FROCCARO: I thought she wasn't being asked if she was interviewed.

THE COURT: This question is fine, but you know what my concern is.

MR. DUNN: Yes. That's the last question on the proffer letter.

THE COURT: Thank you.

(Sidebar conference concluded.)

(Continued on the next page.)

(In open court.)
THE COURT: Thank you.
Ms. Johnson. You may answer the question. So I'll have the court reporter read back the question.
(The requested portion of the record was read back by the Official Court Reporter.)
A. My understanding is that anything I said in the proffer sessions wouldn't be used against me, as long as I was being truthful.
Q. And you're testifying under a grant of immunity here today?
A. Yes.
Q. And have you been made any other promises or guarantees by the Government in connection with your testimony?
A. No.
MR. DUNN: Government Exhibit 151. Please publish, page three, please.
(The above-referenced exhibit was published to the jury.)
Q. Ms. Johnson, have you reviewed this set of documents previously?
A. Yes.
Q. Do you know what they are?
A. They're pictures from the basement of my home where I





was working out of.
Q. What is on page three of Government Exhibit 151?
A. A computer and a barcode scanner.
Q. How were those used in your caging operation?
A. Each mailing that went out had a two barcodes on it. One identified the customer, one identified what list they came from. And that's how data entry was done. The bar codes were scanned on each form.
MR. DUNN: Page five, please.
Q. What is on page five?
A. This is a trash can with trash in it.
Q. What type of mail is this in the trash can?
A. It's from sweeps reports.
Q. When you were finished scanning, what did you typically do with the documents?
A. If this were just removals that were being scanned, they got thrown out. If they were responders and non-buyers they would be held until data entry was e-mailed to Mary Lillenkamp.
MR. DUNN: Page six, please.
Q. And again, what is in page six?
A. Another trash can with sweeps reports trash in it.
MR. DUNN: Okay. Page eight, please.
Q. What is on this white board in your office?
A. That was my calendar. I would keep track of which





companies had cut offs and when.
Q. What do you mean by cut off?
A. When each company's front ends was coming in, they would expert their data to create their back ends. And each company had their own schedule, so I could keep track so I knew which company was a priority that day.
Q. How is that information used in the overall mailing operation?
A. They take all of the buyers from the front end to create their other back end files that get mailed out afterwards.
Q. And you provided that information?
A. Yes.
MR. DUNN: Page 16, please.
Q. Can you describe what is on page 16 of Exhibit 151?
A. These are shelves for each of the separate companies with data entry that had already been completed.
Q. On the bottom, what does Lakeside refer to?
A. That is Sean Philips and Patricia's company.
Q. Above that QMI, what does that refer to?
A. That's Quantum Marketing. That's Sean Novis company.
Q. And above that?
A. Horizon. Gary Denkberg.
MR. DUNN: Okay. Page 17.
Q. We already talked about Horizon. Above that, what is





Haven?
A. Haven is Sean Philips and Josie Rivera.
MR. DUNN: Okay. Page 18, please.
Q. Above Haven, what do you see?
A. France and Germany.
Q. Who is that associated with?
A. That is Gary Denkberg and Sean Novis.
MR. DUNN: Okay. Page 19.
Q. What is on page 19 of Exhibit 151?
A. That is completed data entry for Winners Circle.
Q. Why did you call it WINC?
A. That was Winners Circle. It was just my abbreviation for it.
Q. Si this was mail that had already been recorded and caged; is that correct?
A. Yes.
MR. DUNN: Page 20.
Q. Is this a close up of the same thing we just saw?
A. Yes.
MR. DUNN: Can you zoom in on the document on the top of the pile there?
Q. Can you read the addressee?
A. Asda White.
Q. I'm not going to ask you to read the note, but do you see there's a note on there?

A. Yes.
Q. Did people responding to any of your clients at this time, sweeps report promotions, did they often write notes like this?
A. Yes.
MR. DUNN: Page 21, please.
Q. What is on page 21 of Exhibit 151?
A. Mail that had come in that day.
Q. What is it is that's sticking up at the end of the row there?
A. There's an express mail and then it looks like two priority mails.
Q. Did this -- well, these are responses to sweeps report promotions, correct?
A. Yes.
Q. Did you often get priority mail or express mail responses?
A. Yes.
Q. How often?
A. Everyday.
Q. How about FedEx?
A. Weekly, but regularly.
Q. How much mail did all of this caging you did for the people associated with Sean Novis, how much paper did that generate?





A. Per week, usually about -- there were three big trash cans that I think were 64 gallons each. Those would usually be filled.
MR. DUNN: Please publish Government Exhibit 152.
(The above-referenced exhibit was published to the jury.)
Q. What is this document?
A. This is a contract with a recycling company that picked up the paper from me.
MR. DUNN: On the right side of the document, would you highlight the handwritten note under where it says container and the chart? On the left side, I'm sorry.
Q. What is reflected here?
A. How many containers I had in their size. Three at 64 gallons.
Q. And here it says front end. I don't want to confuse anybody. That's describing a trash container, not anything having to do with direct mail.
A. Correct.
Q. This mail -- I'm sorry. The paper was picked up how often?
A. Weekly.
Q. So if the paper is picked up weekly, how much paper





representing what period of time is in your caging office on any given day?
A. It could be two weeks or so depending on when the cutoffs were for back ends. Because I would hold onto it until I knew the files had gotten to Mary.
Q. So you didn't store the caging paper --
A. No.
Q. -- okay.
MR. DUNN: Please publish Government Exhibit 156.
THE COURT: Granted.
(The above-referenced exhibit was published to the jury.)
Q. What is this document?
A. This is a service agreement between myself and Winners Circle dated August of 2015.
MR. DUNN: Page 11, please.
Q. Whose signatures are on this page?
A. Philip Priolo and myself.
MR. DUNN: Back to page one, please.
Q. Where did you get this document?
A. From Sean Novis.
Q. So you didn't write it?
A. No.
Q. What does this document do? What's its purpose?





A. Just to make it clear what the pricing was for each service. And services provided.
Q. Did you specifically negotiate this with Mr. Priolo?
A. No.
Q. So you didn't come up with a list of new duties or anything?
A. No.
Q. Why not?
A. Because it was just continuing on how I was always doing it when I was working under Sean Novis.
MR. DUNN: Page five of this document, please.
Q. Do you recall who this sponsor is in this contract?
A. That would be Winners Circle on this one.
Q. And that's whose company?
A. Phil Mr. Priolo.
Q. Would you please read paragraph 6.1.
A. Sponsor and PSI agree that all data, documents, instructions, paper goods, and the like pertaining to the business of sponsor and/or relating to the promotional materials of sponsor are and will remain the exclusive property of sponsor. During the course of this agreement, PSI acknowledges that its use of sponsor property shall be restricted to furthering the exclusive business interests of sponsor. And it further acknowledges that it will not utilize sponsor property for any independent business

purpose.
MR. DUNN: Page 12 of this document, please.
Q. What is on this page of the document?
A. This is a list of prices for each service.
Q. What is paid response processing?
A. Those would be people who sent cash, check, or money order in.
Q. What is non-paid response processing?
A. Those are people who just send back the form and don't send money with it.
Q. Why does somebody pay you 35 cents to do one of those?
A. Because it still gets recorded and reflected in this spreadsheet so they can see the percentages.
Q. What else is that data used for; do you know?
A. That, I'm not sure of.
Q. Okay. What is Nixes?
A. That would be unbelievable mail.
Q. What is faxing daily count and/or productive report?
A. It would be e-mailing their deposit sheets and a summary of what would come in for the day.
Q. To whom would you e-mail that?
A. For Winners Circle it went to Phil Priolo and Jeffrey Novis.
Q. Why to Jeff Novis as well as Mr. Priolo?





A. From my understanding, it was both of their company.
Q. What does sweeping PO boxes per location refer to?
A. That would be picking up the mail.
Q. Why do you specify per location?
A. Because they had multiple PO boxes.
Q. What does FedEx to PacNet refer to?
A. That would be if anything needed to be physically sent to their bank in Canada. PacNet.
Q. Customer service open and read. What does that refer to?
A. Opening any letters that came in that were handwritten as opposed posed to coming back in their standard reply envelope.
Q. What does produce CS response letter refer to?
A. Responding to customer service letters.
MR. DUNN: Please publish Government Exhibit 157.
THE COURT: Granted.
(The above-referenced exhibit was published to the jury.)
Q. What is this document?
A. Service agreement between myself and Feel Lucky Group dated June of 2016.
Q. Is this basically the same document as the one we just discussed, but for a different company?





A. Yes.
Q. Whose company is Feel Lucky Group?
A. Phil Priolo.
MR. DUNN: Page 11 of this document.
Q. Whose signatures do you see there?
A. Phil Priolo and myself.
MR. DUNN: Page 12 of this document.
Q. Is this basically the same cost structure?
A. Yes.
Q. What is the handwriting on the right?
A. E-mail data entry price to be determined.
Q. Do you remember what that refers to?
A. One of the promotions had a box requesting e-mail addresses. And at that time, that wasn't something I was doing, so I didn't have a price for it.
Q. Do you know what Mr. Priolo specified the -- was the purpose of collecting that information?
A. No.
MR. DUNN: Government Exhibit 263, which has been previously admitted.
THE COURT: May be published, go ahead.
(The above-referenced exhibit was published to the jury.)
Q. What is this document?
A. That is the corporation binder for Feel Lucky Group.





MR. DUNN: Can you go to page six?
Q. Do you see the corporate seal here?
A. Yes.
Q. Did Mr. Priolo ever come and, like, access this set of documents and the seal?
A. Not that I recall, no.
Q. Why was this in your caging office?
A. I don't recall why it was there.
Q. Did he ever come to update these records; to your knowledge?
A. No.
Q. Did he ever ask you to use the corporate seal for --
A. Not that I recall, no.
MR. DUNN: Your Honor, in terms of time, is the Court going to stop at, 3:15?
THE COURT: We are going to stop at 3:15. You can ask one or two more questions.
MR. DUNN: I'm going to go into a set of documents. So, by my watch, it's 3:15.
THE COURT: So we should save that for tomorrow. Thank you, Ms. Johnson. You can step down.
(Witness leaves the witness stand.)
THE COURT: Mr. Dunn, around how much more time do you have remaining for questioning?
MR. DUNN: How much longer with Ms. Johnson.

THE COURT: Yes.

MR. DUNN: I would imagine at least a couple more hours.

THE COURT: Okay, thank you.

To our jury, we are breaking early. All of my same reminders apply. Please don't speak with each other, with anybody else, or do any research, or have any contact with any of the parties, or counsel, or witnesses, or people you may see in this audience, or any court personnel. Please do not communicate with anyone about this case or anything related to it, whether through verbal, text, electronic communication, or any kind of communications that I haven't named. And, please, do not read any news articles, listen to any podcasts, or engage with any news content that you may come across that concerns this case. Not that I know of any, but just in case. And, again, inform me immediately through Mr. Morabito if you become aware that any other juror is not complying with these rules.

We will start tomorrow morning at 10:00 a.m. We will have half a day and we will try to be very focused tomorrow getting through those two and a half hours of testimony so to best use your time. Thank you so much.

(Jury exits the courtroom.)

THE COURT: Okay, thank you, have a seat.





MR. DUNN: May I raise a matter to the Court, your Honor? And I know exactly what the Court wishes to discuss.

THE COURT: Yes, you may. We don't have that much time to address it, but you can start.

MR. DUNN: Yes, your Honor. I had previously instructed the witness not to reference the truth telling provisions. I apologize, these are real people who may not appreciate the seriousness, sometimes, of instructions they're given. I'm open to suggestions on whether to address it again and call further attention to it. But it was not my intention to elicit that response from the witness, I apologize.

THE COURT: And I made my ruling based on your representation about what her answer was going to be and the representation turned out not to be correct. I did not get an immediate motion to strike from Mr. Froccaro, but, should you wish to make one now, I will strike that answer from the record.

MR. FROCCARO: Judge, strike it, Judge.

THE COURT: Are you making that motion?

MR. FROCCARO: I'll make the motion. I honestly don't think it's a big deal. Just, it can stay in there. That she's going to tell the truth in a proffer. Every interview she has to tell the truth at a proffer.





THE COURT: If you're not making a motion, I will not strike it. I will only strike it if you're going to make a motion for it.

MR. FROCCARO: I do have a question about another issue.

THE COURT: Okay. I want to make sure we're done with this issue.

MR. FROCCARO: We're done.

THE COURT: Anything else --

MR. FROCCARO: Hopefully she doesn't make any more mistakes.

THE COURT: I am going to talk to the Government again to make sure that all of its witnesses are advised and reminded of the instructions and my rulings, and I made a number of them on a number of issues.

MR. DUNN: If I may, your Honor. Normally, it is certainly not our practice to address at all, even really speak to a witness while they're on the stand. But with counsel and the Courts permission, we will, again, address that very specific topic and instruction about what case law refers to as bolstering, provisions of things like a proffer letter, to ensure that she understands that.

THE COURT: And I have -- I grant you my permission to do that discreet thing. And, as I indicated





in my ruling earlier, if the defense opens the door on attacking her credibility, then the door is open to bolstering.

MR. FROCCARO: But it already came in, they already bolstered. There's nothing else to come in.

THE COURT: Well, Mr. Froccaro, that's what I'm asking you.

MR. FROCCARO: That's why I didn't move to strike. I'm going to have to attack her credibility. The problem that I have, your Honor, I apologize for standing. She's saying it's misleading. I mean, is she going to give an interpretation of everything that she thinks is misleading? It's whether it's true or not, this particular fact. She's giving the outcome of the jury determination through her testimony. Is she going to do this the whole time?

THE COURT: She was asked a particular question. I was listening very closely. She spontaneously gave that. Do you recall what the specific question was, Mr. Dunn?

MR. FROCCARO: The consumer service documents.

MR. DUNN: It was in the context of customer service.

THE COURT: And my recollection is is that she was speaking from her personal knowledge as to her own

personal views and it was a legitimate answer. I don't recall there being a problem with that. I hear your question being; are those sorts of statements going to be combing in all of the time.

MR. FROCCARO: Everything she says, yeah. Yeah.

THE COURT: Well, I mean it depends on what her answers are to some of the question. She does have personal knowledge having worked for many, many years on the mailings at issue. So she's going to reflect on personal experience and interpretation. That doesn't mean that the jury has to give it weight. They're assessing the credibility of different witnesses. They heard also from Ms. Jacquard that there were no material misrepresentations. Ms. Jacquard testified that she thought everything was just fine. I didn't hear an objection from either side as to that. This is a different prospective from a witness and the jury gets to weigh the credibility of these witnesses and determine how they feel.

MR. FROCCARO: The only distinction -- the question with Ms. Jacquard was the material part of the transaction was the booklets and they got the booklet. It wasn't about representations.

THE COURT: No. She was asked questions about aggregate amount and whether that was what was actually





being reflected.

MR. FROCCARO: That was true. I didn't make her say, well is it true or not true. I have no problem no problem with them taking her through and saying is there someone who worked there with that name. But if she's going to say misleading to every single question, that's not very fair.

THE COURT: Well, she hasn't yet said it misleading to everything. She said it once in response to one question. I will monitor this, but I was listening to her and she was not straying beyond her personal knowledge and the context of the question there. And I do believe it is squarely analogous to the questioning that was done of Ms. Jacquard and Ms. Jacquard eliciting her own views of certain representations made on the materials.

Okay, anything further?

MR. DUNN: No, your Honor.

THE COURT: Any further applications from the Government?

MR. DUNN: I would only note that if counsel wishes to propose an instruction if he wishes the Court to give one on the issue of truth telling, we'll discuss that.

THE COURT: I'm hearing that he is not asking for that. But, if the parties want to discuss, they can





discuss further.

Any other applications for the Court?

MR. DUNN: No, your Honor.

THE COURT: Mr. Froccaro, any applications for the Court?

MR. FROCCARO: No.

THE COURT: Okay, I will see you all at 10:00 a.m. Thank you very much.

Oh, counsel. Just for the logistics of tomorrow. We have Thomas Ressler. Is he starting first thing tomorrow or are we continuing with Ms. Johnson?

MS. ENTWISTLE: We're continuing with Ms. Johnson, your Honor. We believe with the timing, likely, Ms. Johnson, and then the video testimony of Ms. Teshale will take all of the time on the shortened day tomorrow. So at this point, given the schedule, we anticipate moving the testimony of Thomas Ressler to first thing Monday morning at 10:00 a.m.

THE COURT: I'm sorry, I excused you before I was done asking questions about the schedule and I should not have done that.

At this point, when does the Government anticipate that its case in chief will close?

MR. FROCCARO: They only have one more witness.

MS. ENTWISTLE: As early as Monday, potentially





early Tuesday.

THE COURT: There are many names on the witness list that haven't been called. Are those individuals not being called?

MS. ENTWISTLE: Those are not. Remaining witnesses, the Teshale deposition, Mr. Ressler, Cathy Johnson will finish, and then the summary postal inspector. And that is the end -- that's the Government's full case.

THE COURT: So it's possible that we may even finish on Monday.

MS. ENTWHISTLE: It's possible, your Honor.

THE COURT: And we would have a charge conference on Tuesday morning. If we finish on Tuesday morning, we would have the charge conference on Tuesday afternoon. And Mr. Froccaro, I have not forgotten your request. Okay. Thank you all so much, see you tomorrow.

(Matter adjourned until Friday, March 14, 2025 at 10:00 a.m.)

I N D E X


| WITNESS | PAGE |
|---|---|
| MARLENE MONTILLA | |
| DIRECT EXAMINATION BY MS. ENTWISTLE | 419 |
| CROSS-EXAMINATION BY MR. FROCCARO | 430 |
| REDIRECT EXAMINATION BY MS. ENTWISTLE | 440 |
| CATHY JOHNSON | 446 |
| MARY LILIENKAMP | 450 |
| DIRECT EXAMINATION BY MR. FELDMAN | 450 |
| CROSS-EXAMINATION BY MR. FROCCARO | 508 |
| CATHY JOHNSON | |
| DIRECT EXAMINATION BY MR. DUNN | 526 |






E X H I B I T S


| | |
|---|---|
| Government Exhibits 301 through 310, 6, 6-OE, 21 21-EO, 57 | 450 |
| Government Exhibits Government Exhibit 151, 152, 153, 156, 157, 159, 160, and 160-EO, 162, and 162-OE, 171, and 171-OE, 172, 173, and 173-OE, 174, 175, and 175-OE, 175A, and 175-AOE, 177, and 177-OE, 180, 181, 182, 183, 184, 185, 186, 188; Exhibit 394, the file chats dot XLSX; Government Exhibit 401, page 19 and 20, Government Exhibit in 401-OE were received in evidence | 525 |

## $

**$2,400,000** [1] - 550:9
**$20** [5] - 427:19, 427:23, 438:19, 549:15, 550:11
**$22** [1] - 427:15
**$24** [1] - 427:13
**$25** [2] - 421:22, 424:10
**$26** [2] - 427:17, 428:8
**$30** [1] - 428:4
**$47** [1] - 427:23
**$8,000** [1] - 442:4

## '

**'97** [2] - 527:21, 528:19
**'99** [3] - 527:21, 529:6, 529:23

## 1

**1** [5] - 417:13, 417:14, 422:10, 422:25, 495:17
**1,000** [1] - 494:10
**10** [9] - 370:3, 371:24, 397:9, 418:12, 418:13, 421:21, 424:10, 488:7, 502:1
**10-minute** [1] - 408:11
**100** [3] - 364:15, 416:14, 549:13
**10017** [1] - 364:22
**103W** [1] - 364:19
**105** [1] - 371:19
**1051633** [1] - 369:5
**106** [3] - 371:25, 382:8, 384:19
**10:00** [5] - 364:6, 572:20, 578:8, 578:18, 579:19
**10:30** [1] - 403:9
**11** [7] - 369:6, 418:15, 418:16, 473:1, 502:22, 566:17, 570:4
**110** [1] - 406:25
**1103** [1] - 488:24
**11050** [1] - 364:20
**11590** [1] - 473:13
**11722** [1] - 364:15
**11797** [1] - 472:2
**12** [12] - 418:17, 418:18, 460:11, 460:16, 460:17, 460:19, 488:7, 504:13, 514:13, 514:17, 568:2, 570:7
**12345678910** [2] - 547:17, 548:1
**124** [1] - 384:24
**125** [3] - 382:8, 384:19, 384:24
**12:30** [1] - 448:24
**12th** [1] - 474:9
**13** [6] - 364:6, 370:24, 418:19, 418:20, 505:24, 506:25
**130** [1] - 367:7
**1328** [2] - 494:19, 495:1
**136** [1] - 403:13
**14** [9] - 371:2, 418:22, 418:23, 481:1, 488:7, 488:8, 507:4, 528:4, 579:18
**143** [1] - 384:14
**144** [1] - 380:24
**1443** [2] - 494:9, 494:11
**14th** [1] - 465:8
**15** [4] - 382:24, 386:12, 418:25, 419:1
**151** [8] - 524:3, 525:9, 560:17, 561:2, 562:15, 563:9, 564:7, 581:7
**152** [4] - 524:4, 525:10, 565:5, 581:8
**153** [3] - 524:4, 525:10, 581:8
**156** [4] - 524:4, 525:10, 566:10, 581:8
**157** [4] - 524:4, 525:10, 569:17, 581:8
**159** [3] - 524:4, 525:10, 581:8
**16** [6] - 419:2, 419:3, 480:18, 482:25, 562:14, 562:15
**160** [4] - 484:9, 524:4, 525:10, 581:8
**160-EO** [3] - 524:4, 525:10, 581:8
**162** [3] - 524:4, 525:10, 581:9
**162-OE** [3] - 524:4, 525:10, 581:9
**17** [2] - 366:22, 562:24
**171** [3] - 524:5, 525:11, 581:9
**171-OE** [3] - 524:5, 525:11, 581:9
**172** [3] - 524:5, 525:11, 581:9
**173** [3] - 524:5, 525:11, 581:9
**173-OE** [3] - 524:5, 525:11, 581:10
**174** [3] - 524:5, 525:11, 581:10
**175** [3] - 524:5, 525:11, 581:10
**175-AOE** [3] - 524:6, 525:12, 581:11
**175-OE** [3] - 524:6, 525:12, 581:10
**175A** [3] - 524:6, 525:12, 581:10
**176** [2] - 513:9, 513:11
**177** [3] - 524:6, 525:12, 581:11
**177-OE** [3] - 524:6, 525:12, 581:11
**18** [4] - 410:17, 446:9, 491:1, 563:3
**180** [3] - 524:6, 525:12, 581:11
**181** [3] - 524:6, 525:12, 581:11
**182** [3] - 524:6, 525:12, 581:11
**183** [3] - 524:7, 525:13, 581:12
**184** [3] - 524:7, 525:13, 581:12
**185** [3] - 524:7, 525:13, 581:12
**186** [3] - 524:7, 525:13, 581:12
**188** [4] - 524:7, 525:13, 532:20, 581:12
**18th** [1] - 371:14
**19** [10] - 524:10, 524:21, 525:14, 540:9, 546:20, 552:14, 552:20, 563:8, 563:9, 581:14
**196** [1] - 388:8
**1962** [3] - 377:3, 385:9, 385:17
**1979** [1] - 382:25
**1985** [1] - 388:9
**1990's** [3] - 368:11, 371:9, 372:14
**1990s** [1] - 366:24
**1998** [1] - 527:12
**1999** [1] - 421:5
**19th** [1] - 465:8
**1:00** [2] - 448:24, 449:9
**1:45** [2] - 496:24, 498:18
**1st** [1] - 547:11

## 2

**2** [14] - 382:24, 384:14, 417:17, 417:18, 422:8, 432:23, 488:7, 502:6, 502:24, 504:16, 506:2, 506:17, 506:25, 507:7
**2,300-some** [1] - 443:2
**20** [14] - 364:19, 421:22, 424:10, 458:12, 464:15, 473:12, 493:19, 494:8, 524:11, 524:22, 525:14, 549:25, 563:17, 581:14
**2000** [11] - 530:6, 530:16, 531:16, 532:7, 533:13, 538:10, 538:18, 539:2, 539:15, 539:21, 547:11
**2000's** [2] - 371:9, 372:14
**2000s** [5] - 366:24, 368:11, 452:12, 537:7, 546:6
**2001** [2] - 539:15, 552:8
**2002** [1] - 551:18
**2003** [1] - 551:18
**2007** [2] - 382:8, 384:19
**2008** [3] - 452:17, 452:21, 509:1
**2010** [1] - 369:4
**2013** [1] - 382:22
**2014** [1] - 383:13
**2015** [23] - 372:16, 373:1, 424:19, 426:4, 432:6, 455:7, 455:14, 456:24, 457:7, 457:11, 471:4, 471:11, 471:22, 500:9, 510:6, 530:16, 537:11, 543:12, 546:14, 553:10, 553:14, 556:21, 566:16
**2015/2016** [1] - 421:10
**2016** [35] - 372:16, 373:1, 427:3, 428:24, 430:4, 432:6, 432:10, 455:7, 455:12, 455:14, 456:24, 457:8, 457:11, 461:6, 461:8, 465:8, 473:1, 474:9, 474:19, 476:2, 476:8, 478:15, 480:22, 480:24, 482:23, 493:15, 500:9, 526:21, 538:16, 543:13, 546:15, 556:23, 557:3, 569:23
**2017** [1] - 368:4
**2020** [1] - 397:21
**20202** [1] - 552:8
**2021** [1] - 391:20
**2023** [1] - 374:12
**2024** [3] - 369:5, 369:6, 392:6
**2025** [14] - 364:6, 367:6, 367:22, 370:3, 370:24, 371:2, 371:4, 371:11, 371:13, 371:25, 372:12, 372:17, 398:5, 579:18
**21** [7] - 370:20, 450:15, 450:20, 486:20, 564:6, 564:7, 581:5
**21-CR-00566(NJC** [1] - 364:2
**21-CR-566** [1] - 365:4
**21-CR-573** [1] - 369:5
**21-EO** [2] - 450:20, 581:5
**21-OE** [1] - 450:15
**22** [1] - 557:3
**2248** [1] - 484:18
**22nd** [2] - 461:6, 557:23
**24** [3] - 371:4, 511:17, 512:5
**242** [1] - 369:13
**25** [1] - 547:5
**2500** [1] - 460:4
**263** [1] - 570:19
**27** [1] - 372:12
**28** [1] - 490:23

**2nd** [1] - 476:2

## 3

**3** [6] - 370:5, 374:24, 417:20, 417:21, 422:10, 422:25
**30** [6] - 451:24, 469:12, 477:18, 488:23, 508:18
**30-something** [1] - 508:16
**301** [6] - 450:14, 450:19, 460:23, 462:6, 462:9, 581:4
**302** [3] - 385:9, 385:17, 475:21
**303** [1] - 482:17
**303A** [1] - 483:14
**305** [2] - 487:14, 490:9
**305A** [1] - 488:13
**305B** [1] - 490:18
**307** [1] - 493:8
**307A** [1] - 493:24
**308** [1] - 477:21
**309** [1] - 472:15
**310** [5] - 450:15, 450:19, 470:21, 470:24, 581:4
**3245** [1] - 489:5
**3370** [1] - 485:4
**34** [1] - 488:22
**347** [1] - 385:9
**35** [2] - 473:12, 568:11
**350** [2] - 385:9, 385:17
**3500** [6] - 380:14, 381:4, 435:21, 437:7, 514:8, 554:6
**3500-MM** [1] - 415:10
**359** [1] - 366:22
**3727532** [1] - 374:12
**38** [2] - 369:13, 370:20
**394** [6] - 524:8, 524:21, 525:2, 525:7, 525:13, 581:12
**395** [8] - 366:16, 368:19, 370:5, 370:18, 371:23, 372:20, 372:22, 373:6
**3:15** [6] - 449:1, 496:10, 496:12, 571:15, 571:16, 571:19

## 4

**4** [8] - 371:11, 398:5, 417:23, 417:24, 488:7, 504:23, 506:16, 506:25
**401** [9] - 524:10, 524:21, 525:1, 525:4, 525:14, 540:7, 546:20, 581:13
**401-EO** [1] - 525:4
**401-OE** [4] - 524:12, 524:22, 525:15, 581:14
**40214** [1] - 484:13
**403** [7] - 369:10, 376:11, 378:10, 383:5, 385:25, 398:20, 399:2
**404(b)(2** [1] - 369:8
**419** [1] - 580:6
**430** [3] - 382:8, 384:19, 580:7
**440** [1] - 580:9
**446** [1] - 580:11
**45** [1] - 449:8
**45-minute** [1] - 496:23
**450** [3] - 580:12, 580:13, 581:5
**47798** [1] - 495:2
**48** [1] - 382:22
**496** [1] - 388:8
**497** [1] - 388:9

## 5

**5** [5] - 367:6, 367:22, 372:1, 418:1, 418:2
**5,000** [1] - 512:19
**50** [1] - 512:9
**501** [1] - 364:21
**508** [1] - 580:15
**51** [3] - 382:22, 383:3, 386:11
**511** [2] - 382:21, 386:11
**514** [1] - 364:21
**51931** [1] - 494:17
**525** [1] - 581:15
**526** [1] - 580:17
**556** [1] - 369:3
**56** [2] - 415:13, 426:18
**567** [1] - 435:23
**568** [2] - 435:23, 437:8
**57** [4] - 450:16, 450:20, 491:9, 581:5
**570** [1] - 364:15
**598** [1] - 491:2
**5th** [1] - 364:21

## 6

**6** [7] - 418:3, 418:4, 450:15, 450:19, 488:7, 491:25, 581:4
**6-0E** [1] - 450:15
**6-OE** [2] - 450:19, 581:5
**6.1** [1] - 567:16
**60** [3] - 420:17, 477:18
**6002** [2] - 410:18, 446:9
**6003** [2] - 410:18, 446:9
**6049** [2] - 484:10, 484:11
**607** [2] - 379:1, 399:9
**609** [1] - 369:3
**616** [2] - 382:24, 386:12
**63,114** [1] - 493:21
**64** [2] - 565:2, 565:17
**6746** [3] - 488:10, 488:19, 488:21
**6753** [2] - 490:14, 490:24
**694** [1] - 514:13
**6th** [1] - 367:4

## 7

**7** [5] - 372:17, 418:5, 418:6, 514:13, 514:17
**7/28/2016** [1] - 488:1
**71** [1] - 472:1
**71,532** [1] - 479:15
**72** [3] - 367:8, 367:21, 383:12
**75** [1] - 367:8
**753** [1] - 383:12
**775** [1] - 388:8
**78-3** [1] - 370:6
**79** [1] - 371:2

## 8

**8** [3] - 418:8, 418:9, 488:7
**8-by-10** [1] - 443:16
**800** [1] - 429:17
**800,000** [1] - 443:24
**801** [3] - 367:20, 368:22, 429:18
**82** [2] - 420:9, 443:24
**85** [2] - 371:6, 384:10
**86** [1] - 489:4
**860** [1] - 368:3
**89** [1] - 485:4
**897** [1] - 384:10
**8:00** [1] - 416:11
**8:30** [2] - 404:5, 416:11

## 9

**9** [4] - 371:13, 418:10, 418:11, 489:15
**90** [1] - 368:4
**94** [1] - 368:4
**95,000** [1] - 466:18
**99** [1] - 370:16
**99-3** [1] - 370:7

## A

**A-G-E-S** [1] - 509:23
**a.m** [5] - 364:6, 572:20, 578:8, 578:18, 579:19
**AAA** [1] - 427:11
**abandoning** [1] - 406:9
**abbreviation** [1] - 563:12
**able** [4] - 391:22, 395:16, 443:4, 530:3
**above-referenced** [15] - 486:22, 487:16, 488:15, 489:17, 490:11, 490:20, 491:11, 492:2, 493:10, 495:19, 560:19, 565:6, 566:12, 569:19, 570:22
**Absolutely** [1] - 522:21
**absolutely** [8] - 373:22, 390:1, 395:13, 396:9, 410:2, 509:20, 509:25, 510:3
**abundance** [2] - 400:13, 405:7
**abusing** [1] - 468:16
**accept** [1] - 529:24
**acceptable** [1] - 406:8
**acceptance** [1] - 504:5
**access** [2] - 549:16, 571:4
**accident** [1] - 404:6
**according** [2] - 479:25, 484:16
**According** [2] - 480:1, 481:1
**accurate** [3] - 467:4, 508:16, 508:17
**accuse** [1] - 381:19
**acknowledge** [1] - 469:10
**acknowledges** [2] - 567:22, 567:24
**acquainted** [1] - 528:11
**acronyms** [1] - 431:5
**acted** [1] - 368:5
**action** [1] - 416:25

**activity** [1] - 386:22
**acts** [4] - 375:19, 516:6, 516:9, 517:5
**actual** [5] - 403:13, 458:5, 511:14, 531:5, 552:17
**add** [9] - 376:22, 377:5, 380:9, 399:13, 409:22, 466:15, 466:18, 473:10, 515:6
**added** [2] - 466:25, 482:12
**adding** [1] - 501:18
**addition** [2] - 374:25, 480:4
**additional** [5] - 373:20, 399:14, 474:5, 500:8, 527:13
**additionally** [2] - 369:7, 374:3
**address** [15] - 374:7, 409:7, 423:8, 458:9, 471:24, 471:25, 473:11, 474:11, 484:11, 509:17, 550:6, 573:5, 573:11, 574:17, 574:20
**addressed** [2] - 423:7, 487:10
**addressee** [1] - 563:22
**addresses** [3] - 479:16, 511:13, 570:14
**adjourned** [1] - 579:18
**admissibility** [1] - 370:21
**admissible** [5] - 368:25, 369:8, 373:5, 387:13, 439:4
**admission** [4] - 385:15, 406:18, 407:3, 450:14
**admit** [4] - 368:14, 408:1, 415:13, 523:1
**admitted** [12] - 407:25, 408:6, 416:19, 422:9, 432:21, 450:18, 460:24, 524:15, 532:20, 533:6, 533:8, 570:20
**admittedly** [1] - 375:19
**advance** [1] - 422:13
**advantage** [1] - 492:14
**advantages** [1] - 385:15
**advise** [1] - 526:4
**advised** [3] - 449:19, 549:16, 574:13
**advisement** [1] - 550:10
**advisory** [1] - 547:1
**Advisory** [8] - 366:25, 368:7, 368:20, 372:15, 503:2, 531:23, 540:4, 540:15
**advocated** [1] - 374:20
**affecting** [1] - 397:9
**affirmatively** [1] - 454:4
**afternoon** [8] - 429:1, 450:25, 451:2, 500:6, 508:7, 526:15, 579:16
**afterwards** [1] - 562:11
**age** [2] - 515:18, 552:19
**agent** [2] - 389:20, 389:22
**agents** [1] - 557:22
**ages** [3] - 509:20, 509:22, 509:23
**aggregate** [1] - 576:25
**ago** [6] - 371:18, 427:1, 429:2, 429:5, 433:18, 459:14
**agree** [15] - 393:3, 395:14, 404:21, 405:4, 409:12, 468:11, 516:7, 517:14, 518:9, 518:10, 522:19, 522:20, 522:22, 525:20, 567:17
**agreed** [13] - 381:15, 381:17, 392:2, 405:21, 406:2, 406:4, 408:21, 408:25, 414:21, 467:8, 544:10, 544:12, 558:3
**agreement** [30] - 375:12, 380:23, 381:8, 381:16, 381:21, 383:10, 383:16, 384:6, 384:10, 386:20, 386:21, 387:12, 387:18, 389:1, 389:2, 389:17, 393:19, 393:24, 394:3, 394:8, 405:15, 405:24, 406:16, 407:24, 510:12, 544:19, 559:6, 566:15, 567:21, 569:22
**agreements** [15] - 374:17, 375:8, 376:17, 377:17, 379:8, 380:22, 380:25, 383:24, 383:25, 384:8, 384:11, 384:13, 390:8, 393:23
**agrees** [2] - 381:19, 381:21
**ahead** [16] - 379:6, 432:24, 433:1, 433:15, 441:16, 470:10, 486:11, 491:5, 491:21, 494:2, 514:11, 518:7, 519:5, 526:2, 540:8, 570:21
**aided** [1] - 364:25
**Air** [1] - 420:24
**alarm** [1] - 398:18
**Albert** [2] - 533:21, 533:25
**alemu** [2] - 491:4, 491:16
**alert** [1] - 468:15
**Alexandria** [2] - 420:5, 421:3
**alleged** [3] - 385:19, 546:6, 546:8
**allocate** [1] - 381:21
**allow** [3] - 385:13, 395:20, 535:8
**allowed** [4] - 390:6, 445:10, 445:11, 466:18
**almost** [3] - 420:17, 423:25, 493:6
**alone** [1] - 421:7
**alphabetical** [1] - 427:9
**amazed** [1] - 373:9
**Amendment** [2] - 367:4, 380:4
**AMERICA** [1] - 364:2
**amount** [10] - 443:16, 444:1, 463:5, 463:16, 501:20, 501:22, 548:2, 548:9, 549:12, 576:25
**analogous** [1] - 577:13
**analysis** [1] - 399:14
**ancillary** [2] - 411:8, 447:1
**AND** [1] - 525:7
**and-a-half** [2] - 448:21, 529:15
**Andrew** [1] - 495:3
**andrew** [2] - 495:10, 495:22
**Angeles** [1] - 494:18
**Ann** [1] - 365:10
**ANN** [1] - 364:16
**answer** [25] - 391:5, 392:10, 393:25, 397:1, 400:8, 400:11, 411:21, 425:6, 440:2, 440:14, 441:7, 447:14, 457:9, 469:11, 470:2, 494:24, 518:4, 555:3, 559:10, 559:13, 559:15, 560:3, 573:15, 573:19, 576:1
**answering** [1] - 422:5
**answers** [2] - 454:8, 576:7
**Anthony** [1] - 483:5
**anticipate** [6] - 375:16, 376:3, 382:13, 390:10, 578:16, 578:23
**anticipation** [1] - 504:6
**Anytime** [1] - 482:11
**anyway** [1] - 389:20
**Apartment** [1] - 473:12
**apologize** [14] - 389:8, 397:11, 415:12, 439:14, 440:5, 442:12, 455:1, 513:3, 521:3, 526:7, 526:10, 573:8, 573:13, 575:10
**apparent** [1] - 531:13
**appealed** [1] - 530:1
**appear** [1] - 394:17
**appearances** [1] - 365:6
**appendix** [2] - 382:22, 386:11
**application** [1] - 397:4
**applications** [5] - 497:4, 497:11, 577:18, 578:2, 578:4
**applies** [1] - 387:14
**apply** [6] - 434:24, 435:5, 435:14, 438:20, 440:9, 572:6
**appreciate** [4] - 366:12, 406:15, 444:8, 573:9
**approach** [9] - 404:25, 405:17, 486:9, 493:22, 513:5, 514:9, 540:18, 543:7, 553:23
**approached** [3] - 391:18, 392:1, 553:18
**appropriate** [6] - 390:13, 405:22, 410:24, 446:15, 467:8, 541:19
**approval** [6] - 503:13, 503:16, 503:20, 504:1, 504:3, 504:9
**approved** [2] - 411:2, 446:18
**approximate** [1] - 528:18
**area** [4] - 451:8, 527:1, 527:2, 550:14
**areas** [1] - 442:22
**arguable** [2] - 375:20, 386:14
**argue** [1] - 390:12
**argued** [2] - 367:1, 370:10
**argues** [4] - 372:1, 381:14, 383:9, 386:3
**argument** [4] - 371:12, 372:11, 372:24, 409:24
**arguments** [4] - 371:10, 372:23, 373:20, 399:4
**arise** [1] - 399:1
**arisen** [1] - 399:1
**arising** [1] - 372:6
**Armstrong** [2] - 489:8, 489:20
**armstrong's** [1] - 489:12
**arose** [1] - 399:22
**arrangements** [1] - 548:8
**arrived** [1] - 417:8
**Art** [1] - 420:19
**articles** [1] - 572:14
**Asda** [1] - 563:23
**aside** [2] - 371:10, 430:7
**aspect** [1] - 383:9
**assert** [4] - 394:6, 394:18, 400:17, 402:6
**asserted** [1] - 367:12
**assertion** [3] - 388:7, 395:8, 396:12
**assess** [4] - 382:17, 399:10, 413:9, 520:17
**assessing** [1] - 576:11
**assign** [3] - 464:8, 464:9, 464:20
**assigned** [2] - 462:19, 484:23
**assigns** [1] - 464:10

**assist** [1] - 533:23
**Assistant** [1] - 364:18
**assisting** [1] - 437:3
**associated** [12] - 367:9, 370:23, 488:21, 537:23, 537:25, 538:2, 540:2, 540:5, 547:2, 556:9, 563:6, 564:24
**assume** [5] - 437:19, 438:23, 440:17, 511:17, 512:5
**assumed** [1] - 554:6
**assuming** [4] - 438:8, 438:10, 440:12, 463:5
**astounded** [1] - 392:19
**Astua** [1] - 556:7
**attached** [3] - 370:4, 371:22, 471:14
**attachment** [12] - 461:22, 461:24, 462:1, 462:5, 471:7, 476:7, 476:10, 476:12, 476:19, 482:24, 483:1, 488:2
**attack** [6] - 375:3, 381:17, 387:15, 389:15, 390:8, 575:9
**attacking** [1] - 575:2
**attempt** [1] - 372:13
**attempted** [1] - 434:10
**attempts** [1] - 429:9
**attend** [1] - 382:19
**attending** [1] - 365:10
**attention** [6] - 421:10, 422:4, 503:10, 504:7, 547:18, 573:11
**attorney** [1] - 447:10
**Attorney** [6] - 364:14, 367:10, 367:19, 372:25, 410:21, 446:12
**ATTORNEY** [2] - 486:10, 494:1
**attorneys** [2] - 388:5, 496:17
**Attorneys** [1] - 364:18
**audience** [1] - 572:9
**Audrey** [3] - 484:13, 486:16, 487:11
**August** [5] - 461:6, 478:15, 480:22, 553:14, 566:16
**aunt** [1] - 528:10
**authority** [3] - 398:15, 423:18, 552:23
**AV** [2] - 365:17, 444:12
**available** [5] - 443:13, 445:13, 512:23, 547:23, 548:4
**Avenue** [2] - 364:19, 364:21
**avoid** [2] - 403:7, 499:22
**awardable** [1] - 423:19
**aware** [7] - 371:23, 498:1, 498:2, 505:19, 510:22, 513:22, 572:18

## B

**back-end** [26] - 459:4, 459:6, 459:7, 459:12, 459:16, 459:18, 459:21, 460:7, 460:15, 462:20, 464:2, 464:19, 464:20, 464:22, 464:23, 465:3, 465:5, 465:16, 467:13, 467:22, 468:7, 480:21, 480:25, 483:22, 484:6, 503:19
**back-ends** [9] - 460:9, 460:14, 460:16, 465:9, 465:10, 465:12, 465:13, 465:15, 481:6
**back-in** [1] - 460:19
**background** [2] - 385:16, 546:7
**bad** [2] - 379:17, 380:12
**Bahre** [1] - 549:20
**bank** [9] - 397:8, 397:16, 399:25, 400:5, 424:5, 442:5, 443:2, 532:13, 569:8
**bar** [5] - 385:12, 489:23, 490:1, 495:23, 561:7
**barcode** [1] - 561:3
**barcodes** [1] - 561:5
**based** [17] - 375:11, 383:2, 393:14, 393:15, 398:19, 399:6, 410:11, 411:6, 413:4, 416:18, 429:4, 434:8, 443:11, 446:24, 464:20, 573:14
**basement** [5] - 555:22, 557:25, 558:1, 558:2, 560:25
**basis** [18] - 380:3, 389:1, 394:5, 394:6, 394:19, 394:20, 395:3, 395:7, 396:10, 398:8, 400:15, 400:16, 400:23, 402:3, 402:7, 410:25, 446:16, 554:3
**batches** [2] - 459:1, 459:2
**BE** [2] - 465:14, 465:15
**Bean** [4] - 486:5, 486:15, 486:25, 487:10
**Bean's** [1] - 486:12
**became** [2] - 421:24, 466:8
**become** [2] - 421:11, 572:18
**bed** [1] - 371:17
**BEFORE** [1] - 364:10
**began** [6] - 372:18, 392:4, 421:15, 424:4, 430:6, 539:21
**begin** [2] - 452:13, 499:14
**beginning** [6] - 377:8, 456:10, 531:13, 538:21, 544:6, 552:2
**begins** [1] - 543:12
**behalf** [1] - 367:1
**behind** [2] - 425:5, 425:9
**beliefs** [2] - 428:16, 442:19
**believes** [1] - 443:12
**bells** [1] - 398:18
**Below** [1] - 465:3
**below** [6] - 465:7, 479:19, 495:23, 540:17, 546:24, 547:10
**benefit** [18] - 382:3, 383:10, 391:12, 394:9, 394:13, 395:4, 395:6, 396:13, 396:14, 400:9, 400:16, 400:17, 402:7, 497:20, 498:3, 498:7
**benefits** [1] - 402:15
**Berryville** [1] - 420:14
**beside** [1] - 365:13
**best** [3] - 492:12, 492:21, 572:23
**bets** [1] - 375:6
**better** [2] - 501:13, 501:17
**between** [9] - 370:21, 372:13, 373:9, 448:21, 512:9, 525:17, 546:10, 566:15, 569:22
**beyond** [2] - 531:25, 577:11
**big** [7] - 400:17, 452:25, 456:9, 458:3, 458:17, 565:1, 573:23
**bigger** [2] - 459:22, 547:13
**bills** [3] - 528:16, 529:1
**binder** [5] - 415:6, 415:7, 415:8, 415:9, 570:25
**bit** [2] - 451:4, 465:21
**blew** [2] - 404:8, 404:10
**block** [2] - 531:4, 547:10
**Bloomingdale** [1] - 532:8
**blow** [3] - 403:17, 471:18, 504:24
**blown** [1] - 416:10
**blue** [3] - 500:16, 500:17, 510:17
**BNO** [3] - 488:22, 489:10, 489:22
**board** [1] - 561:24
**Board** [1] - 503:2
**bolster** [3] - 379:21, 387:16, 390:3
**bolstered** [3] - 383:23, 384:7, 575:5
**bolstering** [6] - 378:1, 383:14, 383:21, 410:1, 574:21, 575:3
**book** [12] - 443:16, 443:17, 481:15, 481:16, 481:21, 512:24, 513:15, 513:23, 513:24, 532:2, 532:3, 532:5
**booklet** [2] - 512:22, 576:22
**booklets** [2] - 481:25, 576:22
**books** [3] - 424:17, 443:15, 515:17
**born** [1] - 429:3
**borrowing** [1] - 467:6
**boss** [1] - 538:11
**bother** [1] - 531:6
**bottom** [23] - 389:5, 389:22, 394:9, 409:4, 425:23, 432:2, 471:24, 472:18, 473:24, 489:23, 490:1, 492:7, 502:15, 503:4, 503:23, 504:2, 507:10, 540:17, 546:24, 546:25, 549:10, 549:19, 562:18
**bought** [4] - 460:13, 480:23, 501:22, 501:23
**bounced** [1] - 443:3
**box** [2] - 429:16, 570:13
**boxes** [2] - 569:2, 569:5
**Brady** [15] - 390:15, 392:14, 392:15, 392:19, 393:1, 393:3, 395:12, 395:25, 398:3, 398:12, 399:17, 400:11, 497:22, 498:1, 498:8
**break** [15] - 408:11, 409:12, 444:14, 444:15, 444:25, 445:9, 445:10, 445:11, 448:11, 494:25, 495:6, 496:24, 497:7, 497:8, 553:10
**breaking** [3] - 448:23, 496:5, 572:5
**breaks** [1] - 444:18
**Breinigsville** [1] - 526:19
**brief** [1] - 507:23
**briefly** [8] - 374:2, 374:7, 441:2, 442:9, 484:20, 495:16, 537:2, 557:19
**bring** [10] - 379:10, 380:12, 388:24, 414:2, 444:16, 445:4, 449:14, 458:3, 499:3, 499:5
**bringing** [2] - 374:20, 458:17
**brought** [2] - 385:5, 397:7
**Bryan** [1] - 414:16
**building** [2] - 417:8, 496:19
**built** [1] - 482:5
**bunch** [2] - 431:4, 458:16
**business** [6] - 531:18, 534:25, 556:18, 567:19, 567:23, 567:25

**buyer** [8] - 459:20, 475:6, 479:22, 480:3, 501:19, 501:24, 513:24, 529:19
**buyers** [13] - 459:20, 460:4, 475:5, 477:17, 477:19, 479:21, 481:16, 493:4, 501:18, 513:25, 514:4, 561:18, 562:9
**buying** [1] - 531:11
**BY** [68] - 364:16, 419:24, 423:5, 429:23, 430:21, 432:5, 433:7, 433:16, 436:1, 437:9, 440:4, 441:1, 441:18, 450:24, 455:4, 461:3, 462:7, 470:12, 471:1, 471:19, 472:21, 473:16, 474:3, 475:24, 476:11, 477:24, 478:10, 480:8, 480:19, 481:13, 482:20, 483:17, 484:15, 484:21, 486:2, 494:3, 500:5, 502:7, 502:13, 502:25, 503:24, 504:17, 505:3, 506:3, 506:9, 506:18, 506:23, 507:9, 508:6, 509:14, 513:10, 514:14, 516:11, 518:8, 526:14, 533:10, 534:12, 540:12, 546:22, 547:14, 549:2, 555:6, 580:6, 580:7, 580:8, 580:13, 580:14, 580:17

## C

**cage** [1] - 539:16
**caged** [1] - 563:15
**caging** [14] - 530:8, 530:9, 530:11, 539:17, 553:16, 553:22, 555:10, 556:13, 557:2, 561:4, 564:23, 566:1, 566:6, 571:7
**calendar** [1] - 561:25
**California** [2] - 489:8, 494:18
**camera** [3] - 414:6, 414:9, 533:1
**Canada** [3] - 420:13, 538:9, 569:8
**cannot** [4] - 388:15, 390:23, 525:23, 559:11
**cans** [1] - 565:2
**capturing** [1] - 470:8
**car** [3] - 404:7, 510:23
**carbon** [4] - 424:25, 425:5, 425:9, 425:19
**card** [2] - 550:14, 550:16
**care** [3] - 383:2, 408:9, 444:9
**carried** [1] - 557:7
**carry** [1] - 499:14
**carrying** [1] - 550:15
**case** [57] - 373:19, 374:1, 374:7, 374:9, 374:11, 374:15, 374:16, 374:24, 375:2, 376:12, 376:14, 377:1, 378:10, 378:14, 379:14, 383:4, 383:13, 383:17, 384:20, 385:21, 385:24, 386:15, 393:4, 393:9, 397:22, 399:22, 402:10, 402:13, 402:14, 403:12, 411:13, 412:14, 416:10, 416:16, 416:20, 416:21, 417:7, 442:3, 444:19, 444:22, 444:23, 445:21, 446:21, 447:5, 496:13, 496:15, 520:4, 543:12, 546:14, 572:11, 572:16, 572:17, 574:21, 578:23, 579:9
**cases** [5] - 369:6, 377:3, 377:7, 393:8
**cash** [5] - 430:13, 443:5, 550:12, 550:16, 568:6
**Cashier** [1] - 527:23
**CATHY** [7] - 446:2, 446:4, 519:14, 519:20, 526:11, 580:10, 580:16
**Cathy** [15] - 373:16, 380:19, 381:24, 408:9, 410:14, 445:4, 446:2, 472:22, 518:19, 519:8, 519:20, 525:21, 526:17, 552:10, 579:6
**CAUSE** [1] - 364:9
**caution** [3] - 400:13, 404:18, 405:7
**cautionary** [1] - 385:13
**cautioned** [1] - 385:6
**CBA** [1] - 483:11
**CBA20** [2] - 477:10, 484:18
**CC** [1] - 482:23
**cellphone** [1] - 444:21
**Central** [2] - 364:4, 364:15
**cents** [1] - 568:11
**certain** [6] - 416:9, 465:10, 482:7, 501:20, 501:22, 577:15
**certainly** [6] - 377:22, 388:24, 389:13, 390:17, 517:15, 574:17
**Certified** [3] - 383:12, 383:22, 384:6
**cetera** [1] - 510:11
**chain** [1] - 472:19
**challenge** [6] - 389:9, 389:10, 389:25, 390:1, 394:5, 398:15
**challenged** [1] - 394:18
**challenging** [1] - 389:24
**chambers** [3] - 365:21, 365:22, 366:8
**chance** [3] - 369:18, 404:1, 404:17
**change** [9] - 375:9, 379:1, 379:3, 379:13, 382:16, 399:6, 453:9, 474:11, 501:16
**changed** [3] - 392:16, 429:16, 453:7
**changes** [1] - 399:5
**changing** [1] - 501:12
**characterize** [1] - 381:18
**charge** [14] - 384:5, 390:15, 393:3, 393:8, 393:9, 393:12, 393:13, 394:7, 395:11, 397:2, 397:20, 402:24, 579:13, 579:15
**charged** [40] - 367:13, 368:25, 369:1, 369:9, 374:22, 375:21, 375:22, 375:23, 376:2, 376:6, 386:16, 390:16, 390:24, 391:7, 391:10, 391:11, 392:18, 392:22, 392:24, 394:10, 394:23, 395:7, 395:15, 396:12, 396:20, 396:23, 397:23, 400:7, 402:15, 402:24, 409:15, 409:17, 525:21, 525:24, 543:12, 543:13, 543:14, 546:13
**charges** [7] - 395:15, 396:10, 396:11, 396:13, 396:14, 396:22, 397:6
**charging** [4] - 393:6, 393:7, 395:17
**Charles** [1] - 365:8
**CHARLES** [1] - 364:17
**chart** [1] - 565:13
**charts** [1] - 511:1
**Chase** [1] - 472:1
**chats** [6] - 524:8, 524:21, 525:1, 525:2, 525:13, 581:13
**check** [13] - 366:6, 424:18, 425:10, 426:3, 430:8, 448:16, 491:14, 491:17, 492:23, 503:11, 503:12, 550:12, 568:6
**checkbook** [2] - 425:15, 491:14
**checkbooks** [4] - 421:19, 421:20, 424:24, 425:2
**checking** [3] - 365:19, 366:7, 366:11
**checks** [33] - 421:17, 421:21, 424:4, 424:7, 424:12, 424:14, 424:17, 425:1, 425:3, 425:8, 425:13, 425:20, 425:21, 427:12, 427:15, 427:16, 427:19, 431:4, 431:8, 431:14, 431:16, 431:23, 431:25, 432:1, 442:4, 442:25, 443:2, 443:5, 532:11
**chief** [1] - 578:23
**children** [1] - 429:3
**Choudhury** [1] - 445:20
**CHOUDHURY** [1] - 364:10
**Christmas** [1] - 529:19
**Circle** [31] - 370:22, 461:12, 461:13, 461:15, 461:16, 471:3, 471:8, 471:11, 471:21, 473:5, 473:7, 473:11, 474:21, 476:6, 478:13, 478:20, 479:12, 480:15, 480:21, 480:24, 481:2, 482:23, 487:22, 487:25, 493:14, 493:15, 563:10, 563:12, 566:16, 567:13, 568:23
**circles** [1] - 405:7
**Circuit** [24] - 368:3, 369:2, 369:4, 376:14, 378:19, 382:8, 382:9, 382:18, 382:22, 382:25, 383:13, 384:19, 384:21, 384:24, 385:4, 385:9, 385:10, 385:17, 385:18, 385:22, 386:7, 387:22, 388:9
**Circuit's** [1] - 379:13
**circumstances** [8] - 376:15, 379:4, 382:16, 383:7, 385:11, 388:1, 391:21, 448:13
**circumstantial** [1] - 368:15
**citation** [1] - 374:12
**cited** [8] - 373:19, 374:8, 374:13, 376:15, 378:10, 385:8, 385:10, 413:5
**citing** [4] - 382:21, 382:23, 384:14, 386:11
**city** [6] - 420:4, 458:9, 484:11, 489:2, 489:7, 509:17
**CJ** [1] - 525:7
**CJ-AND-PRIOLO** [1] - 525:7
**claim** [2] - 387:23, 388:3
**claimed** [1] - 368:3
**claiming** [1] - 396:4
**clarification** [1] - 474:4
**clarify** [2] - 536:12, 537:2
**clarifying** [1] - 518:14
**clause** [2] - 367:20, 368:22
**clean** [1] - 407:4
**clear** [19] - 378:20, 380:7, 398:17,

405:4, 406:15, 406:22, 407:11, 407:16, 444:12, 452:9, 479:2, 497:24, 498:6, 498:7, 501:14, 507:20, 511:20, 515:14, 567:1
**client** [5] - 394:17, 395:15, 452:6, 455:20, 457:21
**clients** [6] - 478:25, 479:5, 479:8, 556:2, 556:11, 564:2
**close** [5] - 404:2, 416:13, 559:8, 563:18, 578:23
**closed** [7] - 368:2, 370:15, 371:17, 372:10, 382:12, 382:19, 384:1
**closely** [3] - 373:2, 373:18, 575:18
**closer** [1] - 451:4
**closing** [1] - 409:24
**clothing** [1] - 534:8
**coconspirator** [2] - 385:19, 386:16
**code** [18] - 459:1, 462:19, 464:7, 464:12, 464:17, 464:20, 464:23, 484:13, 484:18, 488:10, 488:17, 489:23, 490:1, 490:14, 490:24, 495:23, 548:1, 550:14
**Code** [2] - 410:18, 446:9
**codes** [7] - 464:5, 464:22, 483:24, 484:2, 484:8, 490:14, 561:8
**collecting** [1] - 570:17
**color** [1] - 402:22
**column** [15] - 462:18, 463:3, 463:9, 463:16, 463:19, 464:24, 465:14, 472:3, 483:24, 484:22, 488:17, 515:18, 515:21, 515:25
**columns** [1] - 463:7
**combing** [1] - 576:4
**coming** [7] - 365:16, 389:3, 415:24, 424:22, 537:9, 562:3, 569:12
**Command** [1] - 420:24
**comment** [2] - 388:2, 406:3
**comments** [1] - 384:15
**commit** [1] - 525:22
**commits** [1] - 396:7
**committed** [3] - 375:19, 392:23, 396:8
**committing** [1] - 516:6
**communicate** [3] - 444:20, 496:14, 572:10
**communication** [3] - 444:21, 503:15, 572:12
**communications** [2] - 421:2, 572:13
**companies** [16] - 368:18, 370:23, 429:11, 430:9, 454:13, 481:4, 510:7, 511:5, 538:2, 550:22, 551:4, 551:8, 551:11, 551:24, 562:1, 562:16
**company** [59] - 451:16, 451:25, 452:20, 453:6, 453:12, 453:14, 453:17, 454:11, 454:23, 455:15, 455:19, 457:18, 463:14, 467:16, 467:17, 467:21, 467:23, 468:5, 468:7, 468:8, 478:7, 502:8, 503:1, 504:18, 509:6, 509:10, 510:10, 516:6, 528:6, 531:15, 531:22, 531:25, 532:17, 533:15, 537:23, 537:25, 538:2, 539:1, 540:2, 540:5, 547:2, 547:6, 550:19, 550:23, 552:1, 552:11, 552:15, 552:16, 552:19, 556:4, 562:5, 562:6, 562:19, 562:21, 565:9, 567:14, 569:1, 569:25, 570:2
**company's** [1] - 562:3
**compare** [3] - 487:6, 491:21, 495:23
**compelled** [4] - 378:11, 395:2, 411:11, 447:3
**compelling** [12] - 376:12, 398:11, 400:20, 401:5, 401:8, 410:11, 411:3, 411:19, 412:20, 446:19, 447:11, 520:11
**compilation** [1] - 366:23
**compile** [1] - 434:6
**compiled** [1] - 503:14
**complainants** [1] - 372:8
**complaint** [11] - 366:23, 367:9, 367:18, 368:10, 368:13, 368:16, 371:10, 372:2, 372:7, 372:13, 372:25
**complaints** [9] - 367:3, 368:6, 368:20, 370:7, 370:9, 370:11, 370:21, 372:7
**complete** [5] - 383:15, 504:6, 548:10, 550:8, 550:10
**completed** [2] - 562:17, 563:10
**completely** [2] - 403:10, 434:6
**complied** [1] - 493:2
**comply** [6] - 411:16, 411:23, 412:17, 447:8, 447:19, 520:6
**complying** [1] - 572:19
**comport** [1] - 369:21
**computer** [4] - 456:3, 532:24, 533:2, 561:3
**Computer** [1] - 364:25
**Computer-aided** [1] - 364:25
**computerized** [1] - 364:24
**concealing** [1] - 381:20
**concern** [12] - 369:16, 373:23, 380:11, 391:15, 398:10, 400:25, 416:20, 496:20, 498:5, 533:18, 533:19, 559:20
**concerned** [5] - 421:11, 421:14, 421:24, 425:21
**concerning** [8] - 372:14, 372:22, 372:23, 372:25, 375:7, 380:20, 397:25, 405:14
**concerns** [19] - 369:24, 371:15, 371:20, 373:6, 373:25, 380:4, 380:5, 382:19, 383:13, 390:18, 392:15, 394:21, 398:25, 409:8, 412:2, 412:24, 497:18, 497:24, 572:16
**concluded** [5] - 523:4, 542:1, 544:25, 554:12, 559:24
**condition** [1] - 409:23
**conditions** [1] - 510:1
**conduct** [5] - 376:16, 398:2, 405:14, 543:11, 546:6
**conducted** [2] - 373:2, 434:5
**conducting** [1] - 531:18
**confer** [6] - 399:15, 403:3, 405:11, 408:12, 449:15, 507:24
**conference** [8] - 398:5, 517:1, 554:1, 554:12, 559:1, 559:24, 579:14, 579:15
**conferred** [2] - 403:15, 408:21
**confirm** [4] - 377:11, 405:25, 417:10, 524:20
**confirmed** [2] - 548:9, 549:13
**confirming** [1] - 414:21
**confrontation** [3] - 367:4, 367:20, 368:22
**confuse** [1] - 565:18
**confusing** [1] - 469:15
**confusion** [5] - 369:12, 374:21, 375:20, 376:7, 499:22
**Congress** [2] - 412:17, 520:8
**connected** [1] - 558:4
**connection** [5] - 403:12, 457:15, 481:18, 505:21, 560:14
**Connetquot** [1] - 451:11
**consent** [1] - 381:22
**consider** [8] - 387:6, 388:7, 413:7, 442:24, 520:15, 538:22, 538:24, 546:12
**considerations** [1] - 376:12
**consisted** [1] - 509:17
**conspiracy** [5] - 368:25, 369:9, 396:8, 525:22, 546:14
**constantly** [1] - 429:19
**Constitution** [1] - 367:5
**constitutional** [2] - 412:12, 520:1
**consulted** [2] - 411:18, 447:9
**consumer** [7] - 433:10, 434:14, 442:16, 512:21, 515:2, 515:22, 575:21
**consumers** [7] - 509:16, 511:19, 512:1, 512:7, 513:25, 514:4, 515:19
**contact** [1] - 572:7
**container** [2] - 565:13, 565:19
**containers** [1] - 565:16
**containing** [1] - 512:22
**contains** [2] - 368:20, 416:16
**contempt** [2] - 411:22, 447:15
**content** [2] - 471:13, 572:15
**contention** [1] - 381:23
**contents** [1] - 559:6
**contests** [1] - 548:11
**context** [4] - 373:24, 559:5, 575:22, 577:12
**continue** [4] - 371:14, 495:5, 495:7, 500:3
**Continued** [12] - 401:9, 436:6, 485:5, 486:1, 498:20, 516:15, 517:23, 520:23, 548:12, 549:1, 554:13, 559:25
**continued** [3] - 392:5, 553:25, 558:14
**continuing** [3] - 567:9, 578:11, 578:12
**Continuing** [3] - 402:1, 437:1, 521:1
**contract** [2] - 565:9, 567:12
**contracted** [1] - 510:9
**contracting** [1] - 479:5
**contrary** [2] - 376:8, 381:23
**contrast** [2] - 375:18, 383:22
**controlled** [1] - 551:4
**convenient** [1] - 550:15

**conversation** [1] - 445:12
**conversations** [3] - 438:11, 442:18, 500:24
**convert** [1] - 458:2
**conveyed** [1] - 367:25
**convicted** [2] - 385:20, 386:15
**convince** [1] - 426:10
**cooperating** [4] - 383:16, 383:23, 383:25, 384:2
**cooperation** [3] - 374:17, 384:8, 394:2
**cooperations** [1] - 375:8
**cooperator** [1] - 383:14
**copied** [1] - 517:7
**copies** [6] - 365:21, 365:25, 366:10, 424:4, 424:25, 425:19
**copy** [17] - 366:9, 381:2, 403:13, 405:17, 414:13, 414:22, 415:2, 415:10, 434:19, 467:1, 467:12, 467:17, 467:20, 474:20, 493:23, 543:3, 543:6
**copying** [3] - 372:18, 487:21, 493:14
**corner** [4] - 425:24, 487:1, 489:24, 492:5
**corporate** [3] - 434:5, 571:2, 571:12
**Corporation** [1] - 370:22
**corporation** [8] - 552:5, 552:17, 555:12, 555:15, 555:17, 555:19, 555:21, 570:25
**corporations** [2] - 368:10, 368:16
**correct** [70] - 379:20, 379:25, 427:4, 431:9, 431:12, 431:25, 432:16, 434:15, 434:25, 435:6, 435:15, 437:12, 437:17, 438:6, 438:22, 440:11, 440:16, 454:14, 455:15, 456:15, 456:25, 459:19, 464:17, 466:19, 468:16, 472:8, 474:21, 476:17, 477:12, 481:7, 486:17, 490:6, 490:7, 499:12, 501:14, 508:19, 509:8, 509:10, 509:11, 509:18, 509:19, 509:21, 510:1, 510:2, 510:4, 510:5, 510:7, 510:11, 510:17, 510:18, 510:20, 512:23, 513:23, 515:4, 515:19, 515:20, 515:23, 515:24, 516:3, 524:22, 533:15, 544:22, 547:3, 549:3, 550:7, 553:11, 563:15, 564:14, 565:21, 573:16
**Correct** [8] - 454:15, 464:18, 476:18, 477:13, 478:18, 479:1, 480:5, 481:8
**correctly** [2] - 377:2, 550:6
**corresponding** [1] - 524:11
**cost** [1] - 570:8
**couch** [1] - 394:8
**Counsel** [3] - 365:6, 447:23, 543:16
**counsel** [30] - 365:9, 372:19, 381:6, 391:19, 391:20, 392:2, 395:17, 395:22, 400:13, 403:16, 403:24, 404:3, 405:25, 409:22, 411:18, 422:19, 422:21, 441:3, 442:16, 448:10, 449:1, 449:16, 486:8, 496:17, 499:9, 520:13, 572:8, 574:19, 577:20, 578:9
**counsel's** [1] - 437:4
**count** [1] - 568:19
**counter** [1] - 390:2
**counting** [1] - 532:11
**couple** [9] - 366:6, 374:14, 404:13, 405:10, 407:10, 408:23, 463:7, 528:24, 572:2
**coupon** [3] - 532:1, 532:3, 532:5
**coupons** [1] - 532:5
**course** [12] - 378:2, 392:5, 415:1, 449:12, 459:20, 462:2, 510:15, 514:22, 524:18, 541:25, 544:8, 567:21
**Court** [37] - 364:23, 372:18, 376:13, 381:2, 381:8, 382:23, 383:5, 383:6, 398:11, 403:20, 403:23, 403:24, 404:3, 404:18, 405:25, 409:13, 413:17, 414:23, 415:1, 416:22, 422:19, 422:20, 449:19, 519:25, 526:4, 541:12, 544:18, 555:5, 559:12, 559:16, 560:6, 571:15, 573:1, 573:2, 577:21, 578:2, 578:5
**COURT** [289] - 364:1, 364:10, 365:2, 365:15, 366:1, 366:5, 373:11, 373:15, 374:6, 374:9, 376:21, 377:6, 377:24, 378:6, 378:8, 378:19, 379:12, 379:20, 380:6, 380:14, 380:18, 381:4, 381:10, 389:2, 389:6, 389:15, 389:25, 390:21, 390:25, 391:5, 391:14, 392:9, 392:25, 393:18, 394:11, 394:25, 395:9, 395:12, 396:17, 397:1, 397:13, 398:4, 398:17, 398:23, 400:12, 400:18, 401:4, 401:7, 402:10, 403:1, 403:8, 404:4, 404:23, 405:1, 405:18, 405:23, 406:1, 406:6, 406:11, 406:14, 407:18, 407:21, 408:17, 408:20, 408:22, 408:25, 409:21, 410:3, 412:4, 412:6, 413:4, 413:16, 413:21, 414:3, 415:6, 415:16, 415:18, 415:23, 417:16, 417:20, 417:23, 418:1, 418:3, 418:5, 418:8, 418:10, 418:12, 418:15, 418:17, 418:19, 418:22, 418:25, 419:2, 419:5, 422:12, 422:16, 422:22, 423:2, 430:17, 432:21, 432:24, 433:15, 438:25, 439:2, 439:6, 439:8, 439:13, 439:15, 440:2, 440:18, 440:20, 440:22, 441:10, 441:16, 444:5, 444:7, 444:11, 445:3, 445:8, 445:11, 445:15, 445:18, 445:20, 446:6, 447:13, 447:17, 447:19, 447:22, 448:2, 448:5, 448:10, 448:15, 448:22, 449:5, 449:8, 449:13, 449:24, 450:11, 450:18, 460:24, 461:1, 468:22, 469:5, 469:8, 469:14, 470:2, 470:5, 470:10, 470:22, 472:16, 475:22, 477:22, 482:18, 483:15, 486:11, 486:21, 487:15, 488:14, 489:16, 490:10, 490:19, 491:10, 492:1, 493:9, 493:25, 494:2, 494:20, 494:24, 495:7, 495:18, 496:7, 497:3, 497:7, 497:11, 497:14, 497:16, 498:13, 498:17, 499:3, 499:8, 499:17, 499:23, 500:2, 502:2, 502:4, 502:23, 504:14, 505:25, 507:5, 508:2, 513:6, 514:11, 516:13, 517:3, 517:5, 517:8, 517:13, 517:18, 518:2, 518:7, 518:13, 518:20, 519:1, 519:5, 519:9, 519:22, 521:4, 522:8, 522:14, 522:18, 522:20, 522:22, 522:25, 524:15, 524:20, 524:24, 525:2, 525:4, 525:8, 526:1, 526:6, 526:8, 532:21, 532:23, 532:25, 533:3, 533:6, 534:11, 535:7, 535:11, 536:2, 536:6, 536:10, 536:12, 540:8, 540:19, 541:7, 541:10, 541:14, 541:17, 541:20, 541:24, 543:2, 543:5, 543:8, 544:2, 544:12, 544:19, 544:22, 546:2, 554:3, 555:2, 558:13, 559:3, 559:13, 559:19, 559:23, 560:2, 566:11, 569:18, 570:21, 571:16, 571:20, 571:23, 572:1, 572:4, 572:25, 573:4, 573:14, 573:21, 574:1, 574:6, 574:9, 574:12, 574:24, 575:6, 575:17, 575:24, 576:6, 576:24, 577:8, 577:18, 577:24, 578:4, 578:7, 578:19, 579:2, 579:10, 579:13
**court** [30] - 365:1, 366:17, 376:13, 377:1, 384:21, 385:25, 390:23, 391:24, 412:11, 416:9, 440:1, 454:8, 470:1, 470:3, 470:5, 499:2, 518:1, 518:3, 524:1, 526:5, 537:1, 541:18, 543:1, 544:5, 546:1, 555:1, 555:2, 560:1, 560:4, 572:9
**Court's** [1] - 365:11
**courtesy** [3] - 365:21, 365:25, 366:9
**Courthouse** [1] - 364:4
**courthouse** [1] - 416:11
**courtroom** [8] - 405:19, 412:7, 416:19, 445:17, 448:9, 497:2, 534:6, 572:24
**COURTROOM** [18] - 365:4, 414:1, 414:5, 414:10, 414:24, 415:21, 419:12, 419:16, 433:5, 441:13, 445:25, 450:3, 450:7, 499:24, 500:1, 519:11, 519:18, 533:5
**Courts** [1] - 574:19
**covered** [1] - 368:8
**create** [2] - 562:4, 562:10
**created** [6] - 425:12, 427:3, 427:10, 428:10, 479:20, 509:15
**credibility** [32] - 375:3, 376:18, 378:24, 378:25, 379:2, 379:3, 379:5, 379:7, 381:18, 382:1, 382:4, 382:7, 382:12, 382:18, 382:19, 385:1, 386:9, 387:16, 389:10, 389:15, 389:24, 390:1, 390:2, 390:8, 399:10, 400:1, 413:10, 520:18, 575:2, 575:9, 576:12, 576:18
**credible** [1] - 402:23
**credit** [2] - 550:14, 550:16
**crime** [11] - 375:21, 376:3, 385:15, 386:15, 389:21, 391:7, 391:10, 391:12, 392:23, 395:7, 395:9
**crimes** [2] - 396:19, 400:6
**CRIMINAL** [1] - 364:9
**criminal** [13] - 375:19, 376:16, 381:18,

385:16, 386:22, 389:21, 410:20, 411:13, 412:14, 445:21, 446:11, 447:5, 520:4
**criminally** [1] - 374:22
**CROSS** [4] - 430:20, 508:5, 580:7, 580:14
**cross** [12] - 375:9, 375:15, 375:16, 375:17, 377:21, 381:16, 387:5, 388:5, 398:3, 409:9, 409:10, 414:8
**cross-examination** [2] - 409:9, 409:10
**CROSS-EXAMINATION** [4] - 430:20, 508:5, 580:7, 580:14
**CRR** [1] - 364:23
**cryptic** [1] - 404:13
**CS** [1] - 569:14
**culpable** [2] - 393:16, 393:17
**current** [2] - 429:4, 451:20
**curry** [1] - 375:4
**customer** [6] - 530:24, 556:15, 561:6, 569:9, 569:15, 575:22
**customers** [1] - 531:5
**cut** [3] - 487:25, 562:1, 562:2
**cutoffs** [1] - 566:4

## D

**daily** [1] - 568:19
**data** [36] - 451:15, 452:19, 454:24, 455:23, 455:25, 456:3, 456:4, 456:5, 457:3, 457:6, 463:14, 481:20, 492:12, 492:21, 494:6, 505:9, 505:13, 505:16, 506:24, 507:1, 509:3, 509:6, 509:9, 509:12, 509:15, 510:10, 513:17, 515:2, 561:7, 561:18, 562:4, 562:17, 563:10, 567:17, 568:15, 570:11
**Data** [1] - 452:8
**database** [8] - 458:3, 475:3, 482:12, 482:13, 483:23, 494:6, 515:6, 515:12
**date** [11] - 371:4, 392:8, 461:5, 462:9, 462:10, 472:25, 475:25, 488:1, 547:9, 557:4, 557:5
**dated** [3] - 533:12, 566:16, 569:23
**dating** [1] - 529:20
**daughters** [1] - 420:12
**days** [4] - 371:18, 424:23, 429:14, 468:6
**DC** [1] - 398:19
**deal** [1] - 573:23
**dealing** [1] - 369:24
**dealt** [1] - 394:16
**Dear** [1] - 547:16
**deceived** [2] - 367:14, 367:16
**December** [2] - 543:13, 546:15
**deceptive** [1] - 367:14
**decide** [3] - 507:18, 517:11, 546:16
**decides** [1] - 470:17
**decision** [18] - 374:23, 375:11, 382:23, 383:4, 388:14, 393:9, 393:12, 393:14, 393:15, 398:10, 399:5, 410:19, 413:5, 413:13, 446:10, 504:5, 504:9
**decisions** [4] - 393:7, 398:1, 402:19, 553:1
**deeply** [1] - 377:6
**defendant** [12] - 364:8, 372:2, 375:1, 375:5, 376:16, 383:11, 385:14, 391:1, 413:8, 520:16, 525:19, 525:20
**Defendant** [1] - 364:19
**defendant's** [1] - 385:7
**defendants** [2] - 388:5, 388:8
**defense** [44] - 366:21, 370:24, 371:14, 372:13, 372:18, 372:22, 373:16, 373:21, 377:4, 381:6, 381:11, 381:15, 381:18, 382:2, 382:14, 382:20, 383:1, 383:4, 385:12, 385:23, 385:24, 386:3, 386:10, 387:4, 387:7, 387:15, 395:24, 397:4, 398:1, 398:6, 403:16, 403:24, 404:3, 405:20, 405:25, 408:5, 409:22, 413:21, 437:4, 441:3, 442:16, 497:14, 544:15, 575:1
**DEFENSE** [2] - 486:10, 494:1
**defer** [1] - 404:2
**defers** [1] - 403:24
**definitely** [1] - 404:11
**defraud** [4] - 367:17, 368:6, 369:10, 373:4
**delay** [2] - 403:7, 403:9
**delayed** [1] - 403:8
**deliberation** [1] - 416:1
**deliberations** [1] - 416:17
**delivery** [1] - 548:8
**demanded** [1] - 393:4
**dementia** [4] - 428:22, 429:13, 430:4, 432:7
**DENISE** [1] - 364:23
**DeniseParisi 72@gmail.com** [1] - 364:23
**Denkberg** [18] - 391:21, 392:1, 393:10, 397:23, 453:24, 456:22, 459:14, 475:7, 479:6, 535:4, 537:13, 537:14, 537:23, 550:21, 555:13, 556:7, 562:23, 563:7
**DeNovo** [1] - 373:2
**Denver** [1] - 420:13
**department** [1] - 397:22
**Department** [2] - 416:23, 472:1
**deposit** [1] - 568:20
**deposition** [5] - 408:4, 408:6, 408:8, 499:10, 579:6
**deputy** [2] - 405:19, 526:5
**DEPUTY** [18] - 365:4, 414:1, 414:5, 414:10, 414:24, 415:21, 419:12, 419:16, 433:5, 441:13, 445:25, 450:3, 450:7, 499:24, 500:1, 519:11, 519:18, 533:5
**derived** [2] - 411:12, 447:4
**describe** [3] - 530:11, 534:8, 562:15
**describing** [2] - 425:13, 565:19
**description** [3] - 462:17, 463:19, 464:24
**desire** [1] - 378:25
**desk** [3] - 539:5, 539:9, 539:11
**desks** [1] - 539:3
**determination** [5] - 379:5, 503:13, 503:17, 503:20, 575:15
**determine** [2] - 408:12, 576:18
**determined** [1] - 570:11
**development** [1] - 546:9
**diagnosed** [4] - 428:22, 428:24, 430:4, 432:10
**different** [25] - 367:24, 372:23, 375:24, 381:9, 390:25, 393:8, 423:8, 429:22, 439:8, 440:6, 441:8, 456:4, 458:8, 458:20, 464:16, 484:3, 484:4, 501:12, 511:2, 511:19, 512:9, 539:22, 569:25, 576:12, 576:17
**Different** [1] - 448:13
**digits** [1] - 486:8
**dire** [1] - 403:20
**DIRECT** [6] - 419:23, 450:23, 526:13, 580:6, 580:13, 580:17
**Direct** [1] - 531:20
**direct** [26] - 368:12, 368:25, 374:21, 378:12, 383:7, 383:19, 383:23, 384:12, 384:22, 385:5, 388:11, 388:15, 390:7, 421:9, 451:20, 451:22, 456:1, 466:3, 466:21, 468:18, 469:12, 470:13, 508:15, 509:16, 511:4, 565:20
**directions** [1] - 548:10
**directives** [1] - 507:15
**directly** [9] - 391:9, 397:16, 411:12, 447:4, 452:13, 452:18, 473:20, 508:24, 549:16
**Directors** [1] - 504:8
**disagree** [1] - 392:25
**disclosed** [2] - 397:4, 497:22
**disclosing** [1] - 396:11
**disclosure** [1] - 398:12
**discount** [1] - 459:2
**discreet** [1] - 574:25
**discretion** [1] - 397:25
**discuss** [5] - 390:9, 573:3, 577:22, 577:25, 578:1
**discussed** [9] - 369:15, 370:7, 387:11, 388:16, 397:5, 443:19, 534:22, 546:10, 569:25
**discussing** [6] - 405:13, 423:14, 429:7, 441:23, 442:11, 443:20
**discussion** [3] - 373:7, 391:25, 392:4
**discussions** [2] - 390:18, 391:11
**display** [4] - 414:17, 414:24, 422:10, 422:25
**distinction** [5] - 370:21, 372:13, 391:14, 559:9, 576:20
**DISTRICT** [3] - 364:1, 364:1, 364:10
**District** [3] - 364:14, 369:5, 374:11
**Dixon** [6] - 382:21, 382:25, 383:3, 386:11, 486:16, 487:11
**DMCS** [8] - 452:22, 453:4, 453:7, 453:11, 454:13, 455:18, 457:18, 505:20
**DMLS** [1] - 551:3
**DNCS** [1] - 551:3
**docket** [10] - 367:7, 369:4, 370:6,

370:16, 371:6, 371:25, 380:24, 384:14, 446:21
**document** [55] - 404:24, 407:13, 414:6, 414:9, 414:11, 415:2, 415:4, 415:11, 416:9, 416:15, 417:2, 417:5, 417:6, 417:9, 417:10, 417:11, 417:12, 422:8, 423:7, 423:9, 423:13, 426:21, 433:8, 433:12, 433:17, 434:15, 436:2, 437:3, 441:14, 471:20, 471:24, 477:25, 484:9, 485:3, 532:23, 533:1, 540:13, 547:5, 549:3, 549:5, 563:20, 565:8, 565:11, 566:14, 566:21, 566:25, 567:11, 568:2, 568:3, 569:21, 569:24, 570:4, 570:7, 570:24
**documentation** [2] - 504:4, 504:9
**documents** [11] - 406:23, 440:9, 524:11, 547:1, 548:6, 560:21, 561:15, 567:17, 571:5, 571:19, 575:21
**DOD** [1] - 420:24
**dollars** [4] - 443:2, 465:2, 548:3, 548:4
**donation** [2] - 425:23, 432:2
**donations** [1] - 425:25
**done** [15] - 407:4, 407:13, 413:11, 449:9, 493:6, 507:18, 507:21, 507:22, 520:19, 561:7, 574:7, 574:8, 577:13, 578:20, 578:21
**Donuts** [1] - 532:5
**door** [8] - 377:21, 383:11, 389:16, 390:2, 424:20, 532:17, 575:1, 575:2
**doors** [1] - 388:25
**dot** [4] - 482:25, 524:8, 525:13, 581:13
**doubt** [2] - 394:14, 394:15
**doubtful** [2] - 394:12, 394:14
**Douglas** [1] - 549:20
**down** [23] - 423:21, 425:15, 440:12, 441:14, 448:6, 465:4, 471:17, 476:9, 483:4, 486:7, 486:12, 487:6, 489:12, 490:2, 491:5, 491:22, 495:11, 495:14, 495:24, 503:11, 519:2, 530:13, 571:21
**draw** [2] - 370:20, 372:13
**drawing** [4] - 464:15, 476:23, 478:16, 480:16
**Drive** [1] - 473:12
**dropped** [1] - 384:5
**Due** [1] - 462:10
**due** [3] - 371:15, 462:12, 462:13
**duly** [4] - 419:21, 446:4, 450:21, 519:15
**Dunkin** [1] - 532:5
**DUNN** [108] - 364:17, 365:8, 373:14, 376:23, 377:20, 378:2, 379:25, 381:2, 381:6, 390:22, 391:3, 391:16, 392:13, 397:5, 397:15, 405:16, 405:24, 407:17, 412:3, 413:2, 413:19, 448:1, 498:12, 519:7, 522:7, 522:24, 524:2, 524:18, 524:23, 525:1, 525:3, 525:6, 526:3, 526:7, 526:10, 526:14, 532:19, 532:22, 533:4, 533:7, 533:10, 534:10, 534:12, 536:11, 540:7, 540:9, 540:12, 540:16, 541:5, 541:9, 541:12, 541:15, 541:18, 541:25, 543:3, 543:7, 544:8, 544:11, 544:14, 544:17, 546:19, 546:22, 547:12, 547:14, 549:2, 549:9, 549:18, 549:25, 554:9, 555:6, 559:10, 559:15, 559:21, 560:17, 561:9, 561:20, 561:23, 562:14, 562:24, 563:3, 563:8, 563:17, 563:20, 564:6, 565:4, 565:11, 566:9, 566:17, 566:20, 567:11, 568:2, 569:16, 570:4, 570:7, 570:19, 571:1, 571:14, 571:18, 571:25, 572:2, 573:1, 573:6, 574:16, 575:22, 577:17, 577:20, 578:3, 580:17
**dunn** [10] - 377:11, 379:21, 379:24, 380:25, 390:21, 391:15, 393:1, 559:3, 571:23, 575:20
**Dunn** [8] - 365:8, 437:16, 437:23, 438:5, 438:17, 448:15, 524:20, 526:2
**duplicate** [1] - 458:18
**Durant** [2] - 395:17, 447:10
**durant** [2] - 397:17, 399:20
**duration** [1] - 387:3
**DURHAM** [1] - 364:13
**during** [22] - 369:20, 375:8, 375:14, 377:21, 381:16, 383:23, 387:11, 388:16, 388:18, 409:12, 409:24, 429:6, 432:6, 432:11, 437:21, 447:25, 462:1, 505:19, 511:5, 546:11, 559:7, 567:21
**duties** [3] - 451:18, 456:1, 567:5
**duty** [1] - 394:17

## E

**e-mail** [8] - 487:18, 487:21, 487:23, 493:12, 493:13, 568:22, 570:11, 570:13
**E-mail** [1] - 364:23
**e-mailed** [1] - 561:19
**e-mailing** [1] - 568:20
**Eagle** [1] - 472:1
**Early** [1] - 452:12
**early** [13] - 365:16, 366:24, 368:11, 371:9, 416:12, 449:1, 449:4, 496:10, 537:7, 546:6, 572:5, 578:25, 579:1
**easier** [1] - 531:3
**EASTERN** [1] - 364:1
**Eastern** [2] - 364:14, 374:11
**easy** [1] - 548:10
**EC** [17] - 453:6, 453:7, 453:8, 453:11, 454:13, 455:17, 505:20, 551:3, 551:9, 552:3, 552:4, 552:9, 552:11, 552:23, 553:1, 553:3
**ECF** [6] - 365:19, 366:6, 366:7, 371:1, 371:19, 403:13
**economic** [2] - 510:4, 516:1
**Edelstein** [2] - 403:17, 405:4
**EDELSTEIN** [9] - 364:21, 374:2, 374:7, 374:10, 404:7, 404:21, 406:7, 406:12, 524:13
**edelstein** [2] - 365:13, 399:4
**editing** [1] - 492:16
**education** [1] - 527:13
**educational** [1] - 527:18
**Educational** [1] - 529:20
**effect** [1] - 398:8
**effort** [1] - 449:15
**Eight** [1] - 455:10
**eight** [6] - 424:23, 443:9, 454:17, 508:23, 509:2, 561:23
**either** [8] - 375:24, 376:5, 378:21, 381:19, 407:6, 409:9, 478:24, 576:16
**elaborated** [1] - 373:17
**electronic** [3] - 371:3, 444:21, 572:12
**electronics** [1] - 421:3
**elements** [1] - 367:24
**elicit** [12] - 374:18, 377:12, 377:24, 378:12, 383:18, 384:12, 384:22, 386:25, 387:9, 388:11, 390:10, 573:12
**eliciting** [8] - 377:10, 377:16, 380:19, 381:12, 383:24, 387:17, 389:17, 577:14
**eligible** [2] - 507:14, 507:15
**eliminates** [1] - 458:18
**Ellen** [4] - 552:6, 552:10, 553:7
**ELMO** [2] - 432:20, 432:24
**email** [16] - 461:4, 461:11, 461:20, 471:2, 471:5, 471:7, 471:10, 471:18, 472:19, 473:9, 473:20, 474:8, 475:25, 476:7, 482:21, 482:22
**emailing** [3] - 473:2, 483:5, 483:6
**embedded** [1] - 547:7
**emphasize** [2] - 382:10, 387:8
**employed** [1] - 533:20
**employees** [2] - 393:12, 551:13
**employer** [1] - 528:5
**enclosed** [1] - 550:11
**encounter** [1] - 496:18
**end** [104] - 402:17, 421:5, 443:3, 455:14, 456:6, 456:8, 456:9, 457:22, 457:24, 458:7, 458:11, 459:4, 459:6, 459:7, 459:8, 459:9, 459:12, 459:16, 459:18, 459:21, 459:23, 460:2, 460:7, 460:13, 460:15, 462:20, 464:1, 464:2, 464:13, 464:15, 464:19, 464:20, 464:22, 464:23, 464:24, 465:3, 465:5, 465:6, 465:16, 465:17, 466:6, 466:7, 466:8, 466:11, 467:13, 467:22, 468:4, 468:7, 476:13, 476:16, 476:24, 477:11, 478:12, 478:16, 479:17, 480:9, 480:11, 480:16, 480:21, 480:23, 480:24, 480:25, 481:5, 482:25, 483:3, 483:6, 483:8, 483:21, 483:22, 484:6, 484:7, 487:23, 487:24, 488:3, 488:4, 488:5, 488:9, 488:19, 492:24, 493:1, 493:5, 493:17, 493:20, 503:14, 503:19, 511:10, 511:14, 511:16, 512:16, 512:17, 512:19, 529:23, 562:9, 562:10, 564:9, 565:18, 579:8
**ended** [3] - 391:25, 443:1, 529:16
**ending** [1] - 448:25
**ends** [25] - 460:9, 460:14, 460:16, 464:3, 465:9, 465:10, 465:12, 465:13, 465:15, 481:6, 481:7, 487:25, 488:6, 488:7, 493:16, 511:1, 512:5, 512:6,

512:18, 517:22, 543:13, 562:3, 562:4, 566:4
**engage** [1] - 572:14
**enhanced** [1] - 423:19
**enjoy** [1] - 498:17
**enjoyed** [1] - 528:2
**ensure** [4] - 408:5, 411:20, 518:16, 574:22
**entails** [1] - 456:1
**enter** [4] - 443:13, 443:15, 443:18, 496:10
**entered** [3] - 377:17, 446:20, 547:23
**enters** [4] - 415:22, 445:17, 449:23, 499:25
**Entertainment** [1] - 551:1
**entire** [4] - 370:14, 379:4, 486:3, 488:24
**entity** [1] - 427:11
**entrance** [1] - 550:10
**entries** [2] - 434:10, 472:7
**entry** [8] - 434:8, 512:23, 548:10, 561:7, 561:18, 562:17, 563:10, 570:11
**Entwhistle** [1] - 365:10
**ENTWHISTLE** [1] - 579:12
**entwhistle** [1] - 365:10
**Entwistle** [10] - 415:18, 419:9, 431:3, 437:16, 437:23, 438:5, 438:17, 440:22, 441:12, 448:16
**ENTWISTLE** [37] - 364:16, 414:7, 414:11, 414:16, 414:21, 415:1, 415:8, 415:17, 415:20, 419:10, 419:24, 422:10, 422:14, 422:20, 422:24, 423:3, 423:5, 423:21, 429:22, 429:23, 430:15, 437:2, 440:24, 441:1, 441:17, 441:18, 444:3, 497:13, 499:12, 499:21, 532:24, 533:1, 578:12, 578:25, 579:5, 580:6, 580:8
**envelope** [2] - 504:7, 569:13
**envelopes** [4] - 421:15, 421:17, 430:7, 530:13
**err** [1] - 384:21
**error** [1] - 387:22
**ESQ** [6] - 364:13, 364:16, 364:17, 364:17, 364:19, 364:21
**essence** [3] - 409:2, 409:18, 409:19
**essentially** [2] - 373:3, 409:14
**establish** [1] - 368:12
**estimate** [6] - 448:20, 501:5, 511:3, 511:6, 511:10, 512:8
**et** [1] - 510:11
**etcetera** [1] - 390:8
**evaluate** [1] - 546:15
**evaluation** [4] - 382:3, 382:6, 382:11, 399:12
**eventually** [1] - 392:6
**everyday** [1] - 564:20
**Evidence** [2] - 367:21, 383:5
**evidence** [39] - 367:1, 367:11, 367:13, 368:9, 368:12, 368:15, 368:21, 368:24, 368:25, 369:8, 370:12, 370:13, 370:14, 371:7, 380:24, 383:15, 383:24, 384:12, 385:4, 385:5, 385:7, 386:6, 386:20, 393:14, 398:20, 405:14, 406:10, 406:18, 416:19, 416:21, 450:20, 524:3, 525:15, 546:5, 546:7, 546:11, 546:12, 546:16, 581:15
**evident** [2] - 390:24, 397:20
**evidently** [1] - 404:9
**exact** [5] - 409:11, 486:15, 487:10, 490:5, 496:2
**Exactly** [4] - 449:21, 470:5, 522:14
**exactly** [7] - 377:20, 395:11, 406:6, 407:14, 410:12, 415:9, 573:2
**EXAMINATION** [12] - 419:23, 430:20, 440:25, 450:23, 508:5, 526:13, 580:6, 580:7, 580:8, 580:13, 580:14, 580:17
**examination** [11] - 375:15, 377:22, 381:16, 383:19, 383:23, 384:22, 385:6, 388:5, 398:3, 409:9, 409:10
**examine** [1] - 387:5
**examined** [2] - 419:22, 519:16
**examining** [1] - 383:6
**example** [4] - 370:9, 377:24, 460:21, 472:10
**Excel** [1] - 471:8
**except** [4] - 411:14, 412:15, 447:6, 520:4
**exception** [3] - 387:13, 388:20, 551:9
**excess** [1] - 404:18
**exchange** [1] - 528:16
**exchanged** [1] - 559:7
**exchanging** [1] - 528:25
**excited** [1] - 507:15
**exclude** [1] - 398:20
**exclusive** [2] - 567:20, 567:23
**excuse** [1] - 509:12
**excused** [3] - 497:6, 519:3, 578:19
**exercising** [2] - 412:19, 520:10
**exhibit** [37] - 370:4, 371:22, 372:19, 372:20, 372:23, 373:2, 407:5, 423:21, 461:2, 470:25, 472:17, 475:23, 477:23, 482:19, 483:16, 486:22, 487:16, 488:15, 489:17, 490:11, 490:20, 491:9, 491:11, 492:2, 492:8, 493:10, 494:19, 495:19, 506:17, 507:8, 513:8, 546:21, 560:19, 565:6, 566:12, 569:19, 570:22
**Exhibit** [70] - 366:16, 366:22, 368:19, 370:5, 370:18, 371:23, 372:22, 406:25, 415:13, 422:8, 423:4, 426:18, 432:23, 433:2, 450:16, 460:23, 470:21, 472:15, 477:21, 482:17, 483:14, 486:20, 487:14, 488:13, 489:15, 490:9, 490:18, 491:25, 493:8, 493:24, 495:17, 502:1, 502:5, 502:22, 504:13, 504:15, 505:24, 506:1, 506:25, 507:4, 507:6, 513:11, 524:3, 524:8, 524:10, 524:12, 525:6, 525:9, 525:13, 525:14, 525:15, 532:20, 533:9, 540:7, 540:11, 546:20, 560:17, 561:2, 562:15, 563:9, 564:7, 565:5, 566:10, 569:17, 570:19, 581:7, 581:12, 581:13, 581:14
**Exhibit's** [2] - 470:24, 475:21
**exhibits** [17] - 367:2, 370:10, 370:17, 370:19, 407:2, 407:4, 407:24, 407:25, 408:6, 449:16, 449:20, 519:4, 522:10, 523:1, 524:3, 524:15, 533:7
**Exhibits** [6] - 450:14, 450:15, 450:19, 525:9, 581:4, 581:7
**exist** [1] - 396:9
**existing** [1] - 434:8
**exists** [1] - 399:20
**exit** [1] - 481:11
**exited** [1] - 448:9
**exits** [3] - 445:2, 497:2, 572:24
**expecting** [1] - 366:10
**experience** [2] - 402:19, 576:10
**experienced** [1] - 395:16
**expert** [1] - 562:4
**explain** [6] - 434:18, 455:25, 458:15, 458:24, 459:6, 531:24
**explained** [2] - 368:23, 429:12
**exposed** [1] - 402:21
**exposure** [3] - 395:19, 400:10, 402:8
**express** [2] - 564:11, 564:16
**expressed** [3] - 372:8, 392:22, 397:25
**expressly** [1] - 381:19
**extension** [1] - 370:24
**extent** [2] - 366:6, 407:23
**extras** [1] - 458:21


## F


**F.2d** [7] - 382:8, 382:24, 384:19, 385:9, 385:17, 386:12, 388:8
**F.3d** [3] - 368:4, 369:3, 383:12
**face** [1] - 531:3
**facing** [1] - 382:1
**fact** [25] - 376:25, 378:13, 379:1, 379:3, 379:8, 379:9, 380:20, 382:13, 382:16, 386:1, 386:7, 388:11, 388:13, 388:24, 388:25, 389:10, 390:24, 399:7, 399:11, 413:10, 425:3, 425:25, 487:9, 520:18, 575:14
**facts** [1] - 391:17
**failed** [1] - 385:23
**failing** [5] - 384:4, 411:16, 412:16, 447:8, 520:6
**fair** [7] - 387:4, 389:23, 398:23, 455:20, 516:5, 517:7, 577:7
**fairly** [2] - 397:6, 444:25
**faith** [11] - 367:15, 367:17, 394:5, 394:6, 394:19, 394:20, 395:7, 400:15, 400:16, 402:3, 402:6
**fall** [3] - 388:19, 406:24, 495:13
**fallen** [1] - 371:18
**false** [4] - 411:15, 412:15, 447:7, 520:5
**familiar** [6] - 456:6, 458:13, 458:22, 459:4, 461:13, 554:6
**family** [4] - 420:10, 496:14, 527:1, 531:8
**far** [6] - 376:12, 402:13, 402:19, 453:4, 454:13, 527:9

**father** [2] - 457:16, 534:16
**fault** [1] - 544:20
**favor** [2] - 375:5, 451:3
**favorable** [4] - 378:21, 378:25, 382:1, 382:14
**favorably** [2] - 382:20, 386:10
**faxing** [1] - 568:19
**February** [10] - 369:24, 371:2, 371:11, 371:13, 371:14, 371:24, 372:12, 392:7, 398:5, 533:12
**Federal** [3] - 364:15, 367:20, 383:5
**federal** [4] - 389:20, 389:22, 400:2, 434:8
**FedEx** [2] - 564:21, 569:6
**fee** [3] - 431:12, 549:15, 550:11
**feelings** [1] - 372:8
**feldman** [4] - 397:18, 397:24, 400:5, 494:20
**FELDMAN** [123] - 364:17, 393:2, 393:20, 393:22, 395:14, 396:25, 403:4, 403:10, 404:25, 409:6, 409:22, 445:6, 445:14, 448:20, 449:3, 449:14, 450:1, 450:12, 450:24, 455:3, 455:4, 460:22, 460:25, 461:3, 462:4, 462:7, 469:10, 469:18, 470:8, 470:11, 470:12, 470:20, 470:23, 471:1, 471:17, 471:19, 472:14, 472:18, 472:21, 473:14, 473:16, 474:1, 474:3, 475:20, 475:24, 476:9, 476:11, 477:20, 477:24, 478:9, 478:10, 480:7, 480:8, 480:18, 480:19, 481:11, 481:13, 482:16, 482:20, 483:13, 483:17, 484:14, 484:15, 484:19, 484:21, 485:3, 486:2, 486:6, 486:19, 487:13, 488:12, 488:23, 489:4, 489:14, 490:8, 490:17, 491:1, 491:8, 491:24, 493:6, 493:22, 494:3, 494:22, 495:4, 495:16, 496:5, 500:4, 500:5, 501:25, 502:6, 502:7, 502:11, 502:13, 502:21, 502:24, 502:25, 503:23, 503:24, 504:12, 504:16, 504:17, 504:23, 505:3, 505:23, 506:2, 506:3, 506:7, 506:9, 506:16, 506:18, 506:23, 507:3, 507:7, 507:9, 507:23, 508:1, 513:9, 516:10, 517:10, 518:22, 518:24, 519:4, 580:13
**Feldman** [3] - 365:10, 449:24, 500:2
**felt** [3] - 393:16, 393:17, 559:16
**few** [11] - 365:20, 371:18, 426:25, 427:7, 429:14, 433:17, 441:21, 468:6, 500:19, 527:16
**Fida** [1] - 420:13
**fifteen** [1] - 528:4
**Fifth** [3] - 380:4, 387:4, 400:17
**fifth** [1] - 394:18
**fifty** [2] - 512:12, 512:16
**figure** [1] - 462:25
**file** [18] - 371:3, 434:20, 458:17, 458:19, 458:25, 479:20, 481:20, 481:21, 481:25, 488:2, 488:3, 488:4, 488:19, 494:6, 524:8, 524:9, 525:13, 581:13
**filed** [15] - 370:6, 370:25, 371:4, 371:21, 371:24, 373:16, 377:9, 380:18, 392:6, 395:21, 416:22, 416:23, 417:6, 547:20, 548:2
**files** [21] - 456:5, 457:25, 458:2, 458:5, 458:6, 458:8, 458:20, 462:12, 462:13, 463:12, 473:11, 479:23, 479:24, 488:10, 509:15, 511:7, 515:2, 524:16, 562:10, 566:5
**filing** [4] - 365:20, 403:11, 403:13, 416:9
**filings** [1] - 366:10
**filled** [1] - 565:3
**final** [3] - 497:1, 550:2, 550:4
**finally** [3] - 387:8, 387:20, 507:3
**financial** [3] - 397:9, 397:11, 397:12
**fine** [10] - 413:18, 445:9, 454:9, 517:18, 541:6, 541:20, 556:5, 559:14, 559:19, 576:15
**finicky** [1] - 433:6
**finish** [6] - 397:13, 444:16, 527:7, 579:7, 579:11, 579:14
**finished** [1] - 561:14
**First** [1] - 522:2
**first** [41] - 366:14, 367:25, 373:17, 374:16, 375:5, 386:7, 391:2, 396:2, 397:22, 412:24, 414:6, 414:8, 419:7, 419:21, 422:19, 429:17, 452:10, 452:21, 455:24, 457:23, 460:14, 467:10, 472:19, 478:4, 484:19, 488:9, 493:17, 494:5, 495:23, 519:15, 528:11, 528:14, 528:18, 534:17, 544:2, 547:12, 558:3, 558:7, 578:10, 578:17
**fit** [2] - 455:17, 457:5
**five** [19] - 396:3, 396:7, 396:8, 400:4, 425:17, 426:20, 427:19, 430:1, 430:2, 438:12, 448:11, 460:5, 465:15, 466:14, 466:17, 561:9, 561:10, 567:11
**five-minute** [1] - 448:11
**five-year** [1] - 396:3
**flipped** [1] - 445:8
**Florida** [1] - 489:3
**flu** [1] - 371:17
**focus** [1] - 442:10
**focused** [1] - 572:21
**folder** [2] - 525:6, 525:7
**follow** [2] - 473:17, 473:18
**following** [7] - 372:2, 377:12, 385:11, 406:17, 436:6, 524:3, 533:20
**follows** [6] - 370:10, 419:22, 446:5, 450:22, 519:17, 526:12
**footnote** [1] - 370:20
**FOR** [1] - 364:9
**forget** [1] - 392:8
**forgotten** [1] - 579:16
**form** [8] - 497:20, 504:5, 552:6, 552:11, 552:15, 555:19, 561:8, 568:9
**formal** [1] - 407:12
**format** [1] - 458:3
**formed** [3] - 552:3, 555:12, 555:17
**forth** [4] - 367:21, 369:3, 384:9, 434:7
**forward** [3] - 365:23, 471:15, 473:11
**four** [8] - 387:25, 430:1, 430:2, 437:8, 465:15, 547:12, 548:3, 548:4
**fourth** [1] - 386:24
**frame** [9] - 432:6, 432:11, 455:2, 457:7, 457:11, 535:5, 535:6, 536:3, 536:7
**France** [1] - 563:5
**frankly** [1] - 379:2
**fraud** [13] - 372:7, 397:8, 397:16, 400:6, 409:15, 409:17, 517:12, 525:22, 525:23
**Fred** [1] - 528:6
**free** [3] - 391:16, 392:10, 392:13
**Freeman** [4] - 385:9, 385:17, 385:18, 386:14
**fresh** [2] - 426:7, 426:9
**Friday** [2] - 372:17, 579:18
**friends** [1] - 496:14
**froccaro** [5] - 365:23, 369:16, 371:11, 372:12, 379:6
**Froccaro** [41] - 365:13, 367:1, 369:18, 369:23, 371:15, 371:20, 373:21, 380:6, 388:21, 394:11, 395:14, 397:13, 398:7, 399:16, 403:1, 404:22, 406:1, 406:24, 407:19, 409:1, 412:4, 414:8, 414:13, 430:17, 430:24, 437:5, 439:2, 444:5, 448:3, 448:12, 448:15, 497:18, 498:4, 498:14, 508:3, 508:8, 517:13, 573:17, 575:6, 578:4, 579:16
**FROCCARO** [149] - 364:19, 365:12, 365:24, 366:2, 373:8, 374:4, 378:3, 378:7, 378:15, 379:7, 379:16, 380:2, 380:11, 380:16, 388:23, 389:4, 389:8, 389:19, 390:11, 391:6, 392:14, 393:21, 393:25, 394:14, 395:6, 395:11, 395:13, 396:2, 396:19, 397:11, 398:14, 398:19, 399:24, 400:15, 401:2, 401:6, 402:2, 402:12, 404:5, 404:20, 406:2, 407:20, 408:19, 408:21, 408:24, 409:2, 409:19, 410:2, 412:5, 413:15, 413:18, 414:14, 414:19, 430:18, 430:21, 432:5, 432:19, 432:22, 433:3, 433:7, 433:14, 433:16, 435:20, 435:23, 436:1, 437:7, 437:9, 439:5, 439:7, 439:11, 439:14, 439:16, 440:4, 440:19, 440:21, 444:6, 445:5, 445:10, 448:4, 448:13, 449:4, 449:7, 449:12, 450:17, 455:1, 468:21, 469:2, 469:6, 469:9, 497:5, 497:15, 498:16, 508:4, 508:6, 509:14, 513:2, 513:7, 513:10, 514:9, 514:12, 514:14, 516:11, 517:6, 517:14, 517:21, 518:6, 518:8, 518:11, 521:2, 522:2, 522:9, 522:15, 522:19, 522:21, 523:3, 525:16, 534:9, 535:5, 535:10, 536:3, 536:9, 536:14, 540:18, 541:2, 541:8, 541:16, 541:22, 544:9, 544:15, 544:20, 553:23, 554:5, 554:10, 559:17, 573:20, 573:22, 574:4, 574:8, 574:10, 575:4, 575:8, 575:21, 576:5,

576:20, 577:2, 578:6, 578:24, 580:7, 580:14
**Froccaro's** [6] - 366:15, 371:15, 375:14, 392:9, 409:7, 544:3
**front** [68] - 417:3, 433:13, 433:20, 439:7, 456:6, 456:8, 456:9, 457:22, 457:24, 458:7, 458:11, 459:8, 459:9, 459:12, 459:16, 459:21, 459:23, 460:2, 460:13, 464:1, 464:3, 464:13, 464:15, 464:24, 465:6, 465:17, 466:6, 466:7, 466:8, 466:11, 467:13, 468:4, 476:13, 476:16, 476:24, 477:11, 478:12, 478:16, 480:9, 480:11, 480:16, 480:23, 481:5, 481:7, 482:25, 483:3, 483:6, 483:8, 483:21, 484:6, 484:7, 487:23, 492:24, 493:4, 493:16, 493:17, 493:20, 503:14, 511:1, 511:10, 511:14, 511:16, 512:5, 512:16, 512:17, 562:3, 562:9, 565:18
**front-end** [47] - 456:6, 456:8, 456:9, 457:22, 457:24, 458:7, 458:11, 459:8, 459:9, 459:12, 459:16, 459:21, 459:23, 460:2, 460:13, 464:1, 464:13, 464:15, 464:24, 465:17, 466:6, 466:7, 466:8, 466:11, 467:13, 468:4, 476:13, 476:16, 476:24, 477:11, 478:12, 478:16, 480:9, 480:11, 480:16, 480:23, 481:5, 482:25, 483:3, 483:6, 483:8, 483:21, 484:6, 484:7, 503:14, 511:14, 511:16
**front-ends** [2] - 464:3, 481:7
**fulfillment** [11] - 481:9, 481:14, 481:15, 481:19, 481:21, 512:24, 512:25, 513:3, 513:15, 513:23, 513:24
**full** [4] - 385:15, 387:4, 549:16, 579:9
**Funds** [1] - 506:4
**furthering** [1] - 567:23
**furthermore** [1] - 375:17
**future** [2] - 515:4, 515:7

## G

**gallons** [2] - 565:2, 565:17
**game** [1] - 389:23
**gardened** [1] - 421:7
**Gary** [21] - 391:21, 392:1, 393:10, 397:23, 453:22, 453:23, 456:16, 456:22, 459:14, 475:7, 479:6, 535:4, 537:13, 537:14, 550:21, 555:12, 555:13, 556:6, 562:23, 563:7
**GDM** [1] - 427:14
**gears** [2] - 474:23, 500:7
**GED** [2] - 527:14, 527:15
**general** [2] - 371:10, 492:11
**General** [3] - 367:10, 367:19, 372:25
**generally** [2] - 442:17, 455:25
**generate** [1] - 564:25
**gentlemen** [1] - 546:2
**Georgia** [1] - 486:5
**Gerald** [1] - 507:13
**Germany** [1] - 563:5
**Gibson** [2] - 484:13, 484:16
**gift** [1] - 432:14
**given** [14] - 376:19, 391:2, 393:19, 398:9, 402:9, 402:20, 448:24, 460:10, 498:7, 499:13, 555:9, 566:2, 573:10, 578:16
**glasses** [1] - 525:18
**Gleason** [2] - 382:24, 386:11
**Global** [1] - 472:10
**goodness** [1] - 426:5
**goods** [1] - 567:18
**government** [6] - 366:22, 371:22, 372:19, 384:25, 560:17, 570:19
**Government** [138] - 364:13, 366:16, 367:24, 368:8, 368:12, 368:13, 368:14, 368:19, 370:3, 370:4, 370:7, 370:9, 370:13, 370:15, 370:17, 370:18, 372:18, 373:12, 374:5, 374:8, 374:18, 374:19, 374:20, 376:21, 377:9, 377:15, 378:23, 379:1, 380:19, 380:22, 381:12, 381:19, 382:2, 383:3, 383:21, 383:22, 384:6, 384:10, 384:15, 384:22, 386:19, 386:22, 387:2, 387:9, 387:11, 387:16, 387:19, 388:2, 388:10, 388:13, 388:15, 388:17, 388:18, 390:4, 390:17, 393:7, 394:12, 394:19, 394:22, 396:23, 399:7, 399:8, 399:17, 399:19, 399:21, 403:23, 405:20, 405:22, 407:3, 408:5, 409:24, 410:10, 410:17, 410:23, 412:2, 412:23, 413:2, 413:19, 415:13, 415:19, 416:4, 417:7, 419:11, 420:22, 431:15, 431:17, 432:22, 439:3, 439:9, 444:13, 445:4, 446:8, 446:14, 449:3, 450:2, 450:14, 450:19, 460:23, 470:23, 475:20, 488:12, 497:12, 497:25, 498:2, 498:8, 498:10, 514:8, 518:21, 519:6, 520:13, 524:2, 524:3, 524:10, 524:11, 525:9, 525:14, 525:17, 525:19, 525:20, 532:19, 540:7, 546:19, 559:4, 560:14, 561:2, 565:4, 566:9, 569:16, 574:12, 577:19, 578:22, 581:4, 581:7, 581:13, 581:14
**Government's** [52] - 366:15, 369:17, 370:5, 370:16, 371:1, 371:5, 371:21, 374:13, 375:5, 378:17, 383:18, 384:20, 386:25, 398:10, 400:24, 403:15, 406:7, 407:7, 410:19, 411:2, 419:7, 422:8, 426:18, 446:10, 446:18, 462:5, 462:9, 470:21, 472:15, 477:21, 482:16, 483:13, 486:19, 487:13, 489:14, 490:9, 490:17, 491:8, 491:24, 493:7, 493:23, 495:17, 502:1, 502:22, 504:13, 505:24, 506:25, 507:4, 513:11, 544:4, 544:12, 579:8
**grade** [1] - 527:10
**grant** [39] - 375:12, 377:13, 378:12, 378:13, 379:17, 380:20, 380:23, 382:4, 382:19, 383:7, 383:20, 384:23, 384:25, 385:5, 386:1, 386:17, 387:1, 387:24, 388:4, 388:12, 391:1, 391:24, 393:5, 395:3, 395:21, 398:12, 399:12, 399:18, 402:9, 407:4, 407:6, 413:7, 413:11, 422:22, 519:25, 520:15, 520:19, 560:10, 574:24
**Grant** [9] - 366:25, 368:7, 368:21, 372:14, 531:17, 531:18, 533:12, 533:21, 552:2
**Granted** [7] - 470:22, 472:16, 475:22, 477:22, 482:18, 483:15, 532:21
**granted** [30] - 371:2, 375:23, 380:3, 383:3, 392:7, 398:6, 401:1, 412:11, 412:18, 422:18, 447:24, 486:21, 487:15, 488:14, 489:16, 490:10, 490:19, 491:10, 492:1, 493:9, 494:2, 495:18, 502:4, 502:23, 504:14, 505:25, 507:5, 520:8, 566:11, 569:18
**granting** [5] - 411:3, 412:21, 446:20, 448:10, 520:12
**grants** [1] - 376:17
**great** [5] - 408:19, 409:20, 513:18, 515:9, 543:5
**Greene** [2] - 494:18, 496:3
**Group** [6] - 453:3, 453:4, 477:10, 569:22, 570:2, 570:25
**guarantees** [1] - 560:14
**guided** [1] - 376:14
**guilt** [1] - 385:7
**guilty** [4] - 374:17, 374:19, 375:4, 375:18
**guys** [1] - 512:25

## H

**half** [9] - 448:21, 494:22, 496:9, 496:25, 503:10, 503:23, 529:15, 572:21, 572:22
**hand** [12] - 375:9, 419:14, 425:24, 426:17, 450:4, 489:23, 492:5, 494:4, 495:12, 496:22, 519:12, 544:18
**handed** [2] - 414:12, 541:12
**handing** [1] - 405:19
**handle** [2] - 403:24, 497:23
**handled** [3] - 421:2, 461:16, 461:18
**handles** [1] - 547:22
**hands** [1] - 430:5
**handwriting** [7] - 403:15, 403:19, 404:12, 417:3, 478:2, 570:10
**handwritten** [4] - 403:14, 404:13, 565:12, 569:12
**happy** [4] - 381:7, 407:23, 499:18, 536:11
**hard** [1] - 495:12
**hate** [2] - 442:9, 463:25
**haven** [1] - 563:2
**Haven** [5] - 477:4, 478:23, 538:4, 563:1, 563:4
**head** [3] - 371:18, 402:14, 454:4
**headers** [1] - 462:8
**health** [5] - 369:24, 371:15, 371:20, 510:1, 515:22
**hear** [17] - 366:17, 366:18, 378:7, 378:8,

378:9, 379:23, 396:23, 412:10, 416:18, 420:1, 425:7, 441:19, 519:23, 519:24, 550:11, 576:2, 576:15
**heard** [16] - 374:2, 378:16, 380:6, 390:19, 392:10, 402:12, 403:1, 466:21, 469:3, 481:9, 482:2, 498:2, 498:6, 546:5, 549:22, 576:12
**hearing** [8] - 378:23, 394:11, 399:16, 399:19, 517:2, 554:1, 559:1, 577:24
**hears** [1] - 376:8
**hearsay** [7] - 367:3, 367:11, 377:19, 387:13, 387:14, 388:18, 388:19
**hedged** [1] - 375:6
**held** [6] - 371:12, 385:4, 411:21, 447:14, 517:1, 561:18
**Hello** [1] - 445:18
**help** [2] - 510:10, 539:16
**helped** [1] - 555:13
**helpful** [1] - 543:4
**hi** [1] - 430:22
**Hi** [1] - 445:19
**Hicksville** [3] - 527:4, 527:6, 532:8
**hidden** [1] - 395:24
**High** [1] - 527:6
**high** [6] - 451:10, 527:5, 527:7, 527:9, 527:11, 527:17
**higher** [1] - 465:17
**highlight** [8] - 442:22, 488:24, 540:16, 547:12, 549:9, 549:18, 550:1, 565:12
**highlighted** [4] - 435:9, 463:21, 464:3, 465:1
**highly** [3] - 379:4, 381:25, 386:8
**hire** [1] - 530:7
**hired** [2] - 509:3, 529:8
**history** [2] - 370:2, 410:10
**HL** [1] - 477:14
**hmm** [4] - 491:7, 511:23, 511:25, 513:1
**Hold** [3] - 441:10, 441:11, 543:15
**hold** [4] - 433:5, 502:2, 513:13, 566:4
**holder** [1] - 527:23
**holidays** [1] - 529:18
**home** [10] - 421:7, 421:17, 429:1, 555:22, 555:23, 557:6, 557:11, 557:13, 557:22, 560:25
**honest** [2] - 394:15, 544:9
**honestly** [3] - 399:25, 402:3, 573:22
**Honor** [85] - 365:8, 365:12, 373:14, 374:2, 377:5, 378:2, 379:25, 391:4, 392:6, 392:16, 394:15, 395:14, 396:25, 397:5, 398:20, 400:1, 402:5, 403:6, 405:16, 405:20, 406:7, 407:17, 409:6, 412:3, 413:3, 413:18, 419:10, 422:14, 423:1, 440:24, 445:14, 448:1, 448:20, 449:14, 450:1, 450:12, 460:22, 468:21, 470:9, 470:20, 472:14, 477:20, 486:6, 490:8, 493:22, 495:4, 496:6, 497:13, 498:12, 498:16, 499:12, 500:4, 501:25, 502:21, 504:12, 505:23, 507:23, 508:1, 517:10, 518:12, 518:22, 518:24, 519:7, 522:7, 524:2, 524:23, 525:3, 526:3, 534:10, 535:6, 536:4, 540:10, 541:5, 541:15, 543:3, 571:14, 573:2, 573:6, 574:16, 575:10, 577:17, 578:3, 578:13, 579:12
**HONORABLE** [1] - 364:10
**hope** [3] - 365:15, 366:3, 507:14
**hoped** [1] - 428:13
**hopefully** [1] - 574:10
**Horizon** [14] - 453:16, 453:19, 453:20, 453:21, 478:8, 478:24, 481:3, 505:20, 537:14, 537:24, 550:20, 562:23, 562:25
**Hospital** [1] - 421:3
**hotline** [4] - 471:12, 471:15, 477:15, 477:16
**hotlines** [1] - 477:18
**hour** [5] - 448:21, 494:23, 496:9, 496:25
**hours** [4] - 365:20, 366:6, 572:3, 572:22
**house** [3] - 553:19, 557:15, 558:1
**hum** [4] - 456:19, 463:22, 466:13, 468:3
**hundred** [9] - 460:3, 466:11, 475:3, 507:13, 512:10, 512:12, 512:16, 548:3, 548:4
**hundreds** [1] - 511:5
**husband** [34] - 420:12, 420:15, 420:16, 420:25, 421:4, 421:6, 421:25, 423:7, 423:9, 423:23, 424:6, 424:14, 426:3, 428:9, 428:22, 429:6, 429:10, 429:24, 430:12, 431:18, 432:7, 432:12, 434:23, 434:25, 435:4, 435:13, 438:11, 440:8, 441:23, 441:24, 442:17, 443:11, 443:20, 557:14
**husband's** [3] - 420:18, 424:25, 428:21
**hypotheticals** [1] - 469:15
**Hyvonen** [1] - 507:13

## I

**ID** [1] - 547:17
**idea** [1] - 552:11
**identification** [1] - 534:9
**identified** [6] - 383:4, 403:18, 549:13, 550:6, 561:6
**identify** [4] - 425:13, 425:20, 431:14, 513:12
**ill** [2] - 369:19, 371:17
**illegal** [5] - 468:10, 516:6, 516:9, 517:5, 518:6
**imagine** [1] - 572:2
**immediate** [2] - 420:10, 573:17
**immediately** [2] - 442:6, 572:17
**immunity** [92] - 375:12, 375:13, 375:23, 376:8, 376:10, 376:17, 377:14, 378:4, 378:12, 378:14, 379:9, 379:11, 379:17, 379:19, 380:3, 380:4, 380:21, 380:23, 381:13, 381:16, 381:20, 381:24, 382:4, 382:9, 382:19, 383:2, 383:8, 383:20, 384:23, 384:25, 385:5, 386:2, 386:8, 386:17, 387:1, 387:24, 388:4, 388:12, 388:24, 389:10, 389:23, 390:18, 390:22, 391:1, 391:7, 391:12, 391:22, 391:24, 392:8, 392:16, 392:18, 392:23, 393:5, 394:4, 394:16, 394:22, 394:23, 395:2, 395:3, 395:5, 395:8, 395:21, 396:12, 396:15, 396:21, 396:22, 397:18, 398:12, 399:12, 399:18, 400:10, 402:8, 402:16, 402:20, 409:25, 411:3, 412:11, 412:17, 412:21, 413:8, 413:11, 446:20, 447:24, 498:4, 519:25, 520:7, 520:12, 520:16, 520:19, 522:16, 560:10
**impact** [1] - 428:13
**impeach** [10] - 375:2, 375:7, 375:11, 378:22, 378:24, 378:25, 379:2, 379:12, 382:15, 399:8
**impeached** [2] - 379:7, 379:9
**impeaching** [1] - 383:9
**impeachment** [1] - 390:5
**impermissibly** [2] - 383:22, 384:7
**implication** [2] - 376:16, 381:20
**implicit** [1] - 392:21
**imply** [1] - 387:9
**important** [3] - 399:10, 400:1, 441:7
**importantly** [1] - 399:9
**impression** [1] - 376:9
**improperly** [1] - 384:16
**in-house** [1] - 553:19
**inadmissible** [2] - 367:3, 378:1
**inadvertently** [2] - 406:20, 416:10
**inbox** [2] - 365:22, 366:8
**Inc** [4] - 452:22, 453:4, 547:1, 555:16
**incentive** [1] - 378:18
**include** [4] - 370:10, 370:17, 384:1, 405:6
**included** [2] - 372:19, 399:12
**includes** [1] - 405:5
**including** [5] - 377:7, 387:17, 511:10, 548:10, 550:20
**inclusive** [1] - 450:15
**incoming** [1] - 530:12
**inconvenienced** [1] - 416:2
**Incorporated** [2] - 383:12, 387:21
**incorrectly** [1] - 407:11
**incrimination** [9] - 400:24, 411:1, 411:7, 412:13, 412:20, 446:17, 446:24, 520:2, 520:10
**independent** [1] - 567:25
**indicate** [4] - 371:19, 379:21, 413:6, 413:11
**indicated** [7] - 369:18, 370:8, 400:21, 456:24, 457:17, 524:21, 574:25
**indicates** [1] - 416:22
**indicating** [3] - 378:10, 379:14, 409:14
**indication** [1] - 484:5
**indicia** [1] - 376:25
**indict** [1] - 397:22
**indicted** [1] - 397:23
**indictment** [5] - 369:2, 393:10, 393:11, 405:14, 546:9

**indirectly** [3] - 391:9, 411:12, 447:4
**individual** [4] - 368:13, 452:3, 480:25, 511:18
**individuals** [5] - 393:13, 405:8, 479:3, 492:13, 579:3
**Industries** [1] - 387:21
**industry** [10] - 451:20, 451:23, 456:2, 466:3, 466:22, 468:18, 469:13, 470:13, 508:16, 508:18
**influence** [1] - 368:2
**inform** [3] - 533:19, 547:17, 572:17
**information** [38] - 381:25, 386:22, 387:12, 391:18, 397:2, 398:2, 398:13, 405:5, 410:22, 410:25, 411:5, 411:11, 411:12, 413:9, 416:16, 426:7, 433:10, 434:14, 442:16, 446:13, 446:16, 446:23, 447:3, 447:4, 462:17, 490:6, 492:14, 509:20, 509:25, 510:3, 512:23, 520:17, 532:12, 546:8, 547:20, 562:7, 562:12, 570:17
**initial** [1] - 370:18
**initials** [1] - 550:5
**injured** [1] - 371:18
**input** [1] - 366:12
**inquire** [3] - 391:16, 392:10, 403:23
**inside** [2] - 426:14, 509:15
**insist** [2] - 397:17, 399:19
**insisted** [1] - 395:18
**insistence** [1] - 400:13
**insists** [1] - 395:1
**inspector** [4] - 404:12, 557:5, 557:17, 579:8
**inspectors** [1] - 403:11
**instances** [1] - 407:10
**instead** [5] - 367:12, 376:13, 396:15, 530:3, 531:11
**institution** [2] - 397:9, 397:12
**instruct** [1] - 411:17
**instructed** [3] - 388:6, 416:17, 573:7
**instructing** [2] - 413:6, 520:14
**instruction** [22] - 383:1, 387:6, 405:13, 408:7, 410:6, 410:14, 412:9, 412:25, 413:20, 499:9, 499:17, 519:23, 536:5, 541:3, 541:6, 541:7, 541:11, 541:14, 543:10, 574:20, 577:21
**instructions** [7] - 385:13, 496:21, 550:8, 550:11, 567:18, 573:9, 574:14
**intend** [5] - 375:2, 375:7, 377:24, 380:1, 386:19
**intended** [2] - 367:17, 386:25
**intends** [1] - 370:13
**intent** [5] - 368:6, 368:17, 369:9, 370:8, 373:4
**intention** [5] - 379:21, 383:18, 395:17, 522:7, 573:12
**interest** [2] - 410:23, 446:14
**interests** [2] - 547:21, 567:23
**Internation** [1] - 487:25
**interpretation** [2] - 575:12, 576:10
**interpreted** [1] - 387:9
**interrupt** [2] - 442:9, 457:9
**interrupting** [1] - 442:14
**interview** [7] - 389:13, 389:20, 391:24, 392:2, 557:20, 558:7, 573:25
**interviewed** [5] - 380:21, 381:13, 383:20, 558:4, 559:18
**interviewing** [1] - 559:4
**interviews** [1] - 558:7
**introduce** [3] - 370:8, 370:13, 522:11
**introduced** [2] - 383:11, 546:7
**introducing** [3] - 380:23, 414:15, 522:10
**introduction** [1] - 371:7
**investigation** [1] - 558:4
**invite** [1] - 503:10
**invoking** [2] - 412:12, 520:1
**involved** [4] - 366:14, 537:6, 538:15, 538:23
**involvement** [3] - 368:9, 371:8, 547:19
**irrevocable** [1] - 375:10
**Island** [3] - 451:8, 526:23, 527:3
**Islip** [2] - 364:4, 364:15
**issuable** [1] - 547:24
**issue** [34] - 365:19, 366:14, 366:20, 369:19, 370:4, 371:22, 372:22, 373:6, 373:24, 374:1, 378:9, 379:3, 381:1, 383:17, 385:22, 391:1, 395:2, 395:22, 396:25, 397:2, 399:2, 399:22, 400:18, 403:5, 403:20, 403:25, 406:5, 411:2, 446:19, 497:18, 574:5, 574:7, 576:9, 577:22
**issued** [6] - 400:19, 411:19, 412:20, 447:10, 507:16, 520:11
**issues** [9] - 365:18, 366:13, 369:25, 373:23, 377:23, 393:8, 416:1, 497:24, 574:15
**items** [2] - 374:19, 522:2
**itself** [3] - 386:20, 390:23, 549:5

## J

**J-O-H-N-S-O-N** [2] - 446:3, 519:21
**Jacquard** [7] - 376:1, 576:13, 576:14, 576:21, 577:14
**jail** [2] - 411:22, 447:15
**James** [2] - 430:24, 508:8
**JAMES** [1] - 364:19
**January** [12] - 370:3, 370:24, 371:4, 381:7, 392:7, 410:16, 424:18, 445:22, 446:7, 530:6, 534:18
**Jason** [4] - 365:9, 409:3, 537:17, 538:20
**JASON** [1] - 364:17
**Jeff** [20] - 457:4, 457:5, 457:12, 457:16, 457:20, 459:15, 466:1, 471:6, 472:1, 472:12, 475:10, 479:4, 487:22, 501:1, 501:7, 501:14, 501:16, 505:13, 534:13, 568:25
**Jefferson** [1] - 451:7
**Jeffrey** [10] - 493:14, 533:22, 534:15, 534:17, 534:19, 538:22, 539:9, 539:14, 556:6, 568:23
**Jen** [1] - 529:18
**Jencks** [3] - 415:3, 415:7, 415:9
**Jennifer** [2] - 533:22, 534:23
**JGS** [3] - 453:16, 454:10, 550:23
**Jiffy** [1] - 532:6
**job** [18] - 373:22, 451:20, 456:12, 456:13, 456:14, 457:23, 462:2, 481:18, 528:1, 528:11, 529:7, 529:21, 529:24, 530:1, 530:22, 530:23, 532:10, 532:15
**John** [9] - 404:5, 504:21, 506:11, 547:16, 547:25, 548:7, 549:13, 550:4, 550:13
**JOHN** [1] - 364:13
**johnson** [2] - 381:17, 397:3
**JOHNSON** [5] - 446:4, 519:14, 526:11, 580:10, 580:16
**Johnson** [73] - 373:16, 375:11, 375:21, 376:6, 376:9, 377:13, 380:15, 380:19, 381:12, 381:24, 382:14, 383:19, 384:11, 386:14, 386:21, 387:5, 387:10, 388:11, 388:15, 391:19, 393:6, 395:18, 397:20, 399:8, 399:18, 408:10, 409:9, 409:10, 409:15, 409:25, 410:6, 410:8, 410:15, 445:4, 445:13, 445:17, 445:18, 446:2, 446:6, 447:9, 447:23, 448:6, 448:9, 449:10, 472:23, 473:2, 473:19, 497:19, 498:3, 499:14, 518:19, 519:8, 519:20, 520:12, 520:18, 525:21, 526:17, 533:8, 533:11, 537:2, 540:13, 546:23, 547:15, 550:3, 550:19, 560:3, 560:21, 571:21, 571:25, 578:11, 578:13, 578:14, 579:7
**johnson's** [2] - 381:17, 399:10
**Johnson's** [8] - 381:20, 384:16, 386:20, 387:1, 387:16, 387:17, 413:7, 520:15
**join** [1] - 496:25
**joined** [1] - 452:21
**joining** [1] - 444:8
**JONATHAN** [1] - 364:21
**Jonesboro** [1] - 486:5
**Joseph** [1] - 365:12
**Josie** [2] - 556:7, 563:2
**JUDGE** [1] - 364:10
**Judge** [32] - 376:20, 379:19, 380:11, 388:23, 389:23, 390:13, 395:8, 397:11, 401:6, 402:12, 407:20, 412:5, 430:18, 432:19, 432:22, 433:4, 444:6, 445:5, 445:20, 455:1, 469:3, 497:15, 508:4, 513:5, 517:14, 517:21, 522:2, 524:14, 525:25, 540:18, 541:3, 573:20
**judge** [15] - 378:3, 385:12, 388:6, 391:6, 393:25, 396:2, 399:24, 400:2, 408:19, 445:20, 497:5, 514:9, 522:4, 553:23, 573:20
**judges** [1] - 394:17
**judgment** [1] - 400:21
**July** [5] - 473:1, 474:9, 474:19, 480:22, 480:24
**June** [1] - 569:23

**Juror** [13] - 417:13, 417:20, 417:23, 418:3, 418:5, 418:8, 418:10, 418:12, 418:15, 418:19, 418:22, 418:25, 419:2
**juror** [7] - 404:17, 405:6, 417:17, 418:1, 418:17, 496:20, 572:18
**JUROR** [16] - 417:14, 417:18, 417:21, 417:24, 418:2, 418:4, 418:6, 418:9, 418:11, 418:13, 418:16, 418:18, 418:20, 418:23, 419:1, 419:3
**jurors** [6] - 372:6, 404:6, 404:19, 404:20, 405:2, 415:24
**Jury** [6] - 415:22, 445:2, 449:23, 497:2, 499:25, 572:24
**jury** [96] - 369:13, 374:21, 376:8, 378:7, 378:8, 380:2, 380:5, 381:23, 382:16, 385:6, 386:23, 387:25, 388:6, 399:10, 403:9, 403:21, 405:8, 406:18, 407:1, 407:9, 407:15, 409:9, 410:9, 411:25, 412:1, 412:7, 412:9, 413:1, 413:24, 414:2, 415:21, 416:1, 422:12, 422:17, 422:23, 432:25, 444:14, 444:24, 444:25, 445:9, 449:15, 452:5, 458:15, 458:24, 459:6, 461:2, 470:25, 472:17, 475:23, 477:21, 477:23, 482:19, 483:14, 483:16, 486:20, 486:23, 487:17, 488:16, 489:18, 490:12, 490:21, 491:12, 491:25, 492:3, 493:11, 495:20, 496:8, 496:24, 499:2, 499:3, 499:22, 499:24, 501:5, 502:1, 502:22, 504:13, 513:12, 515:14, 517:2, 517:11, 519:22, 533:6, 543:9, 546:2, 546:21, 554:2, 559:2, 560:20, 565:7, 566:13, 569:20, 570:23, 572:5, 575:14, 576:11, 576:17
**JURY** [1] - 364:9
**jury's** [4] - 379:5, 382:3, 382:6, 382:11
**justice** [4] - 411:15, 412:16, 447:7, 520:6
**Justice** [1] - 416:24
**justifiably** [1] - 507:14
**Justin** [9] - 366:25, 368:7, 368:21, 372:14, 531:17, 531:18, 533:12, 533:21, 552:2

## K

**Kaiser** [1] - 369:3
**Keara** [2] - 533:21, 533:25
**keep** [6] - 424:11, 431:18, 449:8, 451:3, 561:25, 562:5
**Kentucky** [1] - 484:13
**kept** [1] - 434:19
**key** [20] - 396:10, 396:16, 402:25, 464:5, 464:7, 464:12, 464:17, 464:20, 464:22, 464:23, 483:24, 484:2, 484:7, 484:18, 488:10, 488:17, 490:14, 490:24, 527:23
**kind** [14] - 379:23, 390:19, 399:17, 425:9, 462:17, 497:20, 497:21, 498:7, 531:18, 532:3, 547:7, 556:13, 556:24, 572:12
**King** [1] - 528:8
**kitchen** [2] - 527:19, 529:13
**Kluczinsky** [5] - 495:3, 495:10, 495:11, 495:22, 496:2
**knowing** [1] - 438:23
**knowledge** [9] - 369:9, 385:16, 457:13, 488:4, 559:8, 571:10, 575:25, 576:8, 577:11
**knows** [2] - 439:3, 469:11
**Kore** [2] - 491:4, 491:16
**Kossin** [2] - 533:21, 534:2

## L

**L-I-L-I-E-N-K-A-M-P** [1] - 450:10
**lack** [1] - 398:12
**lacked** [2] - 367:15, 367:16
**Ladies** [1] - 546:2
**Lake** [1] - 489:3
**Lakeside** [2] - 538:4, 562:18
**land** [3] - 373:3, 374:1, 377:8
**landing** [2] - 380:8
**language** [8] - 377:1, 398:9, 406:8, 413:13, 442:15, 522:19, 522:20, 546:23
**laptop** [2] - 414:6, 414:8
**large** [1] - 430:12
**larger** [1] - 528:16
**Laser** [4] - 482:22, 483:5, 487:20, 493:13
**last** [15] - 366:10, 373:9, 374:13, 406:3, 425:6, 425:7, 437:14, 440:2, 516:4, 527:16, 528:7, 555:2, 558:6, 559:21
**late** [7] - 366:24, 368:10, 371:8, 381:7, 410:16, 445:22, 446:7
**latest** [1] - 477:17
**latter** [2] - 524:25, 556:8
**laundering** [1] - 400:4
**law** [7] - 373:19, 402:10, 412:17, 413:6, 520:8, 520:14, 574:21
**lawyer** [11] - 391:3, 393:4, 394:4, 394:7, 394:20, 395:1, 395:18, 402:17, 402:18, 554:7
**lawyers** [1] - 412:22
**lay** [1] - 410:9
**least** [7] - 474:19, 480:2, 481:7, 530:23, 537:8, 539:20, 572:2
**leave** [6] - 412:6, 444:24, 474:11, 527:11, 529:5, 529:7
**leaves** [2] - 497:10, 571:22
**leaving** [1] - 449:4
**Lechter** [1] - 529:12
**Lechters** [1] - 529:11
**left** [5] - 380:5, 425:24, 487:1, 527:17, 565:13
**legal** [1] - 517:5
**legitimate** [1] - 576:1
**length** [1] - 388:4
**less** [3] - 386:13, 537:8, 556:25
**Letter** [1] - 547:25
**letter** [31] - 373:18, 392:3, 396:15, 416:21, 417:6, 423:16, 431:5, 443:24, 443:25, 444:1, 461:25, 462:16, 463:9, 463:11, 463:13, 482:22, 487:20, 493:13, 493:18, 502:14, 533:12, 533:17, 540:14, 547:16, 549:14, 558:8, 558:10, 559:22, 569:14, 574:22
**letters** [29] - 366:23, 367:9, 367:10, 367:18, 367:23, 368:10, 368:16, 371:10, 372:3, 372:14, 372:25, 373:3, 373:18, 421:22, 423:14, 423:17, 424:22, 424:23, 426:4, 428:16, 429:7, 429:11, 429:20, 429:25, 451:19, 452:25, 531:4, 569:11, 569:15
**letting** [1] - 544:7
**level** [1] - 538:23
**levied** [1] - 397:3
**liable** [1] - 434:10
**lie** [2] - 378:18, 389:21
**life** [3] - 394:1, 451:9, 526:25
**light** [1] - 399:18
**lighting** [1] - 375:15
**likelihood** [1] - 385:18
**likely** [4] - 400:22, 410:24, 446:15, 578:13
**likeness** [2] - 505:7, 505:11
**Lilienkamp** [42] - 445:7, 448:18, 449:10, 449:18, 450:2, 450:9, 450:13, 451:1, 451:6, 461:4, 462:8, 465:21, 471:2, 471:20, 472:22, 473:17, 474:23, 475:25, 476:12, 477:25, 478:11, 480:9, 480:20, 481:9, 482:21, 500:6, 502:8, 502:14, 503:1, 503:25, 504:18, 505:4, 505:9, 506:19, 507:17, 508:7, 514:1, 515:4, 516:7, 518:9, 518:15, 518:25
**LILIENKAMP** [2] - 450:21, 580:12
**Lillenkamp** [15] - 376:1, 486:12, 486:24, 487:18, 488:25, 489:6, 489:19, 490:13, 491:3, 491:13, 492:4, 492:15, 493:12, 494:4, 561:19
**lillenkamp** [3] - 376:5, 486:7, 488:17
**Limine** [8] - 367:7, 369:17, 370:1, 370:5, 371:1, 371:6, 371:21, 371:24
**limit** [2] - 385:12, 517:19
**limitations** [3] - 396:3, 397:10, 397:15
**limited** [7] - 377:12, 383:18, 405:13, 492:13, 533:21, 541:7, 559:13
**Limited** [1] - 366:25
**limiting** [5] - 387:6, 408:7, 541:3, 541:6, 541:10
**line** [12] - 389:5, 389:22, 391:15, 394:9, 409:4, 421:23, 432:2, 465:5, 491:19, 514:13, 514:17
**lines** [2] - 437:8, 465:7
**Lingat** [1] - 369:4
**lips** [2] - 375:14, 375:17
**list** [83] - 372:19, 400:6, 424:18, 425:12, 425:14, 426:6, 426:25, 427:3, 428:10, 428:15, 429:14, 431:15, 434:21, 453:20, 453:21, 453:22, 454:2, 454:11, 454:12, 456:9, 458:1, 459:22,

464:8, 464:9, 464:14, 465:22, 465:23, 465:24, 466:1, 466:4, 466:9, 466:12, 466:16, 467:5, 467:14, 467:16, 467:18, 468:2, 468:9, 468:16, 470:14, 470:18, 470:19, 471:3, 471:8, 471:11, 471:14, 471:21, 471:23, 474:6, 474:25, 476:8, 476:25, 477:1, 477:8, 480:13, 480:15, 481:2, 482:5, 482:15, 483:19, 483:22, 483:24, 484:25, 486:17, 488:9, 490:2, 490:22, 493:2, 501:20, 503:14, 504:10, 507:18, 515:5, 515:15, 515:25, 518:16, 518:17, 561:6, 567:5, 568:4, 579:3
**List** [1] - 475:1
**listed** [5] - 476:25, 480:15, 490:14, 491:3, 491:15
**listen** [3] - 379:19, 402:2, 572:14
**listening** [4] - 437:17, 438:6, 575:18, 577:10
**listing** [3] - 424:16, 425:17
**lists** [29] - 454:14, 458:8, 458:10, 458:16, 461:10, 461:16, 464:16, 466:7, 471:22, 473:22, 474:24, 475:8, 475:10, 475:17, 476:8, 476:17, 476:19, 476:23, 478:17, 478:19, 480:2, 482:8, 483:20, 483:21, 501:23, 515:17, 515:18, 515:21
**live** [5] - 416:6, 420:4, 526:18, 526:19, 526:22
**lived** [3] - 421:8, 451:8, 538:9
**living** [3] - 420:20, 451:12, 534:20
**Lizza** [3] - 413:4, 413:13, 413:17
**local** [2] - 372:3, 434:9
**located** [1] - 527:24
**location** [3] - 500:9, 569:2, 569:4
**Logistics** [16] - 453:6, 453:7, 453:8, 453:11, 454:13, 455:18, 505:20, 551:3, 551:9, 552:3, 552:4, 552:9, 552:11, 552:23, 553:1, 553:3
**logistics** [1] - 578:9
**look** [22] - 373:18, 423:13, 425:10, 425:25, 426:18, 426:20, 433:21, 435:24, 436:2, 437:10, 460:21, 462:4, 483:21, 484:2, 487:4, 488:19, 491:13, 492:4, 494:5, 499:18, 506:10, 506:21
**looked** [5] - 365:24, 369:20, 369:22, 373:2, 490:13
**looking** [8] - 423:13, 424:24, 424:25, 425:19, 427:24, 437:11, 495:2, 546:23
**Looks** [1] - 483:10
**looks** [6] - 416:21, 423:16, 467:4, 478:8, 494:6, 564:11
**Los** [1] - 494:18
**loss** [2] - 398:1, 420:15
**lost** [1] - 441:10
**loud** [3] - 366:19, 433:23, 433:24
**Louisville** [1] - 484:13
**love** [1] - 413:15
**Lube** [1] - 532:6
**Lucky** [12] - 370:22, 461:8, 461:9, 461:25, 476:8, 476:15, 477:10, 478:23, 482:25, 569:22, 570:2, 570:25
**lunch** [10] - 409:12, 448:23, 448:25, 449:6, 449:8, 494:25, 496:9, 496:11, 497:8, 498:18
**Lustigam** [1] - 554:7

## M

**M-O-N-T-I-L-L-A** [1] - 419:19
**Ma'am** [2] - 438:1, 438:16
**ma'am** [17] - 431:1, 432:3, 434:12, 434:15, 434:22, 435:2, 435:6, 435:12, 497:7, 499:8, 508:10, 508:16, 512:20, 513:13, 514:5, 515:13, 516:4
**madam** [2] - 437:10, 437:24
**madame** [9] - 431:6, 433:8, 433:22, 433:23, 434:2, 435:18, 436:2, 508:25, 514:15
**mail** [60] - 364:23, 397:8, 397:16, 409:15, 409:17, 421:8, 421:16, 421:17, 426:14, 430:6, 451:20, 451:22, 456:2, 458:20, 459:2, 461:8, 466:3, 466:11, 466:22, 467:3, 468:19, 469:12, 470:13, 475:5, 480:9, 482:14, 484:24, 487:18, 487:21, 487:23, 493:12, 493:13, 508:15, 525:21, 525:22, 530:10, 530:12, 531:12, 531:19, 531:20, 539:16, 539:17, 549:6, 556:15, 556:16, 556:17, 561:12, 563:14, 564:8, 564:11, 564:16, 564:23, 565:20, 565:22, 568:18, 568:22, 569:3, 570:11, 570:13
**Mail** [5] - 482:23, 483:5, 487:20, 493:14, 551:1
**mailed** [12] - 459:7, 464:5, 467:1, 467:13, 467:21, 479:16, 509:21, 515:19, 515:23, 516:1, 561:19, 562:10
**mailer** [1] - 537:20
**mailers** [1] - 556:9
**mailing** [81] - 366:23, 432:12, 434:21, 456:2, 456:6, 456:8, 456:9, 457:24, 458:7, 458:11, 459:4, 459:6, 459:7, 459:23, 460:1, 460:3, 460:7, 460:14, 462:16, 462:21, 463:15, 464:6, 464:13, 464:15, 464:19, 464:20, 464:23, 466:11, 466:25, 467:13, 467:18, 467:22, 468:4, 468:7, 468:11, 468:14, 468:18, 470:17, 470:18, 474:20, 478:6, 478:12, 479:13, 479:18, 479:25, 480:3, 480:4, 480:16, 482:8, 483:2, 483:3, 484:7, 484:16, 484:25, 486:15, 486:16, 489:21, 490:2, 490:5, 490:22, 492:25, 495:21, 496:3, 501:13, 503:4, 503:14, 503:19, 507:18, 511:16, 511:18, 511:22, 511:24, 515:3, 515:15, 515:17, 515:25, 561:5, 562:7, 568:20
**mailings** [49] - 366:24, 367:9, 367:14, 367:16, 367:25, 368:18, 370:11, 370:22, 372:15, 373:1, 421:12, 421:14, 423:24, 429:10, 430:10, 441:23, 441:24, 441:25, 442:11, 442:19, 443:12, 443:19, 457:22, 459:16, 459:18, 464:22, 464:25, 465:3, 467:12, 480:25, 481:4, 482:13, 483:8, 492:16, 501:17, 505:21, 509:16, 511:4, 511:8, 511:9, 511:14, 511:15, 511:18, 512:1, 515:7, 517:12, 531:2, 532:4, 576:9
**mails** [1] - 564:12
**main** [2] - 378:9, 538:19
**maintain** [1] - 406:12
**Makeba** [2] - 489:8, 489:20
**man** [1] - 454:18
**managed** [1] - 509:9
**manager** [1] - 529:8
**mandated** [1] - 372:9
**March** [12] - 364:6, 367:6, 367:22, 369:6, 372:17, 471:4, 471:11, 471:14, 471:22, 543:12, 546:14, 579:18
**Marge** [1] - 489:3
**marginal** [1] - 372:4
**Maria** [1] - 420:13
**Mark** [2] - 395:17, 447:10
**mark** [2] - 503:11, 503:12
**marked** [3] - 415:12, 426:17, 434:16
**Marketing** [6] - 453:3, 453:4, 537:24, 538:1, 551:1, 562:21
**marketing** [1] - 508:19
**marking** [2] - 438:14, 530:13
**MARLENE** [3] - 419:18, 419:20, 580:5
**Marlene** [3] - 415:20, 419:11, 419:18
**married** [1] - 420:16
**mary** [1] - 473:3
**Mary** [5] - 450:2, 450:9, 458:19, 561:19, 566:5
**MARY** [3] - 450:9, 450:21, 580:12
**match** [1] - 490:1
**matches** [3] - 490:3, 491:23, 495:25
**material** [11] - 367:25, 380:14, 381:5, 393:1, 395:12, 396:1, 399:17, 399:20, 497:22, 576:13, 576:21
**materiality** [1] - 368:17
**materials** [3] - 496:16, 567:20, 577:15
**Matter** [1] - 579:18
**matter** [10] - 367:12, 378:20, 378:22, 413:6, 425:2, 432:12, 496:20, 520:14, 547:16, 573:1
**matters** [4] - 365:11, 411:7, 446:25, 547:22
**McDevitt** [2] - 552:6, 553:7
**mean** [25] - 380:14, 380:16, 389:6, 389:9, 390:4, 459:10, 462:9, 463:10, 465:22, 467:23, 472:9, 473:6, 479:19, 484:22, 492:21, 511:12, 536:7, 538:25, 539:11, 552:15, 562:2, 575:11, 576:6, 576:10
**meaning** [5] - 368:1, 375:3, 375:8, 501:22, 554:7
**means** [12] - 412:13, 434:24, 435:5, 435:14, 438:20, 440:9, 444:20,

455:23, 458:15, 468:12, 472:10, 520:3
**mechanical** [1] - 365:19
**mechanism** [1] - 406:22
**mechanisms** [1] - 406:21
**media** [2] - 444:21, 496:15
**meet** [9] - 399:15, 403:2, 405:11, 408:11, 430:25, 431:2, 528:14, 528:18, 534:17
**meeting** [3] - 387:1, 559:5, 559:7
**meetings** [1] - 377:15
**member** [1] - 403:14
**Members** [1] - 543:9
**members** [4] - 403:21, 420:10, 496:17, 533:20
**memo** [3] - 431:8, 431:12, 491:19
**memory** [5] - 426:4, 428:19, 428:21, 429:12, 547:8
**mental** [2] - 509:25, 515:22
**mention** [5] - 375:13, 376:2, 376:17, 386:21, 399:3
**mentioned** [6] - 381:14, 399:6, 428:21, 459:13, 479:3, 537:13
**merely** [1] - 387:24
**merge** [2] - 458:13, 458:16
**Merry** [1] - 529:19
**message** [5] - 472:19, 472:22, 473:18, 474:2, 483:4
**messy** [1] - 406:19
**met** [6] - 377:14, 388:13, 408:21, 429:3, 479:3, 508:10
**microphone** [1] - 451:4
**mics** [1] - 366:17
**middle** [1] - 495:24
**might** [5] - 378:24, 391:5, 403:17, 455:8, 472:11
**Mike** [3] - 473:11, 474:11, 474:15
**milling** [1] - 486:17
**million** [3] - 511:6, 548:3
**mind** [9] - 366:8, 375:9, 426:8, 426:9, 433:21, 504:24, 513:2, 513:13, 517:11
**Mine** [1] - 478:3
**minimized** [1] - 386:19
**minute** [4] - 444:11, 448:11, 495:4, 543:2
**minutes** [3] - 408:23, 444:15, 449:9
**miracles** [1] - 408:24
**misheard** [1] - 465:13
**misleading** [7] - 369:12, 531:3, 531:9, 575:11, 575:13, 577:6, 577:9
**misrepresentations** [3] - 368:1, 368:17, 576:14
**missed** [1] - 404:10
**missing** [2] - 395:1, 524:24
**mistake** [2] - 544:7, 544:22
**mistakes** [1] - 574:11
**misunderstood** [1] - 536:6
**ML-7** [1] - 514:8
**MM6** [1] - 415:12
**MM8** [2] - 435:21, 437:7
**MMP** [4] - 491:18, 492:6, 492:24, 493:2
**moment** [10] - 441:10, 441:11, 459:14, 463:20, 502:2, 506:20, 507:23, 518:22, 524:16, 543:15
**moments** [2] - 427:1, 433:17
**Monday** [6] - 461:6, 473:1, 499:16, 578:17, 578:25, 579:11
**monetary** [1] - 462:25
**money** [30] - 400:4, 423:20, 423:23, 423:25, 424:11, 424:20, 426:11, 431:19, 432:15, 434:9, 435:11, 442:2, 442:3, 444:1, 459:11, 459:19, 460:18, 463:5, 467:21, 468:5, 548:1, 548:5, 548:9, 549:12, 550:8, 550:12, 553:3, 556:24, 568:6, 568:10
**moneys** [1] - 547:23
**monies** [1] - 549:16
**monitor** [1] - 577:10
**month** [11] - 456:10, 460:10, 460:16, 478:14, 481:3, 481:23, 481:24, 501:6, 511:16, 512:6, 512:9
**months** [1] - 500:19
**MONTILLA** [2] - 419:20, 580:5
**Montilla** [46] - 415:3, 415:20, 419:11, 419:18, 419:25, 420:8, 420:11, 420:20, 421:9, 422:7, 423:6, 423:24, 424:13, 424:24, 425:12, 426:2, 426:16, 427:6, 427:14, 427:16, 428:9, 428:23, 429:9, 429:20, 429:24, 430:12, 430:15, 430:22, 430:23, 430:24, 431:3, 432:6, 432:11, 433:8, 434:13, 434:25, 437:3, 440:5, 441:2, 441:7, 441:19, 442:10, 443:10, 444:4, 444:8
**moon** [3] - 500:16, 500:17, 510:17
**Morabito** [8] - 365:22, 407:7, 432:25, 433:1, 444:12, 444:16, 449:22, 533:4
**morabito** [1] - 572:18
**Morbito** [1] - 496:22
**moreover** [1] - 387:15
**morning** [20] - 365:2, 365:8, 365:12, 365:15, 373:10, 397:19, 403:16, 404:8, 415:24, 416:12, 416:13, 417:7, 419:12, 419:25, 526:15, 541:13, 572:20, 578:18, 579:14, 579:15
**most** [2] - 372:4, 393:16
**Motion** [7] - 369:17, 370:1, 370:5, 371:1, 371:5, 371:21, 371:24
**motion** [28] - 366:15, 370:8, 370:10, 370:16, 371:1, 371:2, 371:12, 371:14, 372:1, 372:11, 373:16, 377:9, 380:18, 385:8, 392:6, 395:21, 398:6, 398:9, 398:22, 400:20, 400:25, 410:16, 446:8, 573:17, 573:21, 573:22, 574:1, 574:3
**Motions** [1] - 367:7
**Move** [1] - 469:17
**move** [10] - 397:2, 398:11, 398:19, 407:3, 480:7, 484:9, 504:23, 506:16, 526:20, 575:8
**moved** [3] - 370:24, 410:10, 555:13
**moves** [2] - 450:14, 524:2
**moving** [2] - 449:19, 578:16
**MR** [385] - 365:8, 365:12, 365:24, 366:2, 373:8, 373:14, 374:2, 374:4, 374:7, 374:10, 376:23, 377:20, 378:2, 378:3, 378:7, 378:15, 379:7, 379:16, 379:25, 380:2, 380:11, 380:16, 381:2, 381:6, 388:23, 389:4, 389:8, 389:19, 390:11, 390:22, 391:3, 391:6, 391:16, 392:13, 392:14, 393:2, 393:20, 393:21, 393:22, 393:25, 394:14, 395:6, 395:11, 395:13, 395:14, 396:2, 396:19, 396:25, 397:5, 397:11, 397:15, 398:14, 398:19, 399:24, 400:15, 401:2, 401:6, 402:2, 402:12, 403:4, 403:10, 404:5, 404:7, 404:20, 404:21, 404:25, 405:16, 405:24, 406:2, 406:7, 406:12, 407:17, 407:20, 408:19, 408:21, 408:24, 409:2, 409:6, 409:19, 409:22, 410:2, 412:3, 412:5, 413:2, 413:15, 413:18, 413:19, 414:14, 414:19, 430:18, 430:21, 432:5, 432:19, 432:22, 433:3, 433:7, 433:14, 433:16, 435:20, 435:23, 436:1, 437:7, 437:9, 439:5, 439:7, 439:11, 439:14, 439:16, 440:4, 440:19, 440:21, 444:6, 445:5, 445:6, 445:10, 445:14, 448:1, 448:4, 448:13, 448:20, 449:3, 449:4, 449:7, 449:12, 449:14, 450:1, 450:12, 450:17, 450:24, 455:1, 455:3, 455:4, 460:22, 460:25, 461:3, 462:4, 462:7, 468:21, 469:2, 469:6, 469:9, 469:10, 469:18, 470:8, 470:11, 470:12, 470:20, 470:23, 471:1, 471:17, 471:19, 472:14, 472:18, 472:21, 473:14, 473:16, 474:1, 474:3, 475:20, 475:24, 476:9, 476:11, 477:20, 477:24, 478:9, 478:10, 480:7, 480:8, 480:18, 480:19, 481:11, 481:13, 482:16, 482:20, 483:13, 483:17, 484:14, 484:15, 484:19, 484:21, 485:3, 486:2, 486:6, 486:19, 487:13, 488:12, 488:23, 489:4, 489:14, 490:8, 490:17, 491:1, 491:8, 491:24, 493:6, 493:22, 494:3, 494:22, 495:4, 495:16, 496:5, 497:5, 497:15, 498:12, 498:16, 500:4, 500:5, 501:25, 502:6, 502:7, 502:11, 502:13, 502:21, 502:24, 502:25, 503:23, 503:24, 504:12, 504:16, 504:17, 504:23, 505:3, 505:23, 506:2, 506:3, 506:7, 506:9, 506:16, 506:18, 506:23, 507:3, 507:7, 507:9, 507:23, 508:1, 508:4, 508:6, 509:14, 513:2, 513:7, 513:9, 513:10, 514:9, 514:12, 514:14, 516:10, 516:11, 517:6, 517:10, 517:14, 517:21, 518:6, 518:8, 518:11, 518:22, 518:24, 519:4, 519:7, 521:2, 522:2, 522:7, 522:9, 522:15, 522:19, 522:21, 522:24, 523:3, 524:2, 524:13, 524:18, 524:23, 525:1, 525:3, 525:6, 525:16, 526:3, 526:7, 526:10, 526:14,

532:19, 532:22, 533:4, 533:7, 533:10, 534:9, 534:10, 534:12, 535:5, 535:10, 536:3, 536:9, 536:11, 536:14, 540:7, 540:9, 540:12, 540:16, 540:18, 541:2, 541:5, 541:8, 541:9, 541:12, 541:15, 541:16, 541:18, 541:22, 541:25, 543:3, 543:7, 544:8, 544:9, 544:11, 544:14, 544:15, 544:17, 544:20, 546:19, 546:22, 547:12, 547:14, 549:2, 549:9, 549:18, 549:25, 553:23, 554:5, 554:9, 554:10, 555:6, 559:10, 559:15, 559:17, 559:21, 560:17, 561:9, 561:20, 561:23, 562:14, 562:24, 563:3, 563:8, 563:17, 563:20, 564:6, 565:4, 565:11, 566:9, 566:17, 566:20, 567:11, 568:2, 569:16, 570:4, 570:7, 570:19, 571:1, 571:14, 571:18, 571:25, 572:2, 573:1, 573:6, 573:20, 573:22, 574:4, 574:8, 574:10, 574:16, 575:4, 575:8, 575:21, 575:22, 576:5, 576:20, 577:2, 577:17, 577:20, 578:3, 578:6, 578:24, 580:7, 580:13, 580:14, 580:17

**MS** [37] - 414:7, 414:11, 414:16, 414:21, 415:1, 415:8, 415:17, 415:20, 419:10, 419:24, 422:10, 422:14, 422:20, 422:24, 423:3, 423:5, 423:21, 429:22, 429:23, 430:15, 437:2, 440:24, 441:1, 441:17, 441:18, 444:3, 497:13, 499:12, 499:21, 532:24, 533:1, 578:12, 578:25, 579:5, 579:12, 580:6, 580:8

**multi** [8] - 479:19, 479:20, 479:22, 480:1, 480:3, 501:18, 501:19, 501:24

**multi-buyer** [2] - 501:19, 501:24

**multi-buyers** [1] - 501:18

**Multinational** [1] - 453:16

**multiple** [12] - 428:20, 429:11, 442:18, 460:9, 464:5, 464:22, 476:17, 478:17, 479:23, 479:24, 484:7, 569:5

**must** [2] - 367:24, 416:18

## N

**Nadar** [1] - 372:9

**name** [67] - 415:18, 419:17, 420:18, 423:8, 430:24, 437:5, 446:1, 450:8, 451:16, 452:20, 453:21, 453:22, 454:2, 454:10, 454:11, 454:12, 454:18, 457:17, 458:9, 461:13, 462:21, 462:23, 466:25, 473:10, 474:11, 480:15, 483:1, 484:10, 484:11, 486:4, 489:1, 489:6, 489:21, 491:3, 491:14, 492:8, 492:9, 493:3, 493:17, 494:16, 495:2, 495:9, 502:17, 505:6, 506:10, 506:12, 506:14, 507:16, 507:18, 509:17, 515:12, 519:18, 526:16, 528:7, 531:15, 532:17, 533:25, 534:2, 534:4, 534:13, 547:6, 549:20, 549:22, 550:6, 555:15, 556:4, 577:5

**Name** [1] - 451:25

**named** [5] - 386:16, 452:3, 502:19, 504:21, 572:13

**names** [44] - 405:6, 421:22, 453:12, 453:14, 458:8, 459:13, 463:1, 465:23, 465:24, 466:1, 466:5, 466:12, 466:15, 467:6, 467:7, 468:19, 470:14, 472:12, 475:4, 476:19, 476:25, 477:12, 478:16, 479:8, 479:16, 481:20, 483:23, 493:4, 494:6, 508:8, 511:13, 513:19, 515:7, 518:16, 518:18, 531:22, 550:20, 550:21, 550:22, 551:2, 556:8, 579:2

**Nancy** [2] - 427:22, 427:25

**narcotics** [1] - 385:20

**narrow** [1] - 387:3

**national** [1] - 547:19

**natural** [1] - 368:1

**nature** [1] - 546:8

**Naval** [1] - 420:24

**navigate** [3] - 488:23, 489:4, 491:1

**near** [1] - 371:16

**necessarily** [2] - 405:6, 425:24

**necessary** [2] - 410:22, 446:13

**need** [29] - 366:1, 375:20, 381:10, 381:24, 390:3, 390:9, 392:23, 394:5, 394:25, 396:22, 398:2, 399:15, 400:9, 400:15, 404:20, 408:5, 408:8, 408:22, 416:7, 416:14, 441:7, 445:22, 469:16, 495:12, 499:20, 533:2, 541:2, 543:2, 550:14

**needed** [10] - 373:23, 376:10, 389:11, 395:8, 400:10, 425:10, 442:5, 442:24, 512:21, 569:7

**needs** [7] - 376:7, 382:16, 395:1, 396:21, 402:6, 402:16, 403:20

**negotiate** [1] - 567:3

**network** [1] - 547:1

**Network** [7] - 366:25, 368:7, 368:21, 372:15, 531:23, 540:4, 540:15

**neutral** [1] - 387:25

**never** [17] - 375:14, 375:17, 375:22, 376:3, 376:6, 378:16, 390:15, 390:24, 392:12, 394:10, 402:12, 426:12, 508:10, 515:3, 525:21, 543:14, 549:22

**nevertheless** [1] - 373:1

**new** [7] - 459:7, 466:3, 466:4, 466:12, 529:8, 556:8, 567:5

**NEW** [1] - 364:1

**New** [14] - 364:4, 364:14, 364:15, 364:20, 364:22, 369:5, 374:11, 472:2, 472:6, 472:11, 472:12, 473:12, 531:14

**news** [3] - 408:19, 572:14, 572:15

**next** [25] - 401:9, 413:25, 422:15, 444:13, 445:6, 449:24, 462:25, 465:5, 474:2, 479:15, 485:5, 498:20, 502:11, 502:12, 516:15, 517:23, 519:6, 520:23, 548:12, 550:1, 553:25, 554:13, 558:14, 559:25

**nice** [3] - 430:25, 431:2, 510:20

**night** [3] - 366:10, 373:9, 374:13

**nine** [2] - 391:9, 480:7

**Nixes** [1] - 568:17

**NNP** [1] - 490:23

**non** [2] - 561:18, 568:8

**non-buyers** [1] - 561:18

**non-paid** [1] - 568:8

**none** [5] - 398:3, 404:2, 416:13, 416:15, 552:25

**noon** [1] - 448:24

**Nora** [1] - 420:13

**normal** [4] - 448:17, 448:25, 449:5, 496:9

**normally** [3] - 378:17, 462:1, 574:16

**note** [13] - 369:15, 372:17, 398:4, 399:3, 399:13, 496:22, 507:11, 507:12, 550:13, 563:24, 563:25, 565:12, 577:20

**noted** [4] - 370:19, 385:2, 388:21, 405:12

**notes** [4] - 403:14, 404:13, 444:24, 564:3

**nothing** [9] - 389:12, 402:21, 407:10, 413:2, 429:4, 440:21, 444:6, 536:9, 575:5

**notice** [12] - 367:13, 370:11, 465:16, 465:18, 490:24, 492:9, 492:11, 504:3, 547:10, 547:16, 547:25, 549:14

**notices** [4] - 367:19, 372:3, 372:25, 373:4

**Notification** [1] - 472:10

**notifications** [1] - 424:5

**notified** [1] - 497:22

**notify** [1] - 496:21

**noting** [1] - 398:23

**November** [2] - 526:21, 547:11

**Novis** [100] - 375:25, 391:21, 393:10, 393:11, 397:23, 452:3, 452:7, 452:11, 452:14, 452:18, 453:13, 454:2, 454:3, 454:16, 455:9, 456:15, 456:18, 457:4, 457:5, 457:12, 457:20, 459:14, 459:15, 466:1, 472:1, 472:12, 475:7, 475:10, 477:2, 477:9, 478:25, 479:4, 479:5, 480:14, 487:22, 493:14, 501:1, 501:7, 501:14, 501:16, 505:14, 508:22, 508:24, 510:13, 510:14, 528:9, 528:12, 528:14, 529:17, 530:1, 530:5, 530:15, 530:20, 531:24, 532:9, 532:14, 533:13, 533:22, 533:24, 534:13, 534:15, 534:17, 534:19, 534:22, 534:25, 537:3, 537:4, 537:6, 537:10, 537:13, 537:16, 537:18, 537:25, 538:6, 538:12, 538:22, 538:25, 539:9, 539:14, 549:23, 550:21, 551:5, 552:5, 552:12, 553:2, 553:11, 553:18, 555:13, 556:6, 562:21, 563:7, 564:24, 566:22, 567:10, 568:24, 568:25

**Novis'** [2] - 454:23, 532:7

**Novis's** [10] - 452:20, 477:11, 510:10, 531:15, 534:16, 534:24, 538:18, 539:3, 551:16, 551:19

**NPB** [1] - 427:16

**NPF** [5] - 427:18, 480:4, 480:6, 493:19, 494:8
**NPF20** [2] - 479:14, 479:15
**NRR** [1] - 427:21
**NRS** [5] - 427:20, 428:3, 434:3, 434:5, 434:10
**Nuby** [2] - 494:18, 496:3
**NUMBER** [16] - 417:14, 417:18, 417:21, 417:24, 418:2, 418:4, 418:6, 418:9, 418:11, 418:13, 418:16, 418:18, 418:20, 418:23, 419:1, 419:3
**number** [55] - 367:7, 368:5, 369:4, 370:6, 370:7, 370:16, 371:1, 371:6, 371:19, 371:25, 379:12, 380:24, 384:14, 388:15, 403:13, 407:6, 415:4, 416:3, 416:5, 424:6, 424:14, 429:17, 432:9, 459:25, 460:19, 464:8, 464:9, 464:10, 465:14, 465:15, 479:15, 484:23, 485:1, 486:7, 486:13, 487:4, 487:5, 487:6, 489:12, 490:1, 490:2, 491:5, 491:19, 491:21, 495:11, 495:15, 495:23, 495:24, 536:7, 547:17, 548:1, 550:13, 550:19, 574:15
**Number** [17] - 406:25, 417:13, 417:17, 417:20, 417:23, 418:1, 418:3, 418:5, 418:8, 418:10, 418:12, 418:15, 418:17, 418:19, 418:22, 418:25, 419:2
**numbers** [6] - 404:14, 405:6, 464:12, 482:11, 487:2, 492:13
**numerous** [2] - 438:12, 438:18
**NUSRAT** [1] - 364:10

## O

**oath** [14] - 435:17, 436:4, 437:12, 437:15, 438:4, 438:5, 438:22, 446:5, 450:22, 497:9, 514:3, 514:20, 526:5, 526:12
**object** [3] - 371:9, 381:12, 414:20
**objected** [2] - 371:7, 469:3
**objecting** [3] - 522:3, 522:4, 522:9
**Objection** [1] - 468:21
**objection** [24] - 366:21, 367:8, 373:8, 385:24, 388:21, 406:24, 413:19, 414:15, 449:3, 449:7, 450:17, 470:9, 486:8, 486:10, 493:25, 516:10, 517:9, 522:11, 522:12, 522:24, 536:2, 541:22, 554:4, 576:16
**objections** [5] - 373:22, 406:10, 406:13, 524:14
**objective** [1] - 372:9
**obligation** [2] - 392:14, 392:21
**obligations** [2] - 498:1, 498:9
**observation** [1] - 376:24
**observe** [1] - 539:17
**obstruction** [4] - 411:15, 412:16, 447:7, 520:6
**obvious** [1] - 531:2
**obviously** [1] - 448:22
**occasionally** [1] - 482:7
**occasions** [2] - 377:15, 381:9
**occur** [1] - 481:22
**occurred** [1] - 546:6
**October** [1] - 465:8
**OF** [3] - 364:1, 364:2, 364:9
**offense** [2] - 397:8, 497:21
**offenses** [1] - 525:24
**offer** [4] - 370:15, 384:11, 386:19, 522:5
**offered** [5] - 367:11, 367:12, 375:10, 529:21, 530:2
**offering** [5] - 378:11, 383:15, 383:24, 422:2, 522:25
**office** [29] - 375:25, 393:17, 429:16, 453:1, 459:3, 492:5, 500:10, 500:15, 500:20, 501:2, 510:16, 530:3, 530:21, 532:7, 532:17, 538:5, 538:10, 539:3, 539:8, 539:9, 539:12, 539:15, 539:19, 547:22, 548:7, 549:7, 561:24, 566:1, 571:7
**Office** [1] - 504:8
**offices** [2] - 550:12, 551:11
**Official** [3] - 547:1, 555:5, 560:6
**official** [1] - 504:5
**officials** [1] - 372:3
**offs** [1] - 562:1
**often** [12] - 481:17, 481:22, 500:17, 501:1, 501:3, 501:4, 528:23, 539:19, 564:3, 564:16, 564:19, 565:23
**old** [3] - 420:8, 528:3, 552:13
**omitting** [1] - 472:6
**once** [21] - 379:16, 380:12, 388:23, 389:23, 390:8, 421:6, 422:15, 422:22, 458:20, 481:23, 481:24, 500:16, 500:17, 500:19, 501:6, 510:17, 511:16, 522:12, 528:15, 552:2, 577:9
**one** [88] - 378:10, 378:21, 380:21, 380:25, 381:8, 387:2, 393:9, 397:6, 398:4, 403:4, 403:11, 404:9, 409:3, 414:11, 415:4, 415:11, 417:4, 417:5, 422:7, 425:3, 426:1, 426:4, 427:23, 428:3, 428:6, 428:8, 429:15, 430:18, 431:20, 432:3, 435:21, 437:5, 437:8, 437:14, 439:17, 441:10, 441:11, 443:1, 443:7, 443:11, 443:14, 458:3, 458:17, 460:7, 460:8, 460:15, 460:19, 461:10, 461:16, 464:6, 467:10, 468:11, 475:8, 475:17, 483:11, 488:5, 488:10, 490:14, 492:8, 497:16, 502:2, 509:6, 509:12, 511:22, 516:4, 517:18, 518:14, 522:5, 525:18, 538:24, 543:15, 544:11, 550:17, 553:23, 561:6, 566:20, 567:13, 568:11, 569:24, 570:13, 571:17, 573:18, 577:10, 577:22, 578:24
**one-time** [1] - 468:11
**one-year** [1] - 443:7
**ones** [7] - 372:15, 424:16, 425:5, 438:13, 464:25, 478:22, 530:24
**online** [1] - 435:8
**open** [15] - 365:1, 440:1, 470:1, 499:2, 518:1, 524:1, 530:12, 537:1, 543:1, 546:1, 555:1, 560:1, 569:9, 573:10, 575:2
**opened** [2] - 377:21, 432:15
**opening** [5] - 384:9, 384:15, 388:25, 530:12, 569:11
**opens** [4] - 383:11, 389:16, 390:2, 575:1
**operated** [1] - 510:23
**operating** [1] - 391:18
**operation** [5] - 551:16, 551:20, 555:11, 561:4, 562:8
**operations** [1] - 555:21
**opinion** [8] - 367:6, 367:22, 368:23, 368:24, 369:7, 369:14, 370:19, 370:20
**opportunities** [1] - 434:7
**opportunity** [2] - 387:5, 432:14
**oppose** [1] - 398:9
**opposed** [1] - 569:12
**opposition** [3] - 370:25, 371:5, 400:25
**optional** [2] - 505:5, 505:8
**oral** [2] - 371:12, 372:11
**orally** [1] - 373:17
**order** [56] - 367:6, 367:22, 368:23, 368:24, 369:7, 369:14, 370:19, 370:20, 371:3, 378:6, 382:17, 390:22, 390:23, 395:2, 397:18, 398:11, 400:19, 401:1, 401:4, 401:7, 402:6, 402:16, 410:11, 410:17, 411:3, 411:4, 411:10, 411:11, 411:16, 411:19, 411:23, 412:17, 412:20, 413:9, 424:12, 424:19, 427:9, 445:8, 446:8, 446:19, 446:21, 446:22, 447:2, 447:3, 447:8, 447:10, 447:20, 466:7, 467:6, 475:4, 520:7, 520:11, 520:17, 550:12, 568:7
**ordered** [4] - 371:3, 391:24, 425:9, 443:12
**ordering** [1] - 472:12
**orders** [1] - 474:7
**organizations** [1] - 434:5
**otherwise** [9] - 411:5, 411:16, 412:16, 444:22, 446:23, 447:8, 471:16, 520:6, 535:8
**outcome** [1] - 575:14
**outputting** [1] - 456:5
**outside** [6] - 410:8, 411:25, 426:13, 554:1, 559:1
**outweigh** [2] - 385:15, 386:5
**outweighed** [2] - 369:11, 372:5
**outweighs** [1] - 376:18
**overall** [1] - 562:7
**overdrawn** [1] - 424:5
**overruled** [1] - 367:8
**overseeing** [1] - 530:8
**owed** [1] - 453:22
**Owen** [1] - 555:24
**own** [18] - 371:24, 441:22, 464:16, 464:23, 465:24, 466:1, 466:15, 467:3, 467:11, 530:17, 553:14, 553:15, 553:20, 555:10, 556:25, 562:5, 575:25, 577:14
**owned** [2] - 454:2, 510:22

**owner** [5] - 465:22, 466:4, 470:19, 491:14, 537:14
**owners** [1] - 528:6
**owns** [2] - 465:23, 477:8

## P

**P.M** [1] - 496:12
**PAB** [1] - 504:8
**PacNet** [2] - 569:6, 569:8
**pad** [3] - 486:9, 491:6, 491:22
**page** [101] - 366:22, 367:21, 368:4, 370:9, 370:15, 370:20, 372:1, 374:24, 375:1, 382:8, 382:22, 382:24, 383:3, 384:14, 384:19, 385:9, 385:17, 386:11, 386:12, 388:8, 401:9, 404:14, 417:2, 417:4, 417:6, 425:17, 435:21, 436:6, 437:8, 462:5, 462:9, 471:17, 471:18, 478:5, 478:9, 480:7, 480:18, 484:9, 484:20, 485:4, 485:5, 488:23, 489:4, 491:1, 494:5, 494:9, 494:13, 494:19, 498:20, 502:6, 502:11, 502:12, 502:24, 504:16, 504:23, 506:2, 506:16, 506:25, 507:7, 514:13, 516:15, 517:23, 520:23, 524:10, 525:14, 540:17, 546:20, 546:25, 548:12, 549:19, 549:25, 553:25, 554:13, 558:14, 559:25, 560:18, 561:2, 561:9, 561:10, 561:20, 561:21, 561:23, 562:14, 562:15, 562:24, 563:3, 563:8, 563:9, 563:17, 564:6, 564:7, 566:17, 566:18, 566:20, 567:11, 568:2, 568:3, 570:4, 570:7, 571:1, 581:14
**Page** [1] - 540:9
**PAGE** [1] - 580:3
**pages** [11] - 367:8, 369:13, 384:10, 384:24, 422:10, 422:25, 426:20, 435:23, 438:14, 478:4, 524:21
**paid** [6] - 514:1, 514:4, 530:13, 552:3, 568:5, 568:8
**paper** [19] - 376:23, 403:17, 405:19, 414:12, 415:9, 415:17, 416:20, 437:4, 486:9, 493:23, 541:13, 547:7, 564:24, 565:10, 565:22, 565:25, 566:6, 567:18
**papers** [1] - 404:8
**paragraph** [5] - 492:7, 503:25, 507:10, 549:9, 567:16
**paragraphs** [1] - 547:13
**paralegal** [1] - 407:7
**parameters** [1] - 390:6
**PARISI** [1] - 364:23
**parking** [3] - 403:12, 416:11, 417:7
**Parkside** [2] - 477:1, 478:23
**part** [13] - 379:3, 391:11, 457:18, 465:5, 465:9, 465:12, 466:9, 493:7, 505:1, 524:25, 530:23, 531:1, 576:21
**Part** [1] - 465:13
**Partially** [1] - 527:10
**participating** [1] - 550:10
**participation** [1] - 547:20
**particular** [7] - 369:19, 370:17, 383:2, 395:23, 550:22, 575:14, 575:17
**particularly** [1] - 373:24
**parties** [24] - 367:7, 371:23, 381:9, 398:5, 398:24, 399:15, 403:2, 405:11, 405:12, 405:15, 405:21, 406:15, 407:1, 407:23, 410:5, 412:25, 496:17, 497:17, 497:23, 499:10, 544:3, 544:4, 572:8, 577:25
**partner** [5] - 537:16, 537:18, 538:23, 538:25, 539:13
**partners** [7] - 534:25, 535:3, 537:12, 538:19, 539:2, 551:6, 551:19
**party** [3] - 378:11, 383:6, 416:24
**party's** [1] - 373:18
**pass** [1] - 529:16
**passed** [1] - 420:12
**passing** [1] - 528:22
**past** [1] - 371:16
**patch** [1] - 414:1
**patient** [1] - 496:8
**patiently** [1] - 415:25
**Patricia** [1] - 556:7
**Patricia's** [1] - 562:19
**Pause** [7] - 441:15, 448:14, 502:3, 506:22, 507:25, 518:23, 524:19
**pause** [4] - 430:19, 432:4, 435:22, 509:13
**pay** [5] - 422:4, 443:2, 443:4, 555:19, 568:11
**payable** [1] - 550:12
**paycheck** [1] - 551:23
**paying** [2] - 438:19, 467:6
**Payment** [1] - 504:19
**payment** [3] - 427:14, 428:7, 443:22
**payments** [5] - 424:1, 427:7, 427:10, 427:18, 427:20
**penalties** [1] - 384:4
**Pennsylvania** [2] - 526:19, 526:20
**people** [30] - 374:18, 426:12, 442:1, 443:3, 459:8, 459:18, 459:25, 460:3, 466:14, 468:19, 470:15, 475:11, 478:24, 479:23, 482:8, 482:11, 482:14, 484:25, 493:20, 505:10, 509:21, 556:4, 556:5, 556:14, 564:2, 564:24, 568:6, 568:9, 572:9, 573:8
**per** [6] - 512:16, 512:17, 512:19, 565:1, 569:2, 569:4
**percent** [3] - 416:14, 507:14, 549:13
**percentages** [1] - 568:14
**Perfect** [3] - 471:18, 474:2, 512:11
**perfect** [3] - 413:15, 473:15, 504:24
**perform** [1] - 454:18
**performing** [1] - 456:4
**perhaps** [1] - 404:1
**period** [11] - 369:1, 369:20, 369:23, 373:1, 421:10, 424:15, 429:6, 452:9, 512:13, 543:11, 566:1
**perjury** [5] - 384:5, 411:15, 412:15, 447:7, 520:5
**Permission** [4] - 475:20, 482:16, 483:13, 532:19
**permission** [26] - 365:11, 407:5, 408:2, 423:1, 460:22, 470:20, 472:14, 477:20, 486:19, 487:13, 488:12, 489:14, 490:8, 490:17, 491:8, 491:24, 493:7, 493:22, 495:16, 501:25, 502:21, 504:12, 505:23, 507:3, 574:19, 574:25
**permitting** [1] - 384:22
**person** [17] - 378:13, 394:6, 415:17, 426:16, 435:24, 437:2, 460:13, 465:23, 466:8, 468:14, 484:23, 492:9, 494:16, 513:22, 515:5, 516:1, 549:22
**person's** [4] - 486:4, 489:1, 495:9, 502:17
**personable** [1] - 510:19
**personal** [5] - 575:25, 576:1, 576:8, 576:10, 577:11
**personnel** [1] - 572:10
**persons** [1] - 546:10
**pertaining** [3] - 385:20, 411:8, 567:18
**Phil** [16] - 454:19, 461:19, 461:21, 471:6, 473:10, 473:20, 482:23, 487:22, 493:14, 535:4, 540:6, 556:6, 567:15, 568:23, 570:3, 570:6
**Philip** [11] - 365:4, 410:20, 430:25, 446:11, 457:20, 461:17, 525:20, 533:21, 534:4, 538:20, 566:19
**PHILIP** [1] - 364:7
**Philips** [4] - 393:11, 556:10, 562:19, 563:2
**Phillips** [9] - 457:4, 457:17, 459:15, 475:15, 479:3, 537:19, 538:3, 538:5, 556:7
**phone** [1] - 550:13
**physical** [3] - 500:9, 510:1, 515:22
**physically** [1] - 569:7
**picked** [3] - 565:10, 565:22, 565:25
**picking** [2] - 556:15, 569:3
**pictures** [1] - 560:25
**piece** [5] - 415:3, 416:20, 458:25, 479:13, 544:24
**pieces** [3] - 463:15, 531:9, 547:6
**pile** [1] - 563:21
**PIN** [2] - 482:11, 484:22
**pin** [8] - 486:7, 486:12, 487:4, 487:5, 489:12, 491:5, 495:11, 495:15
**place** [3] - 373:3, 391:2, 429:16
**placed** [1] - 550:4
**places** [2] - 421:22, 442:4
**Placid** [1] - 489:3
**plain** [1] - 391:17
**plan** [3] - 410:12, 411:17, 447:19
**planning** [2] - 379:23, 448:23
**plans** [2] - 411:23, 522:10
**played** [1] - 515:1
**Plaza** [1] - 364:15
**pleas** [1] - 374:18
**pleasure** [1] - 426:15

**pled** [3] - 374:18, 375:4, 375:18
**plus** [1] - 480:1
**PO** [2] - 569:2, 569:5
**podcasts** [1] - 572:14
**point** [26] - 374:1, 374:14, 375:22, 376:24, 389:22, 394:4, 395:23, 396:17, 398:3, 402:16, 409:16, 421:11, 429:21, 429:24, 443:1, 443:14, 452:13, 464:25, 465:16, 496:5, 498:11, 500:22, 510:6, 578:16, 578:22
**pointed** [1] - 385:24
**points** [1] - 465:17
**poll** [2] - 405:2, 405:8
**Port** [2] - 364:20, 451:7
**portion** [3] - 431:8, 555:4, 560:5
**portions** [1] - 431:12
**posed** [1] - 569:12
**position** [8] - 379:17, 380:12, 384:20, 392:25, 398:7, 410:21, 420:23, 446:12
**possession** [1] - 385:20
**possibility** [1] - 424:11
**possible** [2] - 579:10, 579:12
**post** [2] - 429:16, 459:3
**postal** [6] - 403:11, 404:12, 459:2, 557:5, 557:17, 579:7
**potential** [3] - 372:5, 397:6, 408:12
**potentially** [3] - 392:7, 497:19, 578:25
**practice** [1] - 574:17
**pre** [1] - 405:14
**pre-2015** [1] - 406:10
**pre-indictment** [1] - 405:14
**precedence** [1] - 386:7
**precedent** [1] - 369:2
**Precise** [1] - 556:2
**precise** [2] - 436:4, 555:16
**preclude** [4] - 366:15, 377:9, 380:18, 380:22
**precluded** [8] - 367:19, 368:22, 369:10, 378:5, 381:15, 383:6, 385:25
**preclusion** [1] - 376:20
**predicate** [2] - 396:6, 397:8
**preference** [2] - 379:14, 433:23
**prejudice** [13] - 369:12, 372:5, 373:25, 385:14, 385:19, 385:23, 386:4, 386:13, 386:14, 386:18, 386:24, 406:8
**prejudicial** [1] - 379:15
**premotion** [1] - 479:11
**prepared** [6] - 365:17, 412:19, 504:4, 520:9, 544:17, 548:6
**preparing** [3] - 457:23, 492:15, 548:7
**presence** [4] - 409:8, 410:8, 411:25
**present** [4] - 375:21, 399:20, 438:6, 499:2
**presented** [2] - 386:23, 559:16
**preserve** [2] - 385:23, 498:15
**preserving** [1] - 406:4
**president** [3] - 552:16, 552:19, 552:23
**presiding** [1] - 445:21
**presort** [2] - 458:22, 458:24
**Presort** [2] - 458:23, 458:25
**pretty** [2] - 390:6, 531:13
**Pretty** [1] - 451:9
**prevent** [3] - 374:21, 375:20, 398:21
**prevented** [1] - 376:7
**previous** [3] - 367:8, 368:11, 382:23
**previously** [10] - 377:14, 422:9, 426:17, 435:17, 436:3, 515:16, 526:11, 560:22, 570:20, 573:6
**price** [5] - 464:25, 465:16, 465:17, 570:11, 570:15
**prices** [1] - 568:4
**pricing** [1] - 567:1
**printed** [5] - 403:11, 435:9, 467:4, 513:19, 513:20
**printer** [1] - 483:9
**printers** [2] - 488:5, 504:10
**printing** [1] - 463:15
**priolo** [2] - 367:15, 372:1
**Priolo** [97] - 365:5, 365:13, 367:1, 367:2, 367:10, 367:13, 367:16, 368:5, 368:13, 369:12, 370:23, 371:3, 371:4, 371:7, 371:23, 375:6, 377:9, 380:18, 381:14, 381:21, 382:13, 383:9, 383:11, 384:18, 385:8, 386:4, 393:11, 410:20, 413:8, 430:25, 446:11, 454:19, 454:21, 454:25, 455:6, 455:13, 455:17, 456:25, 457:20, 459:14, 460:6, 461:17, 461:19, 465:24, 467:11, 467:12, 467:16, 467:17, 467:20, 468:2, 468:8, 473:12, 474:4, 474:9, 474:10, 474:15, 474:17, 474:19, 475:13, 479:4, 487:22, 493:14, 500:15, 500:20, 505:10, 508:9, 509:17, 510:7, 520:16, 525:17, 525:20, 533:22, 534:4, 534:6, 535:4, 537:3, 537:9, 538:20, 539:5, 539:11, 539:14, 540:6, 543:11, 543:13, 546:10, 547:3, 549:23, 556:6, 566:19, 567:3, 567:15, 568:23, 568:25, 570:3, 570:6, 570:16, 571:4
**PRIOLO** [2] - 364:7, 525:7
**Priolo's** [10] - 367:4, 367:8, 368:9, 368:15, 369:9, 372:1, 381:23, 467:18, 474:13, 511:4
**priority** [3] - 562:6, 564:12, 564:16
**privately** [1] - 414:25
**privilege** [8] - 387:23, 388:3, 388:7, 400:23, 411:1, 411:6, 446:17, 446:24
**privileged** [2] - 404:15, 405:5
**prize** [3] - 370:11, 430:13, 434:9
**Prize** [4] - 502:9, 503:2, 504:19, 506:4
**prizes** [8] - 422:2, 547:23, 548:1, 548:5, 548:9, 549:12, 549:17, 550:8
**probative** [9] - 367:23, 368:16, 369:11, 373:4, 381:25, 382:5, 385:1, 386:5, 386:9
**problem** [6] - 476:22, 499:21, 575:10, 576:2, 577:3, 577:4
**problems** [1] - 429:13
**procedural** [3] - 370:2, 410:10, 499:22
**procedures** [1] - 406:17
**proceed** [4] - 410:7, 444:17, 449:18, 520:22
**proceeding** [4] - 437:21, 441:3, 447:1, 447:25
**Proceedings** [1] - 364:24
**proceedings** [5] - 408:16, 414:4, 441:15, 448:14, 524:19
**process** [7] - 410:6, 458:4, 458:18, 481:20, 482:10, 483:6, 530:11
**processed** [1] - 530:10
**processing** [16] - 452:8, 452:19, 454:24, 455:23, 455:25, 456:3, 457:3, 457:6, 492:12, 492:22, 509:3, 509:6, 510:10, 556:15, 568:5, 568:8
**produce** [1] - 569:14
**produced** [1] - 364:25
**product** [3] - 395:4, 404:16, 547:19
**productive** [2] - 392:4, 568:19
**professional** [1] - 530:22
**professional -type** [1] - 530:22
**proffer** [40] - 375:12, 375:13, 377:15, 377:17, 377:19, 379:8, 380:22, 380:23, 380:25, 381:8, 381:13, 381:16, 381:21, 383:21, 384:11, 386:20, 387:2, 387:11, 387:12, 387:18, 388:14, 388:16, 389:1, 389:2, 391:23, 392:3, 393:19, 393:22, 393:23, 393:24, 558:8, 558:10, 559:5, 559:6, 559:7, 559:22, 560:8, 573:24, 573:25, 574:22
**proffered** [2] - 368:8, 368:14
**profits** [1] - 539:1
**progeny** [1] - 372:9
**programmer** [3] - 451:13, 451:15, 451:19
**projected** [1] - 448:18
**promise** [11] - 390:16, 391:12, 392:17, 392:21, 392:22, 392:24, 393:2, 393:13, 393:18, 394:2, 493:6
**promises** [5] - 384:3, 390:14, 390:19, 393:6, 560:13
**promotion** [26] - 462:19, 462:22, 462:23, 463:1, 463:6, 476:14, 476:16, 476:17, 476:24, 477:10, 477:11, 478:20, 479:13, 479:14, 480:23, 486:24, 487:10, 488:21, 489:9, 489:10, 489:19, 490:22, 493:17, 493:20, 494:7, 547:19
**promotional** [1] - 567:19
**promotions** [10] - 463:20, 464:1, 464:2, 508:19, 537:20, 537:21, 564:3, 564:14, 570:13
**Promotions** [1] - 538:4
**prompted** [1] - 397:17
**proof** [2] - 369:8, 372:7
**proper** [1] - 385:11
**properly** [1] - 369:19
**property** [3] - 567:21, 567:22, 567:25
**proposal** [6] - 405:20, 405:21, 405:22,

544:3, 544:5, 544:13
**propose** [1] - 577:21
**proposed** [9] - 366:22, 368:19, 370:4, 370:18, 372:20, 405:13, 406:8, 410:17, 446:8
**proposes** [1] - 387:7
**proposing** [1] - 376:19
**prosection** [1] - 386:10
**prosecute** [1] - 393:17
**prosecuted** [1] - 392:12
**prosecuting** [1] - 402:18
**prosecution** [21] - 377:14, 382:21, 383:8, 384:4, 386:2, 387:24, 388:13, 396:6, 396:10, 411:4, 411:14, 412:15, 412:22, 446:20, 447:6, 497:21, 498:4, 498:5, 520:5, 520:13, 558:5
**prosecutions** [1] - 387:22
**prosecutor** [3] - 392:20, 437:20, 515:16
**prosecutorial** [1] - 397:25
**prosecutors** [5] - 402:20, 437:16, 438:17, 439:3, 440:11
**prospect** [1] - 550:5
**prospective** [1] - 576:17
**protection** [1] - 392:3
**prove** [1] - 367:24
**provide** [12] - 382:14, 389:16, 410:25, 411:5, 411:6, 412:9, 446:16, 446:22, 446:24, 511:3, 532:9, 532:14
**provided** [12] - 385:6, 399:18, 409:25, 413:9, 425:18, 497:19, 498:3, 514:8, 520:17, 550:9, 562:12, 567:2
**provides** [2] - 383:10, 385:10
**providing** [1] - 386:21
**provision** [1] - 389:20
**provisions** [9] - 384:1, 384:2, 384:3, 384:9, 384:13, 386:21, 389:17, 573:8, 574:21
**PSI** [2] - 567:17, 567:22
**public** [6] - 403:12, 410:23, 446:14, 492:11, 496:17, 548:4
**Public** [1] - 506:4
**publication** [2] - 406:18, 422:22
**publicity** [4] - 505:5, 505:7, 505:11, 505:20
**publish** [37] - 407:5, 407:8, 407:13, 422:16, 423:1, 432:25, 433:1, 460:22, 470:21, 470:23, 472:14, 475:20, 477:20, 482:16, 483:13, 486:19, 487:13, 488:12, 489:14, 490:8, 490:17, 491:8, 493:7, 495:16, 501:25, 502:21, 504:12, 505:23, 507:3, 532:19, 532:22, 533:4, 546:19, 560:18, 565:4, 566:9, 569:16
**published** [32] - 406:20, 407:11, 407:15, 422:12, 422:17, 422:23, 423:4, 433:2, 486:22, 487:16, 488:15, 489:17, 490:11, 490:20, 491:11, 492:2, 493:10, 495:19, 502:5, 504:15, 506:1, 507:6, 533:9, 540:8, 540:11, 560:19, 565:6, 566:12, 569:19, 570:21, 570:22
**Publishes** [8] - 461:2, 470:25, 472:17, 475:23, 477:23, 482:19, 483:16, 546:21
**publishing** [1] - 407:12
**pull** [2] - 451:4, 491:24
**pulled** [1] - 377:1
**purchase** [2] - 434:7, 468:6
**purchased** [5] - 459:11, 479:23, 479:24, 512:21, 513:22
**purge** [2] - 458:13, 458:16
**purpose** [6] - 410:1, 467:2, 546:13, 566:25, 568:1, 570:17
**purposes** [2] - 505:7, 505:11
**pursuant** [10] - 380:21, 383:20, 384:5, 384:23, 387:23, 388:3, 388:12, 399:11, 410:17, 446:8
**pursued** [1] - 527:13
**put** [19] - 380:12, 403:5, 411:22, 421:17, 424:16, 425:14, 425:16, 425:23, 431:16, 432:19, 432:24, 447:15, 467:11, 471:22, 497:16, 515:12, 518:17, 525:17, 544:15
**puts** [1] - 379:17
**putting** [2] - 432:18, 458:25

## Q

**QMI** [1] - 562:20
**Quantity** [2] - 459:24, 459:25
**Quantity-wise** [2] - 459:24, 459:25
**Quantum** [12] - 453:16, 454:1, 454:2, 477:6, 477:8, 478:23, 480:12, 480:13, 481:3, 538:1, 550:20, 562:21
**questioned** [2] - 411:8, 446:25
**questioning** [9] - 377:21, 383:19, 386:25, 387:22, 391:15, 519:23, 524:17, 571:24, 577:13
**questions** [23] - 387:7, 387:25, 411:21, 412:2, 416:8, 430:16, 437:21, 440:19, 441:21, 444:4, 447:14, 455:22, 474:24, 500:8, 508:1, 508:12, 508:14, 518:11, 518:24, 536:8, 571:17, 576:24, 578:20
**quick** [3] - 377:2, 514:10, 521:2
**quickly** [3] - 433:13, 469:16, 513:5
**quite** [2] - 395:25, 513:14
**quote** [19] - 368:1, 368:2, 370:10, 370:15, 371:16, 371:17, 372:10, 374:21, 375:2, 376:25, 382:9, 382:12, 382:18, 382:19, 384:1, 384:2, 385:11, 387:24, 388:6

## R

**R-U-N-N-E-R** [1] - 374:11
**raise** [14] - 369:19, 369:25, 371:11, 373:22, 373:25, 398:10, 398:18, 399:2, 403:4, 419:13, 450:4, 519:11, 553:5, 573:1
**raised** [10] - 365:18, 366:13, 366:21, 369:16, 372:22, 395:23, 398:24, 400:19, 410:5, 497:19
**raising** [2] - 390:25, 405:10
**ran** [1] - 538:10
**rasing** [1] - 373:21
**rate** [2] - 501:13, 501:17
**rather** [4] - 365:22, 416:2, 448:24, 522:10
**re** [2] - 370:6, 526:5
**re-filed** [1] - 370:6
**re-swear** [1] - 526:5
**reach** [6] - 385:22, 394:3, 405:15, 407:24, 499:13, 499:15
**reached** [3] - 406:16, 529:18, 544:19
**reaching** [1] - 429:10
**read** [69] - 377:7, 393:22, 409:8, 416:14, 416:15, 416:19, 417:9, 417:11, 417:15, 417:18, 417:21, 417:24, 418:2, 418:4, 418:6, 418:9, 418:11, 418:13, 418:16, 418:18, 418:20, 418:23, 419:1, 419:3, 433:22, 433:24, 434:17, 442:15, 442:22, 461:7, 470:7, 471:10, 473:9, 474:8, 484:10, 484:11, 486:3, 489:1, 489:6, 492:7, 494:16, 503:12, 503:25, 505:4, 506:25, 507:10, 517:3, 517:4, 518:5, 522:16, 525:16, 533:17, 544:2, 544:6, 544:24, 546:3, 546:24, 547:15, 549:11, 550:3, 555:2, 555:4, 560:4, 560:5, 563:22, 563:24, 567:16, 569:9, 572:14
**readers** [1] - 434:11
**reading** [10] - 374:23, 375:1, 377:2, 433:22, 496:15, 504:24, 522:22, 531:4, 531:10, 544:14
**ready** [2] - 444:17, 506:20
**real** [5] - 394:21, 395:6, 400:17, 547:25, 573:8
**reality** [2] - 400:12, 400:14
**realize** [4] - 422:5, 439:11, 442:17, 531:12
**really** [11] - 389:19, 402:4, 421:18, 469:9, 508:21, 512:20, 513:18, 532:11, 552:21, 574:18
**reason** [9] - 367:18, 368:6, 375:16, 378:15, 411:2, 446:18, 454:7, 552:22, 555:9
**reasons** [7] - 368:23, 374:23, 386:6, 388:10, 389:11, 393:7, 397:24
**receipt** [1] - 382:2
**receive** [24] - 424:5, 443:21, 460:1, 480:25, 481:20, 489:9, 490:4, 490:5, 496:2, 496:3, 504:3, 505:9, 505:13, 505:16, 506:24, 507:1, 507:15, 509:16, 512:22, 515:3, 527:15, 547:18, 550:7, 551:23
**received** [18] - 396:13, 400:9, 410:16, 423:10, 423:11, 432:13, 446:7, 450:20, 481:16, 482:11, 489:10, 499:9, 515:12, 525:15, 527:14, 547:20, 549:15, 581:15
**receiver** [2] - 547:10, 549:14
**receives** [1] - 463:14
**receiving** [6] - 421:12, 428:17, 429:7, 429:25, 463:11, 473:18

**recent** [1] - 547:18
**recently** [1] - 420:12
**recess** [4] - 403:2, 408:16, 414:4, 498:19
**recipient** [1] - 368:2
**recipients** [4] - 366:23, 367:9, 367:15, 367:16
**reciprocal** [1] - 470:16
**recognize** [6] - 369:23, 430:6, 477:1, 477:25, 478:19, 478:22
**recognized** [3] - 382:18, 384:24, 404:11
**recollection** [8] - 369:21, 414:12, 415:5, 415:15, 436:3, 514:8, 514:16, 575:24
**reconvene** [1] - 406:25
**record** [22] - 365:7, 403:5, 406:15, 419:17, 427:6, 427:8, 427:10, 427:16, 440:3, 446:1, 450:8, 489:7, 497:17, 497:25, 498:6, 517:1, 518:5, 519:19, 548:2, 555:4, 560:5, 573:19
**Record** [2] - 470:7, 517:4
**recorded** [4] - 364:24, 557:24, 563:14, 568:13
**records** [7] - 427:18, 458:4, 458:18, 511:7, 511:11, 511:12, 571:9
**recovered** [3] - 372:12, 403:18, 404:12
**recycling** [1] - 565:9
**redirect** [1] - 518:21
**Redirect** [1] - 440:23
**REDIRECT** [2] - 440:25, 580:8
**reduced** [1] - 386:24
**refer** [9] - 381:15, 404:14, 435:21, 562:18, 562:20, 569:2, 569:6, 569:9, 569:14
**reference** [2] - 382:9, 573:7
**referenced** [15] - 486:22, 487:16, 488:15, 489:17, 490:11, 490:20, 491:11, 492:2, 493:10, 495:19, 560:19, 565:6, 566:12, 569:19, 570:22
**referencing** [1] - 441:4
**referring** [3] - 369:13, 387:18, 479:11
**refers** [2] - 570:12, 574:21
**reflect** [2] - 454:8, 576:9
**reflected** [5] - 427:8, 476:24, 565:15, 568:13, 577:1
**reflects** [1] - 405:24
**refresh** [4] - 414:12, 415:5, 415:14, 514:7
**refreshes** [2] - 436:3, 514:16
**refund** [1] - 430:9
**refuse** [7] - 400:22, 410:24, 411:5, 446:15, 446:23, 447:14, 470:9
**refuses** [1] - 411:21
**regard** [2] - 390:23, 515:15
**regarding** [8] - 366:24, 368:7, 384:12, 410:18, 420:15, 428:16, 446:9, 522:16
**regardless** [2] - 382:1, 399:7
**register** [1] - 528:17
**regroup** [1] - 380:7
**regularly** [3] - 539:15, 539:16, 564:22
**regulations** [1] - 434:9
**reinstatement** [1] - 384:5
**rejected** [1] - 378:16
**related** [7] - 367:10, 368:20, 369:1, 370:23, 386:15, 457:12, 572:11
**relating** [3] - 370:21, 372:15, 567:19
**relation** [1] - 528:9
**relationships** [1] - 546:10
**relaying** [1] - 532:13
**release** [1] - 505:5
**relevance** [6] - 372:4, 374:19, 374:20, 376:18, 517:10
**relevancy** [1] - 398:21
**relevant** [6] - 368:21, 369:20, 379:4, 382:3, 382:6, 382:11
**reliance** [1] - 366:16
**relied** [1] - 384:7
**relief** [1] - 396:17
**relies** [2] - 383:12, 384:18
**reluctance** [4] - 382:5, 382:10, 382:11, 385:2
**rely** [3] - 369:2, 400:7, 400:11
**relying** [2] - 382:7, 402:10
**remain** [2] - 497:9, 567:20
**remaining** [2] - 571:24, 579:5
**remains** [1] - 526:5
**remember** [33] - 365:25, 398:7, 423:6, 423:8, 423:11, 423:12, 423:17, 426:3, 426:24, 428:18, 438:12, 438:14, 442:23, 443:16, 452:20, 452:25, 453:3, 453:9, 455:5, 457:2, 492:24, 496:12, 500:14, 501:10, 532:18, 533:25, 534:2, 534:4, 539:10, 547:5, 547:6, 557:4, 570:12
**remembering** [1] - 377:2
**remind** [2] - 414:16, 546:13
**Remind** [1] - 484:5
**reminded** [1] - 574:14
**reminders** [1] - 572:6
**remote** [4] - 366:18, 413:23, 413:25, 414:1
**remotely** [2] - 416:5, 419:8
**removal** [2] - 518:16, 518:17
**removals** [1] - 561:16
**remove** [1] - 482:7
**removed** [3] - 515:3, 515:5, 515:11
**removing** [1] - 515:2
**Renee** [2] - 528:6, 528:10
**renew** [1] - 373:8
**rent** [1] - 470:14
**rental** [7] - 467:5, 471:3, 471:8, 471:11, 471:14, 471:21, 474:6
**rentals** [1] - 458:1
**rented** [1] - 467:16
**renting** [3] - 474:25, 475:1, 481:2
**rents** [1] - 468:2
**repeat** [9] - 425:6, 438:2, 457:9, 467:24, 470:3, 470:6, 508:13, 518:3
**Repeat** [1] - 470:4
**repeatedly** [4] - 434:22, 435:3, 435:13, 440:7
**reply** [1] - 569:13
**report** [16] - 431:12, 434:7, 434:11, 443:12, 512:22, 540:14, 547:24, 548:1, 548:6, 548:8, 549:14, 550:7, 550:11, 564:3, 564:14, 568:19
**reported** [5] - 463:16, 547:23, 548:2, 549:12, 550:9
**reporter** [7] - 366:17, 454:8, 470:3, 470:5, 518:4, 555:2, 560:4
**Reporter** [3] - 364:23, 555:5, 560:6
**reporting** [2] - 434:3, 547:22
**reports** [16] - 431:8, 431:10, 431:14, 431:20, 431:23, 431:24, 539:23, 539:25, 540:3, 551:10, 551:17, 551:20, 556:19, 561:13, 561:22
**represent** [4] - 370:14, 430:25, 464:12, 508:8
**representation** [6] - 374:25, 394:12, 400:3, 400:24, 573:15, 573:16
**representations** [3] - 371:19, 576:23, 577:15
**representative** [1] - 370:12
**represented** [4] - 371:16, 391:20, 395:16, 409:23
**representing** [2] - 416:24, 566:1
**represents** [1] - 464:14
**request** [17] - 377:22, 385:12, 404:22, 404:23, 407:13, 411:2, 412:18, 412:22, 446:19, 520:9, 520:13, 522:24, 548:6, 548:8, 549:15, 550:7, 579:17
**requested** [2] - 555:4, 560:5
**requesting** [4] - 403:22, 437:4, 541:21, 570:13
**requests** [1] - 482:7
**required** [5] - 379:22, 389:14, 391:3, 402:7, 505:7
**requirement** [1] - 366:9
**requirements** [1] - 434:8
**research** [8] - 373:20, 434:3, 444:19, 496:15, 507:18, 507:21, 507:22, 572:7
**researched** [1] - 507:13
**researching** [1] - 434:4
**resembling** [1] - 506:14
**reserve** [1] - 373:7
**resolution** [1] - 497:18
**resolved** [2] - 415:25, 497:23
**resource** [1] - 393:8
**Resources** [1] - 504:19
**resources** [1] - 393:16
**respect** [2] - 387:7, 399:3
**respectable** [1] - 530:22
**respecting** [1] - 496:21
**respond** [7] - 374:4, 390:10, 459:8, 459:9, 466:14, 466:19, 468:5
**responded** [2] - 466:17, 481:5
**responders** [2] - 530:13, 561:17
**responding** [3] - 424:22, 564:2, 569:15
**response** [28] - 369:17, 369:25, 370:25, 371:3, 371:5, 371:6, 371:21, 392:9,

394:22, 423:23, 424:9, 426:4, 443:21, 460:13, 460:18, 466:8, 467:21, 468:13, 473:24, 474:13, 501:13, 501:17, 504:6, 568:5, 568:8, 569:14, 573:12, 577:9
**response)** [4] - 456:19, 463:22, 466:13, 468:3
**responses** [4] - 370:11, 507:1, 564:13, 564:17
**Ressler** [3] - 578:10, 578:17, 579:6
**rest** [2] - 368:11, 448:17
**restricted** [1] - 567:23
**restrictions** [1] - 381:22
**result** [1] - 547:18
**results** [1] - 483:6
**resume** [1] - 445:16
**resumes** [1] - 499:7
**retail** [2] - 530:3, 530:22
**retire** [1] - 421:4
**retired** [3] - 420:21, 421:1, 421:6
**retrieve** [1] - 519:4
**retrieved** [1] - 404:9
**return** [1] - 504:7
**returned** [1] - 529:21
**reveal** [1] - 404:15
**review** [3] - 373:3, 506:19, 514:15
**reviewed** [2] - 368:13, 560:21
**Richie** [1] - 504:21
**RICO** [8] - 395:19, 396:4, 396:5, 396:10, 397:7, 397:17, 400:5
**rid** [1] - 458:21
**rights** [1] - 406:4
**rings** [1] - 494:14
**ripped** [1] - 438:15
**rise** [3] - 396:12, 415:21, 499:24
**risk** [6] - 369:11, 372:6, 386:3, 386:4, 386:13, 386:18
**Rivera** [2] - 556:7, 563:2
**RM** [1] - 548:2
**Road** [1] - 532:8
**Robert** [2] - 533:21, 534:2
**Roger** [4] - 427:22, 427:25, 502:18, 502:19
**role** [6] - 368:15, 455:18, 482:10, 492:15, 492:19, 515:1
**room** [7] - 416:2, 426:17, 444:24, 444:25, 496:24, 530:8, 530:9
**rough** [1] - 501:5
**round** [1] - 469:16
**row** [13] - 484:10, 484:11, 485:4, 486:3, 488:23, 488:24, 488:25, 489:5, 491:1, 491:3, 494:16, 495:2, 564:10
**rows** [1] - 472:7
**RPR** [1] - 364:23
**rude** [1] - 454:7
**Rule** [10] - 367:20, 368:22, 369:8, 369:10, 376:11, 378:10, 379:1, 383:5, 385:25, 399:9
**rule** [1] - 387:13
**ruled** [3] - 368:23, 369:7, 399:2
**Rules** [2] - 367:21, 383:5
**rules** [4] - 365:24, 366:4, 366:5, 572:19
**ruling** [14] - 366:14, 368:8, 368:11, 373:6, 378:9, 387:8, 387:20, 388:22, 399:5, 399:6, 559:3, 573:14, 575:1
**rulings** [3] - 365:18, 373:12, 574:14
**run** [3] - 395:16, 395:20, 538:13
**Runner** [9] - 374:8, 374:10, 374:15, 374:16, 375:1, 375:6, 375:18, 376:13, 399:4

## S

**Sacramento** [2] - 489:8, 489:20
**Sam** [2] - 427:22, 428:1
**sample** [2] - 549:6, 549:8
**SANI** [4] - 547:24, 547:25, 550:9, 550:12
**Saskatchewan** [1] - 420:13
**sating** [1] - 376:15
**satisfied** [3] - 410:23, 446:14, 447:23
**save** [1] - 571:20
**saw** [8] - 366:3, 404:2, 405:8, 416:15, 424:3, 434:22, 435:3, 563:18
**scams** [1] - 435:8
**scanned** [2] - 561:8, 561:16
**scanner** [1] - 561:3
**scanning** [1] - 561:14
**scared** [1] - 557:16
**scenarios** [1] - 400:4
**schedule** [22] - 369:21, 369:22, 448:16, 457:25, 460:11, 461:8, 464:11, 464:21, 476:13, 478:12, 479:11, 479:25, 480:1, 480:10, 480:11, 480:20, 480:21, 481:1, 484:17, 562:5, 578:16, 578:20
**scheduled** [1] - 460:16
**scheme** [3] - 367:13, 371:8, 546:8
**school** [7] - 451:10, 527:3, 527:5, 527:7, 527:9, 527:11, 527:17
**School** [1] - 527:6
**scope** [3] - 387:3, 390:4, 390:9
**screen** [3] - 422:11, 441:11, 471:2
**scroll** [5] - 465:4, 471:17, 472:19, 473:14, 474:1
**scrutinize** [1] - 383:1
**seal** [5] - 540:17, 546:24, 571:2, 571:5, 571:12
**sean** [1] - 555:12
**Sean** [84] - 391:20, 392:1, 393:10, 393:11, 397:23, 452:3, 452:7, 452:11, 452:14, 452:18, 452:20, 453:13, 454:2, 454:3, 454:16, 455:9, 456:14, 456:16, 456:18, 457:12, 459:14, 475:7, 477:2, 477:9, 477:11, 478:25, 479:5, 480:14, 503:5, 503:8, 528:9, 528:12, 528:14, 529:17, 530:4, 530:15, 530:20, 531:15, 531:24, 532:7, 532:9, 532:14, 533:13, 533:22, 533:24, 534:16, 534:22, 534:24, 534:25, 537:3, 537:10, 537:13, 537:16, 537:18, 537:19, 537:25, 538:6, 538:12, 538:18, 538:25, 539:3, 539:8, 550:21, 551:5, 551:19, 552:5, 552:12, 553:2, 553:11, 553:18, 555:7, 555:12, 556:6, 556:7, 556:10, 562:19, 562:21, 563:2, 563:7, 564:24, 566:22, 567:10
**Sean's** [1] - 457:16
**search** [1] - 557:7
**seat** [9] - 365:3, 408:18, 419:17, 446:1, 450:3, 450:8, 497:3, 499:4, 572:25
**seated** [3] - 415:23, 445:3, 500:1
**sec** [1] - 430:18
**second** [15] - 386:13, 393:10, 394:25, 429:18, 432:3, 435:21, 463:3, 472:3, 474:8, 479:25, 492:7, 504:1, 509:12, 522:15, 553:24
**Second** [25] - 368:3, 369:2, 369:3, 376:14, 378:19, 379:13, 382:8, 382:18, 382:22, 382:24, 382:25, 383:13, 384:19, 384:21, 384:24, 385:4, 385:9, 385:10, 385:17, 385:18, 385:22, 386:7, 387:21, 388:9
**section** [2] - 495:5, 506:19
**Section** [2] - 506:17, 506:25
**Sections** [2] - 410:18, 446:9
**securing** [1] - 392:4
**security** [1] - 424:12
**See** [1] - 471:14
**see** [80] - 365:20, 366:7, 366:11, 368:6, 369:22, 381:3, 381:10, 381:11, 389:2, 390:1, 395:25, 404:24, 405:2, 405:8, 407:14, 408:22, 416:18, 417:11, 417:14, 417:18, 417:21, 417:24, 418:2, 418:4, 418:6, 418:9, 418:11, 418:13, 418:16, 418:18, 418:20, 418:23, 419:1, 419:3, 421:15, 427:8, 427:10, 427:14, 427:16, 427:18, 427:20, 428:7, 429:15, 433:3, 433:8, 436:2, 449:9, 462:25, 463:20, 465:14, 467:5, 472:3, 472:22, 474:6, 475:5, 483:25, 487:1, 488:10, 488:17, 489:23, 490:14, 491:19, 502:14, 503:4, 503:6, 514:15, 525:18, 528:23, 534:6, 546:5, 546:24, 547:9, 563:4, 563:25, 568:14, 570:5, 571:2, 572:9, 578:7, 579:17
**seed** [14] - 466:21, 466:24, 466:25, 467:2, 467:11, 470:17, 470:18, 471:11, 471:15, 471:25, 472:4, 472:6, 472:13, 473:22
**seeds** [3] - 471:3, 471:22, 473:5
**seeing** [7] - 365:25, 423:6, 423:8, 423:17, 428:2, 428:15, 547:6
**seek** [6] - 377:12, 378:22, 384:11, 391:22, 430:9, 474:4
**seeking** [3] - 396:18, 406:18, 415:13
**seeks** [2] - 368:14, 387:15
**selected** [4] - 376:25, 477:18, 493:3, 493:4
**self** [11] - 390:24, 397:20, 400:24, 411:1, 411:7, 412:13, 412:20, 446:17,

446:24, 520:2, 520:10
**self-evident** [2] - 390:24, 397:20
**self-incrimination** [9] - 400:24, 411:1, 411:7, 412:13, 412:20, 446:17, 446:24, 520:2, 520:10
**selling** [1] - 532:1
**send** [21] - 365:21, 366:8, 366:9, 423:23, 432:15, 442:2, 442:25, 456:10, 457:23, 459:15, 460:18, 463:14, 467:21, 470:17, 473:20, 476:3, 476:5, 481:17, 481:21, 568:9, 568:10
**sended** [1] - 474:20
**sending** [9] - 430:10, 461:11, 462:22, 481:24, 481:25, 483:8, 487:18, 488:5, 493:18
**senior** [1] - 451:13
**sense** [4] - 398:24, 407:19, 431:11, 431:22
**sent** [34] - 365:21, 366:23, 366:24, 372:16, 372:18, 373:1, 381:6, 423:25, 424:2, 424:10, 429:12, 429:20, 459:11, 459:18, 460:3, 461:20, 471:5, 471:6, 476:17, 486:24, 487:11, 489:19, 492:11, 492:12, 492:17, 504:10, 511:4, 511:19, 512:7, 513:16, 515:6, 541:8, 568:6, 569:8
**sentence** [3] - 434:1, 474:8, 544:2
**separate** [5] - 400:3, 551:11, 551:13, 562:16
**separately** [1] - 381:6
**September** [9] - 461:8, 465:8, 476:2, 476:8, 482:23, 482:25, 493:15, 557:3, 557:23
**sequential** [1] - 484:23
**sequentially** [1] - 408:2
**series** [1] - 387:25
**seriously** [1] - 373:20
**seriousness** [1] - 573:9
**service** [11] - 434:3, 530:24, 556:15, 566:15, 567:2, 568:4, 569:9, 569:15, 569:22, 575:21, 575:23
**Service** [1] - 502:9
**Services** [4] - 383:12, 383:22, 555:16, 556:3
**services** [1] - 567:2
**sessions** [10] - 377:18, 377:19, 383:21, 387:2, 387:3, 387:11, 388:14, 388:17, 388:18, 560:8
**set** [11] - 367:21, 369:2, 384:2, 384:9, 391:18, 430:7, 451:19, 555:21, 560:21, 571:4, 571:18
**sets** [1] - 434:7
**setting** [2] - 384:3, 555:10
**seven** [2] - 443:9, 478:9
**several** [8] - 377:15, 397:19, 428:11, 443:15, 449:19, 454:14, 478:4, 488:6
**shall** [1] - 567:22
**share** [4] - 475:7, 475:10, 475:17, 539:1
**sharing** [2] - 474:24, 474:25
**Shawn** [6] - 457:4, 457:17, 475:15, 479:3, 538:3, 538:5
**sheets** [1] - 568:20
**shelves** [1] - 562:16
**shop** [11] - 461:25, 462:14, 462:15, 462:16, 463:9, 463:11, 463:13, 482:22, 487:20, 493:13, 493:18
**short** [4] - 376:24, 403:4, 444:15, 445:1
**shortened** [1] - 578:15
**shorter** [4] - 448:17, 448:25, 449:5, 496:11
**show** [17] - 378:17, 381:7, 385:2, 388:19, 415:2, 415:5, 422:3, 422:7, 424:19, 431:18, 433:13, 435:10, 436:5, 437:3, 514:7, 520:19
**showed** [10] - 433:17, 434:18, 434:22, 435:4, 435:13, 442:16, 508:20, 557:6, 557:11, 557:15
**showing** [5] - 410:24, 415:14, 438:15, 446:15, 532:25
**shown** [4] - 408:4, 422:18, 515:16, 522:18
**si** [1] - 563:14
**side** [9] - 378:17, 378:21, 401:1, 505:1, 543:16, 565:11, 565:13, 576:16
**sidebar** [11] - 377:22, 390:3, 390:9, 438:25, 440:18, 516:13, 521:2, 535:7, 535:8, 535:10, 558:13
**Sidebar** [22] - 438:25, 439:1, 468:22, 469:1, 516:14, 517:1, 517:22, 521:5, 522:1, 523:4, 535:12, 536:1, 540:20, 541:1, 542:1, 543:17, 544:1, 544:25, 554:1, 554:12, 559:1, 559:24
**sided** [1] - 417:2
**signaled** [1] - 398:12
**signature** [2] - 506:7, 549:19
**signatures** [2] - 566:18, 570:5
**signed** [4] - 381:8, 502:14, 503:4, 533:13
**signifies** [1] - 463:5
**signify** [2] - 462:11, 463:4
**silently** [1] - 506:20
**Silverman** [9] - 376:14, 376:25, 377:7, 378:19, 382:7, 384:19, 384:20, 385:10, 385:22
**similar** [6] - 370:12, 372:24, 413:16, 423:16, 480:9, 499:19
**simple** [1] - 402:16
**simply** [4] - 398:23, 407:5, 409:25, 413:14
**Simpson** [2] - 502:18, 502:19
**single** [4] - 417:2, 467:12, 474:20, 577:6
**sit** [2] - 426:2, 557:20
**sitting** [3] - 399:25, 426:14, 500:23
**situations** [1] - 394:16
**six** [9] - 370:9, 370:15, 386:6, 387:6, 438:12, 443:9, 561:20, 561:21, 571:1
**size** [1] - 565:16
**skip** [2] - 463:7, 492:9
**skirting** [1] - 559:8
**slicing** [1] - 530:12
**slight** [1] - 404:17
**slow** [2] - 435:2, 438:3
**small** [2] - 404:1, 443:16
**smaller** [3] - 443:17, 459:22, 528:16
**Smith** [3] - 458:19, 547:25, 550:4
**SMME** [2] - 550:23, 550:24
**smooth** [1] - 408:2
**Snail** [1] - 551:1
**so-called** [1] - 384:1
**so-to-speak** [1] - 377:16
**social** [2] - 424:12, 496:15
**software** [1] - 459:1
**sole** [1] - 409:25
**solution** [3] - 408:12, 408:13, 408:14
**someone** [12] - 396:7, 455:24, 466:3, 468:15, 479:24, 480:23, 502:14, 502:19, 504:21, 531:7, 577:5
**sometime** [2] - 416:11, 537:11
**Sometimes** [1] - 467:3
**sometimes** [5] - 408:22, 425:23, 467:5, 501:12, 573:9
**somewhat** [1] - 496:11
**somewhere** [2] - 458:12, 460:2
**Sorry** [1] - 457:9
**sorry** [25] - 367:15, 374:9, 399:13, 401:6, 420:15, 427:12, 428:3, 431:13, 437:25, 438:3, 445:6, 454:7, 455:9, 463:25, 465:13, 492:6, 503:16, 505:1, 511:20, 522:8, 525:19, 536:6, 565:14, 565:22, 578:19
**sort** [4] - 376:4, 483:19, 505:20, 549:6
**sorting** [1] - 459:2
**Sorting** [1] - 530:12
**sorts** [4] - 393:7, 397:25, 459:1, 576:3
**sound** [1] - 531:10
**Southern** [1] - 369:5
**speaking** [4] - 420:6, 426:25, 496:12, 575:25
**speaks** [1] - 390:22
**special** [2] - 547:18, 547:22
**specialize** [1] - 434:4
**specific** [7] - 423:9, 427:7, 438:13, 492:13, 525:6, 574:20, 575:19
**specifically** [6] - 371:9, 394:1, 423:11, 503:11, 553:21, 567:3
**specified** [1] - 570:16
**specify** [1] - 569:4
**Spector** [1] - 537:17
**Speculation** [1] - 469:5
**speculation** [1] - 469:7
**spell** [3] - 419:16, 445:25, 450:7
**spend** [2] - 421:6, 553:3
**spendable** [1] - 550:16
**spent** [1] - 469:12
**split** [1] - 422:11
**sponsor** [8] - 567:12, 567:17, 567:19, 567:20, 567:21, 567:22, 567:24, 567:25
**sponsored** [1] - 434:4

**spontaneously** [1] - 575:18
**Sportime** [1] - 533:20
**spreadsheet** [4] - 471:9, 471:14, 471:21, 568:14
**Springfield** [2] - 491:4, 491:16
**sprint** [1] - 496:25
**squarely** [1] - 577:13
**staff** [1] - 551:14
**stamp** [1] - 547:10
**stand** [19] - 376:23, 396:21, 410:9, 419:13, 448:7, 451:14, 452:23, 477:14, 482:4, 497:10, 499:6, 499:7, 519:9, 519:10, 519:11, 550:25, 552:9, 571:22, 574:18
**standard** [7] - 372:9, 393:23, 395:12, 406:22, 458:3, 499:17, 569:13
**standardizing** [1] - 458:6
**standing** [5] - 398:14, 398:16, 402:5, 524:13, 575:10
**stands** [1] - 482:5
**star** [1] - 374:24
**Star** [1] - 372:9
**start** [19] - 377:8, 407:24, 413:24, 416:3, 417:13, 444:16, 448:22, 449:10, 449:19, 453:19, 466:6, 472:18, 522:14, 522:25, 530:4, 544:6, 546:4, 572:20, 573:5
**started** [14] - 430:4, 452:10, 528:3, 530:25, 531:16, 532:9, 533:14, 534:18, 537:4, 538:10, 538:18, 544:14, 555:14, 556:2
**starters** [2] - 431:3, 433:25
**starting** [6] - 449:9, 455:5, 457:6, 467:9, 533:18, 578:10
**starts** [3] - 492:8, 504:1, 541:3
**State** [2] - 367:10, 367:19
**state** [17] - 365:6, 372:3, 417:10, 419:16, 420:4, 434:8, 445:25, 450:7, 458:9, 484:12, 489:2, 489:7, 498:1, 509:18, 517:11, 519:18, 526:15
**statement** [11] - 411:15, 412:16, 435:17, 436:4, 438:4, 438:5, 447:7, 514:3, 514:19, 517:6, 520:5
**statements** [5] - 379:10, 379:22, 388:17, 388:19, 576:3
**STATES** [3] - 364:1, 364:2, 364:10
**states** [1] - 374:10
**States** [21] - 364:4, 364:14, 364:18, 365:9, 367:5, 368:3, 369:3, 369:4, 382:7, 382:21, 382:24, 384:18, 385:8, 387:21, 399:4, 410:18, 410:21, 416:23, 446:9, 446:12, 519:7
**stating** [1] - 550:5
**Station** [1] - 451:7
**statue** [3] - 396:3, 396:5, 396:20
**statues** [1] - 397:17
**stature** [1] - 396:5
**status** [4] - 504:1, 504:3, 510:4, 516:1
**statute** [8] - 395:15, 395:19, 395:20, 397:7, 397:10, 397:15, 398:9, 399:25
**stay** [2] - 444:25, 573:23
**staying** [1] - 390:4
**stenography** [1] - 364:24
**step** [4] - 448:6, 457:23, 519:2, 571:21
**steps** [1] - 424:13
**Steve** [2] - 474:10, 474:12
**Steven** [1] - 474:17
**sticking** [1] - 564:9
**still** [6] - 404:24, 406:12, 424:21, 433:3, 460:19, 568:13
**stipulate** [1] - 525:21
**Stipulate** [1] - 534:9
**Stipulated** [1] - 534:11
**stipulation** [9] - 409:4, 409:7, 409:14, 409:18, 409:23, 522:16, 522:18, 523:2, 525:16
**stop** [10] - 377:10, 394:25, 429:9, 429:24, 433:25, 434:12, 557:2, 571:15, 571:16
**stopped** [2] - 455:11, 557:9
**store** [9] - 527:18, 527:19, 527:20, 527:22, 527:24, 528:15, 529:3, 529:13, 566:6
**strategic** [1] - 404:15
**straying** [1] - 577:11
**streamline** [2] - 407:1, 407:22
**street** [1] - 555:23
**Street** [1] - 555:24
**stricken** [1] - 440:3
**strict** [1] - 390:6
**strike** [11] - 439:15, 481:17, 544:5, 544:23, 546:3, 573:17, 573:18, 573:20, 574:2, 575:9
**Strike** [1] - 441:6
**strikes** [1] - 375:15
**string** [1] - 487:2
**struck** [1] - 530:17
**structure** [2] - 546:9, 570:8
**stuck** [1] - 400:8
**stuff** [2] - 414:25, 434:20
**Subject** [1] - 524:13
**subject** [10] - 388:5, 389:21, 392:3, 396:6, 406:4, 406:9, 461:7, 471:10, 473:4, 558:8
**subjective** [1] - 372:8
**submission** [1] - 374:13
**submit** [3] - 372:2, 375:24, 376:11
**subsequent** [1] - 558:7
**substance** [5] - 387:2, 387:10, 387:12, 388:16, 390:7
**substantially** [2] - 369:11, 386:5
**substantive** [1] - 372:7
**suffering** [2] - 432:7, 432:8
**sufficient** [1] - 368:14
**suggest** [3] - 379:18, 407:1, 413:1
**suggesting** [1] - 377:4
**suggestions** [1] - 573:10
**Suite** [3] - 364:15, 364:19, 364:21
**summary** [2] - 568:21, 579:7
**summation** [2] - 384:9, 388:3
**super** [1] - 407:4
**supply** [4] - 527:18, 527:19, 527:20, 529:13
**supported** [1] - 387:20
**supports** [1] - 384:20
**suppress** [1] - 472:13
**suppressed** [1] - 515:7
**suppressing** [1] - 472:11
**suppression** [1] - 482:13
**surrounding** [1] - 374:23
**survey** [1] - 506:24
**swear** [1] - 526:5
**sweeping** [1] - 569:2
**sweeps** [12] - 539:23, 539:25, 540:2, 540:14, 551:10, 551:17, 551:20, 556:19, 561:13, 561:22, 564:3, 564:13
**sweepstakes** [16] - 432:13, 434:4, 434:6, 443:13, 443:15, 512:23, 531:19, 531:25, 532:1, 532:4, 537:21, 539:22, 547:1, 548:5, 548:9, 548:11
**Sweepstakes** [8] - 366:25, 368:7, 368:20, 371:8, 372:15, 531:23, 540:4, 540:14
**sweepstakes -type** [1] - 537:21
**switch** [3] - 474:23, 500:7, 533:2
**swore** [2] - 526:6, 526:8
**sworn** [8] - 419:15, 445:22, 445:24, 446:4, 450:5, 450:21, 519:13, 526:11
**sworn/affirmed** [2] - 419:22, 519:16
**Syosset** [1] - 500:11
**Systems** [2] - 420:24, 472:11
**systems** [1] - 421:2

## T

**table** [1] - 365:9
**tasks** [2] - 456:4, 528:25
**tat** [1] - 366:8
**taxes** [2] - 421:19, 424:3
**teacher** [1] - 527:20
**teachers** [1] - 527:19
**team** [1] - 558:5
**teams** [1] - 403:15
**technically** [1] - 395:19
**technology** [2] - 492:12, 492:22
**telephone** [1] - 442:6
**ten** [5] - 396:3, 424:23, 444:15, 460:11, 512:6
**ten-year** [1] - 396:3
**tended** [1] - 385:2
**tendency** [1] - 368:2
**tenth** [1] - 527:10
**tenure** [1] - 455:14
**term** [8] - 456:6, 458:13, 458:22, 459:4, 465:22, 466:21, 481:9, 482:2
**terms** [8] - 389:24, 390:5, 457:23, 459:25, 484:5, 490:4, 558:8, 571:14
**Teshale** [3] - 408:4, 578:14, 579:6
**testified** [16] - 376:2, 383:16, 383:25, 385:19, 388:4, 419:22, 440:11, 441:2, 446:4, 450:22, 469:12, 515:1, 518:15,

519:16, 526:12, 576:14
**testifies** [2] - 382:20, 391:8
**testify** [36] - 378:11, 382:5, 382:10, 384:3, 385:2, 388:14, 391:13, 392:19, 393:5, 394:21, 395:2, 395:3, 395:20, 398:11, 400:20, 400:23, 401:5, 401:8, 410:11, 410:19, 411:3, 411:4, 411:19, 412:11, 412:19, 412:21, 416:6, 446:10, 446:16, 446:19, 446:22, 447:11, 519:25, 520:9, 520:12, 559:5
**testifying** [23] - 377:13, 378:13, 379:16, 380:20, 381:24, 382:3, 382:17, 383:19, 384:23, 385:21, 386:1, 386:8, 386:10, 388:2, 388:12, 390:14, 391:20, 394:10, 413:10, 416:4, 419:8, 520:18, 560:10
**testimony** [65] - 376:4, 377:10, 377:11, 377:16, 377:18, 377:25, 378:12, 378:21, 379:4, 379:6, 380:19, 381:14, 382:14, 382:15, 383:1, 383:8, 383:14, 383:15, 383:24, 384:12, 384:17, 384:25, 385:7, 385:13, 385:25, 386:25, 387:10, 387:17, 387:18, 387:23, 388:11, 389:17, 392:5, 399:11, 402:22, 405:13, 409:17, 410:1, 410:22, 410:25, 411:10, 411:13, 412:10, 412:13, 413:7, 419:6, 446:13, 447:2, 447:5, 447:25, 497:1, 499:10, 519:2, 519:24, 520:3, 520:15, 525:23, 546:5, 546:11, 546:16, 560:15, 572:23, 575:15, 578:14, 578:17
**testing** [1] - 365:16
**text** [4] - 533:17, 546:24, 547:10, 572:12
**THE** [315] - 364:10, 365:2, 365:4, 365:15, 366:1, 366:5, 373:11, 373:15, 374:6, 374:9, 376:21, 377:6, 377:24, 378:6, 378:8, 378:19, 379:12, 379:20, 380:6, 380:14, 380:18, 381:4, 381:10, 389:2, 389:6, 389:15, 389:25, 390:21, 390:25, 391:5, 391:14, 392:9, 392:25, 393:18, 394:11, 394:25, 395:9, 395:12, 396:17, 397:1, 397:13, 398:4, 398:17, 398:23, 400:12, 400:18, 401:4, 401:7, 402:10, 403:1, 403:8, 404:4, 404:23, 405:1, 405:18, 405:23, 406:1, 406:6, 406:11, 406:14, 407:18, 407:21, 408:17, 408:20, 408:22, 408:25, 409:21, 410:3, 412:4, 412:6, 413:4, 413:16, 413:21, 414:1, 414:3, 414:5, 414:10, 414:24, 415:6, 415:16, 415:18, 415:21, 415:23, 417:16, 417:20, 417:23, 418:1, 418:3, 418:5, 418:8, 418:10, 418:12, 418:15, 418:17, 418:19, 418:22, 418:25, 419:2, 419:5, 419:12, 419:16, 419:18, 422:12, 422:16, 422:22, 423:2, 430:17, 432:21, 432:24, 433:5, 433:15, 438:25, 439:2, 439:6, 439:8, 439:13, 439:15, 440:2, 440:18, 440:20, 440:22, 441:10, 441:16, 444:5, 444:7, 444:10, 444:11, 445:3, 445:8, 445:11, 445:15, 445:18, 445:19, 445:20, 446:2, 446:6, 447:12, 447:13, 447:16, 447:17, 447:18, 447:19, 447:21, 447:22, 448:2, 448:5, 448:10, 448:15, 448:22, 449:5, 449:8, 449:13, 449:21, 449:24, 450:6, 450:9, 450:11, 450:18, 460:24, 461:1, 468:22, 469:5, 469:8, 469:14, 470:2, 470:4, 470:5, 470:10, 470:22, 472:16, 475:22, 477:22, 482:18, 483:15, 486:11, 486:21, 487:15, 488:14, 489:16, 490:10, 490:19, 491:10, 492:1, 493:9, 493:25, 494:2, 494:20, 494:24, 495:7, 495:18, 496:7, 497:3, 497:7, 497:11, 497:14, 497:16, 498:13, 498:17, 499:3, 499:8, 499:17, 499:23, 499:24, 500:1, 500:2, 502:2, 502:4, 502:23, 504:14, 505:25, 507:5, 508:2, 513:6, 514:11, 516:13, 517:3, 517:5, 517:8, 517:13, 517:18, 518:2, 518:7, 518:13, 518:19, 518:20, 519:1, 519:5, 519:9, 519:11, 519:18, 519:20, 519:22, 521:4, 522:8, 522:14, 522:18, 522:20, 522:22, 522:25, 524:15, 524:20, 524:24, 525:2, 525:4, 525:8, 526:1, 526:6, 526:8, 532:21, 532:23, 532:25, 533:3, 533:6, 534:11, 535:7, 535:11, 536:2, 536:6, 536:10, 536:12, 540:8, 540:19, 541:7, 541:10, 541:14, 541:17, 541:20, 541:24, 543:2, 543:5, 543:8, 544:2, 544:12, 544:19, 544:22, 546:2, 554:3, 555:2, 558:13, 559:3, 559:13, 559:19, 559:23, 560:2, 566:11, 569:18, 570:21, 571:16, 571:20, 571:23, 572:1, 572:4, 572:25, 573:4, 573:14, 573:21, 574:1, 574:6, 574:9, 574:12, 574:24, 575:6, 575:17, 575:24, 576:6, 576:24, 577:8, 577:18, 577:24, 578:4, 578:7, 578:19, 579:2, 579:10, 579:13
**therefore** [3] - 367:3, 411:4, 446:22
**therein** [1] - 373:19
**thinking** [1] - 550:24
**thinks** [1] - 575:12
**third** [5] - 386:18, 417:4, 434:1, 503:11, 549:9
**Thomas** [2] - 578:10, 578:17
**thousand** [11] - 460:3, 460:5, 466:11, 466:14, 466:17, 475:4, 512:10, 512:12, 512:16, 548:3, 548:4
**thousands** [1] - 511:6
**three** [19] - 374:16, 400:3, 417:2, 417:6, 420:12, 421:22, 431:5, 448:12, 458:19, 479:2, 480:1, 480:2, 483:10, 501:23, 560:18, 561:2, 565:1, 565:16
**three-letter** [1] - 431:5
**three-page** [2] - 417:2, 417:6
**three-time** [1] - 501:23
**thrown** [1] - 561:17
**thunder** [1] - 409:3
**timely** [2] - 366:11, 371:5
**timing** [4] - 369:22, 499:13, 499:16, 578:13
**title** [1] - 431:20
**TMO** [2] - 482:2, 482:4
**today** [21] - 365:14, 399:21, 399:22, 408:4, 409:4, 426:2, 438:22, 440:11, 440:15, 441:4, 448:7, 449:1, 449:11, 496:10, 496:12, 499:13, 500:23, 515:16, 534:6, 549:3, 560:11
**together** [3] - 424:16, 425:17, 458:17
**tomorrow** [8] - 499:15, 571:20, 572:20, 572:22, 578:10, 578:11, 578:15, 579:17
**took** [3] - 434:16, 517:15, 557:24
**top** [8] - 402:14, 416:22, 433:10, 475:25, 487:1, 488:24, 503:10, 563:21
**topic** [2] - 531:14, 574:20
**total** [7] - 451:22, 459:22, 508:23, 511:4, 512:1, 548:1, 548:9
**totaling** [1] - 550:8
**totally** [1] - 403:6
**Toussaint** [1] - 489:3
**toussaint** [2] - 489:9, 490:4
**towards** [1] - 455:14
**town** [1] - 555:25
**track** [3] - 467:3, 561:25, 562:5
**training** [2] - 532:9, 532:15
**transaction** [1] - 576:22
**TRANSCRIPT** [1] - 364:9
**Transcript** [1] - 364:24
**Transcription** [1] - 364:25
**trash** [7] - 561:11, 561:12, 561:22, 565:1, 565:19
**treat** [1] - 372:6
**trial** [17] - 366:22, 367:24, 370:13, 370:19, 371:15, 372:18, 372:20, 384:21, 385:12, 392:1, 407:24, 410:20, 411:8, 411:9, 446:11, 447:1
**TRIAL** [1] - 364:9
**tried** [1] - 434:18
**true** [10] - 369:23, 370:16, 380:16, 380:17, 538:15, 551:19, 575:13, 577:2, 577:3
**truly** [1] - 533:23
**truth** [16] - 367:12, 377:25, 378:5, 379:18, 379:22, 384:1, 384:8, 384:13, 389:14, 389:16, 389:19, 469:2, 573:7, 573:24, 573:25, 577:22
**truth-telling** [3] - 384:1, 384:8, 389:16
**truthful** [2] - 514:22, 560:9
**truthfully** [1] - 384:3
**truthfulness** [1] - 384:16
**try** [9] - 379:2, 390:3, 394:8, 400:1, 438:3, 438:16, 440:5, 557:17, 572:21
**trying** [13] - 373:25, 375:4, 379:14, 390:10, 426:10, 430:5, 431:11, 431:18, 431:22, 434:20, 442:1, 443:4, 449:16
**Tuesday** [4] - 579:1, 579:14, 579:15

**turn** [4] - 373:15, 395:25, 419:6, 523:1
**turned** [1] - 573:16
**TV** [1] - 421:7
**Twenty** [1] - 465:2
**twice** [1] - 407:8
**two** [39] - 367:23, 368:5, 371:13, 373:11, 381:9, 388:15, 391:25, 421:2, 427:12, 427:15, 427:17, 437:15, 462:5, 462:9, 463:20, 464:3, 464:24, 471:17, 471:18, 475:3, 484:25, 501:6, 511:17, 512:3, 512:5, 522:2, 529:4, 529:15, 537:8, 548:2, 548:3, 550:22, 556:8, 561:5, 564:11, 566:3, 571:17, 572:22
**type** [13] - 376:17, 423:14, 452:7, 457:3, 478:6, 483:2, 488:2, 503:15, 503:20, 530:22, 537:21, 556:17, 561:12
**types** [5] - 370:12, 429:20, 429:25, 456:1, 501:16
**typical** [2] - 458:10, 460:7
**typically** [1] - 561:15

## U

**Uh-hum** [4] - 456:19, 463:22, 466:13, 468:3
**ultimately** [1] - 517:11
**unable** [1] - 414:24
**unaffiliated** [1] - 434:6
**unanimous** [4] - 503:13, 503:16, 503:20, 504:4
**unbelievable** [1] - 568:18
**uncharged** [1] - 371:8
**under** [59] - 367:4, 367:19, 367:20, 369:8, 377:13, 378:10, 378:11, 378:13, 378:19, 379:1, 379:16, 380:20, 381:24, 382:17, 383:5, 385:13, 385:25, 386:1, 386:7, 386:8, 388:1, 388:19, 390:15, 391:21, 392:2, 393:13, 395:19, 396:20, 398:11, 398:20, 398:21, 399:9, 411:11, 412:11, 412:17, 413:7, 413:10, 435:17, 436:4, 437:12, 437:15, 438:4, 438:5, 438:21, 447:3, 497:9, 505:4, 514:3, 514:19, 519:25, 520:8, 520:15, 520:19, 526:5, 529:15, 560:10, 565:12, 567:10
**Underhill** [1] - 500:12
**underlying** [1] - 406:4
**undersigned** [1] - 400:22
**Understood** [1] - 533:3
**understood** [3] - 406:11, 410:3, 415:16
**unfair** [8] - 369:12, 372:5, 373:25, 386:4, 386:13, 386:14, 386:18, 386:24
**unfairly** [1] - 379:15
**unfold** [1] - 381:11
**united** [1] - 374:10
**UNITED** [3] - 364:1, 364:2, 364:10
**United** [21] - 364:4, 364:14, 364:18, 365:9, 367:5, 368:3, 369:3, 369:4, 382:7, 382:21, 382:24, 384:18, 385:8, 387:20, 399:4, 410:17, 410:21, 416:23, 446:9, 446:12, 519:7
**universal** [1] - 503:16
**universe** [2] - 370:14, 537:10
**unlawfully** [1] - 367:14
**unless** [4] - 383:11, 387:15, 394:21, 471:16
**unlike** [1] - 375:6
**unlikely** [1] - 405:9
**unmaximize** [1] - 474:1
**unopposed** [1] - 395:22
**unquote** [2] - 374:23, 375:5
**unrelated** [3] - 403:5, 403:6, 403:10
**up** [51] - 379:10, 380:12, 388:24, 400:5, 402:17, 402:18, 408:13, 408:14, 409:6, 409:11, 422:15, 422:16, 431:15, 431:17, 431:18, 432:15, 438:14, 451:3, 451:19, 464:11, 471:18, 472:19, 473:15, 473:17, 473:18, 474:1, 484:19, 486:3, 490:1, 491:24, 492:13, 495:8, 501:12, 504:24, 517:11, 529:16, 532:25, 546:15, 555:10, 555:21, 556:16, 557:6, 557:11, 557:15, 563:18, 564:9, 565:10, 565:22, 565:25, 567:5, 569:3
**update** [2] - 524:16, 571:9
**updated** [1] - 372:19
**upheld** [1] - 382:25
**upper** [2] - 492:4, 547:9
**US** [1] - 374:8
**USA** [1] - 365:4
**utilize** [1] - 567:25
**utilizing** [1] - 414:6

## V

**value** [2] - 369:11, 386:5
**Vandeventer** [1] - 364:19
**Variable** [1] - 451:15
**various** [4] - 365:18, 431:5, 458:1, 515:15
**vastly** [1] - 372:5
**VDP** [2] - 451:13, 451:14
**verbal** [1] - 572:12
**verdict** [1] - 416:18
**Verification** [1] - 502:9
**verse** [1] - 374:10
**versus** [9] - 368:3, 369:3, 369:4, 374:8, 384:18, 385:8, 387:21, 399:4, 553:11
**Versus** [3] - 382:7, 382:21, 382:24
**video** [6] - 408:4, 414:17, 441:4, 441:11, 499:10, 578:14
**Vietnam** [1] - 429:3
**view** [1] - 441:25
**viewer** [1] - 532:23
**views** [2] - 576:1, 577:14
**violate** [1] - 367:3
**violating** [2] - 366:3, 366:5
**Virginia** [5] - 420:5, 420:6, 420:14, 491:4, 491:16
**Visa** [1] - 387:21
**voice** [1] - 451:3
**voir** [1] - 403:20
**vouched** [1] - 384:16
**vulnerability** [1] - 497:20

## W

**wait** [2] - 416:1, 433:3
**waiting** [6] - 365:17, 413:23, 415:25, 496:9, 503:15, 503:20
**waivers** [1] - 376:19
**waiving** [1] - 406:9
**Walen** [1] - 451:17
**walk** [2] - 370:1, 557:24
**walked** [1] - 453:1
**wants** [6] - 391:1, 392:19, 404:18, 409:3, 409:11, 475:4
**Warehouse** [1] - 529:20
**warrant** [1] - 557:7
**wash** [2] - 510:23
**Washington** [1] - 364:20
**wasting** [2] - 426:11, 431:19
**watch** [1] - 571:19
**watched** [1] - 421:7
**watching** [1] - 430:5
**ways** [1] - 379:12
**WCS** [1] - 428:7
**Weaver** [1] - 368:3
**Web** [4] - 451:25, 452:2, 452:6, 452:10
**wedded** [1] - 413:14
**week** [2] - 371:16, 565:1
**weekly** [4] - 539:20, 564:22, 565:24, 565:25
**weeks** [4] - 371:13, 429:14, 528:24, 566:3
**weigh** [2] - 379:6, 576:18
**weight** [3] - 379:6, 546:16, 576:11
**Westbury** [2] - 473:12, 527:25
**westbury** [1] - 556:1
**Westlaw** [3] - 369:5, 374:12, 374:24
**Westwood** [1] - 473:12
**whatsoever** [2] - 492:19, 507:12
**white** [1] - 561:24
**White** [1] - 563:23
**whole** [4] - 394:1, 458:16, 526:25, 575:16
**wife** [1] - 534:24
**wilbur** [1] - 486:5
**Wilbur** [4] - 486:12, 486:15, 486:25, 487:10
**Williams** [2] - 503:5, 503:8
**willing** [2] - 505:6, 505:10
**win** [17] - 423:20, 430:12, 434:23, 434:24, 435:4, 435:5, 435:11, 435:13, 435:14, 438:19, 438:20, 440:8, 440:9, 442:3, 443:25, 507:14, 550:8
**WINC** [2] - 473:6, 563:11
**wind** [1] - 416:10
**windy** [1] - 404:8
**Winners** [31] - 370:22, 461:12, 461:13, 461:15, 461:16, 471:3, 471:8, 471:11, 471:21, 473:5, 473:6, 473:11, 474:20,

476:6, 478:12, 478:20, 479:12, 480:15, 480:21, 480:24, 481:2, 482:23, 487:22, 487:25, 493:14, 493:15, 563:10, 563:12, 566:16, 567:13, 568:23
**winning** [2] - 424:11, 424:21
**wire** [6] - 397:8, 397:16, 409:15, 409:17, 525:22, 525:23
**wise** [2] - 459:24, 459:25
**wish** [5] - 373:7, 376:22, 402:2, 529:19, 573:18
**wishes** [9] - 373:13, 381:2, 392:13, 405:25, 498:10, 559:12, 573:2, 577:21
**withdraw** [1] - 559:11
**withdrawn** [1] - 541:4
**witness** [74] - 366:18, 376:18, 378:11, 378:18, 378:22, 379:13, 382:20, 383:7, 383:10, 383:16, 383:23, 383:25, 386:1, 386:8, 386:9, 387:23, 388:1, 388:4, 393:2, 400:22, 410:19, 412:8, 412:10, 412:14, 412:18, 412:21, 413:23, 413:25, 414:2, 414:17, 414:25, 415:19, 416:4, 419:7, 419:13, 419:21, 430:17, 439:3, 440:15, 440:22, 441:11, 444:13, 445:7, 446:11, 448:7, 449:25, 450:11, 493:23, 494:24, 497:5, 497:10, 499:5, 499:7, 508:3, 513:5, 514:10, 518:4, 519:6, 519:10, 519:15, 519:23, 519:24, 520:3, 520:9, 526:4, 533:5, 546:11, 571:22, 573:7, 573:13, 574:18, 576:17, 578:24, 579:2
**Witness** [7] - 419:15, 445:24, 450:5, 497:10, 519:3, 519:13, 571:22
**WITNESS** [15] - 419:18, 444:10, 445:19, 446:2, 447:12, 447:16, 447:18, 447:21, 449:21, 450:6, 450:9, 470:4, 518:19, 519:20, 580:3
**witness's** [14] - 378:20, 382:2, 382:4, 382:5, 382:12, 383:1, 383:15, 385:1, 385:14, 385:25, 386:9, 388:2, 388:4, 388:7
**witnesses** [19] - 374:17, 374:22, 375:3, 375:7, 375:18, 382:10, 384:2, 384:7, 384:23, 385:1, 385:16, 416:5, 496:18, 499:16, 572:8, 574:13, 576:12, 576:18, 579:6
**WL** [1] - 374:12
**women** [1] - 375:25
**won** [4] - 434:9, 434:17, 442:21, 531:10
**Woodbury** [1] - 472:1
**word** [5] - 425:7, 431:24, 517:7, 518:6
**wording** [3] - 409:11, 492:16
**words** [5] - 375:13, 375:17, 409:7, 423:19, 441:22
**works** [3] - 400:11, 474:7, 474:14
**worksheet** [1] - 461:25
**worried** [1] - 406:19
**worry** [2] - 442:24, 495:14
**Woska** [3] - 529:18, 533:22, 534:23
**wow** [1] - 408:22
**wrap** [1] - 495:7
**write** [12] - 421:16, 424:12, 430:8, 442:25, 486:7, 486:12, 489:12, 491:5, 495:11, 495:14, 564:3, 566:23
**writes** [1] - 464:11
**writing** [3] - 424:7, 424:15, 424:20
**written** [3] - 421:21, 431:4, 440:12
**wrote** [13] - 425:15, 425:16, 426:3, 426:6, 429:11, 431:10, 431:25, 487:6, 490:2, 491:22, 495:24, 515:5, 537:20

## X

**XLS** [1] - 525:2
**XLSX** [4] - 524:8, 524:21, 525:14, 581:13
**Xs** [1] - 405:7
**XXX** [1] - 472:1

## Y

**year** [18] - 396:3, 397:9, 424:17, 443:7, 446:7, 455:11, 478:14, 510:6, 520:11, 527:11, 528:18, 529:15, 530:17, 537:8, 551:16, 556:20, 558:6
**years** [32] - 391:9, 391:25, 396:7, 396:8, 400:4, 420:17, 429:2, 430:1, 430:2, 432:9, 438:12, 438:19, 443:9, 451:24, 454:17, 455:10, 455:13, 469:12, 508:16, 508:18, 508:22, 508:23, 511:17, 512:3, 512:5, 527:16, 527:20, 529:4, 529:15, 535:1, 547:5, 576:8
**yellow** [4] - 434:17, 435:10, 442:22, 465:1
**yesterday** [11] - 365:18, 366:15, 366:21, 369:15, 373:2, 373:17, 396:2, 397:5, 400:4, 405:12, 448:12
**YORK** [1] - 364:1
**York** [13] - 364:4, 364:14, 364:15, 364:20, 364:22, 369:5, 374:11, 472:2, 472:6, 472:11, 472:12, 473:13
**YOU** [1] - 483:5
**yourself** [4] - 433:22, 506:20, 553:5, 553:11

## Z

**Zarabel** [1] - 506:11
**zip** [5] - 458:9, 459:1, 482:25, 484:13, 509:18
**zoom** [6] - 473:14, 484:14, 503:23, 506:7, 506:17, 563:20
**Zoom** [2] - 414:25, 444:8