# 25-3078-cr

## United States Court of Appeals
*for the*
## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

SHAWN PHILLIPS, JEFFREY NOVIS,

*Defendants,*

PHILIP PRIOLO,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

# REPLY BRIEF FOR DEFENDANT-APPELLANT

ARTHUR L. AIDALA
LINO J. DE MASI
DIANA FABI
LAW OFFICES OF AIDALA, BERTUNA & KAMINS, P.C.
*Attorneys for Defendant-Appellant*
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (396431)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

PRELIMINARY STATEMENT ........................................................................1

POINT I.

A COMPARISON WITH THE CASES ADVANCED BY THE GOVERNMENT FURTHER SUPPORT THAT PRIOLO DID NOT EXHIBIT THE REQUISITE INTENT TO DEFRAUD (RESPONDING TO POINT C. 1. IN GOVERNMENT'S BRIEF AND IN SUPPORT OF POINT B.2. OF PRIOLO'S PRINCIPAL BRIEF)........................................................................3

POINT II.

PRIOLO'S MAILINGS ARE CLEARLY DISTINGUISHABLE FROM OTHER CASES OF FRAUD AND CLEARLY WERE NOT "CALCULATED TO DECEIVE" (ADDRESSING POINT C.2. IN GOVERNMENT'S BRIEF AND IN SUPPORT OF POINT B.1. IN PRIOLO'S PRINCIPLE BRIEF) ........................................7

POINT III.

THE DISTRICT COURT'S HARMFUL ERROR IN ADMITTING THE TESTIMONY OF THOMAS RESSLER REGARDING THE UNCHARGED SWEEPSTAKES SCHEME IN THE LATE 1990s AND EARLY 2000s WAS PREDICATED ON THE GOVERNMENT'S ILLUSORY PROFFER OF WHAT HIS TESTIMONY WOULD ENTAIL (RESPONDING TO POINT 2.B. OF THE GOVERNMENT'S BRIEF AND IN SUPPORT OF POINT 2.A.1 OF PRIOLO'S PRINCIPLE BRIEF) ......................................12

CONCLUSION........................................................................16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*United States v. Jabar*,
19 F.4th 66 (2d Cir. 2021) .......... 4

*United States v. Thomas*,
377 F.3d 232 (2d Cir.2004) .......... 7, 8

*United States v. Weaver*,
860 F.3d 90 (2d Cir. 2017) .......... 4, 5, 6, 7

## PRELIMINARY STATEMENT

Defendant-Appellant Philip Priolo writes in reply to the Government's submission to address several points raised by appellees. In addition to these arguments, Priolo relies on his principal brief.

The record demonstrates that the Government did not introduce legally sufficient evidence to establish that Philip Priolo possessed the requisite intent to defraud necessary to sustain his convictions for mail and wire fraud. At most, the evidence showed that Priolo sought to market and sell sweepstakes reports through enticing direct-mail solicitations. Unlike the defendants in the fraud cases upon which the Government relies that exhibited the type of deceptive conduct traditionally associated with fraudulent schemes, Priolo did not make false oral representations, did not provide fabricated documents, and did not misuse entrusted funds. To the contrary, the evidence consistently established that the mailings disclosed that recipients had not won any money or prizes and that the product being offered was a collection of available sweepstakes opportunities. The testimony at trial further showed that recipients who actually read the mailings understood their nature and purpose. When changes to the language in the mailers were suggested to Priolo, he made the changes. When refunds were requested, Priolo issued refunds. Viewed against the backdrop of Second Circuit cases, the Government's proof was

legally insufficient to permit a rational jury to conclude beyond a reasonable doubt that Priolo intended to deceive or defraud his customers.

Bolstering the Government's otherwise insufficient case was the district court's erroneous decision to admit testimony from Thomas Ressler concerning his designs for mailing pieces in an unrelated sweepstakes operation that existed decades earlier. The district court's decision to admit Ressler's testimony was based, in significant part, upon the Government's representation that the testimony would directly connect Priolo to Thomas Ressler and the mail pieces he designed for the Sweepstakes Advisory Network and Justin Grant Ltd. In fact, that promised connection never materialized. Instead, Ressler testified only about mailings he created for Sean Novis, leaving the jury to hear extensive and highly prejudicial testimony regarding an uncharged scheme without any credible direct evidence linking Priolo to it. Nevertheless, the Government compounded the prejudice from the erroneous admission of Ressler's testimony by arguing in summation a critical fact that had never been established at trial: that Ressler had previously created misleading sweepstakes mailers specifically for Priolo. From that unsupported premise, the Government urged the jury to infer that Priolo knew the similar mailers used during the charged period were misleading and nevertheless chose to use them. Thus, Ressler's testimony became the foundation for an argument supplying precisely the knowledge and fraudulent intent the Government was otherwise

required to prove. Given the weakness of the Government's evidence of materiality and fraudulent intent, the erroneous admission of Ressler's testimony—and the Government's use of it in summation—could not have been harmless.

Accordingly, because the evidence was insufficient to establish the requisite intent to defraud and because the jury's verdict was tainted by prejudicial evidentiary error, Priolo's convictions should be reversed and the indictment dismissed, or, at a minimum, the matter remanded for a new trial.

## POINT I.

### A COMPARISON WITH THE CASES ADVANCED BY THE GOVERNMENT FURTHER SUPPORT THAT PRIOLO DID NOT EXHIBIT THE REQUISITE INTENT TO DEFRAUD (RESPONDING TO POINT C. 1. IN GOVERNMENT'S BRIEF AND IN SUPPORT OF POINT B.2. OF PRIOLO'S PRINCIPAL BRIEF)

The evidence at trial established that Priolo's intent was to induce customers into the transaction but was not a fraudulent intent. This becomes more evident when comparing Priolo's case with two cases cited by the Government in their respondents' brief. (Gov't Br. at 19; at 22) While the Government does not appear to cite these cases necessarily for factual comparisons to Priolo's case, a view of the evidence presented in those cases in which objective evidence independent of the challenged representations established the fraud, further illustrates how insufficient the record was at Priolo's trial regarding his intent to engage in a fraudulent scheme.

Priolo's case differs drastically from the fraudulent scheme carried out in in *United States v. Jabar*, 19 F.4th 66 (2d Cir. 2021). In *Jabar*, the defendants, organizers of a Non-Governmental Organization ("NGO"), had defrauded the United Nations ("UN") Development Fund for Women out of grant money, which was specifically earmarked, and could only be used for, approved projects. The grant required specific reporting procedures to ensure compliance. The evidence at trial showed that the defendants had previously accrued large personal debts. Those defendants applied for the UN grant for their NGO for the stated purpose of building a radio station in Iraq, when in fact they intended to use the money to pay off their debts. While they ultimately built the radio station (although it was disputed whether the project met the grant specifications), the evidence showed that the defendants flagrantly used the UN funds to pay off their debts. Here, by contrast, Priolo delivered precisely what his mail pieces offered: a collection of available sweepstakes opportunities, with no comparable evidence that he obtained customers' money for one represented purpose while intending to use it for another.

*United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017) is similarly distinguishable. In *Weaver* the defendant was the CEO of a corporation that sold candy vending machines whose employees routinely make explicitly false verbal representations to potential customers regarding the profitability of the vending machines. The evidence showed that these oral representations, together with the

promotional materials accompanying the sales pitch, induced the customers to invest in the machines. There, this Court found that written disclaimers found in the contract did not render the oral representations immaterial or negate the defendant's criminal responsibility. *Id* at 95-96. Here, by contrast, there was no comparable evidence that Priolo or his employees made explicitly false representations to customers about what they were purchasing. Priolo's customers received the very product that was offered—a collection of available sweepstakes opportunities—and the Government identified no affirmative false promise comparable to the false profitability representations that induced the purchases in *Weaver*.

Contrary to the Government's contention, the prize notices themselves *did not* support the jury's verdict that Priolo intended to defraud recipients. (Gov't Br. at 19) The testimony at trial clearly indicated otherwise; the testimony at trial established that those who *actually read* the mailings understood them to be what they were: an offer to purchase a booklet detailing opportunities to enter into sweepstakes. The alleged victims called by the Government either testified that they did not recall fully reading the mailings (T. 196, T. 203-204, T. 309-310, T. 319, T. 322, T. 431) or, in the instances where the victims were no longer available to testify, the surrogates testified that they, themselves, read and understood the mail pieces and explained to their family members they had not won anything – an explanation that ultimately was ignored. (T. 434-435, T. 442, T. 443, T. 741-743). Thus, those who actually read

the mailings understood them for what they were: an offer to purchase a booklet containing a collection of available sweepstakes opportunities.

Unlike *Weaver*, there were no additional statements made to the recipients of the mailers at all, much less any false statements that contradicted or obscured the mailers' express disclaimers that the recipients "ha[d] not won any money or prize." (T. 434) Everything the recipients needed to know about the offer was contained within the mailer itself. The fact that some recipients nevertheless purchased the offered product without fully reading the mailings—or disregarded family members who explained their contents—does not transform an otherwise understandable solicitation into one calculated to deceive. Indeed, it was only through the erroneously admitted testimony of Thomas Ressler that the Government was able to recast otherwise understandable promotional language as evidence of a deliberate scheme to deceive. Without Ressler's testimony supplying that characterization, the Government's own evidence showed that the mailers said what the witnesses who read them understood them to say: the recipient had not won a prize and was instead being offered a collection of available sweepstakes opportunities.

Nor can Priolo's fraudulent be inferred from evidence that he "chose to ignore" edits requested by PacNet's risk department, contrary to the Government's claim (Gov't Br. at 23). Indeed, the record undermines the premise that Priolo deliberately disregarded PacNet's concerns: on other occasions, he adopted edits

PacNet requested. (T. 135). Moreover, the edits the Government claims Priolo "ignored" were proposed in March 2015, while the mail piece at issue was not sent until a year and a half later. (T. 830). That eighteen-month gap substantially weakens the Government's inference that Priolo deliberately rejected those particular edits in order to mislead recipients. Absent evidence connecting Priolo's response to the March 2015 recommendations with the content of a mailing sent eighteen months later, the mere fact that the proposed edits did not appear in the later mailing does not establish fraudulent intent.

## POINT II.

### PRIOLO'S MAILINGS ARE CLEARLY DISTINGUISHABLE FROM OTHER CASES OF FRAUD AND CLEARLY WERE NOT "CALCULATED TO DECEIVE" (ADDRESSING POINT C.2. IN GOVERNMENT'S BRIEF AND IN SUPPORT OF POINT B.1. IN PRIOLO'S PRINCIPLE BRIEF)

The Government next contends that, even if the language in the mail pieces was not materially false or misleading but merely creative language conveying an offer to purchase a sweepstakes booklet, the evidence was nevertheless sufficient to establish that Priolo's conduct was "calculated to deceive." (Gov't Br. at 25) (see *Weaver*, 860 at 95, quoting *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir.2004)). But *Weaver (*discussed above) and the *United States v. Thomas*, 377 F.3d 232 (2d Cir.2004), cited in the Government's response, demonstrate that Priolo's alleged conduct falls far short of conduct "calculated to deceive."

The contrast between Priolo's conduct and the calculated deception in *United States v. Thomas*, *supra*, is even more pronounced. There, the evidence of fraudulent intent did not depend upon an inference drawn from arguably misleading promotional language; it was demonstrated by the defendant's repeated false assurances, his diversion of the victim's money for his own purposes, and his subsequent use of fraudulent documents to perpetuate the scheme. In that case, Thomas, a self-proclaimed financial consultant in New York City, falsely represented to decision-makers of a church in Memphis that he could secure financing for church projects through a no-risk, high-yield investment program. In short, Thomas represented that his strategy would involve pooling a group of clients and use their respective "proof of funds" from their financial institutions to secure a line of credit. Thomas represented that he would then take that line of credit, invest it, and return a portion of the profit from the investments to the clients in the pool. Thomas claimed that the program would secure $ 2 million for the church. Thomas assured the church's representatives, including its pastor, that there was no risk to the church because the funds were needed only to demonstrate proof of funds necessary to obtain a line of credit

However, once the pastor of the church ensured that the church's operating account showed the required $100,000 to obtain a line of credit (risking the Pastor's own retirement funds to do so), Thomas then requested the pastor to transfer those

funds into the defendant's bank account – claiming that there were banking issues preventing the defendant from sending the profits back to the church's bank account. The pastor, despite warnings from his financial advisor, agreed to send Thomas the money. The evidence at trial showed that Thomas took the $100,000 and transferred it to his personal account as well as other accounts and wrote personal checks to family members. The evidence further showed that in order to effectuate his scheme, Thomas continuously made reassurances and promises to the church: including sending a variety of forged, fraudulent or misleading documents. The church never saw the return of the $100,000 or the promised profits.

Unlike in *Thomas* and *Weaver*, the only representations Priolo made to prospective customers were those contained in the mailings. There was no evidence that Priolo's conduct, or anyone acting on his behalf, made any representation apart from the mailings at issue. There is no evidence that Priolo made any assurances or promises to prospective customers to induce them to send the "report fee" and ignore the disclaimer located within the mailing piece itself. And the evidence at trial consistently corroborates that the mailers at issue included language indicating that the recipients had not won any money or prizes and/or that the mailings were not prize notifications or sweepstakes entry forms. (T. 434). The text in the mailer makes clear what was being offered: a report of available sweepstakes the recipient could enter, if they choose, for the chance to win money and prizes. In fact, the

Government's own evidence demonstrated that recipients acknowledged that they were sending in a fee to purchase a "report." (T. 196, T. 309-310, T. 431). Further, the testimony at trial established that those who actually read the mailings understood them to be what they were: an offer to purchase a booklet detailing opportunities to enter into sweepstakes. The alleged victims called by the Government either testified that they did not recall fully reading the mailings (T. 196, T. 203-204, T. 309-310, T. 319, T. 322, T. 431) or, in the instances where the victims were no longer available to testify, the surrogates testified that they, themselves, read and understood the mail pieces and explained to their family members they had not won anything – an explanation that ultimately was ignored. (T. 434-435, T. 442, T. 443, T. 741-743).

Nor did Priolo's use of post-office boxes or multiple DBAs inherently demonstrate a calculated intent to deceive or defraud, as the Government contends. (Gov't Br. at 21). Priolo's use of generic business names did nothing to induce recipients to respond to his mailings with a report fee that use of his own name would not have accomplished. The Government similarly argues that Priolo "targeted" customers who responded to an initial mailing by sending them additional solicitations under different business names. (Gov't Br. at 26) But the different mailings offered different sweepstakes reports containing different prize opportunities. The use of different DBAs therefore adds little, if anything, to the

Government's proof that Priolo intended to deceive recipients about what they were purchasing.

More importantly, the manner in which Priolo actually operated his businesses is inconsistent with an effort to conceal a fraudulent enterprise. His companies could be located and contacted, routinely received communications from customers, and responded to complaints about the products. And when customers requested refunds, Priolo provided them. The Government attempts to draw an inference of fraudulent intent from the fact that Priolo generally refunded only the amounts customers specifically requested. (Gov't Br. at 23) But that inference is difficult to reconcile with evidence that Priolo refunded customers who overpaid their report fees (T. 734) and, on occasion, even mistakenly refunded a customer twice. (T. 320). Those practices are hardly indicative of a business designed to retain customers' money through deception.

The evidence concerning PacNet's requested edits is similarly equivocal. As discussed above, when PacNet brought potentially confusing language to Priolo's attention, Priolo or his staff made the requested changes. (T. 135). The Government repeatedly relies upon a single instance in March 2015 in which suggested edits were not incorporated as evidence that Priolo deliberately ignored compliance concerns. (Gov't Br. at 20, 27)But the mailing on which the Government relies was not sent

until more than eighteen months later. (T. 830). Without evidence connecting Priolo's response to the March 2015 recommendations to the content of a mailing sent a year and a half later, the omission of those edits does not establish that Priolo deliberately rejected them in order to deceive recipients. At most, it permits competing inferences as to why the changes did not appear in that later mailing—far too slender a reed on which to establish fraudulent intent.

The evidence in this case does not support convictions for mail or wire fraud because the mailings did not contain material misrepresentations nor did Priolo intentionally mislead his customers. As a result, the Government provided no evidence that a reasonable juror could rely upon to conclude Priolo possessed the intent to defraud. Accordingly, his convictions should be vacated.

## POINT III.

## THE DISTRICT COURT'S HARMFUL ERROR IN ADMITTING THE TESTIMONY OF THOMAS RESSLER REGARDING THE UNCHARGED SWEEPSTAKES SCHEME IN THE LATE 1990s AND EARLY 2000s WAS PREDICATED ON THE GOVERNMENT'S ILLUSORY PROFFER OF WHAT HIS TESTIMONY WOULD ENTAIL (RESPONDING TO POINT 2.B. OF THE GOVERNMENT'S BRIEF AND IN SUPPORT OF POINT 2.A.1 OF PRIOLO'S PRINCIPLE BRIEF)

Contrary to the Government's contention, the admission of Thomas Ressler's testimony, compounded by the prosecutor's improper use of that testimony in summation, constituted prejudicial error. (Gov't Br. at 29) The Government argues

that Ressler's testimony was relevant and admissible irrespective of Ressler's inability to tie Priolo to a meeting about the mailers (Gov't Br. 32-35), but ignores the district court's decision rested on the Government making that connection at trial.

In its motions in limine to admit Ressler's testimony, the Government repeatedly proffered that Ressler's testimony would include evidence that Ressler met with Sean Novis and Priolo back in the late 1990s and early 2000s to discuss, *inter alia*, the mailing pieces that Ressler had created for the Sweepstakes Advisory Network and Justin Grant Ltd. (A-129; A-201). The Government wrote:

> "Consistent with his most recent memorandum of interview, Ressler is expected to testify that he met with Sean Novis, Priolo, and another person at Ressler's home, and that they went over his work on prize notices." (A-201)

In reaching its decision to admit Ressler's testimony, the District Court explained that it considered the proffered evidence that Priolo had met with Ressler in the late 1990s and early 2000s to discuss the design of the mail pieces:

> "The government proffers that Ressler will testify that he created the Justin Grant and Sweepstakes Advisory Network notices used by the co-conspirators during the late 1990s and early 2000s, and that he will testify about the artistic and linguistic techniques he employed when creating the notices in order to mislead recipients. (*Id.* at 3.) The government represented at the February 4, 2025 hearing that it expects Ressler to testify *that he met Priolo at the time*. (Hr'g, Feb. 4, 2025.)" (A-129) (emphasis added)

> "Third, Ressler's testimony that he created mailings used in the uncharged sweepstakes scheme will also provide direct evidence of the charged conspiracy in connection with the evidence that Priolo was involved in Sweepstakes Advisory Network and Justin Grant—including *Ressler's testimony that he met Priolo at the time.*" (A-149) (emphasis added)

> "Mr. Ressler's testimony about the mailing he created for Sweepstakes Advisory Network and Justin Grant, and the *meeting he had with Sean Novis and Priolo are relevant and admissible evidence* of the conspiracy that's charged in this case." (A-206) (emphasis added)

On the eve of Ressler's testimony, the Government, aware that Ressler could not recall meeting Priolo at the alleged meeting or at any other time, indicated that they would "steer" Ressler around the discussion of any meeting and thus would not testify about meeting with Priolo, nor identify the fact that he worked with Priolo in any capacity. (T. 715). In fact, Ressler only testified that he created the pieces for Sean Novis. (T. 768).

Once the Government abandoned the connection to Priolo upon which it had expressly predicated the relevance of Ressler's testimony, there was no basis for its admission, and the testimony should have been precluded.

The District Court's error in admitting Ressler's testimony was not harmless, given the lack of other sufficient evidence to establish the misleading nature of the mailings at issue. Ressler's testimony prejudiced the jury's view on two critical and disputed factual issues: (1) whether the mailers were misleading and (2) whether

Priolo had the requisite intent to defraud. Given that the Government's "other evidence" of Priolo's intent was not strong, the admission of Ressler's conclusory statements regarding the misleading nature of the letters he designed for the Sweepstakes Advisory Network in the 90s and early 2000s, without any direct link to Priolo, became insurmountably prejudicial. In short, the Government obtained admission of Ressler's highly prejudicial testimony by proffering a direct connection to Priolo that it ultimately failed to establish at trial. Once that promised connection disappeared, so too did the very basis upon which the District Court had found Ressler's testimony relevant and admissible.

Despite Ressler's testimony, the Government argued in summation that the evidence established the very connection between Ressler and Priolo that its proof had failed to establish. The Government speciously argued: "Now, Tom Ressler did not design this piece. Let's be clear. But he told you how the pieces he did design for Mr. Priolo a long time ago work." (T. 975). To be clear, there was no evidence that Ressler ever designed mailings *for* Priolo, nor any evidentiary basis from which the jury could reasonably have inferred otherwise. The Government's argument ultimately relied on the tenuous circumstantial chain created by Cathy Johnson's testimony about Priolo's connection with Justin Grant Ltd. and Sweepstakes Advisory Network – despite an admitted stipulation that Cathy Johnson had previously reported to Postal Inspectors that Priolo was not involved in sweepstakes

reports in the 2000s. (T.883) By supplying in summation the very factual connection that the Government had failed to establish through admissible evidence, the prosecutor magnified the prejudice from Ressler's erroneously admitted testimony and made it impossible to regard the error as harmless.

Again, under these circumstances, it is more than likely that Ressler's testimony improperly influenced the jury's verdict given the lack of any other evidence to establish the misleading nature of the mailings at issue. Accordingly, Priolo's conviction should be reversed.

## CONCLUSION

WHEREFORE, for the foregoing reasons and those set forth in his principal brief, Defendant-Appellant Philip Priolo respectfully requests that this Court reverse his convictions on all counts and direct the entry of a judgment of acquittal and dismissal of the Indictment. Alternatively, Priolo respectfully requests that the Court vacate his convictions and remand the case for a new trial.

Dated: New York, New York

September 4, 2026

Respectfully submitted,

/s/ Arthur L. Aidala
ARTHUR L. AIDALA
LINO J. DE MASI
DIANA FABI
AIDALA BERTUNA & KAMINS, P.C.
*Attorneys for Defendants-Appellants*
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 3,675 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
September 4, 2026

/s/ *Arthur L. Aidala*
Arthur L. Aidala